Benard V. Preziosi, Jr. (BP-5715)
CURTIS, MALLET-PREVOST,
    COLT & MOSLE LLP
Attorneys for Plaintiffs
101 Park Avenue
New York, NY 10178-0061
Telephone: (212) 696-6000
Fax: (212) 697-1559

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

INVISTA B.V., INVISTA S.à r.l., INVISTA    :
TEXTILES (U.K.), INVISTA (Nederland) B.V.,  :
INVISTA (Canada) COMPANY, INVISTA Brasil :
Indústria E Comércio de Fibras Ltda., INVISTA :
(International) S.à r.l., INVISTA NORTH    :
AMERICA S.à r.l., and INVISTA        :
TECHNOLOGIES S.à r.l.,           :

                   Plaintiffs,  :

      v.                     :

E.I. DU PONT DE NEMOURS AND COMPANY,  :

                Defendant.  :

-----------------------------------------------------------x



JUDGE STEIN

08 CV 3063

**COMPLAINT**

RECEIVED
MAR 26 2008
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiffs (collectively "INVISTA"), by and through their undersigned counsel, for their

complaint against defendant E.I. du Pont de Nemours and Company ("DuPont"), allege as

follows:

## INTRODUCTION

      1.     On April 30, 2004, INVISTA purchased DuPont's Textile and Interiors business,

including chemical and fiber manufacturing facilities located throughout the United States and

abroad, at a purchase price of approximately $4 billion. Due to DuPont's repeated assurances

1

regarding its allegedly superior commitment to environmental, health and safety compliance, and DuPont's agreement to indemnify, defend and hold harmless INVISTA from all losses arising out of "all Environmental Claims" and "requirements of Environmental Law" resulting from DuPont's ownership, INVISTA agreed to limited due diligence at many of the facilities.

2.      Less than a month after Closing, INVISTA learned that DuPont's primary benzene treatment unit at a chemical manufacturing facility in Victoria, Texas had been operating illegally since 2000. Shortly after learning of this noncompliance, INVISTA learned that, since in or about 1992, DuPont had been venting uncontrolled benzene-containing vapors directly into the atmosphere at a chemical manufacturing facility in Orange, Texas.

3.      Confronted by these revelations so soon after assuming operational control of the facilities, INVISTA moved quickly to address the violations and protect its employees, the public, and the environment, by promptly removing the noncompliant equipment from service. In June 2004, INVISTA notified the Environmental Protection Agency ("EPA") and the State of Texas of these initial discoveries concerning DuPont's longstanding reckless and dangerous handling of benzene.

4.      INVISTA immediately dispatched its own team of environmental professionals, including health and safety engineers, to both facilities to review their operations and state of compliance. INVISTA's initial assessment was that both facilities had numerous significant compliance issues that put INVISTA's right to operate its newly acquired facilities at risk. As a result, INVISTA entered into a Corporate Audit Agreement with EPA whereby INVISTA agreed to conduct extensive environmental audits at all of the U.S. facilities it acquired from DuPont. Over the course of the next eighteen months, independent environmental engineers conducted

forty-five separate audits at the U.S. facilities, where they discovered 687 instances of noncompliance with federal, state and local environmental laws.

5.     By acting promptly and responsibly to identify and accurately assess the noncompliance at the facilities, by filing true, complete and accurate reports with the regulatory agencies, and by remediating deficiencies, INVISTA avoided extremely adversarial federal and state enforcement actions, including possible criminal prosecution. Faced with the continuing risk of enforcement action, INVISTA has worked in conjunction with state and federal regulators to negotiate the scope and magnitude of the corrective actions required to bring the facilities into compliance. In that regard, INVISTA, EPA and the Department of Justice ("DOJ") have agreed in principle to the terms of a Consent Decree whereby INVISTA has agreed to pay a civil penalty in the amount of $1.7 million and to install major pollution controls at the various facilities to resolve DuPont's permitting failures, to eliminate noncompliance, and to prevent recurrence. The Consent Decree focuses on two significant areas of DuPont's historical noncompliance: its reckless treatment and false reporting of benzene, and its failure to obtain federal permits prior to making major modifications to its equipment. By modifying major equipment without first obtaining the requisite federal permits, DuPont for years avoided implementing costly air-quality control technology as required by the Clean Air Act and state and local air regulations.

6.     INVISTA was also confronted with noncompliance beyond that which is the subject of the Consent Decree, including violations of other environmental, health and safety laws and regulations at the U.S. facilities as well as at foreign facilities acquired from DuPont. INVISTA is seeking compensatory damages in excess of $800 million plus punitive damages to deter similar future conduct. INVISTA has already spent over $140 million in connection with its efforts to remediate DuPont's noncompliance. The corrective actions mandated by the

3

Consent Decree are currently estimated to cost between $300 and $450 million and will result in additional increased operating costs at the U.S. facilities currently estimated to be more than $200 million.

7.     INVISTA first notified DuPont of the pre-Closing noncompliance on June 17, 2004, shortly after discovering it.  Thereafter, INVISTA repeatedly notified DuPont of the violations for which it sought defense and indemnity, sent DuPont copies of reports provided to EPA under the Corporate Audit Agreement, and encouraged DuPont to contact INVISTA with regard to the remediation process and discussions with EPA.  DuPont waited nearly ten months before responding to the multitude of notices and data it had received from INVISTA.  When it finally responded, DuPont informed INVISTA that it would participate in the meetings with EPA and would assemble a "technical team" to work on solutions.  Shortly thereafter, however, DuPont, without explanation, changed its position and reverted to virtually ignoring the entire situation.

8.     DuPont's breach of its defense and indemnity obligations is egregious, and warrants an award of punitive damages, because DuPont knew of several of the more dangerous safety and environmental violations, knew those violations placed its workers and the public at risk, took no action to rectify them, and failed to disclose them to INVISTA.  Indeed, DuPont's own safety engineers, in safety reports going back years, characterized several of the violations as presenting "catastrophic risks" to its employees and the public.  For example, at the facility in Maitland, Canada, the degree of corrosion under the insulation on a pipe that transported flammable chemicals was so severe that an explosion and fire occurred in December 2004, the year INVISTA acquired the facility.

9.      INVISTA's losses are staggering.  In this action, INVISTA seeks to recover all costs, past and future, to remediate the noncompliant conditions that existed at the facilities during DuPont's ownership and punitive damages against DuPont for knowingly and continuously exposing employees and the public to potentially dangerous conditions.

## JURISDICTION AND VENUE

10.      Jurisdiction in this Court is based upon 28 U.S.C. § 1332, as this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the statutory requirements.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(a), and the agreement at issue between the parties, which provides that venue rests exclusively in New York.

## PARTIES

12.      Plaintiff INVISTA B.V. is a business entity organized under the laws of the Netherlands, with its principal place of business in Kansas.

13.      Plaintiff INVISTA S.à r.l. is a business entity organized under the laws of Luxembourg, with its principal place of business in Kansas.

14.      Plaintiff INVISTA Textiles (U.K.) Limited is a business entity organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom.

15.      Plaintiff INVISTA (Nederland) B.V. is a business entity organized under the laws of the Netherlands, with its principal place of business in the Netherlands.

16.      Plaintiff INVISTA (Canada) Company is a business entity organized under the laws of Canada, with its principal place of business in Canada.

5

17.    Plaintiff INVISTA Brasil Indústria E Comércio de Fibras Ltda. is a business entity organized under the laws of Brazil, with its principal place of business in Brazil.

18.    Plaintiff INVISTA (International) S.à r.l. is a business entity organized under the laws of Switzerland with its principal place of business in Switzerland.

19.    Plaintiff INVISTA North America S.à r.l. is a business entity organized under the laws of Luxembourg, with its principal place of business in Kansas.

20.    Plaintiff INVISTA Technologies S.à r.l. is a business entity organized under the laws of Luxembourg, with its registered office in Luxembourg and its principal place of business located at its Zurich Branch in Switzerland.

21.    Plaintiffs together are referred to as "INVISTA."

22.    Each of the plaintiffs is a direct or indirect wholly-owned subsidiary of Koch Industries, Inc. ("Koch").

23.    Defendant E.I. du Pont de Nemours and Company is a Delaware corporation, with its principal place of business in Delaware.

## FACTUAL BACKGROUND

### I.  The Transaction

#### A.    Purchase Agreement

24.    DuPont and two entities owned by Koch, KED Fiber, Ltd. and KED Fiber, LLC (collectively "KED"), entered into a Purchase Agreement dated November 16, 2003 (which, as amended, is referred to herein as the "Purchase Agreement"), pursuant to which DuPont divested itself of its nylon, polyester and spandex operations comprising DuPont's Textiles and Interiors ("DTI") business.  KED's rights and obligations were transferred to and assumed by INVISTA.

25.    The sale included, among other things, manufacturing facilities in the United States and abroad at the following locations: Camden (South Carolina); Chattanooga (Tennessee); Seaford (Delaware); Victoria, Orange and LaPorte (Texas); Waynesboro (Virginia); Maydown, Wilton and Gloucester (United Kingdom); Maitland and Kingston (Ontario, Canada); Dordrecht (Netherlands); and Paulinia (Brazil).

26.    These facilities primarily manufacture two types of products: (1) "intermediates," i.e., chemical products used internally and sold to customers for use in the manufacture of nylon polymer; and (2) "fibers" (e.g., nylon and LYCRA® Fiber) sold to customers engaged primarily in the apparel, carpet and automotive industries. The facilities process hazardous chemicals, requiring strict compliance with various environmental, health and safety laws and regulations.

## B.    Pre-Contract Negotiations

27.    During negotiations of the Purchase Agreement, INVISTA questioned DuPont about whether the manufacturing facilities it was acquiring from DuPont were in compliance with environmental, health and safety laws and regulations, particularly those facilities generating benzene waste. Benzene is a hazardous air pollutant categorized by EPA as a human carcinogen. Benzene use, handling and disposal are subject to strict regulation under the Benzene Waste Operations National Emission Standards for Hazardous Air Pollutants ("BWON"). Noncompliance with the BWON subjects a manufacturer to potential fines, penalties and criminal prosecution.

28.    In light of DuPont's self-declared and purportedly excellent environmental and safety record, as proclaimed in numerous DuPont public relations campaigns, and because of the broad environmental, health and safety indemnifications to be included in the Purchase Agreement, INVISTA agreed to DuPont's insistence on limited due diligence at several facilities.

29.     During the limited due diligence that DuPont permitted, DuPont was unable to demonstrate compliance with the Prevention of Significant Deterioration ("PSD") and Non-Attainment New Source Review ("NNSR") regulations under the Clean Air Act at a number of the manufacturing facilities. Specifically, DuPont could not show that it had correctly analyzed the need for, or obtained, PSD/NNSR permits before it had added, modified or enhanced certain equipment. The PSD and NNSR regulations require a facility to obtain pre-construction permits and to install emissions control technologies (or accept enforceable emissions limits) when a facility undergoes a major modification, i.e., one resulting in a net increase in the emissions of certain pollutants. The corrective measures required to address violations of these regulations typically are extremely expensive. Due to DuPont's inability to demonstrate a basic understanding of the PSD and NNSR regulations and to explain conclusions made at manufacturing facilities that underwent major modifications, the parties agreed that noncompliance with PSD/NNSR regulations at these facilities would be characterized as "Known Violations of Environmental Law" for purposes of, and listed as such in a Schedule to, the Purchase Agreement.

30.     It was against this backdrop that INVISTA and DuPont entered into the Purchase Agreement on November 16, 2003.

C.     **DuPont's Obligations Under the Purchase Agreement**

31.     Consistent with the Parties' negotiations, DuPont made various representations and warranties in the Purchase Agreement regarding its compliance with applicable environmental, health and safety laws and regulations. Specifically, in Section 3.11 of the Purchase Agreement, DuPont represented and warranted, among other things, that, except as specified on certain schedules, "to the Knowledge of DuPont," the DTI business and its

associated assets "are, and for the past three (3) years have been, in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the DTI Business of all Environmental Permits and compliance with the terms and conditions thereof) . . . ."

32.    Pursuant to Section 8.4(a)(iii) of the Purchase Agreement, DuPont agreed to defend, indemnify and hold INVISTA harmless from all Losses related to any breach or failure to be true of the representations and warranties, including those in Section 3.11, provided that such losses exceeded $400,000.

33.    DuPont's obligation to defend, indemnify and hold INVISTA harmless with respect to environmental claims and requirements of environmental law is even broader than the general indemnity set forth in Section 8.4. Under Section 8.5(b), DuPont agreed to:

> indemnify, defend and hold harmless [INVISTA] from and against, and shall reimburse [INVISTA] with respect to, all Losses arising out of or related to, directly or indirectly, **all Environmental Claims and requirements of Environmental Law** (whether or not under applicable Law [INVISTA] or any of its Subsidiaries would have a right to contribution against DuPont therefor) arising out of or related to the matters set forth below (the "DuPont Environmental Liabilities"):
>
> > (i) Remediation of Existing Contamination or Known Environmental Issues required by Environmental Law in connection with the DuPont Remediation Sites . . . .
> >
> > (vii) any release or violation of Environmental Law at sites on Schedule 8.5(b)(vii) [i.e., DuPont Environmental Retained Sites] . . . .
> >
> > (xi) Remediation of Sliding Scale Matters other than Continuing Environmental Issues, but solely to the extent of DuPont's allocation under the Sliding Scale. . . .

(Emphasis added)

34.    The term "Losses" is broadly defined in the Purchase Agreement as:

> . . . any and all damages, losses (including consequential damages . . .), deficiencies, Liabilities, Taxes, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses, whether or not resulting from third party claims, including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements and compromises relating thereto and the costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereof or the enforcement of rights hereunder and costs and expenses of Remediation . . . .

35.    Accordingly, under Section 8.5(b) of the Purchase Agreement, INVISTA is entitled to defense, indemnification and reimbursement for: (1) all Losses related to "Environmental Claims" (i.e., "any claim, action, cause of action, investigation, demand, order, directive or written notice by, or on behalf of, any Governmental Authority or Person alleging potential liability arising out of, based on or resulting from . . . requirements or violation of any Environmental Law or Environmental Permit"); and (2) all Losses related to "requirements of Environmental Law," as defined in the Purchase Agreement, incurred by INVISTA to rectify the noncompliance it inherited from DuPont.

36.    The parties identified various conditions at several facilities on Schedule 1(hh) to the Purchase Agreement as "Known Violations of Environmental Law" as of the Closing. Among other things, Schedule 1 (hh) identified as Known Violations of Environmental Law "Noncompliance with CAA PSD/NSR requirements triggered by site modifications" at Victoria, Camden, Seaford, Chattanooga, and Waynesboro.  Under Section 8.5(b), DuPont was responsible for 100% of the Losses associated with Remediation required by Environmental Law for Known Violations of Environmental Law.

37.    In connection with its indemnity, defense and hold harmless obligations under Section 8.5(b), DuPont also could, with respect to such matters, exercise the authority, under Section 8.5(e), to determine the Remediation, subject to, among other things, mitigation of interference with INVISTA's operations and enforcement risks, and to deal with Governmental Authorities.  Moreover, under Section 5.17, DuPont had the means under the Purchase Agreement to obtain access to records relating to matters for which it was obliged to indemnify, defend and hold INVISTA harmless.  Notwithstanding INVISTA's repeated requests to DuPont to contact INVISTA, DuPont never exercised its authority under Section 8.5(e) and otherwise refused to get involved.

### D.    INVISTA's Post-Closing Discoveries and Disclosure of Noncompliance to Regulators and DuPont

38.    Within weeks of the Closing, INVISTA discovered significant violations of the BWON at both the Victoria and Orange facilities, which were well-known to DuPont prior to Closing and were not disclosed to INVISTA.

### Victoria, Texas

39.    The facility at Victoria, Texas manufactures intermediates, including Adiponitrile ("ADN"), which generates benzene waste.  When INVISTA purchased the Victoria facility, the primary benzene waste treatment unit for the ADN plant was a Nitrile Stripper Column ("NSC"). DuPont used the NSC to remove benzene from wastewater generated by the ADN process and, as such, the NSC was a "treatment process" subject to the BWON.

40.    DuPont put the NSC into service in 2000 as part of a "Deepwell Elimination Project."  It did not manage the NSC as a BWON "treatment unit," however, because it classified it as a "process unit" or a "recycling unit" exempt from the BWON – even though no such

exemption applied. As a result of its misclassification of the NSC, DuPont conveniently and unlawfully eluded the BWON's stringent performance, monitoring, inspection, reporting, and recordkeeping requirements.

41.    DuPont knew that it had misclassified the NSC well in advance of entering into the Purchase Agreement. In January 2003, Michael Miller, the DuPont employee responsible for BWON compliance at Victoria, and Paul R. Jann, a corporate DuPont compliance expert, exchanged e-mails in which both concluded that the NSC was a treatment unit subject to the BWON. Miller's e-mail concluded, in pertinent part:

> The initial determination for Sub FF [BWON] years ago concluded that since organics were to be recycled and the Nitrile Stripper Column was a process unit that it was not a treatment process and that the project simply moved the point of waste generation of the waste stream (produced water). I would like your opinion on this one. **It looks like a treatment process to me.**

(Emphasis added)

42.    As evidenced by an e-mail dated February 10, 2003, DuPont personnel at Victoria reached the same conclusion – the NSC was operated as a treatment unit subject to the BWON.

43.    Despite actual knowledge that it was operating the NSC in violation of the BWON, DuPont took no action pre-Closing to bring the NSC into compliance or to disclose the BWON violations at Victoria to INVISTA, EPA or Texas regulators.

44.    In late May 2004, INVISTA discovered that the NSC was being operated in violation of the BWON and immediately took it out of service. Soon thereafter, INVISTA learned that the only remaining benzene treatment unit at Victoria, the benzene flasher, was also in violation of the BWON because DuPont used the wrong treatment standard under the BWON to assess compliance and had selected improper locations to sample the benzene waste streams

going into, and coming out of, the unit. In mid-July, when INVISTA sampled at the correct locations and under the appropriate BWON protocol, it appeared that the flasher might not meet the applicable benzene treatment requirements, leaving INVISTA without a compliant benzene treatment unit at Victoria.

### Orange, Texas

45.    Having just learned of DuPont's illegal handling of benzene waste at Victoria, INVISTA discovered even more egregious, and potentially more dangerous, conduct by DuPont at the facility in Orange, Texas. At the Orange facility, a sludge-like benzene-containing wastewater stream was pumped to a unit called the APF Filter Press, which removed most of the water and compressed the sludge into hazardous waste cakes that were then transported off-site for disposal.

46.    DuPont had enclosed the APF Filter Press within a metal shroud to prevent benzene from venting into the atmosphere. As designed, benzene-containing vapors would be collected by the shroud and vented through a vent pipe to a control device called the fume abator, which would properly dispose of the benzene.

47.    In 1992, however, the fume abator experienced a "backflash" incident, after which DuPont disconnected the vent pipe from the fume abator. While DuPont redirected some of the vent streams, several streams remained uncontrolled and vented benzene directly into the atmosphere. DuPont did not disclose these uncontrolled streams to regulators or INVISTA prior to the Closing. As with the NSC process at Victoria, DuPont knew that its APF Filter Press process at Orange violated the BWON. In or about late-2003, a DuPont environmental manager at the Orange facility's waste area conducted a visual inspection of the APF Filter Press and determined that the unit was venting benzene vapors directly into the atmosphere. Thereafter,

the manager informed his superiors at the Orange facility of this serious situation. In January 2004, the issue of uncontrolled benzene venting was discussed at DuPont's monthly environmental review meeting. The meeting minutes state:

> Resolve the issue regarding the . . . **line that is venting from the APF to atmosphere.** This line used to vent to the fume abator was later disconnected due to flashback incident we had in the area.

(Emphasis added)

48.    Richard Harr, a former DuPont employee who was aware of the APF's disconnected vent pipe (and who became an INVISTA employee post-Closing) continued DuPont's practice of not disclosing the disconnected pipe in the first report for Orange that he submitted on behalf of INVISTA to EPA post-Closing. The report, dated May 27, 2004, could have exposed INVISTA to criminal prosecution. Thus, in addition to years of false reporting by DuPont, INVISTA also had to deal with an arguably false report that was filed just after its ownership began.

49.    Upon learning that the APF Filter Press was venting benzene into the atmosphere, INVISTA withdrew the erroneous May 27, 2004 report, removed the APF Filter Press from service and has not used it since.

50.    Because of the seriousness of the BWON violations, INVISTA decided that it had no choice but to apprise state and federal regulators immediately of the violations at the Texas facilities.

51.    In June 2004, INVISTA reported the NSC noncompliance at Victoria to EPA and the Texas Commission on Environmental Quality ("TCEQ") and sought protection under each agency's audit policy. Under EPA's Audit Policy, by self-reporting within 21-days of discovery of the BWON violation, INVISTA would be eligible to escape gravity-based penalties and

14

mitigate the risk of criminal enforcement, provided it ascertained the scope and magnitude of the

noncompliance and corrected the deficiencies in accordance with the rules, protocols, and

timetables established by EPA.

52.　　After self-reporting to the appropriate regulators, INVISTA's general counsel sent

DuPont a letter dated June 17, 2004, which notified DuPont of the basis for a claim for loss

under the Purchase Agreement.  This letter provides in relevant part:

> I am writing to notify you of potential claims under the Purchase
> Agreement . . . .  The potential claims are related to the operation
> of the nitrile stripper column, benzene flasher and associated
> processes . . . .  We currently are investigating these issues and will
> provide you with more detailed information once our investigation
> is complete.  If you have any questions in the interim, please do
> not hesitate to contact me.

53.　　As set forth above, after discovering the BWON noncompliance at Victoria,

INVISTA then discovered the venting of benzene at Orange.  On July 13, 2004, INVISTA

notified DuPont that the APF Filter Press at Orange violated the BWON and that INVISTA had

self-reported the Victoria and Orange BWON violations to EPA and TCEQ.  INVISTA also

advised DuPont that, at the request of EPA and TCEQ, it was continuing its investigation and that

it expected to enter into a formal agreement to undertake corporate-wide audits at all of the U.S.

facilities to assess the scope and magnitude of noncompliance.

54.　　By letter dated July 29, 2004, INVISTA advised DuPont that EPA was interested

in entering into a formal corporate-wide audit agreement that would require INVISTA to conduct

environmental audits at all of the U.S. facilities acquired from DuPont.  The letter likewise

informed DuPont that, in determining whether INVISTA would be eligible for the protections

afforded under such an audit program, EPA had requested a copy of the Purchase Agreement and

relevant schedules, which INVISTA later provided to EPA.

55.    DuPont <u>did not respond</u> to INVISTA's June 17, July 13 and July 29, 2004 letters.

56.    Confronted with, among other things, (a) the seriatim discovery of significant BWON violations at Victoria and Orange that DuPont had not disclosed prior to Closing, (b) the fact that INVISTA's continued operation of the benzene flasher at Victoria in the face of evidence that it could not achieve and maintain the required treatment standard created a risk of potential criminal charges for knowingly operating in contravention of the BWON, absent shutting down the ADN area in its entirety, (c) the certainty that the BWON issues could not be addressed and remediated within the sixty day deadline required by the EPA Audit Policy, and (d) the fact that INVISTA's limited due diligence also revealed potential widespread violations of the PSD/NNSR regulations that DuPont had not disclosed to EPA, INVISTA entered into a corporate-wide audit agreement with EPA in early August 2004 ("EPA Corporate Audit Agreement") that covered all U.S. facilities INVISTA had acquired from DuPont.

57.    On August 18, 2004, INVISTA sent DuPont a letter informing it that INVISTA had entered into the EPA Corporate Audit Agreement and attaching, among other documents: (1) the audit protocol for the corporate wide audits, and (2) a letter from Robert A. Kaplan, Director of the Special Litigation and Projects Division of the EPA's Office of Regulatory Enforcement, in which he advised INVISTA that EPA would determine the specific violations that had occurred, whether they were covered by the EPA Audit Policy, and the extent of any penalties, and further that EPA was willing to consider favorable resolution of previously known but undisclosed violations if they were corrected in the context of the EPA Corporate Audit Agreement.

58.    In the August 18, 2004 letter, INVISTA also requested that DuPont "[p]lease advise if, pursuant to Section 8.5(e) of the [Purchase Agreement], you wish to discuss the

corrective actions being taken." As set forth above, Section 8.5(e) provides DuPont with the opportunity to participate in the remediation process, subject to certain express limitations.

59.     DuPont did not respond to INVISTA's August 18, 2004 letter.

60.     Under the EPA Corporate Audit Agreement, INVISTA was required to conduct environmental compliance audits at all of the U.S. facilities it had acquired from DuPont. In return, EPA relaxed the 21-day reporting and 60-day remediation deadlines. INVISTA was thus permitted to continue operating its facilities pending a determination of the true scope and magnitude of the environmental violations at the former DuPont facilities and the development of a plan to address them.

61.     As required by the EPA Corporate Audit Agreement, INVISTA engaged numerous independent environmental engineering firms to conduct the environmental audits at the U.S. facilities. The audits continued for nearly eighteen months during which INVISTA submitted five detailed quarterly reports to EPA and a final report dated January 31, 2006. The reports set forth the auditors' findings, including, in some instances, recommendations for corrective action. Copies of all of these reports were sent to DuPont.

62.     By letter dated October 14, 2004, INVISTA provided DuPont with a summary of the audit findings to date and in advance of sending them to EPA and again asked DuPont to "advise if, pursuant to Section 8.5(e) of the [Purchase Agreement], you wish to discuss the corrective actions being taken, including those specifically identified above."

63.     DuPont did not respond to INVISTA's October 14, 2004 letter.

64.     Over the course of eighteen months, INVISTA's independent auditors conducted twenty-three comprehensive and twenty-two focused environmental audits examining the

compliance of the newly acquired facilities in the U.S. At the conclusion of the audits, the auditors reported that they had found 819 actual or potential violations of environmental law, of which INVISTA, after review, determined that 687 constituted violations for which corrective action was required. The auditors found that the facilities had been operating in violation of benzene regulations and that DuPont had made major modifications to its U.S. facilities without obtaining the requisite permits and installing the required emissions control technology.

### E.     DuPont's Noncompliance and Violations of Law

#### Benzene Violations at Victoria, Texas

65.     As alleged above, both benzene treatment units at the Victoria facility were noncompliant, resulting in one, the NSC, being removed from service and the other, the benzene flasher, ultimately being retrofit to avoid having to shut down the ADN unit.

66.     In addition, in contravention of the BWON, DuPont failed to identify thousands of benzene-containing waste streams in its Total Annual Benzene ("TAB") report and misidentified the location of the points of waste generation ("POWG") of many controlled waste streams by identifying them much further downstream than the actual point at which the stream exited the process and became waste. These fundamental failures allowed DuPont to exclude large swaths of the facility that managed benzene waste streams from all aspects of the BWON, including its monitoring, reporting and recordkeeping requirements.

67.     DuPont also violated the BWON by allowing untreated benzene vapors to be emitted directly into the atmosphere as a result of improperly designed piping systems that carry benzene vapor streams from process units and fixed roof waste tanks to a destruction flare, the 101 Diamine Flare. More specifically, the piping systems contained improper slopes, curves and elbows, high and low points and no "knock-out pots," which caused the constituents in the vapor

streams to condense or solidify, resulting in plugging of the vent header or flare. This prevented the vapors from reaching the flare and caused the pressure to rise in the tanks. This, in turn, caused the tanks' conservation and/or emergency vents to open and emit benzene vapors directly into the atmosphere.

68.     As a result of these and other BWON violations, INVISTA must, under the terms of the Consent Decree, undertake projects to segregate storm water streams from process waste streams in the ADN area and install vapor combustion devices at Victoria, among other remediation.

**PSD Violations at Victoria, Texas**

69.     Victoria also was found to be in violation of PSD requirements in connection with three substantial improvement projects that DuPont undertook in the 1990s – the Nylon Expansion Project, the Deepwell Elimination Project and the Cogeneration Turbine Bucket Upgrade Project. The Nylon Expansion Project involved extensive physical and operational modifications to, among other things, the ADN unit, the Nitric Acid plant and boilers at the Adipic Powerhouse ("APH") and Diamine Powerhouse ("DPH"). The Deepwell Elimination project included, among other things, the construction of a new bio-treatment plant and further modifications to the APH and DPH boilers for the purpose of eliminating the use of underground deepwells for the disposal of hazardous waste. Finally, the Cogeneration Turbine Bucket Upgrade project involved upgrading and modifying critical components of the cogeneration unit.

70.     All of these projects constituted "major modifications" to a "major stationary source" that resulted in a significant increase in the net emissions of pollutants governed by the PSD regulations. Accordingly, at the time the projects were undertaken, DuPont was required to obtain PSD pre-construction permits that were subject to EPA review and to install Best

Available Control Technology ("BACT") to reduce post-construction emissions of Nitrogen Oxide ("$NO_x$"). DuPont did not obtain PSD permits for these projects or for two other projects at Victoria. As a result, DuPont violated the PSD regulations.

71.    Under Texas law, DuPont was required to submit Clean Air Act Title V operating permit applications for various sources at the Victoria facility, including the APH and DPH boilers and the cogeneration unit prior to the Closing Date. DuPont did so on or about January 29, 1999. However, because DuPont did not comply with the PSD requirements for the Nylon Expansion, Deepwell Elimination, and Cogeneration Turbine Bucket Upgrade projects, DuPont illegally failed to include those PSD requirements as "Applicable Requirements" in its Title V permit applications for the boilers and the cogeneration unit. As a result, as of Closing, DuPont was operating the Victoria facility in violation of Texas Title V requirements.

72.    More specifically, DuPont violated Title V by submitting Title V operating permit applications for the Victoria facility that (a) did not identify BACT requirements for $NO_x$ for these "major modifications" because DuPont failed to comply with PSD regulations, and (b) erroneously certified compliance with applicable regulatory requirements for the APH and DPH boilers and the cogeneration unit.

73.    As of the Closing Date, TCEQ had issued draft Title V permits for the APH and DPH boilers and the cogeneration unit. After the Closing Date, INVISTA informed TCEQ that it needed to reevaluate the Title V permit applications that DuPont had filed and the certifications of compliance that DuPont had made. Accordingly, INVISTA excluded the PSD and BWON issues set forth above from its application and certification of compliance and committed to submit corrective action plans upon a determination of the nature and scope of the PSD and BWON noncompliance. TCEQ issued Title V permits for the APH and DPH boilers and the

cogeneration unit on February 17, 2006. Pursuant to the compliance schedules contained in these permits, INVISTA has agreed to submit corrective action plans detailing long-term PSD and BWON corrective measures within 30 days after entering into a formal, written agreement with EPA on the remedies.

74.     As a result of the foregoing violations, and under the terms of the Consent Decree, INVISTA must install designated control technology to reduce emissions of $NO_x$ on the six APH and DPH boilers and the cogeneration unit at Victoria.

## OSHA and Other Violations at Victoria, Texas

75.     DuPont failed to implement corrective actions necessary to minimize or prevent catastrophic risks and hazardous conditions identified in DuPont's 1999 and 2002 process hazard analyses ("PHA") at Victoria. In 1999, DuPont conducted a PHA to review the impact on occupied buildings and personnel of vapor cloud explosions that can result from credible releases of hazardous chemicals. Through the PHA, DuPont determined that vapor cloud explosions could lead to the "catastrophic sudden failure under blast" of un-reinforced vulnerable walls, building collapse and "serious personnel injuries." Accordingly, the PHA report set forth recommendations to mitigate the risks, but DuPont never undertook the recommended corrective action. A 2002 PHA study confirmed the risks posed by vapor cloud explosions and refined the recommendations made in 1999. Again, DuPont failed to implement any of the recommendations to mitigate the risks to its personnel. DuPont's failure to address the recommendations from the PHAs constituted a violation of 29 C.F.R. § 1910.119, 40 C.F.R. Part 68 and/or the general duty clause under the Occupational Health and Safety Act ("OSHA"). Post-Closing, INVISTA eliminated these hazardous conditions and remedied these violations of law by reinforcing the buildings at issue.

76.    DuPont also failed to replace the corroded structural steel support system for a large vessel, the #2 Absorber Column, at Victoria notwithstanding DuPont's determination that the condition of the support structure could result in the loss of containment of nitric off-gas and expose personnel to chemical and thermal burns, $NO_x$ fumes and physical hazards from falling objects and structural instability.  DuPont's failure to replace the support system constituted a violation of 29 C.F.R. § 1910.119, 40 C.F.R. Part 68 and/or OSHA's general duty clause.  After Closing, INVISTA eliminated this hazardous condition and remedied the violation of law by replacing the corroded structural support for the Absorber Column.

77.    Finally, DuPont failed to complete the replacement of an employee emergency notification system at Victoria, which it had identified as noncompliant at least four years prior to the Closing.  DuPont's failure to complete the replacement constituted a violation of 29 C.F.R. §§ 1910.119, 1910.38 and 1910.165 and/or OSHA's general duty clause.  Post-Closing, INVISTA eliminated this violation of law by completing the installation of a compliant employee notification system.

**Benzene Violations at Orange, Texas**

78.    As alleged above, DuPont vented benzene vapors directly into the atmosphere for twelve years, due to the disconnected pipe at the APF Filter Press.  There was also additional widespread noncompliance with the BWON at Orange.  Similar to the failures at the Victoria facility, DuPont failed at Orange to identify thousands of benzene-containing waste streams in its TAB reports and in many instances misidentified the POWGs of controlled streams it had identified, which once again resulted in large swaths of the facility being improperly excluded from all aspects of the BWON.  Indeed, DuPont improperly excluded the single largest benzene-

containing wastewater stream at Orange from its BWON program and failed to conduct the appropriate performance testing on the unit that treated it, the Hydrolysis Column.

79.     Also similar to the Victoria facility, a number of tanks at Orange that stored benzene waste vented into the atmosphere, uncontrolled, on a systematic basis as a result of improper vent header and flare design.

80.     As a result of the foregoing and other BWON violations at Orange, INVISTA will be required, under the terms of the Consent Decree, to install a stripper to treat all regulated aqueous waste streams in the ADN area, segregate stormwater streams from process streams in the ADN area and install vapor combustion devices, among other things.

## OSHA and Other Violations at Orange, Texas

81.     The Orange facility also had numerous OSHA violations.  DuPont failed to implement a compliant mechanical integrity program designed to detect and arrest corrosion under insulation ("CUI"), even though DuPont was well aware that CUI could lead to catastrophic equipment failures and accompanying risks to its personnel and the environment. Among other things, DuPont failed to train its inspectors properly and had no system in place to assure CUI or warning signs of CUI identified by inspectors were addressed through adequate repairs.  After the Closing, during a routine shutdown of the ADN process at Orange, INVISTA discovered widespread CUI, requiring, among other things, the replacement of a number of vessels and extensive repairs to others.

82.     As a result of the CUI issues identified in the previous paragraph, the Orange facility was in violation of 29 C.F.R. § 1910.119 and 40 C.F.R. Part 68 and/or OSHA's general duty clause.

83.    One of the most startling situations discovered at Orange was the risk of steam contamination of the heating, ventilation and air conditioning ("HVAC") system with the toxic chemical hydrogen cyanide. Specifically, in 1997, a DuPont safety team determined that hydrogen cyanide could contaminate the HVAC system used in the ADN area of the Orange facility. DuPont's safety personnel noted that this "catastrophic safety risk is present in both operating and office areas, posing catastrophic health risks for numerous ADN offices and HVAC systems with steam heating coils." Indeed, contamination of the steam system had required evacuations of personnel from occupied buildings in the past. DuPont's failure to address this dangerous condition constituted a violation of 29 C.F.R. §1910.119, 40 C.F.R. Part 68 and/or OSHA's general duty clause. After the Closing, INVISTA addressed this violation of law by implementing a project to eliminate the risks associated with steam contamination.

84.    Similarly, in a series of safety reports starting in 1994, DuPont determined that the occupants of Building 808, which housed maintenance offices, shop areas and a break room, were at risk in the event of toxic releases of $NO_x$ and ammonia and vapor cloud explosions resulting from the release of cyclohexane and butadiene. Despite repeated recommendations that the occupants be relocated to a new building, DuPont repeatedly deferred and ultimately failed to undertake the necessary corrective measures, in violation of 29 C.F.R. § 1910.119, 40 C.F.R. Part 68 and/or OSHA's general duty clause. Post-Closing, INVISTA remedied this violation of law by relocating the personnel from Building 808 to a new building.

85.    DuPont also failed to implement corrective actions to address the recommendations that its process specific enhancements to process safety management ("ProSE") team made in 1999 concerning risks associated with ground level releases and loss of

containment of $NO_x$, in violation of 29 C.F.R. § 1910.119 and/or OSHA's general duty clause. INVISTA is in the process of remediating this violation.

86.     In addition to the foregoing, DuPont's mechanical integrity and process safety information programs associated with the Process Safety Management at the Orange facility were deficient because, among other things, (a) the facility's process safety information and documentation were deficient in that necessary and mandatory equipment files were incomplete, outdated, and/or missing; piping, relief valves, relief systems, flare systems and instrumentation diagrams were inaccurate, outdated and/or lacked critical process safety information necessary to the operation of the plant; and there was insufficient documentation and retention of that documentation that changes made to equipment or processes were in accordance with Recognized and Generally Accepted Good Engineering Practices (RAGAGEP) and the site management of change requirements; (b) the facility lacked documentation establishing inspection, testing and maintenance frequencies of critical equipment, piping, instrumentation and utility services; (c) the required critical process-to-service tie-ins were absent from the facility's mechanical integrity program; (d) the facility had not analyzed and documented that the list of safety instrumented systems (i.e., mandatory systems that are designed to achieve a safe and reliable shutdown of critical and hazardous processes in the event of emergency) was complete, and the facility had not conducted and documented required testing to ensure the safety instrumented systems would function properly; (e) the facility lacked complete lists of process safety management critical equipment which includes, among other systems, piping or instrumentation and utilities services; and (f) the piping circuits with the associated isometric drawings were not well-defined or accurate, and/or were missing.

87.     The foregoing conditions constituted violations of 29 C.F.R. § 1910.119, 40 C.F.R. Part 68 and/or OSHA's general duty clause.  In order to remediate these noncompliant conditions, INVISTA has undertaken and is continuing to undertake significant and costly projects to, among other things:  (a) update, supplement and correct piping and instrumentation diagrams and their associated databases and equipment files; (b) develop a system for tracking and scheduling preventative and predictive maintenance activities for effected site equipment, piping and services; (c) create documentation to support the required analyses, testing and maintenance of the safety instrumented systems and develop the relief design criteria and relief system equipment information and replace inadequate equipment; (d) develop a complete listing of process safety management critical equipment, piping and instrumentation and utility services; (e) circuitize and create the isometrics of the process safety management critical piping; and (f) identify and include process-to-service tie-ins in the mechanical integrity program.

88.     Finally, the Orange facility also violated, among other legal requirements, the terms and conditions of TCEQ Air Permit No. 1302, and 30 TAC § 115.122(a)(2).  During start-up or shut-down of the hydrogen cyanide ("HCN") plant at Orange, and at times when there is maintenance work or a malfunction, volatile organic compounds generated in the ADN process are controlled at a flare called the HCN start-up flare.  This flare failed to meet the minimum control efficiency of 98%, in violation of applicable regulations and permits.  To remedy this violation, INVISTA must replace the HCN start-up flare with a new flare that complies with the control efficiency requirements.

## PSD Violations at Camden, South Carolina

89.    From 1997 through 2003, DuPont implemented at least six projects at Camden

that triggered PSD requirements, the most significant of which occurred in 2001 when DuPont

undertook a major retubing of Boiler No. 3 that cost in excess of $1 million and took fifteen

months to complete.  The five other projects involved upgrades to Dowtherm Vaporizers Nos. 4

(in 1997), 2 (in 1999) and 3 (in 2003); a series of interrelated projects designed to increase resin

production (in 1997-98); and installation of eight new "spinning" machines (in 2003).  In each

case, DuPont failed to seek, let alone obtain, the requisite PSD pre-construction permits.

DuPont's failure to comply with the PSD regulations for the boiler retubing project and the

Dowtherm Vaporizer upgrades is particularly egregious because, as a result, DuPont skirted its

obligation to install the appropriate control technology to limit the post-construction emissions of

$NO_x$ and sulfur dioxide ("$SO_2$").

90.    Following the projects identified above, the Camden facility was operated by

DuPont and then INVISTA in accordance with a Title V operating permit obtained by DuPont

pursuant to the applicable state regulations and the Clean Air Act.

91.    The relevant Title V operating permit applicable to the Camden facility (a) did not

include BACT requirements for the major modifications described above because DuPont failed

to comply with the PSD regulations, (b) erroneously certified compliance with all applicable

regulatory requirements, and (c) contained an incomplete compliance plan.

92.    As a result of the foregoing violations, and under the terms of the Consent Decree,

INVISTA, among other things, must install designated control technology to reduce emissions of

$NO_x$ and $SO_2$ at certain of the boilers (or, alternatively, install control technology at one of the

boilers and convert another boiler to a natural gas fired unit) and burn cleaner fuels at the Dowtherm Vaporizers.

### OSHA and Other Violations at Camden, South Carolina

93.    In addition to the foregoing, as of the Closing Date, the Camden facility was in violation of OSHA in a number of respects. DuPont failed to complete a project to replace and upgrade relief valves in Dowtherm service at the Camden facility by, among other things, failing to install appropriate piping hangers and related equipment required to support the new, larger and heavier relief devices, in violation of 29 C.F.R. § 1910.106 and/or OSHA's general duty clause. Further, DuPont failed to complete a project to address fire risks in the Bulked Continuous Filament manufacturing building that had been identified in 1997 by its "Fire Elimination Team," in violation of OSHA's general duty clause. In order to address these noncompliant conditions, INVISTA completed the Dowtherm relief valve project and implemented a project to address the fire risks.

### PSD/NNSR Violations at Seaford, Delaware

94.    In 2002, DuPont undertook a major retubing of Boiler No. 1 at Seaford, replacing approximately 80% of the tubes in the boiler's firebox. The project cost in excess of $1.2 million and took four months to complete. Similar to the Camden boiler project, the Seaford project triggered PSD requirements, but it also triggered NNSR (Non-Attainment New Source Review) requirements because Seaford is located in a "nonattainment" area for ozone. As a result, DuPont was required to install BACT to limit the post-construction emission of $SO_2$, in addition to the more stringent LAER technology (the "Lowest Achievable Emission Rate") to limit the post-construction emission of $NO_x$. In contravention of PSD/NNSR regulations, DuPont failed to obtain the pre-construction permits or install the requisite control technology.

95. DuPont also failed to comply with PSD and NNSR requirements for major modifications at Dowtherm Vaporizer #2, and other projects.

96. Following the projects identified above, the Seaford facility was operated by DuPont and then INVISTA in accordance with a Title V operating permit obtained by DuPont pursuant to the applicable state regulations and the Clean Air Act.

97. The relevant Title V operating permit applicable to the Seaford facility (a) did not include BACT and LAER requirements for the major modifications described above because DuPont failed to comply with the PSD and NNSR regulations, (b) erroneously certified compliance with all applicable regulatory requirements, and (c) contained an incomplete compliance plan.

98. As a result of the foregoing violations, and under the terms of the Consent Decree, INVISTA must install designated control technology for $NO_x$ and $SO_2$ at two boilers (or replace them with natural gas fired boilers), implement operational and fuel limitations on another boiler and burn cleaner fuels in the Dowtherm Vaporizer, among other things.

### Clean Water Act Violation at Seaford, Delaware

99. As of the Closing Date, DuPont had an inadequate spill-prevention control and countermeasure ("SPCC") plan at the Seaford facility and did not have a secondary containment system to prevent an environmental incident in the event of a Dowtherm release in violation of 40 C.F.R. §§ 112.3, 112.7 and 112.8. Post-Closing, INVISTA remedied these violations of law by updating the SPCC plan and installing secondary containment.

## PSD Violations at Chattanooga, Tennessee

100.    Beginning in 1998, DuPont installed new equipment at Chattanooga designed to expand its production of Type-95 fiber and allocated more than $2 million for the project. As part of this project, DuPont undertook substantial upgrades to its boiler feedwater system so that the boilers could generate additional steam required by the additional production capacity. Among other things, DuPont installed a new feedwater pump, which required a PSD permit. DuPont failed to obtain the requisite permit and failed to install BACT to limit the post-construction emissions of $NO_x$ and $SO_2$ at the boilers. DuPont also made major modifications to the Dowtherm Vaporizers and other units without obtaining a PSD permit, in violation of the applicable PSD regulations.

101.    Following the projects identified above, the Chattanooga facility was operated by DuPont and then INVISTA in accordance with a Title V operating permit obtained by DuPont pursuant to the applicable state regulations and the Clean Air Act.

102.    The relevant Title V operating permit applicable to the Chattanooga facility (a) did not include BACT requirements for the major modifications set forth above because DuPont failed to comply with the PSD regulations, (b) erroneously certified compliance with all applicable regulatory requirements, and (c) contained an incomplete compliance plan.

103.    As a result of the foregoing violations, and under the terms of the Consent Decree, INVISTA, among other things, must install designated control technology to reduce emissions of $NO_x$ and $SO_2$ at various boilers (or cease using the boilers entirely) and burn cleaner fuels in the Dowtherm Vaporizers.

**Violations at Waynesboro, Virginia**

104.   At the Waynesboro facility, DuPont modified Boiler No. 1 and Boiler No. 3 in the 1999–2000 time period, yet failed to bring them into compliance with the requirements of 16 V.A.C. 25-50-550, which incorporates by reference the National Fire Protection Association Code ("NFPA") 85. In order to address these legal requirements, INVISTA is undertaking a project to upgrade the safety features at the boilers to comply with NFPA 85.

105.   In addition to the foregoing, as of Closing, DuPont failed to complete corrective action necessary to upgrade the control system at the Wastewater Treatment Plant at Waynesboro, in violation of its Virginia Pollutant Discharge Elimination System ("VPDES") Permit.

106.   DuPont was also in violation of its VPDES Permit for Outfall 011 at Waynesboro, because DuPont was not sampling discharges through that Outfall. After Closing, INVISTA learned that the discharges through Outfall 011 exceeded the permit limits for ammonia and that the ammonia exceedances resulted from severe sewer integrity issues that were known or suspected by DuPont prior to Closing. While undertaking the sewer repair project to address the ammonia exceedances at Outfall 011, INVISTA further learned that additional sewer lines at the facility lacked integrity and that DuPont knew or suspected as much since the 1980s. The condition of the sewer lines likewise violated the VPDES Permit. To address these violations, INVISTA undertook major sewer repair projects.

107.   In addition to the foregoing, DuPont was in violation of law at the Baugher Farm disposal area at the Waynesboro facility in that the disposal area did not have an appropriate storm water discharge permit and the facility did not comply with the requirements of the Virginia VPDES program, Virginia Waste Management Act and the Virginia Solid Waste

Management Regulation. To address these violations, INVISTA obtained the appropriate permit and may be required to undertake remediation.

### Benzene Violations at LaPorte, Texas

108.    At LaPorte, as at Victoria and Orange, DuPont failed to evaluate BWON applicability at the proper POWG, which led DuPont to conclude that the LaPorte facility had less than 1 Mg/yr of benzene, when in fact it had between 1 Mg and 10 Mg/yr of benzene. As a result of this error, DuPont failed to submit required annual reports to EPA demonstrating that the facility continued to have less than 10 Mg/yr of benzene. To address this violation of the BWON, INVISTA undertook a stream identification project and submitted the required TAB report.

### Other Environmental, Health and Safety Violations at LaPorte, Texas

109.    In August 2003, DuPont determined that the Higher Acetylenes ("HA") Flare at the LaPorte facility did not comply with the requirements of 40 C.F.R. § 60.18, which is applicable to the operation and destruction efficiency of flares. DuPont reported this noncompliance in its November 3, 2003 Title V Deviation Report for the LaPorte facility, along with a compliance plan in which DuPont committed to undertake corrective actions by May 2004. Prior to Closing, DuPont approved a project to address the noncompliance of the HA Flare but failed to undertake the corrective action. INVISTA undertook the project to bring the flare into compliance.

110.    The auditors determined that an intermittent waste stream from the Tetrahydrofuron® manufacturing process at times may not have been properly neutralized, and the Inorganic Retention Basin at LaPorte may have received hazardous waste as a result, in contravention of the Resource Conservation Recovery Act ("RCRA"). Accordingly, INVISTA

had to undertake corrective measures, first to monitor the waste stream and then, when EPA was not satisfied that such monitoring was sufficient, to install continuous pH monitoring and automatic neutralization equipment to assure that RCRA-characteristic waste would not discharge to the basin.

### Violations at Maitland, Ontario

111.    At the Maitland, Ontario facility, DuPont failed to implement a CUI program, and in fact, the facility's critical piping was not even a part of its mechanical integrity program.  In December 2004, a high pressure pipe in Building 412 ruptured due to CUI, resulting in an explosion and fire that caused significant damage.  The Technical Standards and Safety Authority ("TSSA"), which has jurisdiction over pressure vessels and piping in Ontario, issued an order requiring INVISTA to upgrade its CUI program and train its personnel regarding CUI and to undertake a massive project to identify and abate any other CUI at the facility where a similar event could occur.

112.    As of the Closing Date, DuPont, which was well aware of the risks associated with CUI, was in violation of Canadian law, including paragraph 25(2)(h) of Ontario's Occupational Health and Safety Act ("OSHA") and Section 3(3) of Ontario Regulation 220/01. In order to address the requirements of the TSSA orders following the explosion, INVISTA upgraded its CUI program and undertook the required investigation.

113.    In addition to the foregoing, as of the Closing Date, the Maitland facility was in violation of Canadian Law in the following respects: (1) DuPont failed to complete the upgrade of the facility's interlock system, which permits the safe shutdown of the facility in the event of unsafe conditions, despite knowledge of its inadequacy since the late 1990s, in violation of paragraph 25(2)(h) of Ontario's OSHA and Section 3(3) of Ontario Regulation 220/01; (2)

DuPont failed to implement upgrades required by Ontario Fire Code, Part 4, notwithstanding the identification of multiple areas of noncompliance during pre-Closing audits and a compliance deadline of August 2002; (3) DuPont failed to implement corrective action to address the recommendations of a 2001 facility siting study that identified risks to the environment and personnel from a loss of containment at tanks in the building 214 and 216 areas of the facility in violation of paragraph 25(2)(h) of Ontario's OSHA and/or Ontario's Environmental Protection Act and Water Resources Act; (4) DuPont failed to implement corrective action to address the risks to personnel in occupied buildings from credible releases of cyclohexane, hydrogen or ammonia (and a resulting explosion) that had been identified in facility siting studies in 2001, in violation of paragraph 25(2)(h) of Ontario's OSHA; (5) DuPont failed to implement required safety upgrades to the burner management systems and fuel trains at the hydrogen plant and the powerhouse, which had not been approved in accordance with Ontario Regulation 212/01 and therefore were required to meet the requirements of current codes applicable to such operations; and (6) DuPont failed to develop and implement necessary remediation of contamination of areas adjacent to the landfill as required by, among other things, the Maitland facility's Certificate of Approval and the Ontario Ministry of Environment and because levels of contaminants in leachate from the landfill exceed the Provincial Water Quality Objective.

114.    INVISTA remediated or is in the process of remediating the foregoing violations of Canadian law by completing projects that had been initiated by DuPont or implementing new projects post-Closing.

### Violations at Kingston, Canada

115.    As of the Closing Date, the Kingston, Ontario facility was in violation of Canadian Law in a number of respects. DuPont failed to complete the replacement of the fire alarm system, which was approximately sixty years old, was unreliable and had failed on a number of occasions. The fire alarm system was in violation of paragraph 6.3.1.4 of Ontario Regulation 388/97, which requires that fire alarms must be maintained in operating condition, and paragraph 25(2)(h) of Ontario's OSHA. INVISTA completed this safety project post-Closing.

116.    DuPont also failed to implement upgrades at Kingston required by Ontario Fire Code, Part 4, notwithstanding the identification of multiple areas of noncompliance during pre-Closing audits and a compliance deadline of August 2002. Post-Closing, INVISTA implemented projects to address the noncompliance.

### Violations of Environmental, Health and Safety Laws in United Kingdom

### Non-Boric Project at Wilton

117.    DuPont's failure to convert the Ketone Alcohol ("KA") plant at the Wilton facility to a non-boric manufacturing process violated the facility's permit. When DuPont purchased the Wilton facility in 1993, it knew the use of boric acid as a catalyst in KA production presented significant environmental issues.

118.    In or about 1995, DuPont assured the appropriate United Kingdom ("U.K.") regulator, the Environment Agency ("EA"), that it would eliminate the use of boric acid at the KA plant and sought variations to its permit to test alternative means of producing ketone alcohol. Thereafter, in 1998, DuPont sought and obtained a variation to its permit to implement a project known as the "Non-Boric Project," which was designed specifically to eliminate the use

of boric acid from the manufacturing process. As a result of this variation, DuPont was obligated to convert the KA plant to a non-boric process.

119.    DuPont, however, failed to make the conversion from a boric to non-boric process. Instead, it suspended the conversion project numerous times supposedly for "cash conservation reasons" and stalled the EA.

120.    As of the Closing on April 30, 2004, nine years after it had committed to the EA to eliminate the use of boric acid at the KA plant and almost six years after the variation requiring the conversion was issued, DuPont still had not completed the conversion. As a result, it was not in compliance with the express conditions of its operating permit, or, alternatively, with the implied condition to implement Best Available Techniques Not Entailing Excessive Costs to prevent or reduce, or render harmless, the release of dangerous substances ("BATNEEC"), and was in violation of Section 6(1) of the U.K. Environmental Protection Act 1990 ("UKEPA"). Subsequent to the Closing, INVISTA completed the conversion.

121.    In addition to failing to complete the Non-Boric Project pre-Closing, in violation of U.K. environmental law and the facility's permit, DuPont defaulted on a major construction contract related to the project, which resulted in a collection action being brought by the contractor against INVISTA post-Closing. INVISTA settled the action and paid the contractor a negotiated amount.

### Cyclohexane Claims at Wilton

122.    DuPont failed to take appropriate measures to reduce or eliminate the risks of a catastrophic fire or explosion caused by an accidental release of cyclohexane. Cyclohexane, a hazardous and highly flammable chemical, is a raw material used in the production of adipic acid at the Wilton facility. Its release, in liquid or vapor form, from contained vessels and pipes can

cause flash fires or vapor cloud explosions and expose workers and the community to serious safety and health risks. During 1974, the release of cyclohexane caused a catastrophic explosion and fire at a KA plant in the U.K., killing eighteen employees and destroying the entire plant.

123.    Beginning in 1999, DuPont's engineers repeatedly called DuPont's corporate attention to the dangerous conditions at the KA plant in Wilton, including the "obsolete and in need of upgrade" sealing arrangements, lack of capacity in the emergency sumps, steam pipes that exceeded the auto-ignition temperature for cyclohexane, risks associated with storage tanks that contained cyclohexane, the lack of secondary containment in areas where a release of cyclohexane could occur and the locations of the control room and personnel in buildings that were "unacceptable" major accident hazards.

124.    As of Closing, the foregoing conditions constituted violations of the Health and Safety at Work etc. Act 1974 ("HSWA"), the Control of Major Accident Hazard Regulations ("COMAH"), the Dangerous Substances and Explosive Atmosphere Regulations ("DSEAR"), the Control of Substances Hazardous to Health Regulations ("COSHH"), the Management of Health and Safety at Work Regulations 1999 ("MHSWR"), and with respect to the auto-ignition issue, the Pressure System Safety Regulations 2000 ("PSSR"), and of the conditions of the Wilton facility's permit. Post-Closing, INVISTA both completed projects that had been initiated by DuPont and implemented (or is in the process of implementing) additional projects to address these risks in order to reduce them to acceptable levels in accordance with U.K. law.

### Fire Claims at Wilton

125.    Prior to Closing, DuPont identified various deficiencies relating to the fire protection, detection and suppressions systems at various intermediate plants at the Wilton facility (Nitric Acid, KA, Hexamethylene Diamine ("HMD") and Adipic Acid). The

deficiencies related to fire doors and fire compartmentalization, emergency egress, signage, lighting, fire suppression and detection equipment, safety showers, and fire alarms. In each case, DuPont failed to remedy the deficiencies.

126.    Accordingly, as of Closing, DuPont had not complied with either specific or general requirements for addressing the risks associated with fire and was in violation of U.K. law, including the laws and regulations referenced above concerning the cyclohexane claims, as well as the Fire Precautions (Workplace Regulations 1997), the Health and Safety (Signs and Signals) Regulations 1996, and the Workplace (Health, Safety, and Welfare) Regulations 1992, and the conditions of the facility's permit. Post-Closing, INVISTA implemented projects to address these violations.

### Additional Violations of Law at Wilton

127.    In addition to the foregoing, DuPont failed to upgrade its containment system to avoid releases of titanium dioxide ("$TiO_2$") a pigment used in the polymer manufacturing process, into the River Tees. After a series of releases, in May 2003, the EA issued an Enforcement Notice requiring DuPont, among other things, to review its practices and procedures "with respect to operation of secondary containment systems," and to implement revised operating procedures, "paying particular attention to ensuring that these systems are not inadvertently bypassed." In addressing this Enforcement Notice, DuPont reviewed its secondary containment systems and determined that many aspects of the $TiO_2$ system did not have secondary containment. In a December 22, 2003 letter to the EA responding to the Enforcement Notice, DuPont stated that the $TiO_2$ systems had been reviewed pursuant to a Process Hazard Analysis and that "[a] number of recommendations have been identified to improve the system and a project has been scoped to provide secondary containment and increased instrumentation

on the $TiO_2$ system." DuPont failed to upgrade its containment system prior to Closing in violation of the facility's operating permit and of the Enforcement Notice.

128.    DuPont likewise failed to modify a defective Common Off-Gas Abatement ("COGA") unit.  The COGA unit had been installed by DuPont in the mid-1990s to abate $N_2O$ from the adipic acid process, hydrogen off-gas from the HMD process and off-gas from the cyclohexane oxidation process ("KAOG").  During a PHA carried out in late 2002, DuPont identified deficiencies in the COGA unit that created a high risk of fire and/or explosion.  Faced with this risk, DuPont ceased feeding the KAOG to the COGA unit and vented the KAOG directly to the atmosphere.  DuPont failed to repair the COGA unit.  As a result of the foregoing, DuPont was in breach of the HSWA, DSEAR and the facility's permit.

129.    In 2002, nine years after taking over the Wilton facility, DuPont conducted the first full Process Hazard Analysis of the Synthesis area of the HMD plant.  The PHA resulted in 108 recommendations, 38 of which were associated with conditions designated "intolerable" and 70 of which were designated "undesirable."  Within the DuPont system, both designations required attention within a year because of the associated risks.  Many of the findings of the PHA related to the unplanned loss of containment of, and the exposure of employees to, ammonia, hydrogen, HMD and nitrogen, which could result in "serious injury (death or irreversible health effects)."  In addition, some of the findings related to situations which could result in catastrophic incidents with impacts to persons both on site as well as at other facilities within the larger industrial park and the local citizenry.  The amount and complexity of remedial work required to address these recommendations has been, and continues to be, significant.  The work is covered by a number of current projects and will be covered by future projects.  Prior to the Closing Date, DuPont had failed to address the risks identified in the PHA recommendations and

either eliminate them or reduce them in accordance with applicable regulations. DuPont's failure to address the PHA recommendations constituted a violation of HSWA, COMAH, COSHH, DSEAR, PSSR and the facility's permit.

130. The following additional violations of law existed at Wilton prior to Closing: (1) DuPont failed to upgrade the sump in the KA plant; (2) DuPont failed to upgrade the KA plant's drainage system; (3) DuPont failed to upgrade the KA effluent transfer line; (4) DuPont failed to remedy deficiencies identified in the manual handling operations at the Polymer plant; (5) DuPont failed to upgrade certain critical service pipe bridges that support critical pipework, including pipes that transport chemicals (such as hydrogen, ammonia, HMD, and nitrogen), and utilities, which had substantial structural defects; (6) DuPont failed to replace the number 7 hydrogen compressor; and (7) DuPont failed to replace an unsafe vessel called the air blower catchpot. Each of the foregoing conditions constituted violations of the facility's permit and one or more of the following U.K. laws and regulations: HSWA, MHSWR, COMAH, DSEAR, COSHH, the Pipeline Standards Regulations 1996, and the Manual Handling Operations Regulations 1992.

131. INVISTA has addressed or is in the process of addressing the violations of U.K. law set forth in paragraphs 127 through 130.

### Violations at Gloucester and Maydown, United Kingdom

132. During 2001, the Gloucester facility received multiple noise and odor complaints from local residents. Later that year, a formal complaint was made by one of the residents to the Tewkesbury Borough Council, the regulator. DuPont assured the residents and the regulator that DuPont would address these conditions. When no action had been taken by 2002, however, the regulator threatened that action, by the service of an enforcement notice, "could occur." DuPont

failed to take any action to address the issues pre-Closing, although it approved a project in April 2004, just prior to Closing, to install additional emissions control equipment. The complaints by neighbors and threats by the regulator of enforcement action by notice constitute an Environmental Claim. Furthermore, at Closing, DuPont was creating a statutory nuisance as defined in Section 79 of the U.K. Environmental Protection Act of 1990 ("UKEPA") and nuisance contrary to the Common Law. Post-Closing, INVISTA implemented the project to install additional emissions control equipment.

133. DuPont failed to perform a dimethylacetamide emissions study at Maydown pre-Closing, as required by a condition of the facility's operating permit. Subsequent to Closing, INVISTA undertook the study.

### Violations at Dordrecht, Netherlands and Paulinia, Brazil

134. As of the Closing, Dordrecht was noncompliant with its wastewater discharge permit with regard to the discharge of suspended particles, and there were health and safety risks to the workers handling butylated hydroxytoluene, in violation of the Dutch occupational health and safety law and decree (the Arbeidsomstandighedenwet 1998 and the Arbeidsomstandighedenbesluit). In addition, as of the Closing, DuPont had failed to properly maintain certain sewer lines that resulted in tetrahydrofuran ("THF") contamination to the soil and groundwater, and after discovery of the THF contamination, DuPont failed to undertake necessary corrective action to remediate contamination caused by severely corroded sewers, as required by, among others, the Dutch Soil Protection Act (the Wet bodembescherming). INVISTA was required to remediate these violations of Dutch law post-Closing.

135.    At Paulinia, as of the Closing, there was tetrachloroethylene (PCE) and groundwater contamination, which INVISTA is required to remediate in accordance with Brazilian law.

### F.    Continuing Notice to DuPont

136.    As set forth above, commencing on June 17, 2004 and continuing consistently thereafter, INVISTA notified DuPont of the violations discovered at the various facilities and afforded it the opportunity to respond to the violations and deal with the regulatory consequences. As part of its continuing notification to DuPont, INVISTA provided DuPont with each quarterly audit report filed with EPA (by letters dated December 6, 2004, February 15, 2005, May 12, 2005, August 12, 2005 and November 2, 2005). DuPont did not respond substantively to any of the notice letters notwithstanding INVISTA's repeated invitations to participate in the process.

137.    By letter dated April 11, 2005, INVISTA advised DuPont of an April 21, 2005 meeting with EPA to discuss "significant non-compliances discovered to date . . . that may entail significant corrective measures and significant expenditures." INVISTA also indicated its willingness to address corrective actions with DuPont and further stated:

> [W]e construe the decision by DuPont not to respond to any of our notice letters or to seek to discuss these corrective measures with us to represent acquiescence by DuPont in INVISTA's program to resolve these matters in an appropriate manner. Similarly, we construe DuPont's decision not to participate in the resolution and settlement of these non-compliance matters to represent either its conclusion that it has no right to do so or its waiver of its right, if any, to participate.

138.    Nearly ten months after DuPont had received the initial notice from INVISTA, DuPont finally sent a letter to INVISTA, dated April 14, 2005, that stated:

> DuPont expects that, consistent with the express terms of the Purchase
> Agreement, it will be permitted to (x) assist INVISTA with the preparation
> for any meetings that INVISTA has scheduled with the EPA and (y) send a
> DuPont representative to attend and participate in such meetings . . . . I
> look forward to working with you to resolve these issues. Our meeting on
> Tuesday, April 19 in Washington, D.C. will hopefully be a useful step in
> that process. DuPont believes it is in the best interest of both companies
> to promptly resolve specific environmental compliance issues.

139.    On April 19, 2005, INVISTA's Chief Counsel for Environmental, Health and

Safety and her counterpart from INVISTA's parent company met with Guy Johnson, Corporate

Counsel for DuPont and author of the letter set forth in the preceding paragraph. At that

meeting, Johnson informed INVISTA's counsel that DuPont had changed its position and would

not participate in the upcoming meeting with EPA. Notwithstanding this change in course,

Johnson said that DuPont would establish a "technical team" to review the noncompliance issues

discovered in the audits and would cooperate with INVISTA in addressing them. INVISTA met

alone with EPA on April 21, 2005. INVISTA continued to keep Johnson and DuPont fully

informed of its discussions with EPA, but DuPont reverted to ignoring INVISTA. Thus, on

notice to DuPont, INVISTA met with EPA in July 2005 and November 2005; in each case,

DuPont stated that it did not want to attend.

140.    By letter dated November 1, 2005, INVISTA advised DuPont that it was entering

the next stage of discussions with EPA that would encompass a proposal for corrective actions

relating to the key open audit findings, including the BWON and PSD/NNSR matters, and that

INVISTA remained willing to address these matters with DuPont. DuPont did not respond to

INVISTA's letter.

141.    It was not until December 9, 2005, almost eight months after the initial meeting

between Johnson and INVISTA counsel, that DuPont advised INVISTA that it had finally

established a technical team to address the significant noncompliance issues.

142.    By letter dated December 14, 2005, DuPont for the first time requested information regarding any consent decree or agreement that INVISTA might be considering with EPA. One week later, on December 22, 2005, INVISTA responded, advising DuPont of the control technology INVISTA was considering. INVISTA again advised DuPont that a meeting of the parties' technical teams would be the most efficient and effective manner in which to address these matters. DuPont did not seek any such meeting and, indeed, it was not until six weeks later, on January 30, 2006, that DuPont responded to INVISTA's December 22 letter, seeking additional information regarding INVISTA's corrective action proposal. INVISTA provided the requested information within the week, by letter dated February 3, 2006.

143.    In the February 3, 2006 letter, INVISTA also provided DuPont a copy of its final audit report pursuant to the EPA Corporate Audit Agreement and urged DuPont to agree to a meeting between their respective technical teams to address the noncompliance issues, remediation and resolution with the regulators. INVISTA did not receive a response to this request. INVISTA then informed DuPont that a meeting with EPA had been scheduled for April 5, 2006. DuPont finally agreed to meet with INVISTA shortly before the EPA meeting.

144.    The parties met in Philadelphia on April 3, 2006, at the offices of DuPont's outside counsel. INVISTA's general counsel, a board member of INVISTA, and the lead PSD auditor from ENVIRON International Corp., among others, attended the meeting for INVISTA. Johnson, outside counsel and members of DuPont's technical team attended on behalf of DuPont. At the meeting, INVISTA provided DuPont with a preview of the presentation it intended to make to EPA on April 5, 2006, including the defenses to the PSD/NNSR violations, and asked DuPont for input on its presentation, which DuPont refused to provide.

145.    INVISTA met with EPA on April 5, 2006, and proposed the corrective action program that had been discussed with DuPont on April 3, 2006 and outlined for DuPont in letters from INVISTA dated December 22, 2005 and February 3, 2006.  By letter dated April 6, 2006, INVISTA provided to DuPont a copy of the presentation it had given to EPA.  INVISTA also briefed DuPont via conference call regarding the details of the meeting.

146.    After the April 5, 2006 meeting, communications between INVISTA and EPA regarding a corrective action plan proceeded.  INVISTA continued to provide documents and information to DuPont and to keep DuPont apprised of the status of the negotiations with EPA.

147.    On June 21, 2006, EPA provided INVISTA with a counterproposal regarding the corrective actions for the PSD/NNSR and the BWON violations.  In its counterproposal, EPA (a) accepted INVISTA's corrective actions with regard to the BWON violations subject to additional requirements regarding the implementation of a more robust leak detection and repair program, and (b) proposed various alternatives to address the PSD/NNSR violations.  Each of EPA's counterproposals regarding the PSD/NSR violations involved more extensive and expensive controls than had been proposed by INVISTA.

148.    By letter dated June 22, 2006, INVISTA's counsel provided DuPont's counsel with the EPA counterproposal.

149.    In a letter dated June 23, 2006, DuPont's counsel rejected the PSD/NSR violations and stated that "INVISTA is negotiating with EPA over the expenditure of INVISTA's funds alone."

150.    During a July 25, 2006 conference call, INVISTA advised DuPont that an attorney from DOJ had been assigned to the matter and would be forwarding a tolling agreement to

INVISTA.  By letter to DuPont dated July 26, 2006, INVISTA provided DuPont with, and sought comments on, a draft tolling agreement proposed by DOJ, which provided, in part, "**The United States contends that it presently has potential causes of action against INVISTA** regarding INVISTA facilities in the United States pursuant to . . . the Clean Water Act . . . RCRA . . . the Clean Air Act . . . and any other federally-enforceable environmental requirement under federal and state law." (Emphasis added)

151.    DuPont <u>did not respond</u> to INVISTA's July 26, 2006 letter.

152.    In addition to the notice letters discussed above, INVISTA provided DuPont with notice letters regarding other matters of noncompliance set forth herein with respect to the U.S. and foreign facilities it had acquired from DuPont.

153.    DuPont did not defend INVISTA against EPA's and DOJ's claims, did not exercise its authority to participate in or control the remediation process, and essentially ignored the multitude of violations of environmental, health and safety laws set forth above.

154.    Notwithstanding DuPont's position, INVISTA, faced with the government's demands and claims regarding violations of law it inherited from DuPont, had but two choices: (1) continue to attempt to obtain the best deal it could given the government's threat of enforcement action in the absence of a negotiated resolution, or (2) terminate the negotiations and become the subject of an enforcement action as threatened by DOJ, including potential criminal charges for knowingly operating facilities in violation of law, with the risk to its ability to operate.  INVISTA reasonably chose the former.

155.    In the end, INVISTA complied fully with the terms and conditions of the Purchase Agreement, while DuPont egregiously breached its obligations thereunder. As a direct and proximate result of DuPont's breaches, INVISTA has sustained substantial damages.

**G.    Damages**

### Consent Decree

156.    It has taken almost two years for INVISTA, EPA, DOJ, and state regulators to agree in principle upon the terms of a Consent Decree, which will be lodged in response to a complaint filed by the government in Federal District Court in Delaware.  The Consent Decree will require INVISTA to pay a civil fine in the amount of $1.7 million, to undertake corrective action to remediate the pre-Closing environmental noncompliance and implement measures to prevent recurrence, and to pay steep stipulated penalties should it fail to comply with the terms of the Consent Decree.

157.    The Consent Decree will require INVISTA to install designated pollution controls to address DuPont's failure to comply with PSD/NNSR permitting requirements for the major modifications it undertook at the following facilities without having complied with the PSD/NNSR regulations:  Camden, Chattanooga, Seaford and Victoria.

158.    The Consent Decree further will require INVISTA to undertake corrective action to address DuPont's violation of the BWON at its Orange and Victoria facilities.

159.    INVISTA will incur increased operating costs as a result of its compliance with its PSD/NNSR and the BWON obligations under the Consent Decree.

## OSHA and Other Violations

160.    As alleged above, DuPont also perpetrated massive, system-wide OSHA (or foreign analog) violations at the following facilities:  Victoria, Orange, Camden, Waynesboro, Maitland, Wilton and Dordrecht.

161.    As alleged above, DuPont violated fire protection, detection and suppression requirements at the following facilities:  Victoria, Maitland, Kingston and Wilton.

162.    DuPont also was in noncompliance at the LaPorte, Waynesboro, Maitland, Wilton, Gloucester and Paulinia facilities, all of which are set forth above.  Under applicable law, INVISTA was required to rectify these other instances of noncompliance.

163.    In addition to the foregoing, INVISTA has also suffered Losses with respect to non-environmental matters as a result of DuPont's misconduct, violations and breaches: the ITAM receivable, the Overend litigation, and the DOJ investigations of antitrust violations.

## ITAM Receivable

164.    At Closing, DuPont transferred to INVISTA a receivable in the amount of more than € 15 million owed to DuPont by an Italian textile company, ITAM, S.p.A. ("ITAM") and secured by various guarantees (the "ITAM Receivable").  Prior to formal implementation of the transfer of that receivable to INVISTA, DuPont negotiated a check from another Italian company, Incofinsco S.p.A. ("Incofinsco"), in the amount of 1% of the receivable, despite INVISTA's instructions to DuPont that the Incofinsco check "must not be cashed."  As a result, Incofinsco, ITAM and the guarantors of the receivable have asserted that the receivable was sold to Incofinsco by DuPont and that INVISTA has no rights to the receivable or the supporting guarantees.  In addition, INVISTA had to defend against a criminal investigation as a result of

DuPont's negotiation of the check. By this conduct, DuPont breached an "Other Agreement," as such term is defined in the Purchase Agreement, and is obligated to indemnify INVISTA for its Losses arising from that breach, pursuant to Section 8.4(a)(i) of the Purchase Agreement.

## Overend Technologies LLC

165.    In July 2005, Overend Technologies LLC brought suit against INVISTA in the United States District Court for the Eastern District of Wisconsin, alleging violations of the antitrust laws arising out of DuPont's alleged fraudulent obtainment of a patent. Upon notice to DuPont, INVISTA settled the claim after its motion to dismiss was denied. Pursuant to Section 8.4(a)(ii) of the Purchase Agreement, DuPont is required to indemnify INVISTA with respect to all "Retained Liabilities," including those set forth on Schedule 1(zz) of the Purchase Agreement. Paragraph 4 of Schedule 1(zz) provides that DuPont is responsible for all "Liabilities resulting from or arising out of actual or alleged violations of the Antitrust Laws to the extent resulting from or arising out of the ownership of the DTI Assets or the operation or conduct of the DTI Business . . . at any time on or prior to the Closing Date . . . ." As a result of the foregoing, INVISTA is entitled to damages due to DuPont's failure to defend and indemnify it with regard to Overend's claims.

## DOJ Investigations of Antitrust Violations

166.    Shortly before Closing, INVISTA learned that the Department of Justice was conducting confidential criminal antitrust investigations relating to the markets for adipic acid and another product which INVISTA was acquiring from DuPont. Pursuant to dealings with DOJ, INVISTA, subsequent to Closing, undertook an internal investigation into the activities of the DTI Business in connection with these products. The investigations of these two different products were being handled by two different offices within the DOJ Antitrust Division. At the

time INVISTA undertook its internal investigation, INVISTA was aware of another DOJ antitrust investigation involving DuPont relating to conduct that occurred partially in an overlapping timeframe, and where DuPont and a related entity were applicants for immunity under DOJ's corporate amnesty policy. Contemporaneous with the investigations of the products INVISTA was acquiring, INVISTA became aware of yet another DOJ antitrust investigation involving a DuPont joint venture entity. Pursuant to DOJ direction, INVISTA's investigation was conducted confidentially; indeed, DOJ specifically required that INVISTA not disclose the investigation to DuPont. As a result of the investigation, INVISTA obtained immunity for it and its employees with regard to the adipic acid industry worldwide. In March 2006, DOJ first permitted INVISTA to disclose the investigation to DuPont in advance of the issuance of grand jury subpoenas relating to DOJ's on-going adipic acid investigation.

167. Thereafter, DuPont and INVISTA executed a letter agreement dated April 28, 2006 pursuant to which DuPont agreed to indemnify and defend INVISTA with regard to "actual, suspected or alleged violations of the Antitrust Laws worldwide related to the adipic acid portion of the DTI Business that were investigated by INVISTA as a result of, and in cooperation with, the investigation by the Department of Justice . . . of alleged anti-competitive conduct relating to the adipic acid markets." In connection therewith, DuPont paid INVISTA $1.9 million of the costs incurred by INVISTA to date, and agreed to pay INVISTA on-going costs incurred by counsel for INVISTA in monitoring DuPont's defense activities. The parties each reserved their rights with regard to additional costs incurred by INVISTA in connection with the investigation, including with regard to both adipic acid and the other product.

168.    INVISTA complied with all of its material obligations under the letter agreement and provided DuPont with the invoices covering the legal fees and related costs associated with the internal investigations and on-going monitoring by counsel.

169.    Pursuant to Section 8.4(a)(ii) of the Purchase Agreement, DuPont is required to indemnify INVISTA with respect to all "Retained Liabilities," including those set forth in Paragraph 4 of Schedule 1(zz), as described above.  As a result of the foregoing, INVISTA is entitled to damages in an amount in excess of $4.5 million, which is the difference between the costs and expenses incurred by INVISTA in connection with the investigation and subsequent monitoring and the $1.9 million DuPont has already reimbursed to INVISTA.  Further, with respect to legal fees incurred subsequent to the date of the letter agreement, INVISTA is entitled to reimbursement pursuant to the terms of that agreement.

## Public Harm

170.    DuPont breached the Purchase Agreement by not remediating its egregious violations of environmental, health and safety laws set forth above and then by refusing to indemnify INVISTA, the new purchaser of the equipment and systems which had been operating illegally, for the costs of correcting or eliminating such illegal operations.  DuPont's breaches were part of a system-wide pattern of noncompliance directed at the public generally, including the public wrongs of (1) venting benzene directly into the atmosphere for twelve years, (2) tolerating the risk that toxic vapors could seep into the heating system at the Orange facility for seven years, (3) delaying projects to address the risks to employees identified in facility siting studies at each of the intermediates facilities, and (4) allowing pipes to become so corroded that they exploded as happened in Maitland, Canada, in December 2004.  These are but a few examples of DuPont's consistently wanton and reckless conduct that placed the public at risk.

Accordingly, INVISTA is entitled to an award of punitive damages to deter DuPont from engaging in similar conduct in the future.

**COUNT I**
**(Breach of Contract/Indemnification)**

171.   INVISTA repeats and realleges each and every allegation contained in paragraphs 1 through 170 above.

172.   The Purchase Agreement is a valid and enforceable agreement between DuPont and INVISTA.

173.   INVISTA has complied with its obligations under the Purchase Agreement.

174.   DuPont has failed and refused to defend, indemnify and hold harmless INVISTA from and against its Losses arising out of DuPont's breaches, and the failure to be true, of the representations and warranties in Section 3.11 of the Purchase Agreement, as required pursuant to Section 8.4(a)(iii) of the Purchase Agreement with respect to the violations set forth in paragraphs 38-68, 75-88, 93, 99, and 104-135 above.

175.   DuPont has also failed and refused to defend, indemnify and hold harmless INVISTA from and against its Losses arising out of or related to the matters set forth above in paragraphs 38-114, 117-131, and 133-135, as required pursuant to the requirements of Section 8.5(b) of the Purchase Agreement.

176.   DuPont has also failed and refused to defend, indemnify and hold harmless INVISTA from and against all Losses arising out of or related to the matters set forth in paragraphs 38-114, 117-131, 133-135, and 165-169 above, as required pursuant to the requirements of Section 8.4(a)(ii) of the Purchase Agreement.

177.   DuPont has also failed and refused to defend, indemnify and hold harmless INVISTA from and against all Losses arising out of or related to the matters set forth in

paragraph 164 above, as required pursuant to the requirements of Section 8.4(a)(i) of the Purchase Agreement.

178.    The matters set forth in paragraphs 38-135 and 170 above constitute gross, reckless and wanton failures by DuPont to comply with environmental, health and safety laws and regulations which gave rise to catastrophic risks and dangers to public health.

179.    As a result of the foregoing, DuPont has breached the Purchase Agreement in materials respects.

180.    As a direct and proximate result of DuPont's breach of the Purchase Agreement, INVISTA has incurred Losses, and will incur additional Losses.

181.    In accordance with the terms of the Purchase Agreement, INVISTA is entitled to a judgment requiring DuPont to indemnity and hold it harmless from, and to reimburse it for, all Losses incurred in connection with the foregoing matters in accordance with DuPont's obligations under Sections 8.4 and 8.5(b) of the Purchase Agreement, together with punitive damages as a result of DuPont's gross, reckless and wanton conduct.

## COUNT II
### (Declaratory Judgment)

182.    INVISTA repeats and realleges each and every allegation contained in paragraphs 1 through 181 above.

183.    Certain of the matters alleged herein involve Losses, including costs of Remediation, that as of the date hereof are uncertain in amount and are dependent on the Remediation that is either determined to be necessary and appropriate or that will be required by reason of agreement with, or enforcement by, regulators.

184.    The matters set forth herein are ripe for a determination by the Court because DuPont has either expressly refused to indemnify, defend and hold harmless INVISTA from and

against, and to reimburse INVISTA with respect to, all Losses relating to the matters alleged herein or DuPont has chosen not to respond to INVISTA's notice letters and requests to address such matters.

185.    As a result of the foregoing, an actual controversy exists between the parties.

186.    INVISTA has no adequate remedy at law.

187.    Therefore, INVISTA is entitled to a judgment declaring that DuPont is required to indemnify and hold INVISTA harmless and reimburse INVISTA for all Losses arising out of or related to the matters alleged herein, including, without limitation, a judgment obligating DuPont to reimburse INVISTA for all Losses as and when such Losses are incurred and expenses with respect to Remediation as such expenses are paid.

## COUNT III
### (Breach of Contract)

188.    INVISTA repeats and realleges each and every allegation contained in paragraphs 166 through 169 above.

189.    The April 28, 2006 letter agreement is a valid and enforceable agreement between DuPont and INVISTA.

190.    INVISTA has complied with its obligations under the April 28, 2006 letter agreement.

191.    Under the April 28, 2006 letter agreement, DuPont agreed, among other things, to reimburse INVISTA for the fees, costs and expenses of outside counsel relating to the matters that were the subject of the agreement for the period following the execution thereof.

192.    In breach of the April 28, 2006 letter agreement, DuPont has failed to reimburse INVISTA with respect to fees, costs and expenses incurred by INVISTA following the execution of the letter agreement.

193.    As a direct and proximate result of DuPont's breach of the April 28, 2006 letter agreement, INVISTA has incurred losses in excess of $400,000.

### PRAYER FOR RELIEF

WHEREFORE, INVISTA respectfully requests that this Court award it compensatory damages, punitive damages, costs and attorneys' fees plus interest in an amount to be determined at trial and such other relief as may be warranted.

WHEREFORE, INVISTA respectfully requests that the Court enter judgment as follows:

(a)    In favor of INVISTA on its First Cause of Action for breach of the Purchase Agreement and awarding INVISTA compensatory damages in the amount of its Losses subject to indemnification and reimbursement pursuant to Section 8.4(a) and Section 8.5(b) of the Purchase Agreement and punitive damages in an amount to deter future similar conduct plus interest;

(b)    Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, in favor of INVISTA on its Second Cause of Action for a declaratory judgment and ordering DuPont to indemnify and reimburse INVISTA on an on-going basis, as Losses are incurred and expenses are paid, with respect to all matters for which Losses subject to indemnification and reimbursement have not yet been incurred plus interest;

(c)    In favor of INVISTA on its Third Cause of Action for breach of the Letter Agreement and ordering DuPont to reimburse INVISTA with respect to the fees, costs and

expenses incurred by INVISTA following the execution of the letter agreement relating to the

matters that were the subject of the agreement plus interest;

        (d)    Pursuant to the Purchase Agreement, for the costs and expenses incurred

by INVISTA in connection with the defense and investigation of the indemnifiable matters and

in the prosecution of this action plus interest; and

        (e)    For such further and additional relief as the Court deems just and proper.

DATED:     New York, New York
              March 26, 2008

                           CURTIS, MALLET-PREVOST, COLT &
                           MOSLE LLP

                           Benard V. Preziosi, Jr. (BP-5715)
                           Attorneys for Plaintiffs
                           101 Park Avenue
                           New York, New York  10178-0061
                           Telephone: (212) 696-6000
                           Fax: (212) 697-1559

OF COUNSEL
Harry L. Manion III
COOLEY MANION JONES LLP
21 Custom House Street
Boston, Massachusetts 02110
Telephone: (617) 737-3100
Fax: (617) 737-0374