UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                          x
                                          :
INVISTA B.V., et al.,                     :
                                          :
                    Plaintiffs,           :
                                          :
        v                                 :        08 CV 3063 (SHS)
                                          :
E.I. DU PONT DE NEMOURS AND COMPANY,      :
                                          :
                    Defendant.            :
                                          x
```

## ANSWER, ADDITIONAL DEFENSES AND COUNTERCLAIMS OF DEFENDANT DUPONT

Defendant E.I. du Pont de Nemours and Company ("DuPont"), by and through its undersigned counsel, submits its Answer, Additional Defenses and Counterclaims in response to the Complaint of Plaintiffs INVISTA B.V., INVISTA S.à r.l., INVISTA Textiles (U.K.), INVISTA (Nederland) B.V., INVISTA (Canada) COMPANY, INVISTA Brasil Indústria E Comércio de Fibras Ltda., INVISTA (International) S.à r.l., INVISTA NORTH AMERICA S.à r.l., and INVISTA TECHNOLOGIES S.à r.l. (collectively "INVISTA").

## DUPONT PRELIMINARY STATEMENT

Simultaneously with the filing of this Answer, Additional Defenses and Counterclaims, DuPont has filed a Motion to Dismiss the following claims asserted by Plaintiffs: (i) indemnity claims pursuant to Section 8.4(a)(ii); (ii) indemnity claims, pursuant to Section 8.5(b), for remediation expenses relating to the audit process and resulting consent decree; (iii) public harm and punitive damages; (iv) indemnity, pursuant to Section 8.4(a)(ii), for damages arising from the Overend Technologies Litigation; and (v) indemnity, pursuant to Section 8.4(a)(i) and an unspecified "Other Agreement" relating to the ITAM Receivable.

## INTRODUCTION

1.      DuPont denies the allegations contained in Paragraph 1 of the Complaint, except admits that it entered into a Purchase Agreement on November 16, 2003, as later amended, (the "Purchase Agreement") with KED Fiber Ltd. and KED Fiber, LLC, which effectuated the sale of the DuPont Textiles and Interiors business ("DTI") on April 30, 2004 (the "Closing"). DuPont refers to the Purchase Agreement for the contents thereof.

2.      DuPont denies the allegations contained in Paragraph 2 of the Complaint.

3.      DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint, except, upon information and belief, admits that without advance notice to DuPont, in June 2004, INVISTA notified the EPA and the State of Texas of purported issues involving the handling of benzene by DuPont at the Victoria and Orange, Texas facilities; and denies that the DuPont handling of benzene was reckless or dangerous.

4.      DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint, except, upon information and belief, admits that without sufficient advance notice to DuPont, INVISTA proposed to enter into and did enter into a Corporate Audit Agreement with EPA pursuant to which it agreed to conduct extensive environmental audits, and refers to the Corporate Audit Agreement for the contents thereof; and denies that DuPont failed to comply with federal, state, and local environmental laws.

5.      DuPont denies the allegations contained in Paragraph 5 of the Complaint, except, upon information and belief, admits that INVISTA has purportedly agreed to enter into a Consent Decree with EPA and DOJ, and refers to the Consent Decree for the contents thereof.

6.      DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint, except upon information and belief, admits that INVISTA has purportedly agreed to enter into a Consent Decree, and refers to the Consent Decree for the contents thereof; and denies that DuPont violated environmental, health and safety laws and regulations at the U.S. facilities and foreign facilities that INVISTA acquired from DuPont.

7.      DuPont denies the allegations contained in Paragraph 7 of the Complaint, except admits that INVISTA sent DuPont (a) a letter on June 17, 2004, (b) certain other letters purportedly notifying DuPont of indemnity claims and (c) copies of certain reports INVISTA purports to have provided to EPA.

8.      DuPont denies the allegations contained in Paragraph 8 of the Complaint, and refers to the safety reports for the contents thereof, except, upon information and belief, admits that a fire occurred eight months after Closing at the Maitland, Canada facility.  DuPont states that it has moved to dismiss INVISTA's claim for punitive damages because such claim fails to state a claim upon which relief may be granted.

9.      DuPont denies the allegations contained in Paragraph 9 of the Complaint.

### JURISDICTION AND VENUE

10.      DuPont admits the allegations contained in Paragraph 10 of the Complaint.

11.      DuPont admits the allegations contained in Paragraph 11 of the Complaint.

### PARTIES

12.      DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the Complaint.

13.      DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of the Complaint.

14.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Complaint.

15.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of the Complaint.

16.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint.

17.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint.

18.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint.

19.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint.

20.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint.

21.     DuPont admits that Plaintiffs refer to themselves throughout the Complaint collectively as "INVISTA."

22.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint.

23.     DuPont admits the allegations contained in Paragraph 23 of the Complaint.

## FACTUAL BACKGROUND

24.     DuPont denies the allegations contained in Paragraph 24 of the Complaint, except admits that it entered into the Purchase Agreement on November 16, 2003, and refers to the Purchase Agreement for the contents thereof.

25.     DuPont admits the allegations contained in Paragraph 25 of the Complaint.

26.     DuPont denies the allegations contained in Paragraph 26 of the Complaint, except admits that during its ownership of the facilities, it manufactured chemical intermediates and certain fiber products and that the facilities processed chemicals.

27.     DuPont denies the allegations contained in Paragraph 27 of the Complaint, and refers to the Clean Air Act, the referenced regulations, and EPA determinations for the contents thereof.

28.     DuPont denies the allegations contained in Paragraph 28, except admits that it has an excellent environmental and safety record.

29.     DuPont denies the allegations contained in Paragraph 29 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

30.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.  DuPont incorporates by reference its responses to Paragraphs 27-29 of this Answer.

31.     DuPont denies the allegations contained in Paragraph 31 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

32.     DuPont denies the allegations contained in Paragraph 32 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

33.     DuPont denies the allegations contained in Paragraph 33 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

34.     DuPont denies the allegations contained in Paragraph 34 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

35.     DuPont denies the allegations contained in Paragraph 35 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

36.    DuPont denies the allegations contained in Paragraph 36 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

37.    DuPont denies the allegations contained in Paragraph 37 of the Complaint, and refers to the Purchase Agreement for the contents thereof.  Section 8.5(e) of the Purchase Agreement provides that DuPont "will have full authority to control, direct, manage and implement any Remediation and to determine its scope. . . . [and] shall have the full authority to conduct all negotiations, meetings and settlements with Governmental Authorities with respect to the DuPont Environmental Liabilities [enumerated in Section 8.5(b)]."

38.    DuPont denies the allegations contained in Paragraph 38 of the Complaint.

### Victoria, Texas

39.    DuPont denies the allegations contained in Paragraph 39 of the Complaint, except admits that the Victoria facility manufactured intermediates, including ADN, during DuPont ownership and that benzene-containing materials were generated by the ADN production process.

40.    DuPont denies the allegations contained in Paragraph 40 of the Complaint, except admits that the NSC was put into service in or about 2000.

41.    DuPont denies the allegations contained in Paragraph 41 of the Complaint, and refers to the January 2003 e-mail for the contents thereof, except admits that Michael Miller was a DuPont employee and had certain environmental compliance responsibilities at the Victoria facility, and that Paul Jann is an employee of DuPont.

42.    DuPont denies the allegations contained in Paragraph 42 of the Complaint, and refers to the February 10, 2003 e-mail for the contents thereof.

43.    DuPont denies the allegations contained in Paragraph 43 of the Complaint.

44.     DuPont denies the allegations contained in Paragraph 44 of the Complaint, except, upon information and belief, admits that the NSC was taken out of service post-Closing.

### Orange, Texas

45.     DuPont denies the allegations contained in Paragraph 45 of the Complaint, except admits that certain materials were directed to the Automatic Pressure Filter ("APF"), which removed water and compressed the material for disposal.

46.     DuPont denies the allegations contained in Paragraph 46 of the Complaint.

47.     DuPont denies the allegations contained in Paragraph 47 of the Complaint, and refers to the "meeting minutes" for the contents thereof, except admits that there was a backflash incident in 1992, and that, to avoid an unacceptable safety risk, DuPont thereafter disconnected the "vent pipe" from the fume abator.  DuPont then took specific engineering and related measures to redirect emissions from APF operations to the fume abator through a route other than the "vent pipe."

48.     DuPont denies the allegations contained in Paragraph 48 of the Complaint, and refers to the May 27, 2004 report for the contents thereof, except admits that Richard Harr was a DuPont employee and became an INVISTA employee post-Closing.

49.     DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of the Complaint, except, upon information and belief, admits that the APF was removed from service post-Closing.

50.     DuPont denies the allegations contained in Paragraph 50 of the Complaint.

51.     DuPont denies the allegations contained in Paragraph 51 of the Complaint, except, upon information and belief, admits that in June 2004, without any advance notice to DuPont, INVISTA voluntarily disclosed to EPA and TCEQ the alleged noncompliance of the NSC at Victoria, and again without advance notice to DuPont voluntarily sought protection

under both EPA's Audit Policy and the Texas Environmental Health, and Safety Audit Privilege Act.

52.    DuPont denies the allegations contained in Paragraph 52 of the Complaint, except admits that after INVISTA had already self-reported to the government regulators, INVISTA sent DuPont a letter on June 17, 2004, and refers to the June 17, 2004 letter for the contents thereof.

53.    DuPont denies the allegations contained in Paragraph 53 of the Complaint, except admits that after INVISTA had already self-reported alleged violations to EPA and TCEQ, INVISTA sent DuPont a letter on July 13, 2004, and refers to the July 13, 2004 letter for the contents thereof.

54.    DuPont denies the allegations contained in Paragraph 54 of the Complaint, and refers to the July 29, 2004 letter for the contents thereof.

55.    DuPont admits the allegations contained in Paragraph 55 of the Complaint, but denies any inference that it was required to respond.

56.    DuPont denies the allegations contained in Paragraph 56 of the Complaint, except, upon information and belief, admits that without sufficient advance notice to DuPont, INVISTA proposed to enter into and did enter into a Corporate Audit Agreement with EPA covering all U.S. facilities that INVISTA had acquired from DuPont, and refers to the Corporate Audit Agreement for the contents thereof.

57.    DuPont denies the allegations contained in Paragraph 57 of the Complaint, except admits that on August 18, 2004, INVISTA sent DuPont a letter informing it that INVISTA had already entered into the Corporate Audit Agreement and attached to that letter (1) a copy of the 50-plus-page corporate audit protocol it had already submitted to EPA, without advance notice to

DuPont, and (2) a letter dated August 12, 2004 from Robert A. Kaplan of the EPA, and refers to the referenced letters for the contents thereof.

58.    DuPont denies the allegations contained in Paragraph 58 of the Complaint, and refers to the August 18, 2004 letter and the Purchase Agreement for the contents thereof.  Section 8.5(e) provides that DuPont "will have full authority to control, direct, manage and implement any Remediation and to determine its scope. . . . [and] shall have the full authority to conduct all negotiations, meetings and settlements with Governmental Authorities with respect to the DuPont Environmental Liabilities [enumerated in 8.5(b)]."

59.    DuPont denies the allegations contained in Paragraph 59 of the Complaint.

60.    DuPont denies the allegations contained in Paragraph 60 of the Complaint, and refers to the Corporate Audit Agreement for the contents thereof.

61.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61 of the Complaint, except admits that copies of purported audit reports were sent to DuPont after they were purportedly sent to EPA, and refers to the audit reports for the contents thereof, but denies any inference that it was required to respond.

62.    DuPont denies the allegations contained in Paragraph 62 of the Complaint, and refers to the October 14, 2004 letter for the contents thereof.

63.    DuPont denies the allegations contained in Paragraph 63 of the Complaint.

64.    DuPont denies the allegations contained in Paragraph 64 of the Complaint, and refers to the audit reports for the contents thereof.

**Alleged Benzene Violations at Victoria, Texas**

65.  DuPont denies the allegations contained in Paragraph 65 of the Complaint.

66.  DuPont denies the allegations contained in Paragraph 66 of the Complaint, and refers to the TAB reports for the contents thereof.

67.  DuPont denies the allegations contained in Paragraph 67 of the Complaint, except admits that during its ownership certain piping systems carried organic vapors and other gases from process units and tanks to the "101 Diamine Flare."

68.  DuPont denies the allegations contained in Paragraph 68 of the Complaint, and refers to the Consent Decree for the contents thereof.

**Alleged PSD Violations at Victoria, Texas**

69.  DuPont denies the allegations contained in Paragraph 69 of the Complaint, except admits that it performed certain work on the ADN unit, the Nitric Acid plant and boilers at the Adipic Powerhouse ("APH") and Diamine Powerhouse ("DPH") and constructed a new biotreatment plant in the 1990s, but specifically denies INVISTA's characterization and description of these purported "projects."

70.  DuPont denies the allegations contained in Paragraph 70, except admits that it did not obtain PSD permits or install Best Available Control Technology under the PSD program for the purported "projects," because no such permits or controls were required.

71.  DuPont denies the allegations contained in Paragraph 71 of the Complaint, except admits that it submitted Title V operating permit applications for the APH and DPH boilers and cogeneration unit prior to the Closing Date, and refers to the Title V operating permit applications for the contents thereof.

72.    DuPont denies the allegations contained in Paragraph 72 of the Complaint, and refers to the Title V operating permit applications for the contents thereof.

73.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 of the Complaint, and refers to the cited Title V permits for the contents thereof, except admits that it received draft Title V permits from the Texas permitting authority prior to the Closing Date and, upon information and belief, that TCEQ issued Title V permits for the APH and DPH boilers and cogeneration unit on or about February 17, 2006.

74.    DuPont denies the allegations contained in Paragraph 74 of the Complaint, and refers to the Consent Decree for the contents thereof.

## Alleged OSHA and Other Violations at Victoria, Texas

75.    DuPont denies the allegations contained in Paragraph 75 of the Complaint, except admits that it conducted process hazard analyses ("PHAs") in 1999 and 2002, and refers to the PHAs for the contents thereof.

76.    DuPont denies the allegations contained in Paragraph 76 of the Complaint.

77.    DuPont denies the allegations contained in Paragraph 77 of the Complaint.

## Alleged Benzene Violations at Orange, Texas

78.    DuPont denies the allegations contained in Paragraph 78 of the Complaint, and refers to the TAB reports for the contents thereof.

79.    DuPont denies the allegations contained in Paragraph 79 of the Complaint.

80.    DuPont denies the allegations contained in Paragraph 80 of the Complaint, and refers to the Consent Decree for the contents thereof.

## Alleged OSHA and Other Violations at Orange, Texas

81.     DuPont denies the allegations contained in Paragraph 81 of the Complaint.

82.     The allegations contained in Paragraph 82 of the Complaint are conclusions of law to which no response is required; to the extent a response is required, the allegations are denied.

83.     DuPont denies the allegations contained in Paragraph 83 of the Complaint, except admits that it conducted a PHA in 1997, and refers to the PHA for the contents thereof.

84.     DuPont denies the allegations contained in Paragraph 84 of the Complaint, and refers to the safety reports for the contents thereof.

85.     DuPont denies the allegations contained in Paragraph 85 of the Complaint, and refers to the ProSE team recommendations for the contents thereof.

86.     DuPont denies the allegations contained in Paragraph 86 of the Complaint.

87.     The allegations contained in the first sentence of Paragraph 87 of the Complaint are conclusions of law to which no response is required; to the extent a response is required, the allegations are denied.   DuPont lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 87 of the Complaint.

88.     DuPont denies the allegations contained in Paragraph 88 of the Complaint, except admits that during DuPont ownership and operation of the facility, organic compounds would under certain circumstances be vented to the "HCN start-up flare."

## Alleged PSD Violations at Camden, South Carolina

89.     DuPont denies the allegations contained in Paragraph 89 of the Complaint, except admits that it performed work on, or installed, certain equipment at the Camden facility in the 1990s and early 2000s, and that it undertook a like-kind component replacement project on

Boiler No. 3, for which projected costs were approximately $1 million, but denies INVISTA's characterization and description thereof.

90.    DuPont denies the allegations contained in Paragraph 90 of the Complaint, except admits that the Camden facility was operated by DuPont subject to a Title V operating permit issued by the duly authorized permitting authority.

91.    DuPont denies the allegations contained in Paragraph 91 of the Complaint, and refers to the Title V operating permit for the contents thereof.

92.    DuPont denies the allegations contained in Paragraph 92 of the Complaint, and refers to the Consent Decree for the contents thereof.

### Alleged OSHA and Other Violations at Camden, South Carolina

93.    DuPont denies the allegations contained in Paragraph 93 of the Complaint.

### Alleged PSD/NNSR Violations at Seaford, Delaware

94.    DuPont denies the allegations contained in Paragraph 94 of the Complaint, except admits that in the early 2000s, it undertook a like-kind component replacement project on Boiler No. 1, having  projected costs of approximately $1.2 million, and that the Seaford facility is located in an area designated as "non-attainment" for ozone, but denies INVISTA's description and characterization thereof.

95.    DuPont denies the allegations contained in Paragraph 95 of the Complaint.

96.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 of the Complaint.

97.    DuPont denies the allegations contained in Paragraph 97 of the Complaint, and refers to the Title V operating permit for the contents thereof.

98.    DuPont denies the allegations contained in Paragraph 98 of the Complaint, and refers to the Consent Decree for the contents thereof.

**Alleged Clean Water Act Violation at Seaford, Delaware**

99.    DuPont denies the allegations contained in Paragraph 99 of the Complaint.

**Alleged PSD Violations at Chattanooga, Tennessee**

100.    DuPont denies the allegations contained in Paragraph 100 of the Complaint, except admits that it performed work on, and installed, certain equipment at the Chattanooga facility in the late 1990s, including a new "feedwater pump," but denies INVISTA's characterization and description thereof.

101.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101, except admits that the Chattanooga facility was operated by DuPont subject to a Title V operating permit issued by the duly authorized permitting authority.

102.    DuPont denies the allegations contained in Paragraph 102 of the Complaint, and refers to the Title V operating permit for the contents thereof.

103.    DuPont denies the allegations contained in Paragraph 103 of the Complaint, and refers to the Consent Decree for the contents thereof.

**Alleged Violations at Waynesboro, Virginia**

104.    DuPont denies the allegations contained in Paragraph 104 of the Complaint, except admits that it replaced the burners on Boiler No. 1 and Boiler No. 3, and lacks knowledge or information sufficient to form a belief as to the truth of the allegation that INVISTA is undertaking a project to upgrade the safety features of the boilers.

105.    DuPont denies the allegations contained in Paragraph 105 of the Complaint, and refers to the VPDES permit for the contents thereof.

106.    DuPont denies the allegations contained in Paragraph 106 of the Complaint, and refers to the VPDES permit for the contents thereof.

107.    DuPont denies the allegations contained in Paragraph 107 of the Complaint.

### Alleged Benzene Violations at LaPorte, Texas

108.    DuPont denies the allegations contained in Paragraph 108 of the Complaint.

### Alleged Other Environmental, Health and Safety Violations at LaPorte, Texas

109.    DuPont denies the allegations contained in Paragraph 109 of the Complaint, and refers to the purported Title V Deviation Report and compliance plan for the contents thereof.

110.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 of the Complaint.

### Alleged Violations at Maitland, Ontario

111.    DuPont denies the allegations contained in Paragraph 111 of the Complaint, except, upon information and belief, admits that a fire occurred at the Maitland, Canada facility in December 2004, eight months after INVISTA's acquisition of the facility from DuPont and that the TSSA issued an order to INVISTA in January 2005, and refers to the TSSA order for the contents thereof.

112.    DuPont denies the allegations contained in the first sentence of Paragraph 112. DuPont lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 112 of the Complaint.

113.    DuPont denies the allegations contained in Paragraph 113 of the Complaint.

114.    DuPont denies the allegations contained in Paragraph 114 of the Complaint.

### Alleged Violations at Kingston, Canada

115.    DuPont denies the allegations contained in Paragraph 115 of the Complaint, except admits that the referenced fire alarm system was approximately sixty years old and reports indicate that it had failed on more than one occasion.

116.    DuPont denies the allegations contained in Paragraph 116 of the Complaint.

## Alleged Violations of Environmental, Health and Safety Laws in United Kingdom

## Non-Boric Project at Wilton

117.    DuPont denies the allegations contained in Paragraph 117 of the Complaint, except admits that it acquired the Wilton facility in 1993 and that it did not complete the conversion of the KA plant to a non-boric manufacturing process prior to Closing. Any inference that such conversion was required by law is denied.   To the contrary, the DuPont Authorization permitted the boric-assisted process through Closing, and DuPont refers to the Authorization for the contents thereof.

118.    DuPont denies the allegations contained in Paragraph 118 of the Complaint, except admits that (a) in 1995, it sought permission from the EA to test alternative means of producing KA and (b) in 1998, it applied for a variation to its existing permit, which identified a non-boric option for the production of KA, and refers to the variation for the contents thereof. DuPont denies any inference that the variation obligated DuPont to convert the KA plant to a non-boric process.  To the contrary, the DuPont Authorization continued to permit DuPont to use the boric-assisted process through Closing.

119.    DuPont denies the allegations contained in Paragraph 119 of the Complaint, except admits that it did not complete the ongoing conversion from a boric to non-boric process prior to Closing.  DuPont denies any inference that such completion was required by law.  To the contrary, the DuPont Authorization continued to permit DuPont to use the boric-assisted process through Closing.

120.    DuPont denies the allegations contained in Paragraph 120 of the Complaint, except admits that it did not complete the ongoing conversion from a boric to non-boric process prior to Closing.  DuPont denies any inference that such completion was required by law.  To the

contrary, the DuPont Authorization continued to permit DuPont to use the boric-assisted process through Closing.

121.    DuPont denies the allegations contained in the first sentence of Paragraph 121 of the Complaint. DuPont lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 121 of the Complaint.

### Alleged Cyclohexane Claims at Wilton

122.    DuPont denies the allegations contained in Paragraph 122 of the Complaint, except admits that cyclohexane is a raw material used in the production of adipic acid, and, upon information and belief, that the referenced 1974 explosion occurred at the Nypro (UK) plant in Flixborough, UK, which was never owned or operated by DuPont.

123.    DuPont denies the allegations contained in Paragraph 123 of the Complaint, except admits that, prior to Closing and as part of its ongoing safety program, DuPont engineers and/or other personnel identified certain projects at the KA plant at the Wilton facility.

124.    DuPont denies the allegations contained in Paragraph 124 of the Complaint.

### Alleged Fire Claims at Wilton

125.    DuPont denies the allegations contained in Paragraph 125 of the Complaint, except admits that, prior to Closing, it identified certain potential projects related to fire protection at the Wilton facility.

126.    DuPont denies the allegations contained in Paragraph 126 of the Complaint.

### Alleged Additional Violations of Law at Wilton

127.    DuPont denies the allegations contained in Paragraph 127 of the Complaint, except admits that (a) it received an Enforcement Notice from the EA in May 2003, and refers to the Enforcement Notice for the contents thereof; (b) in response to the Enforcement Notice, it reviewed its secondary containment systems, conducted a PHA and wrote a letter to the EA on

December 22, 2003, and refers to the December 22, 2003 letter for the contents thereof; and (c) complied with the Enforcement Notice prior to Closing.

128.    DuPont denies the allegations contained in Paragraph 128 of the Complaint, except admits that the COGA unit was installed in the mid-1990s, that DuPont carried out a PHA in 2002, and that at certain times, DuPont ceased feeding the KAOG to the COGA, and that the EA recognized that DuPont had a permit that allowed the plant to operate in such manner through Closing.

129.    DuPont denies the allegations contained in Paragraph 129 of the Complaint, except admits that in 2002, it conducted a PHA, and refers to the PHA for the contents thereof.

130.    DuPont denies the allegations contained in Paragraph 130 of the Complaint.

131.    DuPont denies the allegations contained in Paragraph 131 of the Complaint. DuPont incorporates by reference its responses to Paragraphs 127-130 of this Answer.

**Alleged Violations at Gloucester and Maydown, United Kingdom**

132.    DuPont denies the allegations contained in Paragraph 132 of the Complaint, except, upon information and belief, admits that it received more than one complaint from local residents and that it commenced a project to install emissions control equipment.

133.    DuPont denies the allegations contained in the first sentence of Paragraph 133 of the Complaint, and refers to the facility's operating permit for the contents thereof. DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 133 of the Complaint.

**Alleged Violations at Dordrecht, Netherlands and Paulinia, Brazil**

134.    DuPont denies the allegations contained in Paragraph 134 of the Complaint.

135.    DuPont denies the allegations contained in Paragraph 135 of the Complaint.

**Alleged Continuing Notice to DuPont**

136.    DuPont denies the allegations contained in Paragraph 136 of the Complaint, except admits that INVISTA sent DuPont (a) a letter on June 17, 2004, (b) other letters purportedly notifying DuPont of indemnity claims and (c) copies of certain reports it purports to have provided to EPA.

137.    DuPont denies the allegations contained in Paragraph 137 of the Complaint, and refers to the April 11, 2005 letter for the contents thereof.

138.    DuPont denies the allegations contained in Paragraph 138 of the Complaint, except admits that it sent INVISTA a letter dated April 14, 2005, and refers to the April 14, 2005 letter for the contents thereof.

139.    DuPont denies the allegations contained in Paragraph 139 of the Complaint, except admits that (a) on April 19, 2005, Guy Johnson met with Tracey L. Mihelic of INVISTA and Laurie C. Sahatjian of INVISTA's parent company, (b) DuPont did not attend the meetings that allegedly occurred between INVISTA and EPA in April, July and November 2005, and (c) DuPont assembled a technical team.

140.    DuPont denies the allegations contained in Paragraph 140 of the Complaint, and refers to the November 1, 2005 letter for the contents thereof.

141.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 141 of the Complaint.

142.    DuPont denies the allegations contained in Paragraph 142 of the Complaint, except admits that (a) on December 14, 2005, DuPont sent INVISTA a letter, (b) on December 22, 2005, INVISTA sent DuPont a letter, (c) on January 30, 2006, DuPont sent INVISTA a

letter, and (d) on February 3, 2006, INVISTA sent DuPont a letter, and refers to the referenced letters for the contents thereof.

143.    DuPont denies the allegations contained in Paragraph 143 of the Complaint, except admits that on February 3, 2006 INVISTA sent DuPont a letter enclosing a copy of what purports to be its final audit report, and refers to the February 3, 2006 letter and its attachments for the contents thereof, and also admits that INVISTA informed DuPont that a meeting with EPA had been scheduled for April 5, 2007 and that DuPont agreed to and did meet with INVISTA before that meeting.

144.    DuPont denies the allegations contained in Paragraph 144 of the Complaint, except admits that on April 3, 2006 the parties and certain of their representatives met at the offices of the outside counsel of DuPont.

145.    DuPont denies the allegations contained in Paragraph 145 of the Complaint, except admits that (a) upon information and belief, INVISTA met with EPA on April 5, 2006; (b) there was a conference call on April 6, 2006; and (c) INVISTA sent DuPont letters dated December 22, 2005, February 3, 2006 and April 6, 2006, and refers to the referenced letters for the contents thereof.

146.    DuPont denies the allegations contained in Paragraph 146 of the Complaint, except admits that INVISTA provided DuPont certain documents and information after April 5, 2006.

147.    DuPont denies the allegations contained in Paragraph 147 of the Complaint, except, upon information and belief, admits that EPA sent INVISTA a letter on June 21, 2006, and refers to the June 21, 2006 letter for the contents thereof.

148.    DuPont admits that INVISTA's counsel sent to counsel for DuPont a letter on June 22, 2006, and refers to the June 22, 2006 letter for the contents thereof.

149.    DuPont denies the allegations contained in Paragraph 149 of the Complaint, except admits that its counsel sent INVISTA a letter on June 23, 2006, and refers to the June 23, 2006 letter for the contents thereof.

150.    DuPont denies the allegations contained in Paragraph 150 of the Complaint, except admits that a conference call took place on July 25, 2006, and that INVISTA sent DuPont a letter dated July 26, 2006, and refers to the July 26, 2006 letter for the contents thereof.

151.    DuPont denies the allegations contained in Paragraph 151 of the Complaint.

152.    DuPont denies the allegations contained in Paragraph 152 of the Complaint, except admits that INVISTA sent DuPont letters regarding other matters relating to the U.S. and foreign facilities it acquired from DuPont.

153.    DuPont denies the allegations contained in Paragraph 153 of the Complaint.

154.    DuPont denies the allegations contained in Paragraph 154 of the Complaint.

155.    DuPont denies the allegations contained in Paragraph 155 of the Complaint.

### Purported Consent Decree

156.    DuPont denies the allegations contained in Paragraph 156 of the Complaint, and refers to the Consent Decree for the contents thereof.

157.    DuPont denies the allegations contained in Paragraph 157 of the Complaint, and refers to the Consent Decree for the contents thereof.

158.    DuPont denies the allegations contained in Paragraph 158 of the Complaint, and refers to the Consent Decree for the contents thereof.

159.    DuPont denies the allegations contained in Paragraph 159 of the Complaint, and refers to the Consent Decree for the contents thereof.

### Alleged OSHA and Other Violations

160.    DuPont denies the allegations contained in Paragraph 160 of the Complaint.

161.    DuPont denies the allegations contained in Paragraph 161 of the Complaint.

162.    DuPont denies the allegations contained in Paragraph 162 of the Complaint.

163.    DuPont denies the allegations contained in Paragraph 163 of the Complaint, and simultaneously with the filing of this Answer, Additional Defenses and Counterclaims, DuPont has filed a Motion to Dismiss the following claims asserted by Plaintiffs: (a) Public Harm and Punitive Damages; (b) ITAM Receivable; and (c) Overend Technologies LLC.

### Alleged ITAM Receivable Claim

164.    Simultaneously with the filing of this Answer, Additional Defenses and Counterclaims, DuPont has filed a Motion to Dismiss INVISTA's claim relating to the ITAM Receivable, and therefore no response to the allegations contained in Paragraph 164 of the Complaint is presently necessary.

### Alleged Overend Technologies LLC Claim

165.    Simultaneously with the filing of this Answer, Additional Defenses and Counterclaims, DuPont has filed a Motion to Dismiss INVISTA's claim based on the Overend Technologies LLC claim, and therefore no response to the allegations contained in Paragraph 165 of the Complaint is presently necessary.

### Alleged DOJ Investigations of Antitrust Violations

166.    DuPont lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 166, except, upon information and belief, admits that (a) INVISTA engaged outside counsel to conduct an investigation into activities of the DTI business with regard to adipic acid and other products; (b) the San Francisco office of the United States Department of Justice conducted an investigation regarding adipic acid; (c) INVISTA

- 22 -

obtained immunity for INVISTA and its employees with regard to the adipic acid industry worldwide; and (d) INVISTA notified DuPont of DOJ's ongoing investigation relating to adipic acid prior to the receipt of a grand jury subpoena by DuPont.

167.    DuPont denies the allegations contained in Paragraph 167 of the Complaint, except admits that (a) it entered into a letter agreement with INVISTA, dated April 28, 2006 ("Letter Agreement"); (b) it paid INVISTA $1.9 million pursuant to the Letter Agreement; and (c) the parties reserved their rights with regard to additional costs incurred by INVISTA in connection with Investigation Matters, and refers to the Letter Agreement for the contents thereof.

168.    DuPont denies the allegations contained in Paragraph 168 of the Complaint.

169.    DuPont denies the allegations contained in Paragraph 169 of the Complaint, and refers to the Purchase Agreement for the contents thereof.

### Alleged Public Harm

170.    Simultaneously with the filing of this Answer, Additional Defenses and Counterclaims, DuPont has filed a Motion to Dismiss INVISTA's claim relating to allegations of Public Harm and Punitive Damages, and therefore, no response to the allegations contained in Paragraph 170 of the Complaint is presently necessary.

### COUNT I
### (Breach of Contract/Indemnification)

171.    DuPont incorporates by reference and restates its answer to Paragraphs 1-170 as if fully set forth herein.

172.    DuPont admits the allegations contained in Paragraph 172 of the Complaint.

173.    DuPont denies the allegations contained in Paragraph 173 of the Complaint.

174.    DuPont denies the allegations contained in Paragraph 174 of the Complaint.

175.    DuPont denies the allegations contained in Paragraph 175 of the Complaint.

176.    DuPont denies the allegations contained in Paragraph 176 of the Complaint.

177.    DuPont denies the allegations contained in Paragraph 177 of the Complaint.

178.    DuPont denies the allegations contained in Paragraph 178 of the Complaint.

179.    DuPont denies the allegations contained in Paragraph 179 of the Complaint.

180.    DuPont denies the allegations contained in Paragraph 180 of the Complaint.

181.    DuPont denies the allegations contained in Paragraph 181 of the Complaint.

## COUNT II
### (Declaratory Judgment)

182.    DuPont incorporates by reference and restates its answers to Paragraphs 1-181 as if fully set forth herein.

183.    DuPont denies the allegations contained in Paragraph 183 of the Complaint.

184.    DuPont denies the allegations contained in Paragraph 184 of the Complaint.

185.    DuPont denies the allegations contained in Paragraph 185 of the Complaint.

186.    DuPont denies the allegations contained in Paragraph 186 of the Complaint.

187.    DuPont denies the allegations contained in Paragraph 187 of the Complaint.

## COUNT III
### (Breach of Contract)

188.    DuPont incorporates by reference and restates its answers to Paragraphs 166 through 169 as if fully set forth herein.

189.    DuPont admits the allegations contained in Paragraph 189 of the Complaint.

190.    DuPont denies the allegations contained in Paragraph 190 of the Complaint.

191.    DuPont denies the allegations contained in Paragraph 191 of the Complaint, except admits that, in the April 28, 2006 letter agreement, DuPont agreed to reimburse INVISTA for the fees, costs, and expenses of outside counsel, subject to express conditions set forth in the

letter agreement, and DuPont refers to the letter agreement for the content of those conditions, which DuPont asserts were not satisfied.

192.    DuPont denies the allegations contained in Paragraph 192 of the Complaint.

193.    DuPont denies the allegations contained in Paragraph 193 of the Complaint.

## ADDITIONAL DEFENSES

For its Additional Defenses, DuPont incorporates herein by reference its Answer, Counterclaims and Motion to Dismiss, and further states as follows:

### General Defenses

1.    To the extent that the titles and headings inserted by INVISTA in the Complaint are intended to make claims or allegations against DuPont, they are denied.

2.    To the extent any of the allegations contained in the Complaint are not specifically responded to, DuPont denies such allegations.

3.    DuPont does not assume the burden of proof on these defenses unless required to do so by substantive law.

4.    INVISTA is not entitled to relief, in whole or in substantial part, because INVISTA fails to state a claim upon which relief can be granted.

5.    INVISTA is not entitled to relief, in whole or in substantial part, by application of the doctrines of laches, waiver, estoppel and/or unclean hands.

6.    INVISTA is not entitled to relief, in whole or in substantial part, by application of the doctrine of accord and satisfaction.

7.    INVISTA is not entitled to relief, in whole or in substantial part, because INVISTA released its right to assert these claims.

8.    INVISTA is not entitled to relief, in whole or in substantial part, because of the applicable statute of limitations.

**Contractual Defenses**

9.      INVISTA is not entitled to relief, in whole or in substantial part, pursuant to the

terms of the parties' Purchase Agreement, including but not limited to application of Sections

8.5(e) and 8.4(f) of the Purchase Agreement, and the Supplemental Agreement dated December

17, 2004.

10.     INVISTA is not entitled to relief, in whole or in substantial part, because DuPont

did not breach the Purchase Agreement.

**Section 8.5(e) Contractual Defenses**

11.     INVISTA is not entitled to relief, in whole or in substantial part, because the

alleged matters for which INVISTA seeks indemnity do not represent actual pre-Closing

violations of Environmental Law, as required by the Purchase Agreement and New York law.

12.     INVISTA is not entitled to relief, in whole or in substantial part, because it cannot

prove that each alleged violation exposed it to a threat of probable and imminent enforcement

action by government authorities, as required by the Purchase Agreement and New York law.

13.     INVISTA is not entitled to relief, in whole or in substantial part, because

INVISTA materially breached Section 8.5(e) by depriving DuPont of its right to full authority to

control, direct, manage and implement any Remediation and to determine its scope.

14.     INVISTA is not entitled to relief, in whole or in substantial part, because

INVISTA materially breached Section 8.5(e) by depriving DuPont of its right to full authority to

conduct all negotiations, meetings and settlements with Governmental Authorities.

15.     INVISTA is not entitled to relief, in whole or in substantial part, because

INVISTA failed, wholly or substantially, to satisfy the occurrence of a condition precedent to the

DuPont defense and indemnity obligations.  Specifically, INVISTA is not entitled to defense or

indemnity because, pursuant to Section 8.5(e) of the Purchase Agreement, the DuPont defense

and indemnity obligations are conditioned on its being provided with full authority to control the scope of any Remediation and any negotiations, meetings or settlements with Governmental Authorities.

16.    INVISTA is not entitled to relief, in whole or in substantial part, because it materially breached the implied covenant of good faith and fair dealing by purposefully and intentionally attempting to take unfair advantage of DuPont and depriving DuPont of its contractual rights.

17.    INVISTA is not entitled to relief, in whole or in substantial part, because it did not face an environmental claim and/or any sort of third-party adversarial action or claim.

18.    INVISTA's claims with respect to Remediation allegedly required under the terms of the Consent Decree are barred, in whole or in substantial part, because the Consent Decree is unreasonable in amount, was not negotiated in good faith, and is vitiated by the existence of strong defenses that INVISTA failed to assert.

### Section 8.4(a)(iii) Contractual Defenses

19.    INVISTA is not entitled to relief, in whole or in substantial part, because it cannot prove that DuPont materially breached any representations or warranties contained in the Purchase Agreement.

20.    INVISTA is not entitled to relief, in whole or in substantial part, because the representations and warranties under which INVISTA asserts its claims have expired.

21.    INVISTA is not entitled to relief, in whole or in substantial part, because it cannot prove that DuPont had actual Knowledge, as required by the Purchase Agreement, that the facilities sold to INVISTA were purportedly in noncompliance with Environmental Laws.

22.    INVISTA is not entitled to relief, in whole or in substantial part, because to the extent any noncompliance with law existed, which DuPont denies, such noncompliance did not constitute a Material Impairment.

23.    INVISTA is not entitled to relief, in whole or in substantial part, because it did not face an environmental claim and/or any sort of third-party adversarial action or claim.

24.    INVISTA is not entitled to relief, in whole or in substantial part, because to the extent INVISTA received any notice of a third-party claim within the meaning of Section 8.4(f), INVISTA materially breached Section 8.4(f) by failing to timely and sufficiently notify DuPont of such third-party claim.

25.    INVISTA is not entitled to relief, in whole or in substantial part, because INVISTA failed, wholly or substantially, to satisfy the occurrence of a condition precedent to the DuPont defense and indemnity obligations.  Specifically, INVISTA is not entitled to defense or indemnity because, pursuant to Section 8.4(f) of the Purchase Agreement, the DuPont defense and indemnity obligations are conditioned on its being provided with timely and sufficient notice of any third-party claim within the meaning of Section 8.4(f).

26.    INVISTA is not entitled to relief, in whole or in substantial part, because it materially breached the implied covenant of good faith and fair dealing by purposefully and intentionally attempting to take unfair advantage of DuPont and depriving DuPont of timely and sufficient notice.

27.    INVISTA's claims with respect to the Consent Decree and/or any other settlement are barred, in whole or in substantial part, to the extent that INVISTA failed or fails to seek or obtain from DuPont consent prior to entering into such settlement.

### Section 8.4(a)(ii) Contractual Defenses

28.      INVISTA is not entitled to relief, in whole or in substantial part, because its claims are not Retained Liabilities for which INVISTA is entitled to defense and/or indemnity.

### Defenses Related to Notice

29.      INVISTA is not entitled to relief, in whole or in substantial part, because of its failure to provide DuPont with sufficient notice for its claims, including, but not limited to: (a) failing to notify DuPont of any action, suit, proceeding, claim, demand or assessment which might give rise to a claim for Losses; (b) failing to timely or meaningfully notify DuPont of its claims; (c) failing to specify the nature of each claim to the extent known; (d) failing to set forth the specific facts and circumstances that are the basis of each claim in reasonable detail, and failing to specify the amount of "Losses" sought for such claim (either an actual amount or a reasonable good faith estimate); (e) failing to identify the specific provisions of the Agreement that allegedly were breached and that therefore give rise to a right of indemnity; and/or (f) for any and all additional reasons and grounds set forth in the correspondence from DuPont and/or its counsel to INVISTA and/or its counsel and set forth in the DuPont Counterclaims.

30.      INVISTA is not entitled to relief, in whole or in substantial part, because it did not timely or adequately notify DuPont of its claims and/or any third-party claims sufficient to trigger a duty to defend, and in doing so it actually and materially prejudiced DuPont.

31.      INVISTA is not entitled to relief, in whole or in substantial part, because none of the letters, documents or reports sent to DuPont were valid, timely or sufficient to trigger any obligations on behalf of DuPont.

### Defenses related to Losses, Causation and Mitigation

32.      INVISTA is not entitled to relief, in whole or in substantial part, because of its failure to mitigate its damages.

33.    INVISTA is not entitled to relief, in whole or in substantial part, insofar as it seeks consequential or other special damages that are unusual, unforeseeable and/or not the probable or expected result of the alleged indemnifiable acts.

34.    INVISTA is not entitled to relief, in whole or in substantial part, because its damages, alleged damages and/or purported losses are not directly and proximately caused by any actions of DuPont.

35.    If INVISTA has sustained any of the damages alleged in the Complaint, which DuPont denies, those damages occurred as a result of INVISTA's own acts, omissions, and/or factors outside DuPont control.  The Losses allegedly sustained by INVISTA, if any, were proximately caused by INVISTA's own free and voluntary acts.

36.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent any of its alleged Losses are Shared Liabilities, for which INVISTA is responsible for a portion thereof.

37.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent any matters are Sliding Scale matters, for which INVISTA is responsible for a portion thereof.

38.    INVISTA is not entitled to indemnity unless its Losses incurred by reason of each such breach exceed $400,000, in each case, individually, and without regard to aggregation.

39.    INVISTA is not entitled to indemnity unless and until its aggregate Losses arising out of purported breaches of representations and warranties exceed $50 million (the "Basket"), and to the extent they exceed $50 million, INVISTA is not entitled to indemnity for the first $50 million.

40.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent its Losses exceed $1,423,975,000 (the "Cap").

41.     INVISTA is not entitled to relief, in whole or in substantial part, to the extent that INVISTA has already gained such relief under another provision of the Purchase Agreement or to the extent that INVISTA already received a purchase price reduction or other consideration for its claims.

42.     INVISTA is not entitled to relief, in whole or in substantial part, by application of the doctrine of unjust enrichment.

43.     INVISTA is not entitled to relief, in whole or in substantial part, to the extent it is seeking indemnity for punitive damages against public policy.

### Other Contractual Defenses

44.     INVISTA is not entitled to relief, in whole or in substantial part, for any matters other than those expressly referenced in the Complaint.

45.     INVISTA is not entitled to relief, in whole or in substantial part, to the extent that the Purchase Agreement requires INVISTA's claims to be asserted exclusively under another provision of the Purchase Agreement, rather than the provision upon which INVISTA currently seeks relief.

46.     INVISTA is not entitled to relief, in whole or in substantial part, to the extent that INVISTA's claims are based on the allegation that DuPont failed to disclose certain matters during pre-Closing due diligence.

47.     To the extent that DuPont owed any contractual duties to INVISTA, any such contractual duties were properly discharged.

48.     DuPont does not have any defense, indemnity or hold-harmless obligations for the reasons set forth in the Answer, Additional Defenses, Counterclaims and Motion to Dismiss.

## Defenses to PSD/NNSR Claims

49.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because the activities identified in its Complaint did not trigger the statutory or regulatory applicability criteria set forth in the Clean Air Act ("CAA") and its associated regulations, including, but not limited to, requirements of the State Implementation Plans ("SIPs") for the States in which the DTI facilities are located.

50.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because some or all of the activities identified in its Complaint consisted of routine, maintenance, repair or replacement ("RMRR"). EPA's and the relevant SIP's PSD/NNSR requirements apply only to "major modifications" involving certain physical or operational method changes, and RMRR is specifically excluded from their scope. Therefore, the PSD and NNSR programs do not extend to activities which constitute RMRR.

51.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because some or all of the activities identified in its Complaint did not "result in" an increase in emissions. Some or all of the emissions increases alleged in the Complaint were attributable to independent factors unrelated to the purported change, including, but not limited to, the combustion of different fuel types or an increase or growth in demand.

52.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because the activities identified in its Complaint did not result in a "significant" net emissions increase of a regulated pollutant. None of the emissions increases that INVISTA alleges to have occurred were "significant" net emissions increases, and therefore, the PSD/NNSR programs were not triggered.

53.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because some or all of its determinations of purported violations are based on

an emissions analysis that ignores the "causal link" requirement mandated by the CAA and EPA and relevant SIP PSD/NNSR regulations, and is therefore contrary to law.

54.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because, for some or all of the activities identified in its Complaint, it uses periods that are not representative of normal operations in determining emissions prior to an alleged change to a particular unit, in contravention of EPA and relevant SIP PSD/NNSR regulations, which require that pre-project baseline emissions be representative of normal source operation.

55.    INVISTA is not entitled to relief, in whole or in substantial part, on its CAA claims because some or all of its allegations are predicated on EPA interpretations that are arbitrary, capricious, contrary to the CAA and associated regulations and not otherwise in accordance with law, and this had been so determined prior to Closing.

56.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because some or all of the plants, units and/or sources identified in its Complaint had received valid permits or other authorizations from clean air State or local permitting agencies authorizing construction and/or operation of those plants, units and/or sources, which agencies determined that certain activities identified in the Complaint were not subject to PSD/NNSR requirements and were in compliance with the CAA and relevant provisions of the applicable SIP.

57.    INVISTA is not entitled to relief, in whole or in substantial part, on its PSD/NNSR claims because for some or all of the "projects" identified in its Complaint, there were no modifications to emitting units.

58.     INVISTA is not entitled to relief, in whole or in substantial part, on its PSD claims because some or all of the units identified in the Complaint had achieved and complied with emissions limitations that represented BACT for one or more pollutants.

**Defenses to BWON Claims**

59.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because all BWON-regulated waste streams were properly controlled by DuPont as required.

60.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because some or all of the equipment that is the subject of these claims was exempt from some or all BWON requirements.

61.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because the equipment that is the subject of these claims complied with any applicable BWON treatment or other standards.

62.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because its purported corrective actions were unilaterally proposed to EPA, are not required under the BWON, are entirely voluntary in nature, and are unrelated to or far exceed what would be required to remediate any alleged violations.

63.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because some or all of the equipment that is the subject of these claims was not required for BWON compliance.

64.     INVISTA is not entitled to relief, in whole or in substantial part, on its BWON claims because it erroneously proposed measures to EPA and then belatedly concluded that these same measures were not required to comply with the BWON.

## Defenses to United States and Canadian OSHA Claims

65.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent that the allegations in the Complaint addressing health and safety projects or matters are barred by their isolated occurrence.

66.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent that the allegations in the Complaint addressing health and safety projects or matters are unenforceable due to vagueness.

67.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent that DuPont has been denied due process, by, and among other things, being alleged to have violated interpretations of Environmental Laws of which it was not given adequate notice

68.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent that INVISTA's alleged Losses arise out of unpreventable employee misconduct.

69.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent that, as the employer, DuPont lacked knowledge of the matter alleged.

70.    INVISTA is not entitled to relief, in whole or in substantial part because DuPont took all reasonable steps, exercised all due diligence and put in place such safety systems as were necessary.

## Defenses to Wilton, UK Claims

71.    INVISTA is not entitled to relief, in whole or in substantial part with respect to the Non-Boric Project, because the operative Authorization conditions permitted DuPont to continue using the boric-assisted process through Closing.

72.    INVISTA is not entitled to relief, in whole or in substantial part, because at all material times prior to Closing, DuPont used BATNEEC in accordance with the Environmental Protection Act 1990.

73.     INVISTA is not entitled to relief, in whole or in substantial  part, because pursuant to the statutory defense under the Control of Major Accident Hazards Regulations 1999 ("COMAH"), DuPont took all measures necessary to prevent major accident hazards and limit their consequences to persons and the environment in accordance with the principles of reducing risks as low as reasonably practicable ("ALARP").

74.     INVISTA is not entitled to relief, in whole or in substantial part, because pursuant to the statutory defense available under the Health and Safety at Work Act 1974 and associated Regulations, DuPont ensured, so far as was reasonably practicable, that the health, safety and welfare of its employees and those affected by its undertaking were protected.

75.     INVISTA is not entitled to relief, in whole or in substantial part, because DuPont conducted suitable and sufficient risk assessments and put in place preventative and protective measures to reduce risks to the lowest level reasonably practicable in accordance with its duty under the Management of Health and Safety at Work Regulations 1999 and the Manual Handling Operations Regulations 1992.

76.     INVISTA is not entitled to relief, in whole or in substantial part, because DuPont took all reasonable steps, exercised all due diligence and put in place such safety systems as were necessary to maintain the Wilton facility in an efficient state, efficient working order and good repair so as to prevent danger and protect persons from risks to their health and safety in accordance with its duty under the Pipelines Safety Regulations 1996, Pressure Systems Safety Regulations 2000 and the Workplace (Health, Safety and Welfare) Regulations 1992.

77.     INVISTA is not entitled to relief, in whole or in substantial part, because pursuant to the statutory defense available under the Fire Precautions (Workplace) Regulations 1997, DuPont took all reasonably practicable steps and exercised all due diligence to provide

appropriate fire fighting equipment which was subjected to a suitable system of maintenance, in an efficient state, efficient working order and good repair.

78.    INVISTA is not entitled to relief, in whole or in substantial part, with respect to its Wilton Claims because DuPont provided and maintained appropriate safety signage in accordance with its duty under the Health and Safety (Signs and Signals) Regulations 1996.

79.    INVISTA is not entitled to relief, in whole or in substantial part, with respect to its Wilton Claims because no enforcement action was taken in connection with the Wilton claims.

## Defenses to Gloucester, UK Claims

80.    INVISTA is not entitled to relief, in whole or in substantial part, because it cannot prove that there was a statutory nuisance under Part III of the Environmental Protection Act 1990 ("EPA 1990") or at common law, and no Abatement Notice was served.

81.    INVISTA is not entitled to relief, in whole or in substantial part, to the extent it could prove a statutory or common law nuisance, because DuPont would have been entitled to avail itself of the available statutory appeals process and/or statutory and common law defenses, which include the defense of Best Practical Means.

## Defenses to ITAM Receivable Claim

82.    INVISTA is not entitled to relief, in whole or in substantial part, because it failed to notify ITAM that it was the new owner of the Receivable and Receivable Securities.

83.    INVISTA is not entitled to relief, in whole or in substantial part, because DuPont used reasonable commercial efforts.

## Defenses to Antitrust/DOJ Claim

84.     INVISTA is not entitled to relief, in whole or in substantial part, because INVISTA has failed to comply with the terms of the April 29, 2006 Letter Agreement between INVISTA and DuPont.

85.     INVISTA is not entitled to relief, in whole or in substantial part, because its fees and expenses relating to the antitrust investigation, for which INVISTA seeks indemnity, are not reasonable.

86.     INVISTA is not entitled to relief, in whole or in substantial part, because its fees and expenses relating to the antitrust investigation, for which INVISTA seeks indemnity, do not constitute "Retained Liabilities," as that term is defined in the Purchase Agreement.

## RESERVATION AND NON-WAIVER

DuPont reserves any additional and further defenses as may be revealed during discovery or upon receipt of additional information.

## COUNTERCLAIMS OF DUPONT

Counterclaim Plaintiff, E.I. du Pont de Nemours and Company ("DuPont"), for its counterclaims against Counterclaim Defendants INVISTA B.V., INVISTA S.à r.l., INVISTA Textiles (U.K.), INVISTA (Nederland) B.V., INVISTA (Canada) COMPANY, INVISTA Brasil Indústria E Comércio de Fibras Ltda., INVISTA (International) S.à r.l., INVISTA NORTH AMERICA S.à r.l., and INVISTA TECHNOLOGIES S.à r.l. (collectively "INVISTA"), hereby alleges as follows:

I.     **INTRODUCTION**

1.     On November 16, 2003, E.I. du Pont de Nemours and Company ("DuPont") and KED Fiber Ltd. and KED Fiber, LLC (subsequently named "INVISTA"), entered into a Purchase Agreement (the "Purchase Agreement"), which effectuated the sale of the DuPont

Textiles and Interiors business ("DTI") on April 30, 2004 (the "Closing"). The Purchase Agreement was the product of lengthy, detailed, often contentious, arm's-length negotiations, in which both parties were represented by sophisticated deal counsel: Skadden, Arps, Slate, Meagher & Flom LLP for DuPont; and Latham & Watkins LLP for INVISTA.

2.        During negotiations, INVISTA, with the full cooperation and assistance of DuPont, conducted exhaustive due diligence regarding the facilities that were the subject of the Purchase Agreement. Thereafter, the parties carefully prepared a 1,000-plus-page agreement (inclusive of schedules), which contained extensively negotiated and comprehensive environmental indemnity provisions, which are key to this dispute.

3.        Pursuant to Section 8.5(b) of the Purchase Agreement, the primary provision for environmental indemnity, DuPont agreed to indemnify INVISTA for defined Losses[1] that were incurred by way of Remediation of actual pre-Closing violations of Environmental Law (the "DuPont Environmental Liabilities"). Further, any provable pre-Closing violations of Environmental Law must expose INVISTA to a threat of probable and imminent government enforcement action before they are indemnifiable by DuPont.

4.        DuPont obligations to INVISTA under Section 8.5(b) are expressly subject to "the terms and . . . conditions set forth in [the Purchase] Agreement." In particular, Section 8.5(e) requires INVISTA to provide DuPont with full authority to control the scope of all Remediation as well as any negotiations with regulatory authorities concerning any matters that might arguably be DuPont Environmental Liabilities (the "Section 8.5(e) Condition Precedent").

5.        Section 8.5(e) was carefully crafted and designed to ensure that DuPont, as a potential first-dollar indemnitor, would not only be aware of the full scope of any potential

---

[1]        Capitalized terms used herein have the same meaning as set forth in the Purchase Agreement, or, for terms not defined in the Purchase Agreement, the meaning set forth in this Counterclaim..

Remediation, but would also have the full authority to control, direct and manage such Remediation and any associated settlement discussions.

6.     Section 8.5(e) was intended to and does provide DuPont with its only meaningful control over the scope, appropriateness and cost of any indemnifiable environmental liability.

7.     DuPont also agreed to a second, general indemnity provision. Pursuant to Section 8.4(a) of the Purchase Agreement, DuPont agreed to indemnify INVISTA for defined Losses (a) constituting Retained Liabilities, or (b) arising from a breach of DuPont representations and warranties set forth in the Purchase Agreement.

8.     Like Section 8.5, Section 8.4 also provides DuPont with certain crucial protections as a potential indemnitor. Specifically, Section 8.4(f) provides, among other things, that if INVISTA receives from a third party notice of any action, suit, proceeding, claim, demand or assessment which might arguably give rise to a claim under Section 8.4, INVISTA must timely and sufficiently notify DuPont, so that DuPont may have the option to assume and conduct the defense as it deems appropriate (the "Section 8.4(f) Condition Precedent").

9.     Section 8.4 further provides that if INVISTA's failure to notify DuPont materially prejudices DuPont, it acts as a bar not only to defense, but also to indemnity.

10.     Despite INVISTA's promise to provide DuPont with timely and sufficient notice, as well as full authority to control the scope of all Remediation and any negotiations with regulatory authorities, approximately one month after Closing, in June 2004, INVISTA set into motion actions and conduct which led to an irreversible, material, prejudicial breach of Sections 8.5(e) and 8.4(f) of the Purchase Agreement.

11.     Without any sufficient advance notice to DuPont, and without any effort to meet its obligations under the Purchase Agreement, INVISTA:

a.  voluntarily self-disclosed to the Environmental Protection Agency ("EPA") and the Texas Commission on Environmental Quality ("TCEQ") alleged historic violations of Environmental Law under DuPont ownership;

b.  proposed to EPA to enter into and did enter into an agreement to conduct comprehensive, overreaching multimedia environmental audits of all U.S. facilities acquired from DuPont under almost every conceivable environmental law and/or regulation;

c.  hired auditors who, among other things, (i) collaterally attacked and second-guessed long-established and legitimate state permitting decisions issued during DuPont ownership of the facilities; and (ii) negligently and carelessly reconstructed DuPont historical permitting records in such a manner that resulted in patently erroneous findings that certain projects triggered the need for corrective actions; and

d.  submitted to EPA audit reports containing patently erroneous audit findings and purporting to document historic violations of law under DuPont ownership.

12.    For the audit reports submitted to EPA and referenced in Paragraph 11(d), INVISTA failed to provide copies to DuPont in advance of their submission.

13.    Those audits and their findings ultimately formed the basis of a draft consent decree between INVISTA, EPA, DOJ, and certain state and local environmental agencies, which was also negotiated without the consent of DuPont.

14.    INVISTA has alleged in its Complaint that this consent decree has been agreed to in principle and will be lodged in the Federal District Court in Delaware (the "Consent Decree"),

and, in the Complaint, it seeks indemnity for certain claims referenced therein (the "Consent Decree Claims"). (*See* Complaint ¶ 156.)

15.     The Consent Decree, which is a private agreement, is unlike a typical consent decree, which arises when the government acts in an enforcement capacity. The Consent Decree here and the process leading to it were <u>voluntarily</u> initiated by INVISTA in connection with its self-reporting of purported violations of Environmental Law that allegedly occurred during DuPont ownership of the relevant facilities. Accordingly, the negotiations leading up to the Consent Decree cannot be construed as a third-party notice of any action, suit, proceeding, claim, demand or assessment; however, to the extent that INVISTA received such notice, INVISTA failed to timely and sufficiently notify DuPont thereof, in breach of Section 8.4(f).

16.     INVISTA's notice failures were astonishing and egregious. Its deception and secret closed-door negotiations with EPA during the process leading to the Consent Decree deprived DuPont not only of its contractual entitlement to conduct all negotiations, meetings and settlements with EPA, but also of its right to control, direct, manage and implement any Remediation and to determine its scope.

17.     INVISTA's conduct was equally egregious with respect to the indemnity claims identified in the Complaint that are not part of the Consent Decree (the "Non-Consent Decree Claims"). INVISTA unilaterally undertook purported Remediation of the various claims long before it notified DuPont that it was doing so.

18.     Indeed, INVISTA alleged in its very claim letters that it had already spent millions of dollars purportedly remedying alleged violations about which it had never previously notified DuPont. It therefore foreclosed the DuPont contractual entitlement to undertake the

purported Remediation in the fashion it deemed appropriate, and by its actions, materially breached the Purchase Agreement.

19.     In its Complaint, INVISTA alleges that it is entitled to indemnity for Losses for more than 50 alleged violations of law, including both Consent Decree Claims and Non-Consent Decree Claims. As set forth in its Answer and Additional Defenses, DuPont denies that INVISTA is or ever was entitled to defense or indemnity because, among other reasons, INVISTA has not suffered any Losses that were incurred by way of Remediation of actual pre-Closing violations of Environmental Law.

20.     Notwithstanding whether INVISTA is entitled to indemnity, Section 8.4(b)(i) of the Purchase Agreement entitles DuPont to reimbursement for its own Losses arising from INVISTA's failure to "duly perform or observe any term, provision, covenant or agreement to be performed or observed by it pursuant to the [Purchase Agreement]."

21.     By the conduct summarized above and set forth in detail below, INVISTA breached and/or failed to perform "term[s], provision[s], covenant[s] or agreement[s]" set forth in the Purchase Agreement, and in particular Sections 8.5(e) and 8.4(f).

22.     Therefore, pursuant to Section 8.4(b)(i) of the Purchase Agreement, DuPont seeks reimbursement for the Losses it has sustained and continues to sustain as a result of INVISTA's breaches of the Purchase Agreement. These Losses include but are not limited to the attorneys' fees DuPont has incurred and continues to incur in investigating and defending this action, and in seeking to enforce its contractual rights.

23.     Sections 8.5(e) and 8.4(f) constitute not only promises by INVISTA – for breach of which DuPont is entitled to recover its Losses – but also conditions precedent to DuPont collateral indemnity and defense obligations. Because the scope and nature of the parties'

contractual rights and obligations is crucial to both the present litigation and any other present or future indemnity disputes, DuPont also seeks a declaration by this Court that the DuPont defense and indemnity obligations are conditioned on Sections 8.5(e) and 8.4(f) of the Purchase Agreement.

II.   **THE PARTIES**

24.   Counterclaim Plaintiff, DuPont, is a Delaware corporation with its principal place of business in Delaware.

25.   Counterclaim Defendant INVISTA, B.V. is a business entity organized under the laws of the Netherlands with its principal place of business in Kansas.

26.   Counterclaim Defendant INVISTA S.à.r.l. is a business entity organized under the laws of Luxembourg with its principal place of business in Kansas.

27.   Counterclaim Defendant INVISTA Textiles (U.K.) Limited is a business entity organized under the laws of the United Kingdom with its principal place of business in the United Kingdom.

28.   Counterclaim Defendant INVISTA (Nederland) B.V. is a business entity organized under the laws of the Netherlands with its principal place of business in the Netherlands.

29.   Counterclaim Defendant INVISTA (Canada) Company is a business entity organized under the laws of Canada with its principal place of business in Canada.

30.   Counterclaim Defendant INVISTA Brasil Indústria E Comércio de Fibras Ltda. is a business entity organized under the laws of Brazil with its principal place of business in Brazil.

31.   Counterclaim Defendant INVISTA (International) S.à.r.l. is a business entity organized under the laws of Switzerland with its principal place of business in Switzerland.

32.     Counterclaim Defendant INVISTA North America S.à.r.l. is a business entity organized under the laws of Luxembourg with its principal place of business in Kansas.

33.     Counterclaim Defendant INVISTA Technologies S.à.r.l. is a business entity organized under the laws of Luxembourg with its principal place of business in Switzerland.

34.     Counterclaim Defendants are together referred to as "INVISTA."

III.    **JURISDICTION, VENUE, AND AUTHORITY TO RENDER DECLARATORY JUDGMENT**

35.     This Court has supplemental jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1367(a), because it is so related to INVISTA's claims against DuPont in this litigation, over which this Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

36.     This Court has personal jurisdiction over INVISTA because INVISTA expressly consented to this Court's exercise of personal jurisdiction by express agreement pursuant to Section 9.11(a) of the Purchase Agreement, and by filing the Complaint in this Court.

37.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(a) and Section 9.11(a) of the contract at issue, which provides that venue rests exclusively in New York.

38.     This Court is vested with authority to render a declaratory judgment pursuant to 28 U.S.C. § 2201, which permits this Court in a case of actual controversy to declare the rights and other legal relations of any interested party. This Court is also vested with authority to award any further necessary or proper relief pursuant to 28 U.S.C. § 2202.

IV.     **FACTUAL BACKGROUND**

39.     Included in the sale consummated under the Purchase Agreement were former DuPont facilities that manufacture intermediates and fibers at the following locations, among others: Camden (South Carolina); Chattanooga (Tennessee); Seaford (Delaware); Victoria,

Orange and LaPorte (Texas); Waynesboro (Virginia); Maydown, Wilton and Gloucester (United

Kingdom); Maitland and Kingston (Ontario, Canada); Dordrecht (Netherlands); and Paulinia

(Brazil).

A.    **Section 8.5 of the Purchase Agreement**

40.    Section 8.5 of the Purchase Agreement defines each party's defense and

indemnity obligations with respect to environmental matters.  Regarding DuPont obligations to

defend and indemnify INVISTA, Section 8.5(b) provides, in pertinent part:

> On the terms and subject to the conditions set forth in this
> Agreement, DuPont agrees to indemnify, defend and hold harmless
> [INVISTA] from and against, and shall reimburse [INVISTA] with
> respect to, all Losses arising out of or related to, directly or
> indirectly, all Environmental Claims and requirements of
> Environmental Law . . . arising out of or related to the Claims set
> forth below (the "DuPont Environmental Liabilities"). . . .

(Emphasis added.)  INVISTA alleges that all of its non-commercial claims referenced herein are

DuPont Environmental Liabilities pursuant to Section 8.5(b) of the Purchase Agreement.  (*See*

Complaint ¶ 175.)

41.    As set forth in its Answer and Additional Defenses, DuPont denies that INVISTA

is or ever was entitled to defense or indemnity pursuant to Section 8.5(e) for any of the claims

INVISTA alleges are DuPont Environmental Liabilities.

42.    To the extent, however, that any of the claims at issue could arguably have been

considered, at the time of discovery, to be DuPont Environmental Liabilities, Section 8.5(e)

required INVISTA to give DuPont certain crucial control and authority rights.

43.    Section 8.5(e) provides that:

> [W]ith respect to DuPont Environmental Liabilities [enumerated in
> Section 8.5(b)] . . . , DuPont will have full authority to control,
> direct, manage and implement any Remediation and to determine
> its scope. . . .

> DuPont also shall have the <u>full authority to conduct all</u>
> <u>negotiations, meetings and settlements with Governmental</u>
> <u>Authorities</u> with respect to the DuPont Environmental Liabilities.

(Emphasis added.)

44.    Section 8.5(e) constitutes both a promise by INVISTA and a condition precedent to DuPont collateral defense and indemnity obligations.

45.    Section 8.5(e) does, and was intended to, ensure that, for any Remediation required to address arguable DuPont Environmental Liabilities:

   a.   INVISTA would notify DuPont, sufficiently in advance, of the full potential scope of any environmental issues;

   b.   DuPont would be entitled to determine whether environmental violations, in fact, existed;

   c.   DuPont would be entitled to determine the scope of any Remediation undertaken; and

   d.   DuPont would be entitled to fully control any and all negotiations with governmental authorities regarding the terms of any settlement or resolution.

46.    INVISTA materially breached Section 8.5(e) by depriving DuPont of its right (a) to have full authority to control, direct, manage and implement any Remediation and to determine its scope, and (b) to have full authority to conduct all negotiations, meetings and settlements with governmental authorities.

47.    By the same conduct, INVISTA failed to satisfy the Section 8.5(e) Condition Precedent, which prevents the triggering of DuPont defense and indemnity obligations.

48.    INVISTA's deprivation of DuPont rights was intentional and purposeful, and breached the implied covenant of good faith and fair dealing.

B.    **Section 8.4 of the Purchase Agreement**

49.    INVISTA also seeks indemnity pursuant to Section 8.4(a) of the Purchase

Agreement.

50.    Section 8.4(a) provides, in pertinent part:

> From and after the Closing, DuPont shall defend, indemnify and hold harmless [INVISTA] from and against any and all Losses arising from, in connection with or otherwise with respect to[:]
>
> (ii) any of the Retained Liabilities (whether arising prior to, on or after the Closing Date), [or]…
>
> (iii) . . . any breach or failure to be true of any representation or warranty of DuPont set forth in Article III of this Agreement. . . .

51.    As set forth in its Answer and Additional Defenses, DuPont denies that INVISTA

is or ever was entitled to defense or indemnity pursuant to Section 8.4(a) for the claims asserted

in the Complaint, because, among other reasons, none of INVISTA's indemnity claims are

Retained Liabilities within the definition of Section 8.4(a)(ii), and INVISTA has not suffered any

defined Losses arising out breaches of representations and warranties by DuPont.

52.    Regardless of whether INVISTA is entitled to indemnity under Section 8.4(a)(i),

Section 8.4(f) places certain affirmative notice obligations on INVISTA, which were intended to

and do provide DuPont with crucial protections.

53.    Section 8.4(f) provides, in pertinent part:

> Upon receipt by [INVISTA] from a third party of notice of any action, suit, proceeding, claim, demand or assessment against [INVISTA] which might give rise to a claim for Losses under this Section 8.4, [INVISTA] shall give written notice thereof to [DuPont] indicating the nature of such claim and the basis therefor; provided, however, that failure to give such notice shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually prejudiced as a result of such failure. The Indemnifying Party shall have the right . . . , at its option, to assume the defense of, at its own expense and by its

own counsel, any such matter involving the asserted liability of [INVISTA]. . . .

In the event [DuPont] does not assume control of the defense of any matter as provided above, [INVISTA] shall have the right to undertake the defense, compromise and settlement of such claim; provided, however, that <u>INVISTA] shall not settle any such claim without the written consent of [DuPont] (which consent will not be unreasonably withheld)</u>.

(Emphasis added.)

54.    Section 8.4(f) constitutes both a promise by INVISTA and a condition precedent to DuPont collateral defense and indemnity obligations.

55.    To the extent that INVISTA received any third-party notice described in Section 8.4(f), INVISTA materially breached Section 8.4(f) by failing to timely and/or sufficiently notify DuPont thereof.

56.    Further, INVISTA failed to satisfy the Section 8.4(f) Condition Precedent, which prevented the triggering of DuPont defense and indemnity obligations, and thereby relieved DuPont of any such obligations.

57.    Moreover, INVISTA's deprivation of DuPont rights was intentional and purposeful, and breached the implied covenant of good faith and fair dealing.

C.    <u>Section 8.4(b)(i) of the Purchase Agreement</u>

58.    Section 8.4(b)(i) of the Purchase Agreement requires INVISTA to indemnify and reimburse DuPont for "any and all Losses arising from, in connection with or otherwise with respect to . . . the failure of [INVISTA] to duly perform or observe any term, provision, covenant or agreement to be performed by it or observed by it . . . pursuant to [the Purchase Agreement]."

59.    "Losses" is defined in Section 1.1 of the Purchase Agreement to include "the costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense [of any and all Actions and demands,

assessments, judgments, settlements and compromises related thereto] or the enforcement of rights hereunder."

60.    By the conduct summarized above and set forth in detail below, INVISTA breached Sections 8.5(e) and 8.4(f) of the Purchase Agreement, as well as the implied covenant of good faith and fair dealing; therefore, pursuant to Section 8.4(b)(i), DuPont is entitled to its Losses arising from INVISTA's breaches.

V.    **INVISTA'S BREACHES CONCERNING THE CONSENT DECREE CLAIMS**

A.    **INVISTA's Voluntary Disclosures to EPA and TCEQ Without Notice to DuPont.**

61.    Approximately six weeks after Closing, on June 17, 2004, DuPont received a vague, seemingly innocuous and non-specific letter from INVISTA providing in its entirety that:

> I am writing to notify you of potential claims under the Purchase Agreement between E.I. du Pont de Nemours, KED Fiber Ltd. and KED Fiber, LLC dated November 16, 2003 (and subsequent amendments Nos. 1, 2 and 3) and other documents related thereto.
>
> The potential claims are related to the operation of the nitrile stripper column, benzene flasher and associated processes at the facility located at 2695 Old Bloomington Road, Victoria, Texas and compliance with air pollution and waste-related regulations.
>
> We currently are investigating these issues and will provide you with more detailed information once our investigation is complete. If you have any questions in the interim, please do not hesitate to contact me.

62.    The four-sentence letter identifying a "potential" claim provided no additional substantive information and did not seek any response from DuPont. INVISTA did not contact DuPont again regarding these issues for nearly one month.

63.    Throughout the course of the following month (and even prior to the June 17 letter), however, unbeknownst to DuPont, INVISTA was secretly and unilaterally engaging in a flood of activity with EPA Region VI and TCEQ.

64.     During June and July 2004, INVISTA was in constant communication with EPA and TCEQ regarding INVISTA's alleged discoveries of purported non-compliance at certain facilities acquired from DuPont.

65.     The following chronology of events (which represents only that activity and correspondence of which DuPont is presently aware) demonstrates that INVISTA acted deliberately, in an effort to keep DuPont in the dark:

a.  On June 3, 2004, INVISTA met with TCEQ regarding the nitrile stripper column and set up another meeting for later in the month of June.  DuPont was neither advised of nor given an opportunity to participate in this meeting.

b.  On June 7, 2004, INVISTA held a conference call with EPA Region VI regarding potential violations at the Victoria, Texas facility.  DuPont was neither advised of nor given an opportunity to participate in this conference call.

c.  Also on June 7, 2004, INVISTA filed a Notice of Intent to Audit with TCEQ pursuant to the Texas Environmental, Health, and Safety Audit Privilege Act (the "Texas Audit Act").  DuPont was neither advised of nor given an opportunity to review or comment on a draft of this notice.

d.  On June 8, 2004, INVISTA began an accelerated audit of the Victoria, Texas facility.  DuPont was neither advised of this decision, nor given an opportunity to comment on the scope of the accelerated audit, nor given an opportunity to participate in or control the audit.

e.  On June 14, 2004, INVISTA provided written notice to EPA Region VI regarding the alleged non-compliance issues at Victoria, Texas, and in which it disclaimed responsibility for the alleged violations as the new owner of the facility.  DuPont

was neither advised of nor given an opportunity to review or comment on a draft of this notice.

f.  On June 16, 2004, INVISTA met with TCEQ again.  DuPont was neither advised of nor given an opportunity to participate in this meeting.  At this point in time, INVISTA still had not sent to DuPont its first purported "notice" letter, dated June 17, 2004 and described above.

g.  On June 18, 2004, the day after its four-sentence June 17, 2004 letter to DuPont, INVISTA sent a letter to EPA Region VI, copying TCEQ, and requested additional meetings to discuss its "ongoing comprehensive review of compliance matters" at all Texas facilities acquired from DuPont.  Despite having sent DuPont the June 17 letter, DuPont was neither advised of this June 18 letter, nor given an opportunity to review or comment on a draft, nor given an opportunity to participate in (let alone fully control) the additional meetings that INVISTA was requesting of its own accord.

h.  On June 20, 2004, INVISTA met with EPA Region VI to discuss alleged violations of the Benzene Waste Operations NESHAP (the "BWON") at LaPorte, Texas.  DuPont was neither advised of nor given an opportunity to participate in this meeting.

i.  On June 25, 2004, INVISTA met with TCEQ to discuss various issues at the Orange, LaPorte, and Victoria, Texas facilities.  DuPont was neither advised of nor given an opportunity to participate in this meeting.

j.  On June 28, 2004, INVISTA sent a letter to EPA Region VI seeking coverage for all of its previous and ongoing disclosures under EPA's Incentives for Self-

Policing: Discovery, Disclosure, Correction and Prevention of Violations; Notice (the "Voluntary Audit Program"), and stating that INVISTA was "interested in reaching agreement with EPA regarding a methodological, focused compliance review at each Texas facility."  Again, INVISTA disclaimed responsibility for its reported "violations," advising that it had "only owned and operated [the facilities at issue] since April 30, 2004."  DuPont was neither advised of this correspondence, nor given an opportunity to review or comment on a draft of INVISTA's letter, nor given an opportunity to intervene in any way in the irreversible course of dealing that INVISTA launched with governmental authorities of its own accord and in material breach of its obligations under the Purchase Agreement.

k.   On June 29, 2004, INVISTA met with EPA Region VI and disclosed additional alleged Clean Air Act violations relating to the Victoria Cogeneration facility and the Orange filter press.  DuPont was neither advised of nor given an opportunity to participate in this meeting.

l.   On July 1, 2004, INVISTA commenced a third-party audit of the Seaford, Delaware facility to determine that facility's compliance with Title V of the Clean Air Act.  DuPont was neither advised of this audit nor given an opportunity to review and comment on its scope.

m.   On July 8, 2004, INVISTA commenced a third-party audit of the Kinston and Kentec, North Carolina facilities.  DuPont was neither advised of this audit nor given an opportunity to review and comment on its scope.

n.  On July 9, 2004, INVISTA sent two more letters to EPA Region VI disclosing alleged Clean Air Act non-compliance at LaPorte, Texas and the Victoria, Texas Cogeneration facility.  DuPont was neither advised of these disclosures nor given an opportunity to review or comment on drafts of this correspondence.

o.  On July 12, 2004, INVISTA wrote to EPA Region VI and disclosed potential violations of the Clean Air Act related to the operation of a filter press at the Orange facility.  DuPont was neither advised of this correspondence nor given an opportunity to review or comment on a draft of INVISTA's letter.

p.  On July 12, 2004, INVISTA commenced a third-party audit of the Victoria, Texas facility.  DuPont was neither advised of this audit nor given an opportunity to review and comment on its scope.

q.  On July 13, 2004, INVISTA wrote to TCEQ advising that INVISTA had already commenced a "comprehensive multi-media environmental audit" for all Texas facilities and had sought to have its disclosures pursuant to that audit covered under the Texas Audit Act.  INVISTA noted that it had already submitted Notices of Audit as required by the Act.  DuPont was neither advised of, nor given an opportunity to review or comment on, INVISTA's letter, the Notices of Audit previously submitted, or the scope of the audit.  DuPont certainly was not given the opportunity to fully control the mature dialogue with the federal and state governmental authorities that INVISTA had been having for more than six weeks.

r.  Also on July 13, 2004, INVISTA wrote to EPA Region VI proposing to "[enter] into a Letter Agreement with Region VI to conduct a multi-facility audit within that Region."  DuPont was neither advised of this letter, nor given an opportunity

to comment on (let alone fully control) the negotiations surrounding INVISTA's unilateral proposal.

66.     INVISTA did not provide DuPont with any of the above correspondence, and did not advise DuPont of the existence of the above discussions, until after the fact, and in many cases, not until months later.

67.     INVISTA's second letter to DuPont was dated July 13, 2004, when it advised DuPont generally that it had already disclosed to EPA and TCEQ several alleged violations.

68.     INVISTA deliberately and strategically determined not to inform DuPont of the extent to which it had been negotiating and meeting with EPA and TCEQ throughout the prior more than six weeks. Instead, INVISTA made a vague reference in its July 13, 2004 letter to its intention at the time to enter into a formal agreement, at some point in the future, to pursue additional auditing, possibly at other facilities. INVISTA provided no further information about its negotiations with regulators or the substantive scope or timing of any possible further auditing.

69.     As of July 13, 2004, DuPont had no reason to be wary of INVISTA's intentions and it could not have known that INVISTA was deliberately keeping it in the dark.

B.     **INVISTA's Unilateral Negotiation of the Operative Corporate Audit Agreement with EPA.**

70.     On July 28, 2004, INVISTA unilaterally proposed to EPA to enter into a national, all-inclusive, comprehensive, multi-media corporate-wide audit agreement addressing all U.S. facilities acquired from DuPont. INVISTA purported again to invoke the Voluntary Audit Program. DuPont was neither advised of this submission, nor given an opportunity to review or comment on the massive scope of the proposed audit agreement, nor provided any, let alone full, authority to control the negotiations surrounding INVISTA's unilateral proposal.

71.    INVISTA, not EPA, first proposed the sweeping scope of the audits it intended to conduct in connection with its proposal. Despite the fact that INVISTA's initial disclosures were primarily limited to discrete alleged violations of the BWON, INVISTA proposed an audit of all the former DuPont facilities under virtually every potentially applicable environmental statute and regulation including, but not limited to, "the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Toxic Substance Control Act and other environmental laws."

72.    By proposing the corporate audit agreement, and deliberately depriving DuPont of sufficient notice thereof (let alone a role in or authority to control the scope and negotiation of it), INVISTA unilaterally assumed the risk of voluntary self-disclosures of potential violations even though it faced no threat of probable and imminent government enforcement action.

73.    INVISTA attached to its proposal an extraordinarily detailed Audit Protocol that was more than 50 pages long. INVISTA did not provide a draft of its proposal or the Audit Protocol for DuPont review or comment in advance of submission to EPA. Indeed, DuPont did not even know of its existence.

74.    INVISTA's unilateral proposal was preceded by at least one meeting between INVISTA and EPA, on July 22, 2004, to discuss that proposal. Consistent with INVISTA's prior course of conduct, DuPont was neither advised of nor given an opportunity to participate in this meeting. INVISTA proceeded on its own, for its own strategic reasons, and in clear contravention of its obligations under the Purchase Agreement and DuPont rights to control the scope of such audits, potential Remediation and any and all negotiations with governmental authorities.

75.    INVISTA's deceptive conduct continued.  On July 29, 2004, the day after INVISTA submitted its proposal to EPA, INVISTA wrote two letters to DuPont.  Neither letter mentioned or attached INVISTA's proposal to EPA on the previous day.

76.    One of the July 29, 2004 letters contains significant and material omissions by INVISTA.  It misleadingly stated that "EPA has expressed interest in INVISTA entering into a formal corporate wide audit agreement under the Audit Policy" (emphasis added).  The letter deliberately omitted mention – let alone attachment for DuPont review – of the comprehensive Audit Protocol submitted by INVISTA to EPA one day prior.

77.    On August 5, 2004, INVISTA met with EPA to discuss INVISTA's comprehensive audit proposal.  Consistent with INVISTA's prior course of conduct, DuPont was neither advised of nor given an opportunity to participate in this meeting.

78.    On August 12, 2004, presumably delighted with INVISTA's unprecedented and, by definition, voluntary offer to engage in what was likely one of the largest audits ever proposed under the Voluntary Audit Program, EPA agreed to INVISTA's proposal (with minor modifications).

79.    Therefore, as of August 12, 2004, INVISTA had unilaterally and without DuPont knowledge fully negotiated an extensive Corporate Audit Agreement (the "Corporate Audit Agreement") which required comprehensive audits, disclosures, and eventually extensive purported Remediation of self-identified and self-disclosed alleged violations of Environmental Law at all former U.S. DuPont facilities nationwide, many of which INVISTA now claims constitute indemnifiable Losses under the Purchase Agreement.

80.    DuPont did not learn what had transpired until August 18, 2004, when INVISTA wrote to DuPont and, for the first time, enclosed the July 28, 2004 letter to EPA along with EPA's August 12, 2004 response and the Audit Protocol INVISTA had submitted to EPA.

81.    In this August 18, 2004 letter, INVISTA, also for the first time, disingenuously inquired whether DuPont: "[P]ursuant to Section 8.5(e) of the Purchase Agreement, [wishes] to discuss the corrective actions being taken."

C.    **INVISTA's Continued Material Breaches of the Purchase Agreement and Deprivation of Rights Thereunder.**

82.    INVISTA's deliberate, strategic decision to deprive DuPont of notice and ignore its contractual obligations under the Purchase Agreement (including its obligation to provide DuPont full authority and control, from the outset, over all arguably necessary Remediation and related negotiations with governmental authorities) continued after August 2004. For example, and without limitation, INVISTA selected and hired third-party auditors without notifying DuPont or allowing DuPont to participate in the selection process.

83.    INVISTA also submitted to EPA each quarterly audit report that it had agreed to submit under the Corporate Audit Agreement (containing hundreds of purported findings of alleged non-compliance by DuPont) without providing DuPont with an opportunity to comment, challenge or evaluate the audit reports prior to submission.

a.    The First Quarterly Audit Report was submitted to EPA on October 29, 2004. INVISTA did not send DuPont a copy until December 6, 2004.

b.    The Second Quarterly Audit Report was submitted to EPA on January 31, 2005. INVISTA did not send DuPont a copy until February 15, 2005.

c.    The Third Quarterly Audit Report was submitted to EPA on April 29, 2005. INVISTA did not send DuPont a copy until May 12, 2005.

    d.   The Fourth Quarterly Audit Report was submitted to EPA on July 29, 2005. INVISTA did not send DuPont a copy until August 12, 2005.

    e.   The Fifth Quarterly Audit Report was submitted to EPA on October 31, 2005. INVISTA did not send DuPont a copy until November 2, 2005.

    f.   The Final Audit Report was submitted to EPA on January 31, 2006.  INVISTA did not send DuPont a copy until February 3, 2006.

84.    The voluntary disclosures which INVISTA made pursuant to the Corporate Audit Agreement ultimately formed the basis of the Consent Decree to which INVISTA alleges it, EPA, and the Department of Justice have reached agreement in principle.  (*See* Complaint ¶ 5)

85.    Throughout this time period, DuPont repeatedly sought – although in vain – to assert any remaining rights under Section 8.5(e) of the Purchase Agreement.  DuPont reminded INVISTA on various occasions of its Section 8.5(e) rights and that it rejected, among other unilateral decisions, INVISTA's unilateral determination that there were violations of law under DuPont ownership of the facilities.

86.    INVISTA either ignored DuPont letters or rejected them outright.  Having already materially breached the Purchase Agreement and deliberately deprived DuPont of crucial indemnitor rights and protections that it had extracted at the bargaining table, INVISTA refused to honor DuPont efforts to invoke its contractual rights, extinguishing any opportunity for DuPont participation, let alone control.

87.    For example, on one occasion, in a letter dated May 12, 2005, INVISTA wrote that "[it did] not think it would be profitable to debate [DuPont] assertions . . . concerning DuPont's rights under the [Purchase Agreement] to participate in or control any Claims or the applicability of those rights to any particular indemnifiable matters, meetings, or discussions."

88.    Seeing that all hope for a meaningful role was lost, DuPont advised INVISTA in a letter dated June 23, 2006 that INVISTA was "negotiating with EPA over the expenditure of INVISTA's funds alone, and DuPont does not consent and has not consented to the settlement approach that INVISTA has taken with EPA or the settlement proposals INVISTA has made to EPA."

### D.    INVISTA's Unilateral Conduct Actually and Materially Prejudiced DuPont and Caused DuPont to Incur Indemnifiable Losses.

89.    As a result of INVISTA's conduct, as set forth in the above Paragraphs, DuPont was actually and materially prejudiced, and has incurred and continues to incur substantial indemnifiable Losses, including but not limited to the attorneys' fees DuPont has incurred in investigating and defending against the claims asserted by INVISTA in this litigation.

90.    INVISTA alleges that it has agreed in principle to install major new equipment and facility upgrades that INVISTA claims are necessary to purportedly remediate the alleged violations of Environmental Law that it voluntarily disclosed to EPA and identified in the Complaint.  (*See* Complaint ¶ 5.)

91.    INVISTA alleges that the corrective actions it will agree to undertake pursuant to the Consent Decree are estimated to cost between $300 and $450 million and will result in increased operating costs at the U.S. facilities estimated to be more than $200 million.  (*See* Complaint ¶ 6.)

92.    To the extent that INVISTA has already undertaken or has agreed (even in principle) to undertake these corrective actions, INVISTA materially breached the Purchase Agreement by depriving DuPont of its entitlement to full authority to control, direct, manage and implement any Remediation and to determine its scope.

93.     This deprivation had already occurred long before INVISTA and EPA began drafting the Consent Decree. Indeed, at a minimum, it had occurred by the time INVISTA and EPA entered into the Corporate Audit Agreement, on August 12, 2004, which established that liability for the full range of self-identified and self-reported alleged violations of law was a foregone conclusion.

94.     Indeed, even as late as in November 2007, DuPont wrote to INVISTA and urged INVISTA to advance arguments in defense of alleged Prevention of Significant Deterioration ("PSD") and Non-Attainment New Source Review ("NNSR") violations at the Victoria, Texas facility that never should have been disclosed as such to EPA. In that letter, dated November 21, 2007, DuPont explained that INVISTA's auditors had negligently reconstructed the permitting record in such a manner that they erroneously found that work triggered PSD requirements when it demonstrably did not.

95.     In a letter dated November 26, 2007, INVISTA refused to advance those defenses in its Consent Decree negotiations with EPA.

96.     By the conduct described above, INVISTA materially breached and failed to perform its obligations under the Purchase Agreement, including but not limited to Sections 8.5(e) and 8.4(f). By the same conduct, INVISTA also failed to satisfy the Section 8.5(e) and Section 8.4(f) Conditions Precedent to DuPont indemnity and defense obligations.

97.     In investigating and defending against INVISTA's Consent Decree Claims, and in seeking to enforce DuPont rights under the Purchase Agreement, DuPont has incurred and continues to incur substantial indemnifiable Losses in connection with this action, including but not limited to attorneys' and other professionals' fees.

VI.   **INVISTA'S BREACHES CONCERNING THE NON-CONSENT DECREE CLAIMS**

98.    INVISTA's conduct with respect to the Non-Consent Decree Claims was equally egregious and, for the reasons set forth in the below Paragraphs, constitutes material breaches of the Purchase Agreement and/or failures to satisfy Conditions Precedent to DuPont indemnity and defense obligations.

99.    For each and every one of INVISTA's Non-Consent Decree claims, prior to even notifying DuPont of its claims, INVISTA:

     a.   completed purported Remediation of the alleged violations of law, spending millions of dollars to do so;

     b.   substantially completed purported Remediation of the alleged violations of law, spending millions of dollars to do so;

     c.   self-reported self-identified alleged violations of law; and/or

     d.   at minimum, hired third-party auditors and contractors to unilaterally determine the scope of purported Remediation and commenced the implementation of the purported Remediation.

100.    In fact, for certain of the Non-Consent Decree claims, INVISTA undertook purported Remediation for many months, and in some cases more than one year, before even notifying DuPont of its claims.

101.    In doing so, INVISTA deprived DuPont of its right to exercise "full authority to control, direct, manage and implement any Remediation and to determine its scope," and deprived DuPont of timely and sufficient notice.

102.    Accordingly, DuPont was unable to participate in, let alone control, purported Remediation of these Non-Consent Decree Claims.  Nor was DuPont given any opportunity to

disabuse INVISTA of its mistaken belief that these projects were violations of law for which Remediation was required.

103.    In addition, to the extent INVISTA met or negotiated with governmental authorities regarding any of the Non-Consent Decree Claims prior to notifying DuPont, INVISTA deprived DuPont of its entitlement to full authority to control, direct, manage and implement any Remediation and to determine its scope and to control all negotiations with governmental authorities.

104.    By unilaterally deciding to undertake purported Remediation prior to even notifying DuPont, and by failing to timely and sufficiently notify DuPont, INVISTA materially breached its obligations under the Purchase Agreement and/or failed to satisfy the Section 8.5(e) and Section 8.4(f) Conditions Precedent to DuPont indemnity and defense obligations.

105.    The following, without limitation, represent INVISTA's material breaches with respect to the Non-Consent Decree Claims.

A.    **Alleged Violations at Victoria, Texas**

106.    On December 6, 2004, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the construction and reinforcement of buildings at the Victoria facility, alleging that purported Remediation was necessary to prevent risks identified in process hazard analyses ("PHA") conducted in 1999 and 2002. (*See* Complaint ¶ 75.)  In its pre-litigation indemnity claim letter, INVISTA advised DuPont that it had "already initiated construction of recommended upgrades" in the PHA studies.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

107.    On October 13, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the replacement of structural steel in the #2 Absorber Column at the Victoria facility. (*See* Complaint ¶ 76.)  INVISTA unilaterally undertook purported Remediation with respect to

this matter, and made substantial expenditures totaling hundreds of thousands of dollars before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

108.    On August 12, 2005, INVISTA wrote to DuPont alleging that it had suffered indemnifiable Losses in replacing an employee emergency notification system at Victoria.  (*See* Complaint ¶ 77.)  INVISTA unilaterally commenced and completed this project, spending in excess of $2 million in purported Remediation costs before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

B.    **Alleged Violations at Orange, Texas**

109.    On August 12, 2005, INVISTA wrote to DuPont alleging that it had suffered indemnifiable Losses because DuPont purportedly failed to implement a mechanical integrity program designed to detect corrosion under insulation ("CUI") at Orange.  (*See* Complaint ¶¶ 81- 82.)  INVISTA unilaterally undertook this purported Remediation, spending in excess of $1.3 million, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

110.    On August 31, 2005, INVISTA wrote to DuPont alleging that INVISTA had suffered indemnifiable Losses in eliminating the risk of steam contamination at Orange.  (*See* Complaint ¶ 83.)  INVISTA unilaterally commenced and substantially completed this purported Remediation, spending hundreds of thousands of dollars, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

111.    On October 18, 2005, INVISTA wrote to DuPont alleging that INVISTA had suffered indemnifiable Losses in connection with relocating personnel from Building 808 at Orange to another building.  (*See* Complaint ¶ 84.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

112.    On November 14, 2005, INVISTA wrote to DuPont alleging that INVISTA had suffered indemnifiable Losses in connection with various corrective actions allegedly recommended in a 1999 report.  (*See* Complaint ¶ 85.)  Upon information and belief, INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

113.    On March 7, 2007, nearly three years after Closing, INVISTA wrote to DuPont alleging that INVISTA had suffered indemnifiable Losses in connection with allegedly missing documentation dealing with Process Safety Information.  (*See* Complaint ¶¶ 86-87.)  Prior to notifying DuPont, INVISTA engaged third-party auditors and contracted with consultants purportedly to remediate the alleged documentation issue.  In its very claim letter, INVISTA advised that it previously closed out most of the audit findings.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

C.    **Alleged Violations at Camden, South Carolina**

114.    On October 13, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the upgrade of relief valves in connection with Dowtherm service at the Camden

facility. (*See* Complaint ¶ 93.)  INVISTA unilaterally commenced and completed this purported Remediation, spending hundreds of thousands of dollars, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

115.    On October 13, 2005, INVISTA notified DuPont by letter of a claim relating to a project to reduce purported fire risks in the BCF manufacturing building at Camden.  (*See* Complaint ¶ 93.)  INVISTA unilaterally commenced and substantially completed this purported Remediation, spending hundreds of thousands of dollars, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

D.    **Alleged Violations at Waynesboro, Virginia**

116.    On October 19, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to purported boiler-code non-compliance at the Waynesboro No. 1 and No. 3 boilers. (*See* Complaint ¶ 104.)  INVISTA unilaterally commenced purported Remediation of this matter and made substantial expenditures before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

117.    On October 19, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an upgrade of the Wastewater Treatment Plant at the Waynesboro facility. (*See* Complaint ¶ 105.)  INVISTA unilaterally commenced purported Remediation of this matter and spent hundreds of thousands of dollars before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

118.    On October 31, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to a sewer repair and the VPDES Permit for Outfall 011 at the Waynesboro facility.  (*See* Complaint ¶ 106.)  Without prior notice to DuPont and without giving DuPont any opportunity to participate, INVISTA hired a third-party consultant to inspect the Waynesboro sewers.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

E.    **Alleged Violations at LaPorte, Texas**

119.    On November 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an upgrade of the Higher Acetylenes (HA) Flare at the LaPorte facility.  (*See* Complaint ¶ 109.)  INVISTA unilaterally commenced purported Remediation of this matter and made substantial expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

120.    On October 14, 2004, INVISTA wrote to DuPont alleging indemnifiable Losses relating to purported deficiencies in waste management at the LaPorte facility in alleged violation of the Resource Conservation Recovery Act.  (*See* Complaint ¶ 110.)  INVISTA unilaterally conducted negotiations with governmental authorities regarding this matter, undertook comprehensive audits.  Upon information and belief, INVISTA also self-disclosed self-identified alleged violations and unilaterally commenced purported Remediation of this matter before notifying DuPont.  In doing so, INVISTA deprived DuPont of timely and sufficient notice, its entitlement to full authority and control over all Remediation, and its entitlement to control all government negotiations.

F.    **Alleged Violations at Maitland, Canada**

121.    On December 29, 2004, INVISTA wrote to DuPont alleging indemnifiable Losses relating to INVISTA's upgrade of the CUI program at the Maitland facility.  (*See* Complaint ¶¶ 111-12.)  INVISTA unilaterally engaged in discussions and negotiations with the government authorities regarding this matter before notifying DuPont that it was doing so, and agreed to undertake purported Remediation in connection with those negotiations.  In doing so, INVISTA deprived DuPont of timely and sufficient notice, its entitlement to full authority and control over all Remediation, and its entitlement to control all government negotiations.

122.    On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the interlock system at Maitland.  (*See* Complaint ¶ 113.)  INVISTA unilaterally undertook purported Remediation of this matter and spent hundreds of thousands of Canadian dollars prior to even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

123.    On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to upgrades at the Maitland facility that were purportedly required by the Ontario Fire Code.  (*See* Complaint ¶ 113.)  INVISTA unilaterally undertook and substantially completed this upgrade project, spending hundreds of thousands of Canadian dollars, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

124.    On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to its desire to upgrade containment at tanks in the building 214 and 216 areas of the Maitland facility.  (*See* Complaint ¶ 113.)  INVISTA unilaterally commenced purported Remediation of this matter and made substantial expenditures before even notifying DuPont of

its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

125. On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to alleged risk to personnel from potential releases of cyclohexane, hydrogen or ammonia, purportedly identified in a 2001 facility siting study. (*See* Complaint ¶ 113.) INVISTA unilaterally commenced purported Remediation of this matter and made substantial expenditures before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

126. On November 17, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to upgrading the Maitland facility's burner management systems. (*See* Complaint ¶ 113.) Before even notifying DuPont of its claim, INVISTA unilaterally hired third-party auditors, reported purported non-compliance to the governmental authority, commenced purported Remediation of this matter, and made substantial expenditures. In doing so, INVISTA deprived DuPont of timely and sufficient notice, its entitlement to full authority and control over all Remediation, and its entitlement to control all government negotiations.

127. On May 13, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to alleged contamination of areas around the Maitland facility's landfill. (*See* Complaint ¶ 113.) Before even notifying DuPont of its claim, INVISTA unilaterally conducted discussions with the regulatory authorities concerning purported Remediation of this matter. In doing so, INVISTA deprived DuPont of timely and sufficient notice, its entitlement to full authority and control over all Remediation, and its entitlement to control all government negotiations.

G.    **Alleged Violations at Kingston, Canada**

128.    On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to replacement of a fire alarm system at the Kingston facility.  (*See* Complaint ¶ 115.) INVISTA unilaterally undertook extensive purported Remediation, spending hundreds of thousands of Canadian dollars, before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

129.    On October 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to upgrades at the Kingston facility that were allegedly required by the Ontario Fire Code.  (*See* Complaint ¶ 116.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this upgrade project and made substantial expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

H.    **Alleged Violations at Wilton, United Kingdom**

130.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the conversion of the Wilton facility to a non-boric manufacturing process.  (*See* Complaint ¶¶ 117-20.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent in excess of $20 million British pounds prior to even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

131.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to precautionary measures to prevent the potential release of cyclohexane at the Wilton facility.  (*See* Complaint ¶¶ 122-24.)  INVISTA unilaterally undertook extensive purported Remediation of these measures and spent millions of British pounds before even notifying

DuPont of its claims. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

132. On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the fire protection, detection, and suppression systems at the Wilton facility. (*See* Complaint ¶¶ 125-26.) INVISTA unilaterally undertook extensive purported Remediation of this project and made substantial expenditures before even notifying DuPont of its claims. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

133. On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the containment of titanium dioxide at the Wilton facility. (*See* Complaint ¶ 127.) INVISTA unilaterally commenced purported Remediation of this matter and spent hundreds of thousands of British pounds before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

134. On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an allegedly defective common off-gas abatement unit at Wilton. (*See* Complaint at ¶ 128.) INVISTA unilaterally commenced purported Remediation of this matter and spent hundreds of thousands of British pounds before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

135. On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to various safety upgrades at the HMD plant synthesis area that were allegedly recommended in the 2002 Process Hazard Analysis. (*See* Complaint ¶ 129.) INVISTA

unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

136.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an upgrade of the KA sump. (*See* Complaint ¶ 130.) INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

137.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the KA plant's drainage system. (*See* Complaint ¶ 130.) INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

138.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an upgrade of the KA effluent transfer line. (*See* Complaint ¶ 130.) INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

139.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to its desire to eliminate manual handling operations at the Polymer plant.  (*See* Complaint ¶ 130.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

140.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to an upgrade of the services pipe bridge at the Wilton facility.  (*See* Complaint ¶ 130.) INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

141.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the replacement of the No. 7 Hydrogen compressor.  (*See* Complaint ¶ 130.) INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

142.    On October 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to replacement of the air blower catchpot at Wilton.  (*See* Complaint ¶ 130.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim.  In doing so,

INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

I.     **Alleged Violations at Gloucester and Maydown, United Kingdom**

143.    On October 13, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to the reduction of noise and odors allegedly emanating from the Gloucester facility. (*See* Complaint ¶ 132.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and spent hundreds of thousands of British pounds before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

144.    On November 18, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to a dimethylacetamide emissions study at the Maydown facility.  (*See* Complaint ¶ 133.)  Without prior notice to DuPont and without giving DuPont any opportunity to participate, INVISTA hired a third-party consultant and, on the consultant's recommendation, unilaterally undertook purported Remediation in connection with this project.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

J.     **Alleged Violations at Dordrecht, Netherlands and Paulinia, Brazil**

145.    On October 31, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to purported wastewater discharges at the Dordrecht facility.  (*See* Complaint ¶ 134.) INVISTA unilaterally undertook purported Remediation of this matter and spent hundreds of thousands of dollars before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

146.    On October 31, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to upgrades of the Dordrecht tank farm.  (*See* Complaint ¶ 134.)  INVISTA unilaterally undertook extensive purported Remediation in connection with this project and made substantial expenditures before even notifying DuPont of its claim. In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

147.    On November 14, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to upgrades at the Dordrecht facility that INVISTA claims were necessary to address health and safety risks to workers handling butylated hydroxytoluene.  (*See* Complaint ¶ 134.)  Upon information and belief, INVISTA unilaterally undertook purported Remediation of this matter and made expenditures before even notifying DuPont of its claim.  In doing so, INVISTA deprived DuPont of timely and sufficient notice and of its entitlement to full authority and control over all Remediation.

148.    On August 31, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to alleged tetrachloroethylene and groundwater contamination at the Paulinia facility. (*See* Complaint ¶ 135.)  INVISTA unilaterally undertook purported Remediation of this matter and made substantial expenditures before even notifying DuPont of its claim.  INVISTA also self-disclosed this matter to regulatory authorities without prior or contemporaneous notice to DuPont.  In doing so, INVISTA deprived DuPont of timely and sufficient notice, its entitlement to full authority and control over all Remediation, and its entitlement to control all government negotiations.

K.    **Overend and Kvaerner Allegations and Claims**

149.    On July 26, 2005, Overend Technologies, L.L.C. ("Overend") sued INVISTA in the United States District Court for the Eastern District of Wisconsin alleging violations of

Antitrust laws and patent laws and regulations. Nearly three months later, on October 24, 2005, INVISTA notified DuPont by letter of the Overend lawsuit and asserted that any Losses INVISTA incurred in connection with that lawsuit would be indemnifiable under the Purchase Agreement. (*See* Complaint ¶ 165.) On January 16, 2006, and on subsequent occasions, DuPont wrote to INVISTA denying that the any such Losses would be indemnifiable.

150.    On August 2, 2006, INVISTA notified DuPont by letter that INVISTA and Overend had settled their lawsuit in principle for a payment from INVISTA to Overend in the amount of $385,000. Neither in the August 2, 2006 letter, nor on any previous occasion, did INVISTA seek the consent of DuPont to INVISTA's settlement of the Overend lawsuit. DuPont never provided its written consent to that settlement, nor did DuPont unreasonably withhold such consent.

151.    On July 28, 2005, INVISTA wrote to DuPont alleging indemnifiable Losses relating to a contract dispute with Aker Kvaerner Engineering Services Limited ("Kvaerner"). (*See* Complaint ¶ 121.) After the Purchase Agreement was signed, but before Closing, INVISTA alleges that DuPont entered into a construction contract with Kvaerner for services related to the KA Non-Boric Project at the Wilton facility. According to INVISTA, Kvaerner claimed that it suffered damages due to the material breach of the contract by DuPont.

152.    INVISTA unilaterally secured counsel and commenced negotiations with Kvaerner, before properly notifying DuPont of its indemnity claim. On January 17, 2006, INVISTA notified DuPont by letter that it had settled the Kvaerner dispute in December of 2005 for €4,393,929. INVISTA never sought consent from DuPont to INVISTA's settlement of the Kvaerner dispute. DuPont never provided its written consent to that settlement, nor did DuPont unreasonably withhold such consent.

L.    **INVISTA's Notice Failures and Other Actions and Omissions Actually and Materially Prejudiced DuPont and Caused DuPont to Incur Indemnifiable Losses.**

153.    For every single one of INVISTA's Non-Consent Decree indemnity claims, INVISTA: (a) failed to timely and sufficiently notify DuPont; (b) deliberately and intentionally deprived DuPont of its clear contractual entitlement to full authority to control, direct, manage and implement any Remediation and to determine its scope; and/or (c) deliberately and intentionally deprived DuPont of its clear contractual entitlement to control all negotiations with governmental authorities.

154.    As a result of INVISTA's failure to provide timely notice of its Non-Consent Decree Claims, DuPont was unable to participate in, let alone control, purported Remediation of these claims.  Accordingly, DuPont had no control whatsoever over the cost or scope of Remediation and was actually and materially prejudiced thereby.

155.    By unilaterally deciding to undertake purported Remediation prior to even notifying DuPont, INVISTA materially breached and failed to perform its obligations under the Purchase Agreement, including but not limited to Sections 8.5(e) and 8.4(f).  By the same conduct, INVISTA also failed to satisfy the Section 8.4(f) and Section 8.5(e) Conditions Precedent to DuPont defense and indemnity obligations.

156.    In investigating and defending against INVISTA's Non-Consent Decree Claims, and in seeking to enforce DuPont rights under the Purchase Agreement, DuPont has incurred and continues to incur substantial indemnifiable Losses in connection with this action, including but not limited to attorneys' and other professionals' fees.

## FIRST COUNTERCLAIM

### (Reimbursement of Losses)

157.    DuPont re-alleges and incorporates by reference the allegations contained in Paragraphs 1-156 as if fully set forth herein.

158.    Section 8.4(b)(i) of the Purchase Agreement requires INVISTA to indemnify and reimburse DuPont for "any and all Losses arising from, in connection with or otherwise with respect to . . . the failure of [INVISTA] to duly perform or observe any term, provision, covenant or agreement to be performed by it or observed by it . . . pursuant to [the Purchase Agreement]."

159.    "Losses" is defined in Section 1.1 of the Purchase Agreement to include "the costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense [of any and all Actions and demands, assessments, judgments, settlements and compromises related thereto] or the enforcement of rights hereunder."

160.    The Purchase Agreement is a valid, legally enforceable contract.

161.    The Purchase Agreement contains an implied covenant of good faith and fair dealing which (a) prohibits either party from opportunistically taking unfair advantage of the other; and (b) prohibits either party from intentionally and purposely engaging in conduct that would interfere with the other party's right to receive the benefit of their bargain.

162.    DuPont has performed all of its duties and obligations under the Purchase Agreement.

163.    The actions and omissions described herein constitute multiple failures by INVISTA to duly perform or observe the terms, provisions, covenants and agreements that INVISTA was obligated to perform or observe under the Purchase Agreement.  Specifically,

INVISTA materially and without justification breached the following terms, provisions, covenants, and agreements:

    a.  INVISTA breached and/or failed to perform or observe Section 8.5(e) of the Purchase Agreement, to the extent any of the Consent Decree or Non-Consent Decree claims were arguably DuPont Environmental Liabilities, by repeatedly depriving DuPont of its "full authority to control, direct, manage and implement any Remediation and to determine its scope," and "to conduct all negotiations, meetings and settlements with Governmental Authorities."

    b.  INVISTA breached and/or failed to perform or observe Section 8.4(f) of the Purchase Agreement, to the extent that INVISTA received notice from a third party fitting the description in Section 8.4(f), by (i) failing to timely and/or sufficiently notify DuPont of such third-party claims; and/or (ii) settling such third-party claims without seeking or obtaining DuPont written consent to settlement, which consent was not unreasonably withheld.

    c.  INVISTA breached and/or failed to perform or observe the implied covenant of good faith and fair dealing by (i) attempting opportunistically to take unfair advantage of DuPont; and/or (ii) intentionally and purposely depriving DuPont of its "full authority to control, direct, manage and implement any Remediation and to determine its scope," and "to conduct all negotiations, meetings and settlements with Governmental Authorities."

164.    Arising from and in connection with INVISTA's breaches and failures to perform or observe the terms of the Purchase Agreement, and as a direct and proximate result thereof, DuPont has incurred and will continue to incur "Losses," including but not limited to

- 79 -

professionals' fees and expenses incurred in connection with the investigation and defense of this action and the enforcement of DuPont contractual rights.

165.    Pursuant to Section 8.4(b)(i) of the Purchase Agreement, DuPont is entitled to judgment in the amount of such Losses.

## SECOND COUNTERCLAIM

### (Declaratory Judgment)

166.    DuPont re-alleges and incorporates by reference the allegations contained in Paragraphs 1-165, as if fully set forth herein.

167.    An actual, ripe and justiciable controversy exists between DuPont and INVISTA concerning their rights, duties, and obligations, if any, under the Purchase Agreement.  In particular, the question whether Sections 8.5(e) and 8.4(f) create conditions precedent to DuPont indemnity and defense obligations, is sufficiently substantive, concrete, and immediate to be appropriate for judicial determination.

168.    INVISTA has already filed a Complaint against DuPont seeking an interpretation of the parties' respective obligations, and indemnity for the Consent Decree and Non-Consent Decree Claims.  Therefore, the parties are in need of a declaratory judgment stating their rights and obligations under the Purchase Agreement with respect to these Claims and any similar future claims.

169.    This declaratory judgment action is judicially economical because it seeks resolution of a critical issue in this litigation.  A declaration by this Court would also forestall potentially protracted litigation and provide relief from future uncertainty.

170.    DuPont is an interested party in this declaratory action.

171.    Section 8.5(e) of the Purchase Agreement creates a condition precedent to DuPont collateral defense, indemnity, and hold-harmless obligations under Section 8.5(b).  The Section

8.5(e) Condition Precedent requires that DuPont be given full authority over all Remediation of arguable DuPont Environmental Liabilities and all related government negotiations. Unless the Section 8.5(e) Condition Precedent has been met, DuPont has no obligations to INVISTA under Section 8.5(b).

172. Section 8.4(f) of the Purchase Agreement creates a condition precedent to DuPont collateral defense, indemnity, and hold-harmless obligations under Section 8.4(a). The Section 8.4(f) Condition Precedent requires that INVISTA timely and sufficiently notify DuPont of any notice from a third party fitting the description in Section 8.4(f). The Section 8.4(f) Condition Precedent also requires that INVISTA seek in good faith and obtain DuPont written consent to any settlement by INVISTA of a third-party claim for which INVISTA seeks indemnity. Unless the Section 8.4(f) Condition Precedent has been met, DuPont has no obligations to INVISTA under Section 8.4(a).

## PRAYER FOR RELIEF

WHEREFORE, having fully answered, DuPont prays that this Court:

A. Enter judgment in favor of DuPont on Plaintiffs' Complaint, and dismiss the Complaint with prejudice;

B. Enter judgment in favor of DuPont on its Counterclaims as follows:

1. Award DuPont its professionals' fees and other "Losses," as defined in Section 1.1 of the Purchase Agreement, incurred in connection with this action;

2. Enter a declaratory judgment that Section 8.5(e) of the Purchase Agreement creates a condition precedent to the defense, indemnity, and hold-harmless obligations of DuPont under Section 8.5(b); and that unless

DuPont has been given the opportunity to assert its control and authority

rights set forth in Section 8.5(e), DuPont has no collateral obligations

under Section 8.5(b); and

3.     Enter a declaratory judgment that Section 8.4(f) of the Purchase

Agreement creates a condition precedent to the defense, indemnity, and

hold-harmless obligations of DuPont under Section 8.4(a); and that unless

DuPont has been given adequate and timely notice and the chance to

approve any settlement, as set forth in Section 8.4(f), DuPont has no

collateral obligations under Section 8.4(a); and

C.     Award DuPont attorneys' fees, costs, and such other and further relief as the

Court deems appropriate.

DATED:      New York, New York
            May 16, 2008

                                        BOIES, SCHILLER & FLEXNER LLP

                                        David Boies (Bar No. DB-4399)
                                        dboies@bsfllp.com
                                        333 Main Street
                                        Armonk, NY 10504
                                        P: 914.749.8200

                                        Robert J. Dwyer (Bar No. RD-6457)
                                        rdwyer@bsfllp.com
                                        575 Lexington Avenue, 7th Floor
                                        New York, NY 10022
                                        P: 212.446.2300

                                        Amy J. Mauser *(Admitted Pro Hac Vice)*
                                        amauser@bsfllp.com
                                        5301 Wisconsin Avenue, N.W., Suite 800
                                        Washington, D.C. 20015
                                        P: 202.237.2727

                                        By:    _Robert J. Dwyer_

                                               Robert J. Dwyer

                                        MORGAN, LEWIS & BOCKIUS LLP

                                        Troy S. Brown *(Admitted Pro Hac Vice)*
                                        tsbrown@morganlewis.com
                                        Jeffrey N. Hurwitz *(Admitted Pro Hac Vice)*
                                        jhurwitz@morganlewis.com
                                        Margot Bloom (Bar No. MB-7455)
                                        margot.bloom@morganlewis.com
                                        Erica C. Blackledge *(Admitted Pro Hac Vice)*
                                        eblackledge@morganlewis.com
                                        1701 Market Street
                                        Philadelphia, PA 19103
                                        P: 215.963.5000
                                        P: 215.963.5001

                                        Attorneys for Defendant