UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x
                                                :
INVISTA B.V., et al.,                           :        08 CV 3063 (SHS)
                                                :
                        Plaintiffs,             :
                                                :
                                                :        AFFIDAVIT OF
            v.                                  :        ROBERT J. DWYER
                                                :        IN SUPPORT OF
                                                :        DEFENDANT'S MOTION
                                                :        TO DISMISS CERTAIN
E.I. DU PONT DE NEMOURS AND COMPANY,            :        ELEMENTS OF
                                                :        PLAINTIFFS'
                        Defendant.              :        COMPLAINT
_____x


STATE OF NEW YORK              )
                               )        ss:
COUNTY OF NEW YORK             )


        Robert J. Dwyer, being duly sworn, hereby deposes and says:

        1.      I am a member of Boies, Schiller & Flexner LLP, counsel for Defendant

E.I. du Pont de Nemours and Company ("DuPont), in the above-captioned action. I

am familiar with the proceedings in this case. I make this statement based on my

personal knowledge of the facts set forth herein and in support of Defendant's

Motion to Dismiss Certain Elements of Plaintiffs' Complaint.

        2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant

excerpts from the Purchase Agreement that effectuated the sale of the Textiles and

Interiors operations of DuPont to Plaintiffs (hereinafter, referred to as INVISTA").

        3.      Attached hereto as Exhibit 2 is a true and correct copy of Schedule

1(zz) to the Purchase Agreement between DuPont and INVISTA.

4.      Attached hereto as Exhibit 3 is a true and correct copy of an August 18, 2004 letter from INVISTA to DuPont, and the accompanying attachments. DuPont has numbered each page of this exhibit sequentially at the bottom center of each page, for ease of reference.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a Supplemental Agreement between DuPont and INVISTA, dated December 17, 2004.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a July 13, 2004 letter from INVISTA to DuPont.

_____

Robert J. Dwyer (RD-6457)

Sworn to before me on

May 16, 2008

_____

NOTARY PUBLIC

SUSAN REDDINGTON
Notary Public, State of New York
No. 31-4829932
Qualified in New York County
Commission Expires May 31, 2011

2

# EXHIBIT 1

EXECUTION COPY

---

PURCHASE AGREEMENT

by and among

E. I. DU PONT DE NEMOURS AND COMPANY,

THE OTHER SELLERS IDENTIFIED HEREIN,

KED FIBER LTD.

AND

KED FIBER, LLC

Dated as of November 16, 2003

---

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................... 2

Section 1.1    Definitions.................................................................................... 2

ARTICLE II THE PURCHASE AND SALE ................................................................. 63

Section 2.1    Purchase and Sale ......................................................................... 63
Section 2.2    Global Purchase Price .................................................................. 65
Section 2.3    The Closing .................................................................................. 65
Section 2.4    Pre-Closing Financial Deliveries .................................................. 68
Section 2.5    Post-Closing Purchase Price Adjustments .................................... 69
Section 2.6    Pension Funding Purchase Price Adjustment ............................... 73

ARTICLE III REPRESENTATIONS AND WARRANTIES OF DUPONT ................. 76

Section 3.1    Organization, Etc. ........................................................................ 76
Section 3.2    Authority Relative to this Agreement, Etc. ................................... 76
Section 3.3    Capitalization ............................................................................... 77
Section 3.4    Consents and Approvals; No Violations ........................................ 79
Section 3.5    Financial Statements; Liabilities .................................................. 80
Section 3.6    Absence of Certain Changes ........................................................ 83
Section 3.7    Compliance with Law; Permits ..................................................... 86
Section 3.8    Litigation ...................................................................................... 89
Section 3.9    Taxes ............................................................................................ 89
Section 3.10   Employee Benefit Plans; ERISA. ................................................. 93
Section 3.11   Environmental Matters ................................................................. 95
Section 3.12   Real Property ............................................................................... 96
Section 3.13   Intellectual Property .................................................................... 101
Section 3.14   Assets; Operation of the DTI Business ......................................... 102
Section 3.15   Labor Relations ............................................................................ 105
Section 3.16   Customers .................................................................................... 105
Section 3.17   Suppliers ...................................................................................... 105
Section 3.18   Material Contracts ........................................................................ 106
Section 3.19   Affiliate Transactions ................................................................... 108
Section 3.20   Territorial Restrictions .................................................................. 109
Section 3.21   Product Warranties ....................................................................... 109
Section 3.22   Disclosure of Guarantees and Letters of Credit ........................... 109
Section 3.23   Brokers and Finders ..................................................................... 109

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ................... 110

Section 4.1    Organization; Etc. ........................................................................ 110

437976.12A-New York Server 5A - MSW

Section 4.2    Authority Relative to this Agreement, Etc........................ 110
Section 4.3    Consents and Approvals; No Violations............................ 111
Section 4.4    Financing............................................................................ 112
Section 4.5    Securities Act..................................................................... 113
Section 4.6    Solvency............................................................................. 113
Section 4.7    Brokers and Finders .......................................................... 113

ARTICLE V COVENANTS ........................................................................ 113

Section 5.1     Conduct of Business ......................................................... 113
Section 5.2     Access to Information........................................................ 118
Section 5.3     Consents and Approvals ................................................... 119
Section 5.4     Further Assurances............................................................ 122
Section 5.5     Cash and Bank Accounts .................................................. 124
Section 5.6     Intercompany Accounts and Arrangements....................... 126
Section 5.7     Releases.............................................................................. 126
Section 5.8     Non-Assignment ............................................................... 127
Section 5.9     Noncompetition.................................................................. 131
Section 5.10    Related Agreements .......................................................... 141
Section 5.11    Provision of Corporate Records ....................................... 142
Section 5.12    Guarantees, Letters of Credit ........................................... 144
Section 5.13    Names ................................................................................ 146
Section 5.14    Post-Closing Cooperation ................................................ 155
Section 5.15    Pending Litigation............................................................. 156
Section 5.16    Employee Matters ............................................................ 157
Section 5.17    Post-Closing Access to Information .................................. 164
Section 5.18    Production of Witnesses and Individuals.......................... 166
Section 5.19    Retention of Records......................................................... 166
Section 5.20    Confidentiality .................................................................. 167
Section 5.21    Privileged Matters............................................................. 170
Section 5.22    Mail and Other Communications...................................... 172
Section 5.23    Compliance with WARN Act and Similar Statutes........... 172
Section 5.24    Shared Liabilities .............................................................. 173
Section 5.25    Shared Contracts. .............................................................. 174
Section 5.26    Responsibility for Subsidiaries ......................................... 177
Section 5.27    Obligations Regarding Joint Ventures .............................. 178
Section 5.28    Delivery of Financial Statements...................................... 189
Section 5.29    Local Asset Transfer Agreements..................................... 191
Section 5.30    Local Purchase Agreements.............................................. 192
Section 5.31    Obligations Regarding Delayed Companies, Etc............... 193
Section 5.32    Title Insurance .................................................................. 195
Section 5.33    Surveys.............................................................................. 196
Section 5.34    No Solicitation .................................................................. 197
Section 5.35    Financing; Cooperation..................................................... 198
Section 5.36    Notification of Certain Matters ......................................... 199
Section 5.37    Resignations; Transfer of Qualifying Shares .................... 199
Section 5.38    Auditor's Consent and Cooperation .................................. 199

ii

Section 5.39    Seller Expenses ........................................................................ 201
Section 5.40    Estoppel Certificates ................................................................ 201
Section 5.41    Schedule Updates ...................................................................... 201
Section 5.42    Certain Additional Matters ...................................................... 202

ARTICLE VI TAX MATTERS ............................................................................ 204

Section 6.1    Tax Indemnification ................................................................... 204
Section 6.2    Closing of Current Taxable Year, Etc. ...................................... 207
Section 6.3    Tax Returns ................................................................................. 208
Section 6.4    Contest Provisions ..................................................................... 208
Section 6.5    Transfer Taxes ............................................................................ 210
Section 6.6    Certain Post-Closing Settlement Payments and Post-Closing Actions... 211
Section 6.7    Wage Information Returns and Records ..................................... 213
Section 6.8    Mutual Cooperation .................................................................... 214
Section 6.9    Maintenance of Tax-Related Books and Records ....................... 215
Section 6.10    Miscellaneous ........................................................................... 215

ARTICLE VII CONDITIONS TO THE SALE ...................................................... 219

Section 7.1    Conditions to the Obligations of the Sellers to Effect the Sale .............. 219
Section 7.2    Conditions to the Obligations of Buyer to Effect the Sale ...................... 221

ARTICLE VIII TERMINATION AND ABANDONMENT; INDEMNIFICATION... 225

Section 8.1    Termination ................................................................................. 225
Section 8.2    Procedure and Effect of Termination .......................................... 226
Section 8.3    Survival of Representations, Warranties and Covenants ............ 227
Section 8.4    Indemnification ........................................................................... 228
Section 8.5    Environmental Matters ................................................................ 236
Section 8.6    Operational Environmental Requirements .................................. 243

ARTICLE IX MISCELLANEOUS ........................................................................ 243

Section 9.1    Amendment and Modifications ................................................... 243
Section 9.2    Extension; Waiver ...................................................................... 244
Section 9.3    Representations and Warranties; Etc. ......................................... 244
Section 9.4    Entire Agreement; Assignment ................................................... 245
Section 9.5    Representatives ........................................................................... 246
Section 9.6    Validity ....................................................................................... 246
Section 9.7    Notices ........................................................................................ 246
Section 9.8    Governing Law ........................................................................... 248
Section 9.9    Specific Performance ................................................................. 248
Section 9.10    Publicity .................................................................................... 248
Section 9.11    Jurisdiction; Forum, Etc. .......................................................... 249
Section 9.12    Descriptive Headings ............................................................... 250
Section 9.13    Counterparts .............................................................................. 250
Section 9.14    Expenses .................................................................................... 250

Section 9.15    Parties in Interest.................................................................... 250
Section 9.16    Interpretation.......................................................................... 250
Section 9.17    Schedules ................................................................................ 251

437976.12A-New York Server 5A - MSW

## SCHEDULES

| | |
|---|---|
| Schedule 1(a) | Adjusted Assets |
| Schedule 1(b) | Adjusted Liabilities |
| Schedule 1(c) | Certain DuPont Subsidiaries (Assumed Liabilities) |
| Schedule 1(d) | Assumed Liabilities |
| Schedule 1(e) | Baseline Environmental Conditions |
| Schedule 1(f)-A | Category A Properties |
| Schedule 1(f)-B | Category B Properties |
| Schedule 1(f)-C | Category C Properties |
| Schedule 1(g) | Closing Balance Sheet Principles |
| Schedule 1(h) | Consolidated Joint Ventures |
| Schedule 1(i) | CSC Contracts |
| Schedule 1(j) | Delayed Companies |
| Schedule 1(k) | Designated Joint Venture Interests |
| Schedule 1(l) | Equity Investments |
| Schedule 1(m) | DTI Assets |
| Schedule 1(n) | DTI Businesses |
| Schedule 1(o) | DuPont Leased Premises |
| Schedule 1(p) | DuPont Mark Contracts |
| Schedule 1(q) | DuPont Remediation Sites |
| Schedule 1(r) | DuPont Retained Sites |
| Schedule 1(s) | Financing Security Interests |
| Schedule 1(t) | Joint Venture Interest Agreed Amounts |
| Schedule 1(u) | Excluded Assets |
| Schedule 1(v) | Excluded Accounts Receivable |
| Schedule 1(w) | Excluded Businesses |
| Schedule 1(x) | Excluded Joint Venture Businesses |
| Schedule 1(y) | Global Asset Sellers |
| Schedule 1(z) | Global Company Sellers |
| Schedule 1(aa) | Global Joint Venture Sellers |
| Schedule 1(bb) | Identified Jurisdictions |
| Schedule 1(cc) | Individual Reference Joint Venture Indebtedness |
| Schedule 1(dd) | Joint Venture Provision Contracts |
| Schedule 1(ee) | Joint Venture Guarantees |
| Schedule 1(ff) | Persons with Knowledge |
| Schedule 1(gg) | Known Existing Contamination |
| Schedule 1(hh) | Known Existing Violations of Environmental Law |
| Schedule 1(ii) | LIFO Definition |
| Schedule 1(jj) | Local Asset Sellers |
| Schedule 1(kk) | Local Asset Transfer Agreements |
| Schedule 1(ll) | Additional Local Asset Transfer Agreements |
| Schedule 1(mm) | Intentionally Omitted |
| Schedule 1(nn) | Local Company Sellers |
| Schedule 1(oo) | Local Joint Venture Sellers |

| | |
|---|---|
| Schedule 1(pp) | Exceptions to Definition of Material Adverse Change Before the Date of this Agreement |
| Schedule 1(qq) | Material Properties |
| Schedule 1(rr) | Minority Owned Joint Ventures |
| Schedule 1(ss) | Non-Material Antitrust Approvals |
| Schedule 1(tt) | Permitted Encumbrances |
| Schedule 1(uu) | Objections to Title Work |
| Schedule 1(vv) | Pipelines |
| Schedule 1(ww) | Primary Joint Venture |
| Schedule 1(xx) | Related Agreements |
| Schedule 1(yy) | Retained DTI Actions |
| Schedule 1(zz) | Retained Liabilities |
| Schedule 1(aaa) | Selected Joint Venture Interests |
| Schedule 1(bbb) | Services Agreements |
| Schedule 1(ccc) | Shared Facilities |
| Schedule 1(ddd) | Qualified Shares |
| Schedule 1(eee) | Specified DTI Actions |
| Schedule 1(fff) | Supply Agreements |
| Schedule 1(ggg) | Transferred DuPont Mark Contracts |
| Schedule 1(hhh) | Transferred Intellectual Property Contracts |
| Schedule 2.1(a)(i) | Global Shares |
| Schedule 2.1(a)(iii) | Directly Transferred Global Joint Venture Interests |
| Schedule 2.3(b)(ix) | Amendments to Local Asset Transfer Agreements |
| Schedule 3.1 | Non-Delivered Organizational Documents |
| Schedule 3.3(a) | DTI Companies |
| Schedule 3.3(b)(i) | Joint Ventures |
| Schedule 3.3(b)(ii) | Outstanding Stock of Joint Ventures |
| Schedule 3.3(b)(iii) | Joint Venture Option Rights |
| Schedule 3.3(b)(iv) | Option Rights to Persons Owning Joint Ventures |
| Schedule 3.3(b)(v) | Persons with Rights to Acquire Joint Ventures |
| Schedule 3.3(b)(vi) | Notice of Joint Venture Capital Calls |
| Schedule 3.3(c) | Joint Venture Agreements |
| Schedule 3.3(d) | Rights to Acquire Assets and Interests |
| Schedule 3.4 | Violations and Required Consents |
| Schedule 3.5(a)(iii) | Preparation of Audited Financial Statements |
| Schedule 3.5(b)(iii) | Preparation of Unaudited Financial Statements |
| Schedule 3.5(c) | Disclosed Liabilities |
| Schedule 3.5(d) | Undeliverable Joint Venture Financial Information |
| Schedule 3.5(e)(i) | Indebtedness |
| Schedule 3.5(e)(ii) | Recourse Joint Venture Debt |
| Schedule 3.5(e)(iii) | Breaches of Joint Venture Debt |
| Schedule 3.5(e)(iv) | Assumed Notes |
| Schedule 3.6(a) | Changes After December 31, 2002 |
| Schedule 3.6(c) | Ordinary Course Exceptions |
| Schedule 3.6(d) | Capital Expenditures |
| Schedule 3.7(a) | Violations of Law |

437976.12A-New York Server 5A - MSW

| | |
|---|---|
| Schedule 3.7(b) | Internal Investigations |
| Schedule 3.7(c) | Certain Business Practices |
| Schedule 3.7(d)(i) | International Trade Law Violations |
| Schedule 3.7(d)(ii) | International Trade Law Investigations |
| Schedule 3.7(e) | Permits |
| Schedule 3.7(f)(i) | Ineffective Permits |
| Schedule 3.7(f)(ii) | Material Permits |
| Schedule 3.8(a) | Pending Litigation |
| Schedule 3.8(b) | Non-Disclosed Actions |
| Schedule 3.8(c) | Subsequent Actions |
| Schedule 3.8(d) | Injunctions, Etc. |
| Schedule 3.9(b) | Taxes |
| Schedule 3.9(c) | Taxes |
| Schedule 3.9(d) | Tax Filings |
| Schedule 3.9(i) | Tax Rulings/Notices |
| Schedule 3.9(n) | DTI Global Restructuring |
| Schedule 3.9(j) | Binding Agreements with Tax Authorities |
| Schedule 3.9(l) | Passive Foreign Investment Companies |
| Schedule 3.9(o) | Entity Classifications |
| Schedule 3.9(p) | Transfer Tax Exceptions |
| Schedule 3.9(q) | Tax Basis |
| Schedule 3.9(r) | Net Operating Losses |
| Schedule 3.9(v) | Reduced Tax Arrangements |
| Schedule 3.10(a) | ERISA Plans |
| Schedule 3.10(d) | Benefit Plan Noncompliance |
| Schedule 3.10(f) | Certain Post-Retirement Benefits |
| Schedule 3.10(h) | Pending or Threatened Claims |
| Schedule 3.10(j)-1 | Certain Foreign Benefit Plan Matters |
| Schedule 3.10(j)-2 | Material Foreign Benefit Plans |
| Schedule 3.11(a)(i) | Environmental Noncompliance |
| Schedule 3.11(a)(ii) | Material Environmental Permits |
| Schedule 3.11(b) | Environmental Claims |
| Schedule 3.11(c) | Environmental Releases |
| Schedule 3.11(d) | Environmental Remediation |
| Schedule 3.11(e) | Non-Delivered Assessments |
| Schedule 3.12(a) | Exceptions to Title |
| Schedule 3.12(b)(i) | DTI Acquired Real Property |
| Schedule 3.12(b)(ii) | DTI Leased Real Property |
| Schedule 3.12(b)(iii) | Third Party Landlord Leased Real Property and Leases |
| Schedule 3.12(b)(iv) | Third Party Tenant Leased Real Property and Leases |
| Schedule 3.12(c) | Improvements |
| Schedule 3.12(d) | Property Violations |
| Schedule 3.12(g) | Non-Conforming Improvements |
| Schedule 3.12(h) | Unpaid Taxes and Assessments |
| Schedule 3.12(i) | Government Property Actions |
| Schedule 3.12(j) | Utility Services |

437976.12A-New York Server 5A - MSW

| | |
|---|---|
| Schedule 3.12(o) | Rights of Way |
| Schedule 3.13(b) | Rights to Intellectual Property |
| Schedule 3.13(c) | Infringement of Intellectual Property by DuPont/DTI |
| Schedule 3.13(d) | Infringement of Intellectual Property by Third Parties |
| Schedule 3.13(e) | Required Grants of Licenses |
| Schedule 3.14(b)(i) | Sufficiency of DTI Assets |
| Schedule 3.14(b)(ii) | Provided Corporate Services |
| Schedule 3.14(b)(iii) | JV Provided Corporate Services |
| Schedule 3.14(c) | Condition of Equipment |
| Schedule 3.14(d) | Divested Businesses |
| Schedule 3.14(e) | Other Activities |
| Schedule 3.14(f) | Separation Completion Plan |
| Schedule 3.15(a) | Collective Bargaining Agreements |
| Schedule 3.15(b) | Labor Strikes and Work Stoppages |
| Schedule 3.15(c) | Unfair Labor Practices |
| Schedule 3.16 | Significant DTI Customers |
| Schedule 3.17 | Significant DTI Suppliers |
| Schedule 3.18(a) | Material Contracts |
| Schedule 3.18(b) | Material Shared Contracts |
| Schedule 3.18(c)(i) | Confidential Material Contracts |
| Schedule 3.18(c)(ii) | Non-Enforceable Material Contracts |
| Schedule 3.18(c)(iii) | Material Breaches |
| Schedule 3.18(c)(iv) | Other Party Breaches |
| Schedule 3.19 | Intercompany Agreements |
| Schedule 3.20 | Territorial Restrictions |
| Schedule 3.21 | Product Warranties |
| Schedule 3.22(a) | DuPont Guarantees |
| Schedule 3.22(b) | Letters of Credit |
| Schedule 4.3 | Consents and Approvals |
| Schedule 4.4(a) | Buyer Financing |
| Schedule 4.4(b) | Buyer Reorganization |
| Schedule 5.1 | Permitted Dispositions of Assets |
| Schedule 5.3 | Rights Under Supply Agreements |
| Schedule 5.5(c) | Bank Accounts |
| Schedule 5.6(a) | Surviving Intercompany Agreements |
| Schedule 5.9(h) | Permitted Joint Venture Operations |
| Schedule 5.13(c) | Names |
| Schedule 5.13(d)(ii) | Notice Letters |
| Schedule 5.13(e)(i) | Retained DTI Mark Contracts |
| Schedule 5.13(e)(ii) | Trademark Letters |
| Schedule 5.15 | Certain Actions that may be Settled Without Consent |
| Schedule 5.16(i) | Buyer Defined Benefit Plan |
| Schedule 5.16(q)(v) | Certain Pension Transfer Matters |
| Schedule 5.23(a) | Non-Shared Facility Terminated Employees |
| Schedule 5.23(b) | Shared Facility Terminated Employees |
| Schedule 5.25(c)(i) | Excluded Shared Contracts |

437976.12A-New York Server 5A - MSW

| | |
|---|---|
| Schedule 5.25(c)(ii) | Mirrored Shared Contracts |
| Schedule 5.27(h) | Joint Ventures (Nine Months Transfer) |
| Schedule 5.27(m) | Treatment of Unifi Assets |
| Schedule 5.31(d) | Delayed Company Agreed Amount |
| Schedule 5.34 | Permitted Solicitation |
| Schedule 5.35(b) | Foreign Jurisdictions for Opinions |
| Schedule 5.37 | Continuing Officers and Directors |
| Schedule 5.42(a) | Matter |
| Schedule 5.42(b) | Camtex Noncompete |
| Schedule 5.42(c) | Other Agreements |
| Schedule 5.42(d) | Buyer's Report |
| Schedule 5.42(g) | China Holdings |
| Schedule 5.42(k)(i) | Other Provisions |
| Schedule 5.42(k)(ii) | Other Provisions |
| Schedule 6.5 | Transfer Taxes |
| Schedule 6.6(d)(5) | Other Tax Elections |
| Schedule 6.6(e) | Restricted Distributions |
| Schedule 6.10(c) | Capitalization of Debt |
| Schedule 6.40(g) | Listed Property |
| Schedule 8.5(a)(i) | Buyer Remediation Sites |
| Schedule 8.5(b)(vii) | DuPont Environmental Retained Sites |
| Schedule 8.5(c)(i) | Corrective Action Plan |
| Schedule 8.5(c)(ii) | DuPont Remediation Sites to be Leased Premises |

## EXHIBITS

| | |
|---|---|
| Exhibit A | ADN Agreement |
| Exhibit B-1(a) | Form of Assignment of Third Party Tenant Leases |
| Exhibit B-1(b) | Form of Assignment of Third Party Landlord Leases |
| Exhibit B-2 | Form of Sublease |
| Exhibit B-3(a) | Form of DTI Ground Lease (Remediation Sites) |
| Exhibit B-3(b) | Form of DTI Ground Lease (Retained Sites) |
| Exhibit B-4 | Form of DTI Space Lease |
| Exhibit B-5 | Form of DuPont Ground Lease |
| Exhibit B-6 | Form of DuPont Space Lease |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Canada Asset Transfer Agreement |
| Exhibit E | Form of Contract Manufacturing Agreement |
| Exhibit F | Form of Copyright Agreement |
| Exhibit G | DuPont's Corporate Records & Information Guide, August 2003 Edition |
| Exhibit H | Forms of Local Asset Transfer Agreements |
| Exhibit I | Forms of Local Purchase Agreement |
| Exhibit J | Form of Novation Agreement |
| Exhibit K | Form of Patent and Technical Information Agreement |
| Exhibit L | Form of PITA Agreement |
| Exhibit M | Forms of Supply Agreements |
| Exhibit N | Forms of Trademark Agreements |
| Exhibit O | Form of Instrument of Assumption |
| Exhibit 7.1(g) | Form of Opinion of Counsel to Buyer |
| Exhibit 7.2(h)(i) | Form of Opinion of Counsel to DuPont |
| Exhibit 7.2(h)(ii) | Form of Opinion of In-House Counsel to DuPont |

## PURCHASE AGREEMENT

PURCHASE AGREEMENT (this "Agreement"), dated as of November 16, 2003, by and among E. I. du Pont de Nemours and Company, a Delaware corporation ("DuPont"), the other Global Sellers (defined herein) and KED Fiber Ltd., a Cayman Islands exempted limited company ("Buyer 1"), and KED Fiber, LLC, a Delaware limited liability company ("Buyer 2"). Except as otherwise indicated, capitalized terms used herein shall have the meanings set forth in Article I.

WHEREAS, in addition to its other businesses, DuPont is engaged directly and through certain of its Subsidiaries, divisions and joint ventures in the DTI Business;

WHEREAS, as a result of certain transactions heretofore consummated, the DTI Companies and the Asset Sellers hold the DTI Assets and are liable for the Assumed Liabilities;

WHEREAS, the parties hereto desire that the Asset Sellers sell, convey, assign, transfer, deliver and, as provided herein, license, sublicense, lease or sublease, to Buyer or one or more of the Buyer Subs, and that Buyer or one or more of the Buyer Subs purchase, acquire, accept and, as provided herein, license, sublicense, lease or sublease, from the Asset Sellers, all right, title and interest of the Asset Sellers in and to the Transferred DTI Assets, in the manner and subject to the terms and conditions set forth herein and in the Local Purchase Agreements, as applicable;

WHEREAS, the parties hereto desire that the Company Sellers sell, assign, transfer, convey and deliver to Buyer or one or more of the Buyer Subs, and that Buyer or one or more of the Buyer Subs purchase and acquire from the Company Sellers, all right, title and interest of the Company Sellers in and to the Shares, in the manner and subject to the terms and conditions set forth herein and in the Local Purchase Agreements, as applicable;

WHEREAS, the parties hereto desire that the Joint Venture Sellers sell, assign, transfer, convey and deliver to Buyer or one or more of the Buyer Subs, and that Buyer or one or more of the Buyer Subs purchase from the Joint Venture Sellers, all right, title and interest of the Joint Venture Sellers in and to the Joint Venture Interests, in the manner and subject to the terms and conditions set forth herein and in the Local Purchase Agreements, as applicable;

WHEREAS, the parties hereto desire that the Buyer or one or more of the Buyer Subs assume each of the Assumed Liabilities (other than the Assumed Liabilities to the extent they are Liabilities of the DTI Companies) in the manner and subject to the terms and conditions set forth herein and in the Local Purchase Agreements, as applicable;

WHEREAS, concurrently with the execution of this Agreement, Parent and DuPont are entering into an agreement (the "Parent Side Agreement") pursuant to which Parent will indemnify DuPont for certain liabilities under the Joint Venture Guarantees, agree to cooperate with respect to the novation of the Joint Venture Guarantees and assure performance by Buyer of certain of its obligations under this Agreement;

WHEREAS, certain Subsidiaries of DuPont, on the one hand, and certain Subsidiaries of Buyer, on the other hand, have executed, or immediately prior to the Closing will execute, Local Purchase Agreements; and

WHEREAS, at, prior to or, in the case of the Contract Manufacturing Agreement, immediately following the Closing, DuPont and Buyer (or their respective Subsidiaries, as applicable) shall enter into the Related Agreements;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  The terms defined in this Article I, whenever used herein, shall have the following meanings for all purposes of this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"2003 Audited Financial Statements" shall have the meaning set forth in Section 5.28(c).

"Action" shall mean any demand, action, claim, suit, countersuit, arbitration, inquiry, subpoena, discovery request, proceeding or investigation by or before any court or grand jury, any Governmental Authority or any arbitration or mediation tribunal.

"Actual Losses" shall mean (a) defense costs (including costs of attorneys', accountants', consultants', and other professionals' fees and expenses), (b) judgments and assessments, (c) Losses, (d) costs (including investigatory costs, cleanup and remedial costs, governmental response costs, monitoring costs and costs of other imposed obligations), and (e) penalties, as well as costs of enforcement of rights hereunder (including costs of attorneys', accountants', consultants', and other professionals' fees and expenses); provided, however, that, with respect to Designated Matters only, Actual Losses shall not include Losses arising from an Action to the extent (i) resulting from negligent or wrongful acts by any Buyer Indemnified Party after the Closing Date, (ii) which negligent or wrongful acts constituted either (x) a change or deviation (other than

2

as required by Law) from the practices of the DTI Business at the Closing Date or (y) a deviation (other than as required by Law) from the practices of the DTI Business at the time such act occurred and (iii) such change or deviation from practice was the basis of the finding of the negligence or wrongful act that resulted in such Actual Losses; provided, that with respect to Designated Matters only, if the Actual Losses arise out of a settlement or compromise that does not contain an express finding of negligence or wrongful act by any Buyer Indemnified Party, then the determination of negligence or wrongful act shall be resolved by the parties in accordance with item (1) of Schedule 1(zz).

"Adjusted Assets" shall mean all DTI Assets of the type set forth on Schedule 1(a), determined in accordance with the Closing Balance Sheet Principles; provided, that Adjusted Assets shall not in any event include (i) Excluded Assets, (ii) Assets relating to Income Taxes or Transfer Taxes, (iii) Assets to be provided under the Related Agreements to the extent relating to post-Closing periods, (iv) Assets constituting LIFO reserves, (v) Assets which are included in the calculation of the purchase price adjustment set forth in Section 2.6, (vi) subject to Section 5.5(c), any Excess Cash, or (vii) receivables of a type described in Section 5.42(l).

"Adjusted Liabilities" shall mean all Assumed Liabilities of the type set forth on Schedule 1(b), determined in accordance with the Closing Balance Sheet Principles; provided, that Adjusted Liabilities shall not in any event include (i) Retained Liabilities, (ii) accruals for Liabilities under the Related Agreements to the extent relating to post-Closing periods, (iii) Liabilities for current Income Taxes or Transfer Taxes, (iv) Liabilities which are included in the calculation of Consolidated Indebtedness or Nonconsolidated Indebtedness (or would have been included in such calculation but for the provisions of Section 5.42(l)), or any guarantees thereof, or (v) Liabilities which are included in the calculation of the purchase price adjustment set forth in Section 2.6.

"Adjusted Net Assets" shall mean (i) the Adjusted Assets *minus* (ii) the Adjusted Liabilities, as of the close of business (New York time) on the Closing Date, determined in accordance with the Closing Balance Sheet Principles and giving effect to Sections 5.5 and 5.6.

"ADN" shall have the meaning set forth in Section 5.9(a)(i).

"ADN Agreement" shall mean the Agreement Relating to the Conversion of Adiponitrile to Aminocapronitrile or Caprolactam for Nylon 6 Production dated as of the Closing Date, by and between DuPont and Buyer, in all material respects in the form attached hereto as Exhibit A.

"Affiliate" shall mean, with respect to any specified Person, a Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean (a) the direct or indirect ownership of more than fifty percent (50%) of the total voting power of securities

3

or other evidences of ownership interest in such Person or (b) the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities, by Contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. For purposes of this definition (i) all Subsidiaries of a specified Person shall be deemed to be Affiliates of such Person and (ii) the Joint Ventures shall be deemed not to be Affiliates of DuPont or Buyer or any of their respective Subsidiaries or Parent.

"Aggregate Global Closing Purchase Price" shall equal $4,068.5 million (i) *plus*, if the Estimated Adjusted Net Assets exceed the Reference Adjusted Net Assets, an amount equal to such excess, (ii) *minus*, if the Reference Adjusted Net Assets exceed the Estimated Adjusted Net Assets, an amount equal to such excess, (iii) *plus*, if the Estimated Pension Funding Amount exceeds zero, the amount of such excess, (iv) *minus*, if zero exceeds the Estimated Pension Funding Amount, the amount of such excess, (v) *minus*, if the Estimated Specified Indebtedness exceeds the Reference Consolidated Indebtedness, the amount of such excess, (vi) *plus*, if the Reference Consolidated Indebtedness exceeds the Estimated Specified Indebtedness, the amount of such excess, (vii) *minus*, if the Estimated Nonconsolidated Indebtedness exceeds the Reference Nonconsolidated Indebtedness, the amount of such excess and (viii) in the event any of the Designated Joint Venture Interests are not, directly or indirectly, transferred, conveyed, assigned or delivered to Buyer or any Buyer Sub (as the case may be) at Closing, *minus* the Estimated Joint Venture Interest Agreed Amount for each such Designated Joint Venture Interest not so transferred, conveyed, assigned or delivered at Closing. For the avoidance of doubt, the calculation of Aggregate Global Closing Purchase Price shall not be increased in the event any portion of the amount deducted pursuant to clause (viii) above is subsequently paid to DuPont or a Subsidiary thereof pursuant to Section 5.27 or if any amount paid for any Joint Venture other than a Designated Joint Venture is subsequently repaid, whether directly or through a letter of credit mechanism or otherwise, to Buyer or a Buyer Sub pursuant Section 5.27; provided that the foregoing shall not limit the parties' obligations under Section 5.27 and under any Local Purchase Agreement related to a Designated Joint Venture.

"Aggregate Local Closing Purchase Price" shall mean the aggregate of the Local Closing Purchase Prices (measured in United States Dollars using the Applicable Spot Rate in effect at the close of business on the last Business Day prior to the Closing Date) payable upon the closing of the Local Purchase Agreements.

"Agreement" shall have the meaning set forth in the introductory paragraph hereof and shall include the Exhibits and Schedules hereto.

"Antitrust Laws" shall mean and include the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, the EC Merger Regulations, the Canadian Competition Act and the Investment Canada Act, in each case as amended, and all other Federal, state or foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other laws that are designed or intended to

4

regulate competition or investment (foreign or otherwise) or to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Applicable Buyer Plans" shall have the meaning set forth in Section 5.16(b)(i).

"Applicable Spot Rate" shall mean, with respect to any non-US. currency, the exchange rate published in the Wall Street Journal based on the five (5) Business Day period ending three (3) Business Days prior to the Closing Date.

"Assessment Period" shall mean the one-year period beginning on the date that a Property Tax is assessed. For Property Taxes with no assessment date, the "Assessment Period" shall mean the one-year period beginning on the first day of the relevant Tax Authority's fiscal year.

"Asset Sellers" shall mean, collectively, the Global Asset Sellers and the Local Asset Sellers.

"Assets" shall mean all properties, assets, claims, Contracts and businesses of every kind, character and description, whether real, personal or mixed, tangible or intangible, whether accrued, contingent or otherwise, and wherever located (including in the possession of vendors or other third parties or elsewhere), in each case whether or not recorded or reflected on the books and records or financial statements of any Person, including the following: (i) all cash, cash equivalents, notes and accounts receivable (whether current or non-current); (ii) all certificates of deposit, banker's acceptances and other investment securities of any other form and maturity; (iii) the fee interest in all owned real properties (including all Improvements located thereon or contained therein and appurtenances thereto); (iv) the leasehold interest in all leased real properties and all leasehold Improvements; (v) all machinery, Equipment (including all transportation and office equipment and all Improvements leased from any Governmental Authority), fixtures, trade fixtures and furniture; (vi) all office supplies, production supplies, computer hardware, spare parts, other miscellaneous supplies and other tangible property of any kind; (vii) all capital stock, partnership interests and other equity or ownership interests or rights, directly or indirectly, in any Subsidiary or other entity; (viii) all inventories of materials, raw materials, catalysts, stores inventories, supplies, products and product samples, work-in-process, finished goods, consigned goods and other inventories; (ix) all Intellectual Property; (x) all rights existing under all Contracts; (xi) all IT Assets; (xii) all prepayments, deposits, performance bonds, guarantees, derivative instruments, receivables from tax authorities, advances for insurance premiums and deferred tax accounts to the extent they constitute an asset and not a liability of such party; (xiii) all claims, causes of action, choses in action, rights to indemnification, rights of recovery and rights of set-off of any kind; (xiv) all customer lists and records pertaining to customers and accounts, personnel records, all lists and records pertaining to suppliers and agents, and all books, ledgers, files and legal and business records of every kind; (xv) all advertising materials and all other printed, electronic or written materials, including purchase orders, forms, labels, shipping materials, catalogues, sales brochures,

5

operating manuals, and instructional documents; (xvi) all goodwill as a going concern; (xvii) all employee contracts, including the right thereunder to restrict an employee from competing in certain respects; (xviii) all trucks, automobiles and other vehicles; (xix) all special and general tools, test devices, prototypes, models and any other tangible personal property; (xx) all telephone and facsimile numbers; and (xxi) all permits, licenses, registrations, approvals and authorizations of Governmental Authorities or third parties relating to the ownership, possession or operation of the Assets.

"Assigned IT Rights" shall have the meaning set forth in Section 5.8(f)(i)

"Assignment of Third Party Lease" shall mean an Assignment of Third Party Lease, in all material respects in the form attached as Exhibit B-1(a), with respect to Third Party Tenant Leases, and Exhibit B-1(b), with respect to Third Party Landlord Leases.

"Assumed Liabilities" shall mean any and all Liabilities whether arising before, on or, for purposes of Section 8.4(b), after the Closing Date, of DuPont; any Seller (other than any Person that is caused to be a Seller solely pursuant to Section 3.14(f) or 6.10(c)), any DTI Company or any of the Subsidiaries of DuPont set forth on Schedule 1(c), in each case to the extent resulting from or arising out of the past, present or, for purposes of Section 8.4(b), future operation or conduct of the DTI Business or the past, present or, for purposes of Section 8.4(b), future ownership or use of the DTI Assets. "Assumed Liabilities" shall also include the following:

(i)     all Liabilities pursuant to or under all Contracts included in the DTI Assets, other than (A) the Liabilities under the Local Asset Transfer Agreements (except as provided in clause (xii) below) and (B) any Shared Contractual Liabilities allocated to DuPont under Section 5.25;

(ii)     all warranty and similar obligations entered into or incurred in the ordinary course of the DTI Business with respect to its products or services;

(iii)     all DTI Environmental Liabilities;

(iv)     all Liabilities arising out of or resulting from (A) the Specified DTI Actions, (B) Actions to the extent arising out of or resulting from the operation of the DTI Business or the ownership or use of the DTI Assets or the Assumed Liabilities at or prior to the Closing, (C) Actions to the extent arising in connection with the operation of the DTI Business or the ownership or use of the DTI Assets or the Assumed Liabilities in each case by Buyer or any of its Subsidiaries following the Closing or (D) any additional Actions to the extent resulting from or arising out of the subject matter of any of the Actions described in clauses (A)-(C) above or any claim based on substantially similar or related factual or legal allegations or claims;

6

(v)    all Indebtedness of DuPont and its Subsidiaries to the extent it constitutes Specified Indebtedness;

(vi)    Buyer's or any Subsidiary of Buyer's (including any DTI Company's) portion, determined pursuant to Section 5.25, of Shared Contractual Liabilities;

(vii)    all Liabilities assumed by, retained by or agreed to be performed by Buyer, any of the Buyer Subs, or any DTI Company pursuant to this Agreement (including pursuant to Section 5.16) or any of the Related Agreements;

(viii)    all Liabilities for Taxes (including Transfer Taxes) for which Buyer or a DTI Company is liable pursuant to Article VI or, except as provided otherwise in Article VI, applicable Law;

(ix)    all Liabilities to the extent allocated as Assumed Liabilities pursuant to Section 5.24;

(x)    all Liabilities resulting from or arising out of the DuPont Guarantees to the extent allocated to Buyer and its Affiliates in Section 5.12;

(xi)    all Liabilities of DuPont or any of the Retained Subsidiaries arising under the Joint Venture Agreements or from its status as an owner of the Joint Venture Interests, excluding Liabilities to the extent arising prior to Closing (or, with respect to any Joint Venture, the Joint Venture Interests of which are not transferred at Closing, prior to the transfer of the applicable Joint Venture Interests) by reason of (i) the failure by DuPont, any of its Subsidiaries or any Majority Owned Joint Ventures to maintain corporate formalities (or analogous formalities for other entities) and separateness with respect to any Joint Venture (including initially inadequately capitalizing such Joint Venture or thereafter receiving distributions therefrom which result in it being inadequately capitalized) or (ii) any breach by DuPont or any of its Subsidiaries of any Joint Venture Agreement or, subject to Section 5.27, disputes between DuPont and any Other Partner relating to pre-Transfer Date matters; provided, however, that with respect to any Joint Venture, the Joint Venture Interests of which are not transferred at Closing, the Liabilities of DuPont or the Retained Subsidiaries (or, with respect to Joint Venture Interests held by DTI Companies, the DTI Companies) arising under the applicable Joint Venture Agreements or from its status as an owner of such Joint Venture Interest shall not be deemed Assumed Liabilities unless such Joint Venture Interests are transferred to Buyer or one of its Subsidiaries, in which case such Liabilities shall be deemed retroactively to the Closing to be Assumed Liabilities to the extent they would have been Assumed Liabilities if the applicable Joint Venture Interests had been transferred at Closing pursuant to Article II;

7

(xii)    all Liabilities of (A) any Asset Seller (with respect to the DTI Business) other than DuPont or (B) any DTI Company, in each case under a Services Agreement;

(xiii)    the Assumed Notes and all contractual Liabilities thereunder; and

(xiv)    all Liabilities set forth on Schedule 1(d);

provided, however, that, notwithstanding anything to the contrary in this Agreement, Assumed Liabilities (other than those set forth in clause (xiv) above) shall in no event include any (A) Liabilities with respect to Environmental Claims that are not DTI Environmental Liabilities, (B) Liabilities that relate to Taxes that are not included pursuant to clause (viii) above, (C) Liabilities related to DTI Employees or Former DTI Employees that are not allocated to Buyer, a Buyer Sub or a DTI Company pursuant to Section 5.16 or in a letter agreement dated the date hereof between Buyer and DuPont or (D) Retained Liabilities of a type described in any of clauses (i)-(xviii) of the definition thereof. The parties acknowledge that although Buyer is providing indemnification pursuant to Article VIII for all Assumed Liabilities, Buyer (as opposed to the Subsidiaries of Buyer that are the acquiring entities under this Agreement and the Local Purchase Agreements) is only assuming the Assumed Liabilities to the extent set forth in Article II.

"Assumed Notes" shall mean any notes representing Indebtedness of any DTI Company of the type described in clauses (i) and (ii) of the definition of "Indebtedness" to the extent outstanding immediately prior to the Closing which is owed to any other DTI Company or Asset Seller; provided, however, that any Assumed Note forgiven, capitalized, transferred or otherwise cancelled by DuPont or any of its Subsidiaries at or prior to Closing shall not be deemed to be an Assumed Note.

"Audited Combined Financial Statements" shall mean audited financial statements for the DTI Business for the three years ended December 31, 2002 containing combined income and cash flow statements of the DTI Business for the years 2000, 2001 and 2002 and combined balance sheets of the DTI Business as of December 31, 2001 and December 31, 2002.

"Authority" shall have the meaning set forth in Section 6.10(c).

"Baseline Environmental Conditions" shall mean those environmental conditions as set forth on Schedule 1(e).

"Basket" shall have the meaning set forth in Section 8.4(h).

"Bill of Sale" shall mean a bill of sale and assignment, in all material respects in the form attached as Exhibit C.

8

"Business Critical IT Rights" shall have the meaning set forth in Section 5.8(f)(iii).

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which United States banks are closed generally.

"Buyer" shall, subject to Sections 4.4(b) and 9.4(b), mean, collectively, Buyer 1 and Buyer 2.

"Buyer 1" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Buyer 2" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Buyer Agent" shall have the meaning set forth in Section 9.11(b).

"Buyer Defined Benefit Plan" shall have the meaning set forth in Section 5.16(i).

"Buyer Indemnified Parties" shall have the meaning set forth in Section 8.4(a).

"Buyer Material Adverse Effect" shall mean any change, event, development or effect that, individually or in the aggregate, has impaired, hindered, delayed or adversely affected, or would reasonably be expected to impair, hinder, delay or adversely affect in any material respect the ability of Buyer and its Subsidiaries to consummate the Sale.

"Buyer Negotiated IT Rights" shall have the meaning set forth in Section 5.8(f)(iv).

"Buyer Reorganization" shall have the meaning set forth in Section 4.4(b).

"Buyer Representative" shall have the meaning set forth in Section 9.5(a).

"Buyer Savings Plan" shall have the meaning set forth in Section 5.16(g).

"Buyer Subs" shall mean the Wholly Owned Subsidiaries of Buyer who, subject to Section 6.10(f), are designated by Buyer to be parties to, or are purchasing DTI Assets under, this Agreement or the Local Purchase Agreements.

"Buyer's Independent Accountant" shall have the meaning set forth in Section 2.5(a).

9

"<u>Canada Asset Transfer Agreement</u>" shall mean the Asset Transfer Agreement, dated the Closing Date, between DuPont Canada and E. I. du Pont Canada Company, in all material respects in the form attached as Exhibit D.

"<u>Canadian Agreements</u>" shall mean the Contract Manufacturing Agreement, the Canada Asset Transfer Agreement, the Stock Transfer Agreement by and between E. I. du Pont de Nemours and Company and Liqui-Box Canada Inc., the Stock Transfer Agreement by and between E. I. du Pont Canada Company and DuPont Canada Inc. and Assignment of Intellectual Property Rights between DuPont Canada Inc. and E. I. du Pont de Nemours and Company.

"<u>Canadian Competition Act</u>" shall mean the Competition Act (Canada), R.S.C. 1985, c. C-34, as amended.

"<u>Cap</u>" shall have the meaning set forth in Section 8.4(i).

"<u>Cash</u>" shall mean all (i) cash and cash equivalents (including certificates of deposit and banker's acceptances) and (ii) marketable securities reasonably acceptable to Buyer that mature (or are readily saleable) in three (3) months or less; <u>provided</u>, that Buyer shall notify DuPont, reasonably promptly after being asked by DuPont, whether any particular marketable securities are not acceptable to Buyer.

"<u>Category A Properties</u>" shall mean the Real Property set forth on Schedule 1(f)-A.

"<u>Category B Properties</u>" shall mean the Real Property set forth on Schedule 1(f)-B.

"<u>Category C Properties</u>" shall mean the Real Property set forth on Schedule 1(f)-C and all Real Property that is not a Category A Property or Category B Property.

" <u>Centek Group</u>" shall mean, collectively, Grupo Centek, S.A. de C.V.; Nylmex, S.A. de C.V.; Nyltek, S.A. de C.V.; Dupek, S.A. de C.V. and Filamentos Elastomericos de Mexico, S.A. de C.V.

"<u>China Holdings</u>" shall mean China Holdings LLC, a limited liability company organized under the laws of the State of Delaware.

"<u>China Holdings Event</u>" shall have the meaning set forth in Schedule 5.42(g).

"<u>China Holdings Sale</u>" shall have the meaning set forth in Section 5.42(g).

"<u>Closing</u>" shall have the meaning set forth in Section 2.3(a).

10

"Closing Balance Sheet Principles" shall mean GAAP consistent with the accounting principles and practices applied in preparation of the balance sheet of the DTI Business as of December 31, 2002 contained in the Audited Combined Financial Statements, as adjusted pursuant to Schedule 1(g), with any inconsistency between the principles of presentation in the balance sheet of the DTI Business as of December 31, 2002 contained in the Audited Combined Financial Statements and Schedule 1(g) to be resolved in favor of Schedule 1(g).

"Closing Date" shall have the meaning set forth in Section 2.3(a).

"Closing Date Proration" shall have the meaning set forth in Section 6.2(c).

"COBRA" shall have the meaning set forth in Section 5.16(n).

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

"Company Sellers" shall mean the Global Company Sellers and the Local Company Sellers.

"Conditions Satisfied Date" shall have the meaning set forth in Section 2.3(a).

"Confidential Information" shall have the meaning set forth in Section 5.20(a).

"Confidentiality Agreement" shall have the meaning set forth in Section 5.2.

"Consolidated Indebtedness" shall mean the principal amount of Indebtedness (other than the Assumed Notes), of the type described in clause (i) or (ii) of the definition of "Indebtedness," of DuPont or any of its Subsidiaries (in each case with respect to the DTI Business) or any Consolidated Joint Venture, in each case as of the close of business on the Closing Date and calculated in accordance with the Closing Balance Sheet Principles.

"Consolidated Joint Ventures" shall mean those Joint Ventures set forth on Schedule 1(h).

"Continuing Environmental Issue" shall mean (i) any Release, (ii) any soil or groundwater contamination by Hazardous Substances or (iii) any violation of Environmental Law, in each case, present or continuing, on or from any DuPont Remediation Site (or, for the sole purpose of Sections 8.5(a)(viii) and 8.5(b)(xiv), at properties then or previously owned or operated by the Joint Ventures) that is discovered after the Closing Date and that neither Buyer nor DuPont can demonstrate to a reasonable

11

degree of certainty existed as of the Closing Date or came into existence after the Closing Date.

"Contract" shall mean any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment or arrangement, whether written or oral, that is binding on any Person or entity or any part of its property under applicable Law, including any amendments thereto.

"Contract Manufacturing Agreement" shall mean the Contract Manufacturing Agreement regarding the DTI Canada Manufacturing Operations, dated the Closing Date, between DuPont, E. I. du Pont Canada Company and DuPont Canada in all material respects in the form attached as Exhibit E.

"Controlled Entity" shall have the meaning set forth in Section 3.9(k).

"Copyright Agreement" shall mean the Copyright Agreement in all material respects in the form attached as Exhibit F.

"Copyrights" shall have the meaning set forth in the definition of "Intellectual Property."

"CRIM Guide" shall mean DuPont's Corporate Records & Information Management Program Guide, August 2003 edition, a copy of which is attached as Exhibit G.

"Criminal Penalty" shall mean any (i) (A) felony criminal jail sentence in the United States or (B) criminal jail sentence involving incarceration of more than one (1) year outside of the United States or (ii) any criminal penalty, criminal fine or similar criminal Liability, in each case, imposed upon any Person for such Person's actions, omissions or violations in connection with the DTI Business, and, in the case of clause (ii) above, requiring the payment of more than (A) $8 million per occurrence or series of related occurrences in the United States or (B) $15 million per occurrence or series of related occurrences outside of the United States; provided, that for the purposes of Sections 8.4(a) and 8.5(b)(iv) only, the dollar amounts specified in each of subsections (A) and (B) of this definition shall be $400,000.

"CSC Contract" shall mean any Contract entered into between an Asset Seller or a DTI Company, on the one hand, and Computer Sciences Corporation, on the other hand, pursuant to which Computer Sciences Corporation will provide information technology-related services to the DTI Business only (and in no part to the DuPont Business), including those Contracts set forth on Schedule 1(i).

"CSC Master Agreement" shall have the meaning set forth in Section 5.1(a)(ix).

12

"Current Title Commitments" shall have the meaning set forth in Section 5.32(a).

"Current Title Work" shall have the meaning set forth in Section 5.32(a).

"Cut Off Date" shall have the meaning set forth in Section 8.4(b).

"Decline Notice" shall have the meaning set forth in Section 5.27(e)(iii)(C).

"Delayed Company" shall mean each of the entities set forth on Schedule 1(j) to the extent DuPont and its Subsidiaries have not received all necessary consents and approvals of any Governmental Authority which are (x) set forth on Schedule 1(j) and (y) required to transfer the Shares or Assets of any such entity to Buyer or a Buyer Sub pursuant to this Agreement or any Local Purchase Agreement at the Closing.

"Designated Joint Venture Interests" shall mean the Joint Venture Interests set forth on Schedule 1(k).

"Designated Matters" shall have the meaning set forth on Schedule 1(zz).

"Development" shall have the meaning set forth in the definition of "Material Adverse Change."

"DFS Employees" shall have the meaning set forth in Section 5.16(b)(i).

"Directive" shall mean an order, directive or written requirement by or on behalf of a Governmental Authority or binding mediating or arbitration panel.

"Directly Transferred Global Joint Venture Interests" shall have the meaning set forth in Section 2.1(a)(iii).

"Directly Transferred Joint Venture Interests" shall mean the Joint Venture Interests other than those held by any DTI Company.

"Directly Transferred Local Joint Venture Interests" shall have the meaning set forth in Section 2.1(a)(v).

"Divested Businesses" shall mean all terminated, divested or discontinued businesses or facilities which, at or prior to the time of termination, divestiture or discontinuation, related to or otherwise would have been part of the DTI Business (without giving effect to clause (xii) of the definition of "Excluded Business") or were operated by a DTI Company or Asset Seller, including the entities and businesses set forth on Schedule 3.14(d), but excluding those that at the time of termination, divestiture or discontinuation were owned or operated by a Joint Venture.

"DOJ" shall have the meaning set forth in Section 3.4.

13

"DTI Acquired Real Property" shall mean all real property which is primarily used or primarily held for use in connection with the DTI Business and which is owned in fee simple by DuPont or any of its Subsidiaries (including the DTI Companies) other than the DuPont Retained Sites, in each case together with all easements and privileges appertaining or relating to such real property owned by DuPont or any of its Subsidiaries (including the DTI Companies), and all Improvements located thereon (other than those Improvements to be transferred to DuPont or one of its Subsidiaries as part of any DuPont Leased Premises).

"DTI Actions" shall mean all Actions for which all Liabilities arising out of or resulting from such Actions constitute Assumed Liabilities.

"DTI Assets" shall mean all right, title and interest, at the time of Closing, of DuPont, the Sellers and their respective Affiliates (including the DTI Companies) in the DTI Business and in all Assets primarily used or primarily held for use in connection with the DTI Business (excluding the Excluded Assets and excluding IT Assets, any Intellectual Property or Intellectual Property Contracts and any real property and interests therein, except to the extent specifically included pursuant to one or more of the clauses below in this definition) during (x) the three months prior to the Closing Date (or such shorter period of time as owned by DuPont or its Affiliates (including the DTI Companies)) or (y) the period beginning on the earlier of December 31, 2002 or the date that is twelve (12) months prior to Closing and ending on the Closing Date (or such shorter period as owned by DuPont or its Affiliates (including the DTI Companies)), including, but not limited by the foregoing (but excluding the Excluded Assets and excluding IT Assets, any Intellectual Property or Intellectual Property Contracts and any real property and interests therein, except to the extent specifically included pursuant to one or more of the clauses below in this definition) (i) all Contracts (other than any Intellectual Property Contract, any Contract that constitutes an IT Asset and any Contract explicitly described as an Excluded Asset) (A) primarily used or primarily held for use in connection with the DTI Business to which DuPont or any of its Affiliates is a party or to which any of the DTI Assets is subject or (B) that would have been included in the DTI Assets but for the fact that such Contracts expired or were terminated at or prior to the Closing (provided, that the time periods referred to in clauses (x) or (y) above shall end at the time of such expiration or termination and not at the Closing Date, except for purposes of defining the "DTI Business" (as opposed to "DTI Assets") which is determined by reference to the Closing Date), (ii) all DTI IT Assets, (iii) all Transferred Intellectual Property Contracts, (iv) all Intellectual Property being transferred or licensed to Buyer or one or more of the Buyer Subs under a Related Agreement or licensed to Buyer under Section 5.13, (v) all of the real property owned in fee that is reflected on the December 31, 2002 balance sheet included in the Audited Combined Financial Statements and, to the extent not included on such balance sheet, the Real Property), (vi) the Assumed Notes, (vii) all rights of the Asset Sellers (with respect to the DTI Business) (other than DuPont) and the DTI Companies under the Local Asset Transfer Agreements, (viii) all of the DTI Books and Records, (ix) all Equipment primarily used or primarily held for use in connection with the DTI Business and all Equipment reflected on the

14

December 31, 2002 balance sheet included in the Audited Combined Financial Statements except for the Equipment sold, transferred or disposed of in the ordinary course of business since December 31, 2002 and except for synthetic leases of IT Assets which are provided for in the Services Agreements, (x) all inventories of raw materials, work-in-process, finished products, goods, spare parts, replacement and component parts, and office and other supplies primarily used or primarily held for use in connection with the DTI Business and all inventories reflected on the December 31, 2002 balance sheet included in the Audited Combined Financial Statements except for those sold, transferred or disposed of in the ordinary course of business since December 31, 2002, (xi) all prepaid expenses, deferred charges, advance payments, security deposits and other prepaid items primarily used or primarily held for use in connection with the DTI Business, (xii) all accounts receivable to the extent arising out of the operation of the DTI Business, (xiii) the equity investments (other than those in Subsidiaries, Affiliates and Joint Ventures) set forth on Schedule 1(l) or reflected on the December 31, 2002 balance sheet included in the Audited Combined Financial Statements except for those sold, transferred or disposed of in the ordinary course of business since December 31, 2002, (xiv) all rights and claims of DuPont or its Affiliates under any confidentiality agreement or similar document entered into by DuPont or its Affiliates with third Persons regarding the Sale Process, (xv) any Asset which was transferred, leased, subleased, licensed or sublicensed to any DTI Company or any Asset Seller pursuant to a Local Asset Transfer Agreement or otherwise transferred to any DTI Company or Asset Seller in connection with the internal separation of the DTI Business by DuPont and its Affiliates except for those Assets sold, transferred or disposed of in the ordinary course of business since the date of such transfer, lease, sublease, license or sublicense, (xvi) all rights, claims and credits (other than to the extent relating to Retained Liabilities or otherwise explicitly excluded pursuant to this Agreement) to the extent relating to any of the foregoing, the DTI Assets or any Assumed Liability, including all rights to indemnification to the extent arising out of the operation of the DTI Business to the extent transferable and all rights in and to products sold or leased (including products returned after the Closing and rights of rescission, replevin and reclamation) in the operation or conduct of the DTI Business and (xvii) the Assets set forth on Schedule 1(m), but in each case excluding the Excluded Assets. For purposes of the foregoing, if Equipment or inventory is, or generally has been after December 31, 2002, located at the DTI Acquired Real Property (excluding any DuPont Leased Premises) or DTI Leased Real Property (or in the case of Shared Facilities, the portion to be occupied by Buyer), then such Equipment or inventory shall be presumed to be a DTI Asset unless DuPont can show that it was not primarily used or primarily held for use in the DTI Business or was otherwise an Excluded Asset; provided, that the parties agree that the title to any furniture located at the DTI Leased Real Property shall (i) if such furniture is leased by DuPont or any of its Subsidiaries from a third party, be returned and conveyed by Buyer to the Person, upon the terms and timing, specified in the lease to which Buyer or its Subsidiary is a party (or if there is no such lease, then to the Person specified in the lease to which DuPont or its Subsidiary is a party), such return and conveyance to occur not later than the expiration or termination of the lease applicable to such DTI Leased Real Property, and (ii) if such furniture is owned by DuPont or any of its Subsidiaries, be transferred and conveyed to Buyer or its

15

applicable Subsidiary at the expiration or termination of the lease applicable to such DTI Leased Real Property (at which time Buyer shall remove such furniture, at no cost to DuPont, from such DTI Leased Real Property). For the avoidance of doubt, DTI Assets shall include the Shares and the Joint Venture Interests. Notwithstanding the foregoing, DTI Assets shall not include (i) Cash held by DuPont or its Affiliates, except to the extent necessary to satisfy the obligations under Section 5.5(c), (ii) fee title ownership to the DuPont Retained Sites and (iii) any Assets of DuPont Canada and its Subsidiaries which are contemplated to be transferred to DuPont or a Retained Subsidiary pursuant to the Local Asset Transfer Agreements to which DuPont Canada or any of its Subsidiaries is a party.

To the extent, pursuant to a Related Agreement, a Local Asset Transfer Agreement, Section 5.13 or any Other Agreement to which Buyer or any Buyer Sub (or any DTI Company or Asset Seller, if the final version of such agreement was disclosed to Buyer prior to the date of this Agreement or otherwise approved by Buyer) is a party, Assets are licensed, sublicensed, leased or subleased to a DTI Company or Asset Seller, as the case may be, the DTI Assets shall consist only of the leasehold interest, subleasehold interest, license interest or sublicense interest, as the case may be, in such Assets and not the underlying Assets themselves. Also for purposes of this definition, with respect to any Third Party Tenant Leased Real Property, the DTI Assets shall consist of the leasehold interest to be assigned to (or, to the extent applicable, the space demised under any Third Party Tenant Lease which will be subleased by) Buyer, a Buyer Sub or a DTI Company (and the ownership interest in any Improvements located on the land so ground leased pursuant to such Third Party Tenant Lease, if any) and, with respect to any DTI Leased Real Property, the DTI Assets shall consist of the leasehold interest in all DTI Leased Real Property to be leased from DuPont or a Retained Subsidiary by Buyer, a Buyer Sub or a DTI Company pursuant to a Real Estate Lease (and the ownership interest in any Improvements and Equipment located on the land so ground leased pursuant to any Real Estate Lease which is a Ground Lease). With respect to the land and buildings constituting those Shared Facilities which are located on DTI Acquired Real Property and a portion of which is or will be DuPont Leased Premises, the DTI Assets shall exclude DuPont's and any Retained Subsidiary's leasehold interest under any DuPont Lease and ownership interest in any Equipment and (in the case of any DuPont Leased Premises Ground Leased pursuant to a DuPont Ground Lease) the Improvements located on any DuPont Leased Premises.

"DTI Benefit Plans" shall have the meaning set forth in Section 3.10(a).

"DTI Books and Records" shall mean such portion of the books and records of DuPont and its Subsidiaries and the Joint Ventures (to the extent of the rights of DuPont and its Affiliates therein, if any), including the books and records as described in the CRIM Guide, and including all computerized books and records owned by DuPont, its Subsidiaries (including the DTI Companies) and the Joint Ventures, to the extent any of the foregoing books or records (i) primarily relate to the DTI Business or the DTI Assets, including the minute books, corporate charters and by-laws or comparable constitutive documents, records of share issuances, and related corporate records of the

16

DTI Companies or the Joint Ventures (to the extent of the rights of DuPont and its Affiliates therein, if any), business plans, books of account, financial and operating data, price lists, books and records to the extent primarily relating to DTI Employees or Former DTI Employees (including health and safety data), the purchase of materials, supplies and services, the manufacture and sale of products by the DTI Business (including vendor lists) or dealings with customers (including customer lists and credit policies and credit information with respect to customers) of the DTI Business, marketing, advertising and promotional materials, product literature, product data, product testing reports, market and other research, Environmental Permits (including associated documentation), records of Environmental Conditions to the extent primarily relating to the DTI Business and all files to the extent primarily relating to any Action the Liability with respect to which is included in Assumed Liabilities (ii) have been transferred to one of the Asset Sellers (other than DuPont to the extent not transferred to DuPont in connection with its ownership or use of the DTI Assets) or one of the DTI Companies, in each case, pursuant to a Local Asset Transfer Agreement or (iii) have been created by one of the Asset Sellers (other than DuPont to the extent not created primarily in connection with its ownership or use of DTI Assets) or one of the DTI Companies, in each case, after the date of the applicable Local Asset Transfer Agreement. Notwithstanding the foregoing, "DTI Books and Records" shall not include (x) any portion of the books and records of DuPont or the Retained Subsidiaries containing minutes of meetings of any board of directors (or committee thereof) of any of them or (y) any Technical Information (which shall be governed by the Patent and Technical Information Agreement). For the avoidance of doubt, "DTI Books and Records" shall include an electronic copy of the agreements, instruments and other documents which were made available on the Daticon database by DuPont to Buyer, its Affiliates and their Representatives during their due diligence investigation of the DTI Business; provided, that DuPont may exclude from such electronic copy any agreements, instruments or other documents that relate exclusively to the Excluded Assets, Retained Liabilities or DuPont Business.

"DTI Business" shall mean, as comprised on or prior to the Closing Date, the businesses, activities and operations of the nylon, polyester and spandex businesses comprising the Textiles & Interiors business segment of DuPont and its Subsidiaries and the Joint Ventures, including the apparel, interiors, industrial, intermediates and other businesses of DuPont and its Subsidiaries and the Joint Ventures to the extent included in such Textiles & Interiors business segment, regardless of whether such businesses, activities or operations are conducted with DTI Assets, Assets used or held for use by Joint Ventures, or Assets at Shared Facilities that have been excluded from the definition of DTI Assets. For the avoidance of doubt, the DTI Business shall include (i) the businesses, activities and operations of the DuPont Flooring Systems business, (ii) the entities or businesses set forth on Schedule 1(n) and (iii) the DTI Canada Business. Notwithstanding the foregoing, the DTI Business shall not include the businesses, activities and operations which constitute the Excluded Businesses.

17

"DTI Canada Business" shall mean, as comprised on or prior to the Closing Date, (i) the businesses, activities and operations of the nylon, polyester and spandex businesses comprising the textiles & interiors business of DuPont Canada and its Subsidiaries, including the apparel, interiors and industrial and intermediates businesses of DuPont Canada and its Subsidiaries to the extent associated with any of the foregoing, regardless of whether such businesses, activities or operations are conducted with DTI Assets or Assets at Shared Facilities that have been excluded from the definition of DTI Assets and (ii) the manufacturing activities and operations of DuPont Canada and its Subsidiaries relating to the manufacture and sale of (A) SUVA® fluoroproducts and engineering polymers at Maitland, Ontario, (B) modified polymers at Sarnia, Ontario and (C) performance coatings at Ajax, Ontario, but only to the extent such manufacturing operations described under subclause (A), (B) or (C) relate to the services to be provided to DuPont and its Affiliates under the Contract Manufacturing Agreement.

"DTI Canada Manufacturing Operations" shall mean the activities and operations described in clause (ii) of the definition of "DTI Canada Business" to the extent such activities and operations were conducted by DuPont Canada or any of its Subsidiaries on or prior to the Closing Date.

"DTI Companies" shall mean the entities set forth on Schedule 3.3(a).

"DTI Employees" shall mean each individual who is employed on the Closing Date as an employee in the DTI Business; provided, however, that in the event that on the Closing Date any such individual shall be employed in connection with both the DTI Business and the DuPont Business, such individual shall be considered a DTI Employee if, but only if, on the Closing Date such individual's employment shall be primarily in connection with the DTI Business. The term "DTI Employees" shall not include any individual who serves solely as a director (or in a similar capacity) of a DTI Company, Asset Seller or Joint Venture and is not otherwise employed in the DTI Business.

"DTI Environmental Liabilities" shall have the meaning set forth in Section 8.5(a).

"DTI Exclusive Nylon Fibers" shall mean Polyamide Fibers composed of no more than 27.5 mole %, on the basis of 100 mole % in polymer, monomers containing aromatic rings that have been wound, baled, or otherwise packaged.

"DTI Exclusive Spandex Fibers" shall mean Solution-Spun Spandex Fibers.

"DTI Field Nylon Monofilaments" shall mean:

     (i)     water-quenched, less than 20 dpf, monofilaments of Nylon,

18

(ii)    Monofilament Products, except those for use in brushes or for synthetic hair, which are less than 100 dpf made of Nylon-66, Nylon-6, and copolymers of Nylon-66 or Nylon-6 containing at least 70 mole %, on the basis of 100 mole % in polymer, of any combination of monomers of Nylon-66 and Nylon-6, and

(iii)    Hyten® Monofilament (NC).

"DTI Global Restructuring" shall have the meaning set forth in Section 3.9(n).

"DTI Ground Lease" shall mean each of the ground leases between DuPont or a Retained Subsidiary, as landlord, on the one hand, and Buyer, a Buyer Sub or a DTI Company, as tenant, on the other hand, in all material respects in the forms attached as Exhibit B-3(a) and Exhibit B-3(b) or, with respect to any DTI Leased Real Property located outside of the United States, such form as is substantially similar to the form used for U.S. properties, subject to (i) the requirements of foreign law and (ii) such changes as may be mutually agreed to by the parties in their reasonable discretion prior to the Closing.

"DTI IT Assets" shall mean all right, title and interest of DuPont, the Sellers and their respective Affiliates (including the DTI Companies) in (i) all IT Assets that were transferred or licensed to an Asset Seller (other than DuPont) or a DTI Company pursuant to a Local Asset Transfer Agreement, but only to the extent of the rights granted therein, and (ii) all other IT Assets exclusively used or exclusively held for use in connection with the DTI Business at the Closing and for the prior twelve (12) months (or such shorter period as owned by DuPont or its Affiliates (including the DTI Companies)).

"DTI Leased Real Property" shall mean all real property which is located on a DuPont Retained Site (together with, in the case of any land ground leased pursuant to a DTI Ground Lease, the Improvements located thereon, including any Improvements leased from a Governmental Authority pursuant to an industrial revenue bond agreement) and shall be (i) in the case of DTI Leased Real Property that Schedule 3.12(b)(ii) contemplates being subject to a DTI Ground Lease, leased by (and which Improvements shall be transferred to) Buyer, a Buyer Sub or a DTI Company from DuPont or a Retained Subsidiary pursuant to a DTI Ground Lease and a Bill of Sale at the Closing or (ii) in the case of office and laboratory space included in the DTI Leased Real Property and contemplated by Schedule 3.12(b)(ii) as being subject to a DTI Space Lease, leased to Buyer, a Buyer Sub or a DTI Company from DuPont or a Retained Subsidiary at the Closing pursuant to a DTI Space Lease.

"DTI Patents" shall mean all right, title and interest (including license rights, rights or obligations of assignment to or from DuPont or any Subsidiary of DuPont (including the DTI Companies) or with respect to which DuPont or any Subsidiary of DuPont (including the DTI Companies) has the power to grant an immunity from suit for infringement) of DuPont, the Sellers and their respective Affiliates (including the DTI

19

Companies) in those Patents being transferred to Buyer, a Buyer Sub or a DTI Company under the Patent and Technical Information Agreement.

"DTI Segment" shall have the meaning set forth in Section 3.5(f).

"DTI Space Lease" shall mean each of the space leases between DuPont or a Retained Subsidiary, as landlord, on the one hand, and Buyer, a Buyer Sub or a DTI Company, as tenant, on the other hand, in all material respects in the forms attached as Exhibit B-4 or, with respect to any DTI Leased Real Property located outside of the United States, such form as is substantially similar to the form used for U.S. properties, subject to (i) the requirements of foreign law and (ii) such changes as may be mutually agreed to by the parties in their reasonable discretion prior to the Closing.

"DTI Title IV Plan" shall have the meaning set forth in Section 3.10(c).

"DTI Transferred Employees" shall mean each DTI Employee employed at (i) any DTI Company on the Closing Date or (ii) any Asset Seller and who accepts an offer of employment from Buyer or any Buyer Sub in accordance with Section 5.16, and including any individual on long-term disability with DuPont Flooring Systems, Inc., or any other DTI Company; provided, however, that employees of a Delayed Company who are DTI Employees shall not be deemed DTI Transferred Employees unless and until such Delayed Company is transferred to Buyer in accordance with Section 5.31.

"Due Date" shall have the meaning set forth in Section 6.3(c).

"DuPont" shall have the meaning set forth in the introductory paragraph of this Agreement.

"DuPont 401(k) Plan" shall mean the Savings & Investment Plan of E. I. du Pont de Nemours and Company.

"DuPont Actions" shall mean all Actions for which all Liabilities arising out of or resulting from such Actions constitute Retained Liabilities.

"DuPont Books and Records" shall mean the books and records as described in the CRIM Guide, including all computerized books and records, minute books, corporate charters and by-laws or comparable constitutive documents, records of share issuances and related corporate records of or owned by DuPont and its Subsidiaries (including the DTI Companies) other than the DTI Books and Records. Notwithstanding the foregoing, "DuPont Books and Records" shall not include any Technical Information (which shall be governed by the Patent and Technical Information Agreement).

"DuPont Business" shall mean the businesses in which, and the activities and operations as to which, DuPont and its Subsidiaries, including the DTI Companies, have been formerly or are currently engaged, including the Excluded Businesses, but excluding the DTI Business.

20

"DuPont Canada" shall mean DuPont Canada Inc. (to be renamed INVISTA Canada Company).

"DuPont Defined Benefit Plan" shall have the meaning set forth in Section 5.16(i).

"DuPont Engineering and Process Standards" shall mean the DuPont Engineering Guidelines which consist of the library of "how-to" guides for designing, constructing, maintaining and operating its facilities, and in the case of the process standards, those mathematical models and calculations comprising the DuPont ChemE Models™.

"DuPont Environmental Liabilities" shall have the meaning set forth in Section 8.5(b).

"DuPont Excluded Nylon Monofilaments" shall mean:

(a) Nylon Monofilament Products for use in brushes or for synthetic hair; and

(e) Monofilament Products other than:

(i) those less than or equal to 100 dpf made of Nylon-66, Nylon-6, and copolymers of Nylon-66 or Nylon-6 containing at least 70 mole % of any combination of the monomers of Nylon-66 and Nylon-6; and

(ii) Hyten® Monofilament.

"DuPont France" shall mean DuPont de Nemours France SAS.

"DuPont Ground Lease" shall mean each of the ground leases between DuPont or a Retained Subsidiary, as tenant, on the one hand, and Buyer, a Buyer Sub or a DTI Company, as landlord, on the other hand, in all material respects in the forms attached as Exhibit B-5 or, with respect to any DuPont Leased Premises located outside of the United States, such form as is substantially similar to the form used for U.S. properties, subject to (i) the requirements of foreign law and (ii) as may be mutually agreed to by the parties in their reasonable discretion prior to the Closing.

"DuPont Guarantees" shall mean all obligations of DuPont or any of the Retained Subsidiaries or DTI Companies under any loan, financing, lease, Contract or other obligation in existence as of the Closing Date for which DuPont or any of the Retained Subsidiaries or DTI Companies is or may be liable (i) as guarantor or surety for the obligations of the DTI Business, (ii) as a Person required to provide financial support for the DTI Business in any form whatsoever, or (iii) otherwise as guarantor with respect to the performance by, or obligations of, third parties to the extent relating to the DTI Business, but in any case excluding (x) obligations under any Shared Contracts, (y) the

21

Joint Venture Guarantees and (z) obligations relating to indebtedness for borrowed money of DuPont and its Subsidiaries that is not an Assumed Liability.

"DuPont Indemnified Parties" shall have the meaning set forth in Section 8.4(b).

"DuPont Leased Premises" shall mean all real property which is set forth on Schedule 1(o) (together with, in the case of any land ground leased pursuant to a DuPont Ground Lease, the Improvements located thereon, including any Improvements leased from a Governmental Authority pursuant to an industrial revenue bond agreement), and shall be (i) in the case of DuPont Leased Premises that Schedule 1(o) contemplates being subject to a DuPont Ground Lease, leased by (and which Improvements shall be transferred to) DuPont or one of its Subsidiaries from Buyer, a Buyer Sub or a DTI Company pursuant to a DuPont Ground Lease and a Bill of Sale at the Closing or (ii) in the case of office, laboratory or manufacturing space included in the DuPont Leased Premises and contemplated by Schedule 1(o) as being subject to a DuPont Space Lease, leased to DuPont or one of its Subsidiaries from Buyer, a Buyer Sub or a DTI Company at the Closing pursuant to a DuPont Space Lease.

"DuPont Leases" shall mean, collectively, the DuPont Ground Leases and the DuPont Space Leases.

"DuPont Mark Contracts" shall mean those Contracts set forth on Schedule 1(p).

"DuPont Marks" shall have the meaning set forth in Section 5.13(a).

"DuPont Negotiated IT Rights" shall have the meaning set forth in Section 5.8(f)(i).

"DuPont Patents" shall mean all Patents owned by or under obligation of assignment to DuPont or any Subsidiary of DuPont (including the DTI Companies) or with respect to which DuPont or any Subsidiary of DuPont (including the DTI Companies) has the power to grant an immunity from suit for infringement, in each case as of the Closing Date, other than the DTI Patents.

"DuPont Remediation Sites" shall mean the sites set forth on Schedule 1(q), which Schedule shall be subject to amendment prior to the Closing Date based on Buyer's diligence if Buyer identifies in writing any additional sites included in the DTI Assets that require Remediation.

"DuPont Representative" shall have the meaning set forth in Section 9.5(b).

"DuPont Retained Sites" shall mean the sites set forth on Schedule 1(r).

22

"DuPont Space Lease" shall mean each of the space leases between DuPont or a Retained Subsidiary, as tenant, on the one hand, and Buyer, a Buyer Sub or a DTI Company, as landlord, on the other hand, in all material respects in the forms attached as Exhibit B-6 or, with respect to any DuPont Leased Premises located outside of the United States, such form as is substantially similar to the form used for U.S. properties, subject to (i) the requirements of foreign law and (ii) such changes as may be mutually agreed to by the parties in their reasonable discretion prior to the Closing.

"EC Merger Regulations" shall mean Council regulation (EEC) No. 4064/89 of December 21, 1989 on the Control of Concentrations Between Undertakings, OJ (1989) L 395/1 and the regulations and decisions of the Council or Commission of the European Community or other organs of the European Union or European Community implementing such regulations.

"Encumbrance" shall mean any lien, encumbrance, security interest, charge, mortgage, deed of trust, deed to secure debt, option, pledge, restriction on transfer of title or voting, right-of-way, easement, right to occupy of any kind, right of first refusal, encroachment, building or use restriction, conditional sales agreement, license or any adverse claim of any nature whatsoever, other than (i) in the case of securities and any other equity ownership interests, any restrictions imposed by federal, state and foreign securities laws and (ii) in the case of securities and any other equity ownership interests and other Assets, any security interest incurred pursuant to financings by DuPont or any Subsidiary thereof, which are set forth on Schedule 1(s) and which shall be released prior to the Closing at no cost to Buyer or any of its Subsidiaries.

"Engineering Resin" shall mean resins, polymers or copolymers with or without additives, modifiers and/or fillers, with tailored physical properties such as toughness, stiffness, impact, crystallization rate, mold release, light, oxidative and heat stabilization, fatigue resistance and/or flame retardancy properties, and the like, for Engineering Resin Applications.

"Engineering Resin Applications" shall mean finished articles, other than Fibers, filaments, and films, and production of such finished articles in many forms and shapes (including tubes and sheets), formed from polymers by many specific techniques such as injection molding, blow molding, roto-molding, extrusion, casting, etc., where such articles have tailored physical properties such as toughness, stiffness, impact, crystallization rate, mold release, light, oxidative and heat stabilization, fatigue resistance and/or flame retardancy properties, and the like which provide specific property benefits such as mechanical strength, temperature, electrical properties, environmental resistance, etc.

"Environment" shall mean the indoor and outdoor environment including any surface water, groundwater, drinking water supply, soil, natural resources, wetlands, land surface, subsurface strata or ambient air.

23

"Environmental Claim" shall mean any claim, action, cause of action, investigation, demand, order, directive or written notice by, or on behalf of, any Governmental Authority or Person alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from: (i) the presence, Release or threatened Release of any Hazardous Substance at any location, (ii) exposure to any Hazardous Substance or (iii) requirements or violation of any Environmental Law or Environmental Permit.

"Environmental Condition" shall mean the presence of Hazardous Substances in the Environment or building materials, or the Release from building materials, including but not limited to the migration or movement of Hazardous Substances in or through the Environment.

"Environmental Laws" shall mean the applicable laws, regulations, ordinances and rules of a Governmental Authority, and the applicable common law, relating to pollution or protection of human health or the Environment (including ambient air, soil, surface water, groundwater, wetlands, natural resources, land surface or subsurface strata), or relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation, disposal, emission, discharge, injection, Release or threatened Release of Hazardous Substances, including with respect to sites in the United States, without limitation, the statutes listed below: Federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 6901, et seq.; Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, et seq.; Federal Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. § 11001, et seq.; Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq.; Federal Clean Air Act, 42 U.S.C. § 7401, et seq.; Federal Water Pollution Control Act, Federal Clean Water Act of 1977, 33 U.S.C. § 1251, et seq.; Federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act of 1978, 7 U.S.C. § 136, et seq.; Federal Endangered Species Act, 16 U.S.C. § 1531, et seq.; Federal Hazardous Materials Transportation Act, 48 U.S.C. § 1801, et seq.; Federal Toxic Substances Control Act, 15 U.S.C. § 2601, et seq.; the Federal Safe Drinking Water Act, 42 U.S.C. § 300f, et seq.; and the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and all similar or analogous foreign, state, regional or local statutes, secondary and subordinate legislation, and directives, as in effect and legally binding, and the rules and regulations promulgated thereunder, and any provisions of common law providing for any remedy or right of recovery or right of injunctive relief with respect to Environmental Matters, as these laws, rules and regulations were in the past or are currently in effect at the relevant time period.

"Environmental Matters" shall mean (i) the pollution or destruction of, or loss or injury to, or any adverse effect upon, the Environment, (ii) the protection, cleanup or restoration of, or removal, Remediation or mitigation of conditions affecting the Environment, (iii) any Release or the generation, handling, transportation, use, treatment or storage of any Hazardous Substances, (iv) the regulation of the manufacture,

24

processing, distribution or use, for commercial purposes, of chemical substances or radioactive materials, by-products or waste or (v) any matter concerning or arising out of the Environment or exposure to Hazardous Substances.

"Environmental Matters Agreement" shall mean the Environmental Matters Agreement, dated May 23, 2003, between DuPont and DuPont Textiles & Interiors, Inc.

"Environmental Permit" shall mean any permit, license, approval, certificate, identification number, or other authorization required under any Environmental Laws in connection with the DTI Assets or the DTI Business.

"Equipment" shall mean all equipment, fixtures, physical facilities, machinery, inventory, spare parts, supplies, tools and other tangible personal property.

"ERISA" shall have the meaning set forth in Section 3.10(a).

"ERISA Affiliate" shall have the meaning set forth in Section 3.10(a).

"Estimated Adjusted Net Asset Amount" shall have the meaning set forth in Section 2.4(a)(ii).

"Estimated Adjusted Net Assets" shall have the meaning set forth in Section 2.4(a)(ii).

"Estimated Closing Balance Sheet" shall have the meaning set forth in Section 2.4(a)(i).

"Estimated Excess Nonconsolidated Indebtedness" shall have the meaning set forth in the definition of "Estimated Joint Venture Interest Agreed Amount."

"Estimated Individual Nonconsolidated Excess" shall have the meaning set forth in the definition of "Estimated Joint Venture Interest Agreed Amount."

"Estimated Joint Venture Interest Agreed Amount" shall mean, with respect to any Joint Venture Interest (other than Selected Joint Venture Interests and Joint Venture Interests in the Primary Joint Venture), the result of the following:

(i) the amount set forth on Schedule 1(t) opposite such Joint Venture Interest; and

(ii) in the case of a Consolidated Joint Venture, (A) *minus,* if the amount of the Individual Estimated Specified Indebtedness of such Joint Venture exceeds the Individual Reference Joint Venture Indebtedness of such Joint Venture, the amount of such excess, (B) *plus,* if the Individual Reference Joint Venture Indebtedness of such Joint Venture exceeds the Individual Estimated Specified Indebtedness of such Joint Venture, the amount of such excess; and

25

(iii) in the case of a Nonconsolidated Joint Venture, *minus*, if (A) the amount of the Individual Estimated Nonconsolidated Indebtedness of such Joint Venture exceeds the Individual Reference Joint Venture Indebtedness of such Joint Venture (such excess, if any, for a particular Nonconsolidated Joint Venture, the "Estimated Individual Nonconsolidated Excess") and (B) the aggregate Estimated Nonconsolidated Indebtedness exceeds the Reference Nonconsolidated Indebtedness (the amount of such excess for the purposes of this definition, the "Estimated Excess Nonconsolidated Indebtedness"), an amount equal to (x) (1) the Estimated Excess Nonconsolidated Indebtedness *multiplied by* (2) the Estimated Individual Nonconsolidated Excess for such Nonconsolidated Joint Venture, *divided by* (y) the sum of all Estimated Individual Nonconsolidated Excesses of all Nonconsolidated Joint Ventures;

provided, that the foregoing shall, if less than zero, be deemed equal to zero.

"Estimated Nonconsolidated Indebtedness" shall have the meaning set forth in Section 2.4(a)(ii).

"Estimated Pension Funding Amount" shall have the meaning set forth in Section 2.6(a)(i).

"Estimated Pension Funding Statement" shall have the meaning set forth in Section 2.6(a)(i).

"Estimated Specified Indebtedness" shall have the meaning set forth in Section 2.4(a)(ii).

"Excess Cash" shall have the meaning set froth in Section 5.5(c).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Assets" shall mean (i) any claims, rights and interest in and to any refunds for Taxes described in Section 6.6(a), (ii) all rights of the Sellers under this Agreement and any documents delivered or received in connection herewith, (iii) except as specifically provided in Section 5.16, all assets held by or in respect of any DTI Benefit Plan, (iv) the Assets constituting ownership interests in, or that are primarily used or primarily held for use in, the Excluded Businesses, (v) the DuPont Books and Records, (vi) the DuPont Marks, DuPont Mark Contracts and the Retained DTI Mark Contracts, (vii) the DuPont Patents, (viii) the Assets listed on or in the categories set forth on Schedule 1(u), (ix) all insurance policies (except for title insurance policies provided for in Section 5.32), (x) the accounts receivable set forth on Schedule 1(v) and (xi) title to the shares of INVISTA Argentina, S.A, INVISTA Nylon Sudamerica S.A. and DTI Nylon Inversora S.A.; provided, that the foregoing shall not limit the rights of Buyer and its Affiliates pursuant to Sections 5.11 and 5.13.

26

"Excluded Businesses" shall mean, collectively, the businesses, activities and operations of (i) the polyester film business, including the DuPont Teijin joint venture, (ii) the engineering resins business (including the nylon engineering polymers, polyester engineering polymers and thermoplastic elastomer engineering polymers businesses (including the businesses associated, or conducted in connection, with the following brands: Zytel®, Minlon®, Crastin®, Rynite®, Hytrel®, Elvamide®, Delrin® and Vespel®)), (iii) the nylon and polyester filaments business of DuPont's engineering polymers business (including the following businesses: Tynex® nylon filament, Chinex® synthetic bristle and Orel® polyester filament), (iv) the surface protection chemicals business operated, conducted, used or owned by DuPont's Chemical Solutions strategic business unit (including the stain and soil resistant chemicals business), (v) the clean and disinfect business operated, conducted, used or owned by DuPont's Chemical Solutions strategic business unit, (vi) the catalyst business, the sulfoisopthalic acid and derivatives business and the businesses associated, or conducted in connection, with the Methacrol® brand, each operated, conducted, used or owned by DuPont's Chemical Solutions strategic business unit, (vii) the businesses associated, or conducted in connection, with the Crystar® brand, (viii) the fibers business operated, conducted, used or owned by DuPont's Advanced Fiber Systems strategic business unit (including businesses associated, or conducted in connection, with the Nomex® and Kevlar® brands), (ix) the businesses associated, or conducted in connection, with the Permasep® brand, (x) the spunbonded fibers businesses operated, conducted, used or owned by the DuPont's Nonwovens strategic business unit (including the businesses associated, or conducted in connection, with the Tyvek® and Sontara® brands), (xi) the businesses associated, or conducted in connection, with the Sorona® and Typar® brands, (xii) except as otherwise expressly provided herein, any Divested Businesses, (xiii) the entities or businesses set forth on Schedule 1(w) and (xiv) the businesses of any joint ventures set forth on Schedule 1(x). Notwithstanding clause (ii) of this definition, Excluded Businesses shall not include the DTI Canada Manufacturing Operations.

"Excluded Default" shall mean a default or breach (or alleged default or breach) by DuPont or Buyer or any of their Subsidiaries to the extent it arises by reason of the fact that (in accordance with Section 5.8) Buyer or one of its Subsidiaries (rather than DuPont or one of its Subsidiaries) is performing DuPont's or its Subsidiary's obligations under, or obtaining DuPont's or its Subsidiaries' benefits under, a Contract or Asset that has not been assigned, licensed, sublicensed, leased, subleased, conveyed or transferred, as applicable, to Buyer or one of its Subsidiaries, but excluding from the foregoing any default or breach (or alleged default or breach) relating to any defect in the performance itself.

"Excluded Shared Contracts" shall have the meaning set forth in Section 5.25(c).

"Excluded Taxes" shall have the meaning set forth in Section 6.1(a).

"Existing Contamination" shall mean (i) any Release or (ii) any soil or groundwater contamination by Hazardous Substances, in each case, present or

27

continuing, as of the Closing Date, on or from any of the Real Property (including, for the sole purpose of Sections 8.5(a)(viii) and Section 8.5(b)(xiv), any real property owned or operated by the Joint Ventures), including DuPont Leased Premises, the DTI Acquired Real Property and those sites where a DTI Company owns a portion of a Shared Facility. Information and data regarding such Releases are contained in, but not limited to, the Baseline Environmental Conditions. "Existing Contamination" shall not include any building materials located in the structures on the DTI Leased Real Property or the DuPont Leased Premises (including any Shared Facilities) as of the Closing Date, including but not limited to asbestos, lead paint and lead pipes; provided, that such building materials are in compliance with Environmental Laws as of the Closing Date.

"Existing Off-Site Disposal" shall mean the disposal, or arrangement for disposal, of a Hazardous Substance at any location other than the Real Property on or before the Closing Date, or the migration of Existing Contamination to any location other than the Real Property prior to, on or after the Closing Date.

"Fibers" shall mean manufactured fibers including staple fibers and continuous filaments but shall exclude Monofilament Products.

"Final Adjusted Net Assets" shall mean (i) the Preliminary Adjusted Net Assets if deemed final pursuant to Section 2.5(b), (ii) the Adjusted Net Assets deemed by mutual agreement of Buyer and DuPont to be the Final Adjusted Net Assets or (iii) the Adjusted Net Assets determined by the Independent Accounting Firm to be the Final Adjusted Net Assets in accordance with Section 2.5(c), whichever shall first occur.

"Final Closing Adjustment" shall have the meaning set forth in Section 2.5(d).

"Final Closing Balance Sheet" shall mean (i) the Preliminary Closing Balance Sheet if deemed final pursuant to Section 2.5(b), (ii) any balance sheet deemed by mutual agreement of Buyer and DuPont to be the Final Closing Balance Sheet or (iii) the balance sheet determined by the Independent Accounting Firm to be the Final Closing Balance Sheet in accordance with Section 2.5(c), whichever shall first occur.

"Final Determination" shall mean the final resolution of any Tax (or other Tax matter) for a Tax Period that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise, including (i) by the expiration of a statute of limitations or a period for the filing of claims for refunds, amending Tax Returns, appealing from adverse determinations or recovering any refund (including by offset), (ii) by a decision, judgment, decree or other order by a court of competent jurisdiction, which has become final and unappealable, (iii) by a closing agreement or an accepted offer in compromise under Section 7121 or 7122 of the Code, or comparable agreements under laws of other jurisdictions, (iv) by execution of an Internal Revenue Service Form 870AD or by a comparable form under the laws of other jurisdictions (excluding, however, with respect to a particular Tax Item for a particular taxable period any such form that reserves (whether by its terms or by operation of law) the right of the

28

taxpayer to file a claim for refund and/or the right of the Tax Authority to assert a further deficiency with respect to such Tax Item for such period) or (v) by any allowance of a refund or credit, but only after the expiration of all periods during which such refund or credit may be recovered (including by way of offset).

"Final Excess Nonconsolidated Indebtedness" shall have the meaning set forth in the definition of "Final Joint Venture Interest Agreed Amount."

"Final Individual Nonconsolidated Excess" shall have the meaning set forth in the definition of "Final Joint Venture Interest Agreed Amount."

"Final Joint Venture Interest Agreed Amount" shall mean, with respect to any Joint Venture Interest (other than Selected Joint Venture Interests and Joint Venture Interests in the Primary Joint Venture), the result of the following:

(i) the amount set forth on Schedule 1(t) opposite such Joint Venture Interest; and

(ii) in the case of a Consolidated Joint Venture, (A) *minus,* if the amount of the Individual Final Specified Indebtedness of such Joint Venture exceeds the Individual Reference Joint Venture Indebtedness of such Joint Venture, the amount of such excess, (B) *plus,* if the Individual Reference Joint Venture Indebtedness of such Joint Venture exceeds the Individual Final Specified Indebtedness of such Joint Venture, the amount of such excess; and

(iii) in the case of a Nonconsolidated Joint Venture, *minus,* if (A) the amount of the Individual Final Nonconsolidated Indebtedness of such Joint Venture exceeds the Individual Reference Joint Venture Indebtedness of such Joint Venture (such excess, if any, for a particular Nonconsolidated Joint Venture, the "Final Individual Nonconsolidated Excess") and (B) the aggregate Final Nonconsolidated Indebtedness exceeds the Reference Nonconsolidated Indebtedness (the amount of such excess for the purposes of this definition, the "Final Excess Nonconsolidated Indebtedness"), an amount equal to (x) (1) the Final Excess Nonconsolidated Indebtedness multiplied by (2) the Final Individual Nonconsolidated Excess for such Nonconsolidated Joint Venture *divided* by (y) the sum of all Final Individual Nonconsolidated Excesses of all Nonconsolidated Joint Ventures;

provided, that the foregoing shall, if less than zero, be deemed equal to zero.

"Final Nonconsolidated Indebtedness" shall mean (i) the Estimated Nonconsolidated Indebtedness if Buyer fails to notify DuPont that it disputes such amount pursuant to Section 2.5(e), (ii) the Nonconsolidated Indebtedness deemed by mutual agreement of Buyer and DuPont to be the Final Nonconsolidated Indebtedness or (iii) the Nonconsolidated Indebtedness determined by the Independent Accounting Firm

29

to be the Final Nonconsolidated Indebtedness in accordance with Section 2.5(e), whichever shall first occur.

"Final Pension Funding Amount" shall mean the amount determined in accordance with Section 2.6(b)(ii).

"Final Specified Indebtedness" shall mean (i) the Estimated Specified Indebtedness if Buyer fails to notify DuPont that it disputes such amount pursuant to Section 2.5(e), (ii) the Specified Indebtedness deemed by mutual agreement of Buyer and DuPont to be the Final Specified Indebtedness or (iii) the Specified Indebtedness determined by the Independent Accounting Firm to be the Final Specified Indebtedness in accordance with Section 2.5(e), whichever shall first occur.

"Foreign Active Benefit Employees" shall have the meaning set forth in Section 5.16(q)(i).

"Foreign Benefit Employees" shall have the meaning set forth in Section 5.16(q)(iii).

"Foreign Benefit Plan" shall have the meaning set forth in Section 3.10(d).

"Foreign Benefit Sellers" shall have the meaning set forth in Section 5.16(q)(i).

"Foreign Pension Plans" shall have the meaning set forth in Section 5.16(q)(iv).

"Former DTI Employees" shall mean those Persons previously employed as officers or employees of the DTI Business whose employment with the DTI Business was terminated before the Closing Date. In the event that any such Person was employed in both the DTI Business and the DuPont Business, such Person shall be considered a Former DTI Employee if, but only if, as of the last day of such Person's employment, such Person was primarily employed in the DTI Business.

"Former Facilities" shall mean any real property used or held for use at any time in connection with the DTI Business (regardless of whether or not such real property constitutes Real Property or a DTI Asset) where operations in connection with the DTI Business were substantially discontinued prior to the Closing Date or where the property was sold prior to the Closing Date.

"FTC" shall have the meaning set forth in Section 3.4.

"GAAP" shall mean United States generally accepted accounting principles as in effect on the date or for the period with respect to which such principles are applied.

30

"Global Asset Sellers" shall mean (a) the Persons set forth on Schedule 1(y), as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion Plan provides may be designated to sell DTI Assets under this Agreement. In the event that DuPont either (i) amends Schedule 1(y) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan, to include any Person that will sell Assets under this Agreement, DuPont shall, at or prior to Closing, cause such Subsidiary to execute a joinder to this Agreement in which it shall agree to be bound by this Agreement as a Global Asset Seller that is a party hereto. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(y) proposed by DuPont pursuant to clause (a) above beginning on the date such proposed amended Schedule 1(y) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for consent within such ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Global Company Sellers" shall mean (a) the Persons set forth on Schedule 1(z), as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion Plan provides may be designated to sell Shares under this Agreement. In the event that DuPont either (i) amends Schedule 1(z) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan, to include any Person that will sell Shares under this Agreement, DuPont shall, at or prior to Closing, cause such Subsidiary to execute a joinder to this Agreement in which it shall agree to be bound by this Agreement as a Global Company Seller that is a party hereto. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(z) proposed by DuPont pursuant to clause (a) above beginning on the date such proposed amended Schedule 1(z) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for consent within such ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Global Joint Venture Sellers" shall mean (a) the Persons set forth on Schedule 1(aa), as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion Plan provides may be designated to sell Joint Venture Interests under this Agreement. In the event that DuPont either (i) amends Schedule 1(aa) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan, to include any Person that will sell Joint Venture Interests under this Agreement, DuPont shall, at or

31

prior to Closing, cause such Subsidiary to execute a joinder to this Agreement in which it shall agree to be bound by this Agreement as a Global Joint Venture Seller that is a party hereto. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(aa) proposed by DuPont pursuant to clause (a) above beginning on the date such proposed amended Schedule 1(aa) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for consent within such ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Global Purchase Price" shall have the meaning set forth in Section 2.2.

"Global Sellers" shall mean, collectively, DuPont, the Global Asset Sellers, the Global Company Sellers and the Global Joint Venture Sellers.

"Global Shares" shall have the meaning set forth in Section 2.1(a)(i).

"Global Transferred DTI Assets" shall have the meaning set forth in Section 2.1(a)(ii).

"Governmental Antitrust Entity" shall mean any Governmental Authority with regulatory jurisdiction over enforcement of any applicable Antitrust Laws.

"Governmental Authority" shall mean any nation or government, any state, municipality or other political subdivision thereof and any entity, body, agency, commission, department, board, bureau or court, whether domestic, foreign or multinational, exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any executive official thereof.

"Governmental Filings" shall have the meaning set forth in Section 3.4.

"Hazardous Substance" shall mean any substance, whether solid, liquid or gaseous, which is listed, defined or regulated as a "hazardous substance," "extremely hazardous substance," "hazardous waste," "oil," "pollutant," "hazardous air pollutant," "toxic substance," "hazardous material," "dangerous substance" or "contaminant" or defined by words of similar import or otherwise subject to Remediation as hazardous, dangerous or toxic, in or pursuant to Environmental Law or which is or contains any asbestos, silica, polychlorinated biphenyls, urea formaldehyde foam insulation, explosive, nuclear or radioactive material, radon, petroleum or other petroleum hydrocarbons, natural or synthetic gas, pesticides, insecticides, fungicides or rodenticides.

"HIPAA" shall mean Health Care Insurance Portability And Accountability Act of 1996.

"HMD" shall have the meaning set forth in Section 5.9(a)(i).

32

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hyten® Monofilament (NC)" shall mean, for purposes of this Agreement, a polyamide Nylon monofilament having: (i) a denier greater than 1000, (ii) a straight tenacity of 8 grams per denier, (iii) a formic acid method RV of greater than 50 in the case of polyamides, (iv) a minimum filament thickness of greater than 0.35 mm, and (vi) an obround (a.k.a. oblong) cross section as shown in US Patent 5,683,808.

"ICSC" shall have the meaning set forth in Section 5.6(b).

"Identified Jurisdictions" shall mean the jurisdictions set forth on Schedule 1(bb).

"Improvements" shall mean all buildings, improvements, fixtures and facilities located on or attached to any real property and used in, on or at such real property, together with (a) any and all loading docks, parking lots, garages and other facilities serving any such buildings and (b) landscaping and site improvements (but in any event excluding any personal property).

"Income Tax Return" shall mean any Tax Return relating to Income Tax.

"Income Taxes" shall mean any income, franchise, net profits, excess profits or similar Taxes measured on the basis of net income.

"Indebtedness" of any Person shall mean (i) all obligations of such Person for borrowed money, including with respect to deposits or advances of any kind, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property or Assets purchased by such Person, (v) all obligations of such Person issued or assumed as the deferred purchase price of property or services, (vi) all obligations of such Person under letters of credit or similar instruments, (vii) all capital lease obligations of such Person and (viii) all securities or other similar instruments convertible or exchangeable into any of the foregoing.

"Indemnifiable Act" shall mean (i) the breach or failure of performance or observance or the breach or failure to be true or other action or failure to act by Buyer or Seller or their respective Affiliates that is specifically made the basis for indemnification under this Agreement and (ii) any act, failure to act, event, circumstance or condition that is provided for in, and specifically made the basis for indemnification under, this Agreement.

"Indemnified Party" shall have the meaning set forth in Section 8.4(e).

"Indemnifying Party" shall have the meaning set forth in Section 8.4(e).

33

"Indemnitee" shall mean any party who is entitled to receive payment from an Indemnifying Party pursuant to Section 8.4 or Section 8.5.

"Independent Accounting Firm" shall be an accounting firm selected in the manner set forth in Section 2.5(c).

"Independent Actuary" shall be an actuary selected in the manner set forth in Section 2.6(b)(ii)(C).

"Individual Consolidated Indebtedness" shall mean, with respect to a Consolidated Joint Venture, the amount of Consolidated Indebtedness of such Joint Venture.

"Individual Estimated Nonconsolidated Indebtedness" shall have the meaning set forth in Section 2.4(a).

"Individual Estimated Specified Indebtedness" shall have the meaning set forth in Section 2.4(a).

"Individual Final Nonconsolidated Indebtedness" shall mean, with respect to a Nonconsolidated Joint Venture, (i) the Individual Estimated Nonconsolidated Indebtedness of such Nonconsolidated Joint Venture if Buyer fails to notify DuPont that it disputes such amount pursuant to Section 2.5(e), (ii) the Individual Nonconsolidated Indebtedness deemed by mutual agreement of Buyer and DuPont to be the Individual Final Nonconsolidated Indebtedness of such Nonconsolidated Joint Venture or (iii) the Individual Nonconsolidated Indebtedness determined by the Independent Accounting Firm to be the Individual Final Nonconsolidated Indebtedness of such Nonconsolidated Joint Venture in accordance with Section 2.5(e), whichever shall first occur.

"Individual Final Specified Indebtedness" shall mean, with respect to a Consolidated Joint Venture, (i) the Individual Estimated Specified Indebtedness of such Consolidated Joint Venture if Buyer fails to notify DuPont that it disputes such amount pursuant to Section 2.5(e), (ii) the Individual Specified Indebtedness deemed by mutual agreement of Buyer and DuPont to be the Individual Final Specified Indebtedness of such Consolidated Joint Venture or (iii) the Individual Specified Indebtedness determined by the Independent Accounting Firm to be the Individual Final Specified Indebtedness of such Consolidated Joint Venture in accordance with Section 2.5(e), whichever shall first occur.

"Individual Nonconsolidated Indebtedness" shall mean, with respect to a Nonconsolidated Joint Venture, the amount of Nonconsolidated Indebtedness of such Joint Venture.

"Individual Reference Joint Venture Indebtedness" shall mean, with respect to each Joint Venture, the amount set forth opposite its name on Schedule 1(cc).

34

"<u>Information</u>" shall have the meaning set forth in Section 5.17(a).

"<u>Intellectual Property</u>" shall mean all trademarks, service marks, certification marks, trade dress, Internet domain names, trade names, identifying symbols, designs, product names, company names, slogans, logos or insignia, whether registered or unregistered, and all common law rights, applications and registrations therefor, and all goodwill associated therewith ("<u>Trademarks</u>"); all copyrights and copyrightable subject matter, mask works, and other rights of authorship, and all applications and registrations therefor ("<u>Copyrights</u>"); all U.S. and foreign patents, patent applications, patent disclosures, invention disclosures and other rights of invention worldwide (and all rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, extensions or renewals of any of the foregoing) ("<u>Patents</u>"); all Technical Information; all DuPont Engineering and Process Standards; all know-how, inventions, discoveries, improvements, processes, techniques, devices, methods, patterns, formulae, specifications, trade secrets and lists of suppliers, vendors, customers, distributors and business partners; all data; all rights in design; all rights to use all of the foregoing and all other rights in, to, and under the foregoing; all drawings, records, books, electronic embodiments or other indicia, however evidenced, of the foregoing; all proprietary or confidential information related to any item set forth in this definition of Intellectual Property; and any other proprietary, intellectual property and other rights relating to any of the items set forth in this definition of Intellectual Property anywhere in the world; <u>provided</u>, <u>however</u>, that IT Assets are excluded from this definition of Intellectual Property.

"<u>Intellectual Property Contracts</u>" shall mean all Contracts that, conditionally or unconditionally, primarily relate to the (i) receiving or granting or limiting of rights in or to any Intellectual Property or (ii) confidentiality of any Intellectual Property.

"<u>Interested Party</u>" shall mean any DTI Company, Joint Venture, Seller (with respect to the DTI Business) or Buyer or any of its Affiliates.

"<u>Interim Period</u>" shall have the meaning set forth in Section 5.31(b).

"<u>International Trade Laws</u>" shall have the meaning set forth in Section 3.7(d).

"<u>Investment Canada Act</u>" shall mean the Investment Canada Act, R.S.C. 1985, c.28 (1st Supp.), as amended.

"<u>IRS</u>" shall mean the United States Internal Revenue Service or any successor agency.

"<u>Issue</u>" shall have the meaning set forth in Section 6.1(c)(ii).

35

"IT Assets" shall mean, with respect to any Person, any and all of such Person's legal and beneficial right (including rights arising under Contracts and intellectual property rights), title and interest in and to all radio licenses, Software, computer systems, databases, data rights and documentation, reference and resource materials relating thereto, and associated contracts and contract rights (including license agreements, source code escrow agreements, support and maintenance agreements, electronic database access contracts, website hosting agreements, Software or website development agreements, outsourcing agreements, service provider agreements, interconnection agreements, governmental permits, radio licenses and telecommunications agreements).

"IT Rights" shall have the meaning set forth in Section 5.8(f)(i).

"IT Vendor" shall have the meaning set forth in Section 5.8(f)(i).

"Joint Venture Agreements" shall mean any Contract (other than Contracts set forth on Schedule 1(dd), which Contracts primarily relate to the provision of goods and services, licenses or similar agreements to which DuPont or its Subsidiaries are a party) (i) relating to any Joint Venture to which DuPont or any of its Subsidiaries, on the one hand, and such Joint Venture or any of its other joint venture partners, on the other hand, is a party or bound or (ii) by which, to the Knowledge of DuPont (with respect to agreements to which neither DuPont nor any of its Affiliates is a party), any Joint Venture is governed or the rights of the joint venture partners vis-à-vis each other or vis-à-vis the Joint Venture is set forth.

"Joint Venture Debt" shall mean any Indebtedness of the Joint Ventures (or any guarantees by Joint Ventures with respect to Indebtedness of other Persons), whether or not such Indebtedness or related guarantee obligation is guaranteed by DuPont.

"Joint Venture Distribution Amount" shall have the meaning set forth in Section 5.27(b).

"Joint Venture Guarantees" shall mean all obligations of DuPont under any Contract set forth on Schedule 1(ee) relating to Joint Venture Debt for which DuPont is or may be liable as guarantor.

"Joint Venture Interest Agreed Amount" shall mean, prior to the final determination of the Final Specified Indebtedness or Final Nonconsolidated Indebtedness, as applicable, pursuant to Section 2.5(e), the Estimated Joint Venture Interest Agreed Amount and, after the final determination of the Final Specified Indebtedness or Final Nonconsolidated Indebtedness, as applicable, pursuant to Section 2.5(e), the Final Joint Venture Interest Agreed Amount.

"Joint Venture Interests" shall mean the equity ownership interests in the Joint Ventures owned directly by DuPont or an Affiliate thereof; provided that any Other

36

Partner Interest acquired after the date of this Agreement as contemplated by Section 5.27 of this Agreement shall not be a Joint Venture Interest.

"Joint Venture Net Proceeds" shall have the meaning set forth in Section 5.27(f).

"Joint Venture Sellers" shall mean, collectively, the Global Joint Venture Sellers and the Local Joint Venture Sellers.

"Joint Ventures" shall mean the entities set forth on Schedule 3.3(b)(i).

"Kingston Property" shall mean those parcels of DTI Acquired Property more particularly identified on Schedule 1(f)-A, as the Delaware, Seaford (warehouse outparcel), Kingston Plant and Maitland Plant, respectively.

"Knowledge" shall mean, with respect to DuPont, the actual knowledge of any of the Persons set forth on Schedule 1(ff), after inquiry of a type consistent with such Person's past practice in the performance of his office or employment.

"Known Environmental Issues" shall mean Known Existing Contamination and Known Violations of Environmental Law.

"Known Existing Contamination" shall mean Existing Contamination (i) disclosed or referenced in any Phase I or Phase II environmental assessments prepared within the past three (3) years, or in any other material reports, studies, analyses, tests or monitoring possessed or initiated by DuPont or any of its Affiliates (or, for the sole purpose of Sections 8.5(a)(viii) and 8.5(b)(xiv), to the Knowledge of DuPont, any of the Joint Ventures) pertaining to Hazardous Substances in, on, beneath or adjacent to any of the DTI Assets (or, for the sole purpose of Sections 8.5(a)(viii) and 8.5(b)(xiv), the Assets of the Joint Ventures), (ii) discovered by Buyer Indemnified Parties and set forth by Buyer on Schedule 1(gg), which Buyer may update from time to time to reflect such discoveries prior to the Closing Date or (iii) with respect to each DuPont Remediation Site (and, for the sole purpose of Sections 8.5(a)(viii) and Section 8.5(b)(xiv), each of the properties then or previously owned and operated by any of the Joint Ventures), discovered by any Seller or Buyer at any time prior to the Transfer of Responsibility Date (provided, that, if discovered by Buyer, Buyer notifies DuPont thereof prior to the Transfer of Responsibility Date).

"Known Violation of Environmental Law" shall mean a violation of Environmental Law (i) disclosed or referenced in any Phase I or Phase II environmental assessments prepared within the past three (3) years, or in any other material reports, studies, analyses, tests or monitoring possessed or initiated by DuPont or any of its Affiliates (or, for the sole purpose of Sections 8.5(a)(viii) and 8.5(b)(xiv), to the Knowledge of DuPont, any of the Joint Ventures) regarding the DTI Business' compliance with applicable Environmental Laws, (ii) discovered by Buyer Indemnified Parties and set forth by Buyer on Schedule 1(hh), which Buyer may update from time to

37

time to reflect such discoveries prior to the Closing Date or (iii) with respect to each DuPont Remediation Site (and, for the sole purpose of Sections 8.5(a)(viii) and Section 8.5(b)(xiv), each of the properties then or previously owned by any of the Joint Ventures), discovered by any Seller or Buyer (provided, that Buyer notifies DuPont thereof prior to the Transfer of Responsibility Date) prior to the Transfer of Responsibility Date and relating to either (i) any Seller's operations prior to the Closing Date or (ii) any Seller's Remediation, at the site.

"KoSa" shall mean KoSa B.V., a corporation organized under the laws of the Netherlands.

"KoSa Confirmation Letter" shall have the meaning set forth in Section 5.28(d).

"Law" shall mean any law (including common law), treaty, statute, ordinance, rule, regulation, order, writ, judgment, injunction or decree of any Governmental Authority, including the Code.

"Liabilities" shall mean any and all Indebtedness, liabilities and obligations, whether accrued, fixed or contingent, mature or inchoate, known or unknown, reflected on a balance sheet or otherwise, including those arising under any Action, Law, order, injunction or consent decree of any Governmental Authority or any judgment of any kind or any award of any arbitrator of any kind, and those arising under any Contract, commitment or undertaking.

"LIBOR" shall mean the three (3) month London Interbank Offered Rate which appears on the Bloomberg Page BBAM as of 11:00 a.m., London time, on the Closing Date.

"LIFO" shall have the meaning set forth in Schedule 1(ii).

"Local Asset Sellers" shall mean (a) the entities set forth on Schedule 1(jj), as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion Plan provides may be designated to sell DTI Assets under a Local Purchase Agreement. In the event that DuPont either (i) amends Schedule 1(jj) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan to designate a Person to sell Assets under a Local Purchase Agreement, DuPont shall, at or prior to Closing, cause such Subsidiary to execute a Local Purchase Agreement pursuant to Section 5.30. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(jj) proposed by DuPont pursuant to clause (a) above, beginning on the date such proposed amended Schedule 1(jj) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for

consent within such ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Local Asset Transfer Agreements" shall mean, collectively, the agreements, as they may have been amended prior to the date of this Agreement, and as further amended after the date of this Agreement in accordance with Section 5.29, entered into in connection with the global restructuring of the DTI Business by DuPont and its Subsidiaries, in each of the jurisdictions in which the DTI Business is conducted, which agreements, as and to the extent amended prior to the date of this Agreement, are set forth on Schedule 1(kk); provided, however, that upon the execution (which execution may be after the date of this Agreement, but prior to the Closing) of any of the agreements set forth on Schedule 1(ll), in all material respects in the applicable form attached as Exhibit H such agreement shall be deemed to be a Local Asset Transfer Agreement.

"Local Closing Purchase Prices" shall mean those portions of the Aggregate Global Closing Purchase Price that are allocated to be paid under the Local Purchase Agreements (i.e., the purchase price specified in such Local Purchase Agreement) which relate to DuPont Textiles and Interiors France SAS or such other companies, Assets or Joint Ventures as the parties mutually agree as updated to reflect any such mutual agreement, such amounts being designated in local currency (Euros in the case of France).

"Local Company Sellers" shall mean (a) the entities set forth on Schedule 1(nn), as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion Plan provides may be designated to sell Shares under a Local Purchase Agreement. In the event that DuPont either (i) amends Schedule 1(nn) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan to designate a Person to sell Shares under a Local Purchase Agreement, DuPont shall, at or prior to Closing, cause such Subsidiary to execute a Local Purchase Agreement pursuant to Section 5.30. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(nn) proposed by DuPont pursuant to clause (a) above beginning on the date such proposed amended Schedule 1(nn) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for consent within ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Local Joint Venture Sellers" shall mean (a) the entities set forth on Schedule 1(oo) as such Schedule may be amended by DuPont (provided, that any entities included on such Schedule are Wholly Owned Subsidiaries of DuPont), with the consent of Buyer (such consent not to be unreasonably withheld), prior to the Closing Date, or (b) any other Person designated by DuPont prior to Closing that the Separation Completion

39

Plan provides may be designated to sell Joint Venture Interests under a Local Purchase Agreement. In the event that DuPont either (i) amends Schedule 1(oo) pursuant hereto or (ii) otherwise determines as permitted by the Separation Completion Plan to designate a Person to sell Joint Venture Interests under a Local Purchase Agreement, DuPont shall, at or prior to Closing, cause such Subsidiary to execute a Local Purchase Agreement pursuant to Section 5.30. In any event and unless expressly waived by Buyer, Buyer shall have ten (10) Business Days within which to consent (such consent not to be unreasonably withheld) or not to any amendment to Schedule 1(oo) proposed by DuPont pursuant to clause (a) beginning on the date such proposed amended Schedule 1(oo) is received by Buyer in accordance with Section 9.7. If Buyer fails to respond in writing to any request for consent within ten (10) Business Days, then it shall be deemed to have consented to DuPont's request.

"Local Purchase Agreements" shall mean the several Local Purchase Agreements and the Schedules and Exhibits thereto to be entered into by the Local Sellers, on the one hand, and the Buyer and Buyers Subs, on the other hand, providing for the sale, conveyance, assignment, transfer, delivery and, as applicable, the license, sublicense, lease or sublease, of the Local Shares, the Local Transferred DTI Assets and the Directly Transferred Local Joint Venture Interests, in all material respects, including only in the case of DuPont Textiles and Interiors France SAS (and such other companies, Assets and Joint Ventures as DuPont and Buyer mutually agree), the portion of the Local Closing Purchase Price attributable thereto, in the form attached as Exhibit 1.

"Local Sellers" shall mean, collectively, the Local Asset Sellers, the Local Company Sellers and the Local Joint Venture Sellers.

"Local Shares" shall have the meaning set forth in Section 2.1(a)(v).

"Local Transferred DTI Assets" shall have the meaning set forth in Section 2.1(a)(v).

"Losses" shall mean any and all damages, losses (including consequential damages (other than (i) lost profits which are not the direct result of the Indemnifiable Act in question and (ii) consequential damages that are (1) not a probable or (2) an unusual or (3) not a reasonably expected result of the Indemnifiable Act in question, all of which are excluded from Losses)), deficiencies, Liabilities, Taxes, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses, whether or not resulting from third party claims, including the costs and expenses of any and all Actions and demands, assessments, judgments, settlements and compromises relating thereto and the costs and expenses of attorneys', accountants', consultants' and other professionals' fees and expenses incurred in the investigation or defense thereof or the enforcement of rights hereunder and costs and expenses of Remediation (including, in the case of Remediation, all expenses and costs associated with financial assurance); provided, however, that except as set forth in the proviso below, in no event shall Losses include diminution in value and punitive damages; provided, further, that Losses shall include consequential damages, diminution in value and punitive damages, in each case,

40

awarded in an Action (or settlement thereof) to any third party against an Indemnified Party, without regard to any of the foregoing limitations.

"Maitland Transfer Date" shall have the meaning set forth in Section 8.5(c)(iii).

"Majority Owned Joint Ventures" shall mean the Joint Ventures other than the Minority Owned Joint Ventures.

"Material Adverse Change" shall mean any change, event, occurrence, development or effect (each, a "Development") that, individually or in the aggregate, has had, or would reasonably be expected to have a Material Adverse Effect; provided, however, that any actual or prospective Development resulting from (a) any change or changes in general economic conditions (including changes in general financial or market conditions) or other regional (to the extent affecting any significant geographic region within or without any nation), national or international conditions in any of the markets or industries in which the DTI Business operates in each case to the extent that the effects thereof do not disproportionately impact the DTI Business, (b) the announcement or consummation of the transactions contemplated by this Agreement, (c) any change in accounting requirements or principles or the interpretation thereof, (d) the taking of any action approved or consented to in writing by Buyer after the date of this Agreement or (e) the matters set forth on Schedule 1(pp) shall be deemed not to constitute a "Material Adverse Change."

"Material Adverse Effect" shall mean any effect that, individually or in the aggregate, (i) has been, or would reasonably be expected to be, materially adverse to the business, Assets, results of operations, or financial condition of the DTI Business (including as operated by the Joint Ventures), taken as a whole, or (ii) has impaired, hindered, delayed or adversely affected, or would reasonably be expected to impair, hinder, delay or adversely affect, in any material respect the ability of DuPont and its Subsidiaries to consummate the Sale; provided, however, for the purposes of the foregoing, any adverse effect relating to a Joint Venture shall be measured by reference to DuPont's and its Subsidiaries' proportionate ownership interest therein.

"Material Contracts" shall have the meaning set forth in Section 3.18(a).

"Material Impairment" shall mean any of the following: (i) the imposition of a Criminal Penalty on any Interested Party, (ii) a material and adverse effect on the ownership, use or operation of any (A) material manufacturing facility or (B) other Asset that is material to the operation of the DTI Business which, in either case, is included in the DTI Assets and which, in the case of an effect occurring after the date of this Agreement, is continuing at the Closing or (iii) a Material Adverse Effect; provided, however, for the purposes of Section 8.4(a) only, "Material Impairment" shall include civil fines or civil penalties imposed on any Interested Party in excess of $400,000 per occurrence or series of related occurrences; provided, further, however, that an event shall, without limitation, be deemed not to "reasonably be expected to result" (or words

41

of similar import) in a Material Impairment of a type described in clause (i) if, prior to Closing (x) no indictment or formal complaint by the appropriate Governmental Authority has been issued with respect thereto and (y) to the Knowledge of DuPont, no Governmental Authority has commenced an investigation with respect thereto.

"Material Intellectual Property Contract" shall mean an Intellectual Property Contract (i) having, for each such Contract, either minimum annual payments of at least $1 million due for the one (1) year period following the Closing Date or an actual payment due of at least $1 million for the one (1) year period prior to the Closing Date or (ii) the termination or breach of which would reasonably be expected to directly and proximately result in a site, plant or strategic business unit within the DTI Business being unable to operate in all material respects as operated at the Closing Date; provided, however, that multiple licenses or contracts that are part of a common plan or arrangement will be aggregated and treated as a single Contract when determining the above thresholds set forth in (i) and (ii).

"Material IT Contract" shall mean any Contract included in the DTI IT Assets (i) having, for each such Contract, a value of at least $500,000 calculated by adding any payments due under the Contract after the date of this Agreement until the first date that DuPont or its Affiliates have a right to terminate such Contract plus any termination fees or charges or (ii) the termination or breach of which would reasonably be expected to directly and proximately result in a site, plant or strategic business unit within the DTI Business being unable to operate in all material respects as operated at the Closing Date, and for which there are no commercially reasonable and timely work-arounds to enable such operation to continue in all material respects; provided, however, that multiple licenses or contracts for the same or substantially similar services, products or applications will not be aggregated when determining the above thresholds set forth in (i) and (ii).

"Material Property" shall mean a Category A Property set forth on Schedule 1(qq).

"Maydown Action Plan" shall have the meaning set forth in Section 8.5(c)(ii).

"Maydown Transfer Date" shall have the meaning set forth in Section 8.5(c)(ii)(B).

"Minority Owned Joint Ventures" shall mean those Joint Ventures set forth on Schedule 1(rr).

"Mirrored Shared Contracts" shall have the meaning set forth in Section 5.25(c).

"Monofilament Products" shall mean water-quenched single unentangled filament products of 20 dpf or greater.

42

"New Title Commitments" shall have the meaning set forth in Section 5.32(b).

"Nonconsolidated Indebtedness" shall mean (a) the aggregate principal amount of Indebtedness, of the type described in clause (i) or (ii) of the definition of "Indebtedness," of the Nonconsolidated Joint Ventures, but, in the case of both (i) and (ii), only to the extent of DuPont's or its Subsidiaries' pro rata share (based on, as of the close of business on the Closing Date, DuPont's or its Subsidiaries' percentage (direct or indirect (without duplication)) equity ownership as of the close of business on the Closing Date of the applicable Nonconsolidated Joint Venture, but not treating as owned by DuPont or its Subsidiaries any Other Partner Interest purchased pursuant to Section 5.27) of such Indebtedness as of the close of business on the Closing Date, together with (b) any interest accrued and unpaid thereon to the Closing Date but only to the extent overdue as of such date.

"Nonconsolidated Joint Ventures" shall mean those Joint Ventures that are not Consolidated Joint Ventures.

"Non-Exclusive Nylon Fibers" shall mean Nylon Fibers composed of no less than 27.5 and no more than 65 mole % monomers containing aromatic rings, on the basis of 100 mole % in polymer that have been wound, baled, or otherwise packaged.

"Non-Income Tax" shall mean any Tax other than an Income Tax.

"Non-Material Antitrust Approvals" shall mean any filings, consents and approvals set forth on Schedule 1(ss).

"Non-Required Transfers" shall have the meaning set forth in Section 5.31(c).

"Non-Technical Information" shall mean information of a non-technical nature, such as business data, financial data, customer data, sales data and procurement data. Non-Technical Information shall not include (i) technical know-how, discoveries, improvements, processes, formulae, specifications and trade secrets, (ii) specifications, ideas and concepts for products, equipment, processes and services, (iii) manufacturing and performance specifications and procedures, (iv) engineering drawings and graphs, (v) technical, research and engineering data, (vi) formulations, materials and material specifications, (vii) laboratory studies and benchmark tests, (viii) service and operation manuals, (ix) quality assurance policies, procedures and specifications, (x) evaluation and/or validation studies, (xi) unpublished patent applications, (xii) all other know-how, methodologies, procedures, techniques and trade secrets related to research, engineering, development and manufacturing, and (xiii) technical environmental information related thereto.

"Non-Transferable Permits" shall mean the Permits which, by their terms or by applicable Law may not be transferred to third parties, including Buyer or any of its

43

Subsidiaries (the obtaining of governmental approval being irrelevant to the transferability of the Permit).

"Novation Agreement" shall mean the Novation Agreement, dated as of the Closing Date, by and among KoSa, Buyer 1 and Buyer 2, DuPont and the other Sellers which are parties hereto in all material respects in the form attached as Exhibit J.

"Nylon" shall mean Polyamide homopolymer or copolymer in which no more than 65 mole % on the basis of 100 mole % in polymer of the monomers contain aromatic acid and/or aromatic amine moieties, but not including polypeptides or polypeptoids, e.g., natural or synthetic proteins.

"Nylon-6" shall mean polycaproamide.

"Nylon-66" shall mean polyhexamethylene adipamide.

"Nylon (NC) Fibers" shall mean DTI Exclusive Nylon Fibers and Non-Exclusive Nylon Fibers.

"Nyltek" shall have the meaning set forth in Section 5.9(i).

"Offering Materials" shall have the meaning set forth in Section 5.35.

"Other Agreements" shall have the meaning set forth in Section 3.2.

"Other Partner" shall have the meaning set forth in Section 5.27(e).

"Other Partner Agreed Amount" shall mean, with respect to any Joint Venture, an amount equal to the product of the Joint Venture Interest Agreed Amount for the applicable Joint Venture Seller's Joint Venture Interests in such Joint Venture multiplied by a number the numerator of which equals the percentage direct equity interest that the Other Partner Interest represents in such Joint Venture and the denominator of which equals the percentage direct equity interest that DuPont's or its Subsidiaries' Joint Venture Interest represents in such Joint Venture.

"Other Partner Interest" shall have the meaning set forth in Section 5.27(e).

"Other Partner Required Payment" shall have the meaning set forth in Section 5.27(e).

"Outside Date" shall have the meaning set forth in Section 8.1(b).

"Parent" shall mean Koch Industries, Inc., a Kansas corporation.

"Parent Side Agreement" shall have the meaning set forth in the recitals.

44

"Patent and Technical Information Agreement" shall mean the Patent and Technical Information Agreement to be entered into between DuPont, INVISTA Inc. and Buyer or one or more Buyer Subs in all material respects in the form attached as Exhibit K, as amended by the Canadian Amendment to the Patent and Technical Information Agreement, to be entered into between DuPont, INVISTA Inc. and Buyer or one or more Buyer Subs, as of the date of this Agreement in all material respects in the form attached as Exhibit K.

"Patents" shall have the meaning set forth in the definition of "Intellectual Property."

"Payment Due Date" shall have the meaning set forth in Section 2.5(d).

"Payor" shall have the meaning set forth in Section 6.3(c).

"Pension Assets" shall have the meaning set forth in Section 2.6.

"Pension Liabilities" shall have the meaning set forth in Section 2.6.

"Permits" shall have the meaning set forth in Section 3.7(e).

"Permitted Encumbrances" shall mean:

(i)     Encumbrances set forth on Schedule 1(tt) and, with respect to each parcel of Real Property (x) which is part of a Category C Property, all matters of record and any state of facts that an accurate survey or inspection of the Real Property would disclose, (y) which is part of a Category B Property, all matters that would be evident from a physical inspection and Encumbrances affecting the estate of the landlord with respect to Third Party Tenant Leases (but not any Encumbrance granted by, caused by, or suffered by DuPont or any of its Subsidiaries or specifically encumbering the leasehold estate under any Third Party Tenant Lease unless otherwise designated as a Permitted Encumbrance under clauses (ii) through (v) and (vii) through (ix) below) or (z) which is part of a Category A Property, all matters set forth on (1) the Current Title Work and the Surveys as of the date of this Agreement, as the same may be supplemented prior to the Closing Date, so long as such supplement is approved, waived or not objected to in accordance with the terms of Section 5.32 hereof (other than those Encumbrances set forth on Schedule 1(uu) hereto) and (2) the New Title Commitments (as the same may be supplemented prior to the Closing Date) so long as such New Title Commitments and any such supplement thereto is approved, waived or not objected to in accordance with the terms of Section 5.32 hereof;

(ii)    all Encumbrances (x) expressly established in this Agreement or the Related Agreements or (y) approved in writing by Buyer after the date of this Agreement;

45

(iii)    easements, rights-of-way, servitudes, permits, licenses and surface leases; conditions, covenants or other restrictions; and easements for streets, alleys, highways, telephone lines, power lines, railways and other easements and rights-of-way on, over or in respect of any Real Property which in the case of any (x) Category A Property or Category B Property, would not result in (A) a Material Impairment with respect to any such Category A Property which is a Material Property or (B) a material and adverse effect on the ownership, use or operation of (1) any Category A Property which is not a Material Property or (2) any Category B Property or (y) Category C Property, would not have a Material Adverse Effect;

(iv)    Encumbrances for Taxes, assessments or other governmental charges not yet due or payable or that may be subsequently paid without penalty or that are being contested in good faith in (if then appropriate) appropriate proceedings;

(v)    any materialman's, mechanics', repairman's, employees', contractors', operators', landlord's or other similar liens, security interests or charges for liquidated amounts arising in the ordinary course of business consistent with past practice and securing payments or obligations, as the case may be, that are not delinquent (or payment in full therefor has been made by DuPont or one of its Subsidiaries) or are being contested in good faith in (if then appropriate) appropriate proceedings;

(vi)    all Encumbrances, Contracts, instruments, obligations, defects and irregularities affecting the Assets (other than to the extent covered by clauses (i)-(v) above or (vii)-(ix) below, and other than securing any obligation with respect to indebtedness for borrowed money) that, in the aggregate together with all other Permitted Encumbrances, are not such as to materially and adversely interfere with the operation or use of any material Assets as the DTI Business is currently conducted;

(vii)    any liens that have been placed by any developer, landlord or third party on property over which any DTI Company has easement rights or on any Third Party Leased Real Property or DTI Leased Real Property and subordination or similar agreements relating thereto;

(viii)    in the case of Joint Venture Interests and the Shares of DTI Companies which hold Joint Venture Interests, any restrictions imposed by any Joint Venture Agreement set forth on Schedule 3.3(c); and

(ix)    in the case of Intellectual Property, all Encumbrances, except any (x) lien, security interest, mortgage, deed of trust, or deed to secure debt, or (y) option pursuant to which a third party may impose any Encumbrance described in clause (x) above upon such Intellectual Property without the further consent of the owner or holder of such Intellectual Property.

46

With respect to Joint Venture Interests and Shares of DTI Companies which hold Joint Venture Interests, only those restrictions described in clause (viii) of this definition shall constitute Permitted Encumbrances.

"Person" shall mean any natural person, firm, individual, corporation, partnership, joint venture, business trust, association, trust, company or other organization or entity, whether incorporated or unincorporated, or any Governmental Authority.

"Pipelines" shall mean the pipelines, lateral lines, compressors, compressor stations and other related machinery and equipment identified on Schedule 1(vv).

"PITA Agreement" shall mean a Personal Information Transfer Agreement in all material respects in the form attached as Exhibit L.

"Polyamide" shall mean a synthetic homopolymer or copolymer in which (a) chemical units are linked together by amide linkages (-NH-CO-) and (b) at least 50% of the coupling functional groups within the molecule are amides.

"Post-Closing Assessment Period" shall mean any Assessment Period beginning after the Closing Date and that portion of any Straddle Assessment Period beginning after the Closing Date.

"Post-Closing Tax Period" shall have the meaning set forth in Section 6.1(b).

"Post-Industrial Nylon Fiber Waste" shall mean:

(i)    Nylon (NC) Fibers or DTI Field Nylon Monofilaments produced in good faith in the normal course of their manufacture which do not meet Buyer's or its Affiliates' or its licensee's standard specifications therefor; and

(ii)    Nylon plops, pellets, flakes, chips and the like (which do not meet DTI's or its Affiliates' or its licensee's standard specifications), produced by the Buyer's or its Affiliates or licensees, in good faith in the normal course of manufacturing Nylon (NC) Fibers, DTI Field Nylon Monofilaments or Nylon.

"PPC" shall have the meaning set forth in Section 8.5(c)(ii)(A).

"Pre-Closing Assessment Period" shall mean any Assessment Period ending on or before the Closing Date and that portion of any Straddle Assessment Period ending on the Closing Date.

47

"Pre-Closing IT Rights" shall have the meaning set forth in Section 5.8(f)(i).

"Pre-Closing Tax Period" shall have the meaning set forth in Section 6.1(a).

"Preliminary Adjusted Net Assets" shall have the meaning set forth in Section 2.5(a).

"Preliminary Closing Balance Sheet" shall have the meaning set forth in Section 2.5(a).

"Preliminary Closing Date Pension Funding Amount" shall have the meaning set forth in Section 2.6(b)(i).

"Preliminary Closing Date Pension Funding Statement" shall have the meaning set forth in Section 2.6(b)(i).

"Preparer" shall have the meaning set forth in Section 6.3(c).

"Primary Joint Venture" shall mean the entity set forth on Schedule 1(ww).

"Private Requirements" as to any Real Property, shall mean:  (a) any Encumbrance affecting such Real Property or relating to the use, operation or occupancy of such Real Property; (b) all material orders, rules, regulations and then-current standards applicable to or affecting any Real Property (other than each Third Party Leased Real Property where DuPont or its applicable Subsidiaries are not responsible for compliance therewith) or any part thereof or any use or condition thereof, which may, at any time, be recommended by the Board of Fire Underwriters, if any, having jurisdiction over any Real Property (other than each Third Party Leased Real Property where DuPont or its applicable Subsidiaries are not responsible for compliance therewith), or such other body exercising similar functions; (c) any requirements or conditions imposed by any utility company on DuPont or its applicable Subsidiaries serving such Real Property; and (d) if such Real Property is Third Party Leased Real Property, then the requirements, covenants, and conditions contained in the applicable Third Party Lease applicable to DuPont or one of its Subsidiaries.

"Privileged Information" shall have the meaning set forth in Section 5.21(a).

"Privileges" shall have the meaning set forth in Section 5.21(a).

"Prohibited Activities" shall have the meaning set forth in Section 5.9(h).

"Property Taxes" shall have the meaning set forth in Section 6.2(c).

48

"Proposed Acquisition" shall have the meaning set forth in Section 5.34.

"Public Requirements" as to any Real Property, shall mean any and all applicable Laws (including building, planning, zoning and the terms of any variances, special permits or other authorizations issued pursuant to any of the foregoing, but excluding Environmental Laws) affecting such Real Property to the extent the property owner, DuPont or one of its Subsidiaries is obligated to comply therewith.

"PWC" shall have the meaning set forth in Section 2.5(a).

"Real Estate Leases" shall mean, collectively, the DTI Ground Leases and the DTI Space Leases.

"Real Property" shall mean, collectively, the Third Party Tenant Leased Real Property, the DTI Leased Real Property, the DTI Acquired Real Property and the Rights of Way.

"Reasonable Negotiating Efforts" shall have the meaning set forth in Section 5.8(f)(i).

"Recipient" shall have the meaning set forth in Section 6.4(a).

"Recycled Nylon" shall mean Nylon reclaimed from:

      (i)    Nylon which has been recycled by a physical process (meaning the sorting, combining, mixing, feeding, remelting, density classifying, or otherwise physically preparing the Nylon); or

      (ii)    Nylon which has been reclaimed or recycled by a process (e.g., solutioning by the dissolving of the Nylon into solution, the filtration of insolubles from the solution, and the precipitation of the Nylon from the solution) other than chemical recycle to monomers or oligomers, which monomers or oligomers can be used for repolymerization to first quality Nylon.

"Reduced Tax Arrangements" shall have the meaning set forth in Section 3.9(v).

"Reference Adjusted Net Assets" shall mean $1,217 million.

"Reference Consolidated Indebtedness" shall mean $272 million.

"Reference Date" shall have the meaning set forth in Section 3.9(q).

"Reference Nonconsolidated Indebtedness" shall mean $420 million; provided, that if the percentage equity interest in the Nonconsolidated Joint Ventures represented by the Joint Venture Interests increases or decreases after the date of this Agreement and prior to Closing (other than any increase or decrease contemplated by

49

Section 5.27(e) or (f)), the Reference Nonconsolidated Indebtedness shall be proportionately adjusted to give effect to such increase or decrease, as the case may be.

"Related Agreements" shall mean those agreements set forth on Schedule 1 (xx).

"Release" shall mean any release, spill, emission, discharge, leaking, pumping, pouring, injection, deposit, disposal, dispersal, dumping, escaping, leaching or migration of Hazardous Substances into the Environment or into or out of any property, including the movement of Hazardous Substances through or in the air, soil, surface water, groundwater or property and abandoned or discarded barrels, containers, or other closed receptacles containing Hazardous Substances.

"Remediation" shall mean an action of any kind to address, correct or respond to an Environmental Claim and/or an Environmental Condition or to comply with Environmental Laws, including the following activities: (i) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (ii) responding to any notice, claim, cause of action, order, action or investigation by any Person alleging potential liability for property damage (including claims for interference with use and diminution in value) or death or injury to Persons; (iii) negotiating with or obtaining any permits, consents, approvals or authorizations from any Governmental Authority or government entity necessary to address, correct or respond to an Environmental Claim and/or an Environmental Condition or to comply with Environmental Laws; (iv) preparing and implementing any plans or studies for any such activity; (v) actions necessary to obtain a written notice from a Governmental Authority or government entity with jurisdiction over the real property at an off-site location under Environmental Laws that no material additional work is required by such Governmental Authority or governmental entity; (vi) the use, implementation, application, installation, operation or maintenance on the real property or an off-site location of remedial technologies applied to the surface or subsurface soils, excavation and treatment or disposal of soils at an off-site location, systems for long-term treatment of surface water or groundwater, replacement, removal or encapsulation of friable or damaged asbestos-containing materials, engineering controls or institutional controls; (vii) the design, acquisition and installation of pollution control equipment required under Environmental Laws; and (viii) any other activities reasonably determined to be necessary or appropriate or required under Environmental Laws to address an Environmental Condition, Existing Contamination or to avoid Liabilities under Environmental Laws or under this Agreement.

"Representative" shall mean, with respect to any Person, each of such Person's directors, officers, employees, representatives, consultants, attorneys, accountants, advisors and agents.

"Required Antitrust Approvals" shall mean any required filings, consents and approvals pursuant to (i) the HSR Act, (ii) the EC Merger Regulations and (iii) all other filings and approvals under Antitrust Laws required to be made or obtained, as the

50

case may be, in order to consummate the Sale, excluding Non-Material Antitrust Approvals.

"Required Filings" shall mean any required filings or requests for consent or approval pursuant to (i) the HSR Act, (ii) the EC Merger Regulations, (iii) the Canadian Competition Act or Investment Canada Act and (iv) all other foreign or domestic filings required under applicable Law to be made in order to consummate the Sale.

"Requirements" shall mean Public Requirements and Private Requirements.

"Retained Canadian Manufacturing Liabilities" shall mean all Liabilities to the extent resulting from or arising out of the operation or conduct of the DTI Canada Manufacturing Operations by DuPont Canada and its Subsidiaries on or prior to the Closing Date, notwithstanding the fact that the DTI Canada Manufacturing Operations, or ownership of the related Assets, are not an Excluded Business.

"Retained DTI Actions" shall mean those Actions set forth on Schedule 1(yy).

"Retained DTI Mark Contracts" shall have the meaning set forth in Section 5.13(e).

"Retained Employees" shall mean all DTI Employees, Former DTI Employees, any individual on long-term disability as of the Closing Date with DuPont or its Affiliates, and other current and former officers and employees of DuPont and its Affiliates (including the DTI Companies), other than DTI Transferred Employees; provided, that any individual on long-term disability with DuPont Flooring Systems, Inc. or any other DTI Company shall not be a Retained Employee.

"Retained Liabilities" shall mean any and all Liabilities, whether arising before, on or after the Closing Date, of DuPont, the Sellers or any of their predecessor companies or businesses, or any of their Affiliates, Subsidiaries or divisions, resulting from or arising out of (a) the present, past or future operations or conduct of the DuPont Business or (b) the ownership or use of any Assets (other than the DTI Assets) owned or used by DuPont or its Affiliates, a Seller or any of the Retained Subsidiaries; provided, however, that Retained Liabilities shall (except as provided in clauses (i)–(xviii) below) in no event include Liabilities of the type described in clauses (i)–(xiv) in the definition of "Assumed Liabilities." "Retained Liabilities" shall also include the following:

(i)     all Liabilities resulting from or arising out of the ownership or use of the Excluded Assets;

(ii)    all Liabilities pursuant to or under Contracts to which DuPont or any of its Affiliates is a party (other than Liabilities pursuant to

51

or under Contracts included in the DTI Assets or Shared Contractual Liabilities allocated to Buyer under Section 5.25);

(iii)    all warranty and similar obligations entered into or incurred (x) not in the ordinary course of the DTI Business with respect to its products or services or (y) in the course of the DuPont Business with respect to its products or services or arising out of a Contract or Asset described in clause (i) or (ii) of this definition of "Retained Liabilities";

(iv)    all DuPont Environmental Liabilities;

(v)    all Liabilities resulting from or arising out of (x) the Retained DTI Actions or (y) Actions to the extent resulting from or arising out of the DuPont Business, the ownership or use of the Excluded Assets or the ownership or use of any Assets in the DuPont Business, whether arising before, on or after the Closing Date (except in all cases for the Specified DTI Actions), and, in all cases, any additional Actions to the extent resulting from or arising out of the subject matter of any Actions described in clause (x) or (y) above or any claim based on substantially similar or related factual or legal allegations or claims; provided, that, except as expressly set forth in Schedule 1(zz) and except for such matters and claims that are described as Retained Liabilities other than pursuant to this clause (v), Liabilities resulting from or arising under any such additional Action that results from or arises out of the subject matter of an Action described in clause (x) or (y), or is based on substantially similar factual or legal allegations or claims, shall be Retained Liabilities only to the extent they have arisen out of the operation or conduct of the DTI Business, or the ownership or use of Assets in the DTI Business, in any case prior to the Closing;

(vi)    DuPont's or any Retained Subsidiary's portion, determined pursuant to Section 5.25, of Shared Contractual Liabilities;

(vii)    all Liabilities to the extent allocated as Retained Liabilities pursuant to Section 5.24;

(viii)    all Liabilities assumed by, retained by or agreed to be performed by DuPont or any of the Retained Subsidiaries pursuant to this Agreement (including pursuant to Section 5.16) or any of the Related Agreements;

(ix)    all Liabilities resulting from or arising out of any Excluded Businesses, including the disposition of any Divested Business;

(x)    all Liabilities for Taxes (including Transfer Taxes) for which DuPont or a Retained Subsidiary is liable pursuant to Article VI or, except as provided otherwise in Article VI, applicable Law;

52

(xi)     all Liabilities of DuPont or its Affiliates (other than a DTI Company or an Asset Seller (with respect to the DTI Business)), in each case under a Services Agreement;

(xii)     all Liabilities resulting from or arising out of the Joint Venture Guarantees; provided, that for purposes of the indemnification provisions of Section 8.4(a), this clause (xi) shall be disregarded;

(xiii)     all indebtedness of DuPont and its Affiliates for borrowed money, including all Indebtedness of DuPont and its Affiliates of the type described in clauses (i) and (ii) of the definition of "Indebtedness" and all guarantees of such indebtedness, except for (1) the Assumed Notes, (2) Specified Indebtedness and (3) the DuPont Guarantees; provided, that the foregoing shall not limit the obligations of the parties hereto under Section 5.12;

(xiv)     all Liabilities for guarantees of Liabilities of third Persons (other than, subject to (A) Section 5.12, DuPont Guarantees and (B) Section 5.25, guarantees representing Shared Contractual Liabilities);

(xv)     all Retained Canadian Manufacturing Liabilities;

(xvi)     (A) all Liabilities to the extent arising prior to Closing (or, with respect to any Joint Venture the Joint Venture Interests of which are not transferred at Closing, prior to the transfer of the applicable Joint Venture Interests) by reason of (i) the failure by DuPont or any of its Subsidiaries or any Majority Owned Joint Venture to maintain corporate formalities (or analogous formalities for other entities) and separateness with respect to any Joint Venture (including initially inadequately capitalizing such Joint Venture or thereafter receiving distributions therefrom which result in it being inadequately capitalized); provided, however, that to the extent that any Liabilities covered by this subclause (A) arose out of or relate (directly or indirectly) to Environmental Claims or requirements of Environmental Law, (1) such Liability shall be treated in the same manner as a Liability of a Consolidated Joint Venture under Section 8.5(b)(xiv)(A) and (2) notwithstanding the foregoing, such Liabilities shall not be deemed to be Retained Liabilities solely by reason of this clause (xvi) to the extent the Joint Venture in question is able to satisfy and discharge such Liability itself (without any additional funding from the partners or members thereof) or (ii) any breach by DuPont or any of its Subsidiaries of any Joint Venture Agreement or, subject to Section 5.27, disputes between DuPont and any Other Partner relating to pre-Transfer Date matters and (B) with respect to any Joint Venture the Joint Venture Interests of which are not transferred at Closing, the Liabilities of DuPont or the Retained Subsidiaries (or, with respect to Joint Venture Interests held by DTI Companies, the DTI Companies) arising under the applicable Joint Venture Agreements or from its status as an owner of such Joint Venture Interest shall be deemed Retained Liabilities unless such Joint Venture Interests are transferred to Buyer or one of its Subsidiaries, in which case such

53

Liabilities (other than those described in clause (A) above) shall be deemed retroactively to the Closing to be Assumed Liabilities to the extent they would have been Assumed Liabilities if the applicable Joint Venture Interests had been transferred at Closing pursuant to Article II;

(xvii)   Liabilities arising (i) out of disputes between DuPont or any of its Affiliates, on the one hand, and Unifi, Inc., on the other hand, relating to matters occurring prior to the Closing in connection with the Unifi Agreements or (ii) by reason of the imposition of liability upon DuPont or, by reason of it being the successor to the ownership of the DTI Business, Buyer or their respective Affiliates for the Liabilities of Unifi, Inc. or its Subsidiaries, but only, in the case of clause (ii), to the extent such Liabilities arise out of or result from acts or failures to act of DuPont or its Affiliates (or occurrences) occurring prior to the transfer of the Unifi Assets to Buyer or an Affiliate; and

(xviii)  all Liabilities that are set forth on Schedule 1(zz);

provided, however, that notwithstanding anything to the contrary in this Agreement, Retained Liabilities (other than those set forth in clause (xviii) above) shall in no event include any (A) DTI Environmental Liabilities (other than such Liabilities that are retained under clause (xvi) above), (B) Liabilities that relate to Taxes that are assumed pursuant to clause (viii) of the definition of "Assumed Liabilities," (C) Liabilities allocated to Buyer, a Buyer Sub or a DTI Company pursuant to Section 5.16 or pursuant to a side letter dated the date hereof between Buyer and DuPont or (D) Liabilities that are set forth on Schedule 1(d).

"Retained Subsidiary" shall mean any Subsidiary of DuPont at any time after the date of this Agreement, other than any DTI Company.

"Retiree Eligible Transferred Employee" shall have the meaning set forth in Section 5.16(j).

"Retiree Welfare Plan" shall mean each post-retirement welfare benefit plan maintained by DuPont or its Subsidiaries (including the DTI Companies) for DTI Employees and Former DTI Employees located in the United States as in effect on the Closing Date.

"Reverse Transfer Agreements" shall mean the Canada Asset Transfer Agreement, the Singapore Asset Transfer Agreement and the UK Non-DTI Asset Transfer Agreement.

"Rights" shall have the meaning set forth in Section 5.27(l).

"Rights of Way" shall have the meaning set forth in Section 3.12(o).

54

"Sale" shall mean the sale, conveyance, assignment, transfer and delivery to, and the purchase, acquisition and receipt by, Buyer or one or more of the Buyer Subs of the Transferred DTI Assets, the Shares and the Joint Venture Interests, or any portion thereof, including pursuant to this Agreement and each Local Purchase Agreement.

"Sale Process" shall mean all matters relating to the sale of the DTI Business and all activities in connection therewith, including the solicitation of proposals from third parties and the consideration of, and actions taken in connection with, possible alternatives to some or all of the transactions contemplated by this Agreement, including an initial public offering of the DTI Business.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"SEC Filings" shall have the meaning set forth in Section 5.38(a).

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Selected Joint Venture Interests" shall mean those Joint Venture Interests set forth on Schedule 1(aaa).

"Seller Agent" shall have the meaning set forth in Section 9.11(c).

"Seller Owned Intellectual Property" shall have the meaning set forth in Section 3.13(a).

"Sellers" shall mean, collectively, the Global Sellers and the Local Sellers.

"Selling Group" shall mean the affiliated group of corporations of which DuPont is the common parent.

"Separate IT Rights" shall have the meaning set forth in Section 5.8(f)(i).

"Separation Completion Plan" shall have the meaning set forth in Section 3.14(f).

"Services Agreements" shall mean those Local Asset Transfer Agreements set forth on Schedule 1(bbb).

"Shared Contracts" shall mean Contracts entered into prior to Closing which are between DuPont or any of its Subsidiaries (or, after the Closing, DuPont or Buyer or any of their respective Subsidiaries), on the one hand, and one or more third parties, on the other hand (regardless of whether such Contracts constitute DTI Assets), that directly benefit both (x) the DuPont Business and (y) the DTI Business; provided, however, that (i)(x) a Contract to which DuPont or one of its Subsidiaries (other than a DTI Company) is a party, and to which Buyer or one of its Subsidiaries is not a party and which is used by DuPont or a Subsidiary thereof (other than a DTI Company) to provide benefits pursuant to a Services Agreement and (y) the DuPont Mark Contracts, in each

55

case, shall not be deemed to be a Shared Contract and (ii) the Transferred DuPont Mark Contracts shall not be deemed to be Shared Contracts.

"Shared Contractual Liabilities" shall mean Liabilities in respect of Shared Contracts.

"Shared Facility" shall mean any land, improvement or space within any improvement that is used or, as of the Closing Date, will be used, in both the DuPont Business and the DTI Business and that is set forth on Schedule 1(ccc).

"Shared Liability" shall have the meaning set forth in Section 5.24.

"Shares" shall mean all of the equity interests in the DTI Companies other than equity interests owned beneficially and of record by other DTI Companies and other than director's qualifying shares and investments by foreign nationals mandated by applicable Law, a list of which, as of the date of this Agreement, is set forth on Schedule 1(ddd).

"Significant Non-Income Tax" shall have the meaning set forth in Section 6.1(c)(i).

"Singapore Asset Transfer Agreement" shall mean the amended and restated Asset Transfer Agreement, effective January 1, 2003, by and between DuPont Textiles and Interiors (Singapore) Pte Ltd, a company incorporated in Singapore, and DuPont Company (Singapore) Pte Ltd, a company incorporated in Singapore, as the same may be amended after the date of this Agreement in accordance with the terms of this Agreement.

"Sliding Scale" shall mean an allocation of the Losses described below in Section 8.5, as follows: (i) DuPont one-hundred percent (100%) and Buyer zero percent (0%) for Sliding Scale Matters discovered, and about which Buyer provides notice to DuPont, on or before the date that is eighteen (18) months after (a) in the case of Sliding Scale Matters (other than Continuing Environmental Issues), the Transfer of Responsibility Date and (b) in the case of Continuing Environmental Issues, the Closing Date; (ii) except as set forth in clause (i), DuPont seventy-five percent (75%) and Buyer twenty-five percent (25%) for Sliding Scale Matters discovered, and about which Buyer provides notice to DuPont, on or before the date that is thirty-six (36) months after (a) in the case of Sliding Scale Matters (other than Continuing Environmental Issues), the Transfer of Responsibility Date and (b) in the case of Continuing Environmental Issues, the Closing Date; (iii) except as set forth in clauses (i)-(ii), DuPont fifty percent (50%) and Buyer fifty percent (50%) for Sliding Scale Matters discovered, and about which Buyer provides notice to DuPont, on or before the date that is forty-eight (48) months after (a) in the case of Sliding Scale Matters (other than Continuing Environmental Issues), the Transfer of Responsibility Date and (b) in the case of Continuing Environmental Issues, the Closing Date; (iv) except as set forth in clauses (i)-(iii), DuPont twenty-five percent (25%) and Buyer seventy-five percent (75%) for Sliding

56

Scale Matters discovered, and about which Buyer provides notice to DuPont, on or before the date that is sixty (60) months after (a) in the case of Sliding Scale Matters (other than Continuing Environmental Issues), the Transfer of Responsibility Date and (b) in the case of Continuing Environmental Issues, the Closing Date; and (v) except as set forth in clauses (i)-(iv), DuPont zero percent (0%) and Buyer one hundred percent (100%) for Sliding Scale Matters discovered after the date that is sixty (60) months after (a) in the case of Sliding Scale Matters (other than Continuing Environmental Issues), the Transfer of Responsibility Date and (b) in the case of Continuing Environmental Issues, the Closing Date.

"Sliding Scale Matters" shall mean, with respect to DuPont Remediation Sites, Existing Contamination (other than Known Existing Contamination) and violations of Environmental Law existing as of the Closing Date (other than Known Violations of Environmental Law) and Continuing Environmental Issues.

"Software" shall mean a set of statements or instructions, in object code or source code forms, used directly or indirectly in a computer to cause the computer to perform specific tasks or functions.

"Solvent" shall mean, with respect to any Person, that (i) the fair saleable value of the property of such Person and its Subsidiaries is, on the date of determination, greater than the total amount of Liabilities of such Person and its Subsidiaries as of such date, (ii) such Person and its Subsidiaries are able to pay all Liabilities of such Person and its Subsidiaries as such Liabilities mature and (iii) such Person and its Subsidiaries do not have unreasonably small capital for conducting the business theretofore or proposed to be conducted by such Person and its Subsidiaries. In computing the amount of contingent or unliquidated Liabilities at any time, such Liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured Liability.

"Spandex" shall mean a long chain synthetic polymer comprised of at least 85% by weight of (a) a segmented block copolymer consisting of soft, elastic segments composed of polymeric glycols joined to hard urea segments by urethane linkages (-NH-CO-O-) and/or (b) a segmented block copolymer consisting of soft, elastic segments composed of polymeric glycols joined to hard urethane segments by urethane linkages (-NH-CO-O-).

"Special Designated Joint Venture" shall mean those Designated Joint Ventures set forth on Schedule 1(k) which are marked with an asterisk (*);provided, that any such Designated Joint Venture shall be deemed not to be a Special Designated Joint Venture if the Joint Venture Interest in such Designated Joint Venture is transferred (directly or indirectly) to Buyer or a Buyer Sub at Closing or if prior to Closing the Other Partner had exercised (or given notice of exercise of) its rights to purchase such Joint Venture Interest (as contemplated by Section 5.27).

"Specified DTI Actions" shall mean those Actions set forth on Schedule 1(eee).

"Specified Indebtedness" shall mean Consolidated Indebtedness other than any such Indebtedness owed by an Asset Seller to DuPont or any of its Affiliates (plus, for purposes of clause (v) of the definition of Assumed Liabilities and clause (xiii) of the definition of Retained Liabilities, any interest thereon), but only to the extent that the aggregate principal amount of such Indebtedness does not exceed $400 million, as such amount may be increased with the consent of Buyer upon receiving a request from DuPont to increase such amount pursuant to Section 5.1(a); provided, that DuPont shall have the right to designate any Consolidated Indebtedness (other than (i) Indebtedness outstanding on both the date of this Agreement and the Closing Date (excluding Indebtedness of INVISTA Argentina S.A., DTI Nylon Inversora S.A. and INVISTA Nylon Sudamerica S.A.) and (ii) Indebtedness (to the extent outstanding at Closing) of a DTI Company, the Shares of which, or any Joint Venture, the Joint Venture Interests in which, are being transferred (directly or indirectly) at Closing to Buyer or a Buyer Sub) as not being Specified Indebtedness.

"Specified Transaction" shall have the meaning set forth in Section 5.3(a).

"Straddle Assessment Period" shall mean an Assessment Period that includes (but does not end on) the Closing Date.

"Straddle Period" shall have the meaning set forth in Section 6.2(b).

"Stub Period Audited Financial Statements" shall have the meaning set forth in Section 5.28(d).

"Sublease" shall mean each of the subleases between DuPont or a Retained Subsidiary, on the one hand, and Buyer, a Buyer Sub or a DTI Company, on the other hand, in all material respects in the form attached as Exhibit B-2.

"Subsequent Action" shall have the meaning set forth in Section 3.8.

"Subsidiary" shall mean with respect to any Person (i) a corporation, fifty percent (50%) or more of the voting or capital stock of which is, as of the time in question, directly or indirectly owned by such Person and (ii) any other partnership, joint venture, association, joint stock company, trust, unincorporated organization or other entity in which such Person, directly or indirectly, owns fifty percent (50%) or more of the equity economic interest thereof or has the power to elect or direct the election of fifty percent (50%) or more of the members of the governing body of such entity or otherwise has control over such entity (e.g., as the managing partner of a partnership). For purposes of this definition, the Joint Ventures shall be deemed not to be Subsidiaries of DuPont or Buyer or any of their respective Subsidiaries.

58

DPP0003032

"Supply Agreements" shall mean the Supply Agreements listed on Schedule 1(fff) in all material respects in the forms attached as Exhibit M.

"Surveys" shall have the meaning set forth in Section 5.33.

"Tax" shall mean, with respect to any Person, any tax, charge, fee, levy, impost, duty or other assessment of a similar nature, including income, alternative or add-on minimum, gross receipts, profits, lease, service, service use, wage, wage withholding, employment, workers compensation, business occupation, occupation, premiums, environmental, estimated, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, occupation, windfall profits, withholding, social security, unemployment, disability, ad valorem, estimated, highway use, commercial rent, capital stock, paid up capital, recording, registration, property, real property gains, real estate, value added, business license, custom duties, bank transaction taxes or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Tax Authority including any interest, additions to tax or penalties applicable or related thereto, whether disputed or not, for which such Person may be liable (including by Contract, as a transferee or successor, by Law (including by application of Treasury Regulation § 1.1502-6 or similar provisions of state, local or foreign Laws) or otherwise).

"Tax Asset" shall mean any Tax Item that could reduce a Tax, including a net operating loss, net capital loss, investment tax credit, foreign tax credit or any other Tax credit or deduction.

"Tax Audit" shall have the meaning set forth in Section 6.4(a).

"Tax Authority" shall mean a Governmental Authority or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including the IRS).

"Tax Item" shall mean any item of income, gain, loss, deduction or credit, or other attribute that may have the effect of increasing or decreasing any Tax.

"Tax Period" shall mean any period prescribed by any Tax Authority for which a Tax Return is required to be filed or a Tax is required to be paid.

"Tax Records" shall have the meaning set forth in Section 6.9.

"Tax Return" shall mean any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return, amended tax return, claim for refund or declaration of estimated tax) required or permitted to be supplied to, or filed with, a Tax Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

59

"Tax Sharing Agreement" shall mean any existing agreement or arrangement (whether or not written) binding any of the DTI Companies that provide for the allocation, apportionment, sharing, indemnity or assignment of any Tax liability or benefit, or the transfer or assignment of income, revenues, receipts or gains for the principal purpose of determining any Person's Tax liability.

"Technical Information" shall mean technical information all in written or other tangible form that either DuPont or INVISTA Inc. owns or possesses and has the right to assign or license pursuant to the Patent and Technical Information Agreement as of the Closing Date including: (i) know-how, discoveries, improvements, processes, formulae, specifications and trade secrets, (ii) specifications, ideas and concepts for products, equipment, processes and services, (iii) manufacturing and performance specifications and procedures, (iv) engineering drawings and graphs, (v) technical, research and engineering data, (vi) formulations, materials and material specifications, (vii) laboratory studies and benchmark tests, (viii) service and operation manuals, (ix) quality assurance policies, procedures and specifications, (x) evaluation and/or validation studies, (xi) unpublished patent applications, (xii) all other know-how, methodologies, procedures, techniques and trade secrets related to research, engineering, development and manufacturing, and (xiii) technical environmental information related thereto; provided, however, that Technical Information shall not include Non-Technical Information.

"Technology" shall mean technical information (whether patentable or not) including (i) know-how, discoveries, improvements, processes, formulae, specifications and trade secrets, (ii) specifications, ideas and concepts for products, equipment, processes and services, (iii) manufacturing and performance specifications and procedures, (iv) engineering drawings and graphs, (v) technical, research and engineering data, (vi) formulations, materials and material specifications, (vii) laboratory studies and benchmark tests, (viii) service and operation manuals, (ix) quality assurance policies, procedures and specifications, (x) evaluation and/or validation studies, (xi) unpublished patent applications, (xii) all other know-how, methodologies, procedures, techniques and trade secrets related to research, engineering, development and manufacturing, and (xiii) technical environmental information related thereto.

"Third Party Default" shall mean a default or breach (or alleged default or breach) by DuPont or Buyer or any of their Subsidiaries to the extent it arises by reason of the fact that (in accordance with Section 5.25) Buyer or one of its Subsidiaries (rather than DuPont or one of its Subsidiaries) is performing DuPont's or its Subsidiary's obligations, or obtaining DuPont's or its Subsidiaries' benefits, under a Contract that is described in Section 5.25(d), but excluding from the foregoing any default or breach (or alleged default or breach) relating to any defect in the performance itself.

"Third Party Landlord Leased Real Property" shall mean the leased premises demised under the Third Party Landlord Leases.

60

"Third Party Landlord Leases" shall mean all of the leases, subleases, licenses and occupancy agreements between DuPont or any of its Subsidiaries (including the DTI Companies) as landlord or licensor, on the one hand, and a third party other than DuPont or Buyer or any of their respective Subsidiaries, as tenant, licensee or occupier, on the other hand, the premises demised under which constitute all of the premises which are leased to third parties by DuPont or any of its Subsidiaries (including the DTI Companies) and which are primarily used or primarily held for use in connection with the DTI Business.

"Third Party Leased Real Property" shall mean, collectively, all Third Party Landlord Leased Real Property and Third Party Tenant Leased Real Property.

"Third Party Leases" shall mean the Third Party Tenant Leases and the Third Party Landlord Leases.

"Third Party Tenant Leased Real Property" shall mean the leased premises demised under the Third Party Tenant Leases.

"Third Party Tenant Leases" shall mean all of the leases, subleases, licenses and occupancy agreements between DuPont or any of its Subsidiaries (including the DTI Companies) as tenant, on the one hand, and a third party other than DuPont or Buyer or any of their respective Subsidiaries, as landlord, on the other hand, the premises demised under which constitute all of the premises which are leased from third parties by DuPont or any of its Subsidiaries (including the DTI Companies) and which are primarily used or primarily held for use in connection with the DTI Business.

"Title Commitments" shall have the meaning set forth in Section 5.32(b).

"Title Company" shall mean Parthenon Title Company, as agent for Chicago Title Insurance Company.

"Title Reports" shall have the meaning set forth in Section 5.32(a)

"Title Review Period" shall have the meaning set forth in Section 5.32(c).

"Title Transfer Date" shall have the meaning set forth in Section 8.5(c).

"Top-Up Notice" shall have the meaning set forth in Section 5.27(e)(iii)(C).

"Trademark Agreements" shall mean the Trademark Agreements in all material respects in the form attached as Exhibits N.

"Trademarks" shall have the meaning set forth in the definition of "Intellectual Property."

61

"Transfer Date" shall (i) with respect to Joint Venture Interests, have the meaning set forth in Section 5.27(d) and (ii) with respect to Shares in Delayed Companies, mean the date such Shares are transferred, conveyed, assigned or delivered to Buyer or a Buyer Sub.

"Transfer of Responsibility Date" shall have the meaning set forth in Section 8.5(c).

"Transfer Taxes" shall have the meaning set forth in Section 6.5.

"Transferred DTI Assets" shall mean the DTI Assets other than to the extent held by a DTI Company at Closing; provided, however, the Transferred DTI Assets shall not include any (i) Non-Transferable Permits, (ii) Shares, (iii) equity interests in any Retained Subsidiary or (iv) Joint Venture Interests.

"Transferred DuPont Mark Contracts" shall mean those Contracts set forth on Schedule 1(ggg).

"Transferred Intellectual Property Contracts" shall mean those Contracts set forth on Schedule 1(hhh).

"Transitional Services Agreement" shall have the meaning set forth in Section 5.25(c).

"Treasury Regulations" shall mean the final, temporary and proposed regulations promulgated by the United States Treasury Department under the Code.

"UK Non-DTI Asset Transfer Agreement" shall mean the UK Non-DTI Asset Transfer Agreement, dated January 1, 2003 between INVISTA (U.K.) Holdings Limited (formerly known as DuPont Textiles & Interiors (U.K.) Holdings Limited) and DuPont (U.K.) Limited (formerly known as DuPont (Remainco) Limited), as the same may be amended after the date of this Agreement in accordance with the terms of this Agreement.

"Unacceptable Conduct" shall have the meaning set forth in Section 8.4(b).

"Unaudited Combined Historical Financial Statements" shall have the meaning set forth in Section 3.5(b).

"Unaudited Combined Interim Financial Statements" shall have the meaning set forth in Section 5.28(a).

"Unifi Agreements" shall mean the Master Agreement-POY Manufacturing Alliance, between DuPont and Unifi, Inc., dated effective June 1, 2000, and the supplemental alliance agreements and ancillary agreements contemplated thereby.

62

DPP0003036

(i)      As of the date of this Agreement, there has been no amendment to, written interpretation or announcement (whether or not written) by the Sellers or any of their Affiliates relating to, or change in employee participation or coverage under, any DTI Benefit Plan or Foreign Benefit Plan which would increase materially the expense of maintaining such DTI Benefit Plan or Foreign Benefit Plan above the level of the expense incurred in respect thereof for the twelve (12) months ended as of the date of the Audited Combined Financial Statements.

(j)      Except as set forth on Schedule 3.10(j)-1, with respect to each Foreign Benefit Plan: (i) all employer and employee contributions to each Foreign Benefit Plan required by applicable Law or by the terms of such Foreign Benefit Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Benefit Plan, the liability of each insurer for any Foreign Benefit Plan funded through insurance or the book reserve established for any Foreign Benefit Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used for local statutory funding or accrual purposes for such Foreign Benefit Plan (or, if there are no such assumptions and valuations, the methodology and assumptions used to determine the liabilities for such Foreign Benefit Plan in the December 31, 2002 Audited Combined Financial Statements); and (iii) each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities. Schedule 3.10(j)-2 contains a true and complete list of each material Foreign Benefit Plan, and DuPont has made available to Buyer true and complete copies of all material Foreign Benefit Plans listed therein.

(k)      The DTI Companies have at all times been in material compliance with applicable Law regarding the classification of employees and independent contractors.

Section 3.11    Environmental Matters.

(a)      Except as set forth on Schedule 3.11(a)(i), to the Knowledge of DuPont, each of the Asset Sellers (with respect to the DTI Business) and the DTI Companies (and, to the Knowledge of DuPont, the Joint Ventures) are, and for the past three (3) years have been, in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the DTI Business of all Environmental Permits and compliance with the terms and conditions thereof), except where failure to be in compliance has not had, and would not reasonably be expected to result in a Material Impairment. Schedule 3.11(a)(ii) sets forth all Environmental Permits that are material to the conduct of the DTI Business and that are held by a Seller, one of the DTI Companies or, to the Knowledge of DuPont, a Joint Venture, as the case may be.

(b)      Except as set forth on Schedule 3.11(b), there is no written Environmental Claim pending or threatened in writing with respect to the DTI Business

95

or with respect to any of the Asset Sellers (with respect to the DTI Business), the DTI Companies or the Joint Ventures, except for any Environmental Claim that has not resulted in, and would not reasonably be expected to result in, Losses in excess of $400,000.

(c)    Except as set forth on Schedule 3.11(c), to the Knowledge of DuPont, there have been no Releases of Hazardous Substances at, on, or underneath any of the DTI Assets (or, to the Knowledge of DuPont, any of the Assets of the Joint Ventures) in quantities reasonably likely to trigger Remediation that would result in a Material Impairment.

(d)    Except for the Remediation activities underway at the sites set forth on Schedule 3.11(d), to the Knowledge of DuPont, there is no Remediation being conducted or planned at any of the DTI Acquired Real Property or DTI Leased Real Property that would reasonably be expected to result in a Material Impairment.

(e)    Except as set forth on Schedule 3.11(e), each of the Sellers or the DTI Companies and, to the Knowledge of DuPont, the Joint Ventures have delivered or otherwise made available for inspection to Buyer true, complete and correct copies and results of any Phase I or Phase II environmental assessments prepared within the past three (3) years, and any other material reports, studies, analyses, tests or monitoring possessed or initiated by DuPont or any of its Affiliates or, to the Knowledge of DuPont, the Joint Ventures pertaining to Hazardous Substances in, on, beneath or adjacent to any of the DTI Assets (or, to the Knowledge of DuPont, the Assets of the Joint Ventures) or regarding the DTI Business' compliance with applicable Environmental Laws.

(f)    Since January 1, 1975, and to the Knowledge of DuPont prior to 1975, the DTI Business has not engaged in the manufacture, sale, processing, storage, distribution, disposal or use of any products containing fluorochemicals which were produced by the Simons Electro-Chemical Fluorination method for producing and processing fluorochemicals except for (i) stain resistant or soil resistant treatment products manufactured by third parties, or (ii) lubricants, greases, and similar products manufactured by third parties which are commonly used in industrial and manufacturing applications.

(g)    The representations and warranties contained in this Section 3.11 shall be the exclusive representations and warranties with respect to Environmental Claims, Environmental Conditions, Environmental Laws, Environmental Matters and Environmental Permits.

Section 3.12    Real Property.

(a)    Except as set forth on Schedule 3.12(a), the Asset Sellers or the DTI Companies have (i) good and valid title in fee simple to the DTI Acquired Real Property (including the Improvements thereon) subject only to Permitted Encumbrances

96

4.2 (<u>Authority Relative to this Agreement, Etc.</u>) and 4.7 (<u>Brokers and Finders</u>) shall survive for fifteen (15) years following the Closing; and (iv) the representations and warranties of DuPont contained in Sections 3.9 (<u>Taxes</u>), 3.10 (<u>Employee Benefits; ERISA</u>), and 3.11 (<u>Environmental Matters</u>) and representations and warranties of Buyer contained in Section 4.5 (<u>Securities Act</u>) shall survive until ninety (90) days after the expiration of the applicable statute of limitations with respect to the matter at issue. All covenants and agreements contained herein which by their terms contemplate actions or impose obligations following the Closing shall survive the Closing and remain in full force and effect in accordance with their terms. All covenants and agreements contained herein which by their terms contemplate full performance at or prior to Closing shall terminate upon Closing, except that claims for indemnification in respect of any breach thereof shall survive until the second anniversary of the Closing; provided, however, that, notwithstanding the foregoing, (x) the obligations of Buyer and the Buyer Subs to assume, and indemnify the DuPont Indemnified Parties for, the Assumed Liabilities and (y) the obligations of DuPont and its Subsidiaries (not including the DTI Companies or the Joint Ventures) to make conveyances, transfers, assignments and deliveries under Article II and to retain, and indemnify the Buyer Indemnified Parties for, the Retained Liabilities shall survive indefinitely; provided, however, that any Assumed Liability of the type described in clause (vii) of the definition thereof or any Retained Liability of the type described in clause (viii) of the definition thereof, in each case, which relates to any covenant or agreement which by its terms is not intended to survive past a particular date, shall not, by reason of the foregoing proviso relating to Assumed Liabilities and Retained Liabilities, survive past the date such covenant or agreement would otherwise terminate. Notwithstanding the foregoing, the representations and warranties of DuPont contained in Section 3.9(u) shall survive until the earlier of (w) six (6) months after the Closing Date, (x) the taking of any action by Buyer or its Affiliates (affiliation measured post-Closing) which requires a new exemption from withholding, or (y) the expiration or renewal date for any withholding exemption with a fixed term (e.g., an annual exemption), whereupon they shall terminate.

### Section 8.4    <u>Indemnification</u>.

        (a)     From and after the Closing, DuPont shall defend, indemnify and hold harmless Buyer, Buyer Subs and their Subsidiaries (including the DTI Companies) and each of their Affiliates and each of Buyer's, its Subsidiaries', and their respective Affiliates' respective officers, directors, employees and agents (collectively, the "<u>Buyer Indemnified Parties</u>") from and against any and all Losses arising from, in connection with or otherwise with respect to (i) the breach or failure of any of the Sellers to duly perform or observe any term, provision, covenant (other than Section 5.36) or agreement to be performed or observed by the Sellers pursuant to this Agreement (other than the failure to deliver prior to Closing reports of PWC pursuant to Section 5.28 that neither are qualified nor contain exceptions), any Related Agreement or any Other Agreement (notwithstanding any provision to the contrary contained herein or therein), (ii) any of the Retained Liabilities (whether arising prior to, on or after the Closing Date), (iii) (x) any breach or failure to be true of any representation or warranty

228

of DuPont set forth in Article III of this Agreement without regard to any Material Adverse Effect or Material Impairment qualifier therein (other than with respect to the representations and warranties contained in Sections 3.6, 3.12 (other than Section 3.12(a)), 3.13(b)(iii) and (e) and the final proviso to Section 3.14(a) and the final proviso to the first sentence of Section 3.14(b)), as if such representation or warranty were made on and as of the Closing Date (except in the case of any representation or warranty that speaks expressly to an earlier specific date) or (y) in the case of any Joint Venture, the Joint Venture Interest in, or Other Partner Interest of, which is not transferred to Buyer or a Buyer Sub until after the Closing, any breach or failure to be true of any representation or warranty of DuPont set forth in Section 3.1 (but only with respect to the first two sentences (but not with respect to good standing) and the last sentence thereof) or Section 3.3 with respect to such Joint Venture, as if such representation or warranty (including to the extent it relates to the Other Partner Interest) were made on and as of the Transfer Date for DuPont's or its Subsidiary's Joint Venture Interest in the Joint Venture in question, but only if such breach or failure to be true (1) existed on the Closing Date or (2) arose thereafter but was due to DuPont's breach of this Agreement or the applicable Joint Venture Agreement or resulted from an event within DuPont's control; provided, that with respect to any particular and separate breach or failure to be true of any representation or warranty (other than Sections 3.13(b)(i), (ii) and (iv), which shall not be subject to this proviso) which contains a Material Impairment or Material Adverse Effect qualifier by reason of such qualifier not being given effect for purposes of this Section 8.4(a)(iii), no claim for indemnity shall be made under this clause (iii) unless the Losses incurred by reason of such failure of such representation or warranty to be true exceed (x) in the case of the representations and warranties in Sections 3.7 (other than Section 3.7(c)), 3.8 (with respect to Subsequent Actions) and 3.13(c) and (d), $3 million (after, in the case of Section 3.8, giving effect to insurance recoveries with respect thereto) and (y) in the case of each other representation and warranty, $400,000, in each case, individually, and without regard to any aggregation concept in such representation or warranty; provided, that separate breaches and failures of a particular representation or warranty to be true arising out of the same acts, failures to act or events that are part of a common plan or arrangement or which are in substantial part logically or causally connected (it being understood that acts, failures to act or events that are similar in nature are not necessarily logically or causally connected) shall be deemed to be a single breach or failure for the purposes of this proviso or (iv) any Encumbrance (other than a Permitted Encumbrance) that is applicable to an Other Partner Interest in Buyer's hands so long as Buyer was required to purchase, and did purchase, such Other Partner Interest pursuant to Section 5.27(e), but only if and to the extent such Other Partner Interest was subject to such Encumbrance at the time Buyer purchased from DuPont or a Subsidiary thereof DuPont's or such Subsidiary's Joint Venture Interest in the Joint Venture in question (whether such purchase was prior to or concurrently with the purchase of such Other Partner Interest); provided, that without limiting any other provision herein, the Buyer Indemnified Parties shall not be entitled to recover Losses with respect to an Other Partner Interest pursuant to this clause (iv) to the extent (A) the price paid by Buyer for such Other Partner Interest was reduced from the amount that it otherwise would have been but for the existence of such Encumbrance or (B) such Losses would exceed the

229

amount paid by Buyer for such Other Partner Interest (including all fees and expenses incurred in connection therewith). Indemnification under Section 8.4(a)(iii) with respect to the final proviso to Section 3.14(a) and the final proviso to the first sentence of Section 3.14(b) shall be subject to the additional limitations that such indemnification shall not be available to the extent the Losses result from Buyer's failure to perform its obligations under Section 5.8; provided, however, the foregoing shall not limit DuPont's obligations under Section 5.8.

          (b)     From and after the Closing, Buyer shall defend, indemnify and hold harmless DuPont, the other Sellers and their Subsidiaries and each of their Affiliates and each of DuPont's, its Subsidiaries' and their respective Affiliates' respective officers, directors, employees and agents (collectively, the "DuPont Indemnified Parties") from and against any and all Losses arising from, in connection with or otherwise with respect to (i) the failure of Buyer or any Buyer Sub to duly perform or observe any term, provision, covenant or agreement to be performed or observed by it or, after the Closing, by a DTI Company pursuant to this Agreement, any Related Agreement or any Other Agreement (notwithstanding any provision to the contrary contained herein or therein), (ii) except to the extent that Buyer would be entitled to be indemnified in respect thereof pursuant to Sections 8.4(a)(ii), 8.4(a)(iii) or 8.4(a)(iv) above (without giving effect to Sections 8.3, 8.4(h) and 8.4(i)), any of the Assumed Liabilities (whether arising prior to, on or after the Closing Date), (iii) any breach or failure to be true of any representation or warranty set forth in Article IV of this Agreement, as if such representation or warranty were made on and as of the Closing Date (except in the case of any representation or warranty that speaks to an earlier specific date) or (iv) (A) the performance by DuPont of its obligations under Section 5.35, including without limitation providing information, documents and personnel in connection with the financing transactions which are the subject of such Section, (B) any disclosure contained in or omission from any offering memorandum or other documents or information, provided to financing sources, including by DTI Employees, in connection with financing contemplated by Sections 4.4 or 5.35 (including any "A/B" exchange offer in connection therewith) and (C) any violations, or alleged violations, of federal or state securities laws in connection with the financing contemplated by Sections 4.4 or 5.35 (and any such exchange offer); provided, however, that the indemnification set forth in this clause (iv) shall not apply to Losses suffered by a DuPont Indemnified Party under this clause (iv) to the extent they arise as a result of (A) the breach or failure of any of the Sellers to duly perform or observe any term, provision, covenant or agreement to be performed or observed by the Sellers pursuant to this Agreement (other than by reason of a breach by DuPont of its obligations under Section 5.35 (so long as such breach was not the result of Unacceptable Conduct (as defined below) by DuPont or Section 5.36) or (B) any breach or failure to be true of any representation or warranty of DuPont set forth in Article III of this Agreement (after giving effect for the purpose of this proviso to any Material Adverse Effect, Material Impairment or other materiality qualifiers contained in any such representation or warranty as if such representation or warranty was made at and as of the date of the printing of the final offering memorandum related to Buyer financing, except for such representations or warranties that speak to a specific earlier date, in which case they need

230

only be true and correct as of such earlier date); provided, that no failure of any representation or warranty to be true shall be taken into account pursuant to clause (B) of the previous proviso if DuPont shall have notified Buyer thereof in writing not later than the date (the "Cut Off Date") which is at least two (2) Business Days prior to the printing of the final offering memorandum related to such financing (or, in the case of any bank financing, prior to the closing thereunder or, if such disclosure would not excuse the lenders from being required to close thereunder, then prior to the execution of the credit, loan or analogous agreement related thereto) (it being agreed that Buyer shall give DuPont at least two (2) Business Days' prior notice of the Cut Off Date (as it may be extended from time to time by Buyer in its sole discretion). As used herein, "Unacceptable Conduct" shall mean a failure by DuPont, that arises to the level of gross negligence or willful misconduct, with respect to DuPont's (which the parties hereto agree does not include members of the DTI Business' management's or PWC's) actions in performing its obligations under Section 5.35. The parties hereto acknowledge that Buyer's obligation to indemnify the DuPont Indemnified Parties under clause (ii) above shall not constitute an assumption of any Assumed Liability by Buyer insofar as third parties are concerned.

(c)     Notwithstanding anything herein to the contrary, (i) none of the Buyer Indemnified Parties shall be entitled to indemnification by a DuPont Indemnified Party for Losses under Section 8.4(a) hereof to the extent, but only to the extent, Buyer has otherwise been compensated by reasons of (x) adjustments (pursuant to Sections 2.5 or 2.6 or the definition of "Aggregate Global Closing Purchase Price" in Section 1.1) in the calculation of the Purchase Price relative to what it would have been absent such Loss or (y) indemnification or compensation for such Loss under another provision of this Agreement, (ii) any indemnification claims relating to any DuPont Environmental Liabilities (other than with respect to breaches or failures to be true of the representations and warranties in Section 3.11) shall be made exclusively under Section 8.4(a)(i) or 8.5 and any indemnification claims relating to breaches or failures to be true of representations and warranties in Section 3.11 shall only be made under Section 8.4(a)(iii), (iii) any indemnification claims relating to Taxes shall be made exclusively under Article VI, (iv) other than for (1) a breach or failure to be true of a representation or warranty contained in Sections 3.7(a), (b), (d) or (f), 3.8, 3.11, 3.18 or 3.21 which is otherwise subject to indemnification under Article VIII hereof, (2) any failure of a condition set forth in Article VII arising out of a breach of representation or warranty set forth in the Sections enumerated in the preceding clause (1), (3) a failure to comply with Article V or Section 8.5 or (4) a failure to comply with any provision in Article VIII (excluding any provisions therein which independently provide substantive rights of indemnification in Section 8.4(a)) or Article IX of the Agreement pertinent to the enforcement of a Person's rights with respect to the foregoing clauses, as between the Buyer Indemnified Parties and DuPont, the sole and exclusive remedy for Liabilities resulting from or arising out of a Designated Matter shall be as provided in clause (ii) of Section 8.4(a) (giving effect to item (1) of Schedule 1(zz)); provided, however, that DuPont shall have the right to update Schedule 3.8(c) prior to Closing to reflect Subsequent Actions that arise out of or relate to a Designated Matter, but any such update

231

shall be given effect solely for purposes of Section 8.4(a)(iii) as it relates to breaches of the representations and warranties in the third sentence of Section 3.8, (v) except as specifically provided in Section 5.27, neither party shall be required to indemnify the Buyer Indemnified Parties or the DuPont Indemnified Parties, as the case may be, with respect to any Joint Venture unless the Joint Venture Interests therein have been transferred to Buyer, in which event any rights to indemnification arising with respect thereto, if any, shall be applied retroactively to the Closing Date, (vi) following the Closing, as promptly as practicable upon first having actual knowledge of any breach or failure to be true of any representation or warranty of DuPont set forth in Section 3.3(b) with respect to any Other Partner Interests which might give rise to a claim for Losses under Section 8.4(a), Buyer shall (A) give written notice thereof to DuPont indicating the nature of such breach or failure to be true (provided, however, that the failure to give such notice shall not constitute a breach of this clause (vi) except to the extent a DuPont Indemnified Party shall have actually been prejudiced as a result of such failure) and (B) reasonably cooperate with DuPont to obtain any recoveries from any Other Partner (including by taking any actions reasonably requested by DuPont to enforce Buyer's or DuPont's rights relating to such breach or failure to be true against such Other Partner or assigning such rights to DuPont) for such Other Partner's breach of any Joint Venture Agreement or other action or failure to act which resulted in such potential Loss, (vii) there shall be no liability of any DuPont Indemnified Party for any breach of the last sentence of Section 3.18(c) and (viii) no Buyer Indemnified Party shall be entitled to indemnification under Section 8.4(a) by any DuPont Indemnified Party for any breach of the fourth sentence of Section 3.5(e) with respect to any Joint Venture Debt that is subject to a Joint Venture Guarantee, if (A) such Joint Venture Guarantee is of a type with respect to which Parent is required to indemnify DuPont pursuant to the Parent Side Letter and (B) Parent is not required to do so by reason of such breach.

(d)    Any calculation of Losses for purposes of this Section 8.4 (including for purposes of determining the amount of Losses for purposes of subsections (h) and (i) below) or any indemnity payments made under Article VI shall be (i) net of (A) any insurance recovery made from unaffiliated third party insurers (net of the expenses of the recovery thereof) by the Indemnified Party, (B) any payments received by a Buyer Indemnified Party from any Other Partner as compensation for such Other Partner's acts or failures to act giving rise to a breach or failure to be true of a representation or warranty of DuPont set forth in Section 3.3(b) or (C) receipt of indemnity payments from an unaffiliated third party; provided, however, that (x) if such recovery is subsequently returned to the insurer by reason of a retroactive adjustment or other reimbursement, then DuPont or Buyer, as the case may be, shall repay to the other the amount of such recovery which (i) was netted against the indemnity payment hereunder and (ii) was actually paid by DuPont or the Buyer, as the case may be, to the insurer, (y) the pendency of such payments shall not delay or reduce the obligation of the Indemnifying Party to make payment to the Indemnified Party in respect of such Losses (it being understood and agreed that each of the parties shall use its reasonable commercial efforts consistent with past practice of such party to maximize insurance or indemnity recoveries prior to either party seeking indemnification with respect to that

232

portion of a Loss which is covered by insurance or rights to any third party payment included in the DTI Assets) and (ii) (x) increased to take into account any net Tax cost incurred by the Indemnified Party arising from the receipt or accrual of indemnity payments hereunder (grossed-up for such increase) and (y) reduced to take account of any net Tax benefit realized by the Indemnified Party arising from the deductibility of any such Losses or Taxes. Any indemnification payment hereunder shall initially be made without regard to this paragraph and shall be increased or reduced to reflect any such indemnity payment, net Tax cost (including gross-up) or net Tax benefit only after the Indemnified Party has actually realized such cost or benefit. For purposes of this Agreement, an Indemnified Party shall be deemed to have "actually realized" a net Tax cost or a net Tax benefit to the extent that, and at such time as, the amount of Taxes payable by such Indemnified Party is increased above or reduced below, as the case may be, the amount of Taxes that such Indemnified Party would have been required to pay but for the receipt or accrual of the indemnity payment or the deductibility of such Losses or Taxes, as the case may be. The amount of any increase or reduction hereunder shall be adjusted to reflect any Final Determination with respect to the Indemnified Party's liability for Taxes and, if necessary, DuPont or Buyer, as the case may be, shall make payments to the other to reflect such adjustment. Any indemnity payment under this Agreement shall be treated as an adjustment to the Global Purchase Price, for Tax purposes, unless a Final Determination with respect to the Indemnified Party or any of its Affiliates causes any such payment not to be treated as an adjustment to the Global Purchase Price for Tax purposes. Each of the parties shall notify the other parties if such party receives notice that any Tax Authority proposes to treat any indemnity payment under this Agreement as other than an adjustment to the Global Purchase Price for Tax purposes.

    (e)  Any claim for Losses subject to indemnification under this Section 8.4 made after the Closing in accordance with this Article VIII by the party seeking indemnification (the "Indemnified Party") to the party from which indemnification is sought (the "Indemnifying Party") within the applicable time period set forth in Section 8.3 shall survive (and be subject to indemnification) until it is finally and fully resolved.

    (f)  (i)  Upon receipt by the Indemnified Party from a third party of notice of any action, suit, proceeding, claim, demand or assessment against such Indemnified Party which might give rise to a claim for Losses under this Section 8.4, the Indemnified Party (or DuPont or Buyer, as applicable, on behalf of an Indemnified Party) shall give written notice thereof to the Indemnifying Party indicating the nature of such claim and the basis therefor; provided, however, that failure to give such notice shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually prejudiced as a result of such failure. The Indemnifying Party shall have the right (subject to the limitations of clause (ii) of this Section 8.4(f)), at its option, to assume the defense of, at its own expense and by its own counsel, any such matter involving the asserted liability of the Indemnified Party as to which either (x) the Indemnifying Party shall have acknowledged its obligation to fully indemnify the

233

Indemnified Party or (y) the Indemnifying Party shall have agreed to pay the reasonable fees, costs and expenses of one separate counsel to the Indemnified Party, who shall be entitled to participate in (but shall not have the right to control) the defense of such litigation in any single jurisdiction pursuant to this Section 8.4(f). If any Indemnifying Party shall, in accordance with the preceding sentence, undertake to defend any such asserted liability, it shall promptly notify the Indemnified Party of its intention to do so, and the Indemnified Party shall agree to cooperate fully with the Indemnifying Party and its counsel in the compromise of, or defense against, any such asserted liability; provided, however, that the Indemnifying Party's counsel shall be reasonably satisfactory to the Indemnified Party and the Indemnifying Party shall not settle any such asserted liability without the written consent of the Indemnified Party (which consent will not be unreasonably withheld); provided, further, however, that the immediately preceding proviso shall not apply in the case of any settlement that unconditionally releases the Indemnified Party completely in connection with such matter and that provides relief consisting solely of money damages borne by the Indemnifying Party.

(ii)    Notwithstanding an election by the Indemnifying Party to assume the defense of such action or proceeding, such Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such action or proceeding. The Indemnifying Party shall bear the reasonable fees, costs and expenses of one such separate counsel in any single jurisdiction (and shall pay such fees, costs and expenses at least quarterly) if, but only if, (A) the Indemnified Party shall have reasonably concluded that (1) there may be a conflict of interest (including one or more legal defenses or counterclaims available to it or to other Indemnified Parties which are different from or additional to those available to the Indemnifying Party) that would make it inappropriate in the reasonable judgment of the Indemnified Party (upon and in conformity with the advice of counsel) for the same counsel to represent both the Indemnified Party and the Indemnifying Party or (2) the claim seeks nonmonetary relief which, if granted, could materially and adversely affect the Indemnified Party or its Affiliates (or, if the Indemnified Party is a Buyer Indemnified Party, a Joint Venture) (in which case, notwithstanding any other term of this Agreement, the Indemnifying Party shall not have the right to direct the defense of such action or proceeding on behalf of the Indemnified Party); (B) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party within a reasonable time after notice of the institution of such action or proceeding; or (C) the Indemnifying Party shall authorize such Indemnified Party to employ separate counsel at the Indemnifying Party's expense including by reason of clause (f)(i)(y) of this Section 8.4. In addition, the Indemnifying Party shall be liable for the fees and expenses of counsel employed by the Indemnified Party as to a claim for any period during which the Indemnifying Party has not assumed the defense thereof. In the event the Indemnifying Party does not assume control of the defense of any matter as provided above, the Indemnified Party shall have the right to undertake the defense, compromise and settlement of such claim; provided, however, that the

234

Indemnified Party shall not settle any such claim without the written consent of the Indemnifying Party (which consent will not be unreasonably withheld). In any event, the Indemnified Party and its counsel shall cooperate with the Indemnifying Party and its counsel and, if the Indemnifying Party shall have assumed the defense of an action or proceeding, the Indemnified Party and its counsel shall not assert any position in any proceeding inconsistent with that asserted by the Indemnifying Party; provided, however, that the foregoing shall not prevent the Indemnified Party from taking the position that it is entitled to indemnification hereunder. All out-of-pocket costs and expenses incurred in connection with an Indemnified Party's cooperation shall be borne by the Indemnifying Party. In any event, the Indemnified Party shall have the right at its own expense to participate in the defense of such asserted liability.

(g)     Except as otherwise provided in Article VI, the indemnification provisions of this Article VIII (i) shall, in the case of the representations and warranties, be the exclusive remedy following the Closing with respect to breaches or failures thereof to be true when made, (ii) shall apply without regard to, and shall not be subject to, any limitation by reason of set-off and (iii) are intended to be comprehensive and not to be limited by any requirements of Law concerning prominence of language or waiver of any legal right under any Law (including rights under any workers' compensation statute or similar statute conferring immunity from suit). The obligations of the parties set forth in this Section 8.4 shall be conditioned upon the Closing having occurred.

(h)     Notwithstanding anything to the contrary set forth herein, neither DuPont nor Buyer shall be required to provide indemnification under Sections 8.4(a)(iii) or 8.4(b)(iii) to the Buyer Indemnified Parties or DuPont Indemnified Parties, respectively, unless the aggregate amount of Losses incurred but not paid by the Buyer Indemnified Parties or DuPont Indemnified Parties, as applicable, with respect to such failures to be true (in the aggregate), exceeds (without giving effect to any claims which are disallowed as a result of any the provisos contained in Section 8.4(a)(iii)) $50 million (the "Basket"), in which case the obligation to provide indemnification under Sections 8.4(a)(iii) or 8.4(b)(iii) to the Buyer Indemnified Parties or DuPont Indemnified Parties, respectively, shall only apply with respect to such amounts that are in excess of the Basket; provided, however, that (i) Losses covered by the indemnification provisions of Article VI and (ii) Losses related to the representations and warranties set forth in Sections 3.1 (Organization, Etc.), 3.2 (Authority Relative to this Agreement, Etc.), 3.3 (Capitalization; other than: representations and warranties set forth in the second sentence of Section 3.3(b) (but only with respect to representations and warranties with respect to Minority Owned Joint Ventures); clause (x) of the fourth sentence of Section 3.3(b) (but only with respect to the representations and warranties with respect to Minority Owned Joint Ventures); clause (y) of the fourth sentence of Section 3.3(b); and the fifth sentence of Section 3.3(b) (but only with respect to representations and warranties (i) with respect to Minority Owned Joint Ventures and (ii) in the case of all Joint Ventures, representations and warranties with respect to any Person other than DuPont who is

235

entitled to receive capital stock or other securities from any Person other than DuPont or a Subsidiary thereof or a Joint Venture), but, in each case, only to the extent Losses relate to failures to be true thereof that arise out of events, facts, circumstances and occurrences arising (and, in the case of Knowledge, Knowledge obtained) after the date of this Agreement), 3.11 (<u>Environmental Matters</u>), 3.12(a) (<u>Real Property</u> (other than representations and warranties with respect to any Category B Property or Category C Property)), 3.14(a) and (b) (<u>Assets</u>), 4.1 (<u>Corporate Organization, Etc.</u>), 4.2 (<u>Authority Relative to this Agreement, Etc.</u>), 4.4(b) (<u>Financing</u>) and 4.6 (<u>Solvency</u>) shall not be applied, or be subject, to the Basket.

        (i)    Notwithstanding anything to the contrary set forth herein, neither DuPont nor Buyer shall be required to provide indemnification to Buyer Indemnified Parties or the DuPont Indemnified Parties, respectively, under Section 8.4(a)(iii) or 8.4(b)(iii) to the extent the amount of Losses paid by DuPont or Buyer, respectively, with respect thereto would exceed $1,423,975,000 (the "<u>Cap</u>"); <u>provided, however</u>, that (i) Losses covered by the indemnification provisions of Article VI and (ii) Losses related to the representations and warranties set forth in Sections 3.1 (<u>Organization, Etc.</u>), 3.2 (<u>Authority Relative to this Agreement, Etc.</u>), 3.3 (<u>Capitalization</u>; other than: representations and warranties set forth in the second sentence of Section 3.3(b) (but only with respect to representations and warranties with respect to Minority Owned Joint Ventures); clause (x) of the fourth sentence of Section 3.3(b) (but only with respect to representations and warranties with respect to Minority Owned Joint Ventures); clause (y) of the fourth sentence of Section 3.3(b); and the fifth sentence of Section 3.3(b) (but only with respect to the representations and warranties (i) with respect to Minority Owned Joint Ventures and (ii) in the case of all Joint Ventures, representations and warranties with respect to any Person other than DuPont who is entitled to receive capital stock or other securities from any Person other than DuPont or a Subsidiary thereof or a Joint Venture), but, in each case, only to the extent Losses relate to failures to be true thereof that arise out of events, facts, circumstances and occurrences arising (and, in the case of Knowledge, Knowledge obtained) after the date of this Agreement), 3.11 (<u>Environmental Matters</u>), 3.12(a) (<u>Real Property</u>) (other than representations and warranties with respect to any Category B Property or Category C Property), 3.14(a) and (b) (<u>Assets</u>), 4.1 (<u>Corporate Organization, Etc.</u>), 4.2 (<u>Authority Relative to this Agreement, Etc.</u>), 4.4(b) (<u>Financing</u>) and 4.6 (<u>Solvency</u>) shall not be applied, or be subject, to the Cap.

Section 8.5    <u>Environmental Matters.</u>

        (a)    On the terms and subject to the conditions set forth in this Agreement, Buyer agrees to indemnify, defend and hold harmless the DuPont Indemnified Parties from and against, and shall reimburse such Indemnitees with respect to, all Losses arising out of or related to, directly or indirectly, all Environmental Claims and requirements of Environmental Law (whether or not under applicable Law, DuPont or any Retained Subsidiary would have a right of contribution against any DTI Company therefor) arising out of or related to the matters set forth below (except to the extent such Liabilities are DuPont Environmental Liabilities under Section 8.5(b) or subject to

236

indemnification by DuPont under Section 8.4(a) or as specified in a Related Agreement or Local Purchase Agreement) (the "DTI Environmental Liabilities"):

      (i)    Remediation required by Environmental Law or voluntarily undertaken by Buyer in connection with that Real Property set forth on Schedule 8.5(a)(i);

      (ii)    with respect to any DuPont Remediation Site, as set forth on Schedule 1(q), and any DuPont Environmental Retained Sites, as set forth on Schedule 8.5(b)(vii), and except for Known Environmental Issues, any Release or violation of Environmental Law to the extent arising from the operation of the DTI Business on or after the Closing Date;

      (iii)    any Remediation required in connection with Continuing Environmental Issues that are identified after the Closing Date, but solely to the extent of Buyer's allocation under the Sliding Scale;

      (iv)    following the Transfer of Responsibility Date pursuant to Section 8.5(c), (A) Remediation of Sliding Scale Matters other than Continuing Environmental Issues, but solely to the extent of Buyer's allocation under the Sliding Scale and (B) the obligations of Buyer set forth in Section 8.5(c);

      (v)    the exposure solely after the Closing Date of any natural person to Hazardous Substances Released after the Closing Date in connection with the DTI Business; provided, however, that (A) Losses from Environmental Claims by DTI Transferred Employees alleging exposure to Hazardous Substances Released in connection with the DTI Business also subject to indemnification under Section 8.5(b)(v) shall be pro-rated between Buyer and DuPont based on the length of the employee's exposure prior to and after the Closing Date and (B) any exposure claim which is a Retained Liability shall be excluded from this clause (v);

      (vi)    Remediation required by Environmental Law for Existing Contamination related to (A) the operation and discharge of waste into underground injection (deepwell) facilities Nos. 9, 14, 3 and 4 at the Sabine, Texas site; (B) the RCRA drum storage pad and the "24 hour tank" at the LaPorte, Texas site; and (C) the Tuas, Singapore site, except for Liabilities at that site arising from dismantling and rearrangement;

      (vii)    to the extent arising from the operation of the DTI Business on or after the Closing Date, Remediation required by Environmental Law related to the operations of the boilers and industrial furnaces at the Sabine, Texas site; and

237

(viii)    Remediation required by Environmental Law and relating to each Joint Venture, in each case, as set forth below:

(A)    in the case of Consolidated Joint Ventures, other than those Joint Ventures identified in Schedule 8.5(a)(i), (i) in response to a Release or a violation of Environmental Law that occurs on or after the date that DuPont's interest in the Joint Venture is transferred to Buyer, and (ii) with respect to Continuing Environmental Issues or Unknown Joint Venture Issues, the product of (x) the amount of Losses incurred by the Joint Venture that are allocated to Buyer pursuant to the Sliding Scale, multiplied by (y) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture; and

(B)    in the case of Nonconsolidated Joint Ventures, (i) in response to a Release or a violation of Environmental Law that occurs on or after the date that DuPont's interest in the Joint Venture is transferred to Buyer, (ii) with respect to Known Environmental Issues, 40% of the product of (x) the amount of Losses multiplied by (y) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture, and (iii) with respect to Continuing Environmental Issues or Unknown Joint Venture Issues, 40% of the product of (u) the amount of Losses that are allocated to Buyer pursuant to the Sliding Scale, multiplied by (v) the percentage direct equity interest that DuPont's and its subsidiaries' Joint Venture Interest represents in such Joint Venture.

(b)    On the terms and subject to the conditions set forth in this Agreement, DuPont agrees to indemnify, defend and hold harmless the Buyer Indemnified Parties from and against, and shall reimburse such Indemnitees with respect to, all Losses arising out of or related to, directly or indirectly, all Environmental Claims and requirements of Environmental Law (whether or not under applicable Law Buyer or any of its Subsidiaries would have a right of contribution against DuPont therefor) arising out of or related to the matters set forth below (the "DuPont Environmental Liabilities"):

(i)    Remediation of Existing Contamination or Known Environmental Issues required by Environmental Law in connection with the DuPont Remediation Sites; provided, however, that such Liabilities shall in no event include the DTI Environmental Liabilities set forth in Section 8.5(a)(iv);

(ii)    Former Facilities;

(iii)    Remediation required by Environmental Law at any Real Property (other than Rights of Way) not identified on Schedules 3.12(b)(i) – (iv);

238

(iv)     any Action seeking a Criminal Penalty in connection with (A) any Release or (B) any facts or circumstances forming the basis for any alleged violation of Environmental Law (whether in connection with the DTI Business or the DuPont Business), in each case, prior to the Closing Date;

(v)     the exposure of any natural person at any time to Hazardous Substances Released on or before the Closing Date in connection with the DTI Business or the DuPont Business; provided, however, that Losses from Environmental Claims by DTI Transferred Employees also subject to indemnification under Section 8.5(a)(iv) alleging exposure to Hazardous Substances Released in connection with the DTI Business shall be pro-rated between Buyer and DuPont based on the length of the employee's exposure prior to and after the Closing Date;

(vi)     Existing Off-Site Disposal;

(vii)     any Release or violation of Environmental Law at sites on Schedule 8.5(b)(vii) except to the extent arising from the operation of the DTI Business on or after the Closing Date;

(viii)    South River mercury contamination associated with the Waynesboro, Virginia site;

(ix)     Existing Contamination associated with the former Terathane business;

(x)     Remediation in connection with Continuing Environmental Issues that are identified after the Closing Date, but solely to the extent of DuPont's allocation under the Sliding Scale;

(xi)     Remediation of Sliding Scale Matters other than Continuing Environmental Issues, but solely to the extent of DuPont's allocation under the Sliding Scale;

(xii)     Remediation required as of the Closing Date by Environmental Law for or as a result of asbestos or asbestos-containing material at any Real Property;

(xiii)    those matters specified in a Related Agreement or Local Purchase Agreement;

(xiv)    Remediation required by Environmental Law arising from activities prior to the Closing Date and relating to each Joint Venture, in each case, as set forth below:

(A)     in the case of Consolidated Joint Ventures, other than those Joint Ventures identified in Schedule 8.5(a)(i), (i) with

239

respect to Known Environmental Issues, the product of (x) the amount of Losses incurred by the Joint Venture, multiplied by (y) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture and (ii) with respect to Continuing Environmental Issues or Unknown Joint Venture Issues, the product of (u) the amount of Losses incurred by the Joint Venture that are allocated to DuPont pursuant to the Sliding Scale, multiplied by (v) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture; and

(B)     in the case of Nonconsolidated Joint Ventures, (i) with respect to Known Environmental Issues, 60% of the product of (x) the amount of Losses incurred by the Joint Venture multiplied by (y) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture and (ii) with respect to Continuing Environmental Issues or Unknown Joint Venture Issues, 60% of the product of (u) the amount of Losses incurred by the Joint Venture that are allocated to DuPont pursuant to the Sliding Scale, multiplied by (v) the percentage direct equity interest that DuPont's and its Subsidiaries' Joint Venture Interest represents in such Joint Venture;

(xv)     Remediation required as of the Closing Date by Environmental Law as a result of or in connection with the wastewater lagoon at Kingston, Ontario, Canada;

(xvi)     Remediation required by Environmental Law as a result of PCE contamination at the Paulinia, Brazil site; and

(xvii)     Remediation associated with the 1975 carbon tetrachloride spill at the Berazategui, Argentina site.

(c)     (i)     With respect to DuPont Remediation Sites (other than the sites at Wilton, U.K., Maydown U.K., and Maitland, Ontario, Canada), DuPont will retain fee simple title to the land at each site (it being agreed that on the Closing Date DuPont shall transfer title to the Improvements located at such DuPont Remediation Site and primarily used or held for use in connection with the DTI Business to Buyer or one of the Buyer Subs pursuant to a Bill of Sale in accordance with Section 2.3 hereof as if such DuPont Remediation Sites constituted DTI Leased Real Property) until such time as the scope of remediation that will be required with respect to Existing Contamination at a site has been determined and approved by the appropriate Governmental Authority by approval of a Corrective Action Plan under RCRA (or the equivalent under applicable local law, or as set forth on Schedule 8.5(c)(i)) and the remediation work required thereunder, except for ongoing operation, monitoring and/or maintenance, has been completed, at which time, subject to Section 5.8, title will transfer to the Buyer (the "Title Transfer Date") and the Sliding Scale will take effect on such sites; provided, that, in the

240

case of the DuPont Remediation Sites set forth on Schedule 8.5(c)(ii) (a portion of which will be DuPont Leased Premises immediately following the Title Transfer Date), on the Title Transfer Date DuPont or a Retained Subsidiary, on the one hand, and Buyer, a Buyer Sub or DTI Company, on the other hand, shall enter into a DuPont Lease. In addition, prior to the time of title transfer for each site, DuPont will provide Buyer with a payment equivalent to seven (7) years of the annual cost of operation, maintenance and monitoring of Remediation, but excluding any fixed cost allocation for plant labor and services not associated with Remediation, as specified in the Corrective Action Plan under RCRA (or the equivalent under applicable local law, or as set forth on Schedule 8.5(c)(i)), including the cost to Buyer for any financial guaranty associated with RCRA financial assurance, if necessary. Upon transfer of title, Buyer will assume responsibility for ongoing operation, maintenance and/or monitoring, as well as any additional Remediation required, for the Existing Contamination addressed by the Corrective Action Plan under RCRA (or the equivalent under applicable local law, or as set forth on Schedule 8.5(c)(i)).

        (ii)      With respect to the DuPont Remediation Sites at Wilton and Maydown, the Sliding Scale will take effect:

        (A)      in the case of the Wilton, UK Site, on the later of (a) the completion of Remediation recommended or required pursuant to Environmental Law by relevant Governmental Authorities as a result of facts or information provided to the Governmental Authority in connection with the application for a Pollution Prevention and Control ("PPC") permit under the Pollution Prevention and Control Regulations 2000 (as amended) or otherwise in the possession of such Governmental Authority on or before the Closing Date; provided in either case that notice of the environmental issues giving rise to such recommendation or requirement was given by the Governmental Authority on or before the second anniversary of the grant of the PPC permit(s) applied for or (b) the grant of the PPC permits for which application was made or was required to be made before the Closing Date (such later date, the "Wilton Transfer Date"), and

        (B)      in the case of the Maydown, UK Site, upon completion of Remediation necessary to meet the standards set out in an action plan (the "Maydown Action Plan") to be agreed between DuPont and Buyer within six (6) months of the Closing Date and to address groundwater contamination (including without limitation by monitored natural attenuation) at, or neighboring, the Site to the satisfaction, non-objection or issuance of adverse comment of relevant Governmental Authorities apprised of relevant facts and information of the Maydown Remediation work, including monitoring data and the results of any sampling, investigation and surveys and for which the Governmental Authorities have reviewed the Maydown Remediation work for twelve (12) months (such date, the "Maydown Transfer Date").

(iii)    With respect to the DuPont Remediation Site at Maitland, Ontario, Canada, which does not include the portion of the Maitland, Ontario, Canada site that is used for the manufacture and sale to DuPont or one of its Subsidiaries of SUVA® fluoroproducts and engineering polymers, the Sliding Scale will take effect on the Closing Date (the "Maitland Transfer Date").

(iv)    The "Transfer of Responsibility Date" shall, as appropriate, be the Title Transfer Date, the Transfer Date, Wilton Transfer Date, Maydown Transfer Date or Maitland Transfer Date, as defined in subclauses (i), (ii) and (iii) above.

(d)    As between the parties to this Agreement, Buyer will have full authority to control, direct, manage and implement Remediation and to determine its scope, and conduct all negotiations, meetings and settlements with Governmental Authorities with respect to DTI Environmental Liabilities and any Sliding Scale Matter for which Buyer is responsible for fifty percent (50%) or more of the Losses arising therefrom pursuant to Section 8.5; provided, however, that Buyer may contract with DuPont on mutually agreeable terms for DuPont to perform any such activities with respect to DTI Environmental Liabilities on Buyer's behalf for such reasonable period of time until an orderly transfer of such activities to Buyer can be arranged.

(e)    As between the parties to this Agreement, and with respect to DuPont Environmental Liabilities and any Sliding Scale Matter for which DuPont is responsible for more than fifty percent (50%) of the Losses arising therefrom pursuant to Section 8.5, including, as between DuPont and Buyer, matters related to the Joint Ventures, DuPont will have full authority to control, direct, manage and implement any Remediation and to determine its scope; provided, however, that DuPont will take measures to ensure that such Remediation does not materially interfere with Buyer's operations at the site and does not create an enforcement risk for Buyer associated with its operations. DuPont will promptly advise and consult with Buyer regarding its Remediation activities if there is a reasonable potential that the proposed or mandated Remediation may materially interfere with Buyer's operations or create an enforcement risk for Buyer. If either of the foregoing is the case, DuPont and Buyer will work together to eliminate the material interference on Buyer's operations or the enforcement risk to Buyer, and Buyer shall have the right to participate in negotiations, meetings and settlement discussions with Governmental Authorities. DuPont also shall have the full authority to conduct all negotiations, meetings and settlements with Governmental Authorities with respect to the DuPont Environmental Liabilities. After the Closing Date, Buyer grants DuPont and its agents, upon reasonable advance notice, access (including to property, non-privileged documents and personnel) as necessary to complete Remediation within the scope of DuPont's Environmental Liabilities. Notwithstanding anything in this Section 8.5(e) to the contrary, with respect to all Remediation contemplated herein, DuPont (i) shall undertake such Remediation in a manner that will not unreasonably interfere with Buyer's use of the Real Property, (ii) shall indemnify, defend and hold harmless Buyer Indemnified Parties against all Losses arising out of or related to the access granted in this Section 8.5(e), (iii) shall provide Buyer with copies of

242

all written communications with any Governmental Authority and a reasonable opportunity to participate in any negotiations or meetings with Governmental Authorities and (iv) shall be responsible for establishing financial assurance for Remediation (including closure) as required by Environmental Law. For purposes of this Agreement, Remediation within the scope of DuPont's Environmental Liabilities shall be deemed complete (i) in the case of Remediation of Existing Contamination when DuPont obtains a "closure " or "No Further Action "/ "No Further Remediation " letter from the applicable Governmental Authorities and (ii) in the case of Remediation of violations of Environmental Law when the violation is corrected. For purposes of this Agreement, a deed restriction limiting the use of any Real Property to non-residential uses shall not be deemed an unreasonable interference with Buyer's use of the Real Property.

(f)    Except as provided in Section 8.6, notwithstanding any provisions of Environmental Law or the provisions or principles of any other statutory or common law including the Comprehensive Environmental Response, Compensation and Liability Act, as amended, and state law analogues, the provisions of this Section 8.5 shall constitute the parties' exclusive remedy with respect to each other for all Environmental Claims. The obligations of the parties set forth in this Section 8.5 shall be conditioned upon the Closing having occurred.

Section 8.6    Operational Environmental Requirements.

(a)    Buyer's Operational Environmental Obligations. Following the Closing, with respect to each of the DTI Leased Real Properties, Buyer shall, or shall cause its Subsidiaries to, comply with the underlying Real Estate Lease.

(b)    DuPont's Operational Environmental Obligations. Following the Closing, with respect to each of the DuPont Leased Premises, DuPont shall, or shall cause the Retained Subsidiaries to, comply with the underlying DuPont Lease.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Amendment and Modifications. This Agreement may be amended, modified or supplemented at any time by the parties hereto only by an instrument in writing signed on behalf of each of the parties. No agreement made through use of electronic records or electronic signatures, as those terms are used in the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 et. seq., or the Electronic Signatures and Records Act, N.Y. State Tech. Law § 101 et. seq., shall be enforceable or binding on either party hereto. Notwithstanding the previous sentence, facsimile or telecopy signatures will constitute a sufficient form of writing for purposes of this Section 9.1.

243

Section 9.2    Extension; Waiver.  At any time prior to or after the Closing, the parties hereto entitled to the benefits of the respective term or provision may (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document, certificate or writing delivered pursuant hereto or (c) waive compliance with any obligation, covenant, agreement or condition contained herein.  Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of the party against whom enforcement of the extension or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in writing and shall in no way in any other respect impair the rights of any party granting such waiver.  Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions or rights hereunder.

Section 9.3    Representations and Warranties; Etc.

(a)    Buyer hereby acknowledges and agrees that neither DuPont nor any Subsidiary thereof nor any of their Representatives is making any representation or warranty whatsoever, express or implied (including with respect to the accuracy or completeness of any information contained in any Offering Materials described in Section 5.35), except those representations and warranties explicitly set forth in this Agreement, the Local Purchase Agreements and the Related Agreements.

(b)    DuPont hereby acknowledges and agrees that neither Buyer nor any Subsidiary thereof nor any of their Representatives is making any representation or warranty whatsoever, express or implied, except those representations and warranties explicitly set forth in this Agreement, the Local Purchase Agreements and the Related Agreements.

(c)    The covenants made by the Sellers in Sections 2.3(b), 5.1, 5.2, 5.4, 5.9, 5.27 and 5.34 as they relate to the Joint Ventures or any other entity in which DuPont or any of its Subsidiaries has an equity interest which is not a Wholly Owned Subsidiary are, in addition to any applicable standards set forth therein, subject to (A) DuPont's or any of its Subsidiaries' ability to take or prohibit actions under any applicable Joint Venture Agreement, (B) the fiduciary duties to the Joint Ventures and its partners owed by DuPont and its Subsidiaries and their respective designees, whether acting as directors, partners, officers or otherwise, and (C) DuPont's or any of its Subsidiaries' ability using reasonable commercial efforts to control any such Joint Venture or any other entity in which DuPont or any of its Subsidiaries has an equity interest which is not a Wholly Owned Subsidiary.

(d)    The representations and warranties of the Sellers shall not be affected or deemed waived by reason of any investigation made by or on behalf of

244

Buyer or its Affiliates or by reason of the fact that Buyer or its Affiliates, or any of their respective Representatives, knew or should have known that any such representation or warranty is or might be inaccurate.

Section 9.4    Entire Agreement; Assignment.

(a)    This Agreement, the Related Agreements, the Local Purchase Agreements, the Transitional Services Agreements and the Local Asset Transfer Agreements, together with any letter agreement delivered by DuPont to Buyer or Buyer to DuPont substantially concurrently with the execution of this Agreement, (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof (other than the Confidentiality Agreement which agreement shall terminate and have no further force or effect upon Closing) and (b) shall not be assigned by operation of law or otherwise; provided, however, that, without the consent of the other parties, (i) DuPont shall have the right to designate additional or different Global Asset Sellers, Global Company Sellers and/or Global Joint Venture Sellers, as the case may be, to sell assets or shares, as the case may be, hereunder as set forth in the respective definitions thereof and in the event DuPont so designates any such other entity to be a party hereto (other than any Global Asset Seller, Global Company Seller and Global Joint Venture Seller who executed this Agreement (as the case may be), then the appropriate party hereto shall assign its rights to such other entity designated by DuPont and such other entity shall execute a counterpart to this Agreement and the assigning entity shall be replaced and (ii) Buyer and Buyer Subs shall have the right, subject to Section 6.10(f), to (x) assign, in whole or in part this Agreement and any of their respective rights and obligations hereunder to any Wholly Owned Subsidiary of Buyer or (y) collaterally assign (so long as such assignment is not effective until, at or immediately following the Closing) in whole or in part, this Agreement, and any of their respective rights hereunder, as security to one or more lenders or purchasers of debt securities who, in each case, are being granted a collateral interest in Assets other than this Agreement or rights hereunder (unless in the case of clauses (i) and (ii), to do so would restrict or delay the consummation of the transactions contemplated by this Agreement), but no such designations or assignments shall relieve DuPont or Buyer, as the case may be, of their respective obligations hereunder; provided, however, that  notwithstanding the foregoing, neither party shall be permitted to assign this Agreement (in whole or in part) to the extent that doing so would conflict with the provisions of Section 6.10(f) or subsection (b) below.

(b)    Buyer 1 and Buyer 2 shall be jointly and severally liable for their obligations, representations and warranties and indemnitees herein.  References in this Agreement or any other agreement or document contemplated hereby (other than the Novation Agreement) to Buyer, and all obligations, covenants and indemnities that were formerly the obligations, covenants and indemnities of Buyer, Buyer 1 or Buyer 2 shall be deemed from and after the completion of the Buyer Reorganization, to be, from and after such date, references to, and obligations, covenants, and indemnities of, KoSa.  Immediately following the completion of the Buyer Reorganization, KoSa shall, if so

245

requested by DuPont, execute and deliver this Agreement, the Related Agreements and such other agreements and documents indicating that it is a party thereto as of the date of the Novation Agreement or, in the case of the Related Agreements and such other agreements and documents, the date of execution thereof.

Section 9.5    Representatives.

(a)    All deliveries of documents and notices required to be provided to Buyer shall be deemed to have been satisfied and complied with if delivered to Buyer in accordance with Section 9.7 (the "Buyer Representative"), which shall be deemed to be authorized to take actions and receive such deliveries and notices on their behalf. The Buyer Representative shall be entitled to designate Buyer as a successor Buyer Representative by written notice to DuPont in accordance with Section 9.7 and thereafter any references herein to the Buyer Representative shall be deemed to refer to such successor. DuPont and its Subsidiaries shall be entitled to rely on any agreement, settlement, waiver or notice reached or received from the Buyer Representative notwithstanding any assignment which Buyer or its Subsidiaries may have made or may make to lenders or purchasers of debt securities.

(b)    All deliveries of documents and notices required to be provided to DuPont shall be deemed to have been satisfied and complied with if delivered to DuPont in accordance with Section 9.7 (the "DuPont Representative"), which shall be deemed to be authorized to take actions and receive such deliveries and notices on their behalf.    The DuPont Representative shall be entitled to designate DuPont as a successor DuPont Representative by written notice to Buyer in accordance with Section 9.7 and thereafter any references herein to the DuPont Representative shall be deemed to refer to such successor. Buyer and its Subsidiaries shall be entitled to rely on any agreement, settlement, waiver or notice reached or received from the DuPont Representative notwithstanding any assignment which DuPont or its Subsidiaries may have made or may make.

Section 9.6    Validity. The invalidity or unenforceability in any respect of any provision of this Agreement shall not affect the validity or enforceability of such provision in any other respect or of any other provisions of this Agreement, each of which shall remain in full force and effect.

Section 9.7    Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when received if delivered personally, (ii) when transmitted if telecopied (which is confirmed), (iii) upon receipt, if sent by registered or certified mail (postage prepaid, return receipt requested) and (iv) the day after it is sent, if sent for next-day delivery to a domestic address by overnight mail or courier, to the parties at the following addresses:

246

If to Buyer or any Buyer Sub prior to completion of the Buyer Reorganization, to:

> KED Fiber Ltd. and KED Fiber, LLC
> 4111 E. 37th Street North
> Wichita, Kansas  67220
> Attn:  Chief Financial Officer
> Fax:   (316) 828-4153

If to Buyer or any Buyer Sub after completion of the Buyer Reorganization, to:

> KoSa, B.V.
> 15710 JFK Boulevard
> Houston, Texas  77032
> Attn:   President and Chief Executive Officer

With copies to:

> Koch Industries, Inc.
> 4111 E. 37th Street North
> Wichita, Kansas  67220
> Attn:  Tye G. Darland, Esq.
> Fax:    (316) 828-3133

and

> Latham & Watkins LLP
> Sears Tower, Suite 5800
> 233 South Wacker Drive
> Chicago, Illinois  60606-6401
> Attn:   Mark D. Gerstein, Esq.
> Fax:    (312) 993-9767

If to the Sellers, to:

> E. I. du Pont de Nemours and Company
> 1007 Market Street
> Wilmington, Delaware  19898
> Attn:   Roger W. Arrington, Esq.
>         Paul J. Bonanto, Esq.
> Fax:    (302) 773-5176

247

With a copy to:

      Skadden, Arps, Slate, Meagher & Flom LLP
      Four Times Square
      New York, New York  10036
      Attn:   Lou R. Kling, Esq.
               Thomas W. Greenberg, Esq.
      Fax:   (212) 735-2000

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above (provided, that notice of any change of address shall be effective only upon receipt thereof).

          Section 9.8    Governing Law.  This Agreement, and any disputes arising hereunder or controversies related hereto, shall be governed by and construed in accordance with the internal laws, and not the laws governing conflicts of laws (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law), of the State of New York.

          Section 9.9    Specific Performance.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

          Section 9.10    Publicity.  Each of the parties to this Agreement hereby agrees with the other party hereto that no press release or similar public announcement or communication shall, if prior to, or within six (6) months after, the Closing, be made or be caused to be made (including by such parties' respective Affiliates) concerning the execution or performance of this Agreement unless the parties shall have agreed in advance with respect thereto; provided, however, that this provision 9.10 shall terminate and the parties shall have no further obligations with respect to the subject matter hereunder upon the earlier of (i) one (1) month after the date of the termination of this Agreement pursuant to Section 8.1 or (ii) such earlier date that DuPont or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation relating to the subject matter of this Agreement. Notwithstanding the foregoing (i) either party may make or cause to be made any press release or similar public announcement or communication as may be required to comply with the requirements of any applicable Laws or the rules and regulations of each stock exchange upon which the securities of one of the parties is listed and (ii) DuPont may disclose any information concerning the transactions contemplated hereby which it deems appropriate in its reasonable judgment, in light of its status as a publicly owned company, including without limitation to securities analysts and institutional investors and in press interviews; provided, that with respect to the DTI Business (except to the extent it relates to DuPont's activities with respect to the effect on DuPont of the separation or disposition

248

of the DTI Business), to the extent practicable, DuPont will try in good faith to remain within the bounds of the parties' prior disclosures; provided, further, that in the case of clauses (i) and (ii) above to the extent in the good faith judgment of such party it is reasonably practicable to do so) such party (x) provides the other party with a reasonable opportunity in light of the circumstances to review such party's intended communication and (y) consider in good faith modifications to the intended communication that are requested by the other party.

Section 9.11    Jurisdiction; Forum, Etc.

(a)    The parties hereto agree that the appropriate, exclusive and convenient forum for any disputes between any of the parties hereto arising out of this Agreement or the transactions contemplated hereby (other than the Local Purchase Agreements and the transactions contemplated thereby) shall be in any state or federal court in the State, City and County of New York, and each of the parties hereto irrevocably submits to the jurisdiction of such courts solely in respect of any Action arising out of or related to this Agreement. The parties hereto further agree that the parties will not bring suit with respect to any disputes arising out of this Agreement or the transactions contemplated hereby in any court or jurisdiction other than the above specified courts; provided, however, that the foregoing shall not limit the rights of the parties to obtain execution of judgment in any other jurisdiction. The parties hereto further agree, to the extent permitted by Law, that final and unappealable judgment against a party in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of such judgment. Except to the extent that a different determination or finding is mandated due to the applicable Law being that of a different jurisdiction, the parties hereto agree that all judicial determinations or findings by a state or federal court in the State, City and County of New York with respect to any matter under this Agreement or the Local Purchase Agreements, as the case may be, shall be binding under the other agreement with respect to such matter.

(b)    By the execution and delivery of this Agreement, each of Buyer and the Buyer Subs (i) irrevocably designates and appoints CT Corporation (the "Buyer Agent") as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to this Agreement and (ii) agrees that service of process upon the Buyer Agent shall be deemed in every respect effective service of process upon Buyer in any such suit or proceeding. Buyer further agrees, at its own expense, to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of the Buyer Agent in full force and effect so long as this Agreement shall be in effect. The foregoing shall not limit the rights of any party to serve process in any other manner permitted by Law.

(c)    By the execution and delivery of this Agreement, each of DuPont and the other Sellers (i) irrevocably designates and appoints CT Corporation (the

249

"Seller Agent") as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to this Agreement and (ii) agrees that service of process upon the Seller Agent shall be deemed in every respect effective service of process upon the applicable Seller in any such suit or proceeding. Each of the Sellers further agrees, at its own expense, to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of the Seller Agent in full force and effect so long as this Agreement shall be in effect. The foregoing shall not limit the rights of any party to serve process in any other manner permitted by Law.

(d)     To the extent that any party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each such party hereby irrevocably (i) waives such immunity in respect of its obligations with respect to this Agreement and (ii) submits to the personal jurisdiction of any court described in Section 9.11(a).

(e)     THE PARTIES HERETO AGREE THAT THEY HEREBY IRREVOCABLY WAIVE AND AGREE TO CAUSE THEIR RESPECTIVE SUBSIDIARIES TO WAIVE, THE RIGHT TO TRIAL BY JURY IN ANY ACTION TO ENFORCE OR INTERPRET THE PROVISIONS OF THIS AGREEMENT.

Section 9.12    Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Section 9.13    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 9.14    Expenses. Whether or not the transactions contemplated by this Agreement are consummated, and except as otherwise expressly set forth herein, all legal and other costs and expenses incurred in connection with the transactions contemplated by this Agreement shall be paid by the party incurring such expenses.

Section 9.15    Parties in Interest. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than DuPont, Buyer (and their respective Subsidiaries) or their successors or permitted assigns, any rights or remedies under or by reason of this Agreement, it being understood that the foregoing shall not limit the right of any DuPont Indemnified Party or Buyer Indemnified Party to bring claims for indemnification under Section 8.4 or Section 8.5 in respect of Losses.

Section 9.16    Interpretation.

(a)     An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on," "set forth in," "set forth on" or "given effect in numbers on" a balance sheet or financial statements including a balance sheet, to the extent any such phrase appears in such representation or warranty, if (i) there is a reserve, accrual or other similar item underlying a number on such balance sheet that relates to the subject matter of such representation, (ii) such item is otherwise specifically set forth on the balance sheet or (iii) such item is reflected on the balance sheet and is specifically set forth in the notes thereto.

(b)     References to "dollar" or "$" contained herein are to United States Dollars (unless otherwise specified).

(c)     When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference shall be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

(d)     The term "including" shall mean "including, without limitation."

(e)     The words "hereof," "herein," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(f)     The word "primarily" shall mean more than fifty percent (50%).

(g)     For purposes of Article V (other than Section 5.3), "reasonable commercial efforts" shall not require DuPont or any Seller, on the one hand, or Buyer or any Buyer Sub, on the other hand, (i) to pay any consideration for any consent, approval or amendment (except for filing fees, other administrative charges and other reimbursement of reasonable out-of-pocket expenses) or (ii) to make payments (x) in respect of Indebtedness or (y) to avoid or cure default under Indebtedness.

Section 9.17    <u>Schedules</u>.  Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in any other Schedule, if the relevance of such disclosure to such other portion is reasonably apparent from the facts specified in such disclosure.

251

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

E. I. DU PONT DE NEMOURS AND COMPANY

By: _John W. Himes_

Name:

Title:


DTI NYLON SUDAMERICA, SA

By: _John W. Himes_

Name:

Title:


DUPONT AUSTRALIA PTY. LTD.

By: _John W. Himes_

Name:

Title:


DUPONT CHEMICAL & ENERGY OPERATIONS, INC.

By: _John W. Himes_

Name:

Title:


DUPONT DE NEMOURS FRANCE SAS

By: _John W. Himes_

Name:

Title:

DUPONT DO BRASIL, LTDA.

By:
    Name:
    Title:

DUPONT ENERGY COMPANY, LLC

By:
    Name:
    Title:

DUPONT FAR EAST, INC.

By:
    Name:
    Title:

DUPONT FRANCE DE NEMOURS SARL

By:
    Name:
    Title:

DUPONT GLOBAL OPERATIONS, INC.

By:
    Name:
    Title:

DUPONT KABUSHIKI KAISHA

By:
Name:
Title:

DUPONT ORIENT OPERATIONS, INC.

By:
Name:
Title:

DUPONT POLYESTER EUROPE APS

By:
Name:
Title:

DUPONT TEXTILES & INTERIORS
DELAWARE, INC.

By:
Name:
Title:

DUPONT TEXTILES & INTERIORS
HOLDINGS, INC.

By:
Name:
Title:

INVISTA INC.

By: _____
Name:
Title:

INVISTA APPAREL TEXTILE TRADERS,
INC.

By: _____
Name:
Title:

INVISTA ARGENTINA, SA

By: _____
Name:
Title:

INVISTA (INTERNATIONAL) S.A.

By: _____
Name:
Title:

KED FIBER LTD.

By: _____
Name: STEVEN J. FELTENBERG
Title:

KED FIBER, LLC

By: _____
Name: STEVEN J. FELTENBERG
Title:

EXHIBIT 2

**Schedule 1(zz)**
**Retained Liabilities**

(1)     All Liabilities resulting from or arising out of the actual or alleged manufacture, sale, processing, storage, distribution, disposal, or use of PFOA or Telomers or Designated Products (the "Designated Activities") in connection with the DTI Business at any time prior to or at the Closing Date or at any time during the period after the Closing Date to and including the Designated Anniversary; provided, however, that in the case of Designated Activities occurring after the Closing Date, such Liabilities (i) shall have resulted from, or arose out of, Designated Activities involving materials or products which were (x) obtained or used by the DTI Business at any time prior to or at the Closing Date or (y) supplied by DuPont, or DuPont's Affiliates (unless prior to use of materials or products not supplied by DuPont, or DuPont's Affiliates, DuPont, or such Affiliate was in material breach of any Contract with DuPont or its Affiliates relating to the supply of products containing PFOA, Telomers or Designated Products) and (ii) shall not have resulted from or arisen out of any violation of Law by a Buyer Indemnified Party after the Closing Date (unless such violation of Law resulted from (A) the activities of DuPont, or DuPont's Affiliates or (B) merely the continuation of actions, failures to act or events occurring, or the continued existence of circumstances or conditions existing, prior to the Closing Date, in each case that constituted a violation of Law prior to the Closing Date; provided further that no such indemnification under this clause (1) shall be provided in respect of any such violation of Law to the extent it continues by the subject Buyer Indemnified Party after the six (6) month anniversary of notice thereof from DuPont to Buyer) (any of the foregoing constituting a "Designated Matter").

        Notwithstanding the foregoing, the indemnifiable Losses of Buyer Indemnified Parties pursuant to Section 8.4 with respect to the Retained Liabilities defined in this item (1) of Schedule 1(zz) shall consist only of Actual Losses paid by a Buyer Indemnified Party as a result of an Action or Directive brought by a third party (including employees and Governmental Authorities); provided, however, that in no event shall Actual Losses include diminution in value or lost profits except to the extent such Actual Losses of the Buyer Indemnified Party are paid pursuant to or required by an Action or Directive by a third party or paid by a Buyer Indemnified Party to a third party in resolution or settlement thereof in accordance with Article VIII hereof.

        To the extent Liabilities result from or arise out of an Action or Directive involving alleged Designated Activities in connection with the DTI Business both before and after the Designated Anniversary, Losses shall be pro-rated between DuPont and Buyer Indemnified Parties based on the alleged duration of the Designated Activities prior to and after, respectively, the Designated Anniversary (unless the final non-appealable judgment in such Action or Directive makes an express finding of duration to the contrary, in which case such finding shall control).

        Notwithstanding anything above, any Remediation of Real Property required by Environmental Law on account of Designated Activities for which notice of the presence of PFOA, Telomers or Designated Products at such Real Property is provided to DuPont prior to the Designated Anniversary shall be deemed one of the DuPont Environmental Liabilities as if set forth in Section 8.5(b) and shall be remediated in accordance with the provisions of Section 8.5(e).

        (i)     "Designated Anniversary" shall mean the third anniversary of the Closing Date; provided, however, that "Designated Anniversary" shall mean the fifth anniversary of the Closing Date (or such earlier date after the third anniversary as the condition in clause (y) or (z) below is satisfied) unless, prior to the third anniversary of the Closing Date, any of the following conditions precedent are met:

                (x) **both** (1) all studies/evaluations to which the Telomer Research Program committed in its Letter of Intent dated March 14, 2003, and any other study/evaluation which may be required within such three-year period pursuant to a Consent Directive or otherwise, have been completed and demonstrate that Telomers do not present a source of PFOA exposure and do not contribute to PFOA loading in the environment, either from articles "in use" or during manufacture, application, use, "aging," or disposal, **and** (2) a reliable, peer reviewed risk assessment is publicly available which demonstrates that Telomers do not present and will not present a significant risk of serious or widespread harm to human beings from cancer, gene mutations, or birth defects and that Telomers do not present and will not present either an unreasonable risk of injury to human health or the environment

or result in significant or substantial exposures; for purposes of this clause (2), a risk assessment shall be deemed "reliable" if it conforms with USEPA's *Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information* (June 2003) (such circumstances constituting "Unresolved Review"), or

(y) the DTI Business has commenced (such determination to commence being in the sole discretion of Buyer) the commercial utilization of one or more Substitute Applications in the DTI Business in lieu of substantially all of its former Designated Activities, or

(z) the Buyer has knowledge[5] that the DTI Business has available to it, for commercial utilization (including, that it is has been available for not less than one year in quantities sufficient to allow substitution as provided in this clause) one or more Substitute Applications that may be used in lieu of substantially all of its then current Designated Activities.

(ii) "<u>Designated Products</u>" refers to any stain resistant or soil resistant treatment products containing fluorochemicals which were produced by the Simons Electro-Chemical Fluorination method for producing and processing fluorochemicals.

(iii) "<u>Directive</u>" means an order, directive or written requirement by or on behalf of a Governmental Authority or binding mediating or arbitration panel.

(iv) "<u>PFOA</u>" refers to any form of Perfluorooctanoic Acid of a straight- or branched- chain variety,

(1) Including, but not limited to, the perfluorooctanoate anion (no specific CAS number), any salt form (various CAS numbers) and the neat, free acid material (CAS Number 335-67-1; Molecular formula: $C8\ H\ F15\ O2$); and

(2) Regardless of whether the PFOA was produced intentionally, is a by-product or impurity of another compound or mixture, or resulted from the metabolism or degradation of another compound or mixture.

(v) "<u>Substitute Applications</u>" shall mean formulations which, may be substituted for the formulations of products or applications containing PFOA and Telomers then utilized in the DTI Business ("Current Formulations"), provided that, in the case of clause (z) of the definition of "Designated Anniversary" only (and specifically not for purposes of clause (y) of the definition of "Designated Anniversary"), such substitute formulations, when substituted for the Current Formulations, (i) achieve equivalent or greater performance and customer acceptance than the Current Formulations, (ii) may be obtained by the DTI Business at a cost equivalent to or lesser than that of the Current Formulations, and (iii) are formulations as to which a reliable, peer reviewed risk assessment is publicly available which demonstrates that any Telomers present in the Substitute Applications do not present and will not present a significant risk of serious or widespread harm to human beings from cancer, gene mutations, or birth defects and do not present and will not present either an unreasonable risk of injury to human health or the environment or result in significant or substantial exposures; for purposes of this clause (iii), a risk assessment shall be deemed "reliable" if it conforms with USEPA's *Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information* (June 2003).

(vi) "<u>Telomers</u>" refers to any compound or mixture in any form of a straight- or branched-chain variety related to the telomerization method for producing and processing fluorochemicals, as distinguished from the Simons Electro-Chemical Fluorination ("ECF") method for producing and processing fluorochemicals,

(1) Including, but not limited to, the compounds listed on Exhibit A to this Schedule 1(zz); and

---

[5]     Buyer to list officers of DTI Business who will be the persons as to who such knowledge is tested.

(2) Regardless of whether the compound was produced intentionally via the telomerization method, is a by-product or impurity of another compound or mixture produced via the telomerization method, or results from the metabolism or degradation of any compound or mixture produced via the telomerization method.

(2) All Liabilities resulting from or arising out of actual or alleged exposure of a third party (excluding employees) to asbestos, benzene or silica resulting from or arising out of the ownership of the DTI Assets or the operation of the DTI Business on or prior to the Closing Date; provided, that the foregoing shall not include any actual or alleged exposure to asbestos, benzene or silica to the extent solely resulting from or arising out of the ownership of the DTI Assets or the operation of the DTI Business after the Closing Date.

(3) All Liabilities resulting from or arising out of claims by the former security holders of DuPont Canada, Inc. relating to DCI Acquisition Inc.'s takeover bid, commenced April 27, 2003 (as extended), for the then outstanding class A common shares, series 1 of DuPont Canada, Inc. and the subsequent amalgamation of DuPont Canada, Inc. consummated thereafter.

(4) All Liabilities resulting from or arising out of actual or alleged violations of Antitrust Laws to the extent resulting from or arising out of the ownership of the DTI Assets or the operation or conduct of the DTI Business (other than any actual or alleged violation of Antitrust Laws to the extent arising solely by reason of the execution, delivery or performance of this Agreement, any Local Purchase Agreement or any Related Agreement) at any time on or prior to the Closing Date or at any time during the period after the Closing Date to and including the first anniversary of the Closing Date; provided, however, that in the case of any actual or alleged violation of Antitrust Laws relating to the ownership of the DTI Assets or the operation of the DTI Business occurring after the Closing Date, such Liabilities shall not have resulted from or arisen out of any violation of Antitrust Law by a Buyer Indemnified Party after the Closing Date (unless such violation of Antitrust Law resulted from (A) the activities of DuPont or DuPont's Affiliates or (B) merely the continuation of actions, failures to act or events occurring, or the continued existence of circumstances or conditions existing, prior to the Closing Date, in each case that constituted a violation of Antitrust Law prior to the Closing Date); provided further that no such indemnification under this paragraph shall be provided in respect of any such violation of Antitrust Law to the extent it continues by the subject Buyer Indemnified Party after 30 days following the earlier of (i) notice from DuPont to Buyer of the existence of such violations of Antitrust Law or (ii) the date that Parent has knowledge of such violation of Antitrust Law.

(5) All Liabilities resulting from or arising out of that certain Indemnification Agreement dated July 12, 2001 by and among DuPont-Akra Polyester LLC, Polimor S.A. de C.V., Alpek S.A. de C.V. and E.I. du Pont de Nemours and Company related to the staple antitrust litigation.

(6) All Liabilities resulting from or arising out of a finding by Deloitte & Touche that The Invironmentalists Commercial Services Company improperly classified one or more of its employees as non-exempt for overtime purposes and such employee(s) worked time that he or she can prove would have otherwise been classified as overtime.

(7) DuPont's obligation to pay to Rhodia S.A. the sum of $5,500,000 if Rhodia. S.A. is obligated to take an accounting charge to earnings in 2003 due to the termination of the Generation III Technology License Agreement, dated November 18, 1999, between E.I. du Pont de Nemours and Company and Butachimie S.N.C. pursuant to that certain letter agreement dated August 28, 2003 between E.I. du Pont de Nemours and Company and Rhodia S.A.

(8) DuPont's obligation to indemnify Rhodia S.A. for Rhodia S.A.'s share (pursuant to its status as a partner of Butachimie S.N.C.) of any expenses related to the need to re-finance Butachimie S.N.C.'s ABN syndicated loan facility due to DuPont's transfer of all of its interest in Butachimie S.N.C. to Buyer.

(9) Butachimie Arbitration – DuPont hereby agrees to retain:

   (i)   100% of all Liabilities, which do not exceed $5,000,000, resulting from or arising out of that certain arbitration claim filed by Rhodia S.A. in June 2003 against DuPont France, relating to the operation of Butachimie SNC (the "Butachimie Arbitration");

   (ii)  50% of all Liabilities, which are in excess of $5,000,000 but less than $25,000,000, resulting from or arising out of the Butachimie Arbitration and

(iii)    100% of all Liabilities, which are in excess of $25,000,000, resulting from or arising out of the Butachimie Arbitration;

provided further that DuPont and Buyers hereby agree that DuPont shall have exclusive authority and control over the investigation, prosecution, defense and appeal of the Butachimie Arbitration and may settle, compromise or consent to the entry of any judgment with respect to the Butachimie Arbitration without the consent of Buyers. Buyers agree to cooperate with and provide reasonable assistance to DuPont in its investigation, prosecution, defense and appeal of the Butachimie Arbitration, including without limitation making available employees with relevant knowledge and documents reasonably requested by DuPont.

(10) Athens, Georgia – All Losses under Environmental Law associated with onsite waste disposal.

(11) Oestringen, Germany – All Losses under Environmental Law associated with noncompliance with Fire Code regarding firewater system secondary containment, subject to Invista completing corrective action set forth in Invista Project No. F-268, entitled "Water Retainment."

(12) Paulinia, Brazil – All Losses associated with Mantovani waste disposal site.

(13) Americana, Brazil  - All Losses associated with PCB contamination of soil and groundwater at Americana, Brazil. Such indemnity obligation expires, however, if DuPont conducts additional sampling, the details of a sampling and analysis plan to be agreed to in advance by DuPont and Invista, and the data confirm that for all samples taken on the Invista site, no PCB contamination is found above the Dutch Intervention Level of 10  nanno grams/liter.

(14) Berazategui, Argentina  - All Losses associated with the expired operating permit (Environmental Fitness Certificate), at the Berazategui, Argentina plant site, not to include any Losses caused by Buyer's failure to comply with applicable Law.

(15) All liabilities to the extent incurred by DuPont or Buyer, resulting from or arising out of that certain anti-dumping investigation of DuPont Far Eastern Company Ltd. initiated by the People's Republic of China government in November 2003.

(16) All liabilities resulting from or arising out of the claims referred to in that certain letter dated September 4th, 2003 from DuPont Sabanci Polyester Europe B.V. to DuPont which has been previously delivered to Buyer, relating to the potential breach of the Technical Information and Patent Agreement between DuPont and DuPont Sabanci Polyester Europe B.V., dated January 11, 2000 and all liabilities resulting from or arising out of the claims referred to in that certain letter dated September 5th, 2003 from Haci Omer Sabanci  Holding A.S. to DuPont which has been previously delivered to Buyer, relating to the potential breach of the Joint Venture Agreement between DuPont and Haci Omer Sabanci  Holding A.S., dated September 10, 1999.

MSW - Draft November 13, 2003 - 7:08 AM

EXHIBIT A to Schedule 1(z-2)

## Schedule of Telomer Products Sold to DTI

### TELOMER FINISHED PRODUCTS FOR TEXTILES

**Textile Finished Product**

Zonyl® 7910
Zonyl® 8110
Zonyl® 9200
Zonyl® 7040
Zonyl® 8300
Zonyl® 8070
Zonyl® 6700
Zonyl® 8412
Zonyl® RN
Zonyl® PPR
Zonyl® S402
Zonyl® 8932
Zonyl® G
Zonyl® D
Zonyl® S401
Zonyl® 6297

### TELOMER FINISHED PRODUCTS FOR FLOORING

Flooring Finished Products

| Flooring Finished Products |
| --- |
| N-140/ N-141 |
| NRD-372 |
| SR-500/525/ /Zelan® 8719 |
| N-119/N-130 |
| Zonyl® 8779 |
| N-129 |
| C-701 |
| Zonyl® LMC (Resis Tech®) |
| Zonyl® 8929B |
| Zonyl® FSN |
| Zonyl® FSP |

EXHIBIT 3



 **INVISTA**

RECEIVED

AUG 1 9 2004

LEGAL

# Facsimile Cover Sheet

**THIS DOCUMENT IS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONSTITUTES ATTORNEY WORK PRODUCT, AND SHOULD NOT BE COPIED NOR ITS CONTENTS DISCLOSED TO PERSONS OUTSIDE THE EMPLOY OF INVISTA**

**To: Roger W. Arrington, Esq.**
**Paul J. Bonanto, Esq.**
**Company:** E. I. duPont de Nemours and Company
**Phone:**
**Fax:** 302-773-5176

**From: Paul Kaleta**
**Company:** INVISTA S.à r.l.
**Phone:** 316-828-1728
**Fax:** 316-828-1801

**Date:** August 18, 2004
**Pages including this**
**cover page:** Sent in 2 parts each containing 49 pages

**Comments:**

If all pages are not received or any page is not legible, please call Gloria Raab at 316-828-1234 as soon as possible.

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail at our expense. Thank you.

INVISTA, Sà r.l.
4123 East 37th Street North • Wichita, Kansas 67220 • 316-828-1000
1
EXHIBIT 3



Paul J. Kaleta
General Counsel
316-828-1728

INVISTA S.à r.L
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

August 18, 2004

**VIA FACSIMILE – 302-773-5176**

E. I. du Pont de Nemours and Company
1007 Market Street
Wilmington, DE  19898

Attn:    Roger W. Arrington, Esq.
         Paul J. Bonanto, Esq.

         RE:    Environmental Claims - Notice #4

Dear Messrs. Arrington and Bonanto:

        I am writing to notify you of claims under the Purchase Agreement between E.I. duPont de Nemours ("DuPont"), KED Fiber Ltd. and KED Fiber, LLC dated November 16, 2003 (and subsequent Amendments Nos. 1, 2 and 3, referred to herein as the PSA) and other documents related thereto. The claims are related to compliance with Environmental Laws (as defined in the PSA) at the facilities located in Seaford, Delaware, Kinston and Kentec, North Carolina, and Victoria and Orange, Texas. All of these violations began prior to and/or existed at the Closing Date. These claims are in addition to those previously sent to you on July 29, 2004, July 13, 2004, and June 17, 2004. A summary of the violations are set forth in the attached disclosure letters to Mary Kaye Lynch, Region IV, dated July 29, 2004, Samantha Fairchild, Region III, dated July 29, 2004, and Gerald Fontenot, Region VI, dated August 5 and August 10, 2004. In addition to those listed, a potential compliance issue related to whether the BIFs at the Sabine River Works facility are operating in compliance with the Resource, Conservation and Recovery Act and implementing regulations has arisen. We are working with Guy Johnson on this issue. The investigation and correction of these violations are ongoing.

        As discussed in my July 13, 2004 letter to you, in order to reduce the risk of enforcement and to avail itself of the benefits afforded by EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (the "Audit Policy"), INVISTA promptly filed notices of the potential violations pursuant to Section D(3) of the Audit Policy. Section D(3) requires that the reporting entity disclose the violation in writing within 21 calendar days of discovery and each of the potential violations has been disclosed in writing to EPA Regions III, IV, and VI within this 21-day period. INVISTA also has met with EPA Region VI to discuss the potential violations.

        In addition, INVISTA filed a Notice of Audit pursuant to the Texas Environmental Health & Safety Audit Privilege Act (the "Texas Audit Act" or "Act") with the Texas Commission on Environmental Quality ("TCEQ") for the three Texas facilities. The violations discovered during the

Roger W. Arrington, Esq.
Paul J. Bonanto, Esq.
August 18, 2004
Page 2

ongoing audits have been reported and will continue to be reported to the TCEQ consistent with the requirements of the Act. Again, INVISTA has met with TCEQ and has made these filings in order to reduce the risk of enforcement relating to these violations.

Both EPA and TCEQ have requested that INVISTA continue its investigation and report any additional violations of Environmental Law pursuant to the requirements of the Audit Policy and the Texas Audit Act. As discussed in my letter to you dated July 13, 2004, INVISTA has also entered into a formal agreement with EPA to audit all of the facilities in the United States acquired from DuPont under EPA's policy for Corporate Auditing Agreements for Audit Policy Disclosures, dated May 7, 2001 ("Audit Agreement"). Pursuant to this Audit Agreement, INVISTA must complete the audits of the facilities within fifteen (15) months. In return, EPA granted INVISTA relief from the 21-day reporting requirement required by the Audit Policy. Instead, INVISTA must file reports every 90 days detailing the findings from the previous 90 days and the corrective actions taken as required by the Audit Policy. Copies of INVISTA's proposal and EPA's approval are attached. INVISTA intends to work with each affected state to ensure that protections afforded under the Audit Agreement and state audit policies or laws remain available.

INVISTA is focused on reducing the risk of enforcement for any of these violations, including reducing any potential penalties to the extent allowed by applicable audit policies and laws, and reducing or eliminating any potential impact on its operations. As such, INVISTA is correcting any violations within the 60-day period mandated by the Audit Policy, or requesting additional time to correct if necessary. Please advise if, pursuant to Section 8.5(e) of the PSA, you wish to discuss the corrective actions being taken.

As indicated above, we are continuing to review compliance at the facilities and will continue to provide you with DuPont's claims arising under indemnity obligations of the PSA. If you have any questions or dispute the claims set forth in these notice letters, please do not hesitate to contact me.

Sincerely,

Paul J. Kaleta

cc:     Lou R. Kling, Esq. (VIA FACSIMILE – 212-735-2000)
        Thomas W. Greenberg, Esq.
        Skadden, Arps, Slate, Meagher & Flom LLP
        Four Times Square
        New York, NY  10036

        Tye G. Darland, Esq.
        Koch Industries, Inc.

        Tracey L. Mihelic, Esq.
        INVISTA, S.à r.l.

INVISTA S.à r.l. · INVISTA Building · P.O. Box 2936 · Wichita, KS 67201-2936 · 316-828-1000 Tel · www.INVISTA.com
EXHIBIT 3



INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

Tracey L. Mihelic
Chief Counsel
Environment, Health and Safety
316-828-1655

July 29, 2004

<u>VIA FACSIMILE AND U.S. MAIL</u>

Mary Kaye Lynch, Esquire
Regional Counsel
Region IV
U. S. Environmental Protection Agency
61 Forsyth Street S.W.
Atlanta, GA  30303

      Re:    INVISTA S.à r.l. Notification Under EPA's Final Policy on "Incentives for
             Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations"

Dear Ms Lynch:

      INVISTA S.à r.l. ("INVISTA") submits this notice pursuant to EPA's Final Policy on
Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations
(the "Audit Policy"). As discussed during a conference call with you yesterday, INVISTA
acquired some of the assets of E. I. duPont de Nemours and Company ("DuPont"), including the
fiber and pack cleaning facilities located at 4695 Highway 11 North, Kinston (Contentnea Neck
Township), North Carolina 28502 (the "Kinston Facility"), and 4610 Braxton Road, Kentec
(Contentnea Neck Township), North Carolina 28530 (the "Kentec Facility," and, collectively,
the "North Carolina Facilities"). The transaction in which INVISTA acquired the North Carolina
Facilities from DuPont closed on April 30, 2004, at 5:00 pm. Since that date, INVISTA has
discovered certain potential violations of environmental law at the North Carolina Facilities.
This letter identifies the violations that have been discovered, and describes the manner in which
INVISTA has satisfied the criteria set forth in the Audit Policy.

      On July 8, 2004, INVISTA commenced a third party audit of the compliance status of the
North Carolina Facilities. The scope of the audit was to assess the Facility's compliance with
applicable environmental, health and safety requirements, in advance of INVISTA's negotiations
with a potential buyer of the North Carolina Facilities. INVISTA has signed an Asset Purchase
Agreement to sell the North Carolina Facilities, and anticipates the transaction to be completed
later this year.

July 29, 2004
Page 2

On July 9, 2004, the audit team reported to INVISTA's outside legal counsel the following existing and potential violations of environmental law:

Kinston Facility:

- The Facility appears to have unpermitted storm water discharges.

- The Facility's Spill Prevention, Control and Countermeasures (SPCC) Plan has not been updated and certified by a professional engineer within the required 3-year period and the Plan is missing certain required elements.

- One unlabeled drum containing hazardous waste was identified in the Facility's 90-day hazardous waste accumulation area.

- Damaged friable asbestos containing material has been identified on the exterior and roof of the former R&D lab building that is currently being decommissioned.

- The Facility's Title V operating permit requires monthly external visual inspections of the system ductwork, multiclones and baghouses of boilers 1 and 2, and documentation of such inspections. Documentation of all of the inspections was not maintained and entries were not properly made in the Facility log book.

- The Facility is missing work practices for sources of volatile organic compounds as required by its Title V permit.

- The Facility's Title V operating permit requires documentation of "when each process heater receives the organic vapor stream from TPA2WW." Some of this documentation was not maintained.

- The Facility's Title V operating permit states that "permittee shall retain all emission factors used, documentation of their origin and/or derivation of the emission factors, and all calculations used to determine monthly VOC attributed to PET production at polymerization line Y7 and associated equipment" in site files. The records were maintained by the Facility's consultant, rather than at the Facility.

Kentec Facility:

- The Facility does not have an industrial storm water permit or a No Exposure Certification for storm water.

- The Facility has not submitted a Form R report for 1,4-dioxane, which is generated as an inadvertent product during the pack cleaning process.

EXHIBIT 3

.828+1801                                               03:54:56 p.m.    08-18-2004         6 /49 .

July 29, 2004
Page 3

INVISTA's outside legal counsel was subsequently advised, on July 20, 2004, that the Kinston Facility also does not have a Class V well permit to discharge steam condensate to the Facility's French drain system.

The discovery of the existing and potential violations disclosed herein warrants coverage under the Audit Policy due to the following factors:

(1)    Systematic Discovery

INVISTA was advised of the existing and potential compliance matters disclosed herein during a third party audit, which, as set forth below, either confirmed matters originally identified during the due diligence prior to INVISTA's acquisition of the North Carolina Facilities, or identified new compliance matters.

(2)    Voluntary Discovery

The compliance review undertaken by INVISTA, and the disclosure of the violations described herein, are completely voluntary and are not the result of legally mandated monitoring or sampling prescribed by statute, regulation, permit, judicial or administrative order, or consent agreement.

(3)    Prompt Disclosure

Certain of the matters disclosed herein (the lack of permits for the storm water discharges at the North Carolina Facilities; the lack of a Class V well permit at the Kinston Facility; and the non-compliant SPCC Plan) were identified by INVISTA during its own due diligence conducted prior to its acquisition of the North Carolina Facilities from DuPont. INVISTA discovered on June 25, 2004 that these violations had not been remedied. In addition, environmental personnel at the Kinston Facility identified certain of the Title V documentation discrepancies during an internal review of Title V compliance requirements conducted on June 22, 2004. As a result of these findings, INVISTA decided to conduct the third party compliance audit described herein. As noted above, INVISTA's outside legal counsel was then advised by the third party auditor on July 9 and 20, 2004, of the specific matters disclosed herein.

(4)    Discovery and Disclosure Independent of Government or Third Party Plaintiff

INVISTA discovered these violations on its own initiative and not as a result of a governmental inspection or third party lawsuit or complaint.

(5)    Correction and Remediation

INVISTA has engaged a consultant to prepare the application to modify its NPDES permit to include the storm water discharge, to prepare the application for the Class V well permit, and to update the SPCC Plan at the Kinston Facility, and to prepare a storm water permit application for the Kentec Facility. The consultant has commenced its work and INVISTA has been advised preliminarily that the application for the Class V well permit and updated SPCC

EXHIBIT 3

328+1801                                                                03:55:14 p.m.     08-18-2004        7/49

July 29, 2004
Page 4

plan for the Kinston Facility, and the application for a storm water permit for the Kentec Facility, should be completed within the next two weeks. The consultant has advised INVISTA that completion of the application to modify its NPDES permit likely will take until the end of August, due to the need to collect certain samples during rainfall events.

The unlabeled drum at the Kinston Facility was labeled immediately after the auditor advised the Facility of its finding.

Tape has been installed and signage posted to restrict access to the area of the Kinston Facility at which friable ACM has been identified.

The Kinston Facility's internal procedures have been revised to ensure strict compliance with all Title V permit conditions. In addition, the Kinston Facility intends to disclose these matters as deviations in its semi-annual report to NCDENR due on July 30, 2004.

(6)     Prevent Recurrence

INVISTA is reviewing environmental compliance of all of its new domestic assets to identify any compliance gaps that may exist and to enhance existing management systems in order to prevent occurrence of the problems identified above at any of its other facilities, and to prevent a recurrence of the problems at the North Carolina facilities. With respect to each identified issue, INVISTA will take corrective measures and will train facility personnel to prevent recurrence. Compliance assessment, training, and management of change are all part of the INVISTA environmental management system that is being implemented at INVISTA's newly acquired assets.

(7)     No Repeat Violations

INVISTA has owned and operated the assets acquired from DuPont, including the North Carolina Facilities, only since April 30, 2004. Accordingly, the specific types of incidents described herein have not, to INVISTA's knowledge, been identified in a judicial or administrative order, consent agreement or order, complaint, or notice of violation, conviction or plea agreement, or an omission for which INVISTA has previously received penalty mitigation (collectively, a "Violation") within the past three years at the North Carolina Facilities, and is not part of a pattern of such Violations by INVISTA's parent organization within the past 5 years.

(8)     Other Violations Excluded

To our knowledge, the issues discussed herein have not resulted in serious actual harm, presented an imminent and substantial endangerment to human health or the environment, or violated the specific terms of any judicial or administrative order or consent agreement. However, as the new owner, we are continuing to investigate these issues and will keep you updated on our findings.

-828+1801                                                                03 55:33 p.m.    08-18-2004        8/49

July 29, 2004
Page 5

(9)    No Economic Benefit

As the new owner, INVISTA has not realized any economic or competitive advantage as a result of these noncompliance activities. In fact, INVISTA promptly initiated a compliance audit upon discovery of potential issues and, upon confirmation of noncompliance, promptly responded by taking steps to achieve compliance at the North Carolina Facilities as soon as possible.

INVISTA disclosed the ongoing potential noncompliance matters to the proposed buyer of the North Carolina Facilities, and retains responsibility for ensuring that actions are taken to remedy any noncompliance. INVISTA looks forward to working with EPA to resolve these matters and to ensure full compliance with the law at the North Carolina Facilities.

Very truly yours,

Tracey Mihelic
Chief Counsel
Environmental, Health & Safety

cc:    Paul Kaleta, General Counsel, INVISTA
       Joe Coco, Vice President, Global Operations, INVISTA

8



Tracey L. Mihelic
Chief Counsel
Environment, Health and Safety
316-828-1655

INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

July 29, 2004

## VIA FACSIMILE AND FIRST CLASS MAIL

Ms Samantha Fairchild
Office of Enforcement
Region III
U. S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA  19103

Re:    Notification under EPA's Final Policy on "Incentives for Self-Policing:
Discovery, Disclosure, Correction and Prevention of Violations"

Dear Ms Fairchild:

This letter is submitted on behalf of INVISTA S.à r.l. ("INVISTA"), in accordance with EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (the "Audit Policy"). INVISTA makes this notification regarding INVISTA's manufacturing facility (formerly owned and operated by E. I. duPont de Nemours and Company ("DuPont")) located at 25876 DuPont Road, Seaford, Delaware (the "Facility"). INVISTA acquired these assets from DuPont on April 30, 2004. This notification identifies the potential violations that have been discovered, and describes the manner in which INVISTA has satisfied the criteria set forth in the Audit Policy.

On July 1, 2004, INVISTA commenced an audit of the Title V compliance status of the Facility. The scope of this audit was to assess the Facility's compliance with the requirements of Title V of the Clean Air Act, and with the specific provisions of the Title V permit issued to the Facility on May 25, 2004. On July 8, 2004 and as noted below, the audit team reported to INVISTA's outside legal counsel the following existing and potential violations of environmental law.

Ms. Samantha Fairchild
July 29, 2004
Page 2

I.    **MATTERS IDENTIFIED DURING THE AUDIT AND PROPOSED
       CORRECTIVE ACTIONS**

A.    **Vacuum Transfer Lines and Associated Baghouses**

On July 8, 11, and 22, 2004, the audit team reported to INVISTA's outside legal counsel that certain baghouses associated with (1) an adipic acid unloading system utilizing vacuum material transfer equipment, (2) the transfer of "flake" from storage to the manufacturing area, and (3) the transfer of dry additives into the nylon manufacturing process or the transfer of intermediate materials to storage areas, are not identified in the Facility's Title V permit.

INVISTA is preparing applications seeking a minor modification of the Title V permit to address these baghouses. State regulations adopted as part of the federally approved Title V program authorize proceeding with the operations addressed in the modification application immediately upon filing of the application.

B.    **Other Issues**

On July 9 and 15, the audit team reported the following additional issues to INVISTA's outside legal counsel:

(a)    Intermittent Observations of Required Data

On a number of occasions, the Facility failed to record operating parameters as required by the Title V permit on a once per day or once per shift basis. These missed observations included items such as visual stack observations, pressure differential across mist eliminators, pressure differential across baghouses and cyclones, and daily operating hours of baghouses. Immediately upon identification of these missed observations, INVISTA's management began an investigation of the causes for the missed data observations and has taken corrective action, including additional training, with respect to the affected employees.

(b)    Emissions Calculations Based on Stack Testing Data

The Title V permit for the Facility requires the use of AP 42 and other numerical emission factors to calculate certain emissions from the BCF stacks. The Facility performed stack testing in December, 2003 and has used the stack testing results as the basis for its emissions calculations, in lieu of the emission factors as set forth in the permit. The Facility will pursue an appropriate amendment of the relevant condition in the Title V permit to reference the stack testing results and to provide for emissions calculations on that basis.

(c)    Equipment Operation Not In Accordance With Permit Operating
       Parameters

On a number of occasions, certain baghouses in the BP flake conveyor area at the Facility operated at a pressure differential outside the range specified in the Title V permit. INVISTA is investigating the cause of this discrepancy, which includes verifying the calibration of the

10

EXHIBIT 3

828+1801                                         03:56.15 p m.      08-18-2004        11 /49

Ms. Samantha Fairchild
July 29, 2004
Page 3

pressure monitoring device, inspecting the equipment for proper operation and leaks, and
confirming the appropriate operating parameters with the equipment manufacturer.

        (d)     Failure of Opacity Monitor

     The Title V permit for the Facility requires continuous opacity monitoring with respect to
certain DOWTHERM vaporizers during periods when the vaporizer units are in operation. For
an approximate two week period in June, 2004, the opacity monitors failed. During that time
period, visual observations were made to confirm the absence of visible emissions. INVISTA
will repair or replace the monitors.

        (e)     Gasoline Vapor Pressure

     The Title V permit for the Facility requires that the 1,000 gallon gasoline storage tank
only store gasoline with a true vapor pressure less than 0.5 psia. Review of fuel records reflects
that the Facility received gasoline with vapor pressure in excess of the permit limit. Upon
discovery of this item, INVISTA determined from fuel suppliers that gasoline with the required
vapor pressure of less than 0.5 psia is not available. INVISTA believes that the inclusion of this
requirement in the permit may have been an administrative error, and will review this issue with
DNREC and seek an appropriate amendment of the permit if necessary.

**II.**    **Application of Audit Policy**

     The items disclosed herein warrant coverage under the Audit Policy due to the following
factors:

        (1)     Systematic Discovery

     INVISTA became aware of the matters identified above during a third party Title V audit
conducted by AAQS, commenced on July 1, 2004.

        (2)     Voluntary Discovery

     The potential violations disclosed and the compliance review being undertaken by
INVISTA are completely voluntary and not the result of legally mandated monitoring or
sampling prescribed by statute, regulation, permit, judicial or administrative order, or consent
agreement.

        (3)     Prompt Disclosure

     INVISTA's outside legal counsel first became aware of an issue regarding potential non-
compliance with Title V permitting requirements on the dates set forth above. Subsequently,
INVISTA's new management analyzed the issues presented and confirmed that the items
identified represented potential violations.

EXHIBIT 3

Ms. Samantha Fairchild
July 29, 2004
Page 4

    (4)    Discovery and Disclosure Independent of Government or Third Party
           Plaintiff

    INVISTA discovered these violations, and may discover additional violations as it conducts its comprehensive compliance review at each of the new assets acquired from DuPont, on its own initiative and not as a result of a governmental inspection or third party lawsuit or complaint.

    (5)    Correction and Remediation

    INVISTA has addressed the items in the manner identified above, and will promptly meet with DNREC to address any additional steps that are necessary, including permit amendment.

    (6)    Prevent Recurrence

    INVISTA is reviewing environmental compliance review at all of its newly acquired domestic assets to identify any compliance gaps that may exist and to enhance existing management systems in order to prevent a recurrence of the problems identified above. With respect to each identified issue, INVISTA will take corrective measures and will train Facility personnel to prevent recurrence. Compliance assessment, training, and management of change are all part of the INVISTA environmental management system that is being implemented at these newly acquired assets.

    (7)    No Repeat Violations

    INVISTA has owned and operated its assets, including the Seaford Facility, only since April 30, 2004, and accordingly the specific type of incidents described herein have not, to INVISTA's knowledge, been identified in a judicial or administrative order, consent agreement or order, complaint, or notice of violation, conviction or plea agreement, or an omission for which INVISTA has previously received penalty mitigation (collectively, a "Violation"), within the past three years at the Facility, and is not part of a pattern of such Violations by INVISTA's parent organization within the past 5 years.

    (8)    Other Violations Excluded

    To our knowledge, the issues discussed herein have not resulted in serious actual harm, presented an imminent and substantial endangerment to human health or the environment, or violated the specific terms of any judicial or administrative order or consent agreement. However, as the new owner, we are continuing to investigate these issues and will keep you updated on our findings.

    (9)    No Economic Benefit

    As the new owner, INVISTA has not realized any economic or competitive advantage as a result of these non-compliance activities. In fact, INVISTA promptly initiated a comprehensive compliance investigation upon discovery of the potential issues and, upon

Ms. Samantha Fairchild
July 29, 2004
Page 5

confirmation of non-compliance, plans to promptly file the appropriate permit modification
applications. In addition, INVISTA has accelerated its timetable for a detailed compliance audit
to be conducted at the Facility and continues to review the compliance status of these assets.

As the new owner of these assets, INVISTA looks forward to working with EPA to
identify and resolve any issues discovered during its audit and ensure full compliance with the
law.

Very truly yours,

Tracey L. Mihelic
Chief Counsel
Environment, Health and Safety

cc:     David Small, Deputy Secretary, DNREC
        Paul Kaleta, General Counsel, INVISTA
        Joe Coco, Vice President, Global Operations, INVISTA

13



Tracey L. Mihelic
Chief Counsel
Environment, Health and Safety
316-828-1655

INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

August 5, 2004

## VIA FACSIMILE AND CERTIFIED MAIL

Mr. Gerald Fontenot
Division Director
Office of Enforcement & Compliance Assurance
Region VI
U. S. Environmental Protection Agency
1440 Ross Avenue, Suite 1200
Dallas, TX  75202

Re:    Notification under EPA's Final Policy on "Incentives for Self-Policing:
       Discovery, Disclosure, Correction and Prevention of Violations"

Dear Mr. Fontenot:

This letter is submitted on behalf of INVISTA S.à r.l. ("INVISTA"), in accordance with EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (the "Audit Policy"). INVISTA makes this notification regarding INVISTA's manufacturing facility (formerly owned and operated by E. I. duPont de Nemours and Company ("DuPont")) located at 2695 Old Bloomington Road North, Victoria, Texas (the "Facility"). As you are aware, INVISTA acquired these assets from DuPont on April 30, 2004. INVISTA commenced a comprehensive environmental and management systems audit (the "Audit") of the Facility. On July 15, 2004, during the field work phase of the Audit, the audit team reported the first existing and potential violations of federal environmental law set forth in more detail below. This notification summarizes the potential violations that have been discovered within the prior twenty one days, and describes the manner in which INVISTA has satisfied the criteria set forth in the Audit Policy. We will be submitting an additional letter early next week to summarize additional findings subsequently discovered (and within the twenty one days of discovery) as part of the Audit.

14
EXHIBIT 3

Mr. Gerald Fontenot
August 5, 2004
Page 2

I.    **Matters Identified on July 15, 2004 During the Audit**

- The total annual benzene quantities previously may not have been accurately calculated. The Facility is currently conducting a comprehensive stream identification and will further assess overall compliance with subpart FF of the NESHAP once the detailed stream identification is completed;

- The Facility currently operates certain small above ground tanks that have associated underground piping and has not previously identified them as USTs. INVISTA is analyzing the applicability of the UST requirements in light of the underground piping connected with these small above ground tanks; and

- Contemporaneous daily tank inspections for certain tanks were conducted, but not documented, on a daily basis per 40 CFR 265.15. The facility certified on a weekly basis the daily inspections.

II.    **Application of Audit Policy**

The items disclosed herein warrant coverage under the Audit Policy due to the following factors:

(1)    Systematic Discovery

INVISTA became aware of the matters identified above during field work phase of the Audit, which is being conducted by an independent, third party auditing firm, Van Bruesegen and Associates, commenced on July 12, 2004.

(2)    Voluntary Discovery

The potential violations disclosed and the compliance review being undertaken by INVISTA are completely voluntary and not the result of legally mandated monitoring or sampling prescribed by statute, regulation, permit, judicial or administrative order, or consent agreement.

(3)    Prompt Disclosure

INVISTA's outside auditors first became aware of the above discussed issues regarding potential non-compliance on the date set forth above. Subsequently, INVISTA's new management analyzed the issues presented and confirmed that the items identified represent potential violations. As noted above, INVISTA is still determining applicability of the UST finding and assessing overall facility-wide NESHAP FF compliance. We will promptly submit any updates to these initial findings.

EXHIBIT 3

Mr. Gerald Fontenot
August 5, 2004
Page 3

      (4)     Discovery and Disclosure Independent of Government or Third Party Plaintiff

INVISTA discovered these initial matters, and may discover additional matters as it conducts similar audits at each of the new assets acquired from DuPont (including two additional facilities located in Region VI), on its own initiative and not as a result of a governmental inspection or third party lawsuit or complaint.

      (5)     Correction and Remediation

INVISTA is developing an action plan to promptly address the items within the time period provided for under the Audit Policy.

      (6)     Prevent Recurrence

INVISTA is reviewing environmental compliance at all of its newly acquired domestic assets to identify any compliance gaps that may exist and to enhance existing management systems in order to prevent a recurrence of the problems identified above. With respect to each identified issue, INVISTA will take corrective measures and will train Facility personnel to prevent recurrence. Compliance assessment, training, and management of change are all part of the INVISTA environmental management system that is being implemented at these newly acquired assets.

      (7)    No Repeat Violations

INVISTA has owned and operated its assets, including the Facility, only since April 30, 2004, and accordingly the specific type of incidents described herein have not, to INVISTA's knowledge, been identified in a judicial or administrative order, consent agreement or order, complaint, or notice of violation, conviction or plea agreement, or an omission for which INVISTA has previously received penalty mitigation (collectively, a "Violation"), within the past three years at the Facility, and is not part of a pattern of such Violations by INVISTA's parent organization within the past 5 years.

      (8)    Other Violations Excluded

To our knowledge, the issues discussed herein have not resulted in serious actual harm, presented an imminent and substantial endangerment to human health or the environment, or violated the specific terms of any judicial or administrative order or consent agreement. However, as the new owner, we are continuing to investigate these issues and will keep you updated on our findings.

      (9)    No Economic Benefit

As the new owner, INVISTA has not realized any economic or competitive advantage as a result of these non-compliance activities, as they stem from pre-acquisition activities.

16
EXHIBIT 3

828+1801                                           03:57:45 p.m.    03-18-2004        17/49

Mr. Gerald Fontenot
August 5, 2004
Page 4


As the new owner of these assets, INVISTA looks forward to working with EPA to identify and resolve any issues discovered during its audit and ensure full compliance with the law.

Very truly yours,

Tracey L. Mihelic
Chief Counsel
Environment, Health and Safety

cc:      Esteban Herrerra (Region VI)
         Environmental Protection Agency

         Brent Wade (Special Assistant, Office of Compliance and Enforcement, TCEQ)
         Special Assistant
         Office of Compliance & Enforcement
         Texas Commission on Environmental Quality

         Buddy Stanley
         Regional Director
         Region 14
         Texas Commission on Environmental Quality

         Paul Kaleta, General Counsel, INVISTA

         Joe Coco, Vice President, Global Operations, INVISTA

·328+1801                                                        03:57:54 p.m.    08-18-2004      18 /49



TRACEY L. MIHELIC
Chief Counsel
Environment, Health and Safety
316-828-1655

INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

August 10, 2004

## VIA FACSIMILE AND CERTIFIED MAIL

Mr. Gerald Fontenot
Division Director
Office of Enforcement & Compliance Assurance
U. S. Environmental Protection Agency, Region VI
1440 Ross Avenue, Suite 1200
Dallas, Texas  75202

Re:    Notification under EPA's Final Policy on "Incentives for Self-Policing:
       Discovery, Disclosure, Correction and Prevention of Violations"

Dear Mr. Fontenot:

This letter is submitted on behalf of INVISTA S.à.r.l. ("INVISTA"), in accordance with EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (the "Audit Policy"). INVISTA makes this notification regarding INVISTA's manufacturing facility (formerly owned and operated by E. I. duPont de Nemours and Company ("DuPont")) located at 2695 Old Bloomington Road North, Victoria, Texas (the "Facility") that INVISTA acquired from DuPont on April 30, 2004.

As you are aware, INVISTA is conducting a comprehensive environmental and management systems audit (the "Audit") of the Facility. We have requested that this Audit be included in a national audit program, proposed to EPA on July 28, 2004, regarding all of the former DuPont operating facilities located in the United States ("Audit Program"). As part of its proposed Audit Program, INVISTA is disclosing existing violations and past violations that impact or may impact current operations, including but not limited to, compliance with permit limitations, assessments of rule applicability and compliance with such applicable rules. INVISTA has submitted previous disclosures regarding this Facility pursuant to the Audit Policy. This notification summarizes known violations and violations for which INVISTA has a reasonable basis to suspect an actual violation may exist that have been discovered since July 20, 2004 as a result of third party audit fieldwork that commenced July 12, 2004 at the Facility. If additional information changes the basis of any of these findings, INVISTA will notify you

Mr. Gerald Fontenot
August 10, 2004
Page 2

promptly of such change. The following also describes the manner in which INVISTA has
satisfied the criteria set forth in the Audit Policy.

I.     **Known Violations Identified Since July 20, 2004**

- Improper registration of above ground storage tanks; failure to identify tanks as
  regulated underground storage tanks and, as a result, failure to comply with
  corresponding requirements; failure to maintain onsite certain records regarding
  tanks; and failure to maintain signed reports;

- Deficiencies in the Facility's hazardous waste contingency plan and SPCC plan;

- Storage of hazardous waste in one tank for 95 days; failure to comply with certain
  labeling, storage and inspection requirements for hazardous waste in tanks, drums
  and satellite accumulation areas;

- Improper labeling of used oil containers;

- Incomplete BIF correspondence file located at the Facility;

- Certain process off gases are introduced to the BIF boilers at temperatures below
  the BIF certification levels;

- Certain waste streams have not been identified as benzene waste streams subject
  to NESHAP FF and thus have not been managed in accordance with 40 CFR Part
  63, Subpart FF and erroneous reporting pursuant to such rules. INVISTA
  currently is conducting a comprehensive stream identification and will further
  assess facility-wide compliance with NESHAP FF once the stream identification
  is complete;

- Failure to maintain appropriate data regarding the performance test for the
  benzene flasher as required by Subpart FF;

- The Facility did not update the executive summary of the Pollution Prevention
  Plan and Pollution Prevention Annual Progress summary report submitted on
  June 23, 2004, to reflect the ownership transfer;

- The Facility exceeds certain permit limits, certain emissions are not accurately
  identified in its permits and process changes and changes to standard calculation
  methods are not reflected in air permits or applications and may impact the limits
  set forth in such permits;

- Failure to maintain accurate records required by permits;

19

EXHIBIT 3

-828+1801

Mr. Gerald Fontenot
August 10, 2004
Page 3

- Previous Facility determinations on NSPS applicability to certain processes are inaccurate, leading to non-compliance with certain NSPS requirements and reporting has been inconsistent with deadlines;

- The current Notice of Registration filed prior to INVISTA's ownership does not accurately detail the current waste generation and management activities;

- Management, registration and certification requirements related to CFCs have not been met;

- Failure to maintain a documented and signed negative applicability determination for the following NESHAPs:  MMMM, PPPP, QQQQ, RRRR, YYYY;

- Operation of the flare for the AOP process in non-emergency situations in violation of its State permit;

- Deficiencies in the semi-annual periodic reports submitted and records kept pursuant to the Hazardous Organic NESHAP, 40 CFR § 63.100 et seq., ("HON");

- Permit by Rule and NSR applications previously filed by the Facility appear to be inconsistent with current operations, some of which may not qualify for Permits by Rule.  Due to the complexity surrounding the Facility's air emissions and corresponding permits, INVISTA will conduct a focused audit relating to compliance with and applicability of the State Permits by Rule, NSR permits and federal Prevention of Significant Deterioration/New Source Review programs;

- The Facility previously submitted a PSD netting table as part of an October 1997 permit application that has internal calculation errors.  INVISTA intends to conduct a focused audit relating to compliance with and applicability of the federal Prevention of Significant Deterioration at the Facility;

- Failure to submit a Compliance Assurance Monitoring plan for the dryers in the Adipic Acid process;

- Annual emissions report contains inaccuracies;

- Failure to adhere to the deed recordation and certain recordkeeping requirements contained in the Facility's TPDES permit;

- Failure to manage three substations with capacitor banks containing dielectric oil with unknown PCB concentrations as PCB-containing equipment;

- Failure to notify TCEQ of transfer of ownership of UIC Waste Disposal Permits;

INVISTA S.à r.L · INVISTA Building · P.O. Box 2936 · Wichita, KS 67201-2936 · EXHIBIT 18 00 Tel · www.INVISTA.com

Mr. Gerald Fontenot
August 10, 2004
Page 4

- Failure to maintain TSCA § 8(c) records and failure to notify EPA of exportation of certain chemicals;

- Failure to perform annual threshold determinations under EPCRA and potential miscalculations of chemical quantities for EPCRA purposes;

- Inappropriate company official signed DMRs without written delegation of authority;

- Groundwater air stripper is removing numerous contaminants although original permit application identifies removal of only tetrachloroethylene; and

**II.     Potential Violations Identified Since July 20, 2004 During the Audit**

- The facility has not conducted a triennial certification test for the BIF units as required by 40 CFR § 266.103(d). The TCEQ has granted annual deferrals to such tests;

- The Facility's Title V for the Adipic Acid process permit application does not identify all current emission sources. INVISTA is reviewing all current Title V applications for the Facility to verify the accuracy of such applications;

- The Facility's TPDES permit prohibits the discharge of visible foam from Outfall Number 151. Visible foam has been previously reported from such outfall. INVISTA is seeking a modification to this condition;

- The Facility has modified its "Procedure and Sample Log" and "Flow Measurements and Sampling Log" required to be maintained by its TPDES permit. INVISTA is investigating whether any modifications violate any recordkeeping requirements;

- Prior to the acquisition, DuPont leased a portion of the land to the employees for recreational activities such as a skeet shooting range and swimming pool. INVISTA is investigating whether any activities at this site impact INVISTA's operations;

- The Facility operates a benzene flasher that it currently believes is exempt from RCRA permitting requirements. INVISTA is continuing to work with the TCEQ to reassess this prior determination.

- The Facility does not have adequate documentation to demonstrate its Group 1 and Group 2 determinations under the HON, and INVISTA is also investigating prior determinations regarding exempt sources;

21
EXHIBIT 3

Mr. Gerald Fontenot
August 10, 2004
Page 5

- Prior to the acquisition, the Facility failed to comply with the composite sampling requirements set forth in its TPDES permit. INVISTA is investigating whether this has impacted current permit limits;

- INVISTA is investigating whether the land application of biosolids is required to be permitted;

- INVISTA has not formally notified the TCEQ of transfer of ownership of certain equipment covered by Permit No. HW-50056-001 as DuPont remains the owner of the land and certain other assets covered by this permit. INVISTA is working with DuPont and TCEQ to separate this permit;

- The Facility previously received waste from the Sabine River Works facility and processed it in the Nickel Recovery Unit. INVISTA is assessing whether this activity required a RCRA permit;

- Modification of certain data records maintained under the Facility's TPDES permit. INVISTA is currently verifying whether any of the modifications violate any recordkeeping requirements; and

- Failure to obtain an Acid Rain permit for the Co-generation unit based on gross sales of electricity to the grid. Prior to INVISTA's ownership, the Facility determined that it was exempt from the permitting requirements based on net sales of electricity to the grid falling below one third of electricity production.

In addition to the findings discussed above, as part of the implementation of its Compliance Assurance Management System, INVISTA discovered that off-site sources (*i.e.*, Equistar and DuPont) periodically discharge stormwater containing process stormwater into Rice Canal, which flows to Outfall 003 in INVISTA's TPDES permit. Equistar also has discharged to Rice Canal storm water containing process wastewater during heavy rain events. While no effluent limits have been exceeded from these discharges, it is unclear whether INVISTA's TPDES permit authorizes these discharges.

III.    **Application of Audit Policy**

The items disclosed herein warrant coverage under the Audit Policy due to the following factors:

(1)    Systematic Discovery

INVISTA became aware of the matters identified above during field work phase of the Audit, which is being conducted by an independent, third party auditing firm, Van Bruesegen and Associates, that commenced on July 12, 2004.

22
EXHIBIT 3

Mr. Gerald Fontenot
August 10, 2004
Page 6

      (2)     Voluntary Discovery

The violations disclosed and the compliance review being undertaken by INVISTA are completely voluntary and not the result of legally mandated monitoring or sampling prescribed by statute, regulation, permit, judicial or administrative order, or consent agreement.

      (3)     Prompt Disclosure

INVISTA's outside auditors first became aware of the above discussed issues starting July 20, 2004. Although the Audit Report is not yet final, INVISTA is disclosing these items as of this time. As noted above, INVISTA is still verifying the findings and assessing the applicability of certain regulations, such as the UST regulations, and assessing overall facility-wide NESHAP FF compliance. We will promptly submit any updates to these initial findings.

      (4)     Discovery and Disclosure Independent of Government or Third Party Plaintiff

INVISTA discovered these initial matters, and may discover additional matters as it conducts similar audits at each of the new assets acquired from DuPont (including two additional facilities located in Region VI), on its own initiative and not as a result of a governmental inspection or third party lawsuit or complaint.

      (5)     Correction and Remediation

INVISTA is developing an action plan to address the identified items within 60 days as provided by the Audit Policy. If INVISTA requires more than 60 days to correct and remediate the violations, INVISTA will seek EPA approval for such extensions within this 60-day timeframe.

      (6)     Prevent Recurrence

As you are aware, INVISTA is reviewing environmental compliance at all of its newly acquired domestic operating assets from DuPont to identify any compliance gaps that may exist and to enhance existing management systems in order to prevent a recurrence of the problems identified above. With respect to each identified issue, INVISTA will take corrective measures and will train Facility personnel to prevent recurrence. Compliance assessment, training, and management of change are all part of the INVISTA environmental management system that is being implemented at these newly acquired assets.

      (7)     No Repeat Violations

INVISTA has owned and operated its assets, including the Facility, only since April 30, 2004, and accordingly the specific type of incidents described herein have not, to INVISTA's knowledge, been identified in a judicial or administrative order, consent agreement or order, complaint, or notice of violation, conviction or plea agreement, or an omission for which INVISTA has previously received penalty mitigation (collectively; a "Violation"), within the

23
EXHIBIT 3

.828+1801

03:59:33 p.m.    08-18-2004 .    24 /49

past three years at the Facility, and is not part of a pattern of such Violations by INVISTA's parent organization within the past 5 years.

        (8)    Other Violations Excluded

To our knowledge to date, the issues discussed herein have not resulted in serious actual harm, presented an imminent and substantial endangerment to human health or the environment, or violated the specific terms of any judicial or administrative order or consent agreement. However, as the new owner, we are continuing to investigate these issues and will promptly notify you of any such findings.

        (9)   .  No Economic Benefit

As the new owner, INVISTA is continuing to assess whether the Facility has realized any economic or competitive advantage as a result of these non-compliance activities.

As we have discussed, INVISTA hopes to incorporate this Audit into its proposed national Audit Program. Accordingly, if approved, INVISTA would provide a more detailed report within ninety (90) days, as proposed. In the interim, INVISTA will continue to comply with the Audit Policy and work with you to correct the violations. Please contact me with any questions you have.

As the new owner of these assets, INVISTA looks forward to working with EPA to identify and resolve any issues discovered during its audit and ensure full compliance with the law.

        Very truly yours,

        Tracey L. Mihelic
        Chief Counsel
        Environment, Health and Safety

cc:     Esteban Herrerra (Region VI)
       Environmental Protection Agency

       Brent Wade
       Special Assistant
       Office of Compliance & Enforcement
       Texas Commission on Environmental Quality

       Buddy Stanley (Region 14)
       Regional Director
       Texas Commission on Environmental Quality

       Paul Kaleta, General Counsel, INVISTA

       Joe Coco, Vice President, Global Operations, INVISTA

INVISTA S.à r.l. · INVISTA Building · P.O. Box 2936 · Wichita, KS 67201-2936 · 316-828-1000 Tel · www.INVISTA.com

828•1801                                          03:59:47 p.m.    08-18-2004       25 /49



INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

Tracey L. Mihelic
Chief Counsel
316-828-1655

July 28, 2004

**VIA EMAIL AND
CERTIFIED MAIL**

Mr. Robert Kaplan
USEPA, Headquarters
Ariel Rios Building
1200 Pennsylvania Ave.
Washington, DC  20460
MC-2248A

   Re:    Proposed Corporate Audit for INVISTA S.à r.l.

Dear Mr. Kaplan:

Thank you for meeting with us on July 22, 2004.  As discussed, INVISTA S.à r.l. ("INVISTA") (a wholly owned subsidiary of Koch Industries, Inc.) is proposing to enter into a corporate auditing agreement with the United States Environmental Protection Agency (the "Agency" or "EPA") addressing ten INVISTA facilities newly acquired from E.I. duPont de Nemours and Company ("DuPont").[1]  DuPont and subsidiaries of Koch Industries, Inc. finalized the sale of these assets at 5:00 p.m. on April 30, 2004.  The overall transaction involved over 40 sites worldwide, eleven of which are in the United States.

As we discussed during our meeting, INVISTA has begun the process of performing comprehensive audits at ten of the newly acquired U.S. facilities.  While INVISTA to date has utilized the EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (the "Audit Policy"), it believes a U.S. corporate auditing agreement with EPA is the best means to effectively assess the facilities compliance under these audits to ensure full compliance with the law.

INVISTA is committed to ensuring that all of its facilities operate in compliance with all environmental laws and regulations.  To demonstrate our commitment to superior Safety, Health and Environmental ("EHS") performance, INVISTA is committed to continuing to improve EHS

---

[1]    INVISTA has entered into an agreement to sell the assets located in Kinston and Kentec, North Carolina, and, therefore, at this time, we are not proposing to conduct an audit at these facilities.  As noted below, a predisposition compliance audit was conducted in early July at these facilities.

Mr. Robert Kaplan
July 28, 2004
Page 2

compliance and performance through implementation of its Compliance Assurance Management System ("CAMS").

A principle element of CAMS is compliance management oversight ("Compliance Oversight"), which is oversight by management, legal and technical experts of regulatory applicability determinations and compliance certifications. Other key elements include assigning a compliance system owner for each facility, developing compliance calendars for each site, developing compliance standards for specific subject matter areas (such as INVISTA's Quality Assurance and Quality Control standard, which is designed to ensure the accuracy of all records and reports before submittal), providing sites with guidance on emerging environmental issues, conducting third party as well as internal audits of its operations to ensure compliance with both INVISTA policies and procedures as well as federal and state regulations, and implementation of INVISTA's management of change procedures.

Within days after the April 30, 2004, acquisition of these DuPont facilities, INVISTA began to introduce its EHS Management System or CAMS at the former DuPont sites. As a first step, INVISTA focused on instituting Compliance Oversight, which is oversight of EHS matters by management, legal and technical experts. Elevation of compliance issues to these levels lead to the discovery by INVISTA of benzene NESHAP compliance issues and potential RCRA violations at INVISTA's Texas chemical (intermediate) facilities, which the company promptly disclosed in writing and orally to EPA Region VI and the Texas Commission on Environmental Quality ("TCEQ"). These discoveries in turn led to the decision to expedite comprehensive environmental audits at each of the three Texas intermediate facilities. Our preliminary audit work at these facilities has yielded additional noncompliance concerns, which also will be disclosed. In order to effectively and efficiently proceed with these comprehensive audits, INVISTA proposed entering into a Letter Agreement with Region VI to conduct a multi-facility audit within that Region. A letter setting forth this proposal was sent to Region VI on July 13, 2004.

Due to the comprehensive nature of INVISTA's audit process, a corporate wide audit agreement with EPA will constitute a more efficient way to meet INVISTA's compliance goals and to disclose, correct and expeditiously resolve violations under EPA's Audit Policy. Thus, INVISTA proposes that this corporate wide program supersede the Region VI specific proposal and combine those facilities into this agreement

The following sets forth the proposed auditing plan, including the facilities to be audited, the scope of the planned audit, a schedule and process for auditing and disclosing the findings to EPA, and commitments to expeditiously correct any violations found. The process laid out below meets the systematic discovery and other requirements for eligibility under the terms of EPA's Audit Policy for any violations discovered through the proposed audits.

Mr. Robert Kaplan
July 28, 2004
Page 3

## I.     Facilities Covered

INVISTA will perform a comprehensive, multi-media, audit and assessment of the following facilities, each of which was acquired by INVISTA on April 30, 2004.

Victoria, Texas: 2695 Old Bloomington Road North, Victoria, TX;
LaPorte, Texas: 12455 Strang Road, LaPorte, TX;
Sabine River Works, Texas: 3055A FM 1006, Orange, TX;
Seaford, Delaware: 25876 DuPont Road, Seaford, DE;
Waynesboro, Virginia: 400 DuPont Blvd., Waynesboro, VA;
Kinston, North Carolina: P.O. Box 800, Highway 11 North, Kinston, NC;
Camden, South Carolina: 643 Highway 1 South, Lugoff, SC;
Chattanooga, Tennessee: 4501 N. Access Road, Chattanooga, TN;
Athens, Georgia: 110 Voyles Road, Athens, GA;
Dalton, Georgia: 403 Holiday Ave., Dalton, GA; and
Martinsville, Virginia: 1008 DuPont Road, Martinsville, VA.

## II.     Scope of the Audit

INVISTA will conduct a comprehensive, multi-media, environmental audit of each of the facilities listed above. The audits will cover compliance with the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Toxic Substance Control Act, and other environmental laws. The audits will include an applicability analysis to ensure activities and processes that may trigger regulatory requirements have been identified and assessed. A copy of the Audit Protocol is attached hereto as Attachment 1.

These audits will be conducted by an experienced, third party audit team, Van Breusegen & Associates, Inc. (VBA). VBA are highly qualified environmental auditors, who have been providing environmental auditing, consulting and management system services to industrial and commercial clients since October 1994 and have completed over 800 environmental compliance projects in 47 states in the U.S., three provinces in Canada, and two states in Mexico. The auditors proposed for this effort have completed numerous auditing and compliance projects throughout the United States and have dealt with every major media area, including air (new source review, permitting, Title V, NESHAPs, air modeling, emission inventories), water (SPCC and SWPPP plans, NPDES permitting), waste (RCRA auditing, permitting and training), and development, implementation, and auditing of environmental management systems. Biographies of a number of the auditors are attached hereto as Attachment 2. VBA will be assisted by outside counsel with expertise in environmental regulatory compliance.

## III.     Schedule

In recognition of the need for comprehensive, high quality, and consistent audits, INVISTA proposes an audit schedule wherein all ten U.S. facilities will be audited over the next 15 months, with the final audit being completed by October 31, 2005. We believe this schedule is

EXHIBIT 3

.828+1801

04:00:43 p.m.    08-18-2004    28/49

Mr. Robert Kaplan
July 28, 2004
Page 4

necessary for a number of reasons.  The facilities to be audited are highly complex industrial
facilities, including the intermediate plants in Texas and fiber manufacturing facilities in the
eastern U.S., and the audits proposed by INVISTA will be comprehensive.  The audits are
initiated by an applicability assessment, where the independent auditors, together with outside
legal counsel and INVISTA EHS personnel and EHS counsel will review operations at each
facility and determine what federal, state, and local laws and regulations may apply to the
operations. In addition, many of the facilities are located at sites where third parties also are
located, and in some cases, share certain services with these third parties (e.g., waste water
treatment, electricity generation, docks, injection wells).  These operations can make audit
preparation more complex if we are to ensure a full understanding of respective compliance
obligations.  All of the factors combine to make thorough audit preparation critical to the success
of the overall process.  INVISTA has learned from its first audits, already underway in Texas,
that considerable effort, sometimes requiring a week or even more, is necessary to develop
detailed audit protocols that accurately reflect the number of federal, state, and local
requirements applicable to an individual facility.

The schedule also is critical to ensure quality and consistency throughout the process.  It is
important to the company that these audits address system issues as well as environmental
compliance at individual facilities.  To achieve this, we are proposing to use the same external,
third party audit team for the intermediates and fiber manufacturing facilities which are similar in
operation.  The audit team will generally consist of 6-10 auditors from VBA supplemented by
2-4 third-party subject-matter experts who team with VBA on a periodic basis.  In addition,
INVISTA's internal Audit and Compliance Assurance group will attend each audit to ensure that
facility personnel, who are not experienced with third-party auditing, understand the process and
cooperate fully with the auditors.

The availability of the auditors is also a key factor in proposing the fifteen month schedule.
VBA auditors are in some demand as they have engagements with several major companies,
including Koch Industries, Inc., Anheuser-Busch Companies, 3M, Madison Gas & Electric,
Heinz, Interstate Brands Corporation, and Kimberly-Clark Corporation, to conduct various types
of EHS compliance audits.  It has been INVISTA's experience, based on the prior experiences of
INVISTA's legal and audit departments, that use of the same audit team ensures the highest
degree of quality and consistency, which cannot easily be achieved by the use of different
auditors even using the same audit protocols.  The experience the team will gain by intimately
learning facility operations, and carrying that knowledge on to the next facility, is invaluable to
the overall process.

Once the actual field audit commences at the facility, it is likely to take several weeks to
complete.  Based on our experience from the first audits underway at the Texas facilities, it may
take several days just for a subject matter auditor to understand fully the operations at the
facility.  For instance, it has taken a minimum of two to three days to conduct a detailed walk-
through of the Victoria facility.  Then, auditors conference with facility staff to review the
processes of each unit in the facility, including reviewing or developing process flow diagrams,
to understand how each unit relates to each other, which is critical to identifying waste streams,

EXHIBIT 3

Mr. Robert Kaplan
July 28, 2004
Page 5

emission points, storage systems, process systems and streams, chemicals used, etc. After this, the auditors conduct their detailed compliance audit, which may involve additional time spent at a particular unit, interviewing employees, and at the end of each day, convening with all the auditors and staff to compare notes, findings, and confirm their understanding of the processes at the facility. Often this requires the auditor to revisit areas previously reviewed as new information becomes available. INVISTA's desire is to allow the auditors sufficient time to gather enough information to provide useful and accurate feedback.

As the audit is ongoing, even before completion of the field work, issues are raised on a daily basis that require further evaluation and review. While the auditors often are able to quickly identify and validate a finding, some issues are more difficult given the complexities of the processes at these facilities and of the various laws and regulations that may apply. Accordingly, these types of issues may require further legal review or more detailed technical analysis. The number of issues requiring more detailed review may vary, but will also impact the length of the audit. A significant amount of time may be spent by the auditors with the facility operations team to explain any noncompliance findings and help the operations staff understand the issue so as to facilitate the development and implementation of corrective action. This is a critical step to ensuring sustainable compliance by the facility.

INVISTA intends to conduct this audit in three phases. These phases involve auditing those facilities that are larger and have more regulated processes first, with those less complex facilities in the last phase. INVISTA will complete all audits by October 31, 2005.

**Phase 1:** Texas Intermediates Facilities: We have been working on the preliminary assessment of the Victoria site since June 8, 2004 and the Sabine River Works since June 18, 2004. The third-party audit team is currently scheduled to conduct comprehensive audits at each of the three facilities on the following timetable:

Victoria Facility – Commenced July 12, 2004
Sabine River Works Facility – August 9, 2004
LaPorte Facility – August 29, 2004

**Phase 2:** Fiber Manufacturing Facilities: VBA has proposed to complete the field work at each of the facilities according to the following schedule:

Seaford, Delaware – October 2004
Waynesboro, Virginia – January 2005
Chattanooga, Tennessee – June 2005
Camden, South Carolina – August 2005

-828+1801                                    04:01:27 p.m.    08-18-2004        30 /49

Mr. Robert Kaplan
July 28, 2004
Page 6

**Phase 3:** Other Facilities

Martinsville, Virginia (machine repair shop): March 2005
Athens, Georgia (mechanical winding and repackaging of synthetic fibers): April 2005
Dalton, Georgia (carpet reclamation center): May 2005

INVISTA will make best efforts to accomplish this schedule and expedite the schedule when possible. In the event that INVISTA is unable to complete the field work on schedule, it will promptly notify EPA and apprise the agency of the revised schedule. Regardless of the audit schedule outlined above, however, INVISTA will continue its ongoing implementation of its CAMS at each of its locations and will conduct periodic reviews of environmental compliance as part of that process. The CAMS requires each facility to conduct ongoing assessments of regulatory applicability and compliance, as well as to have processes to drive continuous improvement in compliance and environmental performance.

To the extent any violations are discovered pursuant to the continuous implementation of CAMS but outside of the audit schedule, INVISTA requests that it be allowed to report those findings in the periodic reports it proposes to file with EPA as set forth in Section VI below. This should allow the process to proceed efficiently both within the company and within EPA.

INVISTA is also conducting topic specific audits at individual facilities. For instance, INVISTA is currently conducting a Title V audit at the Seaford facility since the facility just received a Title V permit. In addition, INVISTA is currently conducting TRI audits at the newly acquired facilities. INVISTA requests that it also be allowed to disclose the results of these additional audits in the periodic reports as set forth in Section IV. INVISTA also has conducted a high level, pre-disposition, audit at its Kinston-Kentec facilities, which, as has been publicly announced, may be sold in the near future.

To the extent that a facility is sold or control otherwise is transferred from INVISTA to an unrelated third party prior to the scheduled audit date, INVISTA will remove that facility from the audit process. INVISTA will advise EPA if any facility is sold or control is otherwise transferred.

**IV.    Prompt Disclosure**

Although EPA's Audit Policy requires noncompliance to be reported within 21 days of discovery, the Agency has previously recognized that in situations where a company steps forward to undertake an audit of multiple facilities, efficiency can be achieved by avoiding iterative disclosures. Accordingly, INVISTA is proposing that it file periodic reports with EPA every 90 days after the date that this Agreement is made final. Each periodic report will set forth all violations discovered during the previous 90 days and the actions taken to correct these violations. (See Section VI below for a description of reports.)

Mr. Robert Kaplan
July 28, 2004
Page 7

A 90-day reporting schedule is needed to compile and ensure quality review of national audit results. First, development of the reports will require pulling together results from several multimedia audits, any targeted audit results, and any discoveries made during implementation of INVISTA's CAMS. Second, once the draft report is compiled the company proposes to review the draft for quality and completeness. A few weeks will be needed to perform the review and address issues or questions arising in this review. This process will provide EPA with a quality product that will conserve the Agency's time and facilitate rapid resolution of the disclosures. Finally, while reporting is proposed on a 90-day interval, INVISTA is committed to the prompt correction schedule provided in Section V below.

Further, if, during the course of audits, INVISTA discovers violations that pose an immediate threat to public health or the environment, INVISTA will promptly disclose those violations to EPA. Such notification will take place as soon as possible, and no later than three days after discovery.

In addition to the time frames outlined above, INVISTA will comply with all statutory and regulatory reporting requirements (e.g., CERCLA/EPCRA reports).

## V.    Prompt Correction

INVISTA will strive to promptly correct any noncompliance discovered as a result of this process. INVISTA proposes that corrective action will be completed within sixty (60) days, unless the nature of the noncompliance requires more than 60 days to correct. In such situations, INVISTA proposes to provide notice to EPA in its periodic reports. The notice will include a description of the non-compliance, details on proposed corrective action and a proposed schedule for implementing the corrective action. INVISTA proposes that it be granted greater than 60 days to correct noncompliance that requires new permits or permit modifications. With respect to other issues that may require greater than 60 days to correct, INVISTA will notify EPA prior to the 60-day deadline and seek an extension of this deadline.

## VI.   Reporting

INVISTA proposes to provide EPA with periodic reports detailing the findings every 90 days. Each periodic report will specify violations discovered during the reporting period, actions taken and planned to promptly correct the violations, and information necessary for resolution of the violations under the terms of EPA's Audit Policy. (INVISTA will specify in the report those violations for which it seeks expedited resolution under the audit policy and will provide all relevant information for EPA to make such determinations.)

INVISTA will provide EPA with a final audit report within 90 days of the completion of the last scheduled audit. The report will provide all information not already provided that is necessary to reach final resolution of audit results with EPA.

EXHIBIT 3

Mr. Robert Kaplan
July 28, 2004
Page 8

**VII.    Coordination with States**

INVISTA will coordinate with the TCEQ, Office of Compliance and Enforcement consistent with the Texas Environmental Health & Safety Audit Privilege Act. In addition, we will also work closely with each of the TCEQ Regional Offices where our Texas facilities are located (TCEQ Regions 10 (Beaumont), 12 (Houston) and 14 (Corpus Christi)). This coordination has already been initiated.

INVISTA will coordinate contact with other States and other Regions where Phase 2 and 3 facilities are located. INVISTA has already contacted Region III and is attempting to contact Region IV. INVISTA will submit plans for that coordination after meeting with each affected State and Region.

INVISTA will continue to cooperate with EPA to ensure that the audits are performed in a timely manner and that any necessary corrective action is taken as quickly as possible. INVISTA greatly appreciates EPA's cooperation and expeditious review of this matter. Please contact me with any questions.

Sincerely,

Tracey L. Mihelic

cc:    Gerald Fontenot
       Region VI, U. S. Environmental Protection Agency

       Esteban Herrera
       Region VI, U. S. Environmental Protection Agency

       Samantha Fairchild
       Region III, U. S. Environmental Protection Agency

       Mary Kaye Lynch
       Region IV, U. S. Environmental Protection Agency

       Joe Coco
       Vice-President of Global Operations, INVISTA

       Paul Kaleta
       General Counsel, INVISTA

EXHIBIT 3

828+1801                                           04:02:21 p.m.     08-18-2004        33 /49

# ATTACHMENT 1

# INVISTA AUDIT PROTOCOL

**INVISTA Environmental Compliance Audit**
**Facility Information**

| | |
|---|---|
| **Facility Name** | INVISTA |
| **Location** | City, State |
| | |
| **Audit Dates** | Dates |
| **Audit Leader** | Name |
| | |
| **Protocol Responsibilities** | |
| Air - General | Name |
| Air - Benzene NESHAP/LDAR | Name |
| Air - HON - Subpart F | Name |
| Air - HON - Subpart G | Name |
| Air - HON - Subpart H | Name |
| Air - LDAR | Name |
| Air - PSD & NSR | Name |
| Air - RMP | Name |
| Air - Title V | Name |
| Coast Guard/Title 33 | Name |
| Drinking Water | Name |
| DOT | Name |
| Emergency Planning | Name |
| EPCRA-CERCLA | Name |
| Pesticides | Name |
| Radiation | Name |
| Stormwater | Name |
| TSCA | Name |
| UIC | Name |
| UST and AST | Name |
| Waste | Name |
| Waste - BIF | Name |
| Waste - TSDF | Name |
| Wastewater | Name |
| TX Administrative | Name |

INVISTA Environmental Compliance Audit
Air - General

Facility Name: INVISTA
Facility Location: City, State
Audit Date(s): Dates
Audit Leader: Name
Auditor: Name
Name
Auditors Signature:

| | Applicable? | | | | Comments |
|---|---|---|---|---|---|
| | Yes | No | NA | | |

EPA REGULATIONS DESIGNATING AREAS FOR AIR QUALITY PLANNING–SECTION 1.0

PREVENTION OF SIGNIFICANT DETERIORATION (PSD) AND NEW SOURCE REVIEW (NSR)–SECTION 2.0

NEW SOURCE PERFORMANCE STANDARDS (NSPS)–APPLICABILITY WITHIN EACH SUBPART–SECTION 3.0

NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS (NESHAP), PART 61 STANDARDS–SECTION 4.0

NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS (NESHAP), PART 63 MACT STANDARDS FOR SOURCE CATEGORIES–SECTION 5.0

CHEMICAL ACCIDENT PREVENTION PROVISIONS (RMP)–SECTION 6.0

FEDERAL/STATE OPERATING PERMIT PROGRAMS (TITLE V PERMITS)–SECTION 7.0

PROTECTION OF STRATOSPHERIC OZONE (CFCs)–SECTION 8.0

STATE REGULATIONS–SECTION 9.0

| | | Compliant? | | | Exceptions and/or Comments and Issuance Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 1.0 | Air Quality | | | | |
| 2.0 | PSD & NSR | | | | |
| 3.0 | NSPS | | | | |
| 4.0 | Part 61 NESHAP | | | | |

Page 1 of 2

INVISTA Environmental Compliance Audit
Air - General

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 5.0 | Part 63 NESHAPs | | | | |
| 6.0 | RMP | | | | |
| 7.0 | TITLE V PERMITS | | | | |
| 8.0 | CFCs | | | | |
| 9.0 | STATE REGULATIONS | | | | |
| | TX Title 30, Part 1, Chapter | | | | |
| 101 | General Air Quality Rules | | | | |
| 104 | Bond Certification Criteria for Air Pollution Control Facilities [Repealed] | | | | |
| 105 | Enforcement Rules [Repealed] | | | | |
| 106 | Permits by Rule | | | | This chapter identifies facilities or types of facilities which the commission has determined will not make a significant contribution of air contaminants to the atmosphere and pursuant to the Texas Health and Safety Code, the Texas Clean Air Act (TCAA), §382.087, are exempt from the permit requirements of the TCAA, §382.0518. |
| 111 | Control of Air Pollution from Visible Emissions and Particulate Matter | | | | |
| 112 | Control of Air Pollution from Sulfur Compounds | | | | |
| 113 | Standards of Performance for Hazardous Air Pollutants and for Designated | | | | |
| 114 | Control of Air Pollution from Motor Vehicles | | | | |
| 115 | Control of Air Pollution from Volatile Organic Compounds | | | | |
| 116 | Control of Air Pollution by Permits for New Construction or Modification | | | | |
| 117 | Control of Air Pollution from Nitrogen Compounds | | | | |
| 118 | Control of Air Pollution Episodes | | | | Outlines the criteria the Department will use in declaring an air pollution episode. |
| 119 | Control of Air Pollution from Carbon Monoxide [Repealed] | | | | |
| 120 | Control of Air Pollution from Hazardous Waste and Solid Waste | | | | |
| 121 | Control of Air Pollution from Municipal Solid Waste Facilities [Repealed] | | | | |
| END | | | | | |

Page 2 of 2

INVISTA Environmental Compliance Audit
Air - Benzene NESHAP

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditors Signature:                Name

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |

**FACILITY IS A CHEMICAL MANUFACTURING PLANT, COKE BY-PRODUCT RECOVERY PLANT, OR PETROLEUM REFINERY**

Note: Chemical manufacturing plants include facilities engaged in the production of chemicals by chemical, thermal, physical or biological processes for use as a product, co-product, by-product or intermediate including, but not limited to industrial organic chemicals, organic pesticide products, pharmaceutical preparations, paint and allied products, fertilizer, and agricultural chemicals.

FACILITY IS A HAZARDOUS WASTE TREATMENT, STORAGE AND DISPOSAL FACILITY THAT TREATS, STORES OR DISPOSES OF HAZARDOUS WASTE GENERATED AT A CHEMICAL MANUFACTURING PLANT, COKE_BY-PRODUCT RECOVERY PLANT OR PETROLEUM REFINERY

NOTE: IF EITHER OR BOTH OF THE ABOVE APPLY TO THE FACILITY, FACILITY IS SUBJECT TO THE BENZENE NESHAP - Complete Sections noted below:

Facility TAB is less than 1 Mg/yr - Complete Sections 1.0 and 2.0
Facility TAB is greater than or equal to 1 Mg/yr, but less than 10 Mg/yr - Complete Sections 1.0 and 3.0
Facility's TAB is greater than or equal to 10 Mg/yr - Complete Sections 1.0 and 4.0

TAB is the Total Annual Benzene quantity from facility waste.

| | Compliant? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| | TAB Determination | | | | |
|---|---|---|---|---|---|
| 1.0 | | | | | |
| 2.0 | TAB Less Than 1 Mg/yr. | | | | |
| 3.0 | TAB Greater Then or Equal to 1 Mg/yr, but less than 10 Mg/yr | | | | |
| 4.0 | TAB Greater Then or Equal to 10 Mg/yr | | | | |

END

37
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - HON - Subpart F

**Facility Name:** INVISTA
**Facility Location:** City, State

**Audit Date(s):** Dates
**Audit Leader:** Name

**Auditor:** Name

**Auditor's Signature:** _____  Name

| | Applicable? | | | Comments |
|---|---|---|---|---|
| | Yes | No | NA | |

**FACILITY HAS ONE OR MORE CHEMICAL PROCESSING UNITS THAT:**
1) Manufacture as a primary product isomethanebenzaldehyde, croionaldehyde, or any chemical listed in Table 1 of 40 CFR Part 63, Subpart F, AND
2) Use as a reactant or manufacture as a product or co-product one or more of the organic HAPs listed in Table 2 of 40 CFR Part 63, Subpart F, AND
3) Are located at a facility that is a major source of HAPs (>10 tpy of one HAP, or >25 tpy combined HAPs) Complete All Sections.

**FACILITY HAS ONE OR MORE CHEMICAL PROCESSING UNITS THAT:**
1) Manufacture as a primary product isomethanebenzaldehyde, croionaldehyde, or any chemical listed in Table 1 of 40 CFR Part 63, Subpart F, AND
2) Are located at a facility that is a major source of HAPs (>10 tpy of one HAP, or >25 tpy combined HAPs), BUT
3) DO NOT use as a reactant or manufacture as a product or co-product one or more of the organic HAPs listed in Table 2 of 40 CFR Part 63, Subpart F.
Complete Last item in Section 4.0 Only.

**NOTE: THE FOLLOWING SECTIONS OF 40 CFR 63.100 (Subpart F) provide assistance in determining what comprises subject equipment.**

| | | | | |
|---|---|---|---|---|
| 40 CFR 63.100(d) | How to determine the primary product of a chemical processing unit | | | |
| 40 CFR 63.100(e) | Describes what equipment constitute a source subject to Subparts F-H | | | |
| 40 CFR 63.100(f) | Lists emission points within a source that are not required to comply with Subparts F-H | | | |
| 40 CFR 63.100(g) | How to determine if a storage vessel is part of a covered source | | | |
| 40 CFR 63.100(h) | How to determine if arms and boxes in a loading rack are part of a covered source | | | |
| 40 CFR 63.100(i) | How to determine if vents from a distillation unit are part of a covered source | | | |
| 40 CFR 63.100(j) | Lists processing exempt from Subparts A and F-H | | | |
| 40 CFR 63.107 | How to determine if vents from an air oxidation reactor, distillation unit, or reactor are part of a covered source | | | |

| | Compliant? |
|---|---|

38
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - HON - Subpart F

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |

**GENERAL PROVISIONS - 40 CFR PART 63, SUBPART A**
Note: Only certain Subpart A provisions apply to HON sources (Subparts F-H). Table 4 in Subpart F designates applicable Subpart A sections.

**1.0  START-UP, SHUTDOWN & MALFUNCTION (SSM) PLAN**

| 40 CFR 63.6(e)(3)(i) | Facility has a written SSM Plan containing all required elements and that addresses SSM events for process equipment, control devices and monitoring equipment. | | | | |
| 40 CFR 63.6(e)(3)(viii) | Each revision to the SSM Plan is included in the next semiannual SSM Report. | | | | |
| 40 CFR 63.6(e)(3)(viii) | SSM Plan is revised within 45 days following a malfunction event that is not adequately addressed in the SSM Plan. | | | | |

**2.0  GENERAL MONITORING REQUIREMENTS**

| 40 CFR 63.8(c)(2) | Continuous monitoring systems installed so that readings are representative measures of emissions or process parameters, display of readings is accessible, and located according to any applicable performance specification. | | | | |
| 40 CFR 63.8(c)(3) | CMS are installed, operated and data-verified in accordance with any relevant standard and manufacturer's specifications. | | | | |

**ECCM NESHAP - 40 CFR PART 63, SUBPART F**

**3.0  COMPLIANCE DATES**

| 40 CFR 63.100(l) | Facility's subject source(s) met the applicable compliance dates contained in 40 CFR 63.100(k). | | | | |
| 40 CFR 63.100(l) & (m) | Changes or additions to a subject chemical processing unit met the applicable compliance dates contained in 40 CFR 63.100(l) and (m). | | | | |
| 40 CFR 63.100(q) | Facility with a chemical processing unit(s) producing tetrahydrobenzaldehyde and/or cyclohexanone met the applicable compliance dates contained in 40 CFR 63.100(q). | | | | |
| 40 CFR 63.100(q) | Facility is complying with the provisions of 40 CFR 63.100(q), including a compliance schedule for any process vent or gas stream transferred to an on-site or off-site control device not operated by the facility, and not able to meet the applicable compliance dates in 40 CFR 63.100(k), (l) & (m). | | | | |

**4.0  GENERAL RECORDKEEPING AND REPORTING**

| 40 CFR 63.103(c) | Facility maintains all records and reports required by Subparts F-H for at least 5 years, unless otherwise specified in Subparts G and H. | | | | |
| 40 CFR 63.103(c)(1) | The most recent 6 months of records and reports is readily accessible in a central location or computer within 2 hours of request. | | | | |

INVISTA Environmental Compliance Audit
Air - HON - Subpart F

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| 40 CFR 63.103(c)(2) | Facility maintains start-up, shutdown and malfunction records (SSM) for such events pertaining to process equipment, pollution control equipment and OMB that result in excess emissions, and include demonstration that the SSM plan was implemented, and actions taken that are not consistent with the SSM plan. | | | | Note: Not required for Group 2 emission points that are not included in an emissions average. |
| 40 CFR 63.104(c)(2) | Facility maintains records of CMS maintenance and calibration conducted at a frequency established by the manufacturer or other written procedures. | | | | Note: Not required for Group 2 emission points that are not included in an emissions average. |
| 40 CFR 63.103(d) | All reports submitted as required by Subpart F-H are submitted to the Administrator at the appropriate address listed in 40 CFR 63.13. | | | | |
| 40 CFR 63.103(d) | All requests for approval of alternative compliance methods and/or approval of a nominal efficiency are submitted to the Director of EPA, OAQPS. | | | | |
| 40 CFR 63.103(e) | Facilities with chemical processing units that are exempt from Subparts A and F-H because no Table 2 chemicals are used as reactants or manufactured as products or coproducts, maintain information, data and analysis that demonstrate the exemption. | | | | |
| **6.0  HEAT EXCHANGE SYSTEMS REQUIREMENTS** | | | | | Note: Applies to heat exchange systems used to cool process equipment contained in a subject chemical processing unit, unless the system(s) meet at least one of the criteria contained in 40 CFR 63.104(a). |
| **Compliance Option I: HAP Concentration Monitoring** | | | | | |
| 40 CFR 63.104(b)(1) | Cooling water is monitored for organic HAP content monthly for the first 6 months, and then quarterly thereafter. | | | | |
| 40 CFR 63.104(b)(2) | Monitoring is for the correct HAPs. | | | | |
| 40 CFR 63.104(b)(4) & (6) | A minimum of 3 samples is taken at the entrance and exit, as defined in 40 CFR 63.104(b)(4). | | | | |
| 40 CFR 63.104(b)(3) | Analysis is conducted by any EPA method listed in 40 CFR Part 136, provided it is sensitive to concentration as low as 10 ppm, and is used for entrance and exit samples. | | | | |
| 40 CFR 63.104(b)(6) | Data is properly calculated to determine if a leak has occurred. | | | | |
| **Compliance Option II: Surrogate Parameter Monitoring** | | | | | |
| 40 CFR 63.104(c)(1) | Facility is implementing a written monitoring plan that details surrogate monitoring for leak detection and that includes all information required by 40 CFR 63.104(c)(1) | | | | |
| 40 CFR 63.104(c)(1) | Monitoring frequency is at least monthly for the first 6 months and then quarterly thereafter. | | | | |
| 40 CFR 63.104(c)(2) | Plan is modified within 180 days if a leak is detected by other means but not detected by chosen surrogate monitoring. | | | | |
| 40 CFR 63.104(c)(1) | Records are maintained as outlined in the plan. | | | | |
| 40 CFR 63.104(c)(3) | Current plan is readily accessible, within 2 hours of request. Most recent superseded plan is maintained for at least 5 years from date of creation. | | | | |

04:03:55 p.m.    08-18-2004    40/49    828+1801

INVISTA Environmental Compliance Audit
Air - HON - Subpart F

Page 1 of 5

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| **Leak Repair** | | | | | |
| 40 CFR 63.104(d) | Leak is repaired within 45 days of receipt of analysis. | | | | |
| 40 CFR 63.104(d) | Confirmation of repair is made within 7 days of repair or start-up, whichever is later. | | | | |
| 40 CFR 63.104(e) | Delay of repair events meet criteria and are addressed in a timely manner. | | | | |
| 40 CFR 63.104(h)(1) | Required leak records are maintained. | | | | |
| 40 CFR 63.104(h)(2) | Required information is included in semiannual report (40 CFR 63.152(c)) for each heat exchanger in which the delay of repair provision is invoked. | | | | |
| **6.0 MAINTENANCE WASTEWATER REQUIREMENTS** | | | | | |
| 40 CFR 63.105(c) | Facility has written description of maintenance procedures for the management of wastewaters that includes all required element. | | | | Applies to maintenance wastewaters containing organic HAPs listed in Table 9 of Subpart G. |
| 40 CFR 63.105(c) | Maintenance wastewater plan is updated following each maintenance procedure, as needed. | | | | |
| 40 CFR 63.105(d) | Maintenance wastewater plan is implemented as part of the SSM Plan. | | | | |
| 40 CFR 63.105(d) | Records documenting implementation of maintenance wastewater plan are maintained as part of the SSM Plan. | | | | |

END

41
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - HON - Subpart G

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditors Signature: _____ Name

**FACILITY HAS ONE OR MORE CHEMICAL PROCESSING UNITS SUBJECT TO SUBPART F THAT INCLUDE:**

- Process vents
- Storage vessels
- Transfer racks
- Wastewater streams
- In-process equipment

If Yes to one or more items, Subpart G applies.

| | Applicable? | | | |
| --- | --- | --- | --- | --- |
| | Yes | No | N/A | Comments |

| | Compliant? | | | |
| --- | --- | --- | --- | --- |
| | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| | |
| --- | --- |
| 1.0 | EMISSION STANDARD |
| 2.0 | PROCESS VENT PROVISIONS |
| 3.0 | STORAGE VESSEL PROVISIONS |
| 4.0 | TRANSFER OPERATION PROVISION |
| 5.0 | PROCESS WASTEWATER PROVISIONS |
| 6.0 | LEAK INSPECTION PROVISIONS |
| 7.0 | CONTROL REQUIREMENTS FOR LIQUID STREAMS IN OPEN SYSTEMS |
| 8.0 | EMISSIONS AVERAGING |
| 9.0 | REPORTING |
| END | |

Page 1 of 1

INVISTA Environmental Compliance Audit
Air - HCN - Subpart H

Facility Name: INVISTA
Facility Location: City, State
Audit Date(s): Dates
Audit Location: Name
Auditor: Name

Auditors Signature: _____ Name

FACILITY HAS ONE OR MORE CHEMICAL PROCESSING UNITS SUBJECT TO SUBPART H THAT INCLUDE: Pumps, compressors, agitators, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connectors, surge control vessels, bottoms receivers, instrumentation systems, and control devices or closed vent systems required by the subpart that are intended to operate in organic hazardous air pollutant service 300 hours or more during the calendar year.

If Yes, Subpart H applies.

| | Applicable? | | | | Compliant? | | | |
|---|---|---|---|---|---|---|---|---|
| | Yes | No | N/A | Comments | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
| 1.0 GENERAL | | | | | | | | |
| 2.0 PUMPS IN LIGHT LIQUID SERVICE | | | | | | | | |
| 3.0 COMPRESSORS | | | | | | | | |
| 4.0 PRESSURE RELIEF DEVICES (PRD) IN GAS/LIQUID SERVICE | | | | | | | | |
| 5.0 SAMPLING CONNECTION SYSTEMS | | | | | | | | |
| 6.0 OPEN-ENDED VALVES OR LINES | | | | | | | | |
| 7.0 VALVES IN GAS/VAPOR AND IN LIGHT LIQUID SERVICE | | | | | | | | |
| 8.0 PUMP, VALVE, CONNECTORS & AGITATORS IN HEAVY LIQUID SERVICE; INSTRUMENTATION SYSTEMS; AND PUMPS IN LIGHT LIQUID SERVICE | | | | | | | | |
| 9.0 SURGE CONTROL VESSELS AND BOTTOM RECEIVERS | | | | | | | | |
| 10.0 DELAY OF REPAIR | | | | | | | | |
| 11.0 CLOSED VENT SYSTEMS AND CONTROL DEVICES | | | | | | | | |
| 12.0 AGITATORS IN GAS/VAPOR SERVICE AND IN LIGHT LIQUID SERVICE | | | | | | | | |
| 13.0 CONNECTORS IN GAS/VAPOR SERVICE AND IN LIGHT LIQUID SERVICE | | | | | | | | |
| 14.0 QUALITY IMPROVEMENT PROGRAM FOR VALVES | | | | | | | | |
| 15.0 QUALITY IMPROVEMENT PROGRAM FOR PUMPS | | | | | | | | |
| 16.0 ALTERNATIVE MEANS OF EMISSION LIMITATION | | | | | | | | |
| 17.0 TEST METHODS AND PROCEDURES | | | | | | | | |
| 18.0 RECORDKEEPING | | | | | | | | |
| x.0 REPORTING | | | | | | | | |
| END | | | | | | | | |

43
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - LDAR

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditors: Name

Auditors Signature: _____   Name

**FACILITY IS SUBJECT TO A PART 61 STANDARD (E.G. SUBPART FF - BENZENE NESHAP)**

**FACILITY HAS ONE OR MORE OF THE FOLLOWING PIECES OF EQUIPMENT IN VOLATILE HAZARDOUS AIR POLLUTANT (VHAP) SERVICE WITHIN A SOURCE SUBJECT TO A PART 61 SUBPART:**
pumps, compressors, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connection, surge control vessels, bottoms receivers, and required control devices or systems.

**If YES to both of the above questions, Subpart V applies.**

| | | | Applicable? | | | | Compliant? | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | N/A | Comments | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
| 1.0 | GENERAL | | | | | | | | | |
| | 40 CFR 61.242-1(d) | Each piece of equipment subject to Subpart V is marked in such a way to distinguish it from equipment not subject to Subpart V. | | | | | | | | |
| 2.0 | PUMPS | | | | | | | | | |
| | 40 CFR 61.242-2(a)(2)<br>40 CFR 61.242-2(a)(1)<br>40 CFR 61.242-2(b)<br>40 CFR 61.242-2(c) | Each pump is visually inspected for leaks each calendar week.<br>Each pump is monitored monthly using Method 21.<br>Readings of 10,000 ppm or greater, or a visible drip indicate a leak.<br>First repair attempt for each leak is made within 5 days, and completed within 15 days. | | | | | | | | |
| | 40 CFR 61.242-2(c) | Pumps with dual mechanical seal systems that include a barrier fluid system meet all exemption criteria | | | | | | | | |
| | 40 CFR 61.242-2(d)(4) | Pumps with dual mechanical seal systems that include a barrier fluid system are inspected at required velocity for drips | | | | | | | | |
| | 40 CFR 61.242-2(d)(4) | Pumps with dual mechanical seal systems that include a barrier fluid system are properly monitored if a visual inspection or sensor monitor indicates a leak | | | | | | | | |
| | 40 CFR 61.242-2(e) | Pumps designated for no detectable emissions (NDE) meet the NDE criteria and are tested annually to ensure emissions less than 500 ppm. | | | | | | | | |

Page 1 of 8

INVISTA Environmental Compliance Audit
Air - LDAR

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| | 40 CFR 61.242-2(j)(l) | | | | Pumps designated as unsafe-to-monitor meet the UTM criteria and are included in a written plan that requires monitoring of the pumps as frequently as possible during safe-to-monitor times. |
| | 40 CFR 61.242-2(h) | | | | Pumps at unmanned sites are visually inspected at least monthly. |
| **3.0** | **COMPRESSORS** | | | | |
| | 40 CFR 61.242-3(a) - (e) | | | | Each compressor is equipped with a seal system that includes a barrier fluid system and that prevents leakage of process fluid to the atmosphere. |
| | 40 CFR 61.242-3(e) - (e) | | | | Each compressor seal system meets the specified requirements. |
| | 40 CFR 61.242-3(g) | | | | First repair attempt for each leak detected by the fluid barrier system monitor is made within 5 days, and completed within 15 days. |
| | 40 CFR 61.242-3(i) | | | | Compressors designated for no detectable emissions (NDE) meet the NDE criteria and are tested annually to ensure emissions less than 500 ppm. |
| **4.0** | **PRESSURE RELIEF DEVICES IN GAS/VAPOR SERVICE** | | | | |
| | 40 CFR 61.242-4(a) | | | | Each PRD that does not relieve to a control device is operated at less than 500 ppm except during pressure relief event. |
| | 40 CFR 61.242-4(b) | | | | Following each pressure relief event, the PRD is returned to less than 500 ppm within 5 days of the event, as confirmed by monitoring within 5 days of the event. |
| | 40 CFR 61.242-4(c) | | | | PRD equipped with a rupture disk upstream of the PRD and claimed to be exempt from monitoring have a rupture disk put in place upstream of the PRD within 5 days of a pressure relief event. |
| **5.0** | **SAMPLING CONNECTION SYSTEMS** | | | | |
| | 40 CFR 61.242-5 | | | | Each sampling connection system is equipped with a closed-purge, closed loop, or closed-vent system that meets specifications. |
| **6.0** | **OPEN-ENDED VALVES OR LINES** | | | | |
| | 40 CFR 61.242-6 | | | | Each open-ended valve or line is equipped with a cap, blind flange, plug, or a second valve that is sealed at all times except when operation requires liquid flow through the open-ended valve or line, during maintenance or repair. |
| **7.0** | **VALVES** | | | | |
| | 40 CFR 61.242-7(a) | | | | Valves are monitored monthly using Method 21 |
| | 40 CFR 61.242-7(c) | | | | Valves monitored exceeding reduced monitoring criteria |
| | 40 CFR 61.242-7(b) | | | | Readings of 10,000 ppm or greater indicate a leak. |
| | 40 CFR 61.242-7(d) | | | | First repair attempt for each leak is made within 5 days, and completed within 15 days. |
| | 40 CFR 61.242-7(f) | | | | Valves designated for no detectable emissions (NDE) meet the NDE criteria and are tested annually to ensure emissions less than 500 ppm. |

INVISTA Environmental Compliance Audit
Air - LDAR

| | | | Compliant? | | | Exceptions and/or Comments and Issues Reviewed |
|---|---|---|---|---|---|---|
| | | | Yes | No | N/A | |
| | 40 CFR 61.242-7(d) | Valves designated as unsafe-to-monitor meet the UTM criteria and are included in a written plan that requires monitoring of the valves as infrequently as possible during safe-to-monitor times. | | | | |
| | 40 CFR 61.242-7(h) | Valves designated as difficult-to-monitor meet the DTM criteria and are included in a written plan that requires monitoring of the valves at least once per calendar year. | | | | |
| 8.0 | **PRESSURE RELIEF DEVICES IN LIQUID SERVICE AND CONNECTORS** | | | | | |
| | 40 CFR 61.242-8(a) | PRDs in liquid service and connectors found to have a potential leak through visual inspection or any other means are either repaired or monitored using Method 21 within 5 days. | | | | |
| | 40 CFR 61.242-8(c) | PRDs in liquid service and connection found to be leaking based on Method 21 monitoring are repaired within 15 days, with a first attempt within 5 days. | | | | |
| 9.0 | **SURGE CONTROL VESSELS AND BOTTOMS RECEIVERS** | | | | | |
| | 40 CFR 61.242-9 | Each surge control vessel or bottoms receiver is either routed back to the process, or meets the conditions specified in table 1 or table 2 of Subpart V and is equipped with a closed-vent system that routes leakage back to the process or to a control device. | | | | |
| 10.0 | **DELAY OF REPAIR** | | | | | |
| | 40 CFR 61.242-10 | All equipment for which delay of repair is asserted meets the delay of repair criteria and repair deadlines. | | | | |
| 11.0 | **CLOSED VENT SYSTEMS AND CONTROL DEVICES** | | | | | |
| | 40 CFR 61.242-11(b) | Vapor recovery systems are designed to recover organic vapors with a 95% efficiency, or to an exit concentration of 20 ppmv, whichever is less stringent. | | | | |
| | 40 CFR 61.242-11(c) | Combustion devices are designed to destroy VHAP emissions with a 95% efficiency, or to an exit concentration of 20 ppmv, whichever is less stringent, or to provide minimum residence time of 0.50 seconds and a minimum temperature of 760 deg. C. | | | | |
| | 40 CFR 61.242-11(d)<br>40 CFR 61.242-11(d)(1) | Plants meet the requirements of 40 CFR 60.18.<br>Each closed vent system consisting of hard-piping is inspected initially by Method 21, and annually thereafter by visual inspection. | | | | |
| | 40 CFR 61.242-11(d)(2) | Each closed vent system consisting of ductwork is inspected initially and annually thereafter by Method 21. | | | | |
| | 40 CFR 61.242-11(f) | First repair attempt for each leak detected is made within 5 days, and completed within 15 days, unless delay of repair is asserted and the situation meets the delay of repair criteria. | | | | |

46
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - LDAR

| | | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|---|
| | | | Yes | No | N/A | |
| | 40 CFR 61.242-11(i) | Any part of the closed vent system and control device designated as unsafe-to-monitor meets the UTM criteria and is included in a written plan that requires monitoring of the equipment as frequently as possible during safe-to-monitor times. | | | | |
| | 40 CFR 61.242-11(k) | Any part of the closed vent system and control device designated as difficult-to-monitor meets UTM criteria and is included in a written plan that requires inspection at least every 5 years. | | | | |
| | 40 CFR 61.242-11(l) | Proper records regarding the closed vent system and control device are maintained. | | | | |
| 12.0 | ALTERNATIVE STANDARDS | | | | | |
| | 40 CFR 61.243-1 and 2 | Facility is properly complying with alternative valve standards, if applicable. | | | | |
| | 40 CFR 61.244 | Facility is properly complying with approved alternative emission standards, if applicable. | | | | |
| 13.0 | TEST METHODS AND PROCEDURES | | | | | |
| | 40 CFR 61.245 | Facility employs proper test methods and procedures for compliance determinations. | | | | |
| 14.0 | RECORDKEEPING | | | | | |
| | 40 CFR 61.246 | Facility maintains all applicable records. | | | | |
| 15.0 | REPORTING | | | | | |
| | 40 CFR 61.247(a) | Facility submitted a timely and complete initial statement that Subpart V is being implemented. | | | | |
| | 40 CFR 61.247(b) | Facility is submitting timely and complete semi-annual reports. | | | | |
| | 40 CFR 61.247(c) | Facility has made timely and complete notification if alternative valve standards are elected. | | | | |
| END | | | | | | |

Page 4 of 4

INVISTA Environmental Compliance Audit
Air - PSD & NSR

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor(s): Name

Auditor's Signature:

Name

| | | Applicable? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Comments |

**PREVENTION OF SIGNIFICANT DETERIORATION**

**1.0** Facility is a major source
"Major Source" is a stationary source that meets one of the following criteria:
(1) PTE of 100 tpy or more of any regulated pollutant, and listed as a source category
(2) PTE of 250 tpy or more of any regulated pollutant, and not included in the source category list

**2.0** Facility is located in an area designated as attainment or unclassifiable for at least one criteria pollutant
40 CFR Part 81 includes designations for each state

**3.0** Facility has made a major modification after August 7, 1977, with a net emissions increase of greater than or equal to a significant level for any attainment/unclassifiable criteria pollutant, or any non-attainment pollutant
Current significant levels include:
CO - 100 tpy
SO2 - 40 tpy
NOx - 40 tpy
PM - 25 tpy
PM10 - 15 tpy
Ozone - 40 tpy VOC
Lead - 0.6 tpy
Fluorides - 3 tpy
Sulfuric acid mist - 7 tpy
Hydrogen sulfide - 10 tpy
Total reduced sulfur - 10 tpy
Reduced sulfur compounds - 10 tpy
Unlisted pollutants - ANY EMISSION RATE

**4.0** Facility is not a major source, but makes a modification after August 7, 1977, with a PTE of greater than an applicable major source threshold

IF YES TO 1.0, 2.0 AND 3.0, MODIFICATION IS SUBJECT PSD REVIEW

Page 1 of 2

INVISTA Environmental Compliance Audit
Air - PSD & NSR

IF YES TO 2.0 AND 4.0, MODIFICATION IS SUBJECT PSD REVIEW

NEW SOURCE REVIEW

5.0  Facility is located in an area designated as nonattainment for one or more criteria pollutants
40 CFR Part 81 include designations for each state

6.0  Facility is a major source
"Major Source" is a stationary source that meets one of the following criteria:
(1) PTE of 100 tpy or more of any criteria pollutant for which the area is designated nonattainment
(2) Any change to a source not meeting (1), above, where the change itself meets (1), above.
Note: Major source definitions are likely lower at the state level.

7.0  Facility has made a major modification after June 30, 1975, with a net emissions increase of greater than or equal to a significant level for a criteria pollutant for which the facility is major and for which the area is designated as nonattainment.
Current significant levels include:
CO - 100 tpy
SO2 - 40 tpy
Nox - 40 tpy
Ozone - 40 tpy VOC
Lead - 0.6 tpy
Note: significant levels are likely lower at the state level, and may include additional criteria pollutants such as PM and PM10

8.0  Facility is not a major source, but makes a modification after June 30, 1975, with a PTE of greater than an applicable major source threshold for a pollutant in which the area is designated nonattainment

IF YES TO 5.0, 6.0 AND 7.0, MODIFICATION IS SUBJECT NSR REVIEW

IF YES TO 5.0 AND 8.0, MODIFICATION IS SUBJECT NSR REVIEW

TEXAS-SPECIFIC THRESHOLDS

9.0  NSR Major Source Thresholds:
Ozone (VOC, Nox) Marginal Nonattainment - 100 tpy
Ozone (VOC, Nox) Moderate Nonattainment - 100 tpy
Ozone (VOC, Nox) Serious Nonattainment - 50 tpy
Ozone (VOC, Nox) Severe Nonattainment - 25 tpy
CO Moderate Nonattainment - 100 tpy
CO Serious Nonattainment - 50 tpy
SO2 - 100 tpy
PM10 Moderate - 100 tpy
PM10 Serious - 70 tpy
Nox - 100 tpy
Lead - 100 tpy

325-1301

2 of 2

 INVISTA™

# Facsimile Cover Sheet

**THIS DOCUMENT IS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONSTITUTES ATTORNEY WORK PRODUCT, AND SHOULD NOT BE COPIED NOR ITS CONTENTS DISCLOSED TO PERSONS OUTSIDE THE EMPLOY OF INVISTA**

**To: Roger W. Arrington, Esq.**
**Paul J. Bonanto, Esq.**
**Company:** E. I. duPont de Nemours and Company
**Phone:**
**Fax:** 302-773-5176

**From: Paul Kaleta**
**Company:** INVISTA S.à r.l.
**Phone:** 316-828-1728
**Fax:** 316-828-1801

**Date:** August 18, 2004
**Pages including this**
**cover page:** Sent in 2 parts each containing 49 pages

**Comments:**

If all pages are not received or any page is not legible, please call Gloria Raab at 316-828-1234 as soon as possible.

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail at our expense. Thank you.

INVISTA Environmental Compliance Audit
Air - PSD & NSR

| | | Compliant? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Exceptions and/or Comments and materials Reviewed |
| **1.0** | **NSR Major Modification Thresholds:**<br>Ozone (VOC; Nox) Marginal Nonattainment - 40 tpy<br>Ozone (VOC; Nox) Moderate Nonattainment - 40 tpy<br>Ozone (VOC; Nox) Serious Nonattainment - 25 tpy<br>Ozone (VOC; Nox) Severe Nonattainment - 25 tpy<br>CO Moderate Nonattainment - 100 tpy<br>CO Serious Nonattainment - 50 tpy<br>SO2 - 40 tpy<br>PM10 Moderate - 15 tpy<br>PM10 Serious - 15 tpy<br>Nox - 40 tpy<br>Lead - 0.6 tpy | | | | |
| | Note: PSD and NSR review is considered at this same level for station with such programs in plant. Consult the state regulations for specifics on application process. | | | | |
| 1.0 | 40 CFR 52.21(n) | Facility has applied for a PSD permit. | | | Texas PSD regulations found at Title 30, Chapter 116, Subdivision B, Division 8 |
| | 40 CFR 52.21(j)(2) | Facility has installed BACT for the pollutant(s) of concern. | | | |
| 2.0 | 40 CFR 52.24 | Facility has applied for a NSR permit. | | | Texas NSR regulations found at Title 30, Chapter 116, Subdivision B, Division 6 |
| | 40 CFR 52.24 | Facility has installed LAER for the pollutant(s) of concern. | | | |
| **3.0** | **ADDITIONAL STATE REGULATIONS**<br>TX Title 30, Chapter 116, Subdivision B | | | | |
| | Division 5 Nonattainment Review | | | | |
| | Division 8 Prevention of Significant Deterioration Review | | | | |
| **PSD** | | | | | |

Page 3 of 3

51
EXHIBIT 3



INVISTA Environmental Compliance Audit
Air - RMP

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditor Signature:

Name

**FACILITY HAS MORE THAN A THRESHOLD AMOUNT OF A REGULATED SUBSTANCE IN A PROCESS**
Note: 40 CFR 68.180 contains tables that list the regulated substance and associated threshold amount.

If YES, facility subject to RMP - Determine Program Level:

Program 1: Facility meets ALL of the following criteria:
 1. Has not had an accidental release of a regulated substance in the 5 years prior to submitting an RMP;
 2. Has not had an accidental death, injury or response to an environmental receptor;
 that lead to off-site death, injury or response to an environmental receptor;
 2. The distance to a toxic or flammable endpoint as modeled under worst

Program 2: Facility has a covered process that does not meet either Program 1 or 3 criteria.

Program 3: Facility meets Program 1 criteria but meets EITHER of the following criteria:
 1. Covered process is in NAICS code 32211, 32411, 32511, 325181, 325188, 325192, 325199, 325211, 325311, or 32532; or
 2. Process is covered by OSHA's PSM standard.

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |

| | | PROGRAM 1 REQUIREMENTS | | | Compliant? | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
| 1.0 | | PROGRAM 1 REQUIREMENTS 40 CFR 68.112b(1) 40 CFR 68.25(b) | Facility has properly analyzed one worse case scenario for each covered process. WCS is based on the greatest amount of a regulated substance contained in a vessel or pipe. | | | | | |

INVISTA Environmental Compliance Audit
Air - RMP

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| 40 CFR 68.25(c) - (i) | Toxic and flammable gases and liquids are modeled under WCS using the parameters established in the regulations. | | | | |
| | The appropriate toxic or flammable endpoint is used in WCS modeling. | | | | |
| 40 CFR 68.22(a) | WCS is based on required wind speed and atmospheric stability class | | | | |
| 40 CFR 68.22(b) | WCS is based on required ambient temperature and humidity values. | | | | |
| | values, unless other values are properly established. | | | | |
| 40 CFR 68.22(c) | WCS is based on required ambient temperature and humidity values. | | | | |
| 40 CFR 68.22(d) | WCS is based on groundlevel release. | | | | |
| 40 CFR 68.22(e) - (g) | Surface roughness, gas density and temperature of released substance are all properly accounted for in WCS. | | | | |
| 40 CFR 68.12(b)(1) | Facility has properly documented that the WCS endpoint is less then the distance to the nearest public receptor. | | | | |
| 40 CFR 68.12(b)(2) | Facility has completed the 5-year accident history | | | | |
| 40 CFR 68.12(b)(3) | Facility has coordinated response actions with local emergency planning and response agencies. | | | | |
| 40 CFR 68.12(b)(4) | RMP contains required certification language for Program 1 submittal. | | | | |
| 40 CFR 68.165 | Facility has included all required information in the RMP submittal. | | | | |
| **PROGRAM 2 REQUIREMENTS** **Management Requirements** | | | | | |
| 40 CFR 68.15(a) | Facility has developed a management system to oversee implementation of the RMP elements. | | | | |
| 40 CFR 68.15(b) | Facility has assigned a qualified person/position responsible for overall management of the RMP elements. | | | | |
| 40 CFR 68.15(c) | Additional persons/positions responsible for individual RMP elements are defined and lines of authority are established and documented. | | | | |
| **Hazard Assessment** 40 CFR 68.22(a) | The appropriate basis of flammable endpoint is used in each offsite consequence analysis. | | | | |
| 40 CFR 68.22(b) | WCS is based on required wind speed and atmospheric stability class values, unless other values are properly established. | | | | |
| 40 CFR 68.22(c) | WCS is based on required ambient temperature and humidity values. | | | | |
| 40 CFR 68.22(d) | WCS is based on groundlevel release. | | | | |
| 40 CFR 68.22(e) - (g) | Surface roughness, gas density and temperature of released substance are all properly accounted for in WCS. | | | | |
| 40 CFR 68.22(f) - (i) | Appropriate values used for each ABS for wind speed, atmospheric stability class, ambient temperature, humidity, released substance, roughness, gas density, and temperature of released substance. | | | | |
| 40 CFR 68.25(a) | Facility has properly analyzed one WCS that is estimated to show the greatest distance to an endpoint for release of a toxic substance from a covered process, and one WCS that is estimated to show the greatest distance to an endpoint for release of a flammable substance from a covered process. | | | | |

Page 2 of 6

INVISTA Environmental Compliance Audit
Air - RMP

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 40 CFR 68.25(e) | Facility has conducted additional WCSs, as needed, if different public receptors are expected to be impacted that are different from the above-described WCS. | | | | |
| 40 CFR 68.28(a) | Facility has properly conducted one ARS for each toxic substance in a covered process, and one ARB to represent all flammable substances in covered processes. | | | | |
| 40 CFR 68.28(b) | WCS is based on the greatest amount of a regulated substance contained in a vessel or pipe. | | | | |
| 40 CFR 68.25(c) - (f) | Toxic and flammable gases and liquids are modeled under WCS using the parameters established in the new sections. | | | | |
| 40 CFR 68.28(a) 40 CFR 68.30 | Modeling methodology for WCS is acceptable. Facility has properly documented the population contained within each release circle, to 2 significant digits. | | | | |
| 40 CFR 68.33 | Facility has properly documented the environmental receptors contained within each release circle. | | | | |
| 40 CFR 68.36(a) 40 CFR 68.36(b) | Each WCS and ARS is reviewed and updated at least every 5 years. If OCAs are revised within 6 months of a change to a covered process that increases or decreases the distance to an endpoint by a factor of 2 or more, and are included in a revised RMP submitted to the Agency. | | | | |
| 40 CFR 68.39 40 CFR 68.42 | Proper documentation is maintained of each OCA. Facility has completed the 5-year accident history | | | | |
| Program Implementation 40 CFR 68.48 | Facility is maintaining required safety information on the regulated substances, processes and equipment, and updates it as needed. | | | | |
| 40 CFR 68.50(a) - (c) | Facility is conducting and documenting a review of the hazards associated with the regulated substances, processes and procedures. | | | | |
| 40 CFR 68.50(d) | Facility is updating the hazard reviews at least every 5 years, and prior to implementation of any major change to a covered process. | | | | |
| 40 CFR 68.52 | Facility has written operating procedures for each covered process that are updated whenever a major change occurs. | | | | |
| 40 CFR 68.54(a) | Each employee assigned to a covered process has been trained or tested competent in the operating procedures. | | | | |
| 40 CFR 68.54(b) 40 CFR 68.54(c) | Refresher training is conducted at least every 3 years. Facility has maintenance procedure to ensure the ongoing integrity of equipment within a covered process. | | | | |
| 40 CFR 68.54(d) 40 CFR 68.56(e) | Employees are trained on maintenance procedures. Facility or owner is ensuring implementation of the program elements contained in Subpart C (Program implementation) every 3 years, and certifies compliance of each 3 year evaluation. | | | | |
| 40 CFR 68.58(c) 40 CFR 68.58(d) | Each evaluation is properly documented in a report. For each such finding, an appropriate response is determined and documented. | | | | |
| 40 CFR 68.58(d) | Facility maintains the 2 most recent audit reports | | | | |

INVISTA Environmental Compliance Audit
Air - RMP

| | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |
| **40 CFR 68.90**<br>**Emergency Response Program**<br>40 CFR 68.95 | Facility properly conducts and documents each incident. | | | |
| 40 CFR 68.90(b) | Facility has implemented a written emergency response plan that includes all required elements.<br><br>In lieu of an ERP, facility has elected to not have its employees respond to an emergency and is included in the community ERP, has coordinated response actions with the fire department, and has implemented notification mechanisms for emergency responders. | | | |
| **RMP Submittal**<br>40 CFR 68.170 | Facility has included all required information in the RMP submittal. | | | |
| **3.0 PROGRAM 3 REQUIREMENTS**<br>**Management Requirements** | Facility has developed a management system to oversee implementation of the RMP elements. | | | |
| 40 CFR 68.15(a) | Facility has assigned a qualified person/position responsible for overall management of the RMP elements. | | | |
| 40 CFR 68.15(b) | Facility has delegated responsibilities for individual RMP elements are defined and lines of authority are established and documented. | | | |
| **Hazard Assessment**<br>40 CFR 68.22(a) | The appropriate toxic or flammable endpoint is used in each offsite consequence analysis. | | | |
| 40 CFR 68.22(b) | WCS is based on related wind speed and atmospheric stability class values, unless other related are properly established. | | | |
| 40 CFR 68.22(c) | WCS is based on required ambient temperature and humidity values. | | | |
| 40 CFR 68.22(d) | WCS is based on ground level release. | | | |
| 40 CFR 68.22(e) - (g) | Surface roughness, gas density and temperature of released substance are at properly accounted for in WCS. | | | |
| 40 CFR 68.22(g) - (I)<br>40 CFR 68.25(a) | Appropriate values used for each ARS for wind speed, atmospheric stability. Facility has properly analyzed one WCS that is estimated to show the greatest distance to an endpoint for release of a toxic substance from a covered process, and one ARS to show the greatest distance to an endpoint for release of a flammable substance from a covered process. | | | |
| 40 CFR 68.25(b) | Facility has conducted additional WCSs, as needed, if different public receptors are suspected to be impacted that are different from the above-described WCS. | | | |
| 40 CFR 68.25(e) | Facility has properly conducted one ARS for each toxic substance in a covered process, and one ARS to represent all flammable substances in covered processes. | | | |
| 40 CFR 68.25(c) | WCS is based on the greatest amount of a regulated substance contained in a vessel or pipe. | | | |
| 40 CFR 68.25(c) - (f) | Toxic and flammable gases and liquids are modeled under WCS using the parameters established in the regulations. | | | |

INVISTA Environmental Compliance Audit
Air - RMP

| Citation | Description | Compliant? Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| 40 CFR 68.25(q) | Modeling methodology for WC3 is acceptable. | | | | |
| 40 CFR 68.30 | Facility has properly documented the population contained within each release circle, to 2 significant digits. | | | | |
| 40 CFR 68.33 | Facility has properly documented the environmental reception contained within each release circle. | | | | |
| 40 CFR 68.36(a) | Each WC3 and ARS is reviewed and updated at least every 5 years. | | | | |
| 40 CFR 68.36(b) | OCAs are revised within 6 months of a change to a covered process that increases or decreases the distance to an endpoint by a factor of 2 or more, and are included in a revised RMP submitted to the Agency. | | | | |
| 40 CFR 68.39 | Proper documentation is maintained of each OCA. | | | | |
| 40 CFR 68.42 | Facility has completed the 5-year accident history. | | | | |
| **Program Implementation** | | | | | |
| 40 CFR 68.65 | Facility is maintaining required safety information on the regulated substances, processes and equipment, and updating as needed. | | | | |
| 40 CFR 68.67(a) - (e) | Facility is conducting and documenting a review of the hazards associated with the regulated substances, processes and procedures. | | | | |
| 40 CFR 68.67(f) | Facility is updating and revalidating the hazard reviews at least every 5 years, and prior to implementation of any major change to a covered process. | | | | |
| 40 CFR 68.67(g) | Facility maintains all hazard reviews, updates and revalidations for the life of the process. | | | | |
| 40 CFR 68.69 | Facility has written, operating procedure for each covered process that are updated whenever a major change occurs. | | | | |
| 40 CFR 68.69(c) | Facility certifies annually that the operating procedures are current and accurate. | | | | |
| 40 CFR 68.71(a) | Each employee assigned to a covered process has been trained or tested competent in the operating procedure. | | | | |
| 40 CFR 68.71(b) | Refresher training is conducted at least every 3 years. | | | | |
| 40 CFR 68.71(c) | Training documentation includes required information. | | | | |
| 40 CFR 68.73 | Facility has a mechanical integrity program in place for the equipment contained in a covered process that include all required elements. | | | | |
| 40 CFR 68.75 | Facility has written management of change procedures that contain required elements. | | | | |
| 40 CFR 68.77 | Facility has pre-startup review procedure in place. | | | | |
| 40 CFR 68.79(a) | Facility evaluates implementation of the program elements contained in Subpart D (Program Implementation) every 3 years, and certify completion of each evaluation. | | | | |
| 40 CFR 68.79(c) | Each evaluation is properly documented in a report. | | | | |
| 40 CFR 68.79(e) | For each audit finding, an appropriate response is determined and documented. | | | | |
| 40 CFR 68.81 | Facility maintains the 2 most recent audit reports. | | | | |
| 40 CFR 68.83 | Facility properly conducts and documents each incident. Facility has a written plan of action for ensuring employee participation requirements are met. | | | | |

INVISTA Environmental Compliance Audit
Air - RMP

| CFR Reference | Description | Compliant? Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| 40 CFR 68.95 | Facility issues hot work permits for work conducted on or near a covered process. | | | | |
| 40 CFR 68.87(b) | Facility maintains contractor responsibilities for selecting and using a contractor on covered process. | | | | |
| **Emergency Response Plan** 40 CFR 68.95 | Facility has implemented a written emergency response plan that includes all required elements. | | | | |
| 40 CFR 68.90(b) | Facility has elected to not have its employees respond to in lieu of an ERP, facility has implemented an emergency action plan in the community ERP, has coordinated an emergency action with the fire department, and has implemented notification mechanism for emergency responder. | | | | |
| **RMP Submittal** 40 CFR 68.175 | Facility has included all required information in the RMP submitted. | | | | |
| **RMP Submittal - All Programs** 40 CFR 68.150(a) 40 CFR 68.150(b)(2) 40 CFR 68.150(b)(3) | RMP has been submitted in the format prescribed by EPA. An RMP is submitted within 3 years of a substance becoming regulated. An RMP is submitted by the first date that a regulated substance is present in a covered process above a threshold amount. | | | | |
| 40 CFR 68.190(e) | RMP was updated by June 21, 2004, and included the required information. | | | | |
| 40 CFR 68.155 40 CFR 68.160 40 CFR 68.168 40 CFR 68.180 40 CFR 68.165(a) | The RMP Executive Summary includes all required information. The RMP includes a registration that contains all required information. The RMP includes 5-year accident history information. The RMP includes emergency response program information. Program 1 RMPs include certification statement contained in 40 CFR 68.120(4). | | | | |
| 40 CFR 68.165(b) | Program 2 and 3 RMPs include certification statement contained in 40 CFR 68.165(b). | | | | |
| 40 CFR 68.190(b) | RMP is revised and updated whenever meeting one of the update criterion. | | | | |
| 40 CFR 68.190(c) | A de-registration is submitted to EPA within 6 months of a source no longer being subject to RMP. | | | | |
| 40 CFR 68.195(a) | Accidental release data is submitted within 6 months of an accident that meets the 5-year accident history reporting criteria. | | | | |
| 40 CFR 68.195(b) | Corrected emergency contact information is submitted within one month of a change to the information. | | | | |
| 40 CFR 68.215 | The Title V permit includes RMP as a permit condition, along with the requirement that the facility either submit a compliance schedule, or submit a certification of compliance with the RMP requirements. | | | | |

END



INVISTA Environmental Compliance Audit
Air - Title V

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditors Signature:

| Name | Applicable? | | | Comments |
|---|---|---|---|---|
| | Yes | No | N/A | |

**FACILITY IS A MAJOR SOURCE - Complete Sections 1.0 - 5.0**
"Major Source" is defined as a stationary source that meets at least one of the following criteria:
(1) Potential to emit 10 tpy of a single HAP
(2) Potential to emit 25 tpy of all HAPs
(3) Potential to emit 100 tpy of any air pollutant
(4) Potential to e

Note: Fugitive emissions shall be considered if the facility is included in the list of 27 source categories.

Note: Groups of stationary sources under the same 2-digit SIC code, under common control, and on contiguous or adjacent properties are considered a single source for purposes of determining Title V applicability.

**FACILITY IS AN AFFECTED SOURCE - Complete Sections 1.0 - 5.0**
"Affected Source" is defined as any source with one or more units subject to the Acid Rain Program.

**FACILITY IS SUBJECT TO A STANDARD UNDER SECTION 112 OF THE ACT - Complete Sections 1.0 - 5.0**
Section 112 standards are generally NESHAP standards found at 40 CFR Part 61 and 63.

Note: Sources subject to Title V solely due to the applicability of NAAP (Section 112(r)) are not required to obtain a Title V permit.

**FACILITY IS SUBJECT TO A STANDARD UNDER SECTION 111 OF THE ACT - Complete Sections 1.0 - 5.0**
Section 111 standards are generally NSPS standards found at 40 CFR Part 60.

Note: Non-major sources subject to a Section 111 or 112 standard after July 21, 1992 ARE NOT currently required to obtain a Title V permit.

**FACILITY MEETS ADDITIONAL STATE-SPECIFIC APPLICABILITY SPECIFICATIONS - Complete Sections 1.0 - 5.0**

Note: Non-major sources subject to a Section 111 or 112 standard after July 21, 1992, ARE NOT currently required to obtain a Title V permit.

Page 1 of 3

58
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - Title V

States delegated the Title V program have the authority to establish more stringent applicability requirements such as requiring NSPS-only sources to obtain a Title V permit. Consult with state-specific Title V regulations.

NOTE: The following Title V sources are not required to obtain a permit:
(sources subject to Title V solely due to the applicability of 40 CFR Part 61, Subpart M (Asbestos))
(sources subject to Title V solely due to the applicability of 40 CFR Part 60, Subpart AAA (Residential Wood Heater))

All sources otherwise subject to Title V that are not major sources, affected sources or solid waste incineration units subject to permitting under Section 129(e) of the Act.

Title V Permits should be reviewed for compliance with each permit condition. The following is a general list of conditions and requirements that are contained in the Federal Title V permit program, and represent the minimum requirements that a facility...

| | | Compliant? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
| 1.0 | PERMIT APPLICATIONS | | | | |
| 2.0 | PERMIT CONDITIONS | | | | |
| 3.0 | PERMIT AMENDMENT AND MODIFICATION | | | | |
| 4.0 | FEES AND EMISSION REPORTS | | | | |
| 5.0 | STATE MODIFICATIONS (TX Title 30, Part 1, Chapter | | | | |

Page 2 of 3

59
EXHIBIT 3

INVISTA Environmental Compliance Audit
Air - Title V

| | | Compliant? | | | Exceptions and/or Comments and Rationale Revised |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| 122 | Federal Operating Permits | | | | Applicable to numerous sources including: i) any site that is a major source as defined in §112.10 of this title; 2) any site that is a non-major source which the EPA, through rulemaking, has designated as no longer exempt from the obligation to obtain a permit. This may include any non-major source subject to the Federal CAA Section 111 (NSPS), Section 112 (hazardous air pollutants, except 112(r) (RMP), or any non-major source in a source category designated by the EPA. Major source is defined as follows: 1) PTE 10 tpy of a single HAP, 2) PTE 25 tpy aggregate for all HAPs, 3) PTE 100 tpy of any regulated air pollutant, 4) VOC PTE of 100 tpy or more in a marginal or moderate ozone NA area, 5) VOC PTE of 50 tpy or more located in a serious ozone NA area, and 6) VOC PTE of 25 tpy or more located in a severe ozone NA area. Non-major sources subject to NSPS and/or NESHAP are currently exempt from the permitting requirement. Will apply if the facility ever triggers one of the major source thresholds. |

END

Page 3 of 3

INVISTA Environmental Compliance Audit
Coast Guard

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor(s): Name

Auditor Signature:                     Name

|  | | Applicable? | | | |
|--|--|--|--|--|--|
|  | | Yes | No | N/A | Comments |

NOTE: Only Sections reviewed include 33 CFR 6, 126 and 150-158.

FACILITY INCLUDES A WATERFRONT FACILITY - Complete Sections 1.0 and 2.0
Includes all piers, wharves, docks, and similar structures to which vessels may be secured; areas of land, water, or land and water under and in immediate proximity to them; buildings on such structures or contiguous to them and equipment and materials on or in them.

FACILITY HAD A DISCHARGE OF OIL OR HAZARDOUS SUBSTANCES TO THE COASTAL WATERS -
Complete Section 3.0

FACILITY IS CAPABLE OF TRANSFERRING OIL OR HAZARDOUS SUBSTANCES TO OR FROM
VESSELS THAT HAVE TOTAL CAPACITY OF 250 BARRELS OR MORE - Complete Sections 4.0 and 5.0

|  | | Compliant? | | | |
|--|--|--|--|--|--|
|  | | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| 1.0 | Part 6: Protection and Security of Vessels, Harbors and Waterfront Facilities | | | | |
| 2.0 | (Part 126: Handling of Class 1 (Explosive) Materials or other Dangerous Cargos within or | | | | |
| 3.0 | Part 153: Control of Pollution by Oil and Hazardous Substances, Discharge Removal | | | | |
| 4.0 | Part 154: Facilities Transferring Oil or Hazardous Materials in Bulk | | | | |
| 5.0 | Part 156: Oil and Hazardous Material Transfer Operations | | | | |
| END | | | | | |

61
EXHIBIT 3

INVISTA Environmental Compliance Audit
Drinking Water

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditors Signature: Name

| | Available? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |

**MEETS DEFINITION OF A PUBLIC WATER SUPPLY SYSTEM – Complete Section 4.0**
A system for providing piped water to the public for human consumption, if such system has at least 15 service connections or regularly serves an average of at least 25 individuals daily at least 60 days out of the year. This term includes:

Any collection, treatment, storage, and distribution facilities under control of the operator of such system.

Any collection or pretreatment storage facilities not under such control that are used primarily in connection with such system.

A public water system is either a community water system or a noncommunity water system.

**FACILITY IS A COMMUNITY WATER SYSTEM – Complete Sections 1.0 and 4.0**
A public water system which serves at least 15 service connections used by year-round residents or regularly serves at least 25 year-round residents.

**FACILITY IS A TRANSIENT NON-COMMUNITY WATER SYSTEM – Complete Sections 2.0 and 4.0**
A public water system that is not a community water system and does not regularly serve at least 25 of the same persons over six months per year.

**FACILITY IS A NON-TRANSIENT NON-COMMUNITY WATER SYSTEM – Complete Sections 3.0 and 4.0**
A public water system that is not a community water system and regularly serves at least 25 of the same persons over six months per year.

**FACILITY MEETS ALL OF THE FOLLOWING CRITERIA – Exempt From SDWA – This Protocol Does Not Apply**
System consists only of distribution and storage facilities and does not have any collection and treatment facilities.

Obtains all of its water from, but is not owned or operated by, a public water system to which such regulations apply.

Does not sell water to any person.

Is not a carrier which conveys passengers in interstate commerce.

**STATE REGULATIONS**
Inconsistent with Federal Regulations – Complete Section 5.0

Page 1 of 2

INVISTA Environmental Compliance Audit
Drinking Water

| | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |
| 1.0 | COMMUNITY WATER SYSTEMS | | | |
| 2.0 | TRANSIENT NON-COMMUNITY WATER SYSTEMS | | | |
| 3.0 | NON-TRANSIENT NON-COMMUNITY WATER SYSTEMS | | | |
| 4.0 | ALL PUBLIC WATER SYSTEMS | | | |
| 5.0 | STATE MODIFICATIONS | | | |
| END | | | | |

Page 2 of 2

63
EXHIBIT 3



INVISTA Environmental Compliance Audit
DOT

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| **1.0** | Shipper | | | | |
| **2.0** | Carriers | | | | |
| **END** | | | | | |

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditors Signature: _____Name_____



Page 1 of 1

64
EXHIBIT 3



INVISTA Environmental Compliance Audit
Emergency Planning

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditors: Name

Auditors Signature: _____ Name

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |

**SPILL, PREVENTION, CONTROL & COUNTERMEASURE (SPCC) PLAN**

Facility has underground oil storage capacity of facility > 42,000 gal.
Facility has underground oil storage capacity of facility >1,320 gal. or if any aboveground aggregate oil storage capacity of facility > 1,320 gal. or if any single oil storage container > 660 gal.
COMPLETE SECTION 1.0 IF USING OLD REGULATION

Facility has underground oil storage capacity of > 42,000 gal (not including those underground tanks subject to 40 CFR 280 or equivalent oil approved State program, which are exempt); aboveground aggregate oil storage capacity of > 1,320 gal (counting only those containers of 55 gallon capacity or greater); or the Regional Administrator has requested the facility to develop a SPCC Plan.
COMPLETE SECTION 2.0 IF USING AUGUST 2002 AMENDED REGULATIONS

**FACILITY RESPONSE PLANS (FRP)**

Facility: (1) has been requested by EPA Regional Administrator to develop an FRP; (2) transfers oil over water and has >42,000 gal total storage capacity; or (3) total storage capacity >1,000,000 gal and either is lacking secondary containment, is within distance to endanger fish/wildlife or to shed down public water intake, or has had reportable discharge> 10,000 gal within last 5 years - COMPLETE SECTIONS 1.0 OR 2.0 AND 3.0.

**ADDITIONAL STATE REQUIREMENTS - SECTION 4.0**

| | Compliant? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| 1.0 | SPILL, PREVENTION, CONTROL & COUNTERMEASURE (SPCC) PLAN | | | | |
| 2.0 | SPILL, PREVENTION, CONTROL & COUNTERMEASURE (SPCC) PLAN (AMENDED REGULATIONS FOR ONSHORE NON-PRODUCTION FACILITIES) | | | | |

Page 1 of 2

65
EXHIBIT 3

INVISTA Environmental Compliance Audit
Emergency Planning

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 3.0 | FACILITY RESPONSE PLAN (FRP) | | | | |
| 4.0 | ADDITIONAL STATE REQUIREMENTS | | | | |
| | TX Title 30, Part 1, Chapter | | | | |
| | 327 — Environmental Quality | | | | |
| | 343 — Spill Prevention and Control | | | | |
| | Oil and Hazardous Substance | | | | |
| | TX Title 31, Part 1, Chapter | | | | |
| | 19 — Natural Resources and Conservation | | | | |
| | 20 — Oil Spill Prevention and Response | | | | |
| | Natural Resource Damage Assessment | | | | |

Page 2 of 2

66
EXHIBIT 3



**INVISTA Environmental Compliance Audit**
**EPCRA-CERCLA**

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Name

Auditor Signature

| | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |
| **1.0** RELEASE NOTIFICATION | | | | |
| **2.0** EMERGENCY PLANNING AND NOTIFICATION | | | | |
| **3.0** HAZARDOUS CHEMICAL REPORTING COMMUNITY RIGHT TO KNOW | | | | |
| **4.0** TOXIC CHEMICAL RELEASE REPORTING | | | | |
| **5.0** SUPPLIER NOTIFICATION REQUIREMENTS | | | | |
| **6.0** STATE MODIFICATIONS | Verify consistency with basis chemical lists, reporting thresholds and fee requirements; Health Services Hazardous Chemical Right-to-Know | | | |
| TX Title 25, Part 1, Chapter 295, Subchapter H | | | | |
| **END** | | | | |

INVISTA Environmental Compliance Audit
Pesticides

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name
Auditors: Name

Auditor's Signature: _____ Name

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |
| Facility personnel apply pesticide, algaecide and/or herbicide – Complete Sections 1.0 and 3.0 | | | | |
| Facility personnel apply "Restricted Use" pesticide (i.e., Predasm) – Complete Sections 1.0, 2.0 and 3.0 | | | | |
| Facility applies Phostoxin or other forms of Aluminum Phosphide | | | | As of January 2004 there are new requirements for the use of Phostoxin based upon label instructions similar to Section 3.0 below. See Phostoxin Users Manual @ Degesch.com. |

| | | Compliant? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Exceptions and/or Comments and Scenarios Reviewed |
| 1.0 | GMP — Facility has an inventory of all registered pesticides / herbicides including algaecides (i.e., cooling towers) and biocimierbicides (i.e., bleach) | | | | |
| 2.0 | FIFRA | | | | |
| 3.0 | CERTIFICATION OF PESTICIDE APPLICATION | | | | Note: Rules apply to "Restricted Use" pesticides only - state regulations may differ significantly from Federal. |

PESTICIDES USED IN THE PRODUCTION OF AGRICULTURAL PLANTS ON FARMS OR IN NURSERIES, GREENHOUSES AND FORESTS

| | | | | | |
|---|---|---|---|---|---|
| 4.0 | STATE MODIFICATIONS | | | | |
| | TX: Title 4, Part 1, Chapter 7 | | | | |
| | TX: Title 4, Part 7, Chapter 105 | | | | |
| | TX: Title 25, Part 1, Chapter 287 | Pesticides - Texas Agriculture Resources Protection Authority | | | Note: Review state regulations for certification and recordkeeping requirements for pesticide application - Department of Agriculture |

68
EXHIBIT 3

126+1301



INVISTA Environmental Compliance Audit
Pesticides

| | Compliant? | | | Observations and/or Comments and Materials Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |
| Pesticide Application | | | | Applies to employees of the United States Government, state, county, city, mosquito control districts, or other political subdivisions of the state who serve as professional pesticide applicators in the categories of vector control, rodent control, sanitation, and extermination and research. |
| END | | | | |

Page 2 of 2

69
EXHIBIT 3

INVISTA Environmental Compliance Audit
Radiation

Facility Name: INVISTA
Facility Location: City, State
Audit Date(s): Dates
Audit Location: Name

Auditor's Name

Auditor's Signature

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comment |

**GENERAL LICENSES - Complete Section 1.0**

**SPECIFIC LICENSES:**
If the facility is licensed by the Nuclear Regulatory Commission (NRC) to receive, possess, use, transfer or dispose of byproduct, source, or special nuclear material or to operate a production or utilization facility, additional regulations (e.g. 10 CFR 20, 30, 31, 40, 50, 61, 70, 72 may 1995).

**STATE REGULATIONS**
Inconsistent with Federal Regulations - Complete Section 2.0

| | Compliant? | | | Exemptions and/or Comments and Inadequate Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |

| 1.0 | FEDERAL REGULATIONS | | | |
| 2.0 | STATE MODIFICATIONS TX Title 25, Part I, Chapter 289 326 | Radiation Control Radiation Rules | | This rules in the chapter apply to all persons who dispose of radioactive substance, except by product material defined by §289.31(3)(B)) of this title. |

END

70
EXHIBIT 3



INVISTA Environmental Compliance Audit
Stormwater

Facility Name: INVISTA
Facility Location: City, State
Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditors Signature: _____ Name

| | Compliant? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
| LIST ONLY REQUIREMENTS THAT ARE INCONSISTENT WITH OR IN ADDITION TO FEDERAL REQUIREMENTS | | | | |
| 1.0 STORMWATER PERMITTING | | | | |
| 2.0 STORM WATER PERMIT | | | | |
| 3.0 STATE MODIFICATIONS | | | | |
| END | | | | |

71
EXHIBIT 3



INVISTA Environmental Compliance Audit
TSCA

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditor Signature: _____    Name

| | Compliant? | | | Exceptions and/or Comments and Instances Reviewed |
| | Yes | No | N/A | |
| Chemical Imports and Exports | | | | |
| 40 CFR 707 | | | | |
| Inventory Reporting Regulations | | | | |
| 40 CFR 710 | | | | |
| Chemical Information Rule | | | | |
| 40 CFR 712 | | | | |
| Health and Safety Data Reporting | | | | |
| 40 CFR 716 | | | | |
| Records and Reports of Allegations that Chemical Substances Cause Significant Adverse Reactions to Health or the Environment. | | | | |
| 40 CFR 717 | | | | |
| Premanufacture Notification (PMN) | | | | |
| 40 CFR 720 | | | | |
| Significant New Uses of Chemical Substances | | | | |
| 40 CFR 721 | | | | |
| Premanufacture Notification Exemptions | | | | |
| 40 CFR 723 | | | | |
| Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions. | | | | |
| 40 CFR 761 | | | | |
| END | | | | |

Page 1 of 1

INVISTA Environmental Compliance Audit
UIC

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditor's Signature: _____   Name

**UNDERGROUND INJECTION WELL CLASSIFICATIONS**

| | | Applicable? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Comments |

Class I - Hazardous or radioactive waste injection below the lowermost formation containing an USDW (40 CFR 144.6(a)).

Class II - Injection of fluids generated in conjunction with the production and/or storage of natural gas and oil, the storage of hydrocarbons or the enhanced recovery of oil or natural gas (40 CFR 144.6(b)). Complete Section 1.0 and 2.0
— X — It has been assumed that there are no Kill facilities with Class II injection wells. Requirements for these wells can be found in 40 CFR 144.21, 144.14, 144 Subpart F, and 146 Subpart G.

Class III - Wells for Frasch process mining of sulfur, in-situ production of uranium and other metals, and solution mining of salts and potash (40 CFR 144.6(c)).
— X — It has been assumed that there are no Kill injection wells. Requirements for these wells can be found in 40 CFR 144.21 and 146 Subpart D.

Class IV - Hazardous or radioactive waste injection into or above a formation containing an USDW (40 CFR 144.6(d)). All Class IV wells are prohibited (40 CFR 114.13). Complete Section 1.0 and 3.0

Class V - Injection wells not included in Classes I through IV including non-residential sanitary septic systems with a capacity design greater than 20 people and dry or draining wells for stormwater infiltration (40 CFR 144.6 (e)). Complete Section 1.0 and 4.0
— X — It has been assumed that there are no Kill facilities with Class V Large Capacity Cesspools or Motor Vehicle Waste Disposal Wells. Additional requirements for these wells can be found in 40 CFR 144.85 - 144.88.

**PRIMACY**

Does the state have an approved UIC program (40 CFR 147)? Indicate which classes and complete Section 5.0

| | | Compliant? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| 1.0 | ALL INJECTION WELL CLASSES | | | | |
| 2.0 | CLASS II WELLS | | | | |

INVISTA Environmental Compliance Audit
UIC

| | | Compliant? | | | Exceptions and/or Comments and Narrative Statement |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 2.0 | CLASS IV WELLS | | | | |
| 3.0 | CLASS V WELLS | | | | |
| 4.0 | STATE MODIFICATIONS (LIST ONLY REQUIREMENTS THAT ARE INCONSISTENT WITH OR IN ADDITION TO FEDERAL REQUIREMENTS) | | | | |
| | TX Title 30, Part 1, Chapter 331 | | | | |
| | Underground Injection Control | | | | |
| END | | | | | |

74
EXHIBIT 3

**INVISTA Environmental Compliance Audit**
**UST and AST**

Facility Name: INVISTA
Facility Location: City, State
Audit Date: Dates
Audit Leader: Name
Auditor: Name

Auditor's Signature: _____ Name

| | Applicability | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |
| Texas has an EPA-Approved UST Program. This protocol is based on the Texas program, which is equally as or more stringent than the Federal requirements. | | | | |
| Facility storage tanks do not meet the definition of a regulated UST or AST, or meet one of the exemptions listed in Title 30 Chapter 334.3(a) and 334.3(b) for USTs and 334.123 and 334.124 for ASTs | | | | |
| Tanks are exempt. This section not applicable. | | | | |
| Facility UST's meet one of the partial exemptions listed in Title 30 Chapter 334.4(b). Complete Sections 1.0, 3.0, 6.0, 7.0, 8.0, 9.0, 10.0. | | | | |
| Facility owns or operates in-ground hydraulic lifts that meet the UST exclusions found in 334.3(a), (b) and 334.4(a) and (e) | | | | |
| Complete Section 11.0 in the event of a release | | | | |
| Facility owns or operates non-exempt regulated underground storage tanks (USTs) on-site [See 334.1(b) for applicability]. Complete Sections 1.0, 2.0, 3.0, 4.0, 5.0, 6.0, 7.0, 8.0, 9.0, 10.0 | | | | |
| A release has occurred from a regulated UST or AST. Complete Section 11.0 | | | | |
| Facility owns or operates non-exempt regulated AST's on-site that store petroleum products [See 334.1(c) for applicability]. Complete Section 12.0 | | | | |
| Facility meets the requirements for storage, treatment and reuse of petroleum-contaminated media. Complete Section 13.0 | | | | |
| Definitions for Determining Applicability: Underground storage tank—Any one or combination of underground tanks and any connecting underground pipes used to contain an accumulation of regulated substances, the volume of which, including the volume of the connecting underground pipes, is 10% or more beneath the surface of the ground. | | | | |

Page 1 of 3

75
EXHIBIT 3

INVISTA Environmental Compliance Audit
UST and AST

**Regulated substance**—An element, compound, mixture, solution, or substance that, when released into the environment, may present substantial danger to the public health, welfare, or the environment. For the purposes of this chapter, a regulated substance is limited to any hazardous substance (as defined in this section), any petroleum substance (as defined in this section), any mixture of two or more hazardous substances and/or petroleum substances, and any other substance designated by the commission to be regulated under the petroleum of this chapter.

**Petroleum product**—A petroleum substance obtained from distilling and processing crude oil that is liquid at standard conditions of temperature and pressure, capable of being used as a fuel for the propulsion of a motor vehicle or aircraft, including, but not limited to motor gasoline, gasohol, other alcohol blended fuels, aviation gasoline, kerosene, distillate, fuel oils, #1 and Number 1 and Number 2 diesel. The term does not include negative-type jet fuel, alcohol, or a petroleum product destined for use in chemical manufacturing of feedstock of that manufacturing.

**Petroleum substance**—A crude oil or any refined or unrefined fraction or derivative of crude oil which is liquid at standard conditions of temperature and pressure (except for any substance regulated as a hazardous waste under the federal Solid Waste Disposal Act, Subtitle C, ((42 United States Code §6921, et seq.))

**Petroleum UST system**—An UST system that contains, has contained, or will contain a petroleum substance (as defined in this section), a mixture of two or more petroleum substances, or a mixture of one or more petroleum substances with very small amounts of one or more hazardous substances. In order for an UST system containing a mixture of petroleum substances with small amounts of hazardous substances to be classified as a petroleum UST system, the hazardous substances must be at such a dilute concentration that the overall release characteristic, dissolvence of corrective action, and toxicity of the basic petroleum substance is not altered to any significant degree.

**Hazardous substance**—Any substance defined or listed in the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), §101(14), (42 United States §6901, et seq.), and which is not regulated as a hazardous waste under the federal Solid Waste Disposal Act, Subtitle C, (42 United States Code §6921, et seq.).

**Aboveground storage tank (AST)**—A non-vehicular device, (including any associated piping), that is made of non-earthen materials, located on or above the surface of the ground, or on or above the surface of the floor of a structure below ground, such as mineworking, basement, or vault; and designed to contain an accumulation of petroleum products.

**Petroleum substance waste**—Any waste, including hazardous waste and liquid wastes, which is generated as a result of a release of a petroleum substance from an underground storage tank or a petroleum product from an aboveground storage tank regulated by the commission pursuant to the Texas Water Code, Chapter 26, Subchapter I.

**Reuse of petroleum-substance waste**—The process by which a petroleum- substance waste is utilized as an effective substitute for a commercial product, such as the proper use as a component of stabilized road base or use as fill for UST tankholds.

**Storage**—The holding of petroleum-substance waste for a temporary period, prior to the final treatment, disposal of, reuse, or storing of the waste elsewhere.

**Treatment**—Methods which are designed to change, by physical, chemical, or biological means, the levels of contamination of the waste to render the waste suitable for reuse or disposal.

**Treatment facility**—A facility or unit which treats, recycles, and/or reuses petroleum-substance wastes.



INVISTA Environmental Compliance Audit
UST and AST

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | NA | |
| 1.0 | General Provisions | | | | |
| 2.0 | Certification | | | | |
| 3.0 | Notification, Registrations and Reporting | | | | |
| 4.0 | Technical Standards | | | | |
| 5.0 | Operation and Maintenance | | | | |
| 6.0 | Corrosion Protection | | | | |
| 7.0 | Release Detection | | | | |
| 8.0 | Spill and Overfill Protection | | | | |
| 9.0 | Repair, Retiring and Reuse | | | | |
| 10.0 | Removal or Change of Status | | | | |
| 11.0 | Release Reporting | | | | |
| 12.0 | Aboveground Storage Tanks Storing Petroleum Products | | | | |
| 13.0 | Storage, Treatment and Reuse Properties for Petroleum-Contaminated Wastes | | | | |

Page 3 of 3

77
EXHIBIT 3



INMISTA Environmental Compliance Audit
Waste

Facility Name: INMISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor Name: Name

Auditors Signature: _____

**HAZARDOUS WASTE GENERATOR CLASSIFICATION**
CESQG < 220 pounds per month - Complete Section 1.0
220 < 600 < 2,200 pounds per month - Complete Sections 2.0 and 3.0
LQG > 2,200 pounds per month - Complete Section 3.0 and 4.0

Facility moves into higher category during the period of review (indicate month(s)).

**UNIVERSAL WASTE**
Facility generated universal waste during period of review - Complete Section 6.0

**USED OIL**
Facility generated used oil during period of review - Complete Section 6.0

**STATE REGULATIONS**
(inconsistent with Federal Regulations - Complete Section 7.0

| | | Applicable? | | | Comments |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |

| | | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| 1.0 | CESQG | | | | |
| 2.0 | SQG and LQG | | | | |
| 3.0 | SQG | | | | |
| 4.0 | LQG | | | | |
| 5.0 | UNIVERSAL WASTE | | | | Assumes small quantity universal waste generator status; accumulates < 11,000 lbs total universal waste. |
| 6.0 | USED OIL | | | | |

INVISTA Environmental Compliance Audit
Waste

| | | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| **7.0** | **STATE MODIFICATIONS** TX Title 30, Part 1, Chapter 205 | | | | |
| 305 | General Permits for Waste Discharges | | | | Allows for the commission to promulgate general wastewater permits, and contains NOI, permit and fee requirements for facilities applying for a general permit. General permits include storm water. Contact the TNRCC for a complete list of available general permits. |
| 323 | Waste Disposal Approvals | | | | System for TNRCC to use in evaluating and rating waste disposal systems. |
| 324 | Used Oil | | | | |
| 328 | Waste Minimization and Reporting | | | | |
| 332 | Composting | | | | |
| 335 | Industrial Solid Waste and Municipal Hazardous Waste | | | | |
| 441 | Disposal Site Management and Operation | | | | The purpose of this section is to establish criteria for determining the compliance of a person to supervise the overall operations of a low-level radioactive waste disposal site owned by the authority. |

END

79
EXHIBIT 3

INMBTA Environmental Compliance Audit
Waste - BIF

Facility Name: INMBTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditors Signature: _____ Name

| | Applicable? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Comments |

THE FACILITY BURNS AND/OR PROCESSES HAZARDOUS WASTE IN A BOILER AND/OR FURNACE

THE FACILITY HAS A BIF PERMIT

If YES to both, facility is subject to BIF permit conditions and Part 266 BIF standards

| | Compliant? | | | |
|---|---|---|---|---|
| | Yes | No | N/A | Exceptions and/or Comments and Materials Reviewed |

| | |
|---|---|
| 1.0 | PERMIT STANDARDS FOR BURNERS |
| 2.0 | STANDARDS TO CONTROL ORGANIC EMISSIONS |
| 3.0 | STANDARDS TO CONTROL PARTICULATE MATTER |
| 4.0 | STANDARDS TO CONTROL METALS EMISSIONS |
| 5.0 | STANDARDS TO CONTROL HYDROGEN CHLORIDE AND CHLORINE GAS EMISSIONS |
| 6.0 | EXEMPTIONS |
| 7.0 | STANDARDS FOR DIRECT TRANSFER |
| 8.0 | REGULATION OF RESIDUES |
| 9.0 | INTERIM STATUS STANDARDS FOR BURNERS |
| | END |

Page 1 of 1

INVISTA Environmental Compliance Audit
Waste - TSDF

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditor Signature: _____    Name

THE FACILITY TREATS, STORES FOR GREATER THAN 90 DAYS, AND/OR DISPOSES OF HAZARDOUS WASTE ON-SITE.

HAS A TSD PERMIT.

If YES to both, facility is subject to Part 264 TSDF Standards.

| | Applicable? | | | Comments |
|---|---|---|---|---|
| | Yes | No | N/A | |

| | Compliant? | | | Exceptions and/or Comments and Materials Reviewed |
|---|---|---|---|---|
| | Yes | No | N/A | |

| | |
|---|---|
| 1.0 | GENERAL STANDARDS |
| 2.0 | PREPAREDNESS AND PREVENTION |
| 3.0 | CONTINGENCY PLAN AND EMERGENCY PROCEDURES |
| 4.0 | MANIFEST SYSTEM, RECORDKEEPING AND REPORTING |
| 5.0 | RELEASES FROM SOLID WASTE MANAGEMENT UNITS |
| 6.0 | CLOSURE AND POST-CLOSURE |
| 7.0 | FINANCIAL REQUIREMENTS |
| 8.0 | USE AND MANAGEMENT OF CONTAINERS |
| 9.0 | TANK SYSTEM |
| 10.0 | SURFACE IMPOUNDMENTS |
| 11.0 | WASTE PILES |
| 12.0 | LAND TREATMENT |
| 13.0 | LANDFILL |
| 14.0 | INCINERATORS |
| 15.0 | DRIP PADS |
| 16.0 | MISCELLANEOUS UNITS |
| 17.0 | AIR EMISSION STANDARDS FOR PROCESS VENTS |
| 18.0 | AIR EMISSION STANDARDS FOR EQUIPMENT LEAKS |
| 19.0 | AIR EMISSION STANDARDS FOR TANKS, SURFACE IMPOUNDMENTS AND CONTAINERS |
| 20.0 | CONTAINMENT BUILDING |
| 21.0 | HAZARDOUS WASTE MUNITIONS AND EXPLOSIVES STORAGE |
| 22.0 | TSDF PERMIT |

Page 1 of 2

81
EXHIBIT 3

INVISTA Environmental Compliance Audit
Waste - TSDF

END

82
EXHIBIT 3



INVISTA Environmental Compliance Audit
Wastewater

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Location: Name

Auditor: Name

Auditors Signature:

Name

| | | Applicable? | | | Comments |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |

**TYPES OF DISCHARGES**
Direct Discharge — Complete Section 1.0 - NPDES
Discharge to POTW — Complete Section 2.0 - Pretreatment Requirements
Stormwater Discharge — Complete Section 1.0 and Stormwater Protocol
Activity - Individual Permit,
Stormwater Discharge
Associated with Industrial
Activity - General Permit — Complete Stormwater Protocol

| | | Compliant? | | | Complete and/or Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1.0 | Direct Discharge | | | | | |
| 2.0 | Pretreatment Requirements | | | | | |
| 3.0 | Categorical Discharge - Organic Chemicals, Plastics and Synthetic Fibers | | | | | |
| 4.0 | Categorical Discharge - Inorganic Chemicals Manufacturing Point Source Category | | | | | |
| 5.0 | Categorical Discharge - Other Categories | | | | | |
| 6.0 | STATE MODIFICATIONS Title 30, Part 1, Chapter 210 | Use of Reclaimed Water | This chapter applies to the reclaimed water producer, provider, and user. Reclaimed water is defined as domestic or municipal wastewater which has been treated to a quality suitable for a beneficial use, pursuant to the provisions of this chapter and other applicable rules and permits. | | | |

Page 1 of 3

83
EXHIBIT 3

LHVISTA Environmental Compliance Audit
Wastewater

| | | Compliant | | | Comments and Materials Reviewed |
|---|---|---|---|---|---|
| | | Yes | No | N/A | |
| 213 | Edwards Aquifer | | | | The purpose of this chapter is to regulate activities having the potential for polluting the Edwards Aquifer and hydrologically connected surface streams in order to protect existing and potential uses of groundwater and maintain Texas Surface Water Quality Standards. The matter incorporates Medina, Bexar, Comal, Kinney, Uvalde, Hays, Travis and Williamson Counties. |
| 216 | Water Quality Performance Standards for Urban Development | | | | Applies to contiguous properties of at least 600 acres. |
| 220 | Regional Assessments of Water Quality | | | | Applicable to subdivision developers. |
| 220 | Groundwater Availability Certification for Platting | | | | |
| 238 | Water Well Drillers Rules [Repealed] | | | | |
| 279 | Water Quality Certification | | | | This chapter governs the issuance of state contained licenses within the jurisdiction of the Texas Natural Resource Conservation Commission as required by 33 United States Code §1341, the Federal Water Pollution Control Act Amendments of 1972, and the Federal Clean Water Act §401(a)(1), requires that any applicant or entity including, but not limited to, the conduct any operation or expansion of facilities which may result in any discharge into navigable waters of the United States, shall obtain from the state in which the discharge originates or will originate a certification that the discharge will comply with applicable provisions of 33 United States Code §§1311, 1312, 1313, 1316 and 1317 (§§401(a), 301, 302, 303, 306 and 307 of the Federal Clean Water Act). |
| 281 | Applications Processing | | | | Outlines procedures to be followed by state agencies in processing applications for water use permits; in-stream discharge permits; underground permits; solar/municipal waste permits; concentration projects; water district creation; petroleum and pesticides; weather permits and diversion; certification of convenience and necessity; industrial solid waste permits; and radioactive material license. |
| 284 | Private Sewage Facilities [Repealed] | | | | |
| 285 | On-Site Wastewater Treatment | | | | Facility regulation on-site disposal of less than 5,000 gallons of sewage per day (septic systems). |

NVSTA Environmental Compliance Audit
Wastewater

| | | Compliant? | | | |
|---|---|---|---|---|---|
| | | Yes | No | N/A | N/A Exceptions and/or Comments and Materials Reviewed |
| 298 | On-Site Wastewater Treatment Research Council [Repealed] | | | | |
| 299 | Water Conservation Plans, Guidelines, and Requirements | | | | Guidance for water conservation and drought plans required with application for water rights under Chapter 258. |
| 299 | Weather Modification | | | | Implements provisions of the federal SDWA. |
| 300 | Public Drinking Water | | | | |
| 305 | Consolidated Permits | | | | |
| 307 | Surface Water Quality Standards | | | | Apply to surface water discharges only. |
| 308 | Criteria and Standards for the National Pollutant Discharge Elimination System | | | | Adopts federal rules for determining standards applicable to state NPDES permit writers. |
| 309 | Domestic Wastewater Effluent Limitation and Plant Siting | | | | |
| 310 | Use of Reclaimed Water [Repealed] | | | | |
| 311 | Watershed Protection | | | | Applies to certain surface waters in Texas. |
| 312 | Sludge Use, Disposal, and Transportation | | | | |
| 313 | Edwards Aquifer [Repealed] | | | | |
| 314 | Toxic Pollutant Effluent Standards | | | | Adopts effluent rules for determining standards applicable to state NPDES permit writers. |
| 315 | Pretreatment Regulations for Existing and New Sources of Pollution | | | | |
| 317 | Design Criteria for Sewerage Systems | | | | |
| 318 | General Regulations Incorporated into Permits | | | | |
| 319 | Regional Assessments of Water Quality [Repealed] | | | | |
| 320 | | | | | |
| 321 | Control of Certain Activities by Rule | | | | Does not cover reuse disposal activities of this facility. |
| 322 | Community Wastewater Planning | | | | |

END

INVISTA Environmental Compliance Audit
TX Administrative

Facility Name: INVISTA
Facility Location: City, State

Audit Date(s): Dates
Audit Leader: Name

Auditor: Name

Auditors Signature:

Name

| Chapter | Part | Title | Rule | Compliant? Yes | No | N/A | Comments |
|---|---|---|---|---|---|---|---|
| 30 | 1 | Environmental Quality Texas Natural Resource Conservation Commission | | | | | |
| | | | 36 Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions | | | | The purpose of this chapter is to implement the commission's authority under Texas Water Code, Chapter 5, Subchapter L, to issue temporary or emergency mandatory, permissive, or prohibitory orders and by those orders to issue temporary permits or temporarily suspend or amend permit conditions. This chapter applies to an owner or operator required to provide financial assurance. |
| | | | 37 Financial Assistance | | | | |
| | | | 39 Public Notice | | | | Agency guidelines for public noticing permit applications. |

END

Page 1 of 1

86
EXHIBIT 3

328+1801                           04:14:37 p.m.     08-18-2004          38/49

# ATTACHMENT 2

# INVISTA ENVIRONMENTAL AUDITS
# AUDITING TEAM QUALIFICATIONS

ATTACHMENT 2 TO ROBERT KAPLAN LETTER

## Core Audit Team

The INVISTA environmental compliance audits at Victoria, Sabine, and La Porte, Texas will be conducted by a team of experienced auditors. Due to the short planning time frame of the project and prior commitments by many of the team members, it is not possible to form a single audit team for all six weeks.

VBA personnel will direct and anchor the audit teams for all six weeks.

### René van Breusegen, E.I.T., CPEA, President

Mr. van Breusegen is a degreed chemical engineer with 19 years of conformance auditing, environmental engineering, and consulting experience and is a BEAC Certified Professional Environmental Auditor (Certificate Number 569). He has participated in and/or led over 175 environmental conformance and management systems audits of industrial and commercial facilities located throughout North American and including over 30 states in the U.S., two provinces of Canada and two states in Mexico. Additionally, Mr. van Breusegen has completed over 100 compliance projects including new source air permitting, emission inventories, Title V permitting, SARA reporting, SPCC plan preparation, SWPP plan preparation, large-scale due diligence assessments including ASTM and environmental compliance, environmental fatal flaws analysis, and stand-alone environmental applicability determinations for facilities located throughout North America.

### Emmett Keegan, CPEA, Associate

Mr. Keegan holds a Master of Science degree in Environmental Engineering and a Bachelor of Science degree in Biology and has 11 years compliance enforcement and compliance consulting experience. Mr. Keegan is a BEAC Certified Professional Environmental Auditor (Certificate Number 547), and has participated in or led over 80 multi-media environmental, health and safety compliance audits located in 20+ states and two provinces of Canada; and has completed over 20 stand-alone environmental applicability determinations for facilities located throughout the United States. Additionally, Mr. Keegan has completed new source air permits, Title V permits; NSR applicability determinations, PSD applicability determinations, Phase I assessments, emission inventories and air source modeling.

### Colene Tschoepe, CPEA, Associate

Ms. Tschoepe holds a masters degree in Environmental Science and has 12 years of environmental consulting/auditing experience and is a BEAC Certified Professional Environmental Auditor (Certificate Number 548). Ms. Tschoepe has conducted over 100 environmental compliance audits and over 30 stand-alone environmental applicability determinations of industrial facilities located throughout North America. Ms. Tschoepe has served as an auditor for Koch Industries, 3M Company, the United States Postal Service, Burlington Northern Santa Fe Railroad, Anheuser-Busch Companies, Pentair Corporation, Pillsbury Company, Interstate Brands Company and Coultier Foods.

I28+I 801

*ATTACHMENT 2 TO ROBERT KAPLAN LETTER*

### Sharon Roberts, CPEA, Associate

Ms. Roberts is a degreed chemical engineer with 16 years of industrial and consulting experience and is a BEAC Certified Professional Environmental Auditor (Certificate Number 558). Ms. Roberts has participated in over 75 comprehensive environmental compliance audits and completed over 10 stand-alone environmental applicability determinations for industrial facilities throughout the United States and Europe. Additionally, Ms. Roberts has completed environmental compliance projects of more than 100 industrial facilities including new source air permits, Title V permits, source tests, emission factor development, industrial wastewater permits, direct discharge permits, slug control plans, Lotus Notes training, SPCC plans, SWPP plans and process wastewater treatability studies. While working with Anheuser-Busch Companies, Ms. Roberts was instrumental in development of the Environmental Quality Manual (EQM), a Lotus Notes based environmental data management program that is currently used by multiple industrial entities.

### Pamela Hesterberg, P.E., CPEA, Associate

Ms. Hesterberg is a licensed Professional Engineer, holds a masters degree in Civil Engineering and has eleven years of environmental engineering and consulting experience, and is a BEAC Certified Professional Environmental Auditor (Certificate Number 572). She has participated in over 80 environmental compliance audits and completed over 15 stand-alone environmental applicability determinations for industrial facilities located throughout North America. Additionally, Ms. Hesterberg has completed environmental compliance projects for more than 50 industrial facilities including emission inventories, SARA reports, industrial discharge permits, industrial sampling, Phase I assessments, Phase II investigations, groundwater sampling, SPCC/SWPP plans and certifications.

### Heather Stork, P.E., Associate

Ms. Stork is a licensed professional engineer with a Bachelor of Science degree in Geological Engineering and is a Professional Engineer licensed in Missouri and Illinois. She has over nine years of multimedia environmental engineering and consulting experience that includes auditing, environmental assessments, permitting, compliance reporting, subsurface investigations, storage tank management, and remediation. Ms. Stork has participated in and/or led more than 20 environmental compliance audits, including development of the Environmental Compliance Guidance Manual, a regulatory compliance manual for a national healthcare organization with eighty facilities located in twenty states. In addition, Ms. Stork has participated in assisting facilities with OSHA compliance, including updating company-wide environmental health and safety management systems. Ms. Stork has passed the BEAC examination for environmental auditing, and has applied for CPEA certification.

### *Associated Auditors*

VBA has audited with the following environmental compliance professionals, and are recommending they be approved by INVISTA for this project.

I28+1801

04:15.24 p.m.    00-10-2004

### ATTACHMENT 2 TO ROBERT KAPLAN LETTER

**Joseph D. Darmody**

Mr. Darmody holds a Master of Science in Industrial Hygiene and a Bachelor of Arts in Chemistry, and has over 12 years professional experience as an environmental chemist and industrial hygienist. His expertise encompasses environmental auditing, air emissions quantification, employee exposure monitoring, in addition to regulatory compliance with various air, solid and hazardous waste, industrial hygiene, and health and safety issues. Mr. Darmody provides environmental, health and safety audits and recommendations for numerous industrial and manufacturing facilities, health care facilities, building owners, and property managers.

**Dave Laubacher**

Mr. Laubacher has a Bachelor of Science in Chemical Engineering and over 27 years of experience in the chemical plant industry. He has conducted over 50 compliance audits in 15 states for industrial clients, including automotive and truck component parts manufacturers, railcar manufacturing and repair, bakeries, aluminum can making and entertainment (theme parks). Protocols covered include hazardous and solid waste, SPCC, storm water, wastewater, drinking water, underground storage tanks and EPCRA. Mr. Laubacher has passed the BEAC examination for environmental auditing, and has applied for CPEA certification.

**Tom Norris**

Mr. Norris is a certified Project Management Professional with a Master of Science in Resource Management and a Bachelor of Science in General Science. Since 1987, Mr. Norris has been directly responsible for the completion of thousands of environmental compliance audits of facilities located throughout the United States. This experience includes audits of dozens of facilities regulated under the Texas Natural Resource Conservation Commission (TNRCC) and the Railroad Commission of Texas (RRC). Mr. Norris has also successfully completed ISO 14001 Lead Auditor training.

**Timothy D. Quarles, P.E.**

Mr. Quarles has a Master of Science in Chemical Engineering and a Bachelor of Science in Environmental Science. Mr. Quarles has 25 years experience in environmental compliance and auditing, with significant emphasis on air regulatory compliance for complex industrial facilities. He has completed numerous environmental audits, in excess of 485 direct audit days, in the last four years. Mr. Quarles is a licensed Professional Engineer in the states of California and Colorado.

**Erin M. Sheehy**

Ms. Sheehy holds a Bachelor of Arts in Economics and a Certificate in Environmental Auditing, and has over 17 years of environmental compliance experience in both the public and private sector. She currently assists industrial facilities by completing environmental compliance audits and preparing air quality reports and permit applications. She has completed air quality audits at approximately 38 different facilities since the beginning of 2003, requiring approximately 20 weeks of on-site work.

*ATTACHMENT 2 TO ROBERT KAPLAN LETTER*

### Eric Wood, E.I.T.

Mr. Eric Wood holds a Bachelor of Science in Mechanical Engineering and has over 11 years experience in environmental management consulting, air quality analyses and auditing.    Mr. Wood has completed numerous air quality compliance audits for various companies. He further assists clients with air quality permitting, regulatory applicability, compliance, emissions inventories, and technical feasibility studies.

### *Support Personnel*

VBA will provide background support throughout the audits for additional research and information requests, and after the audit for production of the final reports.

### Lynn van Breusegen, P.E., Vice President

Ms. van Breusegen is a licensed professional engineer with masters degrees in Information Systems Management and Business Administration.  She has 15 years of engineering, project management, consulting and information systems support experience within industry.  Ms. van Breusegen has completed over 20 protocol-specific and/or comprehensive compliance audits of industrial and institutional facilities.  Ms. van Breusegen is also responsible for the operational and administrative management of VBA, including schedule coordination for professional staff.

528-1801                                                                  04:15:56 p.m.    08-18-2004    43/49



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

AUG 1 2 2004

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

<u>Via Facsimile and U.S. Mail</u>

Tracey L. Mihelic
Chief Counsel
INVISTA S.à r.l
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

Dear Ms. Mihelic:

     This letter responds to your letter of July 28, 2004, in which you outline INVISTA S.à r.l's (INVISTA) proposal for a corporate auditing agreement addressing eleven INVISTA facilities newly acquired from E.I. duPont de Nemours and Company (DuPont). We understand that INVISTA, a wholly-owned subsidiary of Koch Industries, Inc., finalized the acquisition of these facilities on April 30, 2004. The U.S. Environmental Protection Agency (EPA) encourages the conduct of company-wide or multi-facility audits in the acquisition context, and appreciates INVISTA's willingness to undertake this effort. Your proposal, as set forth in your July 28, 2004 letter is acceptable to EPA with some minor adjustments.

     Primarily, per your discussion with Danielle Fidler on August 5, 2004, we request that INVISTA complete the audit of its facilities within a 12-month period and submit a final report to EPA by October 31, 2005. INVISTA has indicated that this deadline is acceptable.

     The remainder of this letter responds to certain points you made in your July 28, 2004 letter that we have determined need clarification. This letter also outlines what information we will be requiring at the conclusion of this process.

**A.**    **Clarifications to Letter dated July 28, 2004**

**1.**    **Summary of the INVISTA Proposal**

     INVISTA's July 28, 2004 letter and attached audit protocol proposes a comprehensive review of the INVISTA facilities for compliance with applicable federal, state, and local requirements. This letter also states that it may be necessary for INVISTA to develop detailed facility-specific audit protocols as the audit process moves forward in order to accurately reflect requirements applicable to an individual facility. Should INVISTA develop such facility-specific audit protocols, EPA requests that copies thereof be provided to the Agency once they are finalized.

2.    **Application of Audit Policy**

    a.    **Systematic Discovery**

        Based on the information provided in your letter, the environmental audits to be conducted by INVISTA appear to be consistent with Condition One of the EPA's *Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations Final Policy Statement* (Audit Policy), 65 Fed. Reg. 19,618 (April 11, 2000), namely that violations at INVISTA's facilities must have been discovered through either an environmental audit or a compliance management system. We note, however, that if any of the violations ultimately disclosed were not discovered through such a systematic review, those violations may not qualify for 100% relief from gravity-based penalties.

    b.    **Prompt Disclosure**

        In accordance with EPA's interpretive guidance document ("Audit Policy Interpretive Guidance," dated January 15, 1997), we accept INVISTA's intention to audit the eleven facilities listed in your July 28, 2004 letter as sufficient to meet the prompt disclosure requirement under the Audit Policy, in lieu of requiring disclosure of each violation within 21 days. During the course of your evaluation, any changes to the facility list should be noted in your status report to EPA.

        Violations that were previously known to the company but not promptly disclosed may not be eligible for penalty mitigation under the Audit Policy. The Agency does have the discretion to mitigate the gravity component of the penalty that it normally would assess for violations that INVISTA may have detected in the past, but did not disclose within 21 days. EPA is willing to consider resolving previously known violations that will be corrected and remedied within this audit process but might not otherwise qualify for Audit Policy protection – such as those specifically described in INVISTA's Purchase Agreement with DuPont dated November 16, 2003 – with reduced gravity-based penalties.

    c.    **Correction and Remediation**

        The Audit Policy requires a disclosing entity to come into compliance within 60 days of discovery of a violation. The Agency understands that flexibility may be required in meeting the 60-day requirement for correcting some violations. The Agency asks that INVISTA provide as much advance notice as possible if correction of violations will take more than 60 days by submitting a written request to the Agency seeking an extension of the corrections period together with a detailed rationale for the extension. EPA may require a compliance schedule to be prepared and implemented if extensions of the 60-day correction period are sought by INVISTA. In addition, where issuance of a permit is required to attain compliance and INVISTA requests an extension to the 60-day corrections period, EPA may require INVISTA to prepare a schedule for the completion and submission of any permit applications.

        If INVISTA discovers or otherwise becomes aware of a concern or concerns that may

2

present an imminent and substantial endangerment to human health or the environment, and such concern(s) may exist at INVISTA facilities covered by this Agreement, notwithstanding any other language herein to the contrary, INVISTA agrees to address such concern(s) at all covered facilities as expeditiously as possible and promptly take such action as may be necessary to protect human health and the environment. In addition to INVISTA's reporting obligations related to any release or discharge of hazardous substances, contaminants, or pollutants, INVISTA shall notify EPA (initial notice may be oral) of such concern(s) within 24 hours of discovery or becoming aware of such concern(s) and shall notify EPA in writing within three business days of such discovery of INVISTA's proposed remedial action.

3.    Reporting

INVISTA will submit a status report detailing its audit activities to EPA every three months throughout the audit period. EPA requests that the status report include a description of any violations found over the prior three months, any actions taken and/or planned to promptly correct such violations, and a brief narrative describing INVISTA's progress toward completing its evaluation. INVISTA's first status report shall be due October 31, 2004, with additional reports due January 31, 2005, April 30, 2005, and July 31, 2005.

In your letter, you suggested that INVISTA will seek expedited resolution under the Audit Policy for certain violations. The Agency is committed to working closely with INVISTA to expeditiously correct violations, however, we do not intend to resolve disclosed violations until the conclusion of INVISTA's evaluation and submission of the final audit report. INVISTA will be required to submit a final audit report that includes information regarding INVISTA's conformance with the Audit Policy, facility compliance, and costs to return to compliance. This report shall be due on or before October 31, 2005.

4.    Coordination with Regions and States

Danielle Fidler, of my staff, will serve as the Agency's central point of contact for INVISTA. Ms. Fidler can be reached at (202) 564-0660, e-mail fidler.danielle@epa.gov. Phil Milton, also of my staff, will serve as the technical lead on the case and may be reached at (202) 564-5029, email milton.philip@epa.gov. We will coordinate with the appropriate Regions and together will coordinate with the states regarding INVISTA's disclosures and any issues concerning correction of violations. We understand that INVISTA may choose to independently disclose to state environmental agencies for relief under their audit policies/statutes, however, we request that INVISTA provide the Agency with copies of those disclosures to facilitate our coordination with those states.

B.    Information Required at Conclusion of Assessment and Correction

Audit Policy Criteria

To determine whether the violations disclosed by INVISTA meet the criteria contained in the Audit Policy, EPA will need additional factual information specific to each of those criteria.

3

Please provide us with all available factual information addressing conditions one through nine of the Audit Policy by no later than October 31, 2005. Attached to this letter is a copy of a questionnaire that addresses the information needed by the Agency in order to determine Audit Policy applicability. If you believe you have already provided sufficient information in response to a specific condition, please provide a written reference to this information to the Agency.

2.    **Facility Compliance** (You may submit the requested information in tabular form to facilitate your response and our review.)

Pursuant to the Audit Policy, we ask that you provide the following information for each potential violation, if applicable, so that the Agency has complete information on the violations that may have occurred and on each facility's compliance record:

Facility name;
Facility type (if appropriate);
Facility address (street, city, state, zip code);
Date facility began operations;
Nature and description of potential violation(s) and specific regulatory, permit and/or statutory provision violated; (include references to state-mandated requirements where appropriate)
Dates of possible non-compliance;
Chemical(s) involved;
Quantity of materials (lbs.) stored, released, spilled or disposed of;
Capacity of tank(s) or other equipment;
Date emission source(s), tank(s), treatment unit(s), etc., was installed;
Date emission source(s), tank(s), treatment unit(s), etc. began operations;
Brief description of emission source(s), tank(s) or treatment unit(s) etc.,
Date audit team discovered possible noncompliance;
Identify the name, title, and employer of each individual who discovered the violation;
Date EPA notified of possible noncompliance, if earlier than periodic self-disclosure;
Date potential violation was corrected or is estimated to be corrected; and
Date remedial actions were taken and/or are planned to correct potential violation.

3.    **Cost of Compliance** (You may submit the requested information in tabular form to facilitate your response and our review.)

For each facility, determine the cost to achieve compliance. Such costs may include items such as: internal staff or outside consultants' time to become familiar with the regulations; determining which chemicals meet/exceed reporting thresholds; preparing forms/plans/permits; submitting forms to appropriate agencies; fees collected by state or other regulatory agencies; release detection equipment; and secondary containment or start-up costs for plan implementation or tank monitoring.

After we have received your response, we will determine the specific violations which occurred, an initial proposed penalty, if any, and whether the Audit Policy applies. It is our goal

4

to attempt to resolve this matter as expeditiously as possible with your cooperation.

As previously mentioned, we ask that you send us the requested information no later than October 31, 2005. If, at any time, you determine that the company will need more time to provide the requested data and to come into compliance, please submit a proposed schedule and your justification for an extension of time well in advance of the audit deadline.

Please send your status reports and all other correspondence to

Philip Milton, Chemical Engineer
Special Litigation and Projects Division (2248A)
U.S. Environmental Protection Agency
Ariel Rios Building, Room 3124 B
1200 Pennsylvania Ave., NW
Washington, DC 20460

Again, EPA appreciates INVISTA's willingness to self-police, disclose, and correct violations at these newly-acquired facilities. If you have any questions concerning this matter, please contact Danielle Fidler at (202) 564-0660 or Phil Milton at (202) 564-5029.

Sincerely,

Robert A. Kaplan, Director
Special Litigation and Projects Division (2248A)
Office of Regulatory Enforcement

Enclosure

cc    Walker Smith, ORE
        Samantha Fairchild, US EPA Region 3
        Mary Kay Lynch, US EPA Region 4
        Gerald Fontenot, US EPA Region 6

5

## SELF-DISCLOSURE QUESTIONNAIRE

Provide the following information for each potential violation at all of the facilities disclosed by INVISTA. Please correlate each answer to the specific violation.

Describe the violation and state the specific regulatory or statutory provision violated.

2. Explain how the violation was discovered. Please be as detailed as possible.

3. State whether the violation of a federal, state, or local regulation was discovered by means of a systematic, internal, environmental audit, or through a compliance management system.

If INVISTA believes that the violation was discovered through a "compliance management system," as defined in EPA's Audit Policy, explain, in detail, how the company's practices and procedures leading to the discovery of the violation constitute such a system.

If the violation was discovered by means of an environmental audit, provide the following information:

A.    State the date(s) on which the environmental audit or systematic procedure or practice that identified the violation was being conducted.

B.    State the frequency of environmental audits of the INVISTA facilities involved. State the date(s) on which the last environmental audit was conducted at each facility prior to your disclosure.

C.    State whether the facilities have a written policy or directive to follow up on audit findings to correct identified problems and prevent their recurrence. Provide the Special Litigation and Projects Division (SLPD) with a copy of this written policy or directive.

D.    Describe the relationship between the involved facilities and the person(s) responsible for conducting environmental audits. Explain how INVISTA ensures the auditor's tasks or inquiries are carried out in an objective and unobstructed manner. Include in your answer a discussion of the manner in which personnel, financial, or other potential conflicts of interest are avoided between employees of the facility and the individuals conducting an audit.

E.    Provide a copy of written audit policies and procedures for the facility. The requested policies and procedures should indicate the scope of the audit, the process for examining audit findings, the protocol for communicating audit results to INVISTA management, auditor conflict of interest policy, auditor education and training requirements, and follow-up measures.

4.   Was the violation identified through an activity which INVISTA was legally required to perform, such as under a state or federal statute, regulation or permit, or under the terms of a judicial or administrative order or consent agreement? If so, identify the authority under which the activity was required.

5.   Is the violation required to be reported under any federal or state statute, regulation or permit? If so, identify each such statute, regulation or permit.

6.   State the date on which the violation was discovered. If INVISTA believed additional analysis or information was needed after the audit/systematic procedure or practice to determine whether a violation existed, state the reasons for the additional analysis.

7    If disclosure of the violation was not within twenty-one days of the date of discovery, or such shorter period as may be provided by law, please explain, in detail, the reasons that the violation was not disclosed within twenty-one days of discovery.

8.   Identify the name, title, and employer of each individual who discovered the violation.

9.   If the violation was discovered by an independent auditor (that is, by a person not employed by INVISTA), provide the date and the manner in which INVISTA was made aware of the violation.

10.  Explain in detail all measures taken to correct or remediate the violation. Provide an estimate of the length of time it took or will take to complete these measures. If INVISTA estimates that more than 60 days will be needed to correct the violation, please explain fully and provide the opinion of any technical or engineering expert relied upon to arrive at that estimate.

1    Explain in detail all measures taken or to be taken to ensure that the violation disclosed will not be repeated. Include in your discussion any improvements made to INVISTA's environmental auditing or compliance management systems in an attempt to prevent recurrence of the violation.

EXHIBIT 4

**EXECUTION COPY**

## SUPPLEMENTAL AGREEMENT

This SUPPLEMENTAL AGREEMENT (this "Agreement") is made as of December 17, 2004, by and between E. I. du Pont de Nemours and Company, a Delaware corporation ("DuPont"), and INVISTA B.V., a Netherlands Besloten Vennootschap ("Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement, dated November 16, 2003, as amended (the "Purchase Agreement"), by and among DuPont, Buyer and certain other parties identified therein.

WHEREAS, DuPont and Buyer entered into (i) the Purchase Agreement, pursuant to which DuPont and the other Sellers sold to certain Affiliates of Buyer, and Buyer and such Affiliates purchased, the DTI Business and (ii) certain other related agreements; and

WHEREAS, the parties wish to reach a prompt settlement, waive certain rights, and release each other from certain obligations, with respect to the matters described herein;

NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## CERTAIN AGREEMENTS

Section 1.1    Waiver and Release. Concurrently with the execution of this Agreement, DuPont, Buyer and Parent have entered into the Waiver and Release Agreement (the "Waiver and Release"). The parties acknowledge that the Waiver and Release is final with respect to the matters contained therein and that the Waiver and Release is binding independent of any condition or any other matter set forth in this Agreement.

Section 1.2    Unknown Claims. For the purposes of this Agreement, "Unknown Claims" shall mean any rights, claims or remedies which the parties do not know or suspect to exist in their favor at the time of the execution of this Agreement which, if known by them, might have affected their settlement with and release of other parties to this Agreement. The parties may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of the releases, but the parties shall each be deemed to have fully, finally, and forever settled and released all claims covered by the releases, known or unknown, suspected or unsuspected, whether or not concealed or hidden, asserted or unasserted, matured or unmatured, direct, indirect or derivative, fixed or contingent, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into

existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The parties separately acknowledge, and shall be deemed by operation of this Agreement to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which the mutual releases are a part, and expressly waive (i) the benefits of the provisions of Section 1542 of the California Civil Code, which provides that "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor" and (ii) the benefits of any similar, comparable or equivalent law, statute, regulation or legal principle of any other jurisdiction.

Section 1.3    Teflon® Royalties. For good and valuable consideration, the receipt of which is hereby acknowledged, DuPont hereby waives, and covenants to refrain from suing with respect to or otherwise exercising, any and all Actions, rights, claims and remedies of any nature whatsoever, at law or in equity (including for fraud), of every kind and nature whatsoever (whether pursuant to a representation, warranty, covenant or otherwise) which DuPont or any DuPont Indemnified Party may have had, now has or may have in the future, including all Unknown Claims, against the Buyer or the Buyer Indemnified Parties or any of their respective successors or assigns, as the case may be, in connection with or with respect to royalty payments which arise out of transactions or matters occurring on or prior to the Closing Date pursuant to the Teflon® Trademark License Agreement (the "Teflon License Agreement"), dated as of the Closing Date, between DuPont and Invista S.a.r.l. ("Invista"). In addition, the royalty payments which arise out of transactions or matters occurring between May 1, 2004 and December 31, 2004 pursuant to the Teflon License Agreement shall be prorated, in the manner set forth in Exhibit A hereto.

Section 1.4    ITAM Collateral. DuPont and Buyer hereby acknowledge that all of DuPont's and any of its Subsidiaries' rights and interests in the accounts receivable owing by ITAM S.p.A. (the "ITAM Receivable") was assigned to one of the Buyer Indemnified Parties, KoSa S.à.r.l. (now INVISTA (International) Sàrl) ("INVISTA International"). DuPont also hereby acknowledges that the ITAM Receivable is secured, in part, by certain mortgages, guarantees and promissory notes (the "ITAM Collateral"), which relate directly to the ITAM Receivable, and were therefore transferred concurrently with the assignment of the ITAM Receivable. Consequently, DuPont and the DuPont Indemnified Parties do not claim any ownership, mortgage or interest (adverse to INVISTA International, Buyer, or any Buyer Indemnified Party or otherwise) in the ITAM Receivable or the ITAM Collateral. DuPont and Buyer acknowledge that, under Italian and Spanish law, additional steps may be required to make the assignment to INVISTA International of all the rights in the ITAM Receivable and ITAM Collateral fully effective. Therefore, DuPont shall, and shall cause its appropriate Subsidiaries to, use commercially reasonable efforts to cooperate with INVISTA International and other Buyer Indemnified Parties in order to complete an effective assignment of all of the rights in the ITAM Receivable and ITAM Collateral under Italian and Spanish law, including, without limitation, the execution of

notarized written assignment documents, notification of the assignments to debtors and guarantors, public recordation of such notarized assignments with the Registrar of Deeds and Mortgages, as necessary for the effectiveness of the assignment of the mortgages included in the ITAM Collateral, endorsement of the promissory note, and provision of such other instruments or documents as may be reasonably requested by or otherwise necessary to make a fully effective assignment of the ITAM Receivable and ITAM Collateral under Italian and Spanish law.

For good and valuable consideration, the receipt of which is hereby acknowledged, Buyer hereby waives, and covenants to refrain from suing with respect to or otherwise exercising, any and all Actions, rights, claims and remedies of any nature whatsoever, at law or in equity (including for fraud), of every kind and nature whatsoever (whether pursuant to a representation, warranty, covenant or otherwise) which Buyer or any Buyer Indemnified Party may have had, now has or may have in the future, including all Unknown Claims, against DuPont or the DuPont Indemnified Parties or any of their respective successors or assigns, as the case may be, as a result of any failure to effectively assign the ITAM Collateral, including under Spanish or Italian Law, so long as DuPont has used the reasonable commercial efforts described in the preceding paragraph.

Section 1.5    Right to Sell DuPont Receivables. Contemporaneously with the execution of this Agreement, DuPont shall execute and deliver to Buyer the Securitization Side Letter which is attached as Exhibit B hereto.

Section 1.6    DUSA Equipment Receivable. For good and valuable consideration, the receipt of which is hereby acknowledged, Buyer hereby agrees to, or cause one of its Subsidiaries to, sell, convey, assign, transfer and deliver to DuPont and its successors and assigns, forever, all of its or such Subsidiary's right, title and interest in and to the receivable from DuPont Sabanci International, LLC ("DUSA") or one of its Subsidiaries relating to that equipment transferred to DUSA by DuPont at the time of the formation of the DUSA joint venture in the remaining amount of approximately US$ 647,087 (the actual amount of which is denominated in pesos) (the "Receivable"); provided, that in the event that Buyer or any of its Subsidiaries has, since December 1, 2004, received or shall thereafter receive any payments or reimbursements in respect of the Receivable, such payments or reimbursements shall be held by such Person in trust for the benefit of DuPont and, promptly upon receipt by such DuPont of any such payment or reimbursement, such Person shall pay over to DuPont the amount of such payment or reimbursement without right of set-off.

## ARTICLE II

## MISCELLANEOUS

Section 2.1    Governing Law. The internal laws of the State of New York applicable to contracts made and wholly performed therein shall govern the validity, construction, performance and effect of this Agreement.

Section 2.2    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 2.3    Severability. The invalidity or unenforceability in any respect of any provision of this Agreement shall not affect the validity or enforceability of such provision in any other respect or of any other provisions of this Agreement, each of which shall remain in full force and effect. Upon any determination that any term or other provision of this Agreement is invalid or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible.

Section 2.4    Conflict. Notwithstanding anything to the contrary in the Purchase Agreement, in the event and to the extent there is a conflict between this Agreement and the Purchase Agreement, the provisions of this Agreement shall control.

Section 2.5    Specific Performance. The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 2.6    Final Agreement. This Agreement constitutes the final and entire agreement and understanding of the parties with respect to the subject matter hereof. All discussions and agreements previously entertained or entered into between the parties concerning the subject matter of this Agreement are merged into this Agreement. No variation, modification, or changes hereof shall be binding on any party hereto unless set forth in a document executed by all the parties.

Section 2.7    Compromise and Settlement. It is expressly understood and agreed that this Agreement, and any negotiations or proceedings in connection herewith, do not constitute and may not be construed as, or deemed to be, either evidence or an admission or concession on the part of any of the parties of any lack of merit whatsoever as to any claims or defenses they or their respective Affiliates have asserted. The act of entering into or carrying out this Agreement and any negotiations or proceedings related thereto shall not be used, offered or received into evidence in any action or proceeding in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Agreement, provided that this Agreement may be filed or submitted by any of the parties to support a claim of res judicata, collateral estoppel, other theory of claim or issue preclusion, release, discharge or satisfaction. All communications (whether oral or in writing) between and/or among the parties, their counsel and/or their respective representatives relating to, concerning or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408 to the fullest extent permitted by law.

Section 2.8    <u>Amendment and Modifications</u>.  No provision of this Agreement may be amended, modified or supplemented, nor may any provision of this Agreement be waived, without the prior written consent of the parties hereto.  Facsimile or telecopy signatures will constitute a sufficient form of writing for purposes of this Section 3.8.

\*              \*              \*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Buyer and DuPont as of the date first above written.

INVISTA B.V.

By: _____
Name:
Title:

E. I. DU PONT DE NEMOURS
AND COMPANY

By: _____
Name: GARY M. PFEIFFER
Title: SENIOR V.P. AND CFO

*(Signature Page to Supplemental Agreement)*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Buyer and DuPont as of the date first above written.

INVISTA B.V.

By: _____
Name: Kelly Bullock
Title: Senior VP / CFO


E. I. DU PONT DE NEMOURS
AND COMPANY


By: _____
Name:
Title:

# EXHIBIT A

The royalties described in Exhibit A, Section 1(a), (b), and (c) of the Teflon License Agreement for Year 2 (calendar year 2004) shall be based on sales made from May 1, 2004 to and including December 31, 2004.

The Annual Minimum Payment as described in Exhibit A, Section 1(d) of the Teflon License Agreement for Year 2 (calendar year 2004) shall be equal to US$1.47 million (8/12 x US$2.2 million).

The credit for Consumer Promotion as described in Exhibit A, Section 1(e) of the Teflon License Agreement for Year 2 (calendar year 2004) shall be for Consumer Promotion from May 1, 2004 to and including December 31, 2004.

The Consumer Promotion required to waive all royalties and annual minimum payments for Year 2 (calendar year 2004) as described in Exhibit A, Section 1(e)(6) of the Teflon License Agreement shall be at least: (i) US$2.67 million (8/12 x US$4 million) for apparel, textile and upholstery (combined total) and (ii) at least US$8 million (8/12 x $12 million) for residential carpets.

DuPont shall, and Buyer shall cause Invista to, promptly execute an amendment to the Teflon License Agreement setting forth the amended terms above.

EXHIBIT B

E. I. du Pont de Nemours and Company
1007 Market Street
Wilmington, Delaware 19898

April 30, 2004

INVISTA B.V. and subsidiaries
4111 E. 37th Street North
Wichita, Kansas 67220

RE: Supply Agreements

Reference is made to each of the Product Supply Agreements (as such term is defined in the Products Master Agreement, dated as of April 30, 2004) entered into by and among E. I. du Pont de Nemours and Company, a Delaware corporation, or any of its subsidiaries (collectively, "DuPont"), on the one hand, and INVISTA B.V., a Dutch company f/k/a KoSa B.V., ("INVISTA B.V.") or any of its subsidiaries (collectively, "INVISTA"), on the other hand, whereby INVISTA is selling product to DuPont (collectively, as such agreements may be amended from time to time, the "Supply Agreements").

Notwithstanding anything contained in the Supply Agreements to the contrary, (i) each applicable INVISTA party to a Supply Agreement shall have the right to sell (which sale may include the grant of a security interest) its receivables (but none of its obligations) under the applicable Supply Agreements to which such INVISTA entity is a party to any wholly-owned (directly or indirectly) subsidiary of INVISTA B.V. that is a special purpose entity created in connection with any securitization or financing of such INVISTA entity's receivables, (ii) each such INVISTA party, special purpose entity or permitted assignee of the INVISTA Party may collaterally assign (or grant a security interest in), any receivables (but none of the obligations) under such Supply Agreements to KoSa Funding Company S.à.r.l. or one or more other lenders to, or purchasers of debt securities of, INVISTA (in each case who are also being granted a collateral or security interest in all or a substantial portion of such INVISTA entity's receivables owed by obligors other than DuPont) (collectively, the "Second Tier Lenders"); and (iii) each of the Second Tier Lenders may further collaterally assign (or grant a security interest in), in whole and not in part, such receivables or their interests therein to any lenders to such Second Tier Lenders (collectively, the "Third Tier Lenders"); provided, however, that the rights of any special purpose entity, Second Tier Lenders or Third Tier Lenders in or to any receivables pursuant to a sale, assignment or grant of a security interest pursuant to this side letter shall in each case be subject to any defenses, rights of setoff or other rights of DuPont against the applicable INVISTA party under the applicable Supply Agreement. In addition, (a) each such INVISTA party may, in connection with future securitizations or financings of its receivables, sell (which sale may include the grant of a security

951284.06-New York Server 7A - MSW

interest), collaterally assign or grant a security interest in its receivables (but none of its obligations) under the applicable Supply Agreements to which such INVISTA entity is a party, to (x) any wholly-owned (directly or indirectly) subsidiary of INVISTA B.V. that is a special purpose entity created in connection with any securitization or financing of such INVISTA entity's receivables, (y) any "orphan" entity that is a special purpose entity created in connection with any securitization or financing of such INVISTA entity's receivables, administered by a company that is in the business of administering orphan entities formed for use in securitizations and the shares of which are held by a charitable corporation or trust, and/or (z) any financial institution or other funding vehicle or special purpose entity sponsored or administered by a financial institution (all such entities of the type described in clauses (x), (y) and (z), the "Future Securitization Parties"), and (b) any Future Securitization Party may further sell (which sale may include the grant of a security interest), collaterally assign or grant a security interest in such receivables to any other Future Securitization Party, it being understood that a receivables securitization may involve numerous sequential sales, collateral assignments and grants of security interest among Future Securitization Parties and all such sequential sales, collateral assignments and grants of security interest shall be permitted hereunder; provided, however, that the rights of any Future Securitization Party in or to any receivables pursuant to a sale, assignment or grant of a security interest pursuant to this side letter shall in each case be subject to any defenses, rights of setoff or other rights of DuPont against the applicable INVISTA party under the applicable Supply Agreement. In no event shall any provision contained in this side letter (including, without limitation, the sale, assignment or grant of a security interest contemplated by this paragraph) relieve or otherwise affect any rights, obligations or duties of any INVISTA party to a Supply Agreement, any DuPont party to a Supply Agreement or any of their applicable affiliates under any applicable Supply Agreement. To the extent that any individual receivable is sold or assigned, or a security interest is granted in such receivable, such sale, assignment or security interest must relate to such receivable as a whole and not only to a portion thereof.

If the applicable DuPont party to the Supply Agreement shall fail to pay any such receivable in accordance with its terms, the INVISTA party to such Supply Agreement, acting as collection agent on behalf of the applicable special purpose entities, Second Tier Lenders and Third Tier Lenders and/or Future Securitization Parties (or, if such INVISTA party has been terminated or replaced as collection agent under the applicable securitization documents, any of the successor collection agent, the applicable special purpose entity, Second Tier Lenders, Third Tier Lenders, Future Securitization Parties, or the applicable administrative agent for the securitization) shall have the right to pursue any appropriate remedies against DuPont for the collection of such receivable (in each case subject to any defenses, rights of setoff or other rights of DuPont against the applicable INVISTA party under the applicable Supply Agreement). Notwithstanding anything to the contrary in this side letter (i) INVISTA B.V. shall use its reasonable best efforts to ensure that at any given time with respect to receivables originated under any Supply Agreement, only one entity (such entity, the "Acting Party") shall (a) provide any notices, (b) act as collection agent or (c) otherwise exercise any rights, in each case, with respect to the receivables owed by DuPont under such Supply Agreement and (ii) in the event the Acting Party under any Supply Agreement will not be the INVISTA party to

such Supply Agreement, the INVISTA party to such Supply Agreement or the administrative agent for the securitization shall provide DuPont with 15 days prior written notice of (a) the name and address of such Acting Party and (b) the Supply Agreement applicable thereto, (iii) all deliveries of documents and notices required to be provided to an INVISTA party under a Supply Agreement with respect to receivables owed by DuPont under such Supply Agreement shall be deemed to have been satisfied and complied with if delivered to the applicable Acting Party which shall be deemed to be authorized to take actions and receive such deliveries and notices on behalf of the applicable INVISTA party, and (iv) at any given time, DuPont shall not be required (or be liable for the failure) to (a) make any payments, (b) respond to any request or (c) take any other action, in each case, with respect to the receivables owed by DuPont under a Supply Agreement if such request is made by (x) a party other than the Acting Party or (y) an Acting Party prior to the 15th day after the date that DuPont receives a notice regarding such Acting Party pursuant to clause (ii) of this sentence; provided that nothing in this clause (iv) shall relieve DuPont from responsibility for any payment or action required of it pursuant to the terms of the applicable Supply Agreement. For the avoidance of doubt, if DuPont receives notice of a change in the Acting Party, then until such notice becomes effective on the 15th day after delivery thereof, so long as DuPont acts in good faith, DuPont can either (i) continue to treat the party that was the Acting Party at the time such notice was given as the Acting Party, or (ii) can treat the new Acting Party named in such notice as the Acting Party, and in either case shall be fully protected in doing so and shall not be deemed to be in breach of this Agreement or any such Supply Agreement.

Except as provided below, DuPont hereby consents to the disclosure of the Supply Agreements to the Second Tier Lenders, the Third Tier Lenders, and any Future Securitization Party (and their financial advisors and attorneys) to the extent reasonably necessary in connection with the sale, assignment and/or grant of security interest in such receivables contemplated herein; provided, that: (i) the applicable INVISTA entity provides DuPont with prior written notice of the disclosure of such Supply Agreements to the Second Tier Lenders, the Third Tier Lenders, and any Future Securitization Party; (ii) all such Second Tier Lenders, Third Tier Lenders, and Future Securitization Parties (and their financial advisors and attorneys) agree in writing to keep confidential this side letter, the Supply Agreements disclosed (and the agreements and documents referenced therein) and the information provided or obtained relating thereto and to be bound by the confidentiality provisions stated herein and therein (any such information, collectively, the "Confidential Information") and (iii) notwithstanding the foregoing, Buyer shall not, without DuPont's prior written consent (which consent shall not be unreasonably withheld), disclose any Confidential Information to a Second Tier Lender, a Third Tier Lender, or a Future Securitization Party (or their financial advisors or attorneys) unless, in each case, such Second Tier Lender, Third Tier Lender, or Future Securitization Party is a financial institution or other funding vehicle or special purpose entity sponsored or administered by a financial institution. INVISTA B.V. shall, and shall cause each INVISTA entity to take, all reasonable steps (including, without limitation, those steps taken to protect its own information, data or other tangible or intangible property that it regards as proprietary or confidential) to ensure that the Confidential Information disclosed to the Second Tier Lenders, the Third Tier Lenders, and the Future

Securitization Parties (or their financial advisors or attorneys) is not disclosed or duplicated for the use of any third party, and shall take all reasonable steps to prevent the Second Tier Lenders, the Third Tier Lenders, and the Future Securitization Parties (and their financial advisors and attorneys) from disclosing or making unauthorized use of any Confidential Information, or from committing any acts or omissions that may result in the disclosure of any Confidential Information. In any event, INVISTA B.V. shall (i) be liable to DuPont for the failure of any of the Second Tier Lenders, the Third Tier Lenders, or the Future Securitization Parties (or their financial advisors or attorneys) to comply with the provisions of this paragraph or the confidentiality provisions contained in any Supply Agreement and (ii) indemnify DuPont and its affiliates from and against any losses arising out of, in connection with or relating to, the unauthorized disclosure of any Confidential Information.

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this side letter.

E. I. DU PONT DE NEMOURS AND COMPANY, for itself and its subsidiaries


By:_____
    Name:
    Title:


INVISTA B.V., for itself and its subsidiaries


By:_____
    Name:
    Title:

Securitization Parties (or their financial advisors or attorneys) is not disclosed or duplicated for the use of any third party, and shall take all reasonable steps to prevent the Second Tier Lenders, the Third Tier Lenders, and the Future Securitization Parties (and their financial advisors and attorneys) from disclosing or making unauthorized use of any Confidential Information, or from committing any acts or omissions that may result in the disclosure of any Confidential Information. In any event, INVISTA B.V. shall (i) be liable to DuPont for the failure of any of the Second Tier Lenders, the Third Tier Lenders, or the Future Securitization Parties (or their financial advisors or attorneys) to comply with the provisions of this paragraph or the confidentiality provisions contained in any Supply Agreement and (ii) indemnify DuPont and its affiliates from and against any losses arising out of, in connection with or relating to, the unauthorized disclosure of any Confidential Information.

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this side letter.

E. I. DU PONT DE NEMOURS
AND COMPANY, for itself and its
subsidiaries

By:_____
    Name:
    Title:

INVISTA B.V., for itself and its subsidiaries

By: _____
    Name: *Kelly Bulloch*
    Title: *Senior VP / CFO*

951284.05-New York Server 7A - MSW

 

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Buyer, DuPont and Parent as of the date first above written.

INVISTA B.V.

By: _____
Name: Kelly Bukoch
Title: Senior VP / CFO

KOCH INDUSTRIES, INC.

By: _____
Name: Steve Feilmeier
Title: Senior VP / CFO

E. I. DU PONT DE NEMOURS
AND COMPANY

By: _____
Name:
Title:

EXHIBIT 5



Paul J. Kaleta
General Counsel
316-828-1728

INVISTA S.à r.l.
INVISTA Building
P.O. Box 2936
Wichita, KS 67201-2936

316-828-1000 Tel
www.INVISTA.com

July 13, 2004

COPY

**VIA FACSIMILE – 302-773-5176**

Roger W. Arrington, Esq.
Paul J. Bonanto, Esq.
E. I. du Pont de Nemours and Company
1007 Market Street
Wilmington, DE  19898

RE:    <u>Environmental Claims - Notice #2</u>

Dear Messrs Arrington and Bonanto:

I am writing to notify you of claims under the Purchase Agreement between E.I. duPont de Nemours, KED Fiber Ltd. and KED Fiber, LLC dated November 16, 2003 (and subsequent Amendments Nos. 1, 2 and 3, referred to herein as the PSA) and other documents related thereto. The claims are related to compliance with Environmental Laws (as defined in the PSA) at the facilities located in Victoria, Orange (Sabine River Works), and LaPorte, Texas, and to potential violations that have been discovered at those facilities. All of these violations began prior to and/or existed at the Closing Date.

As previously disclosed in my notice letter dated June 17, 2004, INVISTA S.à r.l. (INVISTA) discovered potential violations of the Clean Air Act and implementing regulations, including but not limited to, 40 C.F.R. Subpart FF (the benzene waste NESHAP), and other waste related regulations associated with the operation of the nitrile stripper column, benzene flasher and associated processes at the Victoria, Texas, facility. The investigation of these potential violations, and other issues that have arisen, is ongoing.

I.    Potential Violations of Law Discovered To Date

    1.    Victoria Benzene NESHAP – associated with operation of nitrile stripper column.

    2.    Victoria RCRA – failure to obtain a RCRA permit for treatment of hazardous waste within the ADN process.

Roger W. Arrington, Esq.
Paul J. Bonanto, Esq.
July 13, 2004
Page 2

3.   Victoria Clean Air Act Subpart GG – failure to file custom sampling schedule as required by 40 C.F.R. § 60.334(b)(2), relating to the operation of its Cogeneration Facility.

4.   LaPorte - Benzene NESHAP – INVISTA is unable to confirm that the requisite 40 C.F.R. § 61.357(a) initial report was filed by April 7, 1993 or that annual reports under 40 C.F.R. § 61.357(c) were filed by April 7 of each of the subsequent years.

5.   Orange (Sabine River Works) – Benzene NESHAP and air permitting issues associated with the operations of a filter press in the ADN process.

6.   Victoria and Orange (Sabine River Works) – RCRA issues associated with WFE wastes at Orange (Sabine River Works) and the crude creosol waste sent from Victoria to Orange (Sabine River Works).[1]

II.   Actions Taken

In order to reduce the risk of enforcement and to avail itself of the benefits afforded by EPA's Final Policy on "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations," (the "Audit Policy"), INVISTA promptly has filed notices of the potential violations pursuant to Section D(3) of the Audit Policy. Section D(3) requires that the reporting entity disclose the violation in writing within 21 calendar days of discovery and each of the potential violations has been disclosed in writing to EPA Region VI within this 21 day period. As you are aware, the Audit Policy encourages self-policing by providing incentives to regulated entities to detect, disclose, and correct violations. For entities that meet the conditions of the Policy, "available incentives include waiving or reducing gravity-based civil penalties, declining to recommend criminal prosecution for regulated entities that self-police, and refraining from routine requests for audits." Audit Policy, Sec. C(1)-(4). INVISTA also has met with EPA Region VI to discuss the potential violations.

In addition, INVISTA filed a Notice of Audit pursuant to the Texas Environmental Health & Safety Audit Privilege Act (the "Texas Audit Act" or "Act") with the Texas Commission on Environmental Quality (TCEQ) on June 7, 2004. This notice was filed in order to minimize the risk of enforcement as set forth in Section 10(g) of the Texas Audit Act, which provides immunity for violations voluntarily disclosed as a result of a compliance audit. The violations discovered during the ongoing investigation, which was commenced on June 8, 2004, have been reported to the TCEQ consistent with the requirements of the Act. Again, INVISTA has met with TCEQ and has made these filings in order to reduce the risk of enforcement relating to these violations.

---

[1]   As of the date of this letter, the Audit Policy reporting period for this issue has not expired, but INVISTA is preparing an Audit Policy notice in compliance with the reporting period.

Roger W. Arrington, Esq.
Paul J. Bonanto, Esq.
July 13, 2004
Page 3

III.    Next Steps

Both EPA and TCEQ have requested that INVISTA continue its investigation and report
any additional violations of Environmental Law pursuant to the requirements of the Audit Policy
and the Texas Audit Act. INVISTA will be working with EPA at both the Regional and National
level, as appropriate or as directed by EPA, and expects to enter into a formal agreement to
pursue additional auditing under EPA's policy for Corporate Auditing Agreements for Audit
Policy Disclosures, dated May 7, 2001, or as otherwise directed by EPA. To ensure continued
self-policing and the opportunity to qualify for Audit Policy protection, if necessary, INVISTA
may expand its comprehensive audit and investigation to include all U.S. facilities acquired from
DuPont. If this occurs, INVISTA intends to work with each affected state to ensure that
protections afforded under state audit policies or laws also are available to it.

INVISTA is focused on reducing the risk of enforcement for any of these violations,
including reducing any potential penalties to the extent allowed by applicable audit policies and
laws, and reducing or eliminating any potential impact on its operations.

As indicated above, we are continuing our investigation of these issues and will provide
you with more information once our investigation is complete. If you have any questions in the
interim, please do not hesitate to contact me.

Sincerely,

Paul J. Kaleta

cc:    Lou R. Kling, Esq. (VIA FACSIMILE – 212-735-2000)
       Thomas W. Greenberg, Esq.
       Skadden, Arps, Slate, Meagher & Flom LLP
       Four Times Square
       New York, NY  10036

       Tye G. Darland, Esq.
       Koch Industries, Inc.

       Tracey L. Mihelic, Esq.
       INVISTA, S.à r.l.