UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x
                                               :
INVISTA B.V., et al.,                          :        08 CV 3063 (SHS)
                                               :
                    Plaintiffs,                :
                                               :
          v.                                   :
                                               :
                                               :
                                               :
E.I. DU PONT DE NEMOURS AND COMPANY,           :
                                               :
                    Defendant.                 :
_____x

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS
CERTAIN ELEMENTS OF PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………....……….…..……………………….iii

PRELIMINARY STATEMENT………………….……..…..…………….….…….1

BACKGROUND……………………….…………………....……….…..…….6

    I.      The Indemnity Provisions of the Purchase Agreement………....….6

           A.      Section 8.4……………………………………………….….......….6

           B.      Section 8.5………………………………………….…........…..7

    II.     INVISTA's Breach of Its Environmental Indemnity Obligations………..8

    III.   INVISTA's Indemnity Claims Relating to Overend
          Technologies.......................................................................................12

    IV.   INVISTA's Indemnity Claims Relating to the ITAM
          Receivable…………………………………………………….……..13

ARGUMENT …..……………………………………………………………..…….14

    I.      The Plain Language of the Purchase Agreement Bars Many of
         INVISTA's Environmental Indemnity Claim………………….………..14

           A.      INVISTA Fails to State A Claim for Environmental
                  Indemnity Pursuant to Section 8.4(a)(ii)………...........................16

           B.      INVISTA Fails to State A Claim for Environmental Indemnity
                  Pursuant to §8.5(b) Relating to the Audit Process and
                  Resulting Consent Decree……………………….…........……...18

    II.     INVISTA's Claim for Punitive Damages Fails As a Matter
          of Law………………….…………………………………….......…..…….23

           A.   INVISTA Has Not Alleged An Independent Tort……………....24

           B.   The Alleged Failure to Indemnify is Not Part of A
               Pattern Directed at the Public Generally….…………..............…25

    III.   INVISTA's Overend Technologies Claim Fails to State a Claim…......26

IV.   INVISTA's ITAM Receivable Claim Fails to State a
      Claim……………………………………………………………..………29

CONCLUSION………………………….………………………………..………….…..31

## TABLE OF AUTHORITIES

**CASES**

*Americu Credit Union v. Kumis Insurance Society,*
  2007 U.S.Dist. LEXIS 25523 (N.D.N.Y. Apr. 5, 2007) .......................................... 25

*Axelrod v. Simon & Schuster, Inc.,*
  2007 WL 2412257 (S.D.N.Y. Aug. 27, 2007) ...................................................... 15

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,*
  98 F.3d 13 (2d Cir. 1996) .................................................................................. 25

*California Eastern Laboratories, Inc. v. Gould,*
  896 F.2d 400 (9th Cir. 1990) ............................................................................. 27

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002) ................................................................................ 2

*Commander Oil Corp. v. Advance Food Serv. Equip.,*
  991 F.2d 49 (2d Cir. 1993) ................................................................................ 16

*DBT GMBH v. J.L. Mining Co.,*
  2008 U.S.Dist. LEXIS 28564 (S.D.N.Y. April 8, 2008) ........................................ 15

*Dippin' Dots, Inc. v. Mosey,*
  476 F.3d 1337 (Fed. Cir. 2007) ......................................................................... 27

*Dyncorp v. GTE Corp.,*
  215 F.Supp.2d 308 (S.D.N.Y. 2002) .................................................................. 24

*EEOC v. Staten Island Sav. Bank,*
  207 F.3d 144 (2d. Cir. 2000) ............................................................................. 15

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,*
  111 F. 3d 284 (2d Cir. 1997) ............................................................................. 22

*Freedom Chem. Co. v. BC Sugar Refinery, Ltd.,*
  1998 WL 289736 (S.D.N.Y. June 4, 1998), *aff'd,* 166 F.3d 1200
  (2d Cir. 2000) ............................................................................................. 21, 22

*Gilbert v. LaSalle Bank Corp.,*
  2007 U.S.Dist. LEXIS 31955 (S.D.N.Y. May 2, 2007) ........................................... 2

*H. Fox & Co., Inc. v. Blumenfeld,*
    24 A.D.3d 722 (2d Dep't 2005) ......................................................................... 17

*Harris v. City of New York,*
    186 F.3d 243, 247 (2d Cir. 1999) ...................................................................... 14

*Haynes v. Kleinewefers,*
    921 F.2d 453 (2d. Cir.1990) .............................................................................. 16

*IMR Associates,  Inc. v. C.E. Cabinets, Ltd.,*
    2007 U.S.Dist. LEXIS 34788 (E.D.N.Y. May 11, 2007) ....................................... 25

*In re Netflix Antitrust Litigation,*
    506 F.Supp.2d 308, 217 (N.D. Cal. 2007) ................................................... 27, 28

*Int'l Audiotext Network, Inc. v. America Telegraph and Telegraph Co.,*
    62 F.3d 69 (2 Cir. 1995) .............................................................................. 2, 15

*L&B 57th Street, Inc. v. E.M. Blanchard, Inc.,*
    143 F.3d 88 (2d Cir. 1998) ............................................................................... 17

*Manley v. AmBase Corp.,*
    121 F.Supp.2d 758 (S.D.N.Y. 2000), *aff'd*, 337 F.3d 237 (2d Cir. 2003) ...... 16, 22

*Morris v. Flaig,*
    511 F.Supp.2d 282 (E.D.N.Y. 2007).................................................................. 25

*Muzak Corp. v. Hotel Taft Corp.,*
    1 N.Y.2d 42, 150 N.Y.S.2d 171 (1956) ......................................................... 15, 16

*New York University v. Continental Insurance Co.,*
    87 N.Y.2d 308 (1995) ................................................................................. 23, 25

*Noble v. Higgins,*
    214 A.D. 135, 211 N.Y.S. 833 (3d Dep't 1925), *aff'd,* 243 N.Y. 538,
    154 N.E. 596 (1926) ........................................................................................ 18

*Northlake Marketing & Supply, Inc. v. Glaverbel S.A.,*
    861 F.Supp. 653 (N.D. Ill 1994).................................................................. 27, 28

*Overend Technologies, LLC v. INVISTA S.A.R.L.,*
    No. 05-C-0800, 2006 U.S.Dist. LEXIS 49449 (E.D. Wis.
    Feb. 9, 2006) ........................................................................................... 12, 27

*Pludeman v. Northern Leasing Sys., Inc.,*
    40 A.D.3d 366 (1st Dep't 2007) ........................................................................ 26

*RBS Holdings, Inc. v. Wells Fargo Century, Inc.,*
    485 F.Supp.2d 472 (S.D.N.Y 2007) ...................................................................... 30

*Reiss v. Fin. Performance Corp.,*
    97 N.Y.2d 195 (2001) .................................................................................... 16

*Rocanova v. Equitable Life Assur. Soc. of U.S.,*
    83 N.Y.2d 603 (1994) ........................................................................... 23, 24, 25

*Sel-Leb Marketing, Inc. v. Dial Corp.,*
    2002 WL 1974056 (S.D.N.Y. Aug. 27, 2002) ............................................... 29, 30

*Skibinsky v. State Farm Fire and Cas. Co.,*
    6 A.D.3d 975 (3d Dep't 2004) .......................................................................... 26

*Terwiliger v. Terwilliger,*
    206 F.3d 240 (2d Cir. 2000) ............................................................................ 15

*Vaveris v. Hermitage Ins. Co.,*
    24 A.D.3d 537 (2d Dep't 2005) ........................................................................ 25

*Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.,*
    382 U.S. 172 (1965) ................................................................................. 27, 28

*Washington Capital Ventures, LLC v. DynamicSoft, Inc.,*
    373 F.Supp.2d 360 (S.D.N.Y. 2005) .................................................................. 15

*White Mule Co. v. ATC Leasing Co LLC,*
    2008 WL 763486 (N.D. Ohio March 25, 2008) .................................................. 27

*Yak v. Bank Brussells Lambert, BBL (USA),*
    252 F.3d 131 (2d Cir. 2001) ............................................................................ 30

## RULES

Fed. R. Civ. P. 12(b)(6) .............................................................................. 5, 14

## OTHER

EPA, "Incentives for Self-Policing: Discovery Disclosure, Correction and
Prevention of Violations, 65 Fed. Reg. 19618 at 19622 (Apr. 11, 2000) ................ 20, 26

13 Richard A. Lord, Williston on Contracts § 38.6 and § 38.16 (4th ed. 2007) ............... 18

Defendant E.I. DuPont de Nemours and Company (hereinafter, "DuPont") submits this memorandum in support of its motion to dismiss those elements of Plaintiffs' Complaint that fail to state a claim.[1]

## **Preliminary Statement**

The claims in this action arise from a November 16, 2003 Purchase Agreement (later amended)[2] between Plaintiffs (subsidiaries and affiliates of Koch Industries, Inc. hereinafter referred to collectively as "INVISTA") and DuPont, whereby INVISTA acquired the Textiles and Interiors operations of DuPont. INVISTA seeks to be indemnified, pursuant to the Purchase Agreement, for more than $800 million of upgrades and related operating costs that INVISTA incurred or expects to incur with respect to the facilities and other assets INVISTA purchased from DuPont.  INVISTA also seeks to recover damages for other alleged breaches by DuPont of its obligations under the Purchase Agreement and another contract.

After a lengthy description of INVISTA's factual allegations in paragraphs 38-170 of the Complaint, INVISTA sets forth its actual claims in "Count I (Breach of Contract/Indemnification)" and "Count II (Declaratory Judgment)" and seeks compensatory and punitive damages and declaratory relief in its Prayer for Relief.  In particular, INVISTA alleges that "DuPont has failed and refused to defend, indemnify and hold harmless INVISTA from and against its Losses" under §§ 8.4(a)(iii), 8.5(b), 8.4(a)(ii), and 8.4(a)(i) of the Purchase Agreement.  (Complaint ¶¶ 174-177).

---

[1] Simultaneously with filing this motion, DuPont is also filing its Answer and Counterclaims.
[2] A copy of relevant portions of the November 16, 2003 Purchase Agreement, without its amendments and voluminous schedules and other exhibits, is attached as Exhibit 1 to the Affidavit of Robert J. Dwyer, sworn to on May 16, 2008 ("Dwyer Aff."). Capitalized terms used herein have the same meaning as set forth in § 1.1 of the Purchase Agreement, unless otherwise defined herein.

1

DuPont moves to dismiss those of INVISTA's claims – identified below – that are barred as a matter of law.[3]

### 1.    INVISTA's Section 8.4(a)(ii) Environmental Indemnity Claims Fail to State A Claim.

The plain language of the Purchase Agreement bars INVISTA's environmental indemnity claims pursuant to § 8.4(a)(ii).  Those claims relate to alleged DuPont Environmental Liabilities.  Section 8.4(c) of the Purchase Agreement provides that, "notwithstanding anything herein to the contrary," indemnification claims for DuPont Environmental Liabilities "shall be made exclusively under Section 8.4(a)(i) or  8.5(b)," unless the indemnification claim is based on a breach of a warranty or representation, in which case INVISTA's exclusive remedy is § 8.4(a)(iii). Because indemnification for DuPont Environmental Liabilities is therefore not allowed under § 8.4(a)(ii), the provision cannot provide a basis for INVISTA's claims.

### 2.    INVISTA's United States Environmental Indemnity Claims Arising Under Section 8.5(b) Fail to State A Claim.

INVISTA's environmental indemnity claims under § 8.5(b) of the Purchase Agreement, which comprise the vast majority of its remediation expenses at United States facilities, fail to state a claim.  In § 8.5(b), DuPont agreed to provide unlimited indemnification for DuPont Environmental Liabilities, "subject to the conditions set forth in the Agreement."  One of those conditions is the condition precedent set forth

---

[3] The Court may consider the Purchase Agreement and any other documents referenced in the Complaint, without converting the motion to dismiss to one for summary judgment, if "the complaint 'relies heavily upon [their] terms and effect,' which render[ ] the document[s] 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  "Courts typically apply this exception where a plaintiff sues primarily on the basis of a document such as a contract that is not attached to…the complaint." *Gilbert v. LaSalle Bank Corp.*, 2007 U.S. Dist. LEXIS 31955, *9 (S.D.N.Y. May 2, 2007).

in § 8.5(e) that DuPont be given "full authority to control, direct, manage and implement any Remediation and to determine its scope" and "full authority to conduct all negotiations, meetings and settlements with Governmental authorities." By unilaterally acting in two ways without notice to DuPont – (1) disclosing alleged DuPont Environmental Liabilities to the United States Environmental Protection Agency ("EPA") and state regulators, and (2) negotiating and entering into an agreement with EPA to conduct company-wide environmental audits – INVISTA embarked on a preemptive course of action that had the purpose and effect of depriving DuPont of the opportunity to exercise its § 8.5(e) rights in any meaningful way. The audits and their findings ultimately formed the basis for the draft consent decree findings, and INVISTA now seeks indemnification for certain of the remediation required by the consent decree. As a result of INVISTA's unilateral course of conduct, any costs that INVISTA has incurred or may incur as a result of the audit process, and the resulting consent decree that it intends to enter into with EPA and state regulators, fall outside the scope of the indemnification obligations of DuPont in § 8.5(b).

The dismissal of INVISTA's environmental indemnity claims pursuant to § 8.5(b) (as to remediation at United States facilities performed pursuant to the audit process and resulting consent decree) and § 8.4(a)(ii) would narrow the claims and the theories on which they rest. Certain environmental indemnity claims would be dismissed in their entirety (*i.e.,* those for expenses incurred in complying with the Clean Air Act's "New Source Review" or PSD/NNSR programs).[4] The environmental

---

[4] "New Source Review" and "PSD/NNSR" are shorthand for The Prevention of Significant Deterioration (or "PSD") program and the Non-Attainment New Source Review (or "NNSR") program.

3

indemnity claims relating to the audit process and resulting consent decree would be dismissed, except to the extent they are based on § 8.4(a)(iii), the provision governing alleged breaches of warranties or representations in the Purchase Agreement.

　　　　3.　　INVISTA's Request for Punitive Damages Fails to State A Claim.

INVISTA's claim for punitive damages, in connection with its indemnity claims, fails to state a claim. For punitive damages to be recoverable in a breach of contract action, a plaintiff must allege, *inter alia,* conduct that is (i) actionable as an independent tort; and (ii) part of a pattern directed at the public generally. INVISTA has failed to allege an independent tort, and its contract claims involve a purely private dispute over which party is contractually obligated to pay remediation and other costs.

　　　　4.　　INVISTA's Overend Claim Fails to State A Claim.

INVISTA's indemnity claim, pursuant to § 8.4(a)(ii), relating to Overend Technologies LLC ("Overend") (Complaint ¶ 165) fails to state a claim. INVISTA claims it is entitled to damages arising from the alleged failure of DuPont to indemnify INVISTA for damages arising from an antitrust suit by Overend against INVISTA. Overend alleged that INVISTA tried to enforce a fraudulently procured patent in an effort to restrain trade and monopolize relevant markets. DuPont had no obligation to indemnify INVISTA for two reasons. First, Paragraph 4 of Schedule 1(zz) to the Purchase Agreement limits the indemnity obligations of DuPont to

---

Both programs are pre-construction permitting programs required under the Clean Air Act and implementing state and local regulations. The PSD program applies in attainment areas (i.e., those that have attained the national ambient air quality standards for certain pollutants), and the NNSR program applies in non-attainment areas.

4

liabilities arising from its ownership of assets prior to April 30, 2004 when the closing

of the transaction occurred.  INVISTA's liabilities arose not from the ownership of the

patent by DuPont, but rather from INVISTA's subsequent enforcement of the patent

in a way that allegedly violated the antitrust laws.  Second, Schedule 1(zz) expressly

states that DuPont is not obligated to indemnify INVISTA for liabilities arising from

INVISTA's actual or alleged antitrust violations.

     5.    <u>INVISTA's ITAM Claim Fails to State A Claim</u>.

INVISTA's claim relating to the ITAM receivable (Complaint ¶ 164) fails to

state a claim.  INVISTA alleges that DuPont transferred to INVISTA at closing a

receivable from an Italian textile company, ITAM, S.p.A., but that prior to the formal

implementation of the transfer, DuPont sold the receivable to another company,

depriving INVISTA of its rights to the receivable.  INVISTA's claim is barred by a

Supplemental Agreement, dated December 17, 2004, in which INVISTA expressly

waived any claims relating to the ITAM receivable.  (Dwyer Aff., Exh. 4).

These claims should therefore be dismissed by the Court pursuant to Fed. R.

Civ. P. 12(b)(6).[5]

---

[5] Certain of INVISTA's claims will require the Court's consideration of evidence extraneous to the Complaint, and therefore cannot be raised on a motion to dismiss.  Those claims are responded to in Defendant's Answer and Counterclaims filed today.  If the motion to dismiss is granted, the following indemnification claims will remain:  (i) indemnification for remediation expenses pursuant to § 8.4(a)(iii) (representations and warranties); (ii) indemnification, pursuant to § 8.5(b), for remediation not undertaken in connection with the audit process and resulting consent decree; and (iii) indemnification for attorneys' fees, pursuant to § 8.4(a)(ii) and a letter agreement, that were incurred in connection with an antitrust investigation.  DuPont believes that certain of those claims may be amenable to an early partial summary judgment motion after limited discovery.

## Background

## I.    The Indemnity Provisions of the Purchase Agreement

On April 30, 2004, INVISTA purchased the Textiles and Interiors operations of

DuPont, which included facilities in the United States and abroad.  Complaint ¶ 1.

The terms and conditions of the sale are set forth in the Purchase Agreement.

INVISTA's claims rest on two provisions of the Agreement, §§ 8.4 and 8.5.

### A.    Section 8.4

Section 8.4 is the general indemnity provision of the Purchase Agreement.  It

provides that DuPont is to indemnify INVISTA for Losses arising from (i) the breach

or failure of DuPont to perform a term of the Agreement; (ii) Retained Liabilities; and

(iii) the breach of a representation or warranty set forth in the Agreement:

> (a)     From and after the Closing, DuPont shall defend,
> indemnify and hold harmless Buyer, Buyer Subs and their Subsidiaries
> (including the DTI Companies) and each of their Affiliates and each of
> Buyer's, its Subsidiaries', and their respective Affiliates' respective
> officers, directors, employees and agents… from and against any and
> all Losses arising from, in connection with or otherwise with respect to
> (i) the breach or failure of any of the Sellers to duly perform or observe
> any term, provision, covenant (other than Section 5.36) or agreement
> to be performed or observed by the Sellers pursuant to this Agreement
> …, (ii) any of the Retained Liabilities (whether arising prior to, on or
> after the Closing Date), (iii) (x) any breach or failure to be true of any
> representation or warranty of DuPont set forth in Article III of this
> Agreement.… (Dwyer Aff., Exh. 1 at § 8.4(a)).

The Purchase Agreement defines "Retained Liabilities" to include "DuPont

Environmental Liabilities."  Section 8.4(c) of the Agreement, however, expressly

states that indemnification claims relating to "DuPont Environmental Liabilities"  can

only be asserted under § 8.4 if they arise from a breach of the Purchase Agreement

(§ 8.4(a)(i)) or a breach of a representation or warranty (§ 8.4(a)(iii)).  All other

6

indemnification claims relating to "DuPont Environmental Liabilities" must be

asserted pursuant to § 8.5:

> Notwithstanding anything herein to the contrary,…(ii) any
> indemnification claims relating to any DuPont Environmental Liabilities
> (other than with respect to breaches or failures to be true of the
> representations and warranties in Section 3.11) shall be made
> exclusively under Section 8.4(a)(i) or 8.5 and any indemnification
> claims relating to breaches or failures to be true of representations and
> warranties in Section 3.11 shall only be made under Section
> 8.4(a)(iii)…. (*Id.* at § 8.5(c)).

## B.   **Section 8.5**

Section 8.5 of the Purchase Agreement addresses indemnification for

Environmental Matters.  Section 8.5(b), which identifies the Environmental Matters

for which DuPont agreed to indemnify INVISTA, in relevant part, provides:

> (b)   On terms and subject to the conditions set forth in this
> Agreement, DuPont agrees to indemnify, defend and hold harmless
> the Buyer Indemnified Parties from and against, and shall reimburse
> such Indemnitees with respect to, all Losses arising out of or related to,
> directly or indirectly, all Environmental Claims and requirements of
> Environmental Law (whether or not under applicable Law Buyer or any
> of its Subsidiaries would have a right of contribution against DuPont
> therefor) arising out of or related to the matters set forth below (the
> "DuPont Environmental Liabilities"):
>
> > (i)   Remediation of Existing Contamination or
> > Known Environmental Issues required by Environmental Law in
> > connection with the DuPont Remediation Sites; provided,
> > however, that such Liabilities shall in no event include the DTI
> > Environmental Liabilities set forth in Section 8.5(a)(iv);….
> >
> > (vii)   any Release or violation of Environmental
> > Law at sites on Schedule 8.5(b)(vii) except to the extent arising
> > from the operation of the DTI Business on or after the Closing
> > Date…. (Dwyer, Aff., Exh. 1 at § 8.5(b)).

The indemnification that DuPont agreed to provide in § 8.5(b) is "subject to

the conditions set forth in this Agreement," including, without limitation, § 8.5(e).

Section 8.5(e) gives DuPont *full authority* to control, direct, manage, and implement any remediation, to determine its scope, and to conduct all negotiations, meetings, and settlements with governmental authorities that relate to "DuPont Environmental Liabilities."   In contrast, INVISTA's role is limited to the right to participate in negotiations, meetings, and settlement discussions with governmental authorities if DuPont informs INVISTA that there is a reasonable potential that the proposed or mandated remediation may materially interfere with INVISTA's operations or create an enforcement risk:

> (e)    As between the parties to this Agreement, and with respect to DuPont Environmental Liabilities and any Sliding Scale Matter for which DuPont is responsible for more than fifty percent (50%) of the Losses arising therefrom pursuant to Section 8.5…, DuPont will have full authority to control, direct, manage and implement any Remediation and to determine its scope; provided, however, that DuPont will take measures to ensure that such Remediation…does not create an enforcement risk for Buyer associated with its operations.  DuPont will promptly advise and consult with Buyer regarding its Remediation activities if there is a reasonable potential that the proposed or mandated remediation may …create an enforcement risk for Buyer….DuPont and Buyer will work together to eliminate the enforcement risk to Buyer, and Buyer shall have the right to participate in negotiations, meetings and settlement discussions with Governmental authorities.  DuPont also shall have the full authority to conduct all negotiations, meetings and settlements with Governmental Authorities with respect to the DuPont Environmental Liabilities….   (Dwyer Aff., Exh. 1 at § 8.5(e) (emphasis added).

## II.    INVISTA's Breach of Its Environmental Indemnity Obligations

INVISTA alleges that "[w]ithin weeks of Closing," INVISTA discovered purported violations relating to the rules governing benzene waste operations at the Victoria, Texas and Orange, Texas facilities.  Complaint ¶ 38.  INVISTA unilaterally "self-reported" what it considered to be violations to the EPA and the Texas Commission on Environmental Quality (hereinafter, "TCEQ") "and sought protection

under each agency's audit policy." *Id.* ¶ 51. In other words, INVISTA began
negotiations with the regulatory agencies. By self-reporting, and then negotiating
with EPA and TCEQ, INVISTA deprived DuPont of its § 8.5(e) right to have "full
authority" to control, direct, manage, and implement any remediation, to determine
its scope, and to conduct all negotiations, meetings, and settlements with
governmental authorities.

"After self-reporting" the alleged benzene violation at the Victoria, Texas
facility, on June 17, 2004, INVISTA sent DuPont a letter. *Id.* ¶ 52. The letter
mentioned nothing about the fact that INVISTA had "self-reported" alleged violations
or was in discussions with regulatory authorities. To the contrary, the letter briefly
referred to "potential claims" as "issues" that INVISTA was investigating:

> I am writing to notify you of potential claims under the Purchase
> Agreement….The potential claims are related to the operation of the
> nitrile stripper column, benzene flasher and associated processes…
> We currently are investigating these issues and will provide you with
> more detailed information once our investigation is complete. If you
> have any questions in the interim, please do not hesitate to contract
> me. (*Id.*)

On July 13, 2004, INVISTA sent DuPont another letter, identifying an alleged
benzene violation at the Orange, Texas facility, and stating that it had already self-
reported the alleged violation to EPA and TCEQ. *Id.* ¶ 53. In that letter, INVISTA
strategically elected not to advise DuPont of the extent to which it had been
negotiating and meeting with the EPA and TCEQ throughout the month. Instead, it
made a vague reference to its intention, at some point in the future, to enter into a
formal agreement to pursue additional auditing. *Id.* INVISTA provided no further

9

information about its negotiations with EPA or the substantive scope or timing of additional auditing. *Id.,* Dwyer Aff., Exh. 5.

In neither its June 17 nor July 13 letters did INVISTA request or invite any action by DuPont; nor did either letter offer DuPont any opportunity to participate in the discussions with EPA and TCEQ. To the contrary, by the time the second letter was posted on July 13, 2004, INVISTA was deeply into negotiations with EPA to conduct a company-wide audit under almost every environmental regulatory program – going far beyond the issues identified by INVISTA in its June 17 and July 13 letters.

On July 29, 2004, INVISTA alleges that it advised DuPont that "EPA was interested in entering a formal corporate-wide audit agreement that would require INVISTA to conduct environmental audits at all of the U.S. facilities acquired from DuPont." *Id.* ¶ 54. But it was INVISTA – not EPA – that proposed a formal corporate-wide audit agreement. The day before sending its July 29, 2004 letter, INVISTA sent EPA a detailed proposal for a corporate-wide audit agreement. *See* Dwyer Aff., Exh. 3, at 25. EPA accepted INVISTA's proposal with "minor adjustments." *Id.* at 92. By "early August 2004," the audit agreement was finalized. Complaint ¶ 57. This agreement essentially laid and defined the course of INVISTA's dealings with the regulatory agencies over the next few years.

Not until August 18, 2004 did INVISTA send DuPont a letter advising that it had already entered into a formal corporate audit agreement requiring sweeping audits for all facilities in the U.S., "and attaching, among other documents: (1) the audit protocol for the corporate wide audits, and (2) a letter from Robert Kaplan,

10

Director of the Special Litigation and Projects Division of the EPA's Office of Regulatory Enforcement...." *Id.* INVISTA was apparently aware that by its unilateral conduct in making disclosures to EPA and TCEQ, that extended far beyond the disclosures that INVISTA made to DuPont (*see* Dwyer Aff., Exh. 3 at 4-24), and by entering into an audit agreement, INVISTA had negated its right to indemnification under § 8.5(b). In a transparent effort to gloss over that defect in its indemnification claim, INVISTA wrote DuPont in the August 18, 2004 letter: "'Please advise if, pursuant to Section 8.5(e) of the [Purchase Agreement], you wish to discuss the corrective actions *being taken*.'" Complaint ¶ 58 (emphasis added); Dwyer Aff., Exh. 3. But even that letter acknowledged that the actions were "being taken" – not future actions being contemplated.

By early August 2004, when INVISTA's audit agreement was finalized, DuPont had already been deprived of the control rights which were intended to guard against buyer abuse and ensure that INVISTA would only be indemnified for actual pre-closing violations of environmental law that exposed it to a threat of probable and imminent governmental enforcement action and not for ordinary business costs incurred in connection with the acquisition of going concern facilities. By early August, that abuse had already occurred – the buyer had set in concrete the future actions and relationship between itself and the federal and state regulatory agencies. DuPont declined to participate in the ongoing audit process and advised INVISTA that, in unilaterally embarking on a corporate-wide audit, "'INVISTA [wa]s negotiating with EPA over the expenditures of INVISTA's funds alone.'" *Id.* ¶ 149.

**III.    INVISTA's Indemnity Claims Relating to Overend Technologies**

INVISTA alleges that it is entitled to damages arising from DuPont's failure to defend and indemnify INVISTA in an antitrust suit brought by Overend against INVISTA. Complaint ¶ 165. INVISTA alleges entitlement to indemnity pursuant to the Retained Liabilities provision of the Purchase Agreement (§ 8.4(a)(ii)), and that its alleged damages constitute a Retained Liability pursuant to Paragraph 4 of Schedule 1(zz) to the Purchase Agreement. *Id.*

Overend's antitrust claims arise out of INVISTA's enforcement of U.S. Patent No. 6,676,054 ("the '054 patent") against Overend to enjoin it from displaying its products at a Swiss trade show.  Overend sued INVISTA and its exclusive licensee, Accratec, for conspiring to misuse the patent (alleged by Overend to be fraudulently procured) to unlawfully restrain trade and monopolize the relevant market, in violation of Sections 1 and 2 of the Sherman Act. *See Overend Technologies, LLC v. INVISTA S.A.R.L.*, No. 05-C-0800, 2006 U.S. Dist. LEXIS 49449 (E.D. Wis. Feb. 9, 2006).  DuPont was not named a party to the suit.  The district court denied INVISTA's motion to dismiss, finding that Overend had adequately pled an antitrust claim by alleging "that defendants [INVISTA and Accratec] control roughly three-quarters of the market for OETO devices and are using a fraudulently-obtained patent to force competitors out of business and to inhibit others from entering the field." *Id.* at 930.  Thereafter, the parties to the suit settled. Complaint ¶ 165.

INVISTA claims that Paragraph 4 of Schedule 1(zz) to the Purchase Agreement, which lists particular Retained Liabilities covered by the Retained

12

Liability provision in § 8.4(a)(ii), entitles it to indemnification. Paragraph 4, in

relevant part, provides:

> All Liabilities resulting from or arising out of actual or alleged violations of
> Antitrust Laws to the extent resulting from or arising out of the ownership
> of the DTI Assets [which include the '054 patent]...at any time on or prior
> to the Closing Date or at any time during the period after the Closing Date
> to and including the first anniversary of the Closing Date; provided,
> however, that in the case of any actual or alleged violation of Antitrust
> Laws relating to the ownership of DTI Assets or the operation of the DTI
> Business occurring after the Closing Date, such Liabilities shall not have
> resulted from or arisen out of any violation of Antitrust Law by a Buyer
> Indemnified Party [i.e., INVISTA] after the Closing Date (unless such
> violation of Antitrust Law resulted from (A) the activities of DuPont or
> DuPont's Affiliates or (B) merely the continuation of actions, failures to act
> or events occurring, or the continued existence of circumstances or
> conditions existing, prior to the Closing Date, in each case that constitutes
> a violation of Antitrust Law prior to the Closing Date)....

Dwyer Aff., Exh. 2, Schedule 1(zz), at ¶ 4 (emphasis added). Overend's antitrust

claims fall outside the scope of this provision because (i) Overend's claims did not

arise from ownership by DuPont of the '054 patent prior to closing; and (ii) DuPont

has no indemnity obligation with respect to actual or alleged antitrust violations by

INVISTA.

## IV.   INVISTA'S Indemnity Claims Relating to the ITAM Receivable

INVISTA alleges that:

(a)   At Closing, DuPont transferred to INVISTA a receivable owed to
DuPont by an Italian textile company, ITAM, S.p.A. (the "ITAM
Receivable");

(b)   "Prior to formal implementation of the transfer,... DuPont negotiated a
check from...Incofinsco S.p.A. [an unrelated third party]..., in the
amount of 1% of the receivable, despite INVISTA's instructions to
DuPont that the Incofinsco check 'must not be cashed'"; and

(c)   ITAM and Incofinsco have asserted that the receivable was sold to
Incofinsco by DuPont and therefore INVISTA does not have rights to

13

> the receivable or supporting guarantees (the "ITAM Collateral").
> (Complaint ¶ 164).

As a result, INVISTA claims to have been involved in litigation relating to the

ownership of the ITAM Receivable and Collateral and alleges:

> By this conduct, DuPont breached an [unidentified] "Other Agreement," as
> such term is defined in the Purchase Agreement, and is obligated to
> indemnify INVISTA for its losses arising from that breach, pursuant to
> Section 8.4(a)(i) of the Purchase Agreement. *Id.*

Critical to the disposition of INVISTA's ITAM Receivable claim is a

Supplemental Agreement, dated December 14, 2004, between INVISTA and

DuPont, in which INVISTA expressly waived its right to bring its ITAM claim.  That

agreement, in relevant part, provides:

> For good and valuable consideration, the receipt of which is
> hereby acknowledged, <u>Buyer [INVISTA] hereby waives, and
> covenants to refrain from suing</u> with respect to or otherwise
> exercising, any and all Actions, rights, claims and remedies of any
> nature whatsoever, <u>at law or in equity (including for fraud), of every
> kind and nature whatsoever</u>…against DuPont or the DuPont
> Indemnified Parties or any of their respective successors or
> assigns, as the case may be, <u>as a result of any failure to effectively
> assign the ITAM Collateral</u>, including under Spanish or Italian Law,
> so long as DuPont has used the reasonable commercial efforts
> described in the preceding paragraph.

Dwyer Aff., Exh. 4, at § 1.4 (emphasis added).

## Argument

## I.  The Plain Language of the Purchase Agreement Bars Many of INVISTA's Environmental Indemnity Claims.

Dismissal of a complaint for failure to state a claim pursuant to Fed. R. Civ. P.

12(b)(6) is proper where it appears beyond a doubt that the plaintiff can prove no set

of facts in support of its claim for relief that would entitle it to relief. *Harris v. City of*

*New York*, 186 F.3d 243, 247 (2d Cir. 1999).  When making this inquiry, the court

14

assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in the plaintiff's favor. *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).

Where, as here, the allegations rest on the interpretation of the legal rights and obligations of parties pursuant to a contract, the contract is deemed integral to the Complaint and can be considered on a motion to dismiss. Because the Purchase Agreement, and the Supplemental Agreement relating to INVISTA's ITAM Receivable claim, are integral to INVISTA's claims, they may be considered on a motion to dismiss (*see* page 2 n.3 *supra*), and the Court is "'not constrained to accept the allegations in respect of the construction of the [contract].'" *Axelrod v. Simon & Schuster, Inc.*, 2007 WL 2412257 (S.D.N.Y. Aug. 27, 2007) (quoting *Int'l Audiotext Network,* 62 F.3d at 72). The Court is "free to construct the contract independently of the interpretation alleged by the complaint...." *Washington Capital Ventures, LLC v. DynamicSoft, Inc.*, 373 F. Supp.2d 360, 365 (S.D.N.Y. 2005).

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000). "The rules of construction of contracts require [courts] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *DBT GMBH v. J.L. Mining Co.*, 2008 U.S. Dist. LEXIS 28564, *31 (S.D.N.Y. April 8, 2008) (quoting *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171 (1956)). "'[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby

15

make a new contract for the parties under the guise of interpreting the writing.'" *Id.*

at \*42 (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001)).

Indemnification provisions "must be strictly construed so as not to read into

[them] any obligations the parties never intended to assume." *Haynes v.*

*Kleinewefers*, 921 F.2d 453 (2d Cir. 1990). "'[A] court cannot find a duty to

indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify.'"

*Manley v. AmBase Corp.*, 121 F. Supp.2d 758 (S.D.N.Y. 2000) (quoting *Commander*

*Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 41 (2d Cir. 1993)), *aff'd,* 337

F.3d 237 (2d Cir. 2003).

## A.    INVISTA Fails to State A Claim for Environmental Indemnity Pursuant to Section 8.4(a)(ii).

INVISTA alleges that the remediation-related expenses for which is seeks

indemnity are "DuPont Environmental Liabilities." See Complaint ¶ 175. INVISTA's

attempt to seek indemnity for "DuPont Environmental Liabilities," pursuant to §

8.4(a)(ii) (the Retained Liability provision), is expressly barred by § 8.4(c). Section

8.4(c) provides that, other than claims for breach of a representation or warranty

which shall be made under § 8.4(a)(iii), claims relating to any DuPont Environmental

Liabilities shall be made exclusively under § 8.4(a)(i) (indemnification for losses

arising from a breach of the Purchase Agreement)[6] or § 8.5 (indemnification for

environmental matters):

> Notwithstanding anything herein to the contrary,…(ii) any indemnification claims relating to any DuPont Environmental Liabilities (other than with respect to breaches or failures to be true of the representations and warranties in Section 3.11) shall be made

---

[6] INVISTA's Complaint does not seek indemnification relating to environmental issues pursuant to § 8.4(a)(i); it seeks indemnification under this provision only with regard to the ITAM Receivable claim discussed at pages 29 – 31 *infra*.

16

exclusively under Section 8.4(a)(i) or 8.5 and any indemnification claims relating to breaches or failures to be true of representations and warranties in Section 3.11 shall only be made under Section 8.4(a)(iiii)..... (Dwyer Aff., Exh. 1, § 8.4(c) (emphasis added)).

The introductory language to § 8.4(c) – "[n]otwithstanding anything herein to the contrary" – causes § 8.4(c) to trump § 8.4(a)(ii), the Retained Liability provision. Both the Second Circuit and the Appellate Division have reached exactly that conclusion in interpreting other contractual provisions beginning with the introductory language "notwithstanding anything herein to the contrary." *See, e.g., L&B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 93 (2d Cir. 1998) (clause in guaranty providing the building owner a cause of action against guarantor was trumped by provision stating that "[n]otwithstanding anything herein to the contrary, Guarantor's obligations herein shall only be applicable with respect to period [*sic*] prior to such time as Owner obtains vacant, unencumbered possession of the Demised Premises, free and clear of all tenants, subtenants and occupants"); *H. Fox & Co., Inc. v. Blumenfeld*, 24 A.D.3d 722 (2d Dep't 2005) (lease had option for plaintiff to purchase leased premises for $450,000 or a right of first refusal; court rejected defendants' argument that right of first refusal took precedence because lease stated that option to purchase applied "[n]otwithstanding anything to the contrary set forth in this lease").

INVISTA's indemnity claim, pursuant to § 8.4(a)(ii), relating to DuPont Environmental Liabilities should therefore be dismissed.

17

## B.    INVISTA Fails to State A Claim for Environmental Indemnity Pursuant to § 8.5(b) Relating to the Audit Process and Resulting Consent Decree. _____

The agreement of DuPont in § 8.5(b) to provide indemnification for the

environmental matters covered by that section was "subject to the conditions set

forth in [the Purchase] Agreement," including those in § 8.5(e).  Section 8.5(e)

requires that DuPont be given "full authority" (a) "to control, direct, manage and

implement any Remediation and to determine its scope"; and (b) "to direct all

negotiations, meetings and settlements with Governmental Authorities with respect

to DuPont Environmental Liabilities."  Reading §§ 8.5(b) and 8.5(e) together,

DuPont's agreement to provide indemnity in § 8.5(b) was expressly conditioned on

its having "full authority" rights in § 8.5(e). *See generally* 13 Richard A. Lord,

Williston on Contracts § 38.16 (4th ed. 2007) ("The words 'subject to' in a contract

usually indicate a condition to one party's duty of performance and not a promise by

the other.")  Literal compliance with this condition was therefore required:

> "The reason for [literal performance of express conditions] is
> obvious….The condition is part of the promise qualifying and
> limiting it, and the promise, as a matter of plain fact, is not broken
> until the condition has happened or has been performed.  A party to
> a contract cannot have the benefit of favorable provisions and
> ignore its conditions which are performed by that party or which
> must occur before its benefits are due."

*DBT Gmbh v. J.L. Min. Co.*, 2008 U.S. Dist. LEXIS 28564, *38 - 39 (S.D.N.Y. Apr. 8,

2008) (quoting Williston on Contracts § 38.6); *see also Noble v. Higgins*, 214 A.D.

135, 138, 211 N.Y.S. 833, 836 (3d Dep't 1925) ("To require the defendant to perform

unconditionally when he promised not otherwise than conditionally is to remake his

promise.  'As a general rule conditions which are either express or implied in fact

must be exactly fulfilled or no liability can arise on the promise which such conditions qualify.'"), *aff'd,* 243 N.Y. 538, 154 N.E. 596 (1926).  INVISTA, by its conduct, foreclosed DuPont from exercising its "full authority" over controlling, directing, managing, and implementing any remediation and determining its scope and directing all negotiations, meetings, and settlements with governmental authorities.

INVISTA could have preserved its indemnification rights by providing DuPont with the opportunity to direct and control any remediation relating to alleged DuPont Environmental Liabilities and to conduct any discussions, negotiations, or settlements with governmental authorities.  But instead, INVISTA deliberately embarked on a unilateral and preemptive course of action that had the purpose and effect of preventing DuPont from exercising in any meaningful fashion its § 8.5(e) rights by, *inter alia*:

- Disclosing to the EPA and TCEQ what it considered to be violations of environmental law before raising those matters with DuPont and without allowing DuPont to challenge whether there were in fact violations;

- Proposing and negotiating a corporate-wide audit agreement with EPA and TCEQ before discussing with DuPont the desirability of performing such audits or giving DuPont notice that it intended to participate and was participating in such negotiations; and

- Failing to provide DuPont with any information relating to its audit proposal to EPA, until after the audit agreement with EPA was finalized.

Once INVISTA reached an audit agreement with EPA, INVISTA's request that DuPont "'[p]lease advise if, pursuant to Section 8.5(e) of the [Purchase Agreement], you wish to discuss the corrective actions being taken'" (Complaint ¶ 58) was simply too little, too late.  By that point, INVISTA had voided its § 8.5(b) indemnification rights:  the negotiations regarding the terms and scope of the audit had been

19

concluded; the framework and predictable course of action and relationship between INVISTA and EPA for the next several years had been "set in stone"; and the agreement could hardly have been renegotiated.

As a result of INVISTA's deliberate efforts to keep DuPont in the dark, DuPont could not exercise even the nominal attributes of its § 8.5(b) rights, much less the substance of those rights. Because the audit process tends to afford leniency with respect to any "violations" identified, a company that has agreed to an audit (and its auditors) has the incentive to identify and report all possible existing and even future potential environmental violations, no matter how technical or questionable. Once INVISTA had disclosed alleged environmental violations to EPA, those disclosures would be accepted by EPA at face value, and the focus of EPA and INVISTA would be on identifying the extent and cost of appropriate remediation efforts. See EPA, "Incentives for Self-Policing: Discovery Disclosure, Correction and Prevention of Violations, 65 Fed. Reg. 19618, at 19622 (Apr. 11, 2000) (purpose of audit policy, and the resulting reduced penalties, is for entities to "take the initiative to find violations on their own and disclose them promptly").

INVISTA's actions effectively foreclosed any meaningful opportunity for DuPont to object to the disclosures that INVISTA made to EPA and TCEQ. INVISTA sought to keep DuPont from the audit and disclosure process so that INVISTA could document purported environmental violations when none existed, in an effort to saddle DuPont with the costs of facility upgrades not required by environmental laws.

In direct contravention of the terms of the Purchase Agreement, INVISTA, not DuPont, had full control over the audit process from its inception. Even INVISTA's August 18, 2004 letter did not offer to cede control of the process to DuPont, but only offered to provide information about the ongoing negotiations INVISTA was conducting with EPA and state regulatory authorities. *See* Complaint ¶ 58; Dwyer Aff, Exh. 3, at 2-3. DuPont did not agree to participate in the EPA audit process since the § 8.5(b) rights of DuPont had been irretrievably compromised with respect to that process.

INVISTA's deliberate decision to embark unilaterally on its course of action is analogous to the conduct of the plaintiff in *Freedom Chem. Co. v. BC Sugar Refinery, Ltd.*, 1998 WL 289736 (S.D.N.Y. June 4, 1998), *aff'd,* 166 F.3d 1200 (2d Cir. 2000). In *Freedom Chemical*, the seller, like DuPont, conditioned its indemnification obligation on important protections that would control the cost of remediation: (a) the remediation had to be required by governmental bodies; and (b) the seller had "the exclusive right to negotiate and agree with the relevant Governmental Bodies plans for the material physical cleanup and remediation processes...." *Id.* at *1. The buyer sought indemnification for remediation expenses that were not incurred pursuant to a remediation plan negotiated by the sellers with governmental bodies. Relying on the doctrines of prevention and forfeiture, the buyer argued that the seller was foreclosed from relying on the critical protections it bargained for in the purchase agreement, which clearly and unequivocally defined the narrow matters for which the seller agreed to indemnify the buyer.

21

The buyer had asserted that the prevention doctrine applied because the

seller, which knew that the buyer had commenced remediation before closing, did

not seek a remediation plan with governmental authorities.  Judge Rakoff rejected

that argument because its acceptance would have required a rewriting of the parties'

agreement, and subjected the seller to open-ended, unlimited indemnification:

> [A]t bottom, plaintiff's invocation of the prevention doctrine really
> reduces to the argument that it should be reimbursed for all
> environmental clean-ups initiated before the transfer of ownership but
> implemented and paid for after the transfer, even if they do not fulfill
> the express requirements for indemnification....[I]nstead, the Stock
> Purchase Agreement provided that plaintiff would be indemnified only
> as to those clean-ups involving Remediation Plans, a requirement that
> protected defendants from open-ended, unlimited indemnification.
> Nothing in the "prevention" doctrine permits plaintiff to renegotiate this
> allocation after the fact.

*Id.* at *3.  Judge Rakoff also held that the forfeiture doctrine did not apply "because

the nonperformed condition precedent – creation of a Remediation Plan – is material

to the portion of the contract (Article 11) that creates the indemnification obligation.

Indeed, by providing the defendants with their only meaningful control over the cost

of indemnification, the requirement of a remediation plan 'go[es] to the root of the

agreement between the parties.'"  *Id.* at *4 (quoting *Frank Felix Assocs., Ltd. v.

Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).

Requiring DuPont to provide indemnification, based on § 8.5(b), would violate

multiple established rules of contract interpretation:

- It would be inconsistent with the requirement that an indemnification
  provision be strictly construed so that an indemnification obligation is not
  found "absent manifestation of a 'clear and unmistakable intent' to
  indemnify.'"  *Manley*, 337 F. Supp. at 769.

- It would render meaningless and relegate to mere surplusage the introductory language in § 8.5(b) making DuPont's indemnification obligations in that section "subject to the conditions in this Agreement."

- It would render meaningless and relegate to mere surplusage the language in § 8.5(e) giving DuPont "full authority" to "control, direct, manage and implement any Remediation and to determine its scope" and "to conduct all negotiations, meetings and settlements with Governmental Authorities with respect to the DuPont Environmental Liabilities." (emphasis added).

- It would require the Court to rewrite § 8.5(e) by, *inter alia*, excising words such as "full authority" and "all" from the section.

The enforcement of the unambiguous language of § 8.5(e), which reflects the parties' intentions when they entered into the Purchase Agreement, requires the dismissal of INVISTA's § 8.5(b) claims for the expenses it has incurred, and may incur in the future, for environmental remediation, pursuant to INVISTA's audit agreement with EPA and the resulting consent decree.[7]

## II.    **INVISTA's Claim for Punitive Damages Fails As A Matter of Law.**

In connection with its environmental indemnity claims, INVISTA has asserted a claim for punitive damages.  Complaint ¶¶ 170, 181.  Under New York law, "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613 (1994).  Punitive damages may be awarded for breach of contract claims only if the defendant's alleged conduct is (1) "actionable as an independent tort," (2) "egregious," (3) "directed to plaintiff" and (4) "part of a pattern directed at the public generally." *New York Univ.*

---

[7]DuPont is not moving to dismiss INVISTA's indemnity claims, pursuant to § 8.5(b), relating to expenses not covered by the consent decree that INVISTA has, or will, incur.  INVISTA's failure to satisfy the conditions for indemnification for those expenses is addressed in DuPont's counterclaim.

v. Continental Ins. Co., 87 N.Y.2d 308, 316 (1995); see also Rocanova, 83 N.Y.2d at
613 (same).

INVISTA's Complaint fails to satisfy at least two of these elements, each of
which provides an independent basis for dismissal. INVISTA does not allege an
independent tort, and the alleged breaches of the Purchase Agreement are not part
of a pattern directed at the public generally.

## A.    INVISTA Has Not Alleged An Independent Tort.

INVISTA's claims all arise from the Purchase Agreement it entered into with
DuPont, and INVISTA's allegation that it is entitled to indemnity for environmental
remediation pursuant to the agreement. INVISTA does not allege that DuPont had
any legal duty separate and apart from its performance under the Purchase
Agreement. Nor does INVISTA allege any misrepresentations or other tortious
conduct collateral to or extraneous to the agreement. All of INVISTA's alleged
damages are claimed simply as breach of contract damages.

This is not a mere pleading defect. INVISTA cannot convert the alleged
breaches relating to the representation and warranty provisions of the Purchase
Agreement into a claim for fraud or misrepresentation. "Under New York law, a
claim of fraud for breaching representations and warranties provided by a contract is
not legally sufficient unless the complaining party can '(i) demonstrate a legal duty
separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent
misrepresentation or breach collateral or extraneous to the contract; or (iii) seek
special damages that are caused by the misrepresentations and are unrecoverable
as contract damages.'" Dyncorp v. GTE Corp., 215 F. Supp.2d 308, 324 (S.D.N.Y.

2002) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

Where, as here, a plaintiff's claims are pure breach of contract claims, courts must dismiss accompanying claims for punitive damages. *See, e.g., IMR Assocs., Inc. v. C.E. Cabinets, Ltd.*, 2007 U.S. Dist. LEXIS 34788 (E.D.N.Y. May 11, 2007) (dismissing claim for punitive damages in connection with breach of contract claim where underlying tort claim was dismissed); *Americu Credit Union v. Kumis Ins. Soc'y*, 2007 U.S. Dist. LEXIS 25523 (N.D.N.Y. Apr. 5, 2007) ("Because Americu fails to allege a tort independent of its breach of contract claim, its purported 'bad faith' cause of action, and accompanying claim for punitive damages, is dismissed.").

### B. The Alleged Failure to Indemnify Is Not Part of A Pattern Directed at the Public Generally.

"*Rocanova* and *New York University* both noted that punitive damages should only be available where they are necessary to vindicate public rights and in regular private contracts, the only time that generally occurs is where the alleged breach of contract targets the public." *Morris v. Flaig*, 511 F.Supp.2d 282, 296 (E.D.N.Y. 2007). The alleged contract breaches here are not targeted at the public. This is a purely private dispute between sophisticated corporations over which of them should bear the costs of environmental remediation pursuant to their contract. "[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie." *New York Univ.*, 87 N.Y.2d at 316; *see also Vaveris v. Hermitage Ins. Co.*, 24 A.D.3d 537, 538 (2d Dep't 2005) (same).

Courts have awarded punitive damages for contract breaches only where the alleged conduct, and resulting harm, was part of a pattern of tortious conduct that

25

affected not only the plaintiff, but also the public generally. *See, e.g., Pludeman v. Northern Leasing Sys., Inc.*, 40 A.D.3d 366, 369 (1st Dep't 2007) (defendant used form contract that misled a large number of customers, including plaintiff); *Skibinsky v. State Farm Fire and Cas. Co.*, 6 A.D.3d 975, 976 (3d Dep't 2004) (an insurer engaged in "a pattern of deceptive conduct . . . involving the sale of lesser policies than those requested by members of the public, [including to plaintiff,] while at the same time representing that the desired coverage has been provided").

Here, by contrast, the alleged contractual breaches by DuPont do not involve an alleged pattern of tortious conduct directed to the general public. While INVISTA alleges that the alleged underlying environmental violations were "egregious" and "placed the public at risk" (Complaint ¶ 70), that allegation is inconsistent with the representations that INVISTA was required to make to the EPA (as a precondition to INVISTA's participation in EPA's voluntary audit program) that none of the alleged environmental violations would "result in serious actual harm to the environment" or "may have presented an imminent and substantial endangerment to public health or the environment." *See* "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations," 65 Fed. Reg. at 19623. INVISTA therefore also cannot satisfy the "pattern directed at the public generally" requirement.

## III.    **INVISTA's Overend Technologies Claim Fails to State A Claim.**

INVISTA's indemnification claim relating to the Overend antitrust litigation fails to state a claim for two independent reasons. First, Overend's claims did not arise from the ownership by DuPont of the '054 patent prior to closing. Second, Overend's antitrust claims arose from alleged antitrust violations by INVISTA, and

DuPont does not have any obligation to indemnify INVISTA for its actual or alleged antitrust violations.

Overend's claims against INVISTA – based on INVISTA's alleged use of "a fraudulently obtained patent to force competitors out of business and to inhibit others from entering the field" (*Overend Technologies*, 2006 U.S. Dist. LEXIS 49449, \*12) – are *Walker Process* claims. In *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 174 (1965), the Supreme Court held that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." The Court in *Walker Process*, and courts in subsequent cases, have held that actual or threatened *enforcement* of the patent is an essential element of the claim. *See, e.g., California Eastern Lab., Inc. v. Gould*, 896 F.2d 400, 403 (9th Cir. 1990) (affirming dismissal of *Walker Process* claim because plaintiff had not alleged that patentee had "actually attempted to enforce the patents."); *In re Netflix Antitrust Litig.*, 506 F. Supp.2d 308, 217 (N.D. Cal. 2007) ("To plead a claim of *Walker Process* fraud, plaintiffs must plead that the fraudulently-procured patent was enforced; merely procuring a patent by fraud is not sufficient."); *Northlake Marketing & Supply, Inc. v. Glaverbel S.A.*, 861 F. Supp. 653, 660 n.10 (N.D. Ill. 1994) (antitrust claimant's argument that "Sherman Act liability may be imposed merely for the fraudulent procurement of a patent…is simply wrong – it must also be shown that the patent has been used after its issuance in an anticompetitive fashion."). [8]

---

[8] *See, e.g., Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) ("A party who asserts such a fraudulently obtained patent may be subject to an antitrust claim."); *White Mule Co. v. ATC Leasing Co LLC*, 2008 WL 763486, at \*11, \*15 (N.D. Ohio March 25, 2008) ("For a *Walker Process*

The only alleged misconduct against DuPont with respect to the '054 patent is its allegedly fraudulent procurement of the patent from the Patent Office. *See* Complaint ¶ 165; *Overend*, 2006 U.S. Dist. LEXIS 49449, \*12. As a matter of law, however, the alleged fraudulent procurement of the '054 patent by DuPont or its mere ownership of that patent could not have resulted in or given rise to Overend's antitrust claims. *See, e.g., Netflix*, 506 F. Supp.2d at 317 (mere fraudulent procurement is not sufficient to state a *Walker Process* claim); *Northlake*, 861 F. Supp. at 660 n.10 (same). Overend's claims could only have arisen after the Closing of the transaction between DuPont and INVISTA when INVISTA sought to enforce the patent against Overend. Overend's antitrust claims against INVISTA therefore cannot be said to have "result[ed] or aris[en] out of the ownership of the DTI Assets…at any time on or prior to the Closing Date." Overend's antitrust claims therefore fall outside the scope of Paragraph 4 of Schedule 1(zz) to the Purchase Agreement.

In addition, Paragraph 4 of Schedule 1(zz) explicitly states that, "in the case of any alleged violation of Antirust Laws relating to the ownership of the DTI Assets …occurring after the Closing Date, such Liabilities shall not have resulted or arisen out of any violation of Antitrust Law by a Buyer Indemnified Party [i.e., INVISTA] after the Closing Date…." Dwyer Aff., Exh. 2. Overend's antitrust claims "resulted from or ar[ose] out of" INVISTA's attempted enforcement of the '054 patent, which occurred after the Closing Date, when INVISTA assumed ownership of the DTI Assets, including the '054 patent. Thus, DuPont is not required to indemnify

---

claim to apply…, [Defendant] would have to have threatened patent enforcement against its competitors or its competitors' customers.").

28

INVISTA against Overend's antitrust claims because DuPont was not involved in

INVISTA's post-closing activities, and none of DuPont's alleged actions "constitute[d]

a violation of Antitrust Laws prior to the Closing Date...." *Id.*

INVISTA has therefore failed to state an indemnity claim with respect to

Overend's antitrust claims against INVISTA.

## IV.    **INVISTA's ITAM Receivable Claim Fails to State A Claim.**

INVISTA's claim relating to the ITAM Receivable fails to state a claim

because, in a Supplemental Agreement executed after the Purchase Agreement,

INVISTA expressly waived its right to assert a claim against DuPont as a result of

the failure of DuPont to effectively assign the ITAM Collateral:

> Buyer [INVISTA] hereby waives, and covenants to refrain from
> suing...at law or in equity (including for fraud), of every kind and
> nature whatsoever... against DuPont or the DuPont Indemnified
> parties...as a result of any failure to effectively assign the ITAM
> Collateral...so long as DuPont has used the reasonable
> commercial efforts described in the preceding paragraph.

Dwyer Aff., Exh. 4, § 1.4.

In pleading its claim, INVISTA carefully avoided making any mention of the

Supplemental Agreement. Notwithstanding INVISTA's omission, the Court may

consider the waiver provision of the Supplemental Agreement on a motion to

dismiss. In *Sel-Leb Marketing, Inc. v. Dial Corp.*, 2002 WL 1974056, \*3 (S.D.N.Y.

Aug. 27, 2002) (Stein, J.), this Court granted a motion to dismiss a plaintiff's breach

of contact claim based on the defendant's express waiver of its right to sue, which

was set forth in a subsequent agreement entered into between the parties, but not

referenced or attached to the plaintiff's complaint. *Id.* at \*1. In granting the

defendant's motion to dismiss, this Court recognized that "a plaintiff's careful

avoidance of certain documents in its pleading does not make those documents any less integral to the complaint." *Id.* (citing *Yak v. Bank Brussells Lambert, BBL (USA)*, 252 F.3d 131 (2d Cir. 2001)). While the plaintiff cited all of the agreements between the parties, it "studiously avoid[ed] mentioning" the parties' confidential disclosure agreement, which contained an express waiver of the claims the plaintiff had asserted. Based on the waiver in the confidential disclosure agreement, this Court dismissed those of the plaintiff's claims covered by the waiver. *Id.* at *4.

Similarly, in *RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp.2d 472 (S.D.N.Y. 2007), the court granted the defendant's motion to dismiss based on a waiver provision contained in a contract that was neither attached to nor referenced in the complaint. The plaintiff was an importer and wholesaler of clothing that received financial services from the defendant. The companies entered into an agreement prohibiting plaintiff from selling assets without the defendant's consent. Based on the defendant's delay in providing consent, plaintiff claimed to have lost $2.5 million. Defendant ultimately provided consent in a document entitled "Consent and Release," which, *inter alia,* released defendant from all potential claims arising up to the date of the execution of the "Consent and Release." *Id.* a 476. The court held that the "Consent and Release" was integral to the complaint and should therefore be considered on a motion to dismiss because the plaintiff had "actual notice of the [agreement] when the [complaint] was drafted." *Id.* at 477. Because the "Consent and Release" released the defendant from the claims asserted in the complaint, the court granted the defendant's motion to dismiss. *Id.*

Because INVISTA, like the plaintiffs in *Sel-Leb* and *RBS Holdings*, expressly waived in the Supplemental Agreement the indemnification claim it has asserted against DuPont relating to the ITAM Receivable, INVISTA's ITAM Receivable should be dismissed.

## Conclusion

The Court should grant Defendant's motion to dismiss the elements of Plaintiffs' Complaint that allege claims for (i) indemnification, pursuant to § 8.4(a)(ii), for remediation expenses; (ii) indemnification, pursuant to § 8.5(b), for remediation expenses relating to the audit process and resulting consent decree; (iii) punitive damages; (iv) indemnification, pursuant to § 8.4(a)(ii), for damages arising from the Overend litigation; and (v) indemnification, pursuant to § 8.4(a)(i) and an unspecified "other contract," relating to the ITAM Receivable, without leave to replead the dismissed claims.   The Court should also award DuPont its costs and attorneys' fees[9] in connection with this motion.

---

[9] DuPont is entitled to attorneys' fees, pursuant to § 8.4 (b)(i) of the Purchase Agreement, if it prevails on its Motion to Dismiss Certain Elements of Plaintiffs' Complaint.

Dated:  New York, New York
        May 16, 2008

BOIES, SCHILLER & FLEXNER LLP

David Boies (DB-4399)
333 Main Street
Armonk, NY  10504
Phone:  914-749-8200

Robert J. Dwyer (RD-6457)
575 Lexington Avenue, 7th Floor
New York, NY  10022
Phone:  212-446-2300

Amy J. Mauser (admitted *pro hac vice*)
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
Phone:  202-237-2727

By:  _____
     Robert J. Dwyer

MORGAN, LEWIS & BOCKIUS LLP

Troy S. Brown (admitted *pro hac vice*)
Jeffrey N. Hurwitz (admitted *pro hac vice*)
Margot G. Bloom (MB-7455)
Erica C. Blackledge (admitted *pro hac vice*)
1701 Market Street
Philadelphia, PA  19103
Phone:  215-963-5000

Attorneys for Defendant