UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
INVISTA B.V., et al.                                        :
                                                            :
                          Plaintiffs,                       :
                                                            :
        v.                                                  :                08 CV 3063 (SHS)
                                                            :
E.I. DU PONT DE NEMOURS AND COMPANY,                        :
                                                            :
                          Defendant.                        :
                                                            :
------------------------------------------------------------x


**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS CERTAIN ELEMENTS
OF PLAINTIFFS' COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ............................................................................ 5

    A.   Purchase Agreement ................................................................. 5

    B.   Overend Litigation. ................................................................. 11

    C.   ITAM Receivable..................................................................... 12

ARGUMENT ............................................................................................... 13

I.    INVISTA Has Stated Valid Claims for Indemnification Under Sections 8.5(b) of the Purchase Agreement for Losses Relating to the Audit Process and Consent Decree ............................................................................. 13

    A.   The Language in Section 8.5(e) Does Not Create an Express Condition Precedent to DuPont's Duty to Defend, Indemnify and Hold INVISTA Harmless Pursuant to Section 8.5(b). ......................................................................... 15

    B.   Section 8.5(e) Does Not Provide DuPont the Exclusive Right to Control All Communications and Negotiations with Governmental Authorities ...................................................... 20

    C.   The Conflicting Assertions Set Forth in DuPont's Memorandum Cannot Support a Motion to Dismiss Pursuant to Rule 12(b)(6) ............. 23

II.    INVISTA's Complaint States a Claim for Punitive Damages ........................... 27

III.    INVISTA's Complaint States a Claim for Indemnification of Losses It Incurred in the Overend Litigation ....................................... 31

IV.    INVISTA's Complaint States a Claim for Indemnification of Losses It Incurred with Respect to the ITAM Receivable .............................................. 32

CONCLUSION ........................................................................ 35

# TABLE OF AUTHORITIES

**CASES**

*Allwaste Environmental Servs. v. Pastore*,
 911 F. Supp. 29 (D. Me. 1996) ...................................................................26 n.9

*Arnold v. Goetz*,
 245 F. Supp. 2d 527 (S.D.N.Y. 2003) ................................................................. 24

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
 447 F. Supp. 2d 329 (S.D.N.Y. 2006) ................................................................. 35

*C.M. Gridley & Sons, Inc. v. Northeastern Consol. Co.*,
 321 N.Y.S.2d 171 (N.Y. App. Div. 1971) .......................................................... 14

*Executive Photo, Inc. v. Norrell*,
 756 F. Supp. 798 (S.D.N.Y. 1991) ................................................................23, 24

*Fetzer v. Douglass Components Corp.*,
 C.A. No. 11,327, 1994 Del. Ch. LEXIS 48
 (Del. Ch. April 12, 1994) .............................................................................26 n.9

*Freedom Chem. Co. v. BC Sugar Refinery, Ltd.*,
 No. 97CV04634, 1998 WL 289736 (S.D.N.Y. June 4, 1998) ............................ 19

*German v. Fed. Home Loan Mortgage Corp.*,
 885 F. Supp. 537 (S.D.N.Y. 1995) ................................................................28, 29

*Harrison v. Golden Tree Homes, Inc.*,
 608 N.Y.S.2d 63 (N.Y. App. Div. 1993) ............................................................ 14

*Jackson v. Birmingham Bd. of Educ.*,
 544 U.S. 167 (2005) ........................................................................................... 26

*Kramer v. Time Warner Inc.*,
 937 F.2d 767 (2d Cir. 1991) .........................................................................12 n.6

*Lockshaw v. Rohr, Inc.*,
 No. G029533, 2002 Cal. App. Unpub. LEXIS 11294
 (Cal. Ct. App. Dec. 6, 2002) .......................................................................26 n.9

*Manning v. Michaels*,
 540 N.Y.S.2d 583 (N.Y. App. Div. 1989) .......................................................... 15

*Marquardt-Glenn Corp. v. Lumelite Corp.*,
    11 F.R.D. 175 (S.D.N.Y. 1951) ........................................................... 14

*Minjak Co. v. Randolph*,
    528 N.Y.S.2d 554 (N.Y. App. Div. 1988) ....................................28, 29

*New York Univ. v. Continental Ins. Co.*,
    87 N.Y.2d 308 (1995)................................................................28 n.12

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.*,
    297 F. Supp. 821 (S.D.N.Y. 1969)...................................................... 23

*One Beacon Ins. Co. v. Orange & Rockland Util.*,
    361 F. Supp. 2d 331 (S.D.N.Y. 2005) ............................................... 32

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y. 2d 685 (1995)...............................................................15, 16

*Overend Tech., LLC. v. INVISTA*,
    No. 05-C-0800 (E.D.Wis. filed July 26, 2005) ................................. 11

*Park West Mgmt. Corp. v. Mitchell*,
    404 N.Y.S.2d 115 (N.Y. App. Div. 1978) ......................................... 29

*RBS Holdings, Inc. v. Wells Fargo Century, Inc.*,
    485 F. Supp. 2d 472 (S.D.N.Y. 2007) ........................................34 n.15

*Red Ball Interior Demolition Corp., v. Palmadessa*,
    947 F. Supp. 116 (S.D.N.Y. 1996),
    *aff'd* 107 F.3d 4 (2d Cir. 1997) ...........................................16, 18, 19

*RJE Corp. v. Northville Indus. Corp.*,
    198 F. Supp. 2d 249 (E.D.N.Y. 2002)........................................26 n.10

*Sel-Leb Mktg., Inc. v. Dial Corp.*,
    No. 01 CIV.9250, 2002 WL 1974056
    (S.D.N.Y. August 27, 2002) .......................................................34 n.15

*Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.*,
    368 F.3d 944 (7th Cir. 2004) ................................................15, 16, 18

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
    380 F. Supp. 2d 250 (S.D.N.Y. 2005).....................................4, 27, 28

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
    79 N.Y.2d 576 (1992)...........................................................16, 18, 19

*Varveris v. Hermitage Ins. Co.*,
    806 N.Y.S.2d 688 (2005)............................................................................28 n.11

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) ............................................................................... 32

*Yak v. Bank Brussels Lambert, BBL (USA)*,
    252 F.3d 127 (2d Cir. 2001) ....................................................................34 n.15

**STATUTES**

35 U.S.C. § 154(a) (2002) ............................................................................. 11

**RULES**

Fed. R. Civ. P. 8(a)(2) ................................................................................. 13

Fed. R. Civ. P. 12(b)(6)........................................................... 12 n.6, 23, 24, 34

Fed. R. Evid. 201(b)................................................................................12 n.6

**OTHER**

Arthur L. Corbin, *Corbin on Contracts* § 59.2 (rev. ed. 2001) ................................28 n.12

John D. Calamari & Joseph M. Perillo,
    *Contracts* §11-8 (3d ed. 1987) ........................................................... 16

Steven Baicker-McKee et al.,
    *Federal Civil Rules Handbook* 377-78 (2007)................................................12 n.6

Granta Y. Nakayama, US EPA, on *Issuance of "Audit Policy:
    Frequently Asked Questions"* (April 30, 2007).................................................. 30

Restatement (Second) of Contracts § 227 .................................................... 16

Restatement (Second) of Contracts § 245 ................................................... 22

William Lloyd Prosser & W. Page Keeton, *Torts* § 92 (5th ed. 1984)....................28 n.12

<u>**PRELIMINARY STATEMENT**</u>

DuPont's Motion to Dismiss should be denied because it is predicated on a litany of factual assertions, inaccurate statements of New York law and an unsupportable interpretation of a complex agreement pursuant to which INVISTA purchased DuPont's entire Textile and Interiors business for approximately $4 billion (hereinafter the "Purchase Agreement").  A motion to dismiss is not the proper vehicle through which to argue the facts of the case and to request that the Court interpret and construe a complex agreement that contains inconsistent and ambiguous provisions and which DuPont itself describes as "a 1,000-plus-page agreement (inclusive of schedules)."

In seeking to dismiss certain of INVISTA's indemnification claims under section 8.5(b) of the Purchase Agreement, DuPont bases its argument on two incorrect factual assertions that are directly contradicted by the allegations of the Complaint.  First, DuPont asserts in its Memorandum in Support of its Motion to Dismiss that dangerous, long-standing violations of environmental law, which INVISTA discovered at the Orange and Victoria, Texas facilities approximately one month after the closing, were "non-existent."  DuPont's Memorandum, p. 20 (hereinafter "Memo, p. __).  This is a stunning statement in light of the fact that DuPont's own internal documents conclusively establish that DuPont was aware of the violations for a considerable period of time and yet took no action to rectify them.  Moreover, prior to transferring the facilities to INVISTA, DuPont had filed official reports with regulators stating that both facilities were in compliance with benzene regulations when DuPont knew that was not the case.  In any event, DuPont's statement is irrelevant to its Motion to Dismiss because INVISTA has properly alleged that, with respect to the EPA Audits, there were in fact some 687 violations for which corrective actions were required.

1

The second factual assertion upon which DuPont bases its Motion to Dismiss INVISTA's section 8.5(b) claims is that by self-reporting clear violations of state and federal environmental laws and by promptly removing the offending equipment from service, INVISTA breached section 8.5(e) of the Purchase Agreement. Specifically, DuPont argues that, by early August 2004, INVISTA "had set in concrete the future actions and the relationship between itself and the federal and state regulatory agencies." Again, this is simply not true, but more importantly for the purposes of a motion to dismiss, DuPont's factual assertion that INVISTA prevented "DuPont from exercising in any meaningful fashion its § 8.5(e) rights" is irreconcilable with the allegations in the Complaint.[1] The undisputed fact alleged in the Complaint is that on June 17, 2004, INVISTA provided to DuPont notice of claims under the Purchase Agreement related to a benzene treatment unit at Victoria, the Nitrile Stripper Column (hereinafter "NSC"), which had to be removed from service because it violated the Benzene Waste Operations National Emission Standards for Hazardous Air Pollutants (hereinafter "BWON"). DuPont, of course, knew that the NSC did not comply with these regulations, a fact that is reflected in DuPont's own correspondence.

INVISTA sent additional letters to DuPont on July 13, 2004 and July 29, 2004 advising it of noncompliance in Texas. DuPont did not respond to any of these letters and made absolutely no effort to discharge any of its duties or exercise any authority under section 8.5(e). INVISTA continued to send letters to DuPont notifying it of additional claims, but DuPont elected not to respond to any of them until April 14, 2005, more than 10 months after the initial notification. While it is inexplicable why DuPont chose to ignore INVISTA for nearly ten months, it is even

---

[1] In fact, DuPont makes inconsistent allegations in its Motion, asserting on the one hand that it had been "effectively foreclosed" from any meaningful participation in the initial contact with regulators in early June 2004, and on the other hand that there were no violations to discuss with the regulators.

more puzzling why DuPont, after stating in its April 14th letter that it was looking forward to working with INVISTA "to resolve these issues" and indicating that DuPont would be sending a representative to all future meetings with the Environmental Protection Agency (hereinafter "EPA"), five days later changed course and resumed ignoring INVISTA and EPA. Despite DuPont's recalcitrance, INVISTA continued to send DuPont notice letters regarding DuPont's rampant historic noncompliance at the facilities that INVISTA had purchased from DuPont.

In August 2004, rather than responding to INVISTA's letters and working with INVISTA to address the environmental, health and safety noncompliance in Texas, DuPont was focused on developing a strategy to avoid its defense and indemnity obligations under the Purchase Agreement, which included retaining Morgan Lewis & Bockius LLP (hereinafter "Morgan Lewis"), then environmental and safety lawyers for Koch Industries, Inc. (hereinafter "Koch"), who in turn summarily terminated Koch as a client without an accurate explanation, much less a conflict waiver.[2]

---

[2] Co-counsel for DuPont in this action, Morgan Lewis, was counsel to INVISTA's parent, Koch, on environmental matters during the period of May 19, 1998 through August 31, 2004, at which time Morgan Lewis sent Koch's General Counsel, Mark Holden, a letter abruptly terminating its representation of Koch, notwithstanding Koch's prior payment of millions of dollars in fees for advice on environmental and safety matters strikingly similar to those before the Court in this action, including BWON, PSD and OSHA compliance as well as negotiation strategy with EPA, the Department of Justice, and other regulators. In connection therewith, Morgan Lewis obtained from Koch sensitive, proprietary and other confidential information of a non-public nature, which if known to DuPont could be used to Koch's and INVISTA's detriment.

On June 12, 2008, at a meeting held between Morgan Lewis and Koch for the purpose of discussing Morgan Lewis's continued representation of DuPont in this action, Michael Bloom, Morgan Lewis's General Counsel, informed Koch for the first time that DuPont had contacted Morgan Lewis in August 2004 to represent it in connection with INVISTA's indemnity claims. This occurred shortly after INVISTA had sent DuPont the initial claim notices in which INVISTA had asserted serious claims against DuPont for egregious benzene violations at the Texas facilities. Rather than declining representation or seeking a conflict waiver, Morgan Lewis agreed to represent DuPont against INVISTA. Morgan Lewis never advised Koch or INVISTA that it had been retained to represent DuPont against INVISTA. This fact first became known to INVISTA more than a year later when, in October 2005, DuPont's in-house counsel, perhaps inadvertently, copied Morgan Lewis on a letter he sent to INVISTA.

INVISTA repeatedly questioned the timing and circumstances of Morgan Lewis's representation of DuPont in this matter, but Koch's request for information and an explanation was largely ignored. It was not until the June 12 [Footnote continued]

As to DuPont's challenge to INVISTA's claim for punitive damages, DuPont advances an incorrect legal standard in support of its argument that INVISTA's claim for punitive damages should be dismissed. The correct legal standard is set forth in *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 262 (S.D.N.Y. 2005), which requires proof that: (1) the defendant engaged in conduct aimed at the public generally; and (2) the defendant's conduct evinced a "high degree of moral turpitude." Knowingly venting benzene into the atmosphere for twelve years, knowingly exposing workers to steam contaminated with hydrogen cyanide (Cmplt ¶ 83-86), allowing an insulated high-pressure pipe at the Maitland, Ontario facility to become so corroded that it exploded and caused a fire (Cmplt ¶ 111), and failing to comply with contractual obligations designed to ensure that these dangers were disclosed and eliminated, is conduct that meets the standard for punitive damages articulated by this Court in *Topps*.

DuPont also seeks dismissal of INVISTA's claims for losses arising out of an antitrust lawsuit commenced by Overend Technologies, which was based on the assertion that a patent DuPont transferred to INVISTA at Closing had been fraudulently procured by DuPont. DuPont must indemnify INVISTA for these losses because they arose from a "Retained Liability" as that phrase is defined in the Purchase Agreement.

---

meeting, later confirmed in emails, that INVISTA learned that DuPont contacted Morgan Lewis in Summer 2004. Moreover, it was not until the June 12 meeting that Morgan Lewis agreed to produce 106 additional boxes of documents previously withheld by Morgan Lewis pertaining to Morgan Lewis's prior representation of Koch.

These recent developments – post-dating the filing of the Complaint – are relevant to DuPont's Motion to Dismiss because the notice letters sent to DuPont by INVISTA in Summer 2004 lie at the core of DuPont's arguments that it did not understand the effect of INVISTA's notice letters and was not afforded a meaningful opportunity to become involved in the remediation process. Instead, DuPont's contacting Morgan Lewis in Summer 2004 is evidence that DuPont's strategy to ignore INVISTA's claims, EPA, and the problems at the facilities was part of an overall strategy which now appears to have been formulated, at least in part, upon the advice of Morgan Lewis.

INVISTA intends to make a decision as to whether to seek Morgan Lewis's disqualification as counsel in this matter as soon as INVISTA completes its investigation into the circumstances and timing of DuPont's retention of Morgan Lewis.

Finally, with respect to DuPont's request for dismissal of INVISTA's claim based upon the ITAM receivable, there is no basis for DuPont's argument that INVISTA "waived" its rights to be indemnified for losses caused by DuPont which, after having assigned the $23,000,000 receivable to INVISTA, purported to sell it by accepting a $231,713 check. DuPont misleadingly directs the Court to a Supplemental Agreement between INVISTA and DuPont in support of its position, but the Supplemental Agreement is irrelevant to INVISTA's claim for indemnity as it, by its own clear terms, does not waive INVISTA's claim for indemnification for its loss related to the ITAM Receivable.

## STATEMENT OF FACTS

### A.    Purchase Agreement

Prior to the execution of the Purchase Agreement on November 16, 2003, DuPont severely limited INVISTA's due diligence at many of the manufacturing facilities that were part of the transaction.[3] Cmplt ¶¶ 1 & 28-29. INVISTA agreed to limited due diligence primarily because DuPont agreed to sweeping representations and warranties concerning "Environmental Matters" in section 3.11 of the Purchase Agreement, broad indemnification provisions regarding the same in sections 8.4 and 8.5, and DuPont's supposed commitment to environmental, health and safety compliance. Cmplt ¶¶ 31-35.

Specifically, in section 3.11, DuPont represented and warranted that the facilities INVISTA was acquiring were in compliance with "Environmental Laws" and "Environmental

---

[3] As the Complaint sets forth in more detail, the majority of INVISTA's claims involve violations discovered at the sites where it was afforded only limited due diligence, referred to in the Purchase Agreement as "DuPont Remediation Sites." For the purposes of the transaction, the facilities were grouped into three different categories: (1) "DuPont Remediation Sites," where only limited due diligence was allowed (including Camden, Chattanooga, Seaford, Victoria, Waynesboro, Maydown and Wilton, U.K. and Maitland, Ontario); (2) "DuPont Environmental Retained Sites," where again only limited due diligence was allowed (including Orange, LaPorte and Dordrecht, Netherlands); and (3) "Buyer Remediation Sites," at which INVISTA was allowed more expansive due diligence (including Gloucester, U.K., Kingston, Ontario and Paulinia, Brazil). Purchase Agreement, pp. 22, 238-239 & Schedules 1(q), 8.5(a)(i) & 8.5(b)(vii).

Permits" and that the DuPont Textile and Interiors (hereinafter "DTI") business was not subject to any "Environmental Claims." Cmplt ¶ 31. Section 8.4(a) then provides that "DuPont shall defend, indemnify and hold harmless Buyer [INVISTA] . . . from and against any and all Losses arising from, in connection with or otherwise with respect to . . . (iii) any breach or failure to be true of any representation or warranty of DuPont" so long as such Losses exceeded $400,000 for the matter at issue. Cmplt ¶ 32.

In addition to its indemnification obligations with respect to breaches of the environmental representations and warranties under section 8.4(a)(iii), DuPont also agreed in section 8.5(b) to defend, indemnify and hold INVISTA harmless from and against all "Losses" arising out of or related to, directly or indirectly, (a) all "Environmental Claims" (i.e., "any claims, actions, causes of action, investigations, demands, orders, directives or written notices by, or on behalf of, any Governmental Authority or Person alleging potential liability arising out of, based upon or resulting from requirements or violations of Environmental Law or Environmental Permits"); (b) "requirements of Environmental Law" arising out of or related to "Remediation" of "Known Violations of Environmental Law" at the "DuPont Remediation Sites" (Camden, Chattanooga, Seaford, Victoria, Waynesboro, Maydown, Wilton and Maitland); and (c) "requirements of Environmental Law" arising out of or related to "violations of Environmental Law" at the "DuPont Environmental Retained Sites" (Orange, LaPorte and Dordrecht). Cmplt ¶¶ 33-35.

Section 8.5(e) provides DuPont with full authority to control "Remediation" and any negotiations pertinent thereto,

> provided, however, that DuPont will take measures to ensure that such Remediation does not materially interfere with Buyer's operations at the site and does not create an enforcement risk for Buyer associated with its operations. DuPont will promptly advise and consult with Buyer regarding its Remediation

> activities if there is a reasonable potential that the proposed or mandated
> Remediation may materially interfere with Buyer's operations or create an
> enforcement risk for Buyer. If either of the foregoing is the case, DuPont and
> Buyer will work together to eliminate the material interference on Buyer's
> operations or the enforcement risk to Buyer, and Buyer shall have the right to
> participate in negotiations, meetings and settlement discussions with
> Governmental Authorities. DuPont also shall have the full authority to conduct
> all negotiations, meetings and settlements with Governmental Authorities with
> respect to the DuPont Environmental Liabilities.

The Purchase Agreement, attached as Exhibit 1 to the Dwyer Affidavit filed in support of

Defendant's Motion, does not prohibit INVISTA, as the owner of the facilities, from auditing or

self-reporting to state or federal regulators, nor does it provide, in any fashion, that INVISTA's

rights are in any way impacted by such activities. Instead, the Purchase Agreement itself, and

negotiations with DuPont regarding the same, make clear that DuPont always understood that it

would be responsible for the cost of remediating any noncompliance that existed as of April 30,

2004.

The scope and magnitude of DuPont's noncompliance is breathtaking. Cmplt ¶¶ 4-6, 38-

50 & 65-135. Independent engineering firms retained by INVISTA to conduct environmental

audits at the U.S. facilities acquired from DuPont found 687 violations of federal, state and local

environmental statutes and regulations. Cmplt ¶ 4 & 64. Similarly, INVISTA was confronted

with other violations of environmental, health and safety regulations, including OSHA (and

foreign analogs), many of which had been identified by DuPont prior to Closing but not

disclosed on the schedules to section 3.11 (concerning known noncompliance that DuPont

prepared). Cmplt ¶ 6, 38-50 & 65-135. At the Victoria facility alone, there were substantial

violations of the Clean Air Act, the BWON and OSHA, including but not limited to, the

following:

- The operation of the NSC, the primary benzene waste treatment unit at Victoria, violated the BWON, which DuPont knew as early as 2000 and did nothing to correct, nor did it disclose the violation to INVISTA pre-Closing.  Cmplt ¶¶ 41-44;

- The benzene flasher, another benzene treatment unit, also was in violation of the BWON.  Cmplt ¶ 44;

- DuPont failed to identify thousands of benzene-containing waste streams in its Total Annual Benzene reports and misidentified the location of the points of waste generation of many benzene streams, in contravention of the BWON.  Cmplt ¶ 66;

- DuPont allowed emissions of untreated benzene directly into the atmosphere, as a result of an improperly designed piping system that transports benzene vapor streams to a destruction flare, a violation known to DuPont prior to Closing that was not disclosed to INVISTA.  Cmplt ¶ 67;

- DuPont undertook major modifications to several emissions units within the Victoria facility, which resulted in a significant increase in the net emissions of pollutants that are governed by the PSD regulations of the Clean Air Act.  DuPont failed to apply for and obtain the requisite pre-construction permits (which are subject to EPA review) and failed to employ the Best Available Control Technology to reduce emissions of nitrogen oxide post-construction.[4]  The Parties identified DuPont's mishandling of the PSD requirements as "Known Violation[s] of Environmental Law" and placed them on a schedule to the Purchase Agreement (schedule 1(hh)).  Cmplt ¶¶ 29 & 69;

- DuPont failed to implement recommended corrective actions to minimize or prevent catastrophic risks and hazardous conditions that had been identified in 1999 and again in 2002.  The risks included the "catastrophic sudden failure under blast" of un-reinforced walls, building collapse and "serious personnel injuries."  Cmplt ¶ 75;

- DuPont refused to replace a corroded steel support system for a large vessel, notwithstanding its determination that the condition of the support structure could result in the exposure of personnel to chemical and thermal burns, nitrogen oxide fumes and other physical hazards from falling objects and structural instability. Cmplt ¶ 76; and

- DuPont failed to complete replacement of the employee emergency notification system, which had been identified as violating OSHA in 2000.  Cmplt ¶ 77.

---

[4] DuPont's failure to obtain the requisite PSD permits at Victoria also violated Title V of the Clean Air Act, as set forth in more detail in ¶¶ 71 – 73 of INVISTA's Complaint.

Other examples of egregious violations of the BWON and OSHA (or foreign analogs) discovered at the facilities worldwide include, but are not limited to:

- Venting uncontrolled benzene vapors into the atmosphere for twelve years. Cmplt ¶¶ 2 & 46-52;

- Failing to address Corrosion Under Insulation, such that a high pressure pipe ruptured in Maitland, causing serious fire damage. Cmplt ¶ 111;

- Failing to take appropriate measures to reduce or eliminate the risks of catastrophic fire or explosion caused by an accidental release of cyclohexane in Wilton. Cmplt ¶ 122;

- Failing to address the "catastrophic safety risk" at Orange that could result from hydrogen cyanide steam contamination. Cmplt ¶ 83; and

- Failing to relocate personnel at Orange who were at risk in the event of toxic releases of nitrogen oxide, ammonia, and vapor cloud explosions. Cmplt ¶ 84.

Beginning in June 2004, shortly after INVISTA discovered violations of the BWON in Texas, and continuing through January 2008, INVISTA sent at least 182 letters to DuPont that outlined the noncompliance discovered at the various facilities around the world that INVISTA acquired from DuPont, and produced approximately 385,000 pages of documents regarding the same environmental, health and safety violations. Cmplt ¶¶ 52-63 & 136-152. Nearly ten months after INVISTA first contacted DuPont, DuPont finally responded, by letter dated April 14, 2005. Cmplt ¶ 138. In its letter, DuPont stated that it expected to assist INVISTA with preparations for any meetings with EPA and would send a DuPont representative to participate with INVISTA in such meetings. Cmplt ¶ 138. Five days later, DuPont changed its position and informed INVISTA that it would not participate in an upcoming meeting with EPA. Cmplt ¶ 139. DuPont essentially ignored INVISTA and declined at every turn to participate in the process of identifying violations and determining appropriate corrective action. Cmplt ¶¶ 52-63 & 136-155.

DuPont's gambit is to attempt to convince this Court on a motion to dismiss that, even though it was provided notice in June and July 2004, that notice was insufficient such that its authority to control Remediation and negotiations with regulators was wholly eliminated. What DuPont does not address however, are the following clear facts alleged in the Complaint:

i)  INVISTA provided DuPont with the audit protocol and engaged in audits on a schedule fully disclosed to DuPont, made specific reference to section 8.5(e) in its August 18, 2004 notice letter, and DuPont chose not to become involved in any fashion (or to exercise any authority or to lodge any objection) Cmplt ¶¶ 57-59;

ii)  INVISTA provided DuPont with the audit findings to date on October 14, 2004, prior to submission to EPA, and in its disclosure again made specific reference to section 8.5(e), and DuPont again chose not to become involved in any fashion (or to exercise any authority or to lodge any objection) Cmplt ¶¶ 62-63;

iii)  DuPont, when it finally decided to address INVISTA's notice letters in April 2005, did not claim prejudice or breach by INVISTA but instead invoked its authority under section 8.5(e), promised to participate in the meetings with EPA, promised to establish a team to address the issues with INVISTA, and then did a complete about-face Cmplt ¶¶ 137-139; and

iv)  It was not until many months after the June/July 2004 initial notices upon which DuPont's Motion is based that INVISTA engaged in discussions with regulators, on notice to DuPont, regarding the corrective actions to address the audit findings, and DuPont chose not to become involved in any fashion (or to exercise any authority or to lodge any objection) Cmplt ¶¶ 139-155.

In sum, while DuPont focuses on the first three months of INVISTA's ownership of the DTI facilities, it completely ignores everything that followed. Thus, DuPont attempts, by its Motion, to eliminate any scrutiny of its own decisions and inaction by claiming falsely, and in contradiction of the allegations in the Complaint, that the only relevant events occurred during the first three months of INVISTA's ownership when, in fact, INVISTA's indemnity claims, and particularly those relating to the EPA audits and the Consent Decree, were based upon audits, disclosures and discussions with regulators that extended for years.

In fact, at no time between June 2004 and the present has DuPont exercised or attempted

to exercise any authority under section 8.5(e) of the Purchase Agreement. Cmplt ¶ 153. As a result, INVISTA has had to (1) identify the environmental, health and safety violations that require remediation; (2) negotiate for years (often contentiously) with EPA; and (3) evaluate and implement corrective action. INVISTA is now in the final stages of a multi-year process of negotiating the terms of a proposed Consent Decree with EPA. Cmplt ¶¶ 4-9, 52-63 & 136-159.

### B. Overend Litigation

INVISTA acquired U.S. Patent No. 6,676,054 (filed March 19, 2002; issued January 13, 2004) from DuPont at the Closing per the terms of the Purchase Agreement and a related document entitled Patent and Technical Information Agreement dated November 16, 2003.[5] DuPont represented in the Purchase Agreement that it had clear title to its patents, including '054 Patent. Purchase Agreement, p. 101 (section 3.13(b)). This patent *should* have given INVISTA limited monopoly rights – that is, the rights to exclusively make, use and vend the OETO device within the United States through 2024. *See* 35 U.S.C. § 154(a)(2002) (granting inventor 20 year limited monopoly to exploit invention).

On July 26, 2005, Overend Technologies, LLC ("Overend") filed suit against INVISTA concerning the '054 Patent. *See Overend Tech., LLC. v. INVISTA*, No. 05-C-0800 (E.D.Wis. filed July 26, 2005) (hereinafter the "Overend litigation"). Overend alleged, among other things that the '054 Patent was fraudulent and invalid because DuPont supposedly stole the invention from another company and/or because DuPont knew, yet failed to disclose to the United States Patent and Trademark Office in the patent application, that the device existed in prior art for more than one year before the application was filed. *Id.* (No. 9) (Overend Amended Complaint

---

[5] The '054 Patent pertains to a mechanism known as an "over end take off" (or "OETO") device that is used by manufacturers of disposable diapers.

at ¶¶ 19-26, 44, 46(a-b), 50(a-b) & 54 (a-b)).  Overend further alleged that when INVISTA

subsequently exercised the monopoly rights it presumed it had under the '054 Patent, it violated

the Sherman Act because the patent creating and conferring those rights was allegedly invalid.

*Id.* at ¶¶ 46(c), 50(c) & 54(c).[6]  The parties litigated the matter for approximately eleven months

before the case was settled on notice to DuPont for $385,000.  All told, INVISTA incurred

approximately $520,000 in legal fees, costs and settlement payments in connection with the

Overend litigation.  Cmplt ¶ 165.

### C.    ITAM Receivable

At Closing, DuPont held a receivable due from ITAM S.p.A. ("ITAM") in the amount of

€15 million (approximately $23.2 million) (hereinafter the "ITAM Receivable") related to

products supplied by DuPont to ITAM through September 2001.  Cmplt ¶ 164.  DuPont was

required to effectively assign and deliver all its rights, title and interest in this receivable to

INVISTA pursuant to the Purchase Agreement and a related document entitled the Asset

Assignment Deed Stock Transfer and Assumption Agreement (hereinafter "Assignment Deed").

The Parties executed the Assignment Deed at the Closing on April 30, 2004.

Over thirteen months after the Closing and the execution of the Assignment Deed,

DuPont received a letter from Incofinsco S.p.A. (hereinafter "Incofinsco") dated August 6, 2005

that contained an offer to purchase the ITAM Receivable for roughly 1% of its face value.

Incofinsco included a check for €153,315.80 ($231,713) and advised that if DuPont cashed the

---

[6] DuPont purports to paraphrase the Plaintiff's allegations in the Overend litigation in its Memorandum (p. 28), yet fails to cite to the Amended Complaint – the obvious and primary source of the Plaintiff's claims.  Instead, DuPont cites to a page within the court's ruling on INVISTA's Motion to Dismiss in that case, which is of little relevance. INVISTA's assertions regarding Plaintiff's allegations (set forth above) are supported by citations to the Amended Complaint in the Overend litigation.  This is done without converting the DuPont's Motion to a Motion for Summary Judgment.  *See, e.g., Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (parties may submit, and court may take judicial notice of, pleadings in other matters on 12(b)(6) Motions); Steven Baicker-McKee et al., *Federal Civil Rules Handbook* 377-78 (2007); and Fed. R. Evid. 201(b).

check, it would be deemed to have accepted Incofinsco's offer to purchase the ITAM Receivable

at the steeply discounted price. Cmplt ¶ 164. Notwithstanding DuPont's clear, unequivocal

obligation to effectively assign and deliver all its rights in the ITAM Receivable to INVISTA

under the Assignment Deed, DuPont inexplicably cashed Incofinsco's check. Cmplt ¶ 164. As a

result, INVISTA has had to litigate numerous claims in Italy in an attempt to collect the

receivable from ITAM and/or the guarantors of the Receivable (hereinafter the "Italian

litigation"). Cmplt ¶ 164. In the Italian litigation, Incofinsco, the guarantors, and the mortgagors

have claimed, among others things, that Incofinsco legitimately purchased the ITAM Receivable

from DuPont, and INVISTA has no right to the Receivable. Moreover, INVISTA has had to

defend against a criminal investigation regarding its collection efforts due to the fact that DuPont

cashed the Incofinsco check. To date, despite its obvious culpability, DuPont has utterly refused

to participate in and/or fund the Italian litigation and related matters, which have cost INVISTA

in excess of $500,000. Cmplt ¶ 164.[7]

## ARGUMENT

### I.    INVISTA Has Stated Valid Claims for Indemnification Under Sections 8.5(b) of the Purchase Agreement for Losses Relating to the Audit Process and Consent Decree.

Pursuant to Fed. R. Civ. P. 8(a)(2), INVISTA's Complaint states a cause of action for

breach of contract as a result of DuPont's failure to defend, indemnify and hold INVISTA

harmless under section 8.5(b) of the Purchase Agreement. Rule 8(a) requires only a short and

plain statement to give adequate notice of the nature and basis for the claim. In order to

sufficiently plead a cause of action for breach of contract, a party need only allege the existence

---

[7] DuPont dedicates a disproportionate amount of its argument concerning ITAM to the so-called "Supplemental Agreement," and even goes so far as to suggest that INVISTA "studiously avoided" mentioning it in the Complaint. As explained herein (*see* pp. 33-35), the Supplemental Agreement by its clear terms has absolutely no relevance or application to INVISTA's claim for indemnification arising out of its "Loss" related to the ITAM Receivable.

of an enforceable contract, performance by the pleading party, breach of contract and damages. *See Marquardt-Glenn Corp. v. Lumelite Corp.,* 11 F.R.D. 175, 176 (S.D.N.Y. 1951).

INVISTA has more than adequately satisfied these requirements with respect to claims under section 8.5(b) related to the audit process and Consent Decree.  In paragraphs 24-114, 117-135, 171-173, 175 & 177-181 of the Complaint, INVISTA alleges, among other things, that: (1) the Purchase Agreement is an enforceable agreement which requires DuPont to defend, indemnify and hold INVISTA harmless with respect to "Losses" arising out of "Environmental Claims" and violations of "Environmental Law;" (2) INVISTA performed its obligations under the Purchase Agreement; (3) DuPont breached the Purchase Agreement by, among other things, failing to defend, indemnify and hold INVISTA harmless for its "Losses;" and (4) INVISTA has been damaged by DuPont's breach of its indemnification obligations under section 8.5(b) of the Purchase Agreement.  *See Harrison v. Golden Tree Homes, Inc., et al.,* 608 N.Y.S.2d 63 (N.Y. App. Div. 1993) (in denying motion to dismiss, the court accepted allegations of complaint as sufficient to state claim for indemnification); *see also C.M. Gridley & Sons, Inc. v. Northeastern Consol. Co.,* 321 N.Y.S.2d 171, 173 (N.Y. App. Div. 1971) (complaint's allegations sufficiently pled cause of action for contractual indemnification and motion to dismiss, therefore, denied).

DuPont argues, however, that it is entitled to dismissal of all claims under section 8.5(b) related to the audit process and Consent Decree because of the alleged non-occurrence of what it contends is a condition precedent to its duties under section 8.5(b).  Specifically, DuPont argues that its "agreement to provide indemnity in section 8.5(b) was expressly conditioned on its having 'full authority' rights in section 8.5(e)."  Memo, p. 18.  DuPont contends further that "literal compliance" with the supposed "full authority" condition precedent was required and not achieved because "INVISTA deliberately embarked on a unilateral and preemptive course of

action that had the purpose and effect of preventing DuPont from exercising in any meaningful fashion its section 8.5(e) rights . . . ." *Id.* at 19. DuPont's argument fails for three simple reasons. First, the "full authority" language in section 8.5(e) cannot be construed as a condition precedent under New York law. Second, section 8.5(e) requires the parties to cooperate with one another when, as here, a risk of enforcement is created by environmental noncompliance. DuPont refused to take any steps to reduce the enforcement risks that INVISTA faced due to DuPont's failure to comply with environmental laws. Finally, DuPont's argument that its so-called "full authority" condition precedent did not occur is based on disputed factual assertions set forth in DuPont's Memorandum of Law, which cannot serve as the foundation for a motion to dismiss.

> **A.**    **The Language in Section 8.5(e) Does Not Create an Express Condition Precedent to DuPont's Duty to Defend, Indemnify and Hold INVISTA Harmless Pursuant to Section 8.5(b).**

There is no clear language in section 8.5(e) from which one can conclude that the parties intended the "full authority" language described by DuPont to constitute an express condition precedent to DuPont's duty under section 8.5(b) to indemnify, defend and hold harmless INVISTA. "A condition precedent is an act or event, other than a lapse of time, which unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.,* 368 F.3d 944, 951 (7th Cir. 2004) (*quoting Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y. 2d 685 (1995)). For a condition precedent "to exist it must be apparent from the contract itself that this was the intention of the parties." *Manning v. Michaels,* 540 N.Y.S.2d 583, 584 (N.Y. App. Div. 1989). Under New York law, a court will not impose a condition precedent unless the clear language of the agreement reflects an obvious intent by the parties to create such a condition to performance.

*See Red Ball Interior Demolition Corp., v. Palmadessa,* 947 F. Supp. 116, 123 (S.D.N.Y. 1996),

*aff'd* 107 F.3d 4 (2d Cir. 1997); *see also Unigard Sec. Ins. Co. v. North River Ins. Co.,* 79

N.Y.2d 576 (1992); *Smurfit Newsprint*, 368 F.3d at 952 (declining to interpret provision in

contract as a condition precedent noting that agreement at issue lacked any "clear language" to

indicate that "notice is an express condition precedent "). "In determining whether a particular

agreement makes an event a condition, courts will interpret doubtful language as embodying a

promise or constructive condition rather than an express condition. This interpretive preference

is especially strong when a finding of express condition would increase the risk of forfeiture by

the obligee." *Oppenheimer & Co.,* 86 N.Y.2d at 685 (*citing Restatement (Second) of Contracts* §

227). "[W]here there is ambiguity in a contractual term, the law does not favor a construction

which creates a condition precedent." *Id.*; *see also Red Ball,* 947 F. Supp. at 123 (stating that as

general rule "contractual obligations are to be construed as independent promises, rather than

conditions precedent to performance").

   "Conditions can be express or implied.  Express conditions are those agreed to and

imposed by the parties themselves.  Implied or constructive conditions are those imposed by law

to do justice."  John D. Calamari & Joseph M. Perillo, *Contracts* §11-8 (3d ed. 1987).  "Express

conditions must be literally performed, whereas constructive conditions, which ordinarily arise

from language of promise, are subject to the precept that substantial compliance is sufficient."

*Oppenheimer & Co.*, 86 N.Y.2d at 690.  In the absence of an express condition precedent,

DuPont is subject to the general rule "that ordinarily, one seeking to escape the obligation to

perform under a contract must demonstrate a material breach or prejudice." *Unigard Sec. Ins.

Co.,* 79 N.Y.2d at 581.

In light of the foregoing principles, it is clear that the "full authority" language in section 8.5(e) cannot create an express condition precedent to DuPont's duty to defend, indemnify and hold INVISTA harmless. There is quite simply no language in the Purchase Agreement suggesting that the parties intended the "full authority" language in section 8.5(e) to be a condition precedent. In contrast, the Purchase Agreement does include a number of clearly expressed conditions. For example, section 7.1 of the Purchase Agreement sets forth a number of conditions, which are preceded by the following clear language: "The obligations of the Sellers to effect the transactions provided for in Article II shall be subject to the fulfillment or written waiver by DuPont on behalf of the Sellers, at or prior to the Closing of each of the following conditions . . . ." Similarly, section 8.4(g) establishes a condition with this clear language: "[t]he obligations of the parties set forth in this section 8.4 shall be conditioned upon the Closing having occurred." Obviously, the parties to the Purchase Agreement knew how to write an express condition precedent when that was their intention. The fact that the parties did not use similar conditional language in section 8.5(e) clearly demonstrates that they did not intend the "full authority" language in that paragraph to constitute a condition precedent to DuPont's duties.

In support of its motion, DuPont offers the thoroughly unconvincing argument that the first sentence of section 8.5(b) somehow converts section 8.5(e) into an express condition precedent. Memo, p. 18. That sentence, however, does no such thing. The first sentence of section 8.5(b) begins as follows: "[o]n the terms and subject to the conditions set forth in this Agreement, DuPont agrees to indemnify, defend and hold harmless the Buyer Indemnified Parties. . . ." The opening sentence of section 8.5(b) does not create any conditions, it simply makes reference to those conditions that are clearly stated at other places in the Purchase

Agreement, for example, the condition that is expressed in section 8.5(f) with the following language: "[t]he obligations of the parties set forth in this section 8.5 shall be conditioned upon the Closing having occurred."

DuPont's argument with respect to the first sentence of section 8.5(b) is similar to an argument rejected in *Smurfit Newsprint*. In *Smurfit Newsprint,* the defendant argued that its contract with the plaintiff made prompt written notice an express condition precedent to the defendant's duty to indemnify.[8] The Seventh Circuit Court of Appeals stated that the New York Court of Appeals "has held that 'a contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition.'" *Smurfit Newsprint*, 368 F.3d. at 951 (*quoting Unigard Sec. Ins. Co.,* 79 N.Y.2d at 584). In rejecting defendant's argument, the Court stated:

> The general language that the obligation of SP to indemnify Smurfit is 'subject to other terms and conditions of [the APA]' is not sufficiently precise to make prompt written notice an express condition precedent to indemnification. Although the obligation to indemnify is 'subject to the other terms and conditions,' there is no 'clear language' in § 8.02(b) to indicate that notice is an express condition precedent. *Id.* at 951-52.

This Court reached a similar result in *Red Ball*. The plaintiff in that case argued that prompt notice was a condition precedent to indemnification under the agreement at issue. In rejecting plaintiff's position, this Court stated:

> John's arguments assume that prompt notice is a condition precedent to his obligation to indemnify Daniel. However, under New York law, '[a] contractual duty ordinarily will

---

[8] In *Smurfit Newsprint*, the seller of a paper mill sued the buyer of the mill seeking indemnification of an arbitrator's award of severance benefits to Union employees, and for damages for breach of contract. Defendant-buyer refused to indemnify the seller, who subsequently filed suit for indemnification. Section 8.02(b) set forth one of the indemnification provisions at issue and stated:

> Smurfit agrees to give SP prompt written notice of any claim, assertion, event or proceeding by or in respect of a third party of which it has knowledge concerning any liability or damage as to which may request indemnification hereunder. SP shall have the right to direct, through counsel of its own choosing, the defense or settlement of any such claim or proceeding at its own expense. 368 F.3d at 950.

not be construed as a condition precedent absent clear language showing that the parties
intended to make it a condition.

*Red Ball*, 947 F. Supp. at 123 (*quoting Unigard Security Ins. Co.* 79 N.Y.2d at 581). Because
the parties' agreement did not expressly condition the indemnitor's duty upon the promptness of
the indemnitee's notice, the court rejected plaintiff's argument and ruled that the language did
not constitute a condition precedent to indemnification. Choosing to follow the general rule in
New York, the court stated, "this Court declines to create a new exception to the general rule that
contractual obligations are to be construed as independent promises, rather than conditions
precedent to performance." *Red Ball*, 947 F. Supp. at 123. The decision in *Red Ball* readily
applies to DuPont's Motion. This Court should interpret the mutual obligations in sections
8.5(b) and 8.5(e) as independent of each other, as the parties intended and as required by New
York law.

DuPont relies heavily on *Freedom Chem. Co., v. BC Sugar Refinery, et al.,* No.
97CV04634, 1998 WL 289736 (S.D.N.Y. June 4, 1998), to support its argument that section
8.5(e) contains an express condition precedent. Despite its argument to the contrary, DuPont did
not condition its indemnification obligations under section 8.5(b) in the same manner as the
seller in *Freedom Chemical*. In *Freedom Chemical,* the parties' indemnification obligations
were set forth in section 11.1. The express language of section 11.1(a) stated that defendants'
duty to indemnify would be "in accordance with and *subject to the limitations of 11.1(b) and (c)
hereof....*" *Freedom Chem. Co.*, 1998 WL 289736 at * 1 (emphasis added). Sections 11.1(b) and
(c) of the agreement provided that the defendants would indemnify the plaintiff only for losses
arising out of a negotiated "Remediation Plan," which the defendants had the exclusive right to
negotiate with governmental authorities. On motions for summary judgment, the court found
that it was undisputed that no Remediation Plan existed and, therefore, held that the losses

alleged by the plaintiff were simply outside the scope of the indemnity agreement because they were not incurred as the result of a Remediation Plan.  The court did not analyze the issue of the defendants' exclusive negotiating rights because neither the plaintiffs nor the defendants conducted any negotiations with any governmental authorities and in fact the plaintiff admitted that the asbestos problem at issue was not the type of environmental condition that would be the subject of an environmental Remediation Plan.

In its effort to transform the "full authority" language of section 8.5(e) into an express condition precedent, DuPont places great significance on the words "subject to" in section 8.5(b), arguing that what follows those words in a contract are often words describing an event or occurrence that becomes a condition to a duty.  While that may be true in some circumstances, the logic does not apply to the language in section 8.5(b) upon which DuPont relies because in section 8.5(b) the words "subject to" are not followed by words describing an event, occurrence or duty; instead they are followed by the word "conditions."  DuPont's argument, therefore, is hopelessly circular.  There is simply no way for one to conclude based on the clear language of the Purchase Agreement that the parties intended the "full authority" language of section 8.5(e) to serve as an express condition precedent.

**B.     Section 8.5(e) Does Not Provide DuPont the Exclusive Right to Control All Communications and Negotiations with Governmental Authorities.**

DuPont premises its argument on the implicit assumption that "full authority" means the same thing as "exclusive authority" and from this erroneous assumption draws the conclusion that INVISTA "negated" its right to indemnification under section 8.5(b) by making disclosures to EPA and the Texas Commission on Environmental Quality (hereinafter "TCEQ") and then entering into an audit agreement.  Memo, p. 11.  DuPont ignores, however, the language in section 8.5(e) that requires DuPont to "advise and consult" INVISTA and "work together" with

INVISTA to eliminate enforcement risks that might arise from DuPont Environmental Liabilities. Section 8.5(e) requires DuPont to "promptly advise and consult with Buyer regarding its Remediation activities if there is a reasonable potential that the proposed or mandated Remediation may materially interfere with Buyer's operation or create an enforcement risk for Buyer." Section 8.5(e) provides that if Remediation of DuPont Environmental Liabilities may result in material interference with INVISTA's operations or a risk of government enforcement, then "DuPont and Buyer will work together to eliminate the material interference on Buyer's operations or the enforcement risk to Buyer, and Buyer shall have the right to participate in negotiations, meetings and settlement discussions with Governmental Authorities." Section 8.5(e) also affirmatively requires DuPont to "take measures to ensure that such Remediation does not materially interfere with Buyer's operations at the site and does not create an enforcement risk for Buyer associated with its operations."

The environmental violations that INVISTA discovered at Orange and Victoria in June 2004 created an enforcement risk to INVISTA as the new operator of the facilities. DuPont had breached its obligation under the Purchase Agreement to advise INVISTA of these violations and many others that INVISTA discovered after closing. In light of the seriousness of the violations and DuPont's failure to notify INVISTA of them, INVISTA was forced to move quickly to reduce the risk of government enforcement action. Cmplt ¶ 56. Indeed, INVISTA's July 13, 2004 letter to DuPont tracks the specific language of section 8.5(e) by stating that INVISTA was focused "on reducing the risk of enforcement."

DuPont also breached its obligations under section 8.5(e) to "work together to eliminate" the enforcement risk to INVISTA. When DuPont received INVISTA's first notice letter on or about June 17, 2004, it did not step forward to take control of the situation at Victoria. INVISTA

sent additional letters to DuPont on July 13 and July 29, 2004 advising DuPont of the violations

that it had discovered at the sites, but DuPont failed to respond to those letters as well.  One can

reasonably infer that this was a strategic decision by DuPont either to (a) lie in wait with the

argument in an attempt to escape liability for its environmental violations; or (b) avoid its known

violations of Environmental Law by having INVISTA address them.

     In fact, it took DuPont approximately ten months to respond at all to INVISTA.  When

DuPont finally responded to the notice letters by letter dated April 14, 2005, DuPont wrote:

> DuPont expects that, consistent with the express terms of the Purchase
> Agreement, it will be permitted to (x) assist INVISTA with the preparation for
> any meetings that INVISTA has scheduled with the EPA and (y) send a DuPont
> representative to attend and participate in such meetings . . . . I look forward to
> working with you to resolve these issues.  Our meeting on Tuesday, April 19 in
> Washington, D.C. will hopefully be a useful step in that process.  DuPont believes
> it is in the best interest of both companies to promptly resolve specific
> environmental compliance issues.  Cmplt ¶ 138.

Despite DuPont's statement that it would assist INVISTA in its preparation for meetings with

EPA and would attend those meetings, DuPont changed its mind shortly thereafter and refused to

attend any meetings with EPA or assist INVISTA in preparing for those meetings.

     By failing to advise INVISTA of the violations at Orange, Victoria and the other sites,

which created a serious risk of government enforcement against INVISTA, by failing to take

steps of its own to eliminate those enforcement risks, and by failing to work together with

INVISTA to eliminate those enforcement risks, DuPont breached its obligations to INVISTA

under section 8.5(e).  Consequently, even if one could construe the "full authority" language of

section 8.5(e) as an express condition, its non-occurrence would be excused as a result of

DuPont's breach of its duties under section 8.5(e).  "Where a party's breach by non-performance

contributes materially to the non-occurrence of a condition of one of his duties, the non-

occurrence is excused."  *Restatement (Second) of Contracts* § 245.

Similarly, if one could construe the "full authority" language as an express condition precedent, then its non-occurrence would be excused by waiver. *See, e.g., Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F. Supp. 821, 830 (S.D.N.Y. 1969) ("A party may, by words or conduct, waive a provision in a contract or eliminate a condition . . . which was inserted for his benefit . . . [T]he conduct of the parties may be such as to indicate a waiver of the condition . . . and once manifested, it may not be suddenly abandoned") (internal citations omitted).  INVISTA clearly alleges in the Complaint that it notified DuPont of the environmental violations that it discovered after closing.  INVISTA also alleges that DuPont waited approximately ten months before it responded to INVISTA's notices at which point DuPont informed INVISTA that it would participate in meetings with EPA pursuant to its express rights under the Purchase Agreement.  Cmplt ¶ 138.  DuPont did not tell INVISTA that it had negated its indemnity rights, as DuPont now contends, and it did not tell INVISTA that it wanted to control the meetings or negotiations with EPA.  DuPont's election not to exercise any authority under section 8.5(e) and its election not to meet with EPA or the other governmental authorities after having asserted its right to do so under the Purchase Agreement constitutes a waiver of any authority conferred upon DuPont under section 8.5(e).

### C.    The Conflicting Factual Assertions Set Forth in DuPont's Memorandum Cannot Support a Motion to Dismiss Pursuant to Rule 12(b)(6).

DuPont's argument with respect to section 8.5(e) is predicated on a litany of factual assertions made by DuPont in its Memorandum of Law.  A party moving to dismiss a claim is not entitled to support its motion with factual assertions contained in its memorandum in support of the motion.  A court "will not consider the factual allegations set forth in defendant's Memorandum in support of the motion." *Executive Photo, Inc. v. Norrell*, 756 F. Supp. 798, 801 n.2 (S.D.N.Y. 1991).  Courts deny motions to dismiss where defendants seek to meet their

burden simply by raising allegations not introduced in the complaint.  *See Arnold v. Goetz*, 245 F. Supp. 2d 527, 539-540 (S.D.N.Y. 2003).

Despite this fundamental rule of civil practice, DuPont's Motion to Dismiss relies heavily on factual allegations set forth in its Memorandum of Law.  DuPont's essential contention is that INVISTA made it impossible for DuPont to exercise any rights under section 8.5(e).  DuPont makes this allegation many times in a variety of ways.  For example, at page 19 of its Memorandum of Law, DuPont contends that "INVISTA, by its conduct, foreclosed DuPont from exercising its full authority over controlling, directing, managing, and implementing any remediation and determining its scope and directing all negotiations, meetings, and settlements with governmental authorities."  Also, on page 19, DuPont states that "INVISTA deliberately embarked on a unilateral and preemptive course of action that had the purpose and effect of preventing DuPont from exercising in any meaningful fashion its section 8.5(e) rights . . . ."  On page 20, DuPont alleges that "[a]s a result of INVISTA's deliberate efforts to keep DuPont in the dark, DuPont could not exercise even the nominal attributes of its section 8.5(b) rights, much less the substance of those rights."  Further down on page 20, DuPont alleges that "INVISTA's actions effectively foreclosed any meaningful opportunity for DuPont to object to the disclosures that INVISTA made to EPA and TCEQ."  These are all factual assertions that conflict with the allegations in the Complaint.  DuPont will have adequate opportunity to develop and argue the facts of the case at trial after the parties have conducted discovery.  DuPont, however, is not permitted under the Federal Rules of Civil Procedure to base a motion to dismiss under Rule 12(b)(6) on factual allegations contained in its Memorandum of Law.  *See Executive Photo, Inc.*, 756 F. Supp. at 801 n.2.

Even if they were permitted by the Rules, the factual allegations made in DuPont's Memorandum would not provide an adequate basis for dismissal at INVISTA's environmental, health and safety indemnification claims because those allegations are contradicted by the allegations of the Complaint. Specifically, INVISTA alleges in the Complaint that it notified DuPont of the environmental, health and safety issues and claims and offered DuPont the opportunity to exercise its authority under section 8.5(e). Cmplt ¶¶ 52-63 & 136-155. DuPont nonetheless refused to exercise any of authority or fulfill any of its obligations under section 8.5(e). *Id.*

DuPont offers yet another factual allegation in its Memorandum to explain its refusal to act under section 8.5(e). DuPont contends that "[it] did not agree to participate in the EPA audit process since the section 8.5(e) rights of DuPont had been irretrievably compromised with respect to that process." DuPont also alleges in its Memorandum that by early August, 2004, it had already been deprived of its "control rights" and that by that same time "the future actions and relationship between [INVISTA] and the federal and state regulatory agencies" had been "set in concrete." Memo, p. 11. This is yet another factual statement that is not only impermissible on a motion to dismiss but also is contradicted by the language of the DuPont letter that is quoted in the Complaint. At paragraph 138 of the Complaint, INVISTA quotes a letter that it received from DuPont, dated April 14, 2005, which states in part that "consistent with the express terms of the Purchase Agreement, [DuPont] will be permitted to (x) assist INVISTA with the preparation for any meetings that INVISTA has scheduled with the EPA and (y) send a DuPont representative to attend and participate in such meetings . . . ." If, indeed, DuPont believed that its authority under section 8.5(e) had been eviscerated by "early August, 2004," why was DuPont asserting authority under that very provision eight months later? The

answer to this question and many others will have to be obtained through discovery, and they cannot be assumed on a motion to dismiss.[9]

    In evaluating DuPont's motion, the Court must presume the truth of all well-pled allegations, resolve doubts and inferences in INVISTA's favor, and view the pleading in the light most favorable to INVISTA. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 170-71 (2005). Accordingly, DuPont's Motion to Dismiss INVISTA's Claims for Indemnification Under Section 8.5(b) must be denied.[10]

---

[9] To the extent that DuPont argues that INVISTA, by self-reporting and entering into the Audit Agreement, eliminated its right to indemnification from DuPont, its argument fails for three reasons. First, the case law does not support DuPont's position. *See, e.g., Lockshaw v. Rohr, Inc.*, No. G029533, 2002 Cal. App. Unpub. LEXIS 11294, *8 (Cal. Ct. App. Dec. 6, 2002) (finding that indemnitee was entitled to indemnification despite its unilateral decision to self-report to the Department of Defense possible false claims under a government contract); *Allwaste Environmental Servs. v. Pastore*, 911 F. Supp. 29, 30-33 (D. Me. 1996); and *Fetzer v. Douglass Components Corp.*, C.A. No. 11,327, 1994 Del. Ch. LEXIS 48 *32-35 (Del. Ch. April 12, 1994). Second, INVISTA did not undertake to negotiate any actual corrective actions with EPA until much later in the process, long after it first notified DuPont of potential violations in Texas. In essence, INVISTA's dealings with EPA had two distinct stages: First, self-reporting and auditing to determine the extent of the noncompliance. Second, negotiations concerning remediation of the discovered noncompliance. The latter did not commence until well into 2005. Cmplt ¶ 140. Accordingly, the facts as alleged in INVISTA's Complaint indicate that nothing was "set in concrete" when INVISTA first self-reported in June 2004. In fact, DuPont had, at a minimum, twelve months during which it could have stepped in and participated not only in the audit process, but the negotiations of corrective actions. Third, if DuPont had wanted to preclude any defense or indemnity obligations for self-reported noncompliance, it could have tried to negotiate a "no dig/no look" provision in the Purchase Agreement, which limits a buyer's ability to audit for contamination that could result in an indemnification claim. DuPont certainly could have attempted to include one in the Purchase Agreement if its intent was to preclude indemnity for self-reported noncompliance.

[10] INVISTA alleges in paragraph 176 of its Complaint that it is entitled to indemnification for DuPont Environmental Liabilities under Section 8.4(a)(ii) of the Purchase Agreement through the definition of "Retained Liabilities." Section 8.4(a)(ii) provides in relevant part that "DuPont shall defend, indemnify and hold harmless Buyer [INVISTA] . . . from and against any and all Losses arising from . . . (ii) any of the Retained Liabilities." (Purchase Agreement, section 8.4(a)(ii)). The definition of Retained Liabilities includes "all DuPont Environmental Liabilities." (Purchase Agreement at p. 52). Yet, as DuPont points out, section 8.4(c) provides "[n]otwithstanding anything herein to the contrary . . . (ii) any indemnification claims relating to any DuPont Environmental Liabilities . . . shall be made exclusively under . . . 8.5[(b)]." Thus, there is an obvious conflict between the two provisions. When contract language is ambiguous, which would include a case like this where two contract provisions are irreconcilable on their face, extrinsic evidence of the parties' intent should be considered. *See RJE Corp. v. Northville Indus. Corp.*, 198 F. Supp. 2d 249, 263 (E.D.N.Y. 2002). Discovery is necessary to determine the intent of the parties as to the reason for the inconsistency between 8.4(a)(ii) and 8.4(c)(ii) and, thus, the issue should not be resolved on a motion to dismiss. It should also be noted that the dismissal of INVISTA's section 8.4(a)(ii) claims would have no benefit in terms of scope of discovery or judicial economy, as INVISTA would still conduct full discovery on all environmental violations for which it is entitled to indemnification under sections 8.4(a)(iii) (warranties) and 8.5.

## II.    INVISTA's Complaint States a Claim for Punitive Damages.

DuPont argues that INVISTA's claim for punitive damages must be dismissed because INVISTA has not alleged an independent tort and because DuPont's conduct is not part of a pattern aimed at the public generally.  DuPont's argument fails because it is based on an inaccurate articulation of the law.  This Court synthesized the pertinent New York law and articulated the proper legal standard in *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250 (S.D.N.Y. 2005).  In *Topps,* this Court stated that in order to recover punitive damages in a breach of contract case a plaintiff must prove:  (1) that the defendant engaged in conduct aimed at the public generally such that punitive damages are necessary to vindicate a public right, and (2) that the defendant's conduct evinced a "high degree of moral turpitude [demonstrating] such wanton dishonesty as to imply a criminal indifference to civil obligations."  *Id.* at 262.  The Court succinctly characterized the test as requiring two elements: a "public wrong" and "extraordinary egregiousness."

INVISTA has alleged ample facts to support an award of punitive damages.  INVISTA alleges in its Complaint that: (1) DuPont perpetrated egregious environmental, health and safety violations at facilities in the United States, Canada, Europe and South America that INVISTA acquired; (2) DuPont knew about many of the violations, yet falsely represented to INVISTA during negotiations of the Purchase Agreement, and in the Purchase Agreement itself, that the facilities were in compliance with all environmental, health and safety laws; (3) the violations were widespread, substantial, and placed the public in harm's way; and (4) DuPont refused at every turn to be part of the solution to the problems it created, continually ignoring INVISTA and declining to participate in vital negotiations with EPA regarding remediation.  Cmplt ¶¶ 2, 4, 7-8, 31 & 170.  Far from merely a simple, private, breach of contract, INVISTA has alleged that

DuPont's conduct was part of a system-wide pattern of noncompliance directed at the public and, as pled, warrants punitive damages. *Topps Co., Inc.*, 380 F. Supp. 2d at 262.[11]  As such, INVISTA has satisfied its pleading requirements for punitive damages under *Topps* by alleging facts that, if taken as true, evidence (1) a public harm and (2) extraordinary egregiousness.[12]

INVISTA's claim for punitive damages is further supported by the fact that New York courts award punitive damages in breach of contract actions, such as landlord tenant cases involving breaches of the warranty of habitability.  Where a plaintiff has proven breach of the warranty of habitability, New York courts have imposed punitive damages if the plaintiff also has established that the defendant's conduct was sufficiently egregious.  The courts have recognized that these particular types of contract breaches necessarily impact the public.  *See, e.g., Minjak Co. v. Randolph*, 528 N.Y.S.2d 554, 555 (N.Y. App. Div. 1988) (upholding jury award of punitive damages for breach of warranty of habitability where the landlord evinced indifference to the health and safety of others and disregard for the rights of others); *German v. Federal Home Loan Mortgage Corp.*, 885 F. Supp. 537, 568 (S.D.N.Y. 1995) (noting that, since

---

[11] DuPont's reliance on *Varveris v. Hermitage Ins. Co.*, 806 N.Y.S.2d 688 (2005) to support its position is misplaced.  In *Varveris*, the court held only that a punitive damages claim is not sustainable in a simple breach of contract dispute "*with no greater implications.*" *Id.* at 689 (emphasis added).  INVISTA's claim, contrary to DuPont's position, encompasses "greater implications" as contemplated by the *Varveris* court.  Moreover, the *Varveris* court dismissed the plaintiff's punitive damages claim because she failed to allege that defendant's conduct was either egregious <u>or</u> fraudulent.  Accordingly, the *Varveris* court implicitly stated that punitive damages may be available to remedy sufficiently egregious conduct (the "greater implications" of the breach of contract), regardless of whether the underlying action sounds in contract or tort.  *Id.*

[12] Moreover, while INVISTA's claims against DuPont are not "torts" *per se*, DuPont's conduct here falls within the broad definition of tortious conduct.  "A tort obligation is a duty imposed by law to avoid causing injury to others.  It is 'apart and independent of promises made and therefore apart from the manifested intention of the parties' to a contract." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (*citing* William Lloyd Prosser & W. Page Keeton, *Torts* § 92 (5th ed. 1984)).  In the case at bar, DuPont had separate and distinct obligations to the public to refrain from engaging in conduct that endangers the public health, safety, and welfare, in addition to its contractual obligations to INVISTA.  DuPont's conduct, as alleged in the Complaint, suggests that DuPont turned a blind eye to its obligations to the public for financial gain.  As such, this court should apply a remedy consistent with the facts of the case and in line with the public policy behind punitive damages.  "The rule as to measure of damages to be applied [for breach of contract] no longer depends on the form of action used by the plaintiff." Arthur L. Corbin, *Corbin on Contracts* § 59.2 (rev. ed. 2001).

*Park West Mgmt. Corp. v. Mitchell*, 404 N.Y.S.2d 115 (N.Y. App. Div. 1978), New York courts have been "willing to award punitive damages for particularly egregious breaches of the implied warranty of habitability").

In awarding punitive damages in cases where a party has breached the warranty of habitability, New York courts have done exactly what INVISTA asks this court to do in this case – consider the facts alleged in the Complaint and weigh them against the policies (punishment and deterrence) that long have governed awards of punitive damages. Significantly, in these warranty cases, courts focus on one question: is the defendant's conduct morally culpable such that it warrants punishment and must be deterred in the future? "The determining factor is not the form of the action . . . but the moral culpability of the defendant, and whether the conduct implies a 'criminal indifference to civil obligations.'" *Minjak Co.,* 528 N.Y.S.2d at 557-558 (internal quotations omitted) (upholding jury award of punitive damages where landlord permitted highly dangerous construction work to be performed on premises for years and repeatedly ignored tenants' complaints of dust, sand and water leak problems, noting that "it is within the public interest to deter conduct which undermines [the housing code's strict standards] when that conduct rises to the level of high moral culpability or indifference to a landlord's civil obligations"). The same policy considerations, particularly deterrence, weigh in favor of an award of punitive damages where INVISTA has alleged that, contrary to the public interest, DuPont knowingly allowed serious environmental, health and safety violations to exist on its watch and then refused to assist INVISTA in its efforts to remedy the violations.

DuPont attempts to side-step INVISTA's allegations that DuPont's conduct was part of a pattern directed at the public generally by citing to EPA's guidelines for self-policing and auditing. DuPont argues that INVISTA's entry into EPA's Audit Program demonstrates that any

harm from DuPont's conduct was not directed at the public because eligibility for the Audit Program requires "that none of the alleged environmental violations would result in serious actual harm to the environment or may have presented an imminent and substantial endangerment to public health or the environment." Memo, p. 26. DuPont's argument is without merit because, at the motion to dismiss stage, the language of the EPA guidelines has no bearing on INVISTA's allegations that DuPont's conduct in fact caused dangerous environmental conditions to exist that put the public at risk. DuPont will have ample opportunity to make arguments based on the EPA guidelines at other junctures in this case, but not on a motion to dismiss.

In addition to being premature, DuPont's argument based on the EPA guidelines is also incorrect because EPA interprets its Audit Policy in a manner that does not exclude environmental violations from the Audit Program in an absolute fashion. In fact, EPA takes a case-by-case approach and rarely excludes disclosures on the basis that they would result in serious actual harm or posed an imminent threat to the public or environment. Memorandum from Granta Y. Nakayama, US EPA, on *Issuance of "Audit Policy: Frequently Asked Questions"* (April 30, 2007) ("[o]f the nearly 3,500 disclosures to EPA made to date, EPA is aware of only two instances in which the Agency denied Audit Policy credit based on serious actual harm or an imminent and substantial endangerment"). As such, DuPont has misconstrued the language of the Audit Policy in an attempt to obscure the "public harm" prong that is required for an award of punitive damages. Simply because INVISTA was permitted to enter the Audit Program is not *prima facie* evidence, as DuPont contends, that the violations alleged in the Complaint did not constitute a public harm. In addition, DuPont's argument would have no bearing whatsoever on

INVISTA's OSHA claims because the EPA Audit Policy does not cover the OSHA based violations.

**III.    INVISTA's Complaint States a Claim for Indemnification of Losses It Incurred in the Overend Litigation.**

DuPont contends that it does not owe INVISTA indemnification for its "Losses" relating to the Overend litigation because they do not "arise out of" DuPont's pre-Closing handling of the relevant patent and, instead, solely and exclusively "arise out of" INVISTA's alleged subsequent enforcement of the patent. This argument is without merit given the expansive language of the indemnity provision at issue. As alleged in paragraph 165 of the Complaint, section 8.4(a) of the Purchase Agreement provides in pertinent part that "DuPont shall defend, indemnify and hold harmless" INVISTA "from and against any and all Losses arising from, in connection with or otherwise with respect to . . . (ii) any of the Retained Liabilities (whether arising prior to, on or after the Closing Date)" (Purchase Agreement, p. 228). The definition of Retained Liabilities includes "all Liabilities that are set forth on Schedule 1(zz)" (Purchase Agreement, p. 54). Schedule 1(zz) indicates that DuPont's Retained Liabilities include, among various other things, liabilities from alleged violations of the Sherman Act "arising out of" DuPont's pre-Closing conduct.[13]

There can be no legitimate dispute that the alleged violations of Sherman Act in the *Overend* litigation "arise out of" DuPont's pre-closing handling of the '054 Patent. As explained above, DuPont's alleged unlawful conduct (fraudulently obtaining the '054 Patent) was a key

---

[13] Schedule 1(zz) par. 4 provides in, relevant part, "[a]ll Liabilities resulting from or arising out of actual or alleged violations of Antitrust Laws to the extent resulting from or arising out of the ownership of the DTI Assets or the operation or conduct of the DTI Business . . . at any time on or prior to the Closing Date." It is noteworthy that the definition of Retained Liability in Schedule 1(zz) par. 4 also covers post-closing conduct that is "merely the continuation of actions, failures to act or events occurring, or the continued existence of circumstances or conditions existing, prior to the Closing Date . . . ." Though not specifically stated here, that portion of the definition also applies to the case at bar.

element of Plaintiff's Sherman Act claims, even under the *Walker Process* line of cases upon which DuPont so heavily relies. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 173 (1965) (acquisition of fraudulent patent is element of Sherman Act claim). In fact, but for DuPont's alleged unlawful conduct concerning the '054 Patent, Overend would not have been able to claim violations of the Sherman Act because the patent (and its associated monopoly rights) would have been unchallengeable. Thus, the Sherman Act claims in the *Overend* matter clearly "arise out of" DuPont's alleged unlawful pre-closing conduct, and it is entirely irrelevant that INVISTA's subsequent enforcement of the patent, which INVISTA vigorously contends never occurred vis-à-vis Plaintiff Overend in any case, is also an element of a *Walker Process* Sherman Act claim.

In *One Beacon Ins. Co. v. Orange and Rockland Util.*, 361 F. Supp. 2d 331, 334 (S.D.N.Y. 2005), this Court looked at a very similar provision ("arising out of") in a non-insurance indemnification agreement and held that the phrase was "expansive," encompassed more than one cause of damage and, as long as the indemnitor's conduct was a cause of the loss (like DuPont's in the case at bar), the indemnitor owed the indemnitee (here INVISTA) a duty to indemnify because the loss was said to have "arisen from" indemnitor's action.

## IV.    **INVISTA's Complaint States a Claim for Indemnification of Losses It Incurred with Respect to the ITAM Receivable.**

DuPont's position that INVISTA waived its rights to indemnification for its "Losses" related to the ITAM Receivable is based on an abject misreading of the release provision at issue. The ITAM Receivable was one of many receivables and other DTI assets that DuPont was required to effectively assign and deliver all its rights, title and interest in to INVISTA at or after Closing pursuant to the Purchase Agreement and Assignment Deed. As alleged in paragraph 164 of the Complaint, section 8.4(a) of the Purchase Agreement provides in relevant part that

"DuPont shall defend, indemnify and hold harmless" INVISTA "from and against any and all Losses arising from, in connection with or otherwise with respect to . . . (i) the breach or failure of the Sellers [DuPont] to duly perform or observe . . . any Other Agreement." (Purchase Agreement, p. 228). The term "Other Agreement" is defined in the Purchase Agreement as "other agreements executed in connection [with the Purchase Agreement] . . . or therewith at or prior to the Closing." (Purchase Agreement, pp. 44 & 76) The Assignment Deed constitutes an "Other Agreement" because it was executed "in connection" with the Purchase Agreement.

As alleged in paragraph 164 of the Complaint, DuPont breached the Assignment Deed by, among other things, negotiating Incofinsco's check. As a result, DuPont must indemnify INVISTA for all its "Losses," which include more than $500,000 in legal fees spent to date on the Italian litigation and, depending upon the outcome of the Italian litigation, perhaps the full amount of the ITAM Receivable. DuPont, however, claims in its Motion that INVISTA waived its right to indemnification for its "Losses" arising from DuPont's cashing of Incofinsco's check in a document entitled "Supplemental Agreement" dated December 17, 2004 (Exhibit 4 to the Dwyer Affidavit).

DuPont's waiver argument fails for three obvious reasons. First, DuPont's argument hinges on a flagrant misreading of the release provision contained in section 1.4 of the Supplemental Agreement, which is stunning given the plain language of the release. Section 1.4 defines the ITAM Collateral ("certain mortgages, guarantees and promissory notes" securing the ITAM Receivable) as separate and distinct from the ITAM Receivable (the € 15 million due from ITAM). *See* the Supplemental Agreement, p. 2. The release in that section applies on its face only to claims related to the **ITAM Collateral**:

> DuPont shall . . . use commercially reasonable efforts to cooperate with INVISTA . . . in
> order to complete an effective assignment of all its rights in the ITAM Receivable and
> ITAM Collateral under Italian and Spanish law . . . .
>
> Buyer [INVISTA] hereby waives . . . claims . . . as a result of any failure to effectively
> assign the ITAM Collateral . . . so long as DuPont has used the reasonable commercial
> efforts described in the preceding paragraph."  *Id.*, pp. 2-3.

As set forth in the Complaint, and as explained above, INVISTA's indemnification claim against DuPont arises out of DuPont's failure to completely and effectively assign DuPont's rights in the **ITAM Receivable** to INVISTA, and DuPont's purported sale of it to Incofinsco. Thus, as pled, the release provision in the Supplemental Agreement has no application to INVISTA's claim in paragraph 177 of the Complaint for indemnification under section 8.4(a)(i) of the Purchase Agreement for its "Losses" related to DuPont's mishandling of the ITAM Receivable and breach of the Assignment Deed.[14]

Second, the release in section 1.4 is conditional on its face – i.e, effective only if DuPont used "reasonable commercial efforts" in handling the ITAM Receivable and the ITAM Collateral post-Closing, which INVISTA has clearly alleged DuPont failed to do.  Thus, to the extent DuPont takes the position that it somehow exercised "reasonable commercial efforts" despite negotiating the Incofinsco check, there exists an obvious question of fact, making DuPont's 12(b)(6) Motion on this point inappropriate.[15]

Third, the Supplemental Agreement was executed eight months <u>before</u> DuPont negotiated the Incofinsco check.  It is settled law in New York that a release, like the one at issue here, does

---

[14] DuPont glosses over this clear and critical distinction in its Memorandum (pp. 29-30), as it does with most arguments throughout its Motion.

[15] None of the cases cited by DuPont (*Sel-Leb Mktg., Inc. v. Dial Corp.*, No. 01CIV.9250, 2002 WL 1974056 (S.D.N.Y. August 27, 2002), *Yak v. Bank Brussells Lambert, BBL (USA)*, 252 F.3d 131 [sic] (2d Cir. 2001), and *RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472 (S.D.N.Y. 2007)) have any application because they all deal with unconditional, unequivocal release language, unlike the case at bar.

not apply to future intentional conduct (e.g., DuPont's cashing the Incofinsco check many months later) and, to the extent it purports to cover such conduct, it is void as against public policy. *See, e.g., Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 338 (S.D.N.Y. 2006) (denying motion to dismiss and noting that courts have ordinarily held a release to be "inapplicable to conduct subsequent to the execution of the release").

## CONCLUSION

For the foregoing reasons, INVISTA respectfully requests that this Court deny DuPont's Motion to Dismiss in its entirety.

DATED:        New York, New York
              June 20, 2008

                                        COOLEY MANION JONES LLP
                                        s/ Harry L. Manion III
                                        Harry L. Manion III
                                        Admitted *Pro Hac Vice*
                                        21 Custom House Street
                                        Boston, Massachusetts 02110
                                        Telephone: (617) 737-3100
                                        Fax: (617) 737-0374
                                        Email: hmanion@cmjlaw.com

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
Benard V. Preziosi, Jr. (BP-5715)
101 Park Avenue
New York, New York  10178-0061
Telephone: (212) 696-6000
Fax: (212) 697-1559
Email: bpreziosi@curtis.com
Attorneys for Plaintiffs