UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x
:
INVISTA B.V., et al.,                           :        08 CV 3063 (SHS)
:
                     Plaintiffs,     :
:
      v.                                       :
:
:
E.I. DU PONT DE NEMOURS AND COMPANY,            :
:
                     Defendant.      :
——————————————————————————x

**REPLY BRIEF IN SUPPORT OF THE MOTION OF
E.I. DUPONT DE NEMOURS AND COMPANY TO DISMISS CERTAIN
ELEMENTS OF INVISTA'S CLAIMS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………...………..………..…………………...ii

INTRODUCTION………………………………………………..………..……………1

    A.    INVISTA Fails to State A Claim Pursuant to § 8.5(b) for Losses
Arising From the Audit Agreement and Consent Decree…………...........……2

    B.    INVISTA Fails to State A § 8.4(a)(ii) Environmental Indemnity Claim.…….6

    C.    INVISTA Fails To State A Claim for Punitive Damages…………..………...7

    D.    INVISTA's Overend Technologies Claim Fails to State A Claim……….…..8

CONCLUSION………………………………………………………..………………10

**TABLE OF AUTHORITIES**

**CASES**

*Aerotel Ltd. v. RSL Comms., Ltd.*,
    99 F.Supp.2d 368 (S.D.N.Y. 2000)..................................................................................1

*California Eastern Lab Inc. v. Gould*,
    896 F.Supp.2d 400 (9th Cir. 1990) ..................................................................................9

*DBT GMBH v. J.L. Min. Co.*,
    544 F. Supp. 2d 364 (S.D.N.Y. 2008).......................................................................... 2, 3

*Freedom Chem. Co. v. BC Sugar Refinery, Ltd.*,
    1998 WL 289736 (S.D.N.Y. June 4, 1998), *aff'd,* 166 F.3d 1200
    (2d Cir. 2000)..................................................................................................................2

*Golfco v. Kycia Associates, Inc.*,
    45 A.D.3d 531 (2d Dep't. 2007)......................................................................................4

*Haynes v. Kleinewefers*,
    921 F.2d 453 (2d Cir. 1990) ...........................................................................................3

*Morris v. Flaig*,
    511 F. Supp.2d 282 (E.D.N.Y. 2007)..............................................................................8

*New York University v. Continental Ins. Co.*,
    87 N.Y.2d 308 (1995) ................................................................................................ 7, 8

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.*,
    297 F. Supp. 821 (S.D.N.Y. 1969).............................................................................. 4, 5

*One Beacon Ins. Co. v. Orange and Rockland Util.*,
    361 F. Supp.2d 331 (S.D.N.Y. 2003)..............................................................................9

*Palmieri v. Allstate Insurance Co.*,
    445 F.3d 179 (2d Cir. 2006) ...........................................................................................7

*Red Ball Interior Demolition Corp. v. Palmadessa*,
    947 F. Supp. 116 (S.D.N.Y. 1996)..................................................................................2


*Reiss v. Finance Performance Corp.*,
  97 N.Y.2d 195 (2001) ................................................................................................3

*Rocanova v. Equitable Life Assur. Socy.*,
  83 N.Y.2d 603 (1994) ............................................................................................ 7, 8

*Savoy Management Corp. v. Leview Fulton Club, LLC*,
  51 A.D.3d 520 (1st Dep't. 2008) ..............................................................................7

*Smurfit Newsprint Corp. v. Southeast Paper Manufacturing Co.*,
  368 F.3d 944 (7th Cir. 2004) ....................................................................................2

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
  380 F. Supp. 2d 250, 262 (S.D.N.Y. 2005) ........................................................ 7, 8

*Unigaard Sec. Insurance Co. v. North Rivers Insurance Co.*,
  79 N.Y.2d 576 (1992) ............................................................................................ 2, 6

*Walker v. Sheldon*,
  10 N.Y.2d 401 (1961) ................................................................................................7

**OTHER**

13 Richard A. Lord, Williston on Contracts § 38.6 and § 38.16 (4th ed. 2007) ........................ 1, 2

WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1998) ...............................3

INVISTA's opposition ignores the relevant contract language, applicable New York law, and the undisputed facts.[1] Applying the contract language, as written, and New York law to the undisputed facts, the motion of DuPont to dismiss the elements of INVISTA's Complaint that relate to environmental indemnity, pursuant to § 8.5(b) of the Purchase Agreement, for losses arising from its corporate-wide audit agreement and consent decree, environmental indemnity pursuant to § 8.4(a)(ii), punitive damages, and Overend Technologies should be dismissed.[2]

### A. INVISTA Fails to State A Claim Pursuant to § 8.5(b) for Losses Arising From the Audit Agreement and Consent Decree.

INVISTA's argument that § 8.5(b) neither "creates" a condition precedent nor "converts" § 8.5(e) into a condition precedent (Opp. at 17) mischaracterizes the basis for the dismissal motion. DuPont contends that § 8.5(e), when read in connection with § 8.5 and the agreement as a whole, unambiguously provides that DuPont conditioned its agreement to provide indemnification on its having "full authority" to control all "Remediation." "Contracts must be construed as a whole and the intentions of the parties ascertained from consideration of the entire contract, not some isolated provision." *Aerotel Ltd. v. RSL Comms., Ltd.*, 99 F. Supp.2d 368, 373 n.6 (S.D.N.Y. 2000). "No particular form of words is necessary to create an express condition. Whether a promise is expressly conditional, and if so what is the nature of the condition, depend upon interpretation." 13 Richard A. Lord, Williston on Contracts § 38.16 (4th ed. 2007).

---

[1] While INVISTA asserts that DuPont's motion rests on "factual assertions that conflict with the Complaint" (Opp. at 24), the Court is not required to credit those allegations to the extent they are inconsistent with the Purchase Agreement and the correspondence to which the Complaint cites. *See* Opening Br. at 2 n.3.

[2] INVISTA has essentially conceded that its ITAM claim, as pleaded, is insufficient and has attempted to amend it through briefing. (Opp. at 32-35). The Court should require INVISTA to amend its Complaint consistent with its description of the ITAM claim in its brief. DuPont will then answer the ITAM claim, withdraw its motion to dismiss the ITAM claim, and address that claim though a summary judgment motion.

Section 8.5(b), which does not contain a dollar limit on environmental indemnity, states that the agreement to provide indemnity is "subject to the terms and conditions of the Agreement." (See Dwyer Affidavit accompanying Motion to Dismiss ("Dwyer Aff."), Exh. 1, at § 8.5(b)). Section 8.5(b) must be read in conjunction with § 8.5(e), which gives DuPont "<u>full</u> authority to control, direct, manage and implement <u>any</u> Remediation," including "the <u>full</u> authority to conduct <u>all</u> negotiations, meetings and settlements with Governmental Authorities with respect to DuPont Environmental Liabilities." (*Id.* at § 8.5(e) (emphasis added)). When §§ 8.5(b) and 8.5(e) are read together, the "full authority" rights in § 8.5(b) are an express condition precedent to DuPont providing indemnity in § 8.5(b) because "'[t]he condition is part of the promise [to provide indemnity] qualifying and limiting it...'" *DBT GmbH v. J.L. Min. Co.*, 544 F. Supp. 2d 364, 380 (S.D.N.Y. 2008) (quoting Williston on Contracts § 38.6).[3]

Adopting INVISTA's interpretation that § 8.5(e) is not an express condition precedent would require the Court to re-write the parties' agreement by, for example,

---

[3] *Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.*, 368 F.3d 944 (7th Cir. 2004) does not undermine this analysis. *Smurfit* addressed whether a notice provision was a condition precedent to indemnification under a purchase agreement. The court held the notice provision at issue lacked the language necessary to make it a condition precedent, and therefore was not encompassed in the phrase "subject to the terms and conditions of the agreement" in the general indemnity section. *Id.* at 951. The notice provision in *Smurfit* is fundamentally different in purpose and language from the control provision giving DuPont "full authority"; this provision goes "to the root of the agreement between the parties" because it provides DuPont its only meaningful control over the cost of indemnification. *Freedom Chem. Co. v. B.C. Sugar Refinery, Ltd.*, 1998 WL 289736 (S.D.N.Y. June 4, 1998), aff'd, 166 F.3d 1200 (2d Cir. 2000); *see also Unigaard Sec. Ins. Co. v. North Rivers Ins. Co.*, 79 N.Y.2d 576, 583 (1992) (emphasizing the importance of control by the indemnitor). INVISTA's reliance on *Red Ball Interior Demolition Corp. v. Palmadessa*, 947 F. Supp. 116 (S.D.N.Y. 1996) is similarly misplaced. In *Red Ball*, the court rejected plaintiff's argument that the "no prejudice" rule, applicable when an insured does not provide prompt notice pursuant to a notice provision in a primary insurance contract, should be applied to indemnification agreements generally. The court declined to "create a new exception" by extending this rule. *Id.* at 123. DuPont is not seeking to create a "new exception" or to extend the no-prejudice rule. DuPont is asking this Court to interpret § 8.5 consistent with established maxims of contractual interpretation and enforce its rights under the Purchase Agreement.

2

excising words like "any" and "all" and "full."[4] *See DBT GmbH*, 544 F. Supp. 2d at 381 (cautioning that courts cannot "add or excise terms, nor distort the meaning of those used") (quoting *Reiss v. Fin. Perf. Corp.*, 97 N.Y.2d 195, 199 (2001)). INVISTA's interpretation also ignores the requirement that indemnification agreements "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume." *Haynes v. Kleinewefers*, 921 F.2d 453, 456 (2nd Cir. 1990).

Faced with the plain language of the contract, INVISTA appears to concede that the indemnity obligations of DuPont under § 8.5(b) are contingent upon DuPont being provided with the opportunity to exercise its control rights under § 8.5(e). INVISTA argues, however, that its "self-reporting and auditing" activities do not constitute Remediation, and therefore the control rights of DuPont under § 8.5(e) were not triggered until INVISTA began discussions with EPA about corrective action, allegedly in 2005. (Opp. at 26, n.9). This argument is refuted by § 8.5(e)'s plain language, which gives DuPont "*full* authority" "to control, direct, manage and implement *any* Remediation" and "to conduct *all* negotiations, meetings, and settlements with Governmental Authorities. The Purchase Agreement defines "Remediation" to include:

> *an action of any kind to address, correct or respond to an Environmental Claim and/or an Environmental Condition or to comply with Environmental Laws*, including the following activities: (i) monitoring, *investigation*, assessment…(iii) *negotiating with…any Governmental Authority or governmental entity necessary to address, correct, or respond to an*

---

[4] INVISTA also appears to argue that "full authority" means *shared* authority, based on its suggestion that § 8.5(e) requires DuPont to "advise and consult" and "work together" with INVISTA to eliminate any risks that might arise from DuPont Environmental Liabilities. (Opp. at 20-21). This argument contradicts the plain meaning of the word "full," which is defined as: "1. Containing all that is possible or normal… 2. Complete in every detail… 3.a. Of maximum degree…." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1988). In addition, INVISTA confuses "DuPont Environmental Liabilities" with Remediation activities by DuPont. Section 8.5(e) only requires DuPont to consult INVISTA when its *remediation activities* will materially interfere with INVISTA's operations or create an enforcement risk. Section 8.5(e) does *not* give INVISTA the right to *unilaterally* take action when it believes that a purported DuPont Environmental Liability may present a risk of enforcement, and DuPont was not afforded an opportunity to fully control Remediation.

3

> *Environmental Claim and/or Environmental Condition or to comply with Environmental Laws*;…and (vii) *any other activities* reasonably determined to be necessary or appropriate or required under Environmental Laws to address any Environmental Condition, Existing Contamination or to avoid Liabilities…. (Dwyer Aff. 1, Exh. 1 at § 1.1, p. 50 (emphasis added)).

INVISTA concedes that it unilaterally communicated and met with Governmental Authorities at least **fifteen** times from June 3 to July 13, 2004 (Answer to Counterclaim ¶ 65) to disclose alleged environmental violations and discuss the terms and scope of a corporate-wide audit agreement.[5]  These contacts constitute "Remediation" and are the types of activities that § 8.5(e) gave DuPont "full authority" to control.

INVISTA argues that "while DuPont focuses on the first three months of INVISTA's ownership of the DTI facilities, it completely ignores everything that followed" (Opp. at 10), and that DuPont could have stepped in *after* INVISTA had negotiated its audit agreement with the EPA, but by not doing so, DuPont waived its right to invoke § 8.5(b).  (Opp. at 23).  Waiver requires a "voluntary and intentional relinquishment" of a known right, and is not created by "negligence, oversight, or thoughtlessness and cannot be inferred from mere silence."  *Golfco v. Kycia Assocs., Inc.*, 45 A.D.3d 531, 533 (2d Dep't. 2007).  DuPont could not have voluntarily or intentionally relinquished its right to full control over Remediation because INVISTA never provided DuPont with the opportunity to exercise such control.[6]

---

[5] While DuPont fully recognizes the importance and value of self-reporting, INVISTA's briefing on this issue misses the mark.  The problem is not that INVISTA self-reported alleged violations; it is the *process* by which such alleged violations were investigated and reported to governmental authorities before they were reported to DuPont.  Instead of immediately bringing suspected violations to the attention of DuPont so it could evaluate them and, as appropriate, contact relevant governmental authorities and control discussions with them, INVISTA unilaterally disclosed purported violations to EPA and the Texas Commission on Environmental Quality ("TCEQ") while excluding DuPont from that process.  For this reason, the cases cited by INVISTA holding that, as a general matter, self-reporting does not preclude indemnification are inapposite.  *See* Opp. at 29, n.9.  None of these cases involved contractual provisions analogous to § 8.5(e).  While INVISTA asserts that DuPont makes the "stunning statement" that the purported violations were "'non-existent'" (Opp. at 1), DuPont's opening brief took no position on whether the alleged environmental violations existed, only that INVISTA's process of investigating and disclosing them foreclosed DuPont from exercising its § 8.5(e) rights.

[6] The facts here are readily distinguishable from *Oleg Cassini, Inc. v. Couture Coordinates, Inc.,* 297 F. Supp. 821 (S.D.N.Y. 1969), which involved a party's repeated failure to make timely royalty payments under a

4

Indeed, over a six-week period (June 3 to July 13, 2004), INVISTA unilaterally: (1) disclosed alleged violations to Governmental Authorities, (2) conducted negotiations with those authorities, and (3) entered into a comprehensive corporate-wide audit agreement. This period was critical from a control standpoint because, within that period, INVISTA contractually obligated itself to a framework for resolving environmental issues with EPA. Once this framework was in place, it was impractical and unrealistic for DuPont to seek to renegotiate the audit agreement, pursuant to which INVISTA contractually obligated itself to make disclosures to Governmental Authorities. As a result of INVISTA's unilateral conduct, DuPont irretrievably lost its ability to fully "control, direct, manage and implement any Remediation," including "to conduct all negotiations, meetings and settlements with Governmental authorities…." (Dwyer Aff., Exh. 1, at § 8.5(e)).

INVISTA tries to excuse its unilateral conduct by stating that it was "forced to move quickly to reduce the risk of a government enforcement action." (Opp. at 21). INVISTA's claimed justification runs contrary to the Purchase Agreement and the undisputed facts. The purpose of § 8.5(e) was to ensure that any response to the risk of a government enforcement action would be initiated and controlled by DuPont, not by INVISTA. INVISTA had time to communicate with DuPont during the relevant time period, but deliberately chose to initiate unilateral communications with Governmental Authorities and to hide these

---

license agreement. The Court held that plaintiff's acceptance of late payments, and its failure to object to such payments despite on-going negotiations with the defendant, amounted to a temporary waiver of rights to prompt payments. Here, DuPont never approved of INVISTA's unilateral Remediation activities, or consented to have INVISTA assume control over Remediation. INVISTA's out-of-context citation to portions of an April 14, 2005 letter, in which DuPont asserted its rights pursuant to the Purchase Agreement (Opp. at 25), is not inconsistent with DuPont's belief that its "full authority" rights had been eviscerated as of August 2004. To the contrary, DuPont met with INVISTA to discuss its upcoming meeting with EPA, and advised INVISTA that it would not participate in the meeting, but would "establish a 'technical team' to review the noncompliance issues discovered in the audits and would cooperate with INVISTA in addressing them." Cmplt. ¶ 43. DuPont was willing to work with INVISTA to address any environmental issues outside the context of *INVISTA's* "negotiations, meetings and settlements with Governmental Authorities," but DuPont would not agree to inject itself into a negotiation process that INVISTA unilaterally initiated and controlled.

5

activities and withhold critical information from DuPont.[7]  Indeed, INVISTA misrepresented to DuPont in its July 29, 2004 letter that EPA had expressed interest in INVISTA entering into a comprehensive, corporate-wide audit agreement when it was INVISTA -- not EPA -- that proposed the agreement.  (*Compare* Cmplt. ¶ 54 *with* Dwyer Aff., Exh. 3 at 25).  INVISTA did not share with DuPont its detailed July 28, 2004 proposed audit protocol, which called for sweeping audits under almost every environmental program, until after EPA had accepted it.  *Id*., Exh. 3, at 2-3, 27.

INVISTA argues that, even if it breached the Agreement, DuPont has not been prejudiced. (Opp. at 24-26).  Because § 8.5(e) is an express condition precedent, no prejudice is required (*Unigaard*, 79 N.Y.2d at 581); INVISTA's conscious decision to usurp the control rights of DuPont forecloses INVISTA from obtaining § 8.5(b) indemnity for losses relating to its corporate-wide audit agreement and the consent decree.[8]

### B.   INVISTA Fails to State A § 8.4(a)(ii) Environmental Indemnity Claim.

INVISTA's response to the motion to dismiss the § 8.4(a)(ii) environmental indemnity claim is that: (i) "there is an obvious conflict between" §§ 8.4(a)(ii) and 8.4(c); and (ii) "where two provisions are irreconcilable on their face, extrinsic evidence of the parties' intent" is required.  (Opp. at 26 n.10).  This argument fails because:  "The mere assertion of an ambiguity does not suffice to make an issue of fact.  Ambiguity resides in a writing when – after it is viewed objectively – more than one meaning may reasonably be

---

[7] For example INVISTA asserts that "[w]hen DuPont received INVISTA's first notice letter on or about June 17, 2004, it did not step forward to take control of the situation at Victoria" (Opp. at 21).  While that letter simply advised DuPont of a "potential claim" that INVISTA was investigating, INVISTA failed to disclose in the letter that it already had multiple communications with TCEQ, including in-person meetings and a conference call, relating to the subject matter of the letter.  Answer to Counterclaim ¶ 65.

[8] If the Court concludes that § 8.5(e) is not an express condition precedent, DuPont asks the Court to focus initial discovery on (a) whether INVISTA's breach prejudiced DuPont; and (b) the circumstances, including internal INVISTA deliberations, leading up to the audit agreement, allowing for an early dispositive motion.

ascribed to the language used." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006).  Here, § 8.4(c), which states that "[n]otwithstanding anything herein to the contrary,…any indemnification claims relating to any DuPont Environmental Liabilities…shall be made exclusively under Section 8.4(a)(i) or 8.5," resolves any arguable conflict between §§ 8.4(a)(ii) and 8.4(c).  Section 8.4(c) unambiguously provides that § 8.5(b) trumps § 8.4(a)(ii).  "Since the [Purchase] [A]greement is not ambiguous, extrinsic evidence may not be used to create such an ambiguity…." *Savoy Mgmt. Corp. v. Leview Fulton Club, LLC*, 51 A.D.3d 520 (1st Dep't. 2008).  INVISTA's § 8.4(a)(ii) environmental indemnity claim should therefore be dismissed.

      **C.    INVISTA Fails To State A Claim for Punitive Damages.**

INVISTA ignores the standard established by the New York Court of Appeals in *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308 (1995) and *Rocanova v. Equit. Life Assur. Socy.*, 83 N.Y.2d 603 (1994), arguing that the motion to dismiss the punitive damages claim "is based on an inaccurate articulation of the law." (Opp. at 27).  In accordance with *Rocanova* and *NYU*, a plaintiff must plead the following four elements:

> (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon*, 10 N.Y.2d 401, 404-405, 223 N.Y.S.2d 488, 179 N.E.2d 497…; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally[.] (*NYU*, 87 N.Y.2d at 316).

"[T]he threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract." *Id.*

INVISTA instead argues that "[t]he correct legal standard is set forth in *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp.2d 250, 262 (S.D.N.Y. 2005)." (Opp. at 4; *see also id.* at 27).  But the court in *Topps* followed *Rocanova* and *NYU*.  The court first decided whether the plaintiff alleged an independent tort and concluded it had (*i.e.,*

misappropriation). *Id.* at 261. The court dismissed the punitive damages claim because the alleged breach was not part of a pattern directed at the public generally. *Id.* at 263.

INVISTA also asserts that its "claim for punitive damages is further supported by the fact that New York Courts award punitive damages in breach of contract actions, such as landlord tenant cases involving breaches of the warranty of habitability." (Opp. at 28). Those cases are inapposite because the implied warranty of habitability is not a privately negotiated contract term; it is a right implied in all residential leases by statute. Because the implied warranty of habitability is not a privately negotiated contract term, the *Rocanova-NYU* standard does not apply to breaches of the implied warranty of habitability. *Morris v. Flaig*, 511 F. Supp. 2d 282, 296-97 (E.D.N.Y. 2007).

INVISTA does not dispute its failure to meet the four-part *Rocanova-NYU* standard: it has not alleged an independent tort (the first two elements), and the alleged conduct, an alleged breach of the Purchase Agreement,[9] is not directed at the public (precluding satisfaction of the remaining elements).

### D.   INVISTA's Overend Technologies Claim Fails to State A Claim.

INVISTA does not dispute that there were no "actual or alleged violations of Antitrust Laws" relating to the '054 patent prior to the Closing Date. INVISTA tries to avoid that shortcoming in its Complaint by asserting that the alleged fraudulent procurement of the patent by DuPont was a "key element" of Overend's antitrust claim against INVISTA and therefore "the Sherman Act claims in the *Overend* matter clearly 'arise out of' DuPont's alleged unlawful pre-closing conduct." (Opp. at 31-32). Fraudulent procurement of a

---

[9] INVISTA mischaracterizes the moving papers' use of EPA's guidelines, when it asserts that "DuPont attempts to side-step INVISTA's allegations that DuPont's conduct was part of a pattern directed at the public generally by citing to EPA's guidelines for self-policing and auditing." (Opp. at 29). DuPont cited the EPA guidelines only to show that INVISTA's egregious conduct allegations are inconsistent with INVISTA's representations to EPA relating to the environmental issues underlying its indemnity claim. (*Id.* at 26).

8

patent, as a matter of law, does not constitute an antitrust violation and cannot give rise to an antitrust claim; only anticompetitive use of the patent can do so. *California Eastern Lab., Inc. v. Gould*, 896 F.2d 400, 403 (9th Cir. 1990); Opening Br. at 27-28. There were no actual or alleged antitrust violations in connection with the '054 patent until after Closing, when *INVISTA* was alleged to have made anticompetitive use of the patent. Paragraph 4 of Schedule l(zz) expressly provides that "in the case of any actual or alleged violation of Antitrust Laws relating to the ownership of the DTI Assets…occurring after the Closing Date, such Liabilities shall not have resulted from or arisen out of any violation of Antitrust Law by a Buyer Indemnified Party after the Closing Date…." Dwyer Aff., Exh. 2, Schedule l(zz).

INVISTA gains no support from *One Beacon Ins. Co. v. Orange & Rockland Util.,* in which the court interpreted the phrase "arose out of" in the context of a more "expansive" indemnity agreement. 361 F. Supp.2d 331, 334 (S.D.N.Y. 2005) (interpreting term "for purposes of the Agreement"). In *One Beacon,* the indemnitor agreed to provide "unequivocal" indemnification "regardless of [the indemnitee's] negligence." *Id.* at 335. In contrast, the duty of DuPont to indemnify specifically excludes any liability for violations occurring after Closing that "have resulted from or arisen out of any violation of any Antitrust Law by [INVISTA]…." Any alleged or actual violation of the Antitrust Laws in connection with the '054 patent occurred after Closing and resulted from INVISTA's enforcement of the patent, thereby relieving DuPont of any duty to indemnify.

9

## Conclusion

For the foregoing reasons, and those in the opening brief of DuPont, the motion to dismiss the elements of the Complaint relating to environmental indemnity, pursuant to § 8.5(b), for losses arising from the audit agreement and consent decree, and § 8.4(a)(ii), punitive damages, and Overend Technologies should be granted.[10]

| | |
|---|---|
| Dated:  New York, New York<br>            July 11, 2008 | BOIES, SCHILLER & FLEXNER LLP<br><br>David Boies (DB-4399)<br>333 Main Street<br>Armonk, NY  10504 |
| MORGAN, LEWIS & BOCKIUS LLP | Phone:  914-749-8200 |
| Troy S. Brown (admitted *pro hac vice*)<br>Jeffrey N. Hurwitz (admitted *pro hac vice*)<br>Margot G. Bloom (MB-7455)<br>Erica C. Blackledge (admitted *pro hac vice*)<br>1701 Market Street<br>Philadelphia, PA  19103<br>Phone:  215-963-5000 | Robert J. Dwyer (RD-6457)<br>575 Lexington Avenue, 7th Floor<br>New York, NY  10022<br>Phone:  212-446-2300<br><br>Amy J. Mauser (admitted *pro hac vice*)<br>5301 Wisconsin Avenue, N.W., Suite 800<br>Washington, D.C.  20015<br>Phone:  202-237-2727 |
| Attorneys for Defendant | |
| | By:    s/Robert J. Dwyer<br>           Robert J. Dwyer |

---

[10] INVISTA suggests that it might challenge the right of DuPont to be represented by Morgan Lewis in this matter. (Opp. at 3 n.2). If INVISTA files a motion to disqualify, Morgan Lewis will submit a full response, demonstrating why its former client relationship with non-parties Koch Industries, Inc. and certain of Koch's affiliates ("Koch") does not disqualify Morgan Lewis from representing DuPont in this matter. In response to the specific points INVISTA raised, Morgan Lewis states:
 (a) It is undisputed that INVISTA has been aware since October 2005 that Morgan Lewis is representing DuPont on issues that are the subject of INVISTA's Complaint in this matter.
 (b) Morgan Lewis' environmental work for Koch substantially concluded during 2001.
 (c) Morgan Lewis did not provide any legal services to Koch after December 13, 2003, 4 ½ months before Closing.
 (d) Morgan Lewis formally terminated its attorney-client relationship with Koch by a letter, dated August 31, 2004, after the relationship became inactive, and did not serve as counsel to DuPont related to INVISTA until after August 2004.
 (e) Morgan Lewis never provided advice to Koch regarding the facilities at issue in this matter and therefore possesses no client confidences from Koch relating to those facilities.
 (f) INVISTA's assertion that Morgan Lewis previously represented Koch on matters similar to those at issue in this matter is insufficient, as a matter of law, to disqualify Morgan Lewis.