**DOCUMENT FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
INVISTA B.V., et al.,                                             :   08 CV 3063 (SHS)
                                                                  :
                           Plaintiffs,                            :
                                                                  :
                   against                                        :
                                                                  :
E.I. DU PONT DE NEMOURS AND COMPANY,                              :
                                                                  :
                           Defendant.                             :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO DISQUALIFY MORGAN, LEWIS & BOCKIUS LLP
## AS COUNSEL FOR DEFENDANT

---

Scott E. Mollen, Esq.
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, NY 10016
212.592.1400
Attorneys for Plaintiffs INVISTA B.V., *et al.*
smollen@herrick.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF RELEVANT FACTS .................................................... 3

**A.** MLB WAS KOCH'S LONG-TIME ENVIRONMENTAL LAW COUNSEL BEFORE IT DROPPED KOCH TO TAKE ON DUPONT AS A CLIENT ...................................................... 3

    **1.** MLB's Representation Of Koch In BWON And PSD/NSR Matters ...................................................................... 4

    **2.** MLB's Representation Of Koch In Corporate-Wide OSHA Audits ......................................................................... 5

**B.** INVISTA IS A WHOLLY-OWNED SUBSIDIARY OF KOCH ............. 6

**C.** MLB TERMINATES ITS RELATIONSHIP WITH KOCH TO REPRESENT DUPONT IN A MATTER ADVERSE TO INVISTA AND TO CIRCUMVENT ITS OBLIGATIONS UNDER ITS ENGAGEMENT LETTER AND ETHICS RULES .................................................................................. 6

**D.** INVISTA LEARNS OF AND OBJECTS TO MLB'S REPRESENTATION OF DUPONT IN CONNECTION WITH INVISTA'S INDEMNITY CLAIMS ........................................... 7

    **1.** DuPont And MLB Refuse To Terminate Relationship Over Koch And INVISTA's Objection ........................................ 8

    **2.** MLB Retains Files Containing Sensitive, Proprietary And Confidential Information From Its Representation Of Koch ......... 9

    **3.** MLB Continues To Assert The Absence Of A Conflict And Advises That It Assigned Some Of The Same Attorneys Who Worked on Koch Matters To The DuPont Representation ...................................................... 10

**E.** MLB'S PRIOR REPRESENTATION OF KOCH IS SUBSTANTIALLY RELATED TO THE SUBJECT MATTER OF THIS ACTION .......................................................... 11

i

**1.** The Same Environmental Laws And Regulations Are Involved .................................................................................... 11

**2.** The Same Senior Managers And In-House Counsel Were Involved In Addressing Both The Koch And INVISTA Noncompliance Issues .............................................................. 12

**3.** The Koch And INVISTA Consent Decrees Were Negotiated With The Same EPA Representatives and Involved The Same Issues ........................................................................... 13

**4.** DuPont's Defenses Challenge INVISTA's Regulatory Compliance Strategy, Which Is Modeled Upon The Approach MLB Helped Create ..................................................... 13

**F.** MLB IS ADMITTEDLY IN POSSESSION OF CONFIDENTIAL INFORMATION THAT COULD BE USED TO INVISTA'S DISADVANTAGE .............................................................................. 14

ARGUMENT ............................................................................................. 15

THE STANDARD FOR DISQUALIFICATION ............................................. 15

**I.** INVISTA IS A "FORMER CLIENT" OF MLB FOR PURPOSES OF DISQUALIFICATION ..................................................................... 18

**II.** MLB'S REPRESENTATION OF KOCH IS SUBSTANTIALLY-RELATED TO THE SUBJECT MATTER OF THIS CASE .................. 19

**III.** MLB POSSESSES CONFIDENTIAL AND PRIVILEGED INFORMATION THAT COULD BE USED TO INVISTA'S MATERIAL DISADVANTAGE .......................................................... 20

**IV.** LACHES IS NOT A DEFENSE TO DISQUALIFICATION AND DUPONT WILL NOT BE PREJUDICED BY MLB'S DISQUALIFICATION ........................................................................ 23

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

Baird v. Hilton Hotel Corp., 771 F. Supp. 24 (E.D.N.Y.1991) ....................................... 23

Blue Planet Software, Inc. v. Games International LLC, 331 F. Supp. 2d
    273 (S.D.N.Y. 2004) ..................................................................... 15, 17, 19, 23

British Airways, PLC v. Port Authority of New York and New Jersey, 862
    F. Supp. 889 (E.D.N.Y. 1994) ............................................................................ 24

Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976) .................................... 16

Colorpix System of America v. Broan Manufacturing Co., 131 F. Supp.
    2d 331 (D. Conn. 2001) ...................................................................................... 18

Discotrade Ltd. v. Wyeth-Ayerst International, 200 F. Supp. 2d 355
    (S.D.N.Y. 2002) ................................................................................................... 18

Evans v. Artek System Corp., 715 F.2d 788 (2d Cir. 1983) ..................................... 17, 20

Fierro v. Gallucci, No. 06-CV-5189 (JFB) 2007 WL 4287707 (E.D.N.Y.
    Dec. 4, 2007) ...................................................................................................... 24

Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir.
    1977) ................................................................................................................... 20

Glueck v. Jonathan Logan, Inc., 653 F.2d 746 (2d Cir. 1981) ....................................... 19

Hartford Accident & Indemnity Co. v. RJR Nabisco, Inc., 721 F. Supp.
    534 (S.D.N.Y. 1989) ........................................................................................... 18

Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975) ..................................................... 21

J.P. Morgan Chase Bank v. Liberty Mutual Insurance Co., 189 F. Supp.
    2d 20 (S.D.N.Y. 2002) ........................................................................................ 18

Kabi Pharmacia v. Alcon Surgical, Inc., 803 F. Supp. 957 (D. Del. 1992) .................... 16

Mitchell v. Metropolitan Life Insurance Co., No. 01-CV-2112 (WHP)
    2002 WL 441194 (S.D.N.Y., March 21, 2002) ............................................. 22, 23

Picker International, Inc. v. Varian Associates, Inc., 670 F. Supp. 1363
    (N.D. Ohio 1987) ................................................................................................. 17

Schwed v. General Electric, Inc., 990 F. Supp. 113 (N.D.N.Y. 1998) ..................... 20, 23

Stratagem Development Corp. v. Heron International N.V., 756 F. Supp.
789 (S.D.N.Y. 1994) .................................................................................. 17

T.C. Theatre Corp. v. Warner Bros. Pictures, 113 F. Supp 265 (S.D.N.Y.
1953) ........................................................................................................ 21

Ullrich v. The Hearst Corp., 809 F. Supp. 229 (S.D.N.Y. 1992) .................. 19, 20, 21, 24

United States Football League v. National Football League, 605 F. Supp.
1448 (S.D.N.Y. 1985) ............................................................................ 21, 23

United States v. Oberoi, 331 F.3d 44 (2d Cir. 2003) ....................................... 15

## MISCELLANEOUS

Peter R. Jarvis & Bradley F. Tellam, The Dishonesty Rule - A Rule With
a Future, 74 OR. L. REV. 665 (1995) ...................................................... 16

The Professional Rules of Responsibility, DR 1-102(A)(4) .......................................... 16

The Professional Rules of Responsibility, DR 4-101 ..................................................... 17

The Professional Rules of Responsibility, DR 5-105 ..................................................... 17

The Professional Rules of Responsibility, DR 5-108 ..................................................... 17

The Professional Rules of Responsibility, DR 7-102(A)(5) .......................................... 16

Plaintiffs (collectively, "INVISTA") respectfully submit this memorandum in support of their motion to disqualify Morgan, Lewis & Bockius LLP ("MLB") as counsel for Defendant E.I. du Pont de Nemours and Company ("DuPont").

## PRELIMINARY STATEMENT

Starting in May 1998, MLB was primary outside counsel to Plaintiffs' parent company, Koch Industries, Inc. ("Koch") relating to environmental, health and safety ("EHS") issues that are substantially similar to the EHS issues involved in Plaintiffs' indemnity claims. During MLB's six-year representation of Koch in EHS and other matters, MLB lawyers and professionals billed more than 10,000 hours, totaling over $6 million in fees. The relationship continued until MLB terminated its relationship with Koch by letter dated August 31, 2004 – spuriously characterizing the termination as merely a "housekeeping" matter – and immediately undertook representation of DuPont against INVISTA on INVISTA's indemnity claims relating to DuPont's historic EHS noncompliance at facilities that were ultimately acquired by INVISTA. DuPont clearly perceived a great benefit in retaining MLB for its defense against INVISTA.

Given the facts and controlling judicial precedent, there is no viable argument for MLB to continue as counsel for DuPont in this action. No client should have to be questioned and challenged by the very same attorneys who were its confidantes and counselors for six years on the same or substantially the same issues, facts, laws and regulations. Nor should any party have the unfair advantage of being represented by its adversaries' former confidantes and counselors, particularly here where MLB's engagement letter recognized that the confidential information MLB would receive could be used to the disadvantage of Koch and its affiliated companies if MLB undertook representation of an adverse party. That is precisely what would occur if MLB is permitted to continue to represent DuPont adverse to INVISTA, contrary to the engagement letter and MLB's ethical obligations.

Incredibly, some of the very same MLB attorneys who represented Koch are now defending DuPont in this action. As a result of their work with senior Koch executives on EHS issues, MLB had substantial access to important privileged, confidential and sensitive information regarding Koch and its affiliated companies and gained significant insight into Koch's approach and commitment to EHS compliance and to dealing with EPA, DOJ, OSHA[1] and state agencies. MLB also obtained first-hand knowledge of the negotiating capabilities and styles of senior management and in-house attorneys and the process by which Koch addresses potential regulatory noncompliance. DuPont has named many of those same managers and in-house counsel as witnesses. Absent the relief requested in this motion, those witnesses will likely find themselves in the distressing position of being deposed about compliance issues by the same attorneys who were once their confidantes as to the same issues.

Indeed, Koch's approach and commitment to EHS compliance is now at the heart of DuPont's defenses in this action. DuPont challenges INVISTA's approach to compliance as overbroad and attacks the motives of its decision makers, alleging they manufactured violations of EHS laws at the facilities DuPont sold to Koch in order to recover the substantial remediation costs that will be incurred at those facilities. Yet INVISTA's fundamental approach to the regulatory issues underlying the indemnity claims against DuPont – from self reporting, to auditing, to negotiations with the government – was based in part on legal advice from MLB to Koch in connection with its prior work on the same issues.

The significant conflicts problem facing DuPont and MLB here is one of their own making. Although DuPont is generally entitled to counsel of its choice, it is not entitled to hire, out of hundreds of EHS lawyers in this country, its adversaries' long-standing EHS counsel.

---

[1] As used herein, "EPA" refers to the United States Environmental Protection Agency; "DOJ" refers to the United States Department of Justice; and "OSHA" refers to the Occupational Health and Safety Administration and/or the Occupational Health and Safety Act.

MLB cannot switch sides and use or potentially use Koch's sensitive, proprietary and confidential information to DuPont's advantage against Koch and Plaintiffs. Nor can DuPont seriously claim to be disadvantaged by disqualification. DuPont chose to proceed with MLB as counsel despite its knowledge of the conflict and Plaintiffs' repeated objections. As discussed below, under the circumstances, the controlling judicial precedent and applicable Disciplinary Rules do not permit MLB to play both sides of the street and require MLB's disqualification.

## STATEMENT OF RELEVANT FACTS

**A.     MLB WAS KOCH'S LONG-TIME ENVIRONMENTAL LAW COUNSEL BEFORE IT DROPPED KOCH TO TAKE ON DUPONT AS A CLIENT**

Starting in May 1998, MLB was retained as legal counsel to Koch and its affiliates to provide "advice on a range of environmental law issues" (Holden Decl.,[2] ¶3, Ex. A), including matters relating to EHS compliance. From 1998 to 2003, more than 60 different lawyers and a dozen non-lawyer professionals from MLB billed more than 10,000 hours on EHS and various matters, totaling over $6 million in fees. Id., ¶¶4-5.

MLB clearly understood the importance and sensitivity of the environmental matters it was asked to address for Koch. MLB's May 19, 1998 engagement letter for these matters **expressly carves out environmental matters from an advance waiver**. Id., ¶6; Ex. A. In the May 19 engagement letter, MLB also addressed the manner in which it would safeguard Koch's confidential information, specifying that the advance waiver would not apply where

> as a result of our [MLB's] representation of Koch in environmental matters, we have obtained sensitive, proprietary or other confidential information of a non-public nature that, if known to another client of ours, could be used to the material disadvantage of Koch (*or a company affiliated with Koch*) in a matter in which we represent, or in the future are asked to undertake representation of, that client.

Id., Ex. A (emphasis added).

---

[2]   As used herein, "Holden Decl." shall refer to the Declaration of Mark V. Holden; "Sahatjian Decl." shall refer to the Declaration of Laurie Sahatjian; and "Frerking Decl." shall refer to the Declaration of William A. Frerking, all of which are dated August 27, 2008 and are submitted herewith in support of INVISTA's motion to disqualify MLB.

Thus, MLB confirmed that in the course of its work on EHS issues, Koch would undoubtedly disclose to it sensitive, proprietary and confidential information that could be used to the disadvantage of Koch <u>or</u> its affiliates. Accordingly, and as required by New York Disciplinary Rule ("DR") 5-105, MLB was, at a minimum, contractually required to disclose and seek to obtain a waiver from Koch before undertaking any environmental law matter adverse to Koch or any matter where confidential information regarding environmental issues could be used to the material disadvantage of Koch "or a company affiliated with Koch," such as INVISTA. Here, MLB neither disclosed the adverse representation nor obtained Koch's consent to the representation.

### 1.    MLB's Representation Of Koch In BWON And PSD/NSR Matters

As Koch's environmental counsel, MLB attorneys (including Jeffrey Hurwitz who is one of DuPont's counsel of record in this case) counseled Koch in connection with suspected violations of BWON and PSD/NSR[3] regulations at its Flint Hills Resources, LP ("FHR") refineries.[4] Frerking Decl., ¶¶9-11. Spending considerable time meeting and strategizing with senior Koch managers and attorneys, the MLB attorneys navigated Koch through intensive and lengthy negotiations with EPA, DOJ and state regulators, which culminated in a groundbreaking consent decree (the "Koch Consent Decree") involving costly pollution controls and payment of penalties by Koch. <u>Id.</u>, ¶¶12-15.

MLB attorneys participated in almost every significant conference call and meeting between Koch and EPA, DOJ and state agencies regarding the proposed consent decree and advised Koch regarding the manner in which EPA interpreted and enforced its regulations. <u>Id.</u>, ¶¶11-13. Over the course of many months of negotiations, MLB advised Koch regarding

---

[3]  As used herein, "BWON" refers to Benzene Waster Operations NESHAP and "PSD/NSR" refers to Prevention of Significant Deterioration/New Source Review, both regulations under the Clean Air Act.
[4]  FHR, like INVISTA is a wholly-owned subsidiary of Koch. <u>See</u> subpart B, <u>infra</u>.

virtually all aspects of the matter, including the appropriate settlement mechanism, the language and structure of the consent decree, the size of the penalty, and the liability releases for historical and future violations. Id., ¶14. MLB also assisted Koch in working with the government to draft the specific terms of the Koch Consent Decree, and in some cases negotiated proposed language directly with EPA and DOJ attorneys. Id.

As a result of its extensive work on the Koch Consent Decree and other EHS matters, MLB had access to sensitive, proprietary and confidential information regarding Koch, and gained significant insight into Koch's specific approach to addressing compliance issues and dealing with EPA, DOJ and state agencies on a range of important environmental issues. Id., ¶¶16-17. MLB obtained first-hand knowledge of the negotiating capabilities and styles of Koch's senior management, including Jim Mahoney and Joe Coco, among others, and of Koch's in-house attorneys, as well as the processes by which Koch addresses potential regulatory noncompliance, such as those employed to address issues later found at the former DuPont facilities. Id., ¶¶12-13, 16-17; Sahatjian Decl., ¶31; Holden Decl., ¶37.

### 2.     <u>MLB's Representation Of Koch In Corporate-Wide OSHA Audits</u>

MLB also counseled Koch in corporate-wide OSHA audits at various Koch facilities. Sahatjian Decl., ¶¶2-11. MLB attorneys[5] took a lead role in the audits of 234 Koch company facilities nationwide, which included extensive meetings with senior Koch management,[6] visiting and touring Koch facilities and meeting with plant personnel and senior management regarding OSHA and other regulatory issues. Id. MLB closely advised Koch's senior management and internal counsel, including with regard to meetings with government regulators, corrective

---

[5]   MLB attorneys on Koch's OSHA audit/compliance task force signed confidentiality agreements acknowledging that work they performed was privileged and highly confidential, including MLB attorney T. Benjamin Huggett, who has also worked for DuPont in this matter adverse to INVISTA. Sahatjian Decl., ¶10.

[6]   Among others, MLB worked closely with Koch's General Counsel Paul Kaleta, who later became INVISTA's General Counsel, and Bill Caffey, Koch Board member and Executive Vice President (who later became a member of INVISTA's Board of Directors). Id., ¶¶ 3, 7.

measures to offer or accept in negotiations with the Department of Labor ("DOL"), and drafting and vetting terms and conditions of a Strategic Partnership Agreement with the DOL. Id.

**B.    INVISTA IS A WHOLLY-OWNED SUBSIDIARY OF KOCH**

In the course of representing Koch and FHR, MLB became familiar with Koch and its environmental compliance policies.  INVISTA is a wholly-owned subsidiary of Koch and is headquartered in the same office complex in Wichita, Kansas.  Many senior Koch executives are members of INVISTA's Board of Directors. Holden Decl., ¶¶38-39.  As MLB knows from its prior representation, Koch, a privately-held company, imbues in its subsidiaries the same compliance philosophies with respect to EHS and regulatory issues.  Personnel of all of Koch companies, including INVISTA, are trained in a like manner regarding EHS compliance, and many of the legal, executive and operational personnel at INVISTA were initially with Koch or other of the Koch subsidiaries. Id.  Thus, the Koch family of companies and their personnel share a uniform approach to identifying, addressing and resolving business, legal and compliance issues.  Koch's legal counsel often works closely with its subsidiary's in-house counsel in connection with serious EHS matters. Id., ¶40.  Accordingly, and consistent with MLB acknowledgement in its May 19, 1998 engagement letter that it could learn sensitive and confidential information that could be used to the disadvantage of Koch and its *affiliates*, Koch and INVISTA should be considered the same "client" of MLB for purposes of the disqualification analysis.

**C.    MLB TERMINATES ITS RELATIONSHIP WITH KOCH TO REPRESENT DUPONT IN A MATTER ADVERSE TO INVISTA AND TO CIRCUMVENT ITS OBLIGATIONS UNDER ITS ENGAGEMENT LETTER AND ETHICS RULES**

MLB's work for Koch continued through the end of 2003, when the work tapered off. Holden Decl., ¶9.  In late August 2004, Dennis Morikawa of MLB, the lead outside counsel on Koch's nationwide OSHA audit and compliance efforts, called Koch's General Counsel of

Litigation & Compliance, Mark Holden, to inform him that MLB had decided to terminate its relationship with Koch and that he would send a letter to that effect. Id., ¶ 8. When Holden asked Morikawa why MLB was terminating the relationship, Morikawa said that MLB had assessed the reduced level of activity on Koch matters and concluded that the relationship should be terminated. Id., ¶10. Morikawa described the forthcoming termination letter as "housekeeping" and "purely administrative." When Holden asked if there was any other reason for the termination or anything else that he should know, Morikawa replied, "no." Id. Morikawa sent Holden a termination letter dated August 31, 2004 stating the relationship was being concluded because of the reduced level of activity in Koch matters over the year. Id., Ex. B.

Unbeknownst to Koch, MLB's true motivation for terminating its representation of Koch was that DuPont had contacted MLB's John Quarles and Michael Steinberg (both of whom had worked heavily on Koch EHS matters) either mid or late August 2004 seeking to retain MLB to handle an environmental matter adverse to INVISTA.[7] Id., ¶¶21, 29, Ex. H. MLB did not tell Koch about DuPont's inquiry or, indeed, say anything about a potential adverse representation on behalf of even an unnamed client. MLB never disclosed the conflicting representation nor sought a conflict waiver despite its ethical and contractual obligations to do so. Rather, MLB dropped Koch on the pretense of "housekeeping," misled Koch about the true reason for the termination when directly asked, and first billed time to DuPont the next day. Id., ¶¶10, 29.

**D.    INVISTA LEARNS OF AND OBJECTS TO MLB'S REPRESENTATION OF DUPONT IN CONNECTION WITH INVISTA'S INDEMNITY CLAIMS**

Purely by happenstance, INVISTA subsequently learned that MLB may have been involved in the INVISTA indemnity claims that underlie this lawsuit when DuPont's in-house counsel copied two MLB attorneys on a letter he sent to INVISTA in October 2005. Sahatjian

---

[7]    By this time (August 2004), INVISTA had sent DuPont three notice letters regarding indemnification claims arising from environmental issues discovered at DuPont's DTI businesses, which had been acquired by Koch in Spring of 2004. Holden Decl., ¶46, Ex. N.

Decl., ¶12, Ex. B.  After rebuffing INVISTA's repeated requests for a meeting for over a year, DuPont agreed to schedule a meeting for April 3, 2006 to discuss the PSD/NSR and BWON violations at the former DuPont facilities acquired by Koch and an upcoming meeting between INVISTA and EPA regarding proposed corrective measures. Id., ¶¶13-14.  DuPont proposed that the meeting take place at MLB's offices, confirming INVISTA's concerns that MLB was now representing DuPont adverse to it. Id.

**1.    DuPont And MLB Refuse To Terminate Relationship Over Koch And INVISTA's Objection**

In advance of the meeting, Koch sent a letter dated March 31, 2006, placing DuPont on notice of its objection to MLB's conflicting representation of DuPont. Id., Ex. D.  Koch also indicated that it expected MLB to wall off from the INVISTA matter all MLB attorneys and personnel who worked on Koch matters.  Id.  DuPont admitted that it was aware of the conflict issue but responded that it understood MLB had cleared conflicts by terminating its relationship with Koch. Id., ¶¶17-19, Ex. E.  MLB also responded to INVISTA, taking the position that the current representation of DuPont was not "substantially related" to the former representation of Koch and, therefore, MLB would not wall off from the DuPont representation any of the MLB attorneys who were involved in the representation of Koch. Id., ¶25, Ex. F.

Over Koch and INVISTA's objection, MLB and DuPont insisted that Michael Steinberg and Jeffrey Hurwitz, MLB attorneys who also had worked on Koch EHS matters, attend the April 3 meeting. Id., ¶22.  MLB agreed at the April 3 meeting that it would not in the future allege that INVISTA waived any rights by going forward with the meeting with DuPont at that time. Id., ¶23.  INVISTA again raised concerns about MLB's representation of DuPont in light of the prior representation of Koch in an April 7, 2006 letter to DuPont and MLB and continued to reserve all rights regarding MLB's representation of DuPont. Id., ¶26, Ex. G.  Thereafter, based upon DuPont's repeated representations that it wanted to avoid litigation and resolve the

8

disputes "commercially," INVISTA and DuPont engaged in extended negotiations in an attempt to settle indemnification claims relating to BWON, PSD/NSR and OSHA violations at the former DuPont facilities. Id., ¶32.  Clearly, there would have been no chance to reach settlement had INVISTA refused to deal with DuPont while it was represented by MLB.  Id.

### 2.    MLB Retains Files Containing Sensitive, Proprietary And Confidential Information From Its Representation Of Koch

In March 2008, after negotiations terminated without settlement, INVISTA filed its Complaint in this matter and its counsel contacted MLB to again inquire how the firm planned to address its conflict in representing DuPont in this matter. Id., ¶33; Holden Decl., Ex. C.  MLB again responded that it did not believe any conflict existed and continued to maintain that it had no obligation to wall off the attorneys and personnel who worked on Koch matters. Id., Ex. D.  INVISTA requested that MLB return of all of the confidential information it obtained or generated in connection with its representation of Koch. Id., Ex. E.  In April 2008, MLB returned approximately 200 boxes of materials, but upon review of the materials, Koch learned that MLB had withheld files that purportedly contained "internal memoranda" and "client retention documents" relating to the Koch representation. Id., ¶17.

It was not until mid-June 2008, after further discussions with Koch counsel regarding the conflict, that MLB allowed Koch to inspect at MLB's offices in Philadelphia 106 boxes of additional files, which included "attorney notes" and voluminous "working files" regarding the EHS matters at Koch and its affiliates. Id., ¶¶32-33.  All of these files, which include memoranda and notes relating to the same OSHA, BWON and PSD/NSR violations and compliance issues and strategies that are the subject of this action, remain in MLB's possession and control to date. Id.

3.    **MLB Continues To Assert The Absence Of A Conflict And Advises That It Assigned Some Of The Same Attorneys Who Worked on Koch Matters To The DuPont Representation**

MLB finally agreed to meet with Koch representatives in June 2008 to discuss the conflict. Holden Decl., ¶¶18-23.  At that meeting, Koch first learned that MLB's representation of DuPont dated back to 2004 and that DuPont's call to MLB regarding the matter adverse to INVISTA had led MLB to terminate its relationship with Koch on August 31, 2004. Id.  As MLB admitted after that meeting, the August 31 letter was motivated by the "opportunity [that] came about" to represent DuPont in a matter MLB knew was or could be adverse to INVISTA.  Id., Ex.28.[8]  MLB also disclosed for the first time that, while it repeatedly refused to wall off from the INVISTA matter any of the attorneys who worked on Koch matters because there was "no conflict" (Id., ¶15, Ex. C; Sahatjian Decl., ¶25), it *had*, in fact, walled off only one MLB attorney, Dennis Morikawa, who was in charge of OSHA and labor-related work for Koch. Holden Decl., ¶25.  MLB walled off Morikawa in April 2006, a year and a half after it "opened" the DuPont/INVISTA matter in October 2004 and shortly after Koch's March 31, 2006 letter objecting to MLB's representation of DuPont. Id., ¶31.  MLB still did not wall off any of the other attorneys who worked on the OSHA matters nor a single attorney who worked on the PSD/NSR and BWON issues and Koch Consent Decree.[9]  **In fact, six current partners or counsel of MLB – Jeffrey Hurwitz, Michael Steinberg, William Lewis, Jack Dodds, T. Benjamin Huggett and Kenneth Rubin – have worked on both the Koch environmental**

---

[8]    Nevertheless, MLB remained dismissive of any obligation to disclose the conflict to Koch, obtain a waiver or otherwise address the patent conflict.  See June 13, 2008 email from Michael Bloom of MLB to Holden. Holden Decl., Ex. H.

[9]    MLB advised it decided to wall off Morikawa in an "overabundance of caution." Holden Decl., Ex. J.  This decision to wall off Morikawa, who was involved in the OSHA-related work, but not other attorneys who worked on Koch EHS matters, is puzzling in light of the fact that the most significant of the claims at issue both in April 2006 and in this litigation related to violations of the PSD/NSR and BWON regulations.

matters **and DuPont's defense against the INVISTA environmental indemnity claims**.[10] Id.,
¶29, Exs. G , H.  Thus, rather than taking any steps to protect Koch's confidences, MLB used its
same attorneys to represent DuPont, substantially increasing the likelihood that confidential
information would be shared or otherwise used improperly to the advantage of DuPont.

**E.    MLB'S PRIOR REPRESENTATION OF KOCH IS SUBSTANTIALLY RELATED TO THE SUBJECT MATTER OF THIS ACTION**

MLB's position that the prior representation of Koch and the current adverse
representation of DuPont are not "substantially-related" rings hollow.  The prior Koch
representation and the current action involve the <u>same</u> types of violations of the <u>same</u>
environmental regulations and the <u>same</u> strategies for negotiating resolution with the <u>same</u>
regulatory bodies.

**1.    The Same Environmental Laws And Regulations Are Involved**

In this action, INVISTA seeks indemnification from DuPont for, <u>inter alia</u>, losses
associated with numerous violations of EHS regulations at the facilities it acquired from DuPont.
Many of INVISTA's claims are the subject of a proposed consent decree with EPA, DOJ and
several state agencies ("Consent Decree Claims").  The proposed INVISTA Consent Decree, like
the prior Koch Consent Decree that MLB helped negotiate and draft, involves suspected
violations of the same BWON and PSD/NSR regulations.  Following the strategy created by
Koch and MLB that resulted in the Koch Consent Decree, INVISTA self-reported and ultimately
agreed to settle with EPA and DOJ. Sahatjian, ¶31.  INVISTA, like Koch, will incur substantial
costs in implementing the INVISTA Consent Decree. Id.

INVISTA is also seeking indemnification from DuPont for violations INVISTA
discovered that are not subject to the consent decree ("Non-Consent Decree Claims").  Certain of

---

[10]    MLB also identified additional non-attorney employees from MLB who have worked on both the prior
Koch matters and the current DuPont matter against INVISTA. Holden Decl., Exs. G and H.

the Non-Consent Decree Claims relate to OSHA violations at the facilities acquired from DuPont. These claims also arise under the same or similar provisions of OSHA on which MLB closely advised Koch during its nationwide audit of its facilities and its negotiation of a Strategic Partnership Agreement with the DOL in 2000 through 2001. Sahatjian Decl., ¶¶2-11, 32.

   2.   **The Same Senior Managers And In-House Counsel Were Involved In Addressing Both The Koch And INVISTA Noncompliance Issues**

   As Koch's environmental counsel, MLB worked closely with Koch personnel and in-house attorneys who were later involved in the proposed INVISTA Consent Decree or who are otherwise involved in INVISTA's indemnity claims against DuPont, including:

- **Joe Coco**, then Senior Vice President of FHR, who worked with MLB on negotiating and drafting the Koch Consent Decree. He was also involved with the limited due diligence DuPont allowed during the purchase process and, after the purchase, the audits, determinations of corrective actions, and negotiation of the INVISTA Consent Decree in his role as INVISTA Vice President of Operations (Holden Decl., ¶45; Frerking Decl., ¶13);

- **Jim Mahoney**, currently Koch's Executive Vice President of Operations Excellence and Compliance and a member of INVISTA's Board of Directors, who was heavily involved in negotiating <u>both</u> the Koch and INVISTA Consent Decrees with EPA, DOJ and state regulators (Holden Decl., ¶45; Frerking Decl., ¶¶5, 13);

- **Bill Caffey**, formerly Koch's Executive Vice President and a member of INVISTA's Board of Directors, who was involved in the Koch OSHA audits, assisted with the limited due diligence allowed by DuPont during the purchase process, and participated in negotiations with DuPont for the purchase of the facilities, and later was involved in oversight as to compliance issues discovered by INVISTA at the former DuPont facilities (Sahatjian Decl., ¶¶3, 7, 27);

- **William Frerking**, then FHR's lead in-house attorney on environmental matters, who worked extensively with MLB on Koch OSHA issues and later was involved in certain aspects of the Purchase Agreement and due diligence for the purchase of the DuPont facilities (Frerking Decl., ¶1-5, 14, 18);

- **Paul Kaleta**, Koch's former General Counsel and, after the purchase, INVISTA's General Counsel, who worked closely with MLB on OSHA issues at Koch and signed INVISTA's early notice letters to DuPont regarding violations discovered at the DuPont facilities (Holden Decl., ¶46; Sahatjian Decl., ¶¶3, 7);

- **Laurie Sahatjian**, Associate General Counsel for EHS at Koch, who worked on OSHA matters with MLB, negotiated environmental-related provisions in the purchase

agreement for the DuPont facilities, assisted with the limited EHS due diligence allowed by DuPont, and later played an instrumental role in audits of the facilities and negotiations with EPA of the INVISTA Consent Decree (Sahatjian Decl., ¶¶2-12, 27).

That these same people are directly involved in the subject matter of this action cannot be disputed.  In fact, **DuPont's Initial F.R.C.P. 26 Disclosures in this action identify Joe Coco, Jim Mahoney, Bill Caffey, William Frerking, Paul Kaleta and Laurie Sahatjian as witnesses** "likely to have discoverable information that Defendants may use to support its claims or defenses."  Holden Decl., Ex. O at  8, fn 2; 10; 11; 14; 16; 18 and 20.   Stated plainly, MLB is now in a position to depose and cross-examine the very same individuals it previously counseled on the same subject matters underlying its previous representation.

### 3.    The Koch And INVISTA Consent Decrees Were Negotiated With The Same EPA Representatives and Involved The Same Issues

Some of the same individuals at EPA were involved with negotiation of the prior Koch Consent Decree and the INVISTA Consent Decree, including Adam Kushner, Director, EPA Air Compliance Division; Shaun Burke, a technical expert for EPA; and Ken Garing, an EPA expert in BWON issues. Sahatjian Decl., ¶29; Frerking Decl., ¶12.  Given the similarity between the Koch Consent Decree and the issues discovered at the former DuPont facilities, INVISTA's negotiating team was relying upon the advice and counsel MLB attorneys previously provided during the Koch Consent Decree negotiations. Sahatjian Decl., ¶30.  In sum, there is substantial overlap between the two consent decrees: one that MLB helped negotiate and draft, and the other that MLB, if allowed to continue as counsel to DuPont, will seek to challenge and repudiate.

### 4.    DuPont's Defenses Challenge INVISTA's Regulatory Compliance Strategy, Which Is Modeled Upon The Approach MLB Helped Create

In this action, DuPont is challenging INVISTA's approach to regulatory compliance as a defense to the indemnity claims.  Specifically, with respect to INVISTA's Consent Decree Claims, DuPont has alleged that INVISTA resolved the PSD/NSR and BWON issues with EPA

13

by agreeing to corrective actions that go beyond what EPA or the law require.  See, e.g., DuPont Affirmative Defenses, ¶¶49-64 [Doc. No. 38]; DuPont Motion to Dismiss at 20 [Doc. No. 32]. As discussed above, INVISTA's legal strategy was based upon the model created by Koch and MLB in connection with the earlier Koch Consent Decree.[11]

With respect to INVISTA's Non-Consent Decree Claims, DuPont indicates that it will challenge whether the OSHA violations are actual violations of law. (See DuPont Affirmative Defenses ¶¶65-70 [Doc. No. 38].)  MLB's role in developing Koch's corporate-wide OSHA compliance program will prove invaluable in challenging INVISTA's OSHA claims.  MLB knows how Koch evaluated OSHA violations, and therefore can use that knowledge in challenging how INVISTA evaluated the OSHA violations here.

In short, it is clear that MLB's representation of Koch is substantially related to the instant action and, in fact, will likely be *itself* a subject matter of this action should DuPont continue to pursue its defenses that question INVISTA's approach to environmental law compliance.

## F.    MLB IS ADMITTEDLY IN POSSESSION OF CONFIDENTIAL INFORMATION THAT COULD BE USED TO INVISTA'S DISADVANTAGE

As set forth above, there is no question that as a result of its long-standing representation of Koch on highly-sensitive EHS matters, MLB possesses sensitive, proprietary and confidential information relating to the subject matter of this action.  MLB's general counsel conceded in a meeting with Koch's general counsel on June 12, 2008 that MLB is in possession of confidential and privileged information as a result of its representation of Koch. Holden Decl., ¶23.

During its representation of Koch, MLB had access to significant sensitive, proprietary, confidential and privileged information related to Koch's family of companies, and its approach

---

[11]    By way of further example, DuPont has asserted that some or all the PSD/NSR claims INVISTA has made are not PSD/NSR violations but constitute routine maintenance, repair and replacement ("RMRR"), which DuPont asserts is excluded from PSD/NSR applicability. See DuPont Affirmative Defense ¶50.  Notably, MLB provided analyses of RMRR to Koch, which Koch relied upon in negotiating the Koch Consent Decree.  Frerking Decl., ¶4.

and dedication to EHS compliance. MLB obtained unique insight into the managerial styles, personalities, strengths and weaknesses of key managers and in-house attorneys at INVISTA who are involved in the indemnity claims and named as witnesses by DuPont. Frerking Decl., ¶¶5-17; Holden Decl., ¶¶45-46, 48.

MLB is in a position to exploit its unique and privileged knowledge as Koch's prior EHS counsel to DuPont's benefit and to the disadvantage of INVISTA by attempting to challenge the judgment, decision-making and motivation of INVISTA and its key decision-makers and in-house counsel in identifying and resolving EHS violations at the former DuPont facilities. INVISTA now respectfully requests that this Court disqualify MLB as DuPont's counsel to protect INVISTA from precisely this type of misuse of privileged and confidential information.

## ARGUMENT

## THE STANDARD FOR DISQUALIFICATION

As this Court has recognized, given the role of attorneys in litigation and the importance of the appearance of propriety in the trial process, any doubts regarding disqualification should be resolved in favor of disqualification:

> The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. **These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage**.

Blue Planet Software, Inc. v. Games Int'l, LLC, 331 F. Supp. 2d 273, 275 (S.D.N.Y. 2004), quoting United States v. Oberoi, 331 F.3d 44, 51 (2d Cir. 2003) (emphasis added).

The standard applicable to this motion would be somewhat different, but equally dispositive, depending on whether MLB's representations of Koch and DuPont is a conflict between two current clients – in which case a strict *per se* test for disqualification applies based

upon an attorney's duty of undivided loyalty – or a conflict between a former and current client – in which case a "substantially-related" test applies.  See Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976).

Here, Koch was a current client of MLB at the time that MLB decided to take on the representation of DuPont adverse to INVISTA.[12]  MLB owed not only a duty of undivided loyalty to Koch (Cinema 5, Ltd., 528 F.2d at 1386; DR 5-105(A)), but also a duty under its May 19, 1998 engagement letter to disclose potential conflicts and obtain a waiver before taking on an environmental law matter adverse to Koch or *any* matter in which sensitive, proprietary or confidential information learned about Koch in the context of the representation could potentially be used to the disadvantage of Koch or "any company affiliated with Koch," such as INVISTA. Holden Decl., Ex. A.

Rather than disclosing the potential conflict and seeking a waiver from Koch (and likely knowing that it could be subject to *per se* disqualification in concurrently representing Koch and DuPont in the matter adverse to INVISTA), MLB terminated its relationship with Koch and deliberately misled Koch about the reason for the termination,[13] even when Koch's General Counsel asked if there was any other reason for the termination.  Holden Decl., ¶10.

A law firm cannot shield itself from an obvious conflict and potential disqualification merely by dropping the disfavored client like a "hot potato" and transforming an existing

---

[12]  MLB argues that because its work on Koch EHS matters tapered off before the opportunity to represent DuPont arose, Koch was no longer a client of MLB.  This is not sufficient to terminate a relationship or to relieve MLB of its duty of undivided loyalty to Koch.  See, e.g., Kabi Pharmacia v. Alcon Surgical, Inc., 803 F. Supp. 957, 962 (D. Del. 1992) ("[A]lleged 'sporadic' nature of [law firm's work for prior client does not] support[] a finding that there was not an ongoing attorney-client relationship.  Nor does a lull in its work…support such a finding").

[13]  The Professional Rules of Responsibility prohibit attorneys from engaging in such misrepresentation.  See DR 1-102(A)(4) (law firm shall not…engage in conduct involving dishonesty,…deceit or misrepresentation) and DR 7-102(A) (5) ("In the representation of a client, a lawyer shall not…(5) knowingly make a false statement of law or fact…").  "A person must be able to trust a lawyer's word as the lawyer should expect his word to be understood, without having to search for equivocation, hidden meanings, deliberate half-truths or camouflaged escape hatches." Peter R. Jarvis & Bradley F. Tellam, The Dishonesty Rule - A Rule With a Future, 74 OR. L. REV. 665, 671 (1995).

16

relationship into a former relationship.  In <u>Stratagem Dev. Corp. v. Heron Int'l N.V.</u>, 756 F. Supp. 789, 794 (S.D.N.Y. 1994), the court held that a law firm had to withdraw from representation of one client in a matter adverse to another client's parent company.  The law firm, recognizing the conflict, had attempted to obtain a conflict waiver from the disfavored client (a step MLB did not even take here).  When the waiver was not forthcoming, the firm terminated its relationship with the disfavored client and continued to represent the other. Noting law firms have an ethical duty of loyalty to the disfavored client, the court held that the firm could not avoid disqualification by using such a tactic.  <u>Id.</u>, <u>citing</u> <u>Picker Int'l, Inc. v. Varian Assocs., Inc.</u>, 670 F. Supp. 1363, 1365-1366 (N.D. Ohio 1987) (disqualifying counsel, noting that "a firm may not drop a client like a hot potato, especially if it is in order to keep happy a far more lucrative client" and that ceasing representation before disqualification motion is made is not sufficient, "[o]therwise a firm could avoid DR 5-105 by simply converting a present client into a former one").

Nevertheless, even if Koch is considered a "former" client of MLB by virtue of MLB's August 31, 2004 termination letter, disqualification of MLB is <u>still</u> warranted under the standard applicable to conflicts arising between former and current clients.

In this Circuit, an attorney may be disqualified from representing a <u>former</u> client if: "(1) the moving party is a former client of the adverse party's counsel;  (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client." <u>Blue Planet Software, Inc.</u>, 331 F. Supp. 2d at 276, <u>quoting</u> <u>Evans v. Artek Sys. Corp.</u>, 715 F.2d 788, 791 (2d Cir. 1983). <u>See</u> <u>also</u> DR 5-108 (Conflict of Interest; Former Client); DR 4-101 (Preservation of Confidences and Secrets of a Client).  Under

this standard, MLB should be disqualified from representing DuPont in this case. Each element of the standard is addressed below.

## I.    INVISTA IS A "FORMER CLIENT" OF MLB FOR PURPOSES OF DISQUALIFICATION

While Koch, by virtue of MLB's unilateral termination, is MLB's nominal former client, INVISTA is also MLB's former client for purposes of the disqualification analysis. <u>See</u> Statement of Facts, Part B, <u>supra</u>. Many of the very same senior managers and in-house counsel that MLB counseled relating to EHS matters for Koch are also key players and in-house counsel on behalf of Koch and INVISTA with respect to the subject matter of this lawsuit. In its May 19, 1998 retention letter, MLB recognized the fact that the confidences it learned as environmental law counsel to Koch were privileged and sensitive to both Koch <u>and</u> its affiliated companies – such as INVISTA – and could provide an MLB client adverse to a Koch affiliate, such as DuPont, with an unfair strategic advantage if known. Holden Decl., Ex. A.

The law is clear that INVISTA should be considered MLB's "former client" for purposes of the disqualification analysis. <u>See</u> <u>J.P. Morgan Chase Bank v. Liberty Mut. Ins. Co.</u>, 189 F. Supp.2d 20, 21 (S.D.N.Y. 2002) (disqualifying firm from representation adverse to former client's subsidiary, noting close, interdependent relationship between parent and subsidiary, "both financially and in terms of direction"); <u>Discotrade Ltd. v. Wyeth-Ayerst Int'l.</u>, 200 F. Supp. 2d 355 (S.D.N.Y. 2002) (considering two sister companies the same "client" for conflict of interest purposes – companies were both members of the parent company's "family," noting similarities between Board of Directors and senior executives and intimate interaction). <u>Hartford Accident & Indem. Co. v. RJR Nabisco, Inc.</u>, 721 F. Supp. 534, 540 (S.D.N.Y. 1989) (where parent supervised the subsidiary's litigation, parent and subsidiary were single client for purposes of disqualification); <u>Colorpix Sys. of Am. v. Broan Mfg. Co.</u>, 131 F. Supp. 2d 331, 335–38 (D. Conn. 2001) (subsidiary can be a vicarious client of parent's attorney where current

litigation will have a financial impact[14] on the parent or where parent and subsidiary share "a unity of an identity of interest"). See also Glueck v. Jonathan Logan, Inc., 653 F.2d 746 (2d Cir. 1981) (disqualifying law firm that was counsel to a trade association from representation adverse to association member company); Blue Planet Software, Inc., 331 F. Supp. 2d at 276. MLB cannot escape disqualification on the technicality that it is INVISTA that is the named party to this action rather than Koch. Accordingly, the first factor of the test is met.

## II. MLB'S REPRESENTATION OF KOCH IS SUBSTANTIALLY-RELATED TO THE SUBJECT MATTER OF THIS CASE

The matters for which MLB provided advice and counsel in its prior representation of Koch are substantially related to the matters at issue in this lawsuit:

- The subject matter of the prior representation involved resolution of violations of the same EHS laws and regulations;

- The same Koch senior managers and legal counsel are involved in both matters and are named as witnesses in this action;

- Negotiations regarding resolution of EHS violations were conducted with the same government agencies and even the same government representatives;

- DuPont is affirmatively challenging INVISTA's approach to EHS violations as one of its defenses in this action, thus making MLB's prior representation of Koch, which informed INVISTA's approach, *itself* a subject matter of the action.

See Statement of Facts, Section E, supra.

This is precisely the kind of situation where courts have held that the prior representation is substantially related to the present litigation. See, e.g., Ullrich v. The Hearst Corp., 809 F. Supp. 229, 234-35 (S.D.N.Y. 1992) (in disqualifying an attorney from representing employees in wrongful termination cases against his former client, attorney's legal advice on various employment law issues to his former client over a period of 20 years, including advising

---

[14]    It was Koch that negotiated the deal with DuPont to purchase the subject facilities. The assets Koch acquired in the $4 billion acquisition, the largest Koch acquisition to that date, were then transferred to INVISTA. Holden Decl., ¶41. INVISTA's liabilities associated with the corrective actions required by the INVISTA Consent Decree will have a direct impact on Koch's financial position, as will the outcome of this indemnity case. Id., ¶42.

management on the same types of claims as those at issue in the current lawsuits, held to be substantially related to the subject matter of the current lawsuits); Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 235–36 (2d Cir. 1977) (disqualifying attorney affiliated with MLB based on substantial relationship between current matter and other matters where MLB had represented it and was privy to confidential information).

As these cases demonstrate, it is irrelevant that MLB's prior representation involved EHS violations at different facilities.  Rather, the substantial relationship is evidenced by the fact that MLB has intimate and confidential information relating to the manner in which INVISTA addresses EHS violations because of its prior representation of Koch in similar matters. See Ullrich, 809 F. Supp. at 234-35; Schwed v. Gen. Elec., Inc., 990 F. Supp. 113, 116 (N.D.N.Y. 1998) (though two matters involved different layoffs, different facilities, different employees, different managers, and different business units, the matters were substantially related because they both related to age discrimination).  Applying the law to the facts of this case, MLB's prior representation of Koch in EHS matters is unquestionably substantially related to this action.

### III.    MLB POSSESSES CONFIDENTIAL AND PRIVILEGED INFORMATION THAT COULD BE USED TO INVISTA'S MATERIAL DISADVANTAGE

The final factor of the Evans disqualification test requires a determination whether the attorney had access to relevant privileged and confidential information[15] in the course of the prior representation thus placing the attorney in a position to use those confidences to the advantage of his new client.  See, e.g., Fund of Funds, Ltd., 567 F.2d at 235–36.  It need not be shown that the lawyer did, in fact, receive confidential information in the prior representation, but rather that it "can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent

---

[15] Confidential information has been defined as "all 'information about [the former] client or…client's matter contained in oral communications, documents, or other forms of communications, other than information that is generally known, if the lawyer...learned or came[] into possession of the information...during the course of representing [the former] client....'" Ullrich, 809 F. Supp. at 234 (internal citation omitted).

representation." <u>Hull v. Celanese Corp.</u>, 513 F.2d 568, 572 (2d Cir. 1975) (emphasis in original) (upholding disqualification where attorney had access to confidential information that could be used in the current action to the disadvantage of the former client). When the former and current representations are both adverse and substantially related, the receipt of confidential information that would potentially disadvantage the former client is presumed. <u>Ullrich</u>, 809 F. Supp. at 233, <u>citing</u> <u>T.C. Theatre Corp. v. Warner Bros. Pictures</u>, 113 F. Supp 265, 268-69 (S.D.N.Y. 1953).

In <u>Ullrich</u>, Bernbach, who had served as Hearst's labor and employment lawyer for 20 years, ended the relationship with Hearst and took on representation of former Hearst employees in wrongful termination suits against it. After noting that Bernbach possessed or had access to substantial confidential information by virtue of his work as Hearst's employment law counsel, including how Hearst dealt historically with employment discrimination claims and "how Hearst's management assesses its vulnerability to such claims," the court disqualified Bernbach from representing the former employees because of the danger that this confidential information would be used to the disadvantage of Hearst. Judge Leval observed:

> Adverse use of confidential information...includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses. <u>The rule concerns itself with the unfair advantage that a lawyer can take of his former client in using adversely to that client information communicated in confidence in the course of the representation. It concerns itself also with the importance of protecting the confidential relationship between client and attorney;</u> if clients withheld information from their lawyers out of fear that the lawyers might use the information against the client in a subsequent adverse representation, the ability of the legal profession to render valuable advice to its clients would suffer.

<u>Ulrich</u>, 809 F. Supp. at 236 (underline emphasis in original; bold emphasis added). <u>See also</u> <u>United States Football League v. National Football League</u>, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (disqualification required where law firm gained highly confidential knowledge about

former client through broad-ranging representation; knowledge of client's background pertained to subsequent lawsuit and could be used to potential detriment of former client).

Similarly, in <u>Mitchell v. Metro. Life Ins. Co.</u>, No. 01-CIV-2112 (WHP), 2002 WL 441194 (S.D.N.Y., March 21, 2002), the Lieff Cabraser law firm was disqualified from representing MetLife employees in a gender discrimination lawsuit against MetLife because a new Lieff Cabraser partner, Wendy Fleishman, had worked on product liability matters for MetLife at her previous law firm.

Despite the fact that Fleishman was *not* working on the adverse engagement, nor had worked on employment discrimination matters for MetLife at her previous firm, the court found that "as a result of her prolonged and extensive prior representation of the company, [she] acquired or was privy to confidential <u>institutional information</u> about MetLife, its MLFS division and MLFS personnel and ... this information is relevant to this pending action in which plaintiffs, on an institutional level, attack the company's employment policies and practices." 2002 WL 441194 at *6 (emphasis added). Judge Pauley held that, "[p]erhaps dispositive of the matter":

> **Fleishman personally interviewed managers who had decision-making authority over certain named plaintiffs and who, at least in one documented instance, have been identified as potential witnesses.** Fleishman would be privy to confidential information that could serve to challenge credibility, to prepare cross-examinations, and to otherwise contest their proffered justifications for the adverse employment decisions challenged by the plaintiffs. **Taken together, these circumstances establish a sufficiently close factual nexus between Fleishman's previous representations of MetLife and the matters fairly raised in the current employment discrimination action to pose a significant risk of trial taint to the disadvantage of MetLife.**

<u>Id</u>. at *7 (emphasis added). Accordingly, Fleishman's firm was disqualified. The same principles compel the disqualification of MLB here.

As contemplated in the May 19 engagement letter (Holden Decl., Ex. A), there can be no dispute that during its six-year representation of Koch MLB had access to privileged and confidential information about Koch's businesses and its approach to compliance issues – and

22

specifically the BWON, PSD/NSR and OSHA compliance issues that are also the subject of INVISTA's indemnity claims.[16]  Moreover, MLB's new client, DuPont, has made it plain that it intends to attack the manner in which INVISTA analyzed and dealt with these compliance issues. DuPont's defenses alone directly implicate the confidences MLB learned during its prior, extensive representation of Koch when it counseled Koch relating to the same approaches to the same regulatory issues that DuPont now challenges.  The potential for using this knowledge to the advantage of DuPont is patent.

This is precisely the type of unfair advantage and potential improper use of privileged and confidential information about an adversary that the conflict rules are intended to prevent. Now that the parties are in litigation, and INVISTA has uncovered the extent of the conflict, MLB's continued use or potential use of relevant confidential information has even greater repercussions, particularly where DuPont has named Koch employees whom MLB previously counseled as witnesses.  It is respectfully submitted that the only recourse at this stage to preserve the integrity of the trial process and to protect INVISTA is for the Court to disqualify MLB as DuPont's counsel.  See Mitchell, 2002 WL 441194 at *10; United States Football League, 605 F. Supp. at 1466-67; Blue Planet Software, Inc., 331 F. Supp.2d at 278-79.

## IV.    LACHES IS NOT A DEFENSE TO DISQUALIFICATION AND DUPONT WILL NOT BE PREJUDICED BY MLB'S DISQUALIFICATION

In a footnote to DuPont's reply memorandum in support of its motion to dismiss, MLB suggests that it might try to avoid disqualification based upon a laches argument.  MLB is wrong.

Laches is not a defense to a motion to disqualify, except in situations where there is prejudice to the adverse party.  See Schwed, 990 F. Supp. at 118; Baird v. Hilton Hotel Corp., 771 F. Supp. 24, 28 (E.D.N.Y.1991).  DuPont is not prejudiced by the timing of this motion,

---

[16]   As noted above, MLB still possesses 106 boxes of documents relating to its representation of Koch, which include significant privileged and confidential information.  Moreover, six MLB lawyers have worked on both the Koch matters and INVISTA/DuPont matter, as have four non-attorney MLB employees. Holden Decl., ¶¶29, 32.

which precedes discovery in this matter and is well before trial. Fierro v. Gallucci, No. 06-CV-5189 (JFB)(WDW), 2007 WL 4287707 at *9 (E.D.N.Y. Dec. 4, 2007) (granting motion to disqualify over defense of laches where court found no prejudice); British Airways, PLC v. Port Authority of New York and New Jersey, 862 F. Supp. 889, 901 (E.D.N.Y. 1994) (holding that a two-year delay did not bar motion to disqualify where there was no unfair prejudice, particularly where disqualified firm did not advise moving party of the potential conflict and where moving party expressly advised that it would *not* consent to firm's continued representation of adversary). Furthermore, DuPont still retains able counsel in the Boies, Schiller firm, which is its primary counsel of record in this action.

There has been no undue delay in making this motion. INVISTA has repeatedly attempted to address the issue directly with MLB and DuPont without Court intervention. Koch and INVISTA first placed DuPont and MLB on notice of the objection to the conflicting representation and reservation of rights regarding the same in a letter dated March 31, 2006. Sahatjian Decl., Ex. D. Koch and INVISTA raised objections repeatedly thereafter, including the day after this action was commenced, and sought information from MLB about the circumstances relating to the conflicting representations. See Ullrich, 809 F. Supp. at 236-37 (no waiver or undue delay where, three years prior, Hearst placed former lawyer on notice of its objection to his conflicting representation of employees in matters adverse to it, and where disqualification motion was filed within four months of institution of subject lawsuit).

It was not until June 2008 that Koch, through its repeated efforts, was first able to glean the full extent of the conflict from MLB. Holden Decl., ¶¶19-29. By letter dated August 13, 2008, Koch and INVISTA attempted, through counsel, to resolve the conflict issue with MLB once more without resorting to motion practice. Id., Ex. K. MLB, through its own counsel, responded by letter dated August 19, 2008, remaining steadfast in its representation and

threatening to disclose presumably privileged information surrounding the "circumstances" of the termination of the relationship between Koch and MLB. Id., Ex. L. Koch and INVISTA requested further clarification of MLB's position in a letter dated August 21, 2008; MLB provided no clarification in its response dated August 26, 2008, but again threatened to disclose privileged information "as required to defend itself" against a motion to disqualify. Id. Ex. M.

In sum, INVISTA has not delayed in bringing this disqualification motion nor does this motion serve to prejudice DuPont. Conversely, INVISTA will be prejudiced if MLB is permitted to represent DuPont in this action as it seeks to challenge INVISTA's interpretation of EHS laws and approach to regulatory compliance. INVISTA and the Koch employees DuPont has named as witnesses on these issues should not be required to be questioned by MLB attorneys or attorneys aided and prepared by MLB attorneys about the same topics and decision-making processes to which MLB was privy as Koch's trusted outside environmental law counsel.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that MLB should be disqualified from serving as co-counsel to Defendant DuPont in this action.

Dated: New York, New York
      August 27, 2008

Respectfully submitted,
HERRICK, FEINSTEIN LLP
Attorneys for Plaintiffs INVISTA B.V., *et al*.

By: _____s/ Scott E. Mollen_____
      Scott E. Mollen, Esq.
2 Park Avenue
New York, NY 10016
212.592.1400
smollen@herrick.com