Document Electronically Filed

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
:
INVISTA B.V., et al.                            :    08 CV 3063 (SHS)
:
        Plaintiffs,                     :
:
     v.                                          :    DECLARATION OF
:    WILLIAM A. FRERKING
E.I. DU PONT DE NEMOURS AND COMPANY,  :    IN SUPPORT OF PLAINTIFFS'
:    MOTION TO DISQUALIFY
:
        Defendant.                      :
------------------------------------------------------------ x

      **WILLIAM A. FRERKING, ESQUIRE,** hereby declares under penalty of perjury as follows:

      1. From March 1996 through 2002, I held in-house attorney positions with Koch Industries, Inc. ("Koch") and its affiliates (collectively "Koch"), including Flint Hills Resources, LP ("FHR"). Koch is the ultimate parent corporation of the Plaintiffs in this action (collectively, "INVISTA"). During my time with Koch and FHR, I was an attorney licensed to practice in various jurisdictions. As a result of my work for Koch and FHR, I am familiar with certain of the representations that Morgan, Lewis & Bockius, LLP ("MLB") undertook for Koch from 1998 through 2002. This affidavit is based on my personal knowledge and my review of documents kept in the ordinary course of business. I respectfully make this Declaration in support of INVISTA's motion to disqualify MLB as counsel for Defendant E.I. du Pont de Nemours and Company ("DuPont") in this action.

## MLB's Representation of Koch and Koch Affiliates

2.  MLB provided a broad range of legal services to Koch and FHR related to environmental, health and safety matters. From 1998 through 2002, I worked closely with MLB attorneys William Lewis and John Quarles, and to a lesser extent Dennis Morikawa and James Philbin, among other MLB attorneys.

3.  Beginning in 1998, MLB provided extensive advice and consultation to FHR regarding compliance with the Benzene Waste Operations NESHAPS ("BWON") of the Clean Air Act and other provisions of the Clean Air Act applicable to refineries, including the New Source Performance Standard Subpart J rule ("NSPS Subpart J").

4.  MLB also provided advice on Prevention of Significant Deterioration/New Source Review ("PSD/NSR") regulations of the Clean Air Act, including, among other things, an analysis of the routine maintenance, repair and replacement ("RMRR") exception to PSD/NSR applicability.

5.  With regard to MLB's work on the NSPS Subpart J rule and other Clean Air issues, William Lewis worked extensively for Koch and certain of its affiliates with me, Robert Mueller (FHR in-house attorney), Jon Bloomberg (an outside environmental attorney doing work for FHR's Minnesota refinery), Jim Mahoney (then FHR Senior Vice President, Operations, currently Koch Industries, Inc. Executive Vice President of Operations Excellence and Compliance, and a member of the Boards of Directors of Koch Industries, Inc., INVISTA, and other affiliated companies), Eric Kaysen (currently Vice President of Environmental Health & Safety for FHR) and other Koch employees.

6. During this time period, Michael Steinberg of MLB also provided advice regarding Koch's application of the Resource Conservation and Recovery Act ("RCRA") to certain idled or shut-down crude oil storage tanks.

7. Dennis Morikawa and several other MLB attorneys assisted Koch in performing corporate-wide audits of Koch facilities regarding compliance with the Occupational Safety and Health Act ("OSHA") and other health and safety regulations.

8. During 2001 and 2002, Dennis Morikawa and Jim Philbin of MLB provided legal advice to FHR regarding potential environmental, health and safety liabilities arising from contracts with third-parties. This included working with me and with FHR in-house attorneys Robert Mueller and Travis Pearson. This work included providing comments on an internal FHR compliance system manual.

**MLB's Work on the Koch Consent Decree**

9. In or around early 2000, Koch, the United States Department of Justice ("DOJ") and the United States Environmental Protection Agency ("EPA") began discussions about settling suspected PSD/NSR violations at the FHR (then known as Koch Petroleum Group, L.P., hereinafter referred to as "FHR") refineries in Texas and Minnesota. Early communications between the company, DOJ and EPA included the applicability of the principles underlying the EPA Audit Policy as it might relate to potential PSD/NSR enforcement.

10. The settlement discussions also ultimately included the BWON, Leak Detection and Repair ("LDAR"), and NSPS Subpart J compliance programs at the FHR refineries.

11. John Quarles of MLB was retained by Koch/FHR early in those discussions to represent Koch/FHR in this matter and was an instrumental part of Koch/FHR's

negotiating team. Mr. Quarles, who was assisted by, among other MLB attorneys, Jeffrey Hurwitz, led or participated in almost every significant conference call and meeting between Koch and EPA (and with DOJ and state agencies) regarding the proposed consent decree (the "Koch Consent Decree"). There were many such calls and meetings. As a former General Counsel (chief legal officer) and Deputy Administrator of EPA, Mr. Quarles was extremely knowledgeable about the consent decree process and EPA's approach to compliance issues, which was invaluable to the Koch/FHR team, especially due to the unprecedented scope and nature of this particular consent decree.

12. We negotiated the terms of the Koch Consent Decree with, among other representatives of EPA (as well as DOJ representatives and representatives from the States of Minnesota and Texas), Adam Kushner, who is now Director, Air Enforcement Division, at EPA, Shaun Burke, a technical expert for EPA, and Ken Garing, an EPA expert on BWON issues.

13. In connection with the Koch Consent Decree negotiations, Mr. Quarles and other attorneys at MLB spent considerable time meeting and strategizing with Koch senior management, including Jim Mahoney (then Senior Vice President of Operations for FHR), Joe Coco (then Senior Vice President of FHR) and Donald Clay, Managing Director, Environmental and Regulatory Affairs for Koch Industries, environmental and management representatives from each of FHR's refineries, and with various Koch in-house attorneys. Mr. Quarles helped Koch/FHR plan its approach to the EPA and DOJ negotiations, including making recommendations regarding what to offer and what to reject, what strategies were effective and what strategies should be abandoned. MLB also provided advice on the application of the EPA Audit Policy.

14. MLB was heavily involved in the strategy behind and the terms and language of the Koch Consent Decree and interacted on a regular basis with me, Robert Mueller, Jon Bloomberg and other attorneys for Koch. MLB advised Koch regarding all critical aspects of the matter, including the appropriate settlement mechanism, the language, terms and structure of the consent decree, the size of the civil penalty and the liability releases for historical and future violations. In some cases Mr. Quarles and others at MLB dealt directly with EPA and DOJ attorneys regarding the proposed language of the consent decree.

15. Ultimately, Koch agreed to settle with EPA and to install approximately $80 million of control technology and pay a $4.5 million penalty. The Koch Consent Decree, which resulted from Koch's voluntary cooperation with EPA, DOJ and state agencies, was unprecedented and was followed as a model for similar consent decrees between EPA, DOJ and other refining companies.

16. In light of its representation of Koch in this unprecedented process, MLB was privy to and helped shape Koch's vision of and commitment to compliance, its strategies towards complying with the underlying programs subject to the Koch Consent Decree, and other important compliance processes.

17. As a result of its work discussed above, MLB: (i) had access to confidential and sensitive information regarding Koch and its affiliates; (ii) gained significant insight into, and in some instances helped form, Koch's approach to compliance issues and to dealing with EPA, DOJ and state agencies on environmental issues; and (iii) obtained first-hand knowledge of the negotiating capabilities and styles of senior managers and in-house and outside FHR and Koch attorneys and the process by which Koch addresses potential noncompliance.

**Purchase Agreement and Due Diligence of the Former DuPont Facilities**

18. In 2003, I assisted Koch on certain aspects of the Purchase Agreement (and ancillary documents) whereby certain Koch entities acquired the former DuPont chemical intermediate and fiber manufacturing facilities. I was also involved in the due diligence of the acquired DuPont facilities.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

_____
WILLIAM A. FRERKING

Signed this 27th day of August, 2008 at Atlanta, Georgia.